**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**ZEST LABS, INC. F/K/A INTELLEFLEX
CORPORATION AND ECOARK HOLDINGS, INC.**                    **PLAINTIFFS**

**v.**                            **CASE NO. 4:18-CV-00500-JM**

**WALMART INC. F/K/A WAL-MART STORES, INC.**                    **DEFENDANT**

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**REDACTED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | |
|---|---|
| **ZEST LABS, INC. F/K/A INTELLEFLEX CORPORATION AND ECOARK HOLDINGS, INC.** | **PLAINTIFFS** |
| **v.** | **CASE NO. 4:18-CV-00500-JM** |
| **WALMART INC. F/K/A WAL-MART STORES, INC.** | **DEFENDANT** |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs have thrown everything but the proverbial kitchen sink at Walmart in this litigation. They blindsided Walmart with a ten-count Complaint seeking ███████████ based on a marketing blog post, sought a preliminary injunction and expedited discovery (which were mooted and denied, respectively), and have used hyperbolic and disparaging language to accuse Walmart and its counsel of "dereliction," of "circumventing agreements between the parties," and of "stick[ing] its head in the sand." But Plaintiffs' rush to courthouse, heated rhetoric, and finger-pointing are no substitute for actual evidence. Walmart need not engage in such uncivil tactics, because the undisputed facts establish that Walmart has not committed any acts of misappropriation or other wrongdoing. It is those undisputed facts alone which are the focus of this motion for summary judgment.

The dearth of facts to support their claims have left Plaintiffs struggling to find a theory of wrongdoing. Plaintiffs initially alleged that Walmart's Eden/Muse technology misappropriated Plaintiffs' Zest Fresh technology. But after discovery revealed that Eden/Muse is indisputably and fundamentally different from Zest Fresh, Plaintiffs shifted to a theory that Walmart was using Plaintiffs' shelf-life prediction algorithms. But after discovery revealed that Walmart had never even received Plaintiffs' complete shelf-life prediction algorithms (and thus had never used them), Plaintiffs shifted again, this time landing on a new theory that Walmart disclosed certain of

1

Plaintiffs' proprietary information in a Walmart patent application in 2019 ("the Bohling Application"). Yet even as their liability theory has shifted radically, Plaintiffs not only have maintained their Complaint, but they have also maintained a damages theory that now bears no nexus to the alleged wrongdoing. That is fatal to Plaintiffs' misappropriation claims.

At the same time, Plaintiffs have insisted that only a single contract—a non-disclosure agreement executed in 2015—ever governed the parties' relationship. But by the plain terms of a later-executed 2016 agreement (and related contracts) that have been fully embraced by the Plaintiffs and from which Plaintiffs have reaped considerable benefits, that 2015 NDA is no longer in force. Even if that 2015 NDA were the operative agreement governing this litigation, Plaintiffs have sought to recover for the alleged misappropriation of information that is plainly not subject to any confidentiality protections or use restrictions in the 2015 NDA. These undisputed facts notwithstanding, Plaintiffs have also insisted on maintaining multiple tort claims that are preempted, and that are separately deficient as a matter of law.

In summary, there is no genuine issue of disputed fact that:

- Plaintiffs' claims for misappropriation and breach of contract based on information (a) disclosed to Walmart prior to July 21, 2015 (i.e., the date of the sole non-disclosure agreement asserted as a basis for Plaintiffs' claims); (b) disclosed orally to Walmart; (c) disclosed after January 16, 2016 (i.e., the date of an agreement that supersedes the sole non-disclosure agreement asserted as a basis for Plaintiffs' claims); (d) disclosed in connection with a 2016 proof-of-concept; (e) disclosed in response to a 2017 Request for Information; and (f) disclosed in connection with a 2018 contract are barred based on the plain and ordinary interpretation of the contracts-at-issue;

- Plaintiffs cannot recover damages for misappropriation or breach of contract because the only alleged acts of misappropriation and breach could not have proximately caused any of the alleged damages;

- Plaintiffs' tort claims are preempted;

2

- Plaintiffs' unjust enrichment claim is barred because the only conduct at issue was governed by the parties' contracts; and

- Plaintiffs' fraud claim is defective as a matter of law.

Walmart therefore respectfully requests that Plaintiffs' Complaint be dismissed in its entirety, and that judgment be entered in Walmart's favor on all counts.

## I.   STATEMENT OF RELEVANT FACTS

As described at length below, Plaintiffs and Walmart had numerous interactions over a five year period when Zest was pitching its services to Walmart.  Though none of these interactions give rise to any cognizable claim by Plaintiffs, they are detailed here to provide context for Walmart's summary judgment arguments.

### A.   The Inception of the Parties' Relationship

In 2010, Zest began developing its "Zest Fresh" technology, which was marketed as a solution to reducing fresh food waste (also known as "shrink").[1] (Compl. ¶¶ 1, 2.)  In 2013, Ecoark Inc. entered into a definitive agreement to purchase Zest. (Omnibus Ex. No. 12 at 29:20-36:2.)  Ecoark Inc.'s CEO was Randy May, a former Walmart executive. (*Id.* at 8:8-15.)  Shortly thereafter, Zest and Ecoark Inc. began to pitch their Zest Fresh technology to Walmart. (*Id.* at 118:7-119:13.)

On February 27, 2014, Thomas Reese, Zest's Senior Director of Business Development, stated that Zest '████████████████████████████████████████ ████████████████████████████████' in connection with those '██████████████' the Zest Fresh technology. (Omnibus Ex. No. 37 at 181.)  Walmart insisted that prior to that visit, Zest '██████████████████████████████████████████████' to protect

---

[1] At that time, plaintiff Zest Labs Inc. was known as Intelleflex Corporation.  Throughout this brief, that entity is referred to as "Zest," regardless of the timeframe.

Walmart's information.  (*Id.* at 180.)  Zest's CEO, Peter Mehring, executed a Confidentiality Agreement and Document of Understanding on behalf of Zest, which was effective as of March 5, 2014 (hereafter "the 2014 NDA").  (Compl. ¶ 29; *see also* Omnibus Ex. No. 39.)  The 2014 NDA acknowledged that Zest and Walmart were '



By contrast, Walmart had no obligations under the 2014 NDA with respect to information that it received from Zest.  (*See id.*)

## B.    The Parties' Course of Dealing From March 2014 Through July 2015

Although Walmart was under no obligation or duty to keep any Zest information confidential or restrict its use, representatives from Zest and Ecoark met numerous times with Walmart personnel to discuss the Zest Fresh technology, and sent PowerPoint presentations and emails describing that technology to Walmart during the course of 2014 and early 2015.  (Omnibus Ex. No. 32 at 68-69.)  Also during early 2015, Walmart personnel, including "Shawn Baldwin[,] visited a Zest Labs active site." (Compl. ¶ 30.)

In early 2015, separate from those discussions with Zest, Walmart began an effort to automate and digitize legacy business processes that were still being performed manually.  One of these processes was the Quality Control ("QC") intake process used at Walmart Distribution Centers ("DCs") for fresh fruits and vegetables.  Using paper copies of the USDA standards and guidelines for fresh produce, along with Walmart-specific guidelines, Walmart's QC associates would inspect selected samples of incoming produce, write their observations down on paper,

4

determine whether the produce was of sufficient quality to be accepted, and then manually enter the results of that inspection into an excel spreadsheet.  (Omnibus Ex. No. 30 at 15.)

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

### C.    Walmart and Zest Execute a New Non-Disclosure Agreement

While Zest was not involved in the QC digitization effort, discussions continued on whether Zest's more holistic supply-chain management solution was the right fit for Walmart.  In connection with those discussions, Walmart and Zest entered into a Mutual Confidentiality and Non-Disclosure Agreement, effective July 21, 2015 ("the 2015 NDA").  (Compl. ¶ 31.)  The 2015 NDA contemplated a mutual exchange of Confidential Information between Walmart and Zest '██

███████████████████████████████████'  (Omnibus Ex. No. 2 at 1.)  ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████'  (*Id.* § 1.)  ████████████

███████████████████████████████████████████████



(*Id.*)

(*Id.* § 2(a).)

(*Id.* § 2(d).)

' (*Id.* § 17.)

### D.   The Hackathon and Early Development of the Eden Technology

Separate from the ongoing discussions with Zest, Walmart continued to work on its QC digitization efforts                    and a Walmart internally developed QC digitization solution, which had originally been conceived in a "hackathon"—an annual event held at Walmart where computer programmers try to come up with new digital solutions. (Omnibus Ex. No. 9 at 103:25-104:25; 106:14-16; 116:6-12) Ultimately, the internally developed solution—called "Eden"—was selected in early 2016 as the winner of the bake-off. (*Id.* at 128:12-15.) Eden was envisioned as a suite of mobile and desktop software applications, which would be written in computer code by Walmart's programmers. Work on the design and coding of the first of those applications, called Inspect (as it replaced the manual QC "inspection" process) continued throughout 2016. (Omnibus Ex. No. 30 at 5, 8, 13-14, 20.)

### E.     The 2016 Master Services Agreement

On December 16, 2015, Walmart told Zest that its proposal █████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████

On January 18, 2016, Ecoark Inc. and Walmart entered into the Master Services Agreement ("2016 MSA").  The 2016 MSA '████████████████████████████████████████' between the parties and provides that '████████████████████████████████████████████████████
████████████████████████████████████' (Omnibus Ex. No. 3 at 1.)  In particular, '████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████' (*Id.* § 16(K) (emphasis added).)  The MSA further provides that '███████████████████████████
███████████████████████████████████████████████████████████████
█████████████████████████████████' such that Walmart shall be the '████
████████████████████████████' to that work product.  (*Id.* § 9(A).)  The MSA specifically contemplates that '██████████████████████████████████' of Ecoark Inc. might be '██████████████████████████████' with '██████████' defined as '████████████████████
███████████████████████████████████████████████████████████████

7

███████████████████████ ███████████████████████ '████
██████████ ████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████

Appendix 6 to the MSA outlines the procedures in the event of a '████████████' and

provides that '███████████████████████████████':

███████████████████
███████████████████
███████████████████
███████████████████

(*Id.*, App. 6 § F.2.)██████████████████████████████████

██████████████████████████████████████████

██████████████████████ Mr. Mehring was not '████████████████' Ecoark Inc. at that

time (or any time), although he worked closely with Ecoark Inc. and its CEO, Mr. May.

On January 29, 2016, roughly two weeks after the effective date of the 2016 MSA, plaintiff

Ecoark Holdings, Inc. was first formed, with Ecoark Inc. as its wholly owned subsidiary.[2]

**F.      The 2016 Statement of Work**

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████ (Omnibus Ex. No. 4.) ████████
████████████████████████████████████████

---

[2] Omnibus Ex. No. 27, Item 2.01.

[3] ██████████████████████████████████████████
███████████████████████████████████



' (*Id.* at 1, 3.)

' (*Id.* at 3.)

(*Id.* at 1.)

(*Id.* at 2.)

(Omnibus Ex. No. 12 at 199:5-9.)

' (Compl. ¶ 32; *see*

*also* Omnibus Ex. No. 4 at 3 (providing that '

').)

9



(Omnibus Ex. No. 42 (emphasis added).)

### G.    The Launch of Eden, Walmart's New QC Digitization Solution

At the same time that Zest separately was engaged in the POC under the 2016 SOW, Eden was rolled out to all of Walmart's distribution centers.  As of January 2017, when the rollout was complete, Eden consisted of a single mobile application, called Inspect, which '███████████ ████████████████████████' for inspecting fresh fruits and vegetables.  (Omnibus Ex. No. 10 at 276:9-11.)   Shortly thereafter, the Almanac application was launched, which was a digitization of the USDA and Walmart standards that had previously been maintained in hard copy binder sets.  For all of 2017 and 2018, Eden consisted entirely of those two mobile applications (along with a desktop version of Inspect).  (Omnibus Ex. No. 24 ¶¶ 52-57; Omnibus Ex. No. 30 at 8-9.)

### H.    The 2017 Bake-Off

In December 2016, Zest was among several companies invited to submit a response to a Walmart Request for Information ("Cold Chain RFI") in connection with its search for a single vendor to provide temperature monitoring sensors for its fresh food supply chain.  (Omnibus Ex. No. 32 at 68.)   According to the Cold Chain RFI, any responses provided thereto were '███ ████████████████████'  (See, e.g., Omnibus Ex. No. 34.)   As noted in Plaintiffs' Complaint, Zest participated in this "'Bake-off' competition," which was directed to '███████ ████████'  (Compl. ¶ 38.)  ████████████████████████████████████



(Omnibus Ex. No. 8 at 100:1-9; 283:4-9; 313:8-23.)

## I. The 2018 Statement of Work

(Omnibus Ex. No. 7 at 310:9-15.)

(Omnibus Ex. No. 5 at 1, 5.)

(Id. at 2)

' (Id. at 2, 4.)                          (Id. at 3.)

(Id. at 2.)

## J. Plaintiffs' Claims Against Walmart

On August 1, 2018—the day after the term of the 2018 SOW concluded—Plaintiffs filed their Complaint. (Compl.) The Complaint asserts ten Counts, including Trade Secret Misappropriation (Counts I & II), Contract Claims (Counts III & VII), Tort Claims (Counts IV–VI), Unjust Enrichment (Count VIII), and Remedies (Counts XI & X). (*See id.*)

Plaintiffs have asserted misappropriation claims against Walmart under both the federal Defend Trade Secrets Act of 2016 ("DTSA") in Count I and the Arkansas Trade Secrets Act

("ATSA") in Count II.   (Compl. ¶¶ 46-57.)   The relevant provisions of these statutes are substantively the same.  *Compare* 18 U.S.C. §§ 1832 to 1839, *with* Ark. Code Ann. §§ 4-75-601 to 4-75-607.  Through their expert, Dr. Stephen Becker, Plaintiffs offer three *alternative* damages calculations for their claims of misappropriation:

> (1) **Lost profits** of "at least $205.2 million, as measured by the present value of the profits that Zest Labs would have earned by providing Walmart with the Zest Fresh system" starting on January 1, 2017;

> (2) **Unjust enrichment** damages of $993.5 million, which is calculated by taking Walmart's estimate of waste savings from Eden's Inspect and Almanac applications of ▮▮▮▮▮▮▮ in in fiscal year 2018 (which began February 1, 2017, and ended January 31, 2018), and then extrapolating that figure to determine the waste savings that are allegedly attributable to a three-year head start on the launch of the Inspect and Almanac application; or

> (3) **Reasonable royalty** damages of $917 million, which is calculated by estimating the net present value of a ▮▮▮-per-pallet royalty for all pallets of fresh produce, meat, and seafood that Walmart received from January 1, 2017, until December 31, 2026.

(Omnibus Ex. No. 24 ¶ 8.)

Each of the foregoing calculations depends on the assumption that Walmart was using the alleged trade secrets in its supply chain as of no later than February 1, 2017, at a time when the only Eden technology being used in the Walmart supply chain were the Inspect and Almanac applications.  (*See generally id.*)  As discussed below, there is no evidence that any alleged Zest trade secrets were used to create those applications, and no evidence that those applications use any of the alleged Zest trade secrets.

## II.   LEGAL STANDARD

### A.   Summary Judgment Standard

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is

genuinely disputed only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (holding that the non-moving party must do more than raise metaphysical or conjectural doubts about issues requiring resolution at trial). The court resolves all ambiguities and draws all factual inferences in favor of the non-moving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)).

This Court has summarized the parties' respective burdens on a motion for summary judgment as follows:

> "[T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*, "[to] point out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted."

*Gray v. Welch Motor Co.*, No. 5:15CV00258 JM, 2017 WL 4224590, at *2 (E.D. Ark. Jan. 5, 2017) (Moody, J.) (alterations in original) (quoting *Counts v. MK-Ferguson Co.*, 862 F.3d 1338, 1339 (8th Cir. 1988)), *aff'd*, 695 F. App'x 168 (8th Cir. 2017).

### B.    Standard for Interpretation of Contracts

All of the contracts in this case—the 2014 NDA, the 2015 NDA, the 2016 MSA, the 2016 SOW, and the 2018 SOW—are governed by Arkansas law. Under Arkansas law, "'[t]he cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, if it can be done consistently with legal principles.'" *Booth v. Riverside Marine Remanufacturers, Inc.*, 376 S.W.3d 450, 457 (Ark. App. 2010) (quoting *Connelly v. Beauchamp*, 13 S.W.2d 28, 30 (Ark. 1929)). "In interpreting a contract, the court should use a commonsense

approach and should give effect to the words used as they would be generally understood in their ordinary sense." *Transcon. Ins. Co. v. Edwards*, 139 F.3d 1185, 1187 (8th Cir. 1998). "When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed." *William L. Patton, Jr. Family Ltd. P'ship, LLLP v. Simon Prop. Grp., Inc.*, 370 F. Supp. 2d 846, 848 (E.D. Ark. 2005) (citation omitted). If the parties dispute the meaning of a contractual term, "the trial court must initially perform the role of gatekeeper, determining first whether the dispute may be resolved by looking solely to the contract," and if an "ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's duty to make such a determination as a matter of law." *Elam v. First Unum Life Ins. Co.*, 57 S.W.3d 165, 169–70 (2001).

## III.   ARGUMENT

### A.   Plaintiffs' Claims for Misappropriation of Trade Secrets or Confidential Information Provided To Walmart Prior to July 21, 2015 Are Barred

Plaintiffs' claims for misappropriation and breach of contract rely heavily on disclosures that were made prior to July 21, 2015. Those disclosures cannot give rise to a cognizable claim because until the 2015 NDA was executed, there was no "'confidential relationship" protecting Zest's disclosures to Walmart at that time. *See Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, No. 5:14-CV-5262, 2018 WL 1597976, at *11 (W.D. Ark. Mar. 31, 2018), *aff'd sub nom. Walmart, Inc. v. Cuker Interactive, LLC*, No. 18-1959, 2020 WL 727698 (8th Cir. Feb. 12, 2020). The ATSA defines "misappropriation" as:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(a) Derived from or through a person who had utilized improper means to acquire it;

(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Ark. Code Ann. § 4-75-601(2).[4]  Plaintiffs do not contend that Walmart acquired any of the Zest trade secrets "by improper means" or through "accident or mistake," or that Walmart knew or had reason to know that its knowledge of the trade secrets was "derived from or through a person who had utilized improper means to acquire [them]" or who "owed a duty . . .to maintain [their] secrecy] or limit [their] use." (*See* Compl. ¶ 48.)  On the contrary, Plaintiffs' only theory of misappropriation is that the Zest information that Walmart used and/or disclosed had been "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Ark. Code Ann. § 4-75-601(2)(B)(ii)(b).  Prior to July 21, 2015, Walmart was under no duty to maintain the secrecy or limit the use of any information from Plaintiffs because the only written agreement among the parties did not obligate Walmart to do so.  (*See* Omnibus Ex. No. 1.)

### 1.   The Only Pre-July 21, 2015 Agreement Between The Parties Provides No Protection for Zest Confidential Information

The only written agreement among the parties that had been executed prior to July 21, 2015, was the 2014 NDA.  Under the 2014 NDA, Walmart was not obligated to maintain the secrecy or

---

[4] The definition of "misappropriation" under the ATSA is virtually identical to the definition of "misappropriation" under the DTSA. *See* 18 U.S.C. § 1839(5).

limit the use of any information that it might receive from Zest, and Walmart had no ' 

' (*Id.* ¶¶ 2, 3, 10.)

In addition, Walmart and Zest Labs clarified that the 2014 NDA '

' and that the 2014

NDA '

' (*Id.* ¶¶ 8, 17.)   The plain terms of the 2014 NDA therefore establish that it is the sole and exclusive source of the terms of how confidential information exchanged between Walmart and Zest would be governed.

When faced with analogous factual circumstances, multiple courts have rejected claims for trade secret misappropriation of information disclosed in the absence of a confidentiality agreement. *See, e.g.*, *In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1376 (N.D. Ga. 2003) (granting summary judgment dismissal of trade secret claims where there was no evidence of a confidential relationship), *aff'd sub nom. Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197 (11th Cir. 2004); *Contracts Materials Processing, Inc. v. Kata Leuna GmbH Catalysts*, 164 F. Supp. 2d 520, 534-35 (D. Md. 2001) (granting summary judgment dismissal of trade secret claims where none of the agreements among the parties "restrict[ed] [the defendant] from

disclosing the information," and at least one such agreement required only the plaintiff "to maintain secrecy and confidentiality," with "[n]o similar restriction" on the defendant); *Web Commc'ns Grp., Inc. v. Gateway 2000, Inc.*, 889 F. Supp. 316, 320-21 (N.D. Ill. 1995) (granting summary judgment to defendants on trade secret misappropriation claim where the plaintiff did not "have a non-disclosure agreement or other confidentiality agreement" with defendant).

For instance, in *Dippin' Dots*, the court granted summary judgment of no trade secret misappropriation because of "the lack of a confidentiality agreement between the parties." *Dippin' Dots*, 249 F. Supp. 2d at 1376. The court noted that "[b]etween 1994 and 1998, there was no confidentiality agreement between Plaintiffs and Defendants, during which time all of [the] putative trade secrets were disclosed." *Id.* Plaintiffs later inserted a confidentiality clause into a 1998 contract with Defendants, but that could not "give Uniform [Trade Secrets] Act protection to those things which were already disclosed openly, without protective warnings, for four years." *Id.* The same is true here: information Plaintiffs disclosed to Walmart prior to July 21, 2015, cannot be protected as a trade secret because there was no confidentiality agreement protecting that information. Moreover, the 2015 NDA explicitly states that there are no '███████' on Walmart's use or disclosure of information that "█████████████████████████████████████████████████████████████████████ ' and thus the 2015 NDA cannot be read as retroactively conferring confidentiality protections on information that had previously been provided to Walmart on a non-confidential basis. (Omnibus Ex. No. 2 ¶ 2(d)(iii).) The 2015 NDA is the sole basis Plaintiffs have identified for their breach of contract and misappropriation claims.

17

2.    **None of the Pre-July 21, 2015 Disclosures That Zest Has Cited Can Be
The Basis for a Misappropriation or Breach of Contract Claim**

Despite the clear language of the 2014 NDA and 2015 NDA, Plaintiffs nonetheless have

argued that Walmart is liable for misappropriation of information that Zest disclosed prior to July

21, 2015.  For instance, in response to Interrogatory No. 6, Plaintiffs identify four '██████

█████████████████████████':

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

(Omnibus Ex. No. 32, 68-69.)    All of those disclosures predate the establishment of any

confidential relationship between the parties, and therefore cannot, as a matter of law, be the basis

for any claims of misappropriation.  The same is true for the presentations and emails relating to

the 2015 Zest site visit by Shawn Baldwin referenced in Plaintiffs' Complaint, which included

'█████████████████████████' (*See id.* at 71 (citing ZEST_ECOARK0011838).)

In addition, a key PowerPoint presentation from June 11, 2015, is likewise not protectable

as confidential or as a trade secret.  Mr. Lanning, Plaintiffs' technical expert, ████████████

█████████████████████████████████████████████████

█████████████████████████ (*See, e.g.*, Omnibus Ex. No. 26 ¶¶ 162, 170, 266

(citing Omnibus Ex. No. 43).)  However, that document pre-dates the 2015 NDA.  Moreover, this

document confirms that Walmart had no obligation to keep any information received from Zest

---

[5] The term "Bohling Application" refers to U.S. Patent Application No. 16/112,974.  The Bohling
Application is also the primary subject of the expert report of Mr. Q. Todd Dickinson, although
Mr. Dickinson refers to it as "the '974 Application."

confidential or restrict its use, and it was also entirely in Walmart's "discretion" to choose how to

deal with information that Zest disclosed prior to July 21, 2015:



(Omnibus Ex. No. 43 at ZEST_ECOARK0012156.)  Because Walmart was ████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████  disclosures of information can be the basis for a claim for

misappropriation or breach.

### B.   Plaintiffs Cannot Assert Misappropriation or Breach of Contract Based on Any Information That Was Orally Conveyed to Walmart

Plaintiffs claim that Walmart misappropriated a substantial amount of information that was

conveyed only through oral disclosures to Walmart.   Specifically, Plaintiffs contend that the

alleged trade secrets were orally disclosed to Walmart '████████████████████████████████

████████████████████████████'  (Omnibus Ex. No. 32 at 67; *see also id.* at 68-71

(listing 27 separate meetings or teleconferences which allegedly '████████████████████████

████████████████████████);[6] Omnibus Ex. No. 11 at 48:18-54:21 (testifying

that the details about Zest's system architecture were conveyed orally to Walmart).)

---

[6] Many of these alleged oral disclosures predate the execution of the 2015 NDA, and thus could not be the basis for any misappropriation or claims for breach of the 2015 NDA, as discussed in the preceding section.

Under the 2015 NDA, oral disclosures are treated differently from written disclosures. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

'████████████████████████████████████████' *Cf. Transcon Ins.*, 139 F.3d at

1187 (holding that courts must "use a commonsense approach" to contract interpretation and "give

effect to the words used as they would be generally understood in their ordinary sense"). There is

thus no genuine dispute that Plaintiffs have failed to follow the procedure in the 2015 NDA that

would have triggered Walmart's obligation to treat Zest's oral disclosures as Confidential

Information. No oral disclosures from Zest to Walmart can be the basis for a claim of

misappropriation or breach of the 2015 NDA.

### C. Plaintiffs' Claims For Misappropriation and Breach Based on Information Provided To Walmart Subsequent to January 16, 2016 Are Barred

#### 1. The 2016 MSA Governs All Post-January 16, 2016 Disclosures

On January 16, 2016, Plaintiffs entered into the 2016 MSA, which then supplanted the

2015 NDA as the operative agreements between Plaintiffs and Walmart. Though Ecoark, Inc. was

the signatory to the document, the circumstances surrounding the 2016 make clear that it binds Plaintiffs collectively as a matter of law.

(a)     **By its Plain Terms, the 2016 MSA Supersedes the 2015 NDA**



(*See* Compl. Ex. A at 1 (noting that the purpose of the 2015 NDA related to the " █████████████████████████████ "); *see also* Compl. ¶ 4 ("Over the course of a multi-year relationship . . . Zest Labs worked extensively with Walmart . . . demonstrating how the Zest Fresh solution" operates.).)

When it is clear from the unambiguous language of a subsequent contract that an earlier agreement has been superseded, any claims that depend on that superseded agreement should be dismissed. *See, e.g.*, *Baldor Elec. Co. v. Sungard Recovery Servs. LP*, No. 2:06-CV-02135, 2006 WL 3735980, at *6-7 (W.D. Ark. Dec. 15, 2006) (dismissing a claim where "the plain language" of certain contract schedules unambiguously provided "that they *supersede[d] and replace[d]* the previous Schedule[s]" (third alteration in original) (citation omitted)); *see also Farhang v. Indian Inst. of Tech., Kharagpur*, No. C-08-02658 RMW, 2010 WL 2228936, at *7 (N.D. Cal. June 1, 2010) (noting that a "subsequent joint venture agreement . . . appears to supersede" an earlier NDA and dismissing claim for breach of the non-disclosure and non-use provisions of that NDA because the pleading contained no facts suggesting that the development of the allegedly misappropriate technology "was outside the scope of what [the defendant] was permitted to do under the joint

venture agreement"); *Russell v. Energy Exch. Corp.*, 646 F. Supp. 173, 174-76 (S.D. W. Va. 1986) (dismissing a contract claim where a later agreement provided that all prior agreements, including the asserted contract, were superseded by that later agreement), *aff'd mem. sub nom. Russell v. Donaldson Lufkin & Jenrette Sec. Corp.*, 820 F.2d 1220 (4th Cir. 1987).  The unambiguous terms of the 2016 MSA provide that there are no grounds for a cognizable claim based on breach of the 2015 NDA or of any implied covenants.

### (b)    Plaintiffs Are Bound by the 2016 MSA

Neither plaintiff signed the 2016 MSA.  Nevertheless, Plaintiffs are bound by its terms (including the Entire Agreement clause) under well-established principles of equitable estoppel. Plaintiffs have embraced the 2016 MSA and the two agreements based on it (the 2016 SOW and 2018 SOW), accepted the benefits of the 2016 MSA, and specifically represented that they are parties to that agreement.  Because the foregoing facts are not genuinely disputed, Plaintiffs are equitably estopped from renouncing the 2016 MSA.

### (i)    Zest is Specifically Referenced in the 2016 MSA and its Related Agreements



'[redacted]'[7]  When a non-signatory and its

---

[7] Zest has argued that that the preamble to the 2018 SOW refers to a '[redacted]'  (Omnibus Ex.
*(cont'd)*

address are referenced in an agreement, that weighs in favor of a finding that the non-signatory is bound by its terms. *See Gillins v. Celadon Trucking Servs., Inc.*, No. 2:16-cv-00795-DCN, 2016 WL 4455018, at \*2-3 (D.S.C. Aug. 24, 2016) (rejecting argument that non-signatory could not be bound by an agreement where its name "appears twice on the face of the Agreement," and "the address provided [was non-signatory's] corporate headquarters").

<blockquote>

**(ii)     Zest and Ecoark Inc. Coordinated the Negotiation, Execution, and Performance of the 2016 MSA**

</blockquote>

When related corporate entities work together in a coordinated and overlapping fashion pursuant to the terms of a contract that the non-signatory holds out as its own, that non-signatory is equitably estopped from rejecting the terms of that contract. *See, e.g.*, *Medicalgorithmics S.A. v. Ami Monitoring, Inc.*, C.A. No. 10948-CB, 2016 WL 4401038, at \*1, 18 (Del. Ch. Aug. 18, 2016) (holding that non-signatory to a Strategic Alliance Agreement was equitably bound by its terms where the signatory and non-signatory "operated in a coordinated fashion," the two entities were "often used interchangeably," and the non-signatory had represented in correspondence with the defendant that it was "***our*** Strategic Alliance Agreement") (emphasis in original).

Such is the case here.  Zest had extensive involvement in all aspects of the Walmart relationship, including the 2016 MSA.  There have technically been three different entities who have worked to try to convince Walmart to purchase the Zest Fresh technology for its supply chain: Ecoark Holdings, Inc.; its subsidiary Ecoark Inc.; and its subsidiary Zest Labs, Inc.  Ecoark

---

No. 31 at 18.)  There is no genuine dispute that the 2018 SOW refers to the 2016 SOW for at least three reasons.  First, the 2016 MSA is the only Master Services Agreement that Walmart had executed relating to Zest's technology.  Plaintiffs have never pointed to any other MSA that could possibly be referred to in the 2018 SOW that Zest signed.  Second, the 2016 MSA was executed in January 2016, so it was indisputably still '█████████████████████████' Third, the only testimony on this point establishes that any reference other than to the effective date of the 2016 MSA in the preamble of the 2018 SOW was merely a typographical error. (Omnibus Ex. No. 9 at 261:23-262:1.)

Holdings, Inc. is merely a "holding company that supports the businesses of its subsidiaries." (Omnibus Ex. No. 16 at 6.) Randy May is the CEO of both Ecoark Holdings, Inc., and Ecoark Inc. (*See id.* at Ex. 32.1; *see also* Omnibus Ex. No. 12 at 43:5-44:24.) Similarly, Mr. Mehring is the President of both Zest Labs, Inc. and its ultimate parent, Ecoark Holdings, Inc. (Omnibus Ex. No. 17 ¶ 1.)

In addition to this overlapping management and corporate governance, the parties' course of dealing has established that Plaintiffs and Ecoark Inc. were effectively operating as a single, coordinated business effort for the Walmart relationship. Mr. Mehring and Mr. May were both involved in the initial Walmart site visit in early 2015. (Omnibus Ex. No. 44.) Mr. Mehring and Mr. May were both involved in the negotiations that led to the execution of the 2016 MSA. (Omnibus Ex. No. 38.) Mr. Mehring and Mr. May were also both involved in the negotiation and execution of the 2018 SOW, although only Zest executed that contract. (*See, e.g.*, Omnibus Ex. No. 21 at WM00083354.) Similarly, the 2016 proof-of-concept, which was a test of the Zest Fresh software at five Walmart DCs, was carried out by a team of personnel from both Ecoark and Zest, with Peter Mehring from Zest as part of the "Core Team," and with multiple Ecoark employees (including Gregg Hames and Andrew Bogner) as part of the "Field Execution Team." (Omnibus Ex. No. 23 at WM00004521.)

Zest also represented that it was effectively a party to the 2016 MSA, and that it considered contracts executed by its parent companies to be its own. For instance, Todd Clayton, a Senior Vice President at Zest, stated in a November 30, 2016 email to Kelly Boyle that ' █████████ █████████████████████████████████████ ' and thus could proceed with a full installation of the Zest Fresh technology at all of Walmart's DCs if Walmart approved an ' ████ █████████████ ' (Omnibus Ex. No. 18 at WM00000340.) On April 26, 2017, Mr. Mehring

24

also discussed the effect of the 2016 SOW (signed only by Ecoark Inc.), and noted that it

'███████████████████████████████████████████████████████

███████████████████████████████' and that it '█████████████████████████'

(Omnibus Ex. No. 19 at ZEST_ECOARK0030624 (emphasis added).)  And on January 18, 2018,

Mr. Mehring '█████████' that Zest and Walmart '█████████████████████████

██████████████' to draft the 2018 SOW, as Walmart's Senior Director, Kelly Boyle recounted in

an  email  copying  both  Mr.  Mehring  and  Mr.  May.     (Omnibus  Ex.  No.  20  at

ZEST_ECOARK0064200.)

A finding of equitable estoppel is especially appropriate here, where plaintiff Ecoark

Holdings, Inc.—which has never executed any agreement with Walmart—has specifically asserted

a claim for breach of contract under the 2015 NDA.  (*See, e.g.*, Compl. ¶ 64 ("Walmart breached

the agreement **with Plaintiffs** . . ."); *see also id.* ¶¶ 65, 66.)  This is all the more notable because

Ecoark Holdings, Inc. did not even exist at the time that the 2015 NDA was executed.  (Omnibus

Ex. No. 27.)  It is thus clear that affiliates in the Zest corporate family are treated as parties to their

affiliates' contracts even if they have not formally signed them.

### (iii)    Plaintiffs Have Accepted Benefits of the 2016 MSA

In addition, Plaintiffs have accepted the benefits of the 2016 MSA, and cannot now attempt

to repudiate selected contractual terms that are less favorable to their case than those found in the

2015 NDA.[8]  The benefits to Plaintiffs have taken many forms, including access and exposure to

Walmart DCs, personnel, and growers; data relating to Walmart fresh food and its supply chain;

---

[8] If the Court were to conclude that the 2016 MSA did supersede the 2015 NDA and binds
Plaintiffs, that would not leave Plaintiffs without a contractual remedy for alleged misuse of
confidential information.  ████████████████████████████████████████████
████████████████████████████████████████████████████  (*See* Omnibus
Ex. No. 3, §§1(B), 10.)

and ████████ in direct payments.  As explained to Plaintiffs, Walmart requires that an MSA be in force before authorizing any vendor projects. (Omnibus Ex. No. 38.)  Thus, the execution of the 2016 MSA was a prerequisite to beginning the months-long proof-of-concept by Zest, during which time Zest received direct access to two key Walmart growers (████████████████████████), as well as direct access to five Walmart DCs across the U.S.  (*Id.*; Omnibus Ex. No. 4 at 2-3.)  Zest also received ████████████████████████████████████████████████████████ ████████████████████████████████████ (*See, e.g.*, Omnibus Ex. No. 36; Omnibus Ex. No. 8 at 329:12-20)  Furthermore, Zest received a direct pecuniary benefit from the 2016 MSA.  As with the 2016 SOW, the 2016 MSA was a prerequisite to the 2018 SOW; additionally, because the 2018 SOW was entered into pursuant to the 2016 MSA, and Zest was able to use Ecoark Inc.'s vendor number established by the 2016 MSA to get paid pursuant to the 2018 SOW.  In an email exchange involving personnel from both Ecoark Holdings Inc. (including Randy May) and Zest (including Peter Mehring), Walmart agreed to process Zest invoices using Ecoark Inc.'s vendor number.  (Omnibus Ex. No. 22.)  Zest then used the vendor number from the 2016 MSA to get paid:

In addition, Ecoark Holdings, Inc. reported a "significant gross profit in 2018" due to Walmart's payments to Zest pursuant to the 2016 MSA and 2018 SOW.  (Omnibus Ex. No. 16 at 25.)

There is thus no genuine factual dispute that Plaintiffs have accepted the benefits that have flowed from the 2016 MSA.  It would be fundamentally unfair to allow Plaintiffs to have done so, but to then avoid the contractual terms of the 2016 MSA, which provide that it superseded the 2015 NDA.  Multiple courts have applied principles of equitable estoppel as a matter of law in

order to avoid such an outcome.  For instance, the Fifth Circuit has recognized that the principles of estoppel "hold[] a non-signatory to a clause if it 'knowingly exploits the agreement' containing the clause." *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 291 (5th Cir. 2015) (citation omitted). By "'knowingly seeking and obtaining "direct benefits"'" from a contract to which it was not a party, *id.* (citation omitted), a non-signatory was bound by the provisions of that contract, as it had "actually perform[ed] services and provided reports directly to [a counter-party]" to that contract." *Id.* at 292; *see also Medicalgorithmics*, 2016 WL 4401038, at *19 (determining that non-signatory to agreements had "accepted the benefits of the [agreements] and the commercial relationship with [plaintiff], and therefore must accept the obligations of the agreements as well"); *All Energy Corp. v. Energetix, LLC*, 985 F. Supp. 2d 974, 990-91 (S.D. Iowa 2012) (determining that because a non-signatory to a non-disclosure agreement had "received confidential information" pursuant to that agreement, and had "common ownership and control," it was therefore "foreseeable that [non-signatory] would be bound by the agreement"); *In re HBLS, L.P.*, No. 01 CIV.2025(JGK), 2001 WL 1490696, at *9 (S.D.N.Y. Nov. 21, 2001) (holding that a non-signatory was estopped form challenging an arbitration clause when he had knowingly accepted the benefit of the agreement that contained that clause); *Cleveland-Akron-Canton Advert. Coop. v. Physician's Weight Loss Ctrs. of Am., Inc.*, 922 N.E.2d 1012, 1016 (Ohio Ct. App. 2009) (holding that a non-signatory "co-op [had] knowingly accepted the benefits conferred by the franchise agreements and must endure its burdens").

Zest and its corporate parents presented a coordinated and united effort to pitch Zest Fresh to Walmart.  When it was beneficial to Zest, it was more than happy to claim that it was a party to the 2016 MSA—such as when it was trying to convince Walmart to expand the Zest Fresh proof-of-concept, when it was negotiating the 2018 SOW, or when it was using the vendor number from

the 2016 MSA to get paid by Walmart in 2018.  And although Ecoark Holdings Inc. is not a party to any agreement with Walmart, it has nonetheless asserted breach of contract alongside the sole signatory to the 2015 NDA.  Plaintiffs cannot use the 2016 MSA as a sword in its business dealings with Walmart, and then shield itself from its legal obligations and effects.

> **(c)** **Plaintiffs' Litigation Arguments Are Insufficient to Overcome the Estoppel Effect of Their Own Undisputed Actions**

While Plaintiffs dispute that the 2016 MSA superseded the 2015 NDA, their contentions are insufficient to overcome the well-established law that they are bound by estoppel to the superseding effect of the 2016 MSA.  Walmart asked Plaintiffs to identify and describe the bases for their contention that the 2015 NDA was not superseded by the 2016 MSA in Interrogatory No. 21.  In response, Plaintiffs identified the following bases: (1) '



'; and (2) '                         ' of Denise Sharpe.  (Omnibus Ex. No. 32 at 98 (referencing prior briefing).)  Those arguments do not create a genuine issue of fact as to the estoppel effect.

In support of their argument that the 2016 MSA—a prerequisite for the proof-of-concept project that Plaintiffs had been trying to land with Walmart for years—did not supersede the 2015 NDA, Plaintiffs rely primarily on an email exchange between Denise Sharpe, a Senior Project Manager at Walmart, and Mr. Mehring, Zest's CEO, from June 2017.  As an initial matter, this is not "contemporaneous evidence," as Plaintiffs contend; that email exchange occurred more than 18 months after the 2016 MSA had been signed.  (*See* Omnibus Ex. No. 40.)

In that 2017 email chain, Ms. Sharpe, who was helping to coordinate the Cold Chain Bake-Off,

█████████████████   ████████████████████████

████████████████████████████████████████' (*Id.* at

ZEST_ECOARK0082364.)  Notably, the 2016 SOW that Mr. Mehring referenced was between

Walmart and "Ecoark," not Zest.   (Omnibus Ex. No. 4 at 1.)   Moreover, Mr. Mehring's

representation is undeniably incorrect:  he mentions neither the 2014 NDA or the 2016 MSA.

Based on Mr. Mehring's incomplete and incorrect representations, Ms. Sharpe agreed that Zest's

technology could be evaluated in the Cold Chain Bake-Off under the terms of the 2015 NDA,

without executing a separate evaluation agreement.  (*Id.*)

Plaintiffs also cite Ms. Sharpe's deposition testimony to argue that she understood '████

████████████████████████████████████████' (Omnibus Ex. No. 32

at 98.)  Ms. Sharpe clarified that she had no exposure to Plaintiffs prior to her involvement with

the 2017 Cold Chain Bake-Off, and that she was offering no evaluation of whether the 2016 MSA

had superseded the 2015 NDA, but instead relied on Mr. Mehring's representations.  (Omnibus Ex.

No. 8 at 50-61.)

The emails and testimony from Ms. Sharpe are insufficient to create a genuine issue of fact

as to the construction of the Entire Agreement clause in the 2016 MSA for at least four reasons.

*First*, the email chain and testimony is all from at least 18 months **after** the 2016 MSA was

executed, and cannot alter the plain meaning of what was intended when the 2016 MSA was

executed.  *Second*, Ms. Sharpe never addresses the question of whether the 2016 MSA superseded

the 2015 NDA in either her emails or testimony.  *Third*, even if the 2015 NDA was used to govern

the exchange of information subsequent to June 30, 2017, in connection with the Cold Chain Bake-

Off, that does not address the issue of how to interpret the 2016 MSA's Entire Agreement clause,

or whether the 2016 MSA governed all disclosures to Walmart outside the Cold Chain Bake-Off.

*Finally*, Mr. Mehring's email exchange with Ms. Sharpe establishes that Zest considered the 2016 SOW, which was executed pursuant to the 2016 MSA, to be a valid and enforceable agreement governing its relationship with Walmart.

### 2.   Even If the 2016 MSA Did Not Supersede the 2015 NDA, the 2016 SOW Governed the 2016 Proof of Concept and All Information Provided to Walmart from Zest in Connection Therewith

The 2016 SOW governs the '

█████████████' and provides that '███████████████████████████

███████████████████████████' (Omnibus Ex. No. 4 at 1, 3.) Under the plain and unequivocal terms of the 2016 SOW, Walmart cannot be liable for misappropriation or breach of contract based on any of the '█████████████████' from September 20, 2016, to December 31, 2016. (*Id.*)

As noted above, the 2016 SOW is specifically referenced in the Complaint, and Zest has already conceded that this was a '███████████████' that governed the relationship of Zest and Walmart prior to its '████████████████' (D.I. 45 at 5 (citing Compl. ¶ 32); Omnibus Ex. No. 40.) Plaintiffs therefore cannot assert a claim for misappropriation or breach of contract for any information that was conveyed by Plaintiffs in connection with the 2016 POC, which extended from September 2016 to December 2016.

### 3.   Information Zest Submitted in Response to the Cold Chain RFI Is the Property of Walmart

In January of 2017, Zest submitted a response to the Cold Chain RFI, the entirety of which is claimed to be a trade secret in this litigation. (Omnibus Ex. No. 32 at 68 (claiming in response to Interrogatory No. 6 that '████████████████████████████

████████████████████████████████████

30

████████████████████████████████████████████████ ').)   But that position is flatly

contradicted by the terms of the Cold Chain RFI itself:



(Omnibus Ex. No. 34 (emphasis added).)  Any information that Plaintiffs submitted in response to

the Cold Chain RFI thus cannot be the basis of any claim for misappropriation or breach of contract.

### 4.  Plaintiffs Cannot Assert Misappropriation or Breach Based on Any Information Disclosed to Walmart Pursuant to the 2018 SOW

As discussed above, Walmart and Zest entered into the 2018 SOW pursuant to the 2016

MSA, under which Zest agreed to '████████████████████████████████

████████████████ ' the area of '██████████████ ' so that those tools could be incorporated

'████████████████████████████ ' (Omnibus Ex. No. 5 at 2.)  In addition,

Zest  was  to  provide  a  '████████████████████████████

████████████████ ' (*Id.* at 3.)  Walmart was also explicitly identified as the owner of '████████

████████████ ' (*Id.* at 4.)

Zest alleges both that Walmart misappropriated certain algorithms and certain information

relating to '██████████████ ' in breach of the 2015 NDA.  (*See* Omnibus Ex. No. 32 at 9-13,

27-28,  51-57.)    Information  provided  by  Zest  pursuant  to  the  2018  SOW—including  any

information relating to freshness algorithms and retention sampling—belongs to Walmart, with no

restrictions on how Walmart may use that information.  Plaintiffs admitted this fact to the Court,

noting in prior submissions that they '████████████████████████████████████

████████████████████ ' (D.I. 45 at 5.)  As such, none of the information that was provided

to Walmart pursuant to the 2018 SOW can be the basis for either a claim of misappropriation or a claim for breach of contract.

### D.   Plaintiffs' Alleged Damages Were Not Proximately Caused By Any Alleged Acts of Misappropriation or Breach of the 2015 NDA

Even if the Court does not grant summary judgment on any of the foregoing bases, Plaintiffs' claims for misappropriation and breach still fail because Plaintiffs have not shown "damages proximately caused *by the conduct at issue in each claim* to recover *on that claim*." *Walker Mfg., Inc. v. Hoffmann, Inc.*, 261 F. Supp. 2d 1054, 1085 n.6 (N.D. Iowa 2003); *see also Walmart Inc. v. Cuker Interactive, LLC*, No. 18-1959, 2020 WL 727698, at *5 (8th Cir. Feb. 12, 2020) (holding that, under Arkansas law, "a showing of proximate cause" is required for a "[c]laim for [d]amages [b]ased upon [t]rade [s]ecret [m]isappropriation"); *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1054 (D. Ariz. 2010) ("To recover on a tort or a breach of contract claim, a plaintiff must show proximately caused damages.").[9]   There is no evidence that any of Walmart's waste savings, Plaintiffs' lost profits, or the loss of a per-pallet royalty were proximately caused by the unauthorized use or disclosure of the alleged Zest trade secrets.

### 1.   None of the Alleged Unjust Enrichment Damages Were Proximately Caused By Walmart's Alleged Misconduct

Walmart's use of Inspect and Almanac is the sole measure of Plaintiffs' unjust enrichment damages.[10]   Those applications were developed after Zest was eliminated as a potential vendor for

---

[9] Plaintiffs' damages expert, Dr. Becker, concedes that there must be a nexus between the recovery sought and the particular misconduct alleged. (*See* Omnibus Ex. No. 24 ¶ 7 (noting that any ███████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████' (emphasis added)).)

[10] In Interrogatory No. 20, Walmart asked Plaintiffs to identify the bases for their contention that the use of the alleged trade secrets resulted in any waste savings to Walmart. (Omnibus Ex. No. *(cont'd)*

the digital conversion of Walmart's manual QC inspection procedures, in part because Zest did not even pitch a QC digitization solution.  (Omnibus Ex. No. 9 at 33, 102; Omnibus Ex. No. 15; Omnibus Ex. No. 35; Omnibus Ex. No. 9 at 102.)  Inspect and Almanac were independently developed at Walmart starting in 2015 and were rolled out to Walmart's DCs in early 2017.  That was before Zest had made many of its alleged disclosures of trade secrets to Walmart.  (*See, e.g.*, Omnibus Ex. No. 24 at ¶ 52; Omnibus Ex. No. 32 at 68 (identifying disclosures in January 2017 and June 2017); *id.* at 70-71 (referencing 15 post-January 2017 disclosures of allege trade secrets).)  As Mr. Lanning, Zest's technical expert has admitted, Inspect and Almanac are '███████████████████ ██████████████████████' and he offered no opinion that the use or development of those applications implicates any Zest trade secrets.  (Omnibus Ex. No. 10 at 276:9-11; 277:15-278:5; *see generally* Omnibus Ex. No. 26.)  There is thus no genuine dispute that Inspect and Almanac were developed independently of, and without using, any of the alleged trade secrets, none of which are directed to '████████████████████████'

In order to calculate the amount by which Walmart has been unjustly enriched, Dr. Becker relied entirely on the alleged waste savings that were attributable to Walmart's use of Inspect and Almanac—two applications that indisputably do not use the alleged trade secrets and were not created using any of the trade secrets.[11]  (Omnibus Ex. No. 24 ¶¶ 55, 114-17, 122-23.)  The benefits that Walmart received from those applications thus could not have caused any injury to Plaintiffs.

---

32 at 94.)  Plaintiffs did not answer that question.  Instead, they simply noted that Walmart internally estimated that it could save billions of dollars in waste from a variety of initiatives, and then string-cited more than a hundred documents, the entirety of ten deposition transcriptions, and "all exhibits" to those depositions, with no explanation whatsoever as to which trade secrets were used, how they were used, and how those resulted in any waste savings to Walmart.  (*Id.* at 95-97.)  That deflection cannot create a genuine issue as to proximate causation.

[11] Dr. Becker does not calculate any waste savings or other unjust enrichment damages attributable to the only other application in the Eden/Muse ecosystem, Retain, which was launched in 2019.

*See, e.g.*, *Covid, Inc. v. Misencik*, No. 1 CA-CV 12-0666, 2014 WL 1056794, at *5 (Ariz. Ct. App. Mar. 18, 2014) (affirming summary judgment dismissal of trade secret misappropriation claim where plaintiff set forth no proof that the defendant had used the trade secret information in a way that could have damaged plaintiff). Moreover, Dr. Becker admitted that his unjust enrichment damages analysis was conducted ███████████████████████████ ███████████████████ ' (Omnibus Ex. No. 13 at 112:16-113:5.) That is insufficient to demonstrate proximate causation of the unjust enrichment damages claimed.

For instance, in an analogous case, the Fourth Circuit affirmed summary judgment dismissal of trade secret misappropriation where the plaintiff "failed to produce evidence showing that [the] transfer of the alleged trade secrets to [defendant] was a proximate cause of [plaintiff's] loss of revenue." *360 Mortg. Grp. LLC v. Home Point Fin. Corp.*, 740 F. App'x 263, 267 (4th Cir. 2018). In that case, the plaintiff alleged that certain information from a secure internal database had been transmitted to a competitor mortgage brokerage by an employee who later left to join defendant's firm. *Id.* at 265-66. Although the plaintiff submitted multiple financial reports in connection with its damages claim, those reports "did not provide any evidence . . . of a causal connection between [defendant's] misappropriation of customer information and any profits gained by [defendant]." *Id.* at 268. The same is true here; Plaintiffs appear to rely exclusively on the fact that Walmart had access to Plaintiffs' information at the time that Inspect and Almanac were developed. But that access cannot support an inference that Walmart was unjustly enriched by the use or disclosure of that information. Just as the misappropriation claims for damages were properly dismissed in *360 Mortgage Group* at summary judgment for failing to show proximate causation, *see id.* at 269, so too should the claims for unjust enrichment damages be dismissed here.

### 2.   None of the Plaintiffs' Alleged Actual Losses Were Proximately Caused by Walmart's Alleged Misconduct

Dr. Becker claims that Zest is due actual losses (in the form of lost profits) because Walmart used the alleged Zest trade secrets without purchasing Zest Fresh.  Specifically, Dr. Becker identifies two alleged uses of Zest trade secrets: (1) the filing and publication of the Bohling Application (Omnibus Ex. No. 24 ¶ 78), and (2) Walmart's development of Eden.  (*Id.* ¶ 88.)  He also generally claims that Walmart ' ███████████████████████████████

██████████████████████████ " (*Id.* ¶ 78.)  Notably, Dr. Becker does not identify any instance when Walmart actually used any such information "obtained" from Zest.  In light of these two assumptions, Dr. Becker states that ' ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ ' (*Id.* ¶ 88.)

There is no nexus between Walmart's activities with respect to the Bohling Application and any lost profits to Plaintiffs for several reasons.  *First*, Walmart has not implemented any of the technology in the Bohling Application, and thus even if Walmart had relied on Zest trade secrets to compose the Bohling Application, that could not have caused any lost profits to Zest.  (Omnibus Ex. No. 6 at 311:19-313:1.)  *Second*, there is no evidence that Dr. Becker's assumption of ' ████████

████████████████████████████ ' would have given Walmart access to any information disclosed in the Bohling Application.  Zest had proposed to provide services in connection with a software and hardware license, along with services from Zest, but Plaintiffs have been very clear that use of the Zest Fresh System <u>does not</u> disclose any trade secrets.  (Omnibus Ex. No. 32 at 77-79; 84-87.)  Indeed, Dr. Becker confirmed that Zest's intent was to prevent paying

customers from learning the details of Zest's trade secrets.  (Omnibus Ex. No. 24 ¶ 133, 49 n.228



').)  Accordingly, even if

Walmart misappropriated Zest's trade secrets in connection with the Bohling Application, that

cannot have been the proximate cause of any lost profits in connection with Zest's administration

of Zest Fresh for Walmart, because entering into such an agreement would not have given Walmart

access to any of the information in the Bohling Application.

With respect to Walmart's alleged uses of the Zest trade secrets to develop Eden, Dr. Becker

begins with the '

'  (*Id.* ¶ 88.)  But the only benefits from the Eden

project that had been achieved by January 1, 2017 were due to the Inspect and Almanac

applications.  (*See, e.g.*, i*d.* ¶ 55 (noting that Walmart '                ' Inspect and Almanac '

' and reducing '                    ' per year); *see*

*also* Omnibus Ex. No. 10 at 276:9-11; 277:15-278:5.)

### 3. None of Plaintiffs' Reasonable Royalty Damages Were Proximately Caused By Walmart's Alleged Misconduct

Dr. Becker's calculation of reasonable royalty damages is based on Walmart's use of the

alleged trade secrets to develop Eden/Muse, (Omnibus Ex. No. 24 ¶ 145), with the calculated

royalty rate then doubled to account for the fact that '

'  (*Id.* ¶ 130.)

As with the other damages calculations, Dr. Becker assumes a January 1, 2017 start

date.  However, as described above, it is undisputed that the only applications of the Eden/Muse

ecosystem that existed at that time (Inspect and Almanac) did not use and were not created using

36

the alleged trade secrets. (See *id.* ¶ 131;   Omnibus Ex. No. 10 at 276:9-11; 277:15-278:5.)  Nevertheless, Dr. Becker bases his reasonable royalty calculation in part on the Walmart waste savings attributable to Inspect and Almanac. (Omnibus Ex. No. 24 ¶¶ 176-179.)  Dr. Becker also refers to dated Walmart plans to develop a shelf-life algorithm; but Walmart never made it past the initial planning stages for the development of any shelf-life algorithm, and those efforts were been completely abandoned. (Omnibus Ex. No. 30 at 10, 12.)  Likewise, Walmart has not implemented any of the concepts or technology discussed in the Bohling Application. (Omnibus Ex. No. 6 at 311:19-313:1).

The only other alleged use of Zest trade secrets that Dr. Becker cites as a basis for his reasonable royalty calculation is Walmart's development of the Retain application (which is mentioned in passing just once in the 103 paragraphs of Dr. Becker's Report discussing reasonable royalty damages). (Omnibus Ex. No. 24 ¶ 175.)  However, any proposed reasonable royalty for the use of Retain would need to be calculated with a hypothetical negotiation date of March 2019, as that is the first alleged use of that technology. (*Id.* ¶ 57.)  Retain could not have proximately caused any damages before this date, and thus at a minimum there is no basis for any pre-March 2019 reasonable royalty damages attributable to Retain.   Moreover, Retain could not be the proximate cause of any damages on a per-pallet royalty basis, because it is not used on a per-pallet basis. (Omnibus Ex. No. 26 ¶¶ 531, 563.)

Finally, the publication of the Bohling Application cannot have proximately caused any loss of business to Zest starting in January 1, 2017 (as Dr. Becker contends), because the Bohling application did not publish until nearly 2½ years later, on May 16, 2019. (*See* Omnibus Ex. No. 29)  Thus, no disclosures by Walmart could have caused any loss of business until at least that time.  And Plaintiffs have put forward no evidence that they lost any business based on the

publication of the Bohling Application; on the contrary, Mr. Mehring testified ██████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ (Omnibus Ex. No. 11 at 248:23-

250:19.)  The only evidence of record therefore indicates that the publication of the Bohling

Application has proximately caused no loss of business to Plaintiffs, and thus Plaintiffs are not

entitled to double the per-pallet royalty on that basis.  *See, e.g.*, *Firetrace USA*, 800 F. Supp. 2d at

1054-55 (granting summary judgment on the grounds of no proximate causation of trade secret

damages where plaintiffs had failed to show "they suffered damages as a result of . . . Defendants

creating a competing product, and destroy[ing] the value of the confidential information").

### 4.   Unspecified Future Uses of the Alleged Trade Secrets Are Speculative And Could Not Have Proximately Caused Any Damages

Plaintiffs have also alleged that Walmart may use the alleged trade secrets in connection

with some unspecified future projects, goals, or undertakings that have not yet occurred.  (*See, e.g.*,

Omnibus Ex. No. 24 ¶¶ 111, 124.)  That allegation does not establish proximate causation for any

actual losses, unjust enrichment, or reasonable royalty damages to Plaintiffs.

Throughout this case, when faced with a dearth of evidence that Walmart has ever used

any of the Zest trade secrets, Plaintiffs have argued that Walmart's goals and plans for combatting

fresh food waste might involve using those Zest trade secrets.  (*See, e.g.*, *id.* ¶ 111 (noting that '██

████████████████████████████████████████████████████████████████████

████████████████████████'),  *id.*  ¶  124  (referencing  '██████

████████████████████████████████████████████').)  But any

actual losses, unjust enrichment damages, or reasonable royalties cannot have been proximately

caused by mere speculation of future use.  *See, e.g.*, *RLM Commcn's Inc. v. Tuschen*, 66 F. Supp.

3d 681, 698, 700-01 (E.D.N.C. 2014) (granting summary judgment on the grounds of no proximate

causation for trade secret damages where plaintiff alleged that the misappropriation might have lost future business opportunities because that argument was "speculative and dependent on multiple intervening factors"), *aff'd*, 831 F.3d 190 (4th Cir. 2016).

### E.   Counts IV, V, VI, and VIII Are Preempted by Plaintiffs' ATSA Claim[12]

The ATSA "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret." Ark. Code Ann. § 4-75-602(a). Plaintiffs attempt to artfully plead their tort claims to distinguish them from their misappropriation claims, presumably in an attempt to avoid ATSA preemption. When assessing whether a tort claim is preempted or displaced by the ATSA:

> [T]he issue is not what label the plaintiff puts on [its] claims. Rather the court is to look beyond the label to the facts being asserted in support of the claims. A plaintiff may not rely on acts that constitute trade secret misappropriation to support other causes of action.

*R.K. Enter., LLC v. Pro-Comp Mgmt., Inc.*, 158 S.W.3d 685, 689-90 (2004) (citation omitted).

Regardless of their labels, Counts IV, V, VI, and VIII are based on the same supposed wrongdoing as that alleged under Plaintiffs' ATSA trade secret misappropriation claim, and therefore should be dismissed as preempted. *See Welsco, Inc. v. Brace*, No. 4:12-cv-00394-KGB, 2014 WL 4929453, at *25 (E.D. Ark. Sept. 30, 2014) (granting motion for summary judgment dismissal of tort claim based on ATSA preemption because that "claim relie[d] on the same acts alleged in [plaintiff's] claim for misappropriation of trade secrets"); *accord Secure Energy, Inc. v. Coal Synthetics, LLC*, No. 4:08CV1719 JCH, 2010 WL 1691454, at *3 (E.D. Mo. Apr. 27, 2010)

---

[12] The general positions taken in §§V(E)-(H) were also taken in Walmart's original motion to dismiss. (D.I. 46), which the Court converted to a motion for summary judgment (D.I. 73). Earlier this week, that still-pending motion was withdrawn in favor of the present motion for summary judgment. (D.I. 182.)

("Preemption [under Missouri Uniform Trade Secrets Act], however, is not avoided simply because a claim requires different elements of proof than a [trade secret misappropriation] claim.").

### 1.    Plaintiffs' Conversion Claim Is Preempted

For its conversion claim (Count IV), Plaintiffs allege only that "Walmart has exercised dominion over property in violation of the rights of Plaintiffs, including Plaintiffs' intellectual property, confidential information, and electronic data," and "Walmart's actions denied Plaintiffs the right to their property." (Compl. ¶¶ 69-70.) Plaintiffs' Complaint does not even attempt to distinguish the material alleged to have been converted from the trade secrets alleged to have been misappropriated, which results in ATSA preemption. *See R.K. Enter.*, 158 S.W.3d at 690 (holding that "the statutory language of the [Arkansas] Trade Secret Act displaces or preempts the award of damages based upon tort claims for conversion of trade secrets"); *Infinity Headwear & Apparel, LLC v. Coughlin*, 447 S.W.3d 138, 142-43 (Ark. Ct. App. 2014) (affirming summary judgment on conversion claim because "the [Arkansas] Trade Secrets Act is the exclusive remedy for the alleged misappropriation of trade secrets").

Plaintiffs' position appears to be that their conversion claim is distinct from their misappropriation claim because it involves information that does not rise to the level of a trade secret. In Interrogatory No. 3, Walmart asked Plaintiffs to "[i]dentify with particularity all 'confidential information' Plaintiffs allege was disclosed to Walmart," as opposed to information Plaintiffs allege is a trade secret (which was addressed in Interrogatory Nos. 1 and 2). (Omnibus Ex. No. 32 at 62-63.) In their response, Plaintiffs refused to identify any such "confidential information" that was not also alleged to be a trade secret, arguing that "it is impossible and impracticable to ascertain which information identified in response to Interrogatory No. 1 is trade secret versus confidential information." (*Id.* at 63.) If Plaintiffs are unable to identify any particular information they contend is merely confidential information and outside the scope of

their trade secret claims, then Plaintiffs should be unable to preserve their tort claims by referencing unspecified non-trade-secret information.

In addition, the expert report of Mr. Lanning, Plaintiffs' technical expert, confirms that the only basis for the conversion claim is "Zest Confidential Information."  (*See* Omnibus Ex. No. 26 ¶ 562 ('███████████████████████████████████████

███████████████████████'); *id.* ¶ 563 ('███████████████████████

███████████████████████████████████████████████

███████████').)  Mr. Lanning defines "Zest Confidential Information" as information '███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████' (*Id.* at 26 n.2.)  Mr. Lanning's definition

of "Zest Confidential Information" tracks the definition of a trade secret under the DTSA and the ATSA; information that Mr. Lanning contends is "Zest Confidential Information" is information that satisfies the statutory definition of a trade secret. (*See id.* ¶¶ 22-24.)  *See also* 18 U.S.C. § 1839(3) (definition of "trade secret"); Ark. Code Ann. § 4-75-601(4) (definition of "trade secret").

Indeed, even if Plaintiffs had identified the "information falling short of trade secret status" which allegedly differentiates their conversion claim from their misappropriation claim (which they have not), the conversion claim should still be dismissed as preempted, because it depends entirely on the misuse of information.  "The majority interpretation appears to be that the UTSA [Uniform Trade Secrets Act] preempts all common law tort claims based on misappropriation of information, whether or not it meets the statutory definition of a trade secret."  *Firetrace USA*, 800 F. Supp. 2d at 1048 (collecting cases); *see also Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp.

41

2d 649, 655 (E.D. Tenn. 2004) ("[T]he UTSA's preemption provision has generally been interpreted to abolish all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade secret status . . . .").

Allowing Plaintiffs' conversion claim to survive summary judgment would also undermine the very purpose of the UTSA's preemption provision, which was adopted verbatim in the ATSA. The purpose of this provision "is to 'create a uniform business environment [with] more certain standards for protection of commercially valuable information . . . and thus to eliminate other tort causes of action founded on allegations of misappropriation of information.'" *Firetrace USA*, 800 F. Supp. 2d at 1048 (alteration in original) (quoting *Mortg. Specialists, Inc. v. Davey*, 904 A.2d 652, 663 (N.H. 2006)).   In accordance with the overarching purpose of the ATSA, and in accordance with the majority interpretation of UTSA preemption, Plaintiffs' conversion claim should be dismissed.

### 2. Plaintiffs' Unfair Competition Claim Is Preempted

With regard to Count V for unfair competition, Plaintiffs allege that Walmart's "us[e] [of] the Zest Fresh technology without authorization" has (a) given Walmart a "competitive advantage"; (b) "denied Plaintiffs the right to their property"; and (c) "caused commercial damage to Plaintiffs." (Compl. ¶¶ 73-74.)   Even accepting these contentions as true, these supposed *outcomes* relate to the same *act* alleged in Plaintiffs' claim for trade secret misappropriation: "us[e] [of] the Zest Fresh technology without authorization." (*Id.* ¶ 73.)   As Plaintiffs' damages expert made clear in his report ███████████████████████████████████████████████████████

████████████████████████   The Zest Fresh technology that allegedly gives rise to an unfair competition claim is the same as that which allegedly gives rise to Plaintiffs' ATSA claim. Accordingly, the unfair competition claim is preempted. *See 3A Composites USA Inc. v. United Indus., Inc.*, No. 5:14-CV-5147, 2015 WL 5437119, at *6-7 (W.D. Ark. Sept. 15, 2015) (granting

summary judgment dismissal of tort claims and noting that "[w]hen analyzing whether particular claims are preempted under the ATSA, Arkansas courts look to whether such claims '*stem from the same acts constituting a violation of the Trade Secrets Act*'" (citation omitted)); *accord Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005) (granting summary judgment on unfair competition claim that was "based on the same nucleus of facts as the misappropriation of trade secrets claim").

### 3.    Plaintiffs' Fraud Claim Is Preempted

Count VI for fraud is likewise based on the same acts on which Plaintiffs' trade secret misappropriation claim is based (*i.e.*, alleged misuse of Plaintiffs' trade secrets) and should be dismissed as preempted.  Count VI refers repeatedly to Plaintiffs' trade secrets as the foundation for this claim.  (*See, e.g.*, Compl. ¶ 76 ("Walmart falsely represented that it would maintain Plaintiffs' confidential information and **trade secrets** in confidence . . . ." (emphasis added)); *id.* ¶ 78 ("Walmart intended to induce Plaintiffs to provide valuable information, including **trade secrets** . . . to Walmart." (emphasis added)).)  The crux of Plaintiffs' fraud claim is that Walmart allegedly misrepresented its intent, both with respect to a potential business relationship with Walmart and with respect to its confidentiality obligations, in order to get access to "the Zest Fresh approach, terminology, requirements, algorithms, and technology" so that Walmart could then use that technology to "reduce Walmart's Fresh Food Shrink." (Compl., Count VI.)  This is the same conduct that is alleged to form the basis for Plaintiffs' misappropriation claims.

Despite its explicit reference to and reliance on Plaintiffs' trade secrets, Plaintiffs have argued that their fraud claim is not preempted because it:  (1) implicates Zest-provided information that goes beyond trade secrets; and (2) involves allegedly false representations regarding a potential "business relationship" among the parties.  (*See* Omnibus Ex. No. 31 at 28.)  Neither of those arguments can avoid summary judgment.

43

As for Plaintiffs' first argument, as discussed above, similar attempts to parse the different types of information (*i.e.*, trade secrets vs. mere confidential or proprietary information) to survive summary judgment have been rejected under the majority approach. *See Firetrace USA*, 800 F. Supp. 2d at 1048; *Hauck Mfg.*, 375 F. Supp. 2d at 655; *Mortg. Specialists*, 904 A.2d at 663. In addition, this principle has specifically been recognized in the context of fraud claims. For instance, in *Secure Energy*, the Eastern District of Missouri granted summary judgment based on its finding that the Missouri Uniform Trade Secrets Act (MUTSA)[13] preempted fraud claims that are analogous to Plaintiffs' claims here. *See Secure Energy*, 2010 WL 1691454, at *3-4. In support of their fraud and misrepresentation claims, the plaintiffs in *Secure Energy* alleged "that Defendants . . . falsely represented to Secure that they would not reveal Secure's confidential, proprietary information," and "that [defendants] falsely represented that they were devoting their full time to the [plaintiff's] project." *Id.* at *3. The court found that, because "[a]ll of these allegations amount to a claim that defendants misrepresented, concealed, and lied about the taking and use of Plaintiffs' confidential information. 'As such, these allegations merely restate [Plaintiffs'] claim for misappropriation of trade secrets.'" *Id.* at *4 (second alteration in original) (citation omitted). The same is true here—Plaintiffs contend that Walmart's fraudulent representations were designed in order to "induce Plaintiffs" to provide trade secrets to Walmart that it could then use to minimize "loss associated with Fresh Food Shrink." (Compl. ¶ 78.) That is precisely the scenario that led to dismissal based on preemption in *Secure Energy*. *See also Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 974 (N.D. Ill. 2000) (finding fraud claims preempted

---

[13] The subchapter of the Missouri Annotated Statutes addressing MUTSA includes a nearly identical preemption provision to that of the ATSA subchapter of the Arkansas Code: "Except as provided in subsection 2 of this section, sections 417.450 to 417.467 displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Mo. Ann. Stat. § 417.463(1); *accord* Ark. Code Ann. § 4-75-602.

by the Illinois Trade Secrets Act (ITSA), and noting that plaintiff "adds nothing more to its ITSA claim by alleging that defendants lied about misappropriating a trade secret").

Courts have similarly rejected attempts to couch a misappropriation claim in terms of an aborted business relationship, finding that there was a commonality of facts that led to preemption, even if the business relationship was emphasized more in the fraud claim. *See, e.g., C&F Packing Co. v. IBP, Inc.*, No. 93 C 1601, 1994 WL 30540, at *6-7 (N.D. Ill. Feb. 1, 1994) (dismissing fraud claims at summary judgment as preempted where defendant allegedly "represented that [plaintiff] would receive a long-term contract and a substantial portion of [defendant's] business" and "[a]fter obtaining the secret . . . , [defendant] allegedly reneged on its promises and used the misappropriated trade secret"), *rev'd*, 224 F.3d 1296 (Fed. Cir. 2000); *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1145 (Fed. Cir. 2004) (affirming summary judgment rejection of a fraud claim as preempted even though plaintiff "contend[ed] that its fraud claim [was] based on the proposed business transaction being negotiated by the parties, rather than the misappropriation of trade secrets," and finding that "the ultimate injury to which the alleged fraud was directed was the misappropriation of [plaintiff's] trade secrets").

Just as in the cases discussed above, the "ultimate injury" alleged to have been suffered by Plaintiffs stems exclusively from Walmart's alleged theft of Zest's information. A separate claim for fraud cannot be maintained under those circumstances, and summary judgment should be granted in Walmart's favor.

### 4.    Plaintiffs' Unjust Enrichment Claim Is Preempted

Count VIII alleges Unjust Enrichment, claiming that Walmart has received unidentified "valuable confidential and proprietary items and information that were beyond the scope of any contract," resulting in unjust enrichment to Walmart. (Compl. ¶¶ 86-95.) The only allegedly unjust enrichment identified in the Complaint is that which derives from the same acts that are the

subject of Plaintiffs' trade secret misappropriation claim. (*See id.* ¶ 43 ("Walmart integrated the Zest Labs technology into Eden without authorization and without compensating Zest Labs.").) As with Plaintiffs' other tort claims, Plaintiffs have generically asserted that there is some unspecified distinction between the alleged trade secrets that form the basis for the misappropriation claims and the alleged non-trade-secret information that forms the partial basis for their unjust enrichment claim. (Omnibus Ex. No. 31 at 29-30.) That argument has been rejected under the majority view of the preemption provisions in the ATSA. *See, e.g., Firetrace USA*, 800 F. Supp. 2d at 1046-47, 1049 (finding at summary judgment that unjust enrichment claim based on the misappropriation of information was preempted "whether or not that information meets the statutory definition of a trade secret"); *see also Unitherm Food Sys., Inc. v. Hormel Foods Corp.*, Case No. 14-cv-4034, 2016 WL 4005649, at \*4-5 (D. Minn. Jul. 25, 2016) (granting summary judgment dismissal of unjust enrichment claim because it was "based on the same operative facts" as the trade secret misappropriation claim), *aff'd sub nom. HIP, Inc. v. Hormel Foods Corp.*, 888 F.3d 334 (8th Cir. 2018).

At its core, Plaintiffs' unjust enrichment claim is just a restatement of their claim for trade secret misappropriation, and thus should be dismissed as preempted by ATSA.

### F.     Even if Not Preempted, Count VI Should Be Dismissed Because It Is Defective As Matter of Law

As noted above, Count VI of Plaintiffs' Complaint is a claim for common law fraud. Plaintiffs have alleged that Walmart made two generic, non-particularized, false representations upon which Plaintiffs relied: (1) "it would maintain Plaintiffs' confidential information and trade secrets in confidence"; and (2) "Walmart intended to purchase Plaintiffs' services and solutions in order to integrate the Zest Fresh technology into Walmart's quality control and inventory

management platforms." (Compl. ¶ 76.) These allegations are insufficient as a matter of law to sustain a fraud claim.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy the particularity requirement of Rule 9(b), a complaint must plead such facts as the **time, place, and content of the defendant's false representations**, as well as the details of the defendant's fraudulent acts, including **when the acts occurred, who engaged in them, and what was obtained as a result**." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (emphasis added); *see also United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003) (holding that a valid fraud claim requires pleading the "**who, what, where, when, and how**" of the allegedly fraudulent acts) (emphasis added).

Plaintiffs provide none of the details required under the Eighth Circuit's interpretation of Rule 9(b). While Plaintiffs speculate about Walmart's intentions and offer justifications for their own reliance, (*see* Compl. ¶¶ 75-80), they provide *no* information about the "who, what, where, when, and how" of the two alleged false representations by Walmart. For instance, the Complaint never identifies **who** at Walmart allegedly said that it intended to purchase Plaintiffs' services and solutions, **when** such communication occurred, **how** much Walmart agreed to purchase and **where** that technology would be used, etc. This omission is particularly notable, because the Complaint quotes several alleged representations from Walmart personnel on topics that are unrelated to the fraud claim. (*See id.* ¶ 30 ("Mr. Baldwin stated to Zest Labs that ███████████████████████");
*id.* ¶ 33 ("Mr. Foran . . . ████████████████████████████████████████
████████████████████████████").) Plaintiffs have thus assiduously avoided stating a particularized basis for their fraud claim.

Indeed, after Walmart moved to dismiss the fraud claim at the start of this case, Plaintiffs had ample opportunity to amend their pleading to state their fraud claim with particularity. (D.I. 47 at 18-19.) Plaintiffs never did so. Moreover, Plaintiffs should not have needed to take any discovery from Walmart in order to identify the particularized facts, as this claim was based on two allegedly false representations that Walmart made to Plaintiffs, and thus the (still unidentified) basis for this claim should have been known to Plaintiffs since the start of this case.

Adding to the confusion regarding the basis for Plaintiffs' fraud claim has been the expert report of Mr. Lanning, Plaintiffs' technical expert. Mr. Lanning includes a section in his report entitled '███████' but rather than address the two allegedly false representations that Walmart made to Plaintiffs, Mr. Lanning instead opines ██████████████████████████

████████████████████████████████████████████████

(Omnibus Ex. No. 26 ¶¶ 552-54.) Mr. Lanning also addresses Walmart's standard data security process in this ██████ section, which has no connection to any of the allegations in Count VI of the Complaint (and likewise does not identify the "who, what, when, where, how, and why" of the conduct discussed). (*Id.* ¶¶ 555-57.) Walmart's conduct with unrelated third parties and its standard data security procedures for vendors have no nexus to the fraud claim as pled.

Plaintiffs' failure to set forth the basis of its fraud claim is not a mere procedural technicality; this is a critical failure of proof on Plaintiffs' part, which has left Walmart in the dark as to the basis for that claim on the eve of trial. Under such circumstances, multiple courts have dismissed fraud claims at the summary judgment stage. *See, e.g.*, *Princess House, Inc. v. Lindsey*, 918 F. Supp. 1356, 1372 (W.D. Mo. 1994) (granting summary judgment dismissal of fraud claim because that claim failed to "identify the persons who made the alleged misrepresentations and the place of these misrepresentations," and "insufficiently state[d] the time of the alleged misrepresentations

48

as 'at the time that Counterclaimants were recruited and thereafter'" (citation omitted)), *aff'd*, 77 F.3d 486 (8th Cir. 1996); *see also Eckhardt v. Qualitest Pharms. Inc.*, 889 F. Supp. 2d 901, 909 (S.D. Tex. 2012) (granting summary judgment dismissal of a fraud claim for failing to describe "the who, what, when, where, and how" (citations omitted)), *aff'd*, 751 F.3d 674 (5th Cir. 2014). The Court should likewise grant summary judgment in Walmart's favor on Plaintiffs' fraud claim.

### G.   Even if Not Preempted, Count VIII Should Be Dismissed Because Written Contracts Govern the Parties' Relationship

Plaintiffs have asserted a common law claim for unjust enrichment in Count VIII, which is preempted by the ATSA.  Alternatively, that Count should be dismissed because there is a contractual scheme that governs the conduct that is the subject of that claim.  "Under Arkansas law, the doctrine of unjust enrichment has no application when an express, written contract exists." *Peace v. Bank of Am.*, *N.A.*, No. 4:10CV0058 JLH, 2010 U.S. Dist. LEXIS 25277, at *9-10 (E.D. Ark. Mar. 17, 2010); *see also Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 210 S.W.3d 101, 112-113 (Ark. 2005) (affirming the lower court's dismissal of the unjust enrichment claim due to the existence of a contract between the parties); *Unitherm Food Sys., Inc.*, 2016 WL 4005649, at *4-5 (granting summary judgment dismissal of unjust enrichment claim because of existence of written contracts and noting that "[u]njust enrichment is an equitable theory which cannot be asserted where the rights of the parties are governed by a valid contract" (citations omitted)).  When a person has an express contract, "such a person should not be allowed by means of such a proceeding to recover anything more or different from what the contract provides for." *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 609 (8th Cir. 1999).

Here, the business relationship between parties was indisputably controlled by a series of contracts, including the 2015 NDA, 2016 MSA, 2016 SOW, and 2018 SOW.  Plaintiffs contend that some unspecified information "beyond the scope of any contract" is the basis for this claim,

but do not identify what that information was, or any of the circumstances under which it was allegedly provided to Walmart. As noted above, Plaintiffs' interrogatory responses have failed to distinguish the various types of information that Walmart allegedly received, and instead have simply identified a single body of alleged trade secret information that was provided to Walmart pursuant to the 2015 NDA. (Omnibus Ex. No. 32 at 62-63.) Accordingly, an unjust enrichment claim is not available to Plaintiffs.

### H.   Counts IX and X Should Be Dismissed Because They Are Not Independent Claims For Relief

Counts IX and X seek Exemplary Damages and Attorneys' Fees, and Injunctive Relief, respectively. (Compl. ¶¶ 96-106.) Because these so-called causes of action are merely remedies, they must be dismissed. *See Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, L.L.C.*, No. 4:07CV000594-WRW, 2007 WL 3256869, at *1 (E.D. Ark. Nov. 2, 2007) (dismissing count for recovery for attorneys' fees because "the recovery of attorneys' fees is not technically a cause of action upon which relief can be granted"); *Gordon v. Planters & Merchants Bancshares, Inc.*, 935 S.W.2d 544, 554 (Ark. 1996) (Shafer, J., dissenting) ("Under Arkansas law, a claim for punitive damages is a remedy, not an independent cause of action."); *Plan Pros, Inc. v. Zych*, No. 8:08CV125, 2009 WL 928867, at *2 (D. Neb. Mar. 31, 2009) (dismissing a cause of action for injunctive relief and noting that "no independent cause of action for injunction exists"); *Henke v. Arco Midcon, L.L.C.*, 750 F. Supp. 2d 1052, 1059-60 (E.D. Mo. 2010) (same).

## IV.   CONCLUSION

Plaintiffs' Complaint suffers from many fatal flaws. Walmart identified many of these flaws in its original motion to dismiss, but Plaintiffs have taken no action to amend, alter, or otherwise edit any of its claims at any time in the 18 months since then. Plaintiffs have asserted claims for misappropriating information that was orally conveyed and that was conveyed prior to

July 21, 2015, but those claims are barred under the plain terms of the 2015 NDA—the only contract asserted as a basis for recovery in Plaintiffs' Complaint.  Plaintiffs have also asserted claims for misappropriating information that was indisputably conveyed pursuant to other agreements executed by the parties (or that they are bound to under the well-established principles of estoppel), and thus that is not governed by the 2015 NDA.  In addition, Plaintiffs' alleged damages bear no proximate connection to any of the alleged acts of misappropriation.  And finally, Plaintiffs have asserted multiple tort claims that are irrefutably based on the same facts and circumstances as their ATSA claim, rendering them preempted.  Because there is no genuine issue of material fact as to any of the foregoing claims, Walmart respectfully submits that summary judgment should be entered in its favor.

Dated:  February 28, 2020

P. Anthony Sammi (*Pro Hac Vice*)
Douglas R. Nemec (*Pro Hac Vice*)
Edward L. Tulin (*Pro Hac Vice*)
Rachel R. Blitzer (*Pro Hac Vice*)
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Telephone: (212) 735-2419
Facsimile: (917) 777-2419
anthony.sammi@skadden.com
douglas.nemec@skadden.com
edward.tulin@skadden.com
rachel.blitzer@skadden.com

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
jtull@qgtlaw.com
cpekron@qgtlaw.com
ryounger@qgtlaw.com

By: _____

    John E. Tull III (84150)
    Chad W. Pekron (2008144)
    R. Ryan Younger (2008209)

*Attorneys for Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February 2020, I served a true and correct copy of the foregoing, *via* electronic mail and U.S. mail, upon the following counsel of record:

Dustin B. McDaniel
Scott Richardson
Bart Calhoun
McDaniel, Richardson & Calhoun PLLC
1020 West 4th Street, Suite 410
Little Rock, Arkansas 72201
dmcdaniel@mrcfirm.com
scott@mrcfirm.com
bcalhoun@mrcfirm.com

Fred I. Williams
Michael Simons
Todd E. Landis
Jonathan L. Hardt
Williams Simons & Landis PLLC
327 Congress Avenue, Suite 490
Austin, Texas 78701
fwilliams@wsltrial.com
msimons@wsltrial.com
tlandis@wsltrial.com
jhardt@wsltrial.com

Ross David Carmel
Carmel, Milazzo & DiChiara LLP
55 West 39th Street, 18th Floor
New York, New York 10018
rcarmel@cmdllp.com

Chad W. Pekron