## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

ZEST LABS, INC. F/K/A INTELLEFLEX
CORPORATION AND ECOARK HOLDINGS, INC.                    PLAINTIFFS

v.                           CASE NO. 4:18-CV-00500-JM

WALMART INC. F/K/A WAL-MART STORES, INC.                    DEFENDANT

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE TESTIMONY
OF DAMAGES EXPERT STEPHEN L. BECKER, PH.D.**

**REDACTED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**ZEST LABS, INC. F/K/A INTELLEFLEX
CORPORATION AND ECOARK HOLDINGS, INC.**                    **PLAINTIFFS**

**v.**                              **CASE NO. 4:18-CV-00500-JM**

**WALMART INC. F/K/A WAL-MART STORES, INC.**                    **DEFENDANT**

### BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF DAMAGES EXPERT STEPHEN L. BECKER, PH.D.

For nearly a decade, Plaintiff Zest Labs, Inc. ("Zest") has tried and failed to find a retail customer for its Zest Fresh technology. Despite pitching that technology to dozens of retailers as a potential means to reduce fresh food waste, and despite piloting the Zest Fresh technology multiple times, no retailer has ever been persuaded to move beyond the pilot stage with Zest. That failure has meant that Zest has never made a profit on Zest Fresh, never achieved any demonstrable waste savings from Zest Fresh, and never received royalties for Zest Fresh from any retailer. In fact, during the time that Plaintiffs have been pitching their Zest Fresh technology, they have run up an accumulated deficit of more than $127 million, while never making more than $▇▇▇ from any Zest Fresh customer.

Nonetheless, Plaintiffs' damages expert, Dr. Stephen L. Becker, opines that Walmart's alleged misuse of certain aspects of Zest Fresh entitles Plaintiffs to: (1) lost profits of $270.6 million; (2) unjust enrichment damages of $993.5 million; and (3) reasonable royalty damages of $1.26 billion.[1] Setting aside that those calculations are wildly out of proportion to Plaintiffs'

---

[1] Dr. Becker's original expert report (Omnibus Ex. No. 24) served October 29, 2019, provided damages calculations of (1) $205.2 million in lost profits; (2) $993.5 million in unjust enrichment damages; and (3) $917 million in reasonable royalty damages. Just last night, Plaintiffs served a supplemental expert report from Dr. Becker (Omnibus Ex. No. 46), calculating new damages numbers based on documents served by Walmart on December 18, 2019. (*Id.* at ¶ 8).

limited actual revenue, Dr. Becker's opinions **are not the product of independent analysis**, and instead are based on **unsupported speculation**, **counterfactual assumptions**, and the **failure to apportion** damages in accordance with the alleged use of the trade secrets.  Because such testimony is irreparably unreliable, it should be excluded under the *Daubert* standard.

## I.    FACTUAL BACKGROUND

### A.    The Becker Report

On October 29, 2019, Dr. Becker served an expert report that contained three alternative measures of damages for Walmart's alleged misappropriation of Zest trade secrets.

*First*, Dr. Becker opines that " ███████████████████████████

██████████████████████████████████████████████

████ " (Omnibus Ex. No. 24 ¶ 79.)  For purposes of this "but for" world, Dr. Becker considered two alleged acts of misappropriation: (1) Walmart ' ██████████████████████

█████████ in a patent application that was published on May 16, 2019; and (2) Walmart's development of ' ████████████████████████████████

██████████████████ '[2]  (*Id.* ¶ 78.)  According to Dr. Becker, those alleged acts of misappropriation resulted in ' ████████████████████████

██████████████ " (*Id.* ¶ 81.)  To calculate those lost profits, Dr. Becker begins with a December 2016 price quote to Walmart for a ███████ Zest software and services agreement.  Based on conversations with Peter Mehring, Zest's CEO, Dr. Becker then assumes that in the "but for" world, this ██████ agreement would have been accepted by Walmart, that Walmart's growers and suppliers would all have agreed (by the ███████ of the agreement) to

---

[2] The elements of the Eden/Muse system are discussed at length in Walmart's Motion for Summary Judgment, filed concurrently herewith.  As noted in that motion, there is no dispute that from January 1, 2017, to at least March 1, 2019, Eden/Muse consisted entirely of two applications that are not alleged to embody any of the Zest trade secrets.

pay Zest a per-pallet fee of $███ that it would have been extended for an additional ███████ (for a total term of ████████), and that Zest would make a ██% profit margin in connection with the payments from Walmart and its growers and suppliers. (*Id.* ¶¶ 86, 90, 95.) Applying those assumptions, Dr. Becker calculates the lost profits to Zest over that █████ term as $270.6 million. (Omnibus Ex. No. 46, ¶ 6(a), SLB-1 Supplemental.)

*Second*, Dr. Becker opines that Plaintiffs are alternatively entitled to unjust enrichment damages equal to the amount of waste reduction that Walmart's Eden/Muse technology has achieved during a three-year "head start" period. (Omnibus Ex. No. 24 ¶¶ 118-123.) In order to calculate those unjust enrichment damages, Dr. Becker compares the fresh food waste that Walmart observed in the fiscal year prior to the launch of the Eden/Muse ecosystem to the fresh food waste that Walmart observed in the two fiscal years since Eden/Muse was launched. (*Id.*, SLB-4A.) In the first year after the Eden/Muse ecosystem was launched, Walmart's fresh waste went down by $████████ as compared to the baseline, while in the second year, Walmart's fresh waste went down by $█████████ (*Id.*) Dr. Becker then speculates that for the next two fiscal years, Walmart's waste savings would continue to grow by ██% annually, and assumes ██% of all waste reduction at Walmart since February 1, 2017, is attributable to the Eden/Muse ecosystem. (*Id.* ¶¶ 116, 117, SLB-4A, SLB-4B.) Using that speculation and assumption, Dr. Becker calculates the total unjust enrichment damages as $993.5 million.

*Third*, Dr. Becker opines that Plaintiffs are alternatively entitled to reasonable royalty damages of $1.26 billion, which is calculated by estimating the net present value of a $██-per-pallet royalty for all pallets of fresh produce, meat, and seafood that Walmart received (and will

receive) from January 1, 2017, until December 31, 2026.[3]  Dr. Becker applies the *Georgia-Pacific*

factors to first calculate a reasonable royalty of $█ per pallet based on a hypothetical negotiation

date of January 1, 2017.  (*Id.* ¶¶ 133-220.)  Then, Dr. Becker assumes that through the publication

of a patent application (the "Bohling Application"),[4]  Walmart has █████████████████



(*Id.* ¶¶ 223-25.)

To account for this, Dr. Becker makes a "██████████████████████████████████

█████████████" and thus ███████ his calculated royalty rate from $█ per pallet to $█ per pallet.  (*Id.*

¶ 228.)  The $1.26 billion calculation represents the "██████████████████████████████

█████████████████████████████████████████████"  (Omnibus Ex. No.

46, ¶ 6(b), SLB-5 Supplemental.)

## B. The Becker Deposition

On January 13, 2020, Walmart's counsel deposed Dr. Becker.  During his deposition, Dr.

Becker readily acknowledged that he was relying on a variety of unproven assumptions.  For

example, Dr. Becker admitted that Zest has "███████████████████████████████████

████████ and has never "██████████████" the Zest Fresh solution, so he was unable to rely upon any

---

[3]  For the first three years of this 20-year term, Dr. Becker assumes a "████████" such that
Plaintiffs would receive a $█ fee for █%, █%, and █%, respectively, of all pallets of produce,
meat, and seafood that Walmart received during that time.  In other words, in 2017, Plaintiffs
receive a fee of $█ on roughly █ of all fresh food pallets that Walmart receives; in 2018,
Plaintiffs receive a fee of $█ on roughly █ of all fresh food pallets that Walmart receives; and
in 2019 Plaintiffs receive a fee on roughly █ of all fresh food pallets that Walmart receives.  For
the subsequent 17 years (starting January 1, 2020), Plaintiffs receive a $█ fee for every single
pallet of fresh food that Walmart receives.

[4]  The Bohling Application is U.S. Patent Publication No. 2019/0147396, and published on May
16, 2019.  The Bohling Application is discussed at length in Walmart's co-pending Motion for
Summary Judgment, Motion to Exclude Testimony of Mark Lanning, and Motion to Exclude
Testimony of Q. Todd Dickinson.

████████████████ in his calculations.  (Omnibus Ex. No. 13 at 123:11-22; 140:12-141:6; 272:8-273:3.)  Relatedly, Dr. Becker was unable to identify any software licenses that Zest has entered into, let alone a software license that is analogous to or consistent with the proposal he used as the basis for his calculations.  (*Id.* at 210:3-18; 134:9-135:9.)  In addition, although Dr. Becker's "but for" lost profits analysis assumes that Walmart is monitoring its fresh food on a pallet-by-pallet basis ('████████████████'), he admitted that '████████████████ ████████████' (*Id.* at 203:2-4.)   That means that '████████████████████████' of the Becker "but for" model, '██████████████████████████████████' (*Id.* at 203:16-20.)

With regard to his unjust enrichment analysis, Dr. Becker likewise admitted that although he assumed that ███% of all waste savings Walmart's entire company has achieved were attributable to Eden, that '█████████' figure actually refers only to the portion of <u>additional produce rejections</u> at Walmart distribution centers for which Eden has been responsible.  (*Id.* at 235:7-236:15.)

In addition to admitting that key assumptions in his lost profits and unjust enrichment analyses were based on speculation or were incorrect, Dr. Becker made several admissions relating to the portion of his reasonable royalty calculation that was based on the Bohling Application.  For instance, he admitted that the Bohling Application does not disclose '████████████████' (*Id.* at 60:22-61:2.)  Yet, Dr. Becker failed to conduct (or rely upon) any analysis as to <u>*which portion*</u> of the alleged Zest trade secrets were actually disclosed in the Bohling Application.  He was unsure if, for instance, '████████████████████████████████████ ██████████████████████████' because that was '████████████████████████ ██████████████████████████████' (*Id.* at 61:13-62:17; *see also id.* at 67:4-9; 76:15-20.)  In addition, although Dr. Becker bases his reasonable royalty calculation

on the premise that the publication of the Bohling Application ██████████ ██████████ ' (Omnibus Ex. No. 24 ¶ 226), he admitted that he conducted no market analysis to determine whether Zest had actually lost any business opportunities relating to that publication. (Omnibus Ex. No. 13 at 83:10-84:1.)

## II.   LEGAL STANDARD

"The party seeking admission of expert testimony has the burden of establishing admissibility." *Hale Cty. A&M Transp., LLC v. City of Kansas City*, 998 F. Supp. 2d 838, 841 (W.D. Mo. 2014) (citing *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)). Expert testimony is admissible only if it is both "relevant and reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Said another way, Rule 702 of the Federal Rules of Evidence "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility," as well as "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). This assessment is a critical part of the Court's "basic gatekeeping obligation." *Kumho*, 526 U.S. at 147; *see also Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714-15 (8th Cir. 2001) ("When it comes to admission of expert testimony under the Federal Rules of Evidence, a trial judge has a gatekeeping responsibility to 'ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand.'" (alteration in original) (quoting *Kumho*, 526 U.S. at 141)). Indeed, as the Advisory Committee notes to Rule 702 provide, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note to 2000 amendments (citation omitted).

Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93. "Under *Daubert*, 'scientific knowledge' requires more than speculation and subjective belief . . . ." *Jennings v. Nash*, No. 18-

3261-CV-C-WJE, 2020 WL 770325, at *1 (W.D. Mo. Feb. 17, 2020) (citing *Daubert*, 509 U.S. at 592-93); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) ("Expert testimony that is speculative is not competent proof and contributes 'nothing to a "legally sufficient evidentiary basis."'" (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000))).   In connection with this inquiry, a district court should not admit evidence which "is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## III.   DR. BECKER'S TESTIMONY SHOULD BE EXCLUDED

### A.   Dr. Becker's Opinion on Actual Losses/Lost Profits Should Be Excluded

Dr. Becker contends that a company that has run an accumulated deficit of $127 million,[5] has never made more than $▮▮▮ in revenue from the allegedly misappropriated technology,[6] and has never made a profit on Zest Fresh, has nonetheless suffered more than a quarter-of-a-billion dollars in lost profits from Walmart's alleged misappropriation of Zest Fresh.  There are four critical methodological flaws in Dr. Becker's lost profits analysis that compel its exclusion under *Daubert*:  (1) it is based on a ▮▮% profit model that is purely speculative; (2) it is based on a ▮▮▮▮ term that is purely speculative and at odds with the record evidence; (3) it depends on the counterfactual assumption that Walmart was performing pallet-level monitoring as of January 1, 2017, and will continue to do so for the next ▮▮▮▮, and (4) it depends on the speculative and unproven assumption that every Walmart grower of fresh produce and supplier of fresh meat and seafood would have agreed to a per-pallet fee of $▮▮▮

---

[5] *See* Omnibus Ex. No. 28.

[6] *See* Omnibus Ex. No. 11 at 275:4-8.

### 1.    Dr. Becker's ██% Profit Model Is Unproven and Speculative

As Dr. Becker admits, Zest has never made a profit on its Zest Fresh technology, and thus he was unable to use an '██████████████████████' that was '█████████████████ ██████████████████' or Zest's '████████████'   (Omnibus Ex. No. 13 at 140:25-141:6; 272:19-273:3.)  The figure that Dr. Becker uses to calculate Zest's lost profits is simply something that Zest hopes could be achieved, which he took from a pitch presentation that Zest gave to potential investors.  (Omnibus Ex. No. 24 ¶¶ 44-45; Omnibus Ex. No. 13 at 139:9-140:24.)  That pitch presentation is a marketing document intended to attract investors, and has no empirical support.  Given that Walmart would have been the first company to have ever undertaken a '██ ██████' deployment of Zest Fresh, there is absolutely no evidence that Zest could achieve such a profit margin.  (Omnibus Ex. No. 13 at 125:11-22.)  Dr. Becker also performed no independent analysis to verify that the assumptions and projections that underlie the hypothetical profit margin were economically sound.

The inherently speculative nature of Dr. Becker's opinion, combined with his failure to independently verify that the ██% hypothetical profit model accurately accounted for the projected revenues, costs, and other factors on which an accurate projection would be based, render his opinions unreliable.  *See, e.g.*, *Craig v. Xlear, Inc.*, Case No. 2:16-cv-00392-DB-EJF, 2019 WL 1119429, at *11-12 (D. Utah Mar. 11, 2019) (granting motion to exclude expert damages testimony where expert relied on "the specific growth projections provided by [litigation party]" and thus was merely providing "the opinions of an interested party"); *King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) (excluding expert testimony on damages in trade secret misappropriation case were that opinion "merely parrots information provided to him by a party," and did not "independently verify" its reliability or veracity); *JRL Enters. Inc. v. Procorp Assocs., Inc.*, No. Civ.A. 01-2893,

2003 WL 21284020, at *8 (E.D. La. June 3, 2003) (granting *Daubert* motion to exclude damages expert who performed "no independent analysis of the numbers given him").

### 2.  Dr. Becker's ▆▆▆▆ License Term Is Unproven and Speculative

In addition to adopting Zest's unproven speculation regarding its profit margins, Dr. Becker also selects an arbitrary and unsupported duration for the hypothetical agreement at the heart of his lost profits calculation.  The pricing proposal that Dr. Becker uses (which was never adopted by Walmart or any other entity) had a term of ▆▆▆▆▆▆  Yet, based on nothing more than his own *ipse dixit* and his conversation with Peter Mehring, Zest's CEO, Dr. Becker arbitrarily extends the term of that agreement by ▆▆▆▆▆ for a total term of ▆▆▆▆▆



(Omnibus Ex. No. 13 at 185:15-186:11 (emphasis added).)  Dr. Becker admitted that he simply took the opinion of an interested party regarding how much longer than the actual proposal a hypothetical agreement would extend, and then arbitrarily ▆▆▆▆▆▆▆▆▆ (*Id.*)  Dr. Becker did not independently analyze any of Walmart's contracts, any of Zest's contracts, or any contracts relating to the fresh food supply chain.  Instead, he cites his experience in his "▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ and notes that such energy contracts—which bear no discernible relation to fresh food supply chain contracts—▆▆▆▆▆▆▆ (*Id.* at 187:16-189:1.)  But Dr. Becker provides no actual analysis of Walmart's infrastructure, how that

compares to '█████████████' infrastructure, or any other basis to analogize the term of

the particular Zest-Walmart agreement in the "but for" world to generic '███████████'"

At any rate, Dr. Becker admits that Zest has never entered into a contract relating to Zest

Fresh that extends for ████████ years, and was not even aware of the longest-term contract that

Zest had executed. (*Id.* at 189:2-8.) Dr. Becker also admits that the only executed agreement

produced by either side relating to work in the fresh food supply chain is Walmart's contract with

████████ which has a ████████ term. (*Id.* at 189:15-23.) Although the only Zest proposal was

for a ████████ term, and although the only executed Walmart contract was for a ████████ term,

Dr. Becker nonetheless applies a ████████ term when calculating Zest's lost profits. His arbitrary

and unsupported *ipse dixit* as to the lost profits period is unreliable and should be excluded. *See,*

*e.g.*, *First Premium Servs., Inc. v. Best W. Int'l, Inc.*, Case Nos. 95-1466-CIV, 99-0643-CIV, 2004

WL 7203535, at *3 (S.D. Fla. Jan. 8, 2004) (excluding expert damages opinion and concluding

that an assumed "revenue stream [of] fourteen years" was "inadmissible rank speculation of a

manufactured best case scenario").

### 3.   Dr. Becker Relies on the False Assumption That Walmart Has Used Pallet-Level Monitoring

Dr. Becker's lost profits model assumes—contrary to all evidence of record—that Walmart

had been monitoring at least ███% of its food deliveries at the pallet-level, and would have by now

adopted pallet-level monitoring for every shipment of meat, seafood, and produce that it receives.

(Omnibus Ex. No. 13 at 195:12-196:4.) That is demonstrably false, as Dr. Becker admits. (*Id.* at

191:18-192:15.) That means that Dr. Becker has opined that Zest should be compensated in the

"but for" world for something that Walmart is indisputably not doing. (*Id.* at 203:16-20.) Dr.

Becker's opinion would thus over-compensate Zest based on an incorrect fact.[7]   Because that opinion is "based on factual assumptions that are entirely unsupported in the record, it fails [to] meet the second prong of *Daubert*."   *Bakst v. Cmty. Mem'l Health Sys., Inc.*, Case No. CV 09-08241 MMM (FFMx), 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011) (granting motion to exclude and noting that "[e]xpert testimony . . . is inadmissible when the facts upon which the expert bases his testimony contradict the evidence" (quoting *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999))).

### 4.   Dr. Becker's Assumption That Growers and Suppliers Would All Pay a Per-Pallet Fee Is Unproven and Speculative

In addition to an unproven profit margin, an unsupported ████████ term extension, and a counterfactual assumption of pallet-level monitoring, Dr. Becker's lost profits model also assumes that every Walmart grower and supplier would have agreed to pay Zest $████ for each and every pallet of food supplied to Walmart (regardless of the fact that in the "but for" world, Walmart was not monitoring every pallet of food).   (Omnibus Ex. No. 24 ¶ 86, SLB-2B.)   There is no reliable basis for this assumption.   Dr. Becker has performed no market analysis, has not spoken with any growers or suppliers, and has identified no facts indicating that Walmart's growers and suppliers would have agreed to such payments.   Indeed, at his deposition, Dr. Becker could not "████████ ██████████████████████████████████████████"   (Omnibus Ex. No. 13 at 134:9-135:9.)   His testimony that those suppliers and growers would do so for every pallet of food sent to Walmart is purely unsupported speculation.   It thus does not "fit" with any of the facts of

---

[7] Dr. Becker also admits that, although he includes a lost profits calculation based on the use of the Zest Fresh technology in connection with monitoring of meat and seafood, the Zest Fresh system has "██████████████████████████"   (Omnibus Ex. No. 13 at 152:9-20.)   Dr. Becker's lost profits calculation would thus also overcompensate Zest by including products that have never been monitored using the Zest Fresh technology, at Walmart or anywhere else.

record in this case, and is "insufficiently tied to the facts of the case to meet the *Daubert* fit requirement." *Bakst*, 2011 WL 13214315, at *19.

**B.     Dr. Becker's Opinion on Unjust Enrichment Should Be Excluded**

Dr. Becker's unjust enrichment opinion suffers from many of the same flaws as his lost profits calculation.  As an initial matter, just as Zest has never seen any profits from Zest Fresh, so too is Dr. Becker unable to point to any evidence showing how much the use of Zest Fresh by a Zest customer has actually reduced fresh food waste.  (Omnibus Ex. No. 13 at 153:21-154:10.) Instead, his unjust enrichment calculation is admittedly based on an unsupported and hypothetical ██% model, in which Eden/Muse is responsible for ██% of an ever-burgeoning reduction of waste at Walmart over a ████████ head start period, leading to damages to Zest of well over $1 billion. There are two critical methodological flaws in Dr. Becker's unjust enrichment analysis that should compel its exclusion under *Daubert*:  (1) it depends on the unsupported and counterfactual assumption that ██% of all waste reduction at Walmart is attributable to Eden/Muse; (2) it depends on the speculative assumption that Walmart's waste reduction will increase at a ██% rate through fiscal year ████.

**1.     Dr. Becker's ██% Waste Reduction Attribution Model Is Factually Incorrect And Not the Product of Independent Analysis**

The lynchpin of Dr. Becker's unjust enrichment calculation is his assumption, based entirely on the purported statements of Walmart VP Chuck Tilmon, that Walmart's Eden/Muse technology is responsible for ██% of all waste reduction that Walmart has achieved since January 1, 2017.  (Omnibus Ex. No. 24 ¶ 117 (relying on the '████████████████'); Omnibus Ex. No. 13 at 232:9-13 ('████████████████████████████████████████████████ ████████').  But as Dr. Becker admitted under oath, Mr. Tilmon said no such thing.  Dr. Becker noted that '████████████████████████████████████████████████████████'

12

(Omnibus Ex. No. 13 at 235:4-6.)  When confronted with the actual text of that email, Dr. Becker admitted that it assumed Eden/Muse was responsible for ██% of increased <u>rejections of produce</u> at Walmart distribution centers, and <u>not</u> that Eden/Muse was responsible for ██% of <u>total</u> waste savings at Walmart:



(*Id.* at 235:14-236:15 (emphasis added).)  In other words, Dr. Becker has now admitted that his unjust enrichment calculation is based on a mistake.  He mistakenly assumed Eden/Muse was responsible for ██% of all waste reduction (a figure which Dr. Becker estimated at more than $██ ████████████ when in reality Mr. Tilmon assumed only that Eden/Muse was responsible for the value of ██% of additional produce rejections at distribution centers (a fixed annual savings of

13

no more than $█████ (*see* Omnibus Ex. No. 30).  While those increased rejections do reduce waste, there is no factual basis for the notion that Eden/Muse was responsible for █% of Walmart's entire annual waste reduction in perpetuity.  This factual mistake is fatal to Dr. Becker's unjust enrichment calculation, and renders it unreliable and inadmissible under the *Daubert* standard. *See, e.g.*, *Elcock v. Kmart Corp.*, 233 F.3d 734, 755 (3d Cir. 2000) (finding that it was an abuse of discretion under *Daubert* to admit damages testimony that was predicated on an assumption of "100 percent disab[ility]," when the actual evidence demonstrated a much lower disability percentage).

This is not the first time that Dr. Becker has misread critical documents, and then used that misreading as the basis for unreliable expert testimony.  For instance, in *Mars, Inc. v. TruRx LLC*, Dr. Becker offered an opinion on lost profits in a patent case involving breath-freshening pet foods. Case No. 6:13-cv-526-RWS-KNM, 2016 WL 4034790, at *2 (E.D. Tex. Apr. 18, 2016).  Dr. Becker's opinion was based on his conclusion that the patents-at-issue merely claimed an essential oil formulation; in reality, the patents-at-issue claimed an entire pet food formulation (with essential oils as one component).  *Id.*  The Court concluded that Dr. Becker's opinions were "founded upon a fundamental misunderstanding" of the plain language of the patent documents, and therefore he was "precluded from testifying" on that issue of lost profits.  *Id.*  The Court should similarly exclude his unjust enrichment opinion here, because Dr. Becker has admitted that his analysis was founded upon a fundamental misunderstanding of Mr. Tilmon's statements, and that he thus applied the wrong metric to determine the waste reduction attributable to Eden/Muse.

Indeed, even if Dr. Becker had not misread the Tilmon email, he admittedly performed no independent analysis of how much waste reduction has been attributable to Eden/Muse since January 1, 2017, or that will be attributable to Eden/Muse in the future.  He simply applied a █%

assumption from one of Walmart's executives across the board to all past and anticipated future waste reduction. That calculation is therefore not the product of reliable methods—indeed, it is not the product of any methods at all, as Dr. Becker intended to rely entirely on Walmart's own assumptions and perform no analysis of his own. (*See, e.g.*, Omnibus Ex. No. 13 at 233:5-6 ('███████

████████████████████████████').) That cannot pass muster under the *Daubert* standard, and thus his opinions separately should be excluded on that basis alone. *See, e.g.*, *King-Ind. Forge*, 2009 WL 3187685, at \*2 (excluding expert damages testimony for failure to perform independent analysis); *JRL*, 2003 WL 21284020, at \*6-8 (same).

> ### 2.     Dr. Becker's Assumption Regarding The Rate of Waste Reduction Is Speculative and Unsupported

In calculating unjust enrichment damages, Dr. Becker assumes that Walmart's ████████ ████████████ will continue at a rate of '████████████' for ████████████ (Omnibus Ex. No. 24, SLB-4B.) Dr. Becker offers no basis for this assumption, other than that it is "based on the growth in savings Year 1 [i.e., fiscal year 2018] to Year 2 [i.e., fiscal year 2019]," and the fact that Walmart had set a goal of reducing waste by \$2 billion per year over five years. (*See id.*, *see also id.* ¶¶ 114, 117 (citing the blog post referenced in Plaintiffs' Complaint stating that Walmart's "goal is to eliminate \$2 billion in waste over the next five years").) Dr. Becker identifies no new technology that Walmart has developed or started to implement that is expected to accelerate waste savings, and no specific existing technology that he concludes would result in increased year-over-year waste savings.

Indeed, Dr. Becker readily admitted that he failed to consider the actual effect of Walmart's multiple waste reduction initiatives, including '████████████████████' '████ ████████████████████' the implementation of "████████████ ████" or the "████████████████████' (Becker Depo Tr. at 241:9-243:19.)

He thus offers no independent analysis or reliable method of analyzing the contribution to waste reduction of either Eden/Muse or those other initiatives. He is therefore just guessing as to the effect of these other initiatives, and guessing as to the rate of increased waste reduction based on Walmart's goals. That is insufficient to satisfy the *Daubert* standard. *See, e.g.*, *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1292 (M.D. Ala. 2001) (excluding expert damages testimony as "speculative, without sufficient factual basis, and methodologically flawed," in part because expert relied on a "guess" about future production capacity without considering any "sound economic principles").

    **C.**    **Dr. Becker's Reasonable Royalty Opinion Should Be Excluded**

As a third alternative measure of damages, Dr. Becker calculates the net present value of a lump-sum royalty of $█ per pallet of fresh food that Walmart has received, and is expected to receive, until ████████ which gives a value of $1.26 billion. (Omnibus Ex. No. 46 ¶ 6(b); SLB-5 Supplemental.) Setting aside the fact that Zest has never received more than $█ from any customer for Zest Fresh (i.e., an amount that is ████████ below the royalties that Zest seeks in this case), Dr. Becker's reasonable royalty calculation suffers from two critical methodological flaws: (1) he fails to reliably apportion his royalty rate enhancement to the value of any trade secrets that were allegedly destroyed through the publication of the Bohling Application; and (2) he conducts no independent market analysis relating to any lost opportunities that Zest may have suffered because of the Bohling Application.

    **1.**    **Dr. Becker's █ Enhancement of The Royalty Rate Is Not Properly Apportioned and Arbitrary**

Dr. Becker's rate of $█ per pallet for a 20-year term is calculated by first applying the *Georgia-Pacific* factors to determine a royalty rate of $█ per pallet. (Omnibus Ex. No. 24 ¶ 220.) He then assumes that the publication of the Bohling Application has "█████████

16

 ' which in turn has

' ' to market participants

other than Walmart, which make up ' ' (*Id.* ¶¶ 223, 225.) He then

states that '

' to reflect the '

' (*Id.* ¶ 226.) But Dr. Becker assumes that '

' and therefore decides to '

' (*Id.*) This ' ' is arbitrary and fails to reliably apportion the effect of

Walmart's alleged misconduct.

Dr. Becker admits that all of the alleged Zest trade secrets were not disclosed in the Bohling

Application. (Omnibus Ex. No. 13 at 60:22-61:4; 76:15-20.) But he was unable to identify what

percentage of the alleged Zest trade secrets were disclosed in that application, and admitted that

he did not '

' (*Id.* at 61:3-62:17.)

Instead, he merely plucks out an enhancement factor for his royalty that is midway between no

enhancement and a █ enhancement. That arbitrary selection is not based on any independent

analysis, and is at odds with the established law regarding apportionment.

"[T]he controlling principle [is] that damages must be confined or apportioned to the value

or contribution made by the misappropriated features contained within a multi-component

product." *MSC Software Corp. v. Altair Eng'g, Inc.*, Civil Action No. 07-12807, 2015 WL

13273227, at *4 (E.D. Mich. Nov. 9, 2015). By analogy, the alleged destructive effect of the

Bohling Application must be apportioned according to which Zest trade secrets were in fact allegedly disclosed in that application, and the relative value of those as compared to the aspects of Zest Fresh that were not disclosed.  Dr. Becker performs no analysis as to whether the trade secrets that were disclosed are what actually creates demand for Zest Fresh, and how that demand might persist even with the publication of an unspecified portion of those trade secrets in the Bohling Application.  Because Dr. Becker failed to "allocate the value of the trade secrets" allegedly disclosed in the Bohling Application, "his testimony on the lump sum reasonable royalty damage theory should be excluded."  *MSC*, 2015 WL 13273227, at *12; *see also KW Plastics*, 131 F. Supp. 2d at 1295 (excluding opinion in part because the expert "did not attempt to determine the value of the specific trade secrets used").

> ### 2.  Dr. Becker's Opinion That Zest Has Lost, or Will Lose, Business Opportunities from the Publication of the Bohling Application Is Unsupported and Not the Product of Independent Analysis

In addition to his improper and arbitrary enhancement of his calculated royalty rate, Dr. Becker does not perform any independent analysis of the market effect of the Bohling Application. He assumes that it has "███████████████████████████████" but does not identify the basis for this opinion, other than the fact that some unspecified portion of the Zest trade secrets has allegedly been disclosed. (Omnibus Ex. No. 24 ¶ 226.) For instance, Dr. Becker was unable to identify any "████████████████" that "███████████████████████████ ███████" (Omnibus Ex. No. 13 at 83:10-84:1.) Dr. Becker also acknowledged that prior to the time that the Bohling Application published, Zest had already tried—and failed—to monetize its trade secrets to a variety of potential customers, including ██████ █████ and ████ (*Id.* at 126:24-128:9.) Without knowing the value of the trade secrets that were allegedly disclosed in the Bohling Application, and without knowing which, if any, market opportunities have been lost based on that publication, Dr. Becker's opinion is based merely on his own *ipse dixit*. Dr. Becker's

unsupported speculation that there would have been an adverse effect from the Bohling Application on some unspecified portion of the marketplace does not satisfy the *Daubert* standard. *See, e.g.*, *Lasorsa v. Showboat: The Mardi Gras Casino*, Civil No. 07-4321 JBS/JS, 2009 WL 2929234, at *4 (D.N.J. Sept. 9, 2009) (excluding expert opinion because he "applied no objective methodology to come to his opinion, instead impermissibly relying on . . . *ipse dixit*"); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (holding that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" (citation omitted)).

## IV.  CONCLUSION

Dr. Becker's lost profits, unjust enrichment, and reasonable royalty calculations each suffer from critical methodological flaws—ranging from assumptions that are directly at odds with all record evidence, to speculation about profit margins and waste reduction, to a failure to apportion damages to the actual misconduct alleged.  Those flaws render his opinions unreliable under the *Daubert* standard.  While Walmart certainly disagrees with the enormous sums Dr. Becker has proposed for damages, this motion addresses only the legal sufficiency of the methodology (or, more precisely, the lack of any methodology) used to reach those conclusions.  This is precisely the scenario where it is appropriate for the Court to perform its gatekeeping function and reject Dr. Becker's opinions as unreliable and speculative.  Walmart therefore respectfully requests that all testimony from Dr. Becker on the foregoing opinions be excluded.

Dated:  February 28, 2020

P. Anthony Sammi (*Pro Hac Vice*)
Douglas R. Nemec (*Pro Hac Vice*)
Edward L. Tulin (*Pro Hac Vice*)
Rachel R. Blitzer (*Pro Hac Vice*)
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Telephone: (212) 735-2419
Facsimile: (917) 777-2419
anthony.sammi@skadden.com
douglas.nemec@skadden.com
edward.tulin@skadden.com
rachel.blitzer@skadden.com

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
jtull@qgtlaw.com
cpekron@qgtlaw.com
ryounger@qgtlaw.com

By: _____

    John E. Tull III (84150)
    Chad W. Pekron (2008144)
    R. Ryan Younger (2008209)

*Attorneys for Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February 2020, I served a true and correct copy of the foregoing, *via* electronic mail and U.S. mail, upon the following counsel of record:

Dustin B. McDaniel
Scott Richardson
Bart Calhoun
McDaniel, Richardson & Calhoun PLLC
1020 West 4th Street, Suite 410
Little Rock, Arkansas 72201
dmcdaniel@mrcfirm.com
scott@mrcfirm.com
bcalhoun@mrcfirm.com

Fred I. Williams
Michael Simons
Todd E. Landis
Jonathan L. Hardt
Williams Simons & Landis PLLC
327 Congress Avenue, Suite 490
Austin, Texas 78701
fwilliams@wsltrial.com
msimons@wsltrial.com
tlandis@wsltrial.com
jhardt@wsltrial.com

Ross David Carmel
Carmel, Milazzo & DiChiara LLP
55 West 39th Street, 18th Floor
New York, New York 10018
rcarmel@cmdllp.com

_____
Chad W. Pekron