**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ZEST LABS, INC. F/K/A INTELLEFLEX**
**CORPORATION AND ECOARK HOLDINGS, INC.**                    **PLAINTIFFS**

**v.**                              **CASE NO. 4:18-CV-00500-JM**

**WALMART INC. F/K/A WAL-MART STORES, INC.**                    **DEFENDANT**

**DEFENDANT'S RESPONSE TO ZEST LABS, INC.'S MOTION FOR SUMMARY**
**JUDGMENT THAT INFORMATION IN WALMART'S PATENT APPLICATION WAS**
**NOT GENERALLY KNOWN OR READILY ASCERTAINABLE**

**REDACTED**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 2 0 2020

JAMES W. McCORMACK, CLERK
By:_____
PLAINTIFFS   DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

ZEST LABS, INC. F/K/A INTELLEFLEX
CORPORATION AND ECOARK HOLDINGS, INC.

PLAINTIFFS

v.                                    CASE NO. 4:18-CV-00500-JM

WALMART INC. F/K/A WAL-MART STORES, INC.                    DEFENDANT

**DEFENDANT'S RESPONSE TO ZEST LABS, INC.'S MOTION FOR SUMMARY
JUDGMENT THAT INFORMATION IN WALMART'S PATENT APPLICATION WAS
NOT GENERALLY KNOWN OR READILY ASCERTAINABLE**

Zest's motion seeks very peculiar relief for a party asserting misappropriation of Zest's

alleged trade secrets:   asking that limited portions of a ***non-Zest*** document—the Bohling

Application (also referred to as the "Walmart Application" in Zest's motion)—be deemed not

generally known and not readily ascertainable.  Presumably, Zest believes that a judgment from

the Court cementing this fact as a matter of law will be helpful to Plaintiffs in their later efforts to

establish their own trade secrets and prove misappropriation of them.   However, summary

judgment is not simply a vehicle to ask the Court to issue an order on any fact a party deems

potentially helpful—as evidenced by the total lack of supporting case law in Zest's brief.  Zest's

motion fails to satisfy two procedural requirements of Federal Rule of Civil Procedure 56(a):  (1)

it is not related to any of Plaintiffs' claims in this case; and (2) even if granted, it would not be

dispositive of any claim or defense in this case.  Accordingly summary judgment is not available.

Even if Zest's motion were procedurally proper, it suffers from three substantive defects

that are fatal to Zest's requested relief.  *First*, Zest argues that Walmart's technical expert, Dr. Hutt,

conceded that certain limited portions of the Bohling Application were "not generally known and

not readily ascertainable." (Dkt. 204 (hereafter "Pl. Br.") at 8-9.) Dr. Hutt said no such thing. She

testified, consistent with her expert report, that while much of the Bohling Application involves

publicly known principles, it includes a "unique" algorithm for estimated shelf-life of produce that Walmart independently developed. That algorithm was disclosed in Figure 3 of the Bohling Application, and is further reflected in portions of the accompanying text and claims. But Zest does not seek a judicial declaration regarding "uniqueness" or based on Dr. Hutt's actual testimony. Instead, Zest's motion asks this Court to determine, as a matter of law, that because Dr. Hutt testified that certain aspects of the Bohling Application were "unique," that necessarily requires a finding that (a) those aspects; (b) all information in the paragraphs in which those "unique" elements appear; ___and___ (c) all "systems and methods" claimed in the Bohling Application were ___all___ "generally known and readily ascertainable." Zest cites no legal basis for the Court to make those inferential leaps. _Second_, Zest argues that the inventor declarations for the Bohling Application (which track the standard form utilized under Section 115 of the Patent Act) confirm that certain portions of the Bohling Application were "generally known and not readily ascertainable." There is no support for that inferential leap either in the text of the declarations or under the patent laws. _Third_, there are genuine issues of material fact that preclude summary judgment.

For all of these reasons, Zest's motion should be denied.

## I.  ZEST'S MOTION DOES NOT SEEK SUMMARY JUDGMENT ON A CLAIM OR A PART OF A CLAIM

To prevail on their claims for trade secret misappropriation under the Arkansas Trade Secrets Act ("ATSA") (Ark. Code Ann. § 4-75-601) and the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1839) (Compl., Counts I and II), Plaintiffs must prove, among other things, that Plaintiffs actually own a trade secret.[1] In order to prove that information is a trade secret, Plaintiffs must establish certain elements. Plaintiffs characterize these as four independent elements, with one being that "the information is not generally known and not

---

[1]    Though Counts I and II were brought by both Plaintiffs, the present motion was filed only by Zest.

readily ascertainable." (Pl. Br. at 8.)[2] The standard for trade secret misappropriation could be mapped out as follows (with the element that is purportedly the subject of Zest's motion for partial summary judgment emphasized):

A claim for misappropriation of a trade secret requires:

1. Existence of a trade secret, which is information that:

   a. Derives independent economic value, actual or potential, from **not being generally known to, and not being readily ascertainable** by proper means by, other persons who can obtain economic value from its disclosure or use, and

   b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

2. Misappropriation of that trade secret when a person either:

   a. Knows or has reason to know that the trade secret was acquired by improper means, or

   b. Discloses or uses the trade secret of another and knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it or acquired it under circumstances giving rise to a duty to maintain its secrecy or limit its use.

*See* Ark. Code Ann. § 4-75-601(2), § 4-75-601(4)(A). (*See also* Omnibus Ex. No. 26, ¶¶ 21-25.) Accordingly, Zest's motion implicates only one portion of one element of the multi-element test for misappropriation.

---

[2]     In reality, the secrecy requirement is more complex: a trade secret must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." (Ark. Code Ann. § 4(A); 18 U.S.C. § 3(B).) As such, it is not enough that an alleged trade secret be both confidential and have economic value; the economic value must specifically derive from that confidentiality. (*Id.*) But in any event, the parties agree that a trade secret must not be generally known or readily ascertainable.

**A.    Zest's Motion for Summary Judgment Does Not Meet the Requirements of
Rule 56(a) Because it Does Not Seek Judgment on a Claim or Part of a Claim**

Under the Federal Rules of Civil Procedure, "[a] party may move for summary judgment,

identifying each claim or defense — or the part of each claim or defense — on which summary

judgment is sought." Fed. R. Civ. P. 56(a). Zest seeks partial summary judgment that "a 'trade

secret' . . . is not generally known and not readily ascertainable." (Pl. Br. at 8.) However, Zest

**does not identify any of Plaintiffs' alleged trade secrets** as the basis for this motion. Plaintiffs'

reticence to identify their trade secrets has been a point of contention throughout this case. (*See,

e.g.*, Dkt. 36 (Walmart's Motion to Dismiss); Dkt. 89 (Walmart's Motion for Protective Order and

to Compel Identification of Alleged Trade Secrets); Dkt. 183 (Walmart's Motion for Summary

Judgment).) Zest's summary judgment motion exemplifies that avoidance strategy, as it ignores

the question of whether its own alleged trade secrets (whatever those may be) are not generally

known or readily ascertainable.

Instead, Zest asks that Figure 3, paragraphs 60-64, and all "the systems and methods

claimed **in the Walmart Application**" be ruled to be not generally known or readily

ascertainable.[3]  (Pl. Br. at 1 (emphasis added).)  While Plaintiffs have broadly accused Walmart

of "incorporating" "certain of Zest Labs' process know-how trade secrets" into the Bohling

Application (Omnibus Ex. No. 33 at 50, 61), in order to prove trade secret misappropriation

Plaintiffs must show that ***their own trade secret*** is not generally known or readily ascertainable

(among other requirements).  Whether some portion of the Bohling Application was not

generally known or readily ascertainable at some unspecified date in the past is simply not an

---

[3]      Zest's motion does not specify the date before which it contends that the portions of the Bohling
Application were "not generally known and not readily ascertainable."  Presumably, Zest means prior to May 16,
2019 (i.e., the date of publication of the Bohling Application), but the fact that Zest has not even clarified the nature
of the judicial relief it is seeking underscores the inappropriateness of Zest's motion.

4

element of either of Plaintiffs' trade secret misappropriation claims.[4]  (Compl. at 10-11.)

Accordingly, summary judgment is not available.  Moreover, Zest does not furnish any case law

to support a motion for summary judgment on the content of Walmart's documents—indeed,

other than a section on general "Summary Judgment Standards" (Pl. Br. at 6-7), Zest cites no

case law at all.

> **B.**     **Even if Zest's Motion Related to One of its Claims, it Still Does Not Meet the Requirements of Rule 56(a) Because Summary Judgment is Not Available on an Element of a Claim**

Even if Zest were to reframe its motion in its reply brief as seeking summary judgment

on one of Plaintiffs' own trade secrets, rather than on the Bohling Application, that would still be

procedurally improper because summary judgment may not be granted on a discrete element of a

claim.[5]  As explained above, summary judgment is only available under Rule 56(a) on (a) a

claim or (b) part of a claim (such as the liability portion of a claim, or the damages portion of a

claim).  *Cardenas v. Kanco Hay, L.L.C.*, No. 14-1067-SAC, 2016 WL 3881345, at *7 (D. Kan.

July 18, 2016) (explaining that "'[j]udgment' cannot be entered upon . . . 'elements' of the claims

upon which plaintiff moves for partial summary judgment," but that "[t]here may be parts of

claims, such as liability, upon which a motion for partial summary judgment may be granted").

Whether an alleged trade secret is not "generally known" or "readily ascertainable" is just one

portion of one element that a plaintiff must prove to prevail on a claim of trade secret

---

[4]      Presumably Zest is trying to work backwards from the information in Walmart's documents, get a ruling that such information is not generally known or readily ascertainable, and then assert that information as one of Plaintiffs' trade secrets.  But that is not how a trade secret proof works.  *See, e.g., M.C. Dean, Inc. v. City of Miami Beach*, 199 F. Supp. 3d 1349, 1357 (S.D. Fla. 2016) (dismissing claim under DTSA where plaintiff failed to plead facts establishing either existence of trade secret or misappropriation).

[5]      Zest has filed two motions for partial summary judgment seeking factual declarations rather than judgment on a claim or part of a claim:  the present motion and Zest's Motion for Partial Summary Judgment That Walmart Used and Disclosed Zest Labs' Information in the Walmart Applications (Dkt. 193).  So as to avoid the potential confusion associated with cross-referencing among briefs, Walmart has repeated overlapping responsive substantive points in its opposition briefs.

misappropriation, and a finding in Zest's favor on this single issue does not resolve a "part" of any claim, such as liability for trade secret misappropriation. Plaintiffs may not move for "partial" summary judgment on a portion of one <u>element</u> of the test for liability. *See, e.g., id.* ("While plaintiff's motion states that plaintiff is asking for partial summary judgment, the motion does not describe a claim or part of a claim upon which a 'judgment' may be entered," because "[j]udgment cannot be entered upon 'elements' of the claims . . . ."); *see also Powers v. Emcon Assocs., Inc.*, No. 14-cv-030060KMT, 2017 WL 4102752, at *2 (D. Colo. Sept. 14, 2017) ("This court, as well as others, have expressly found motions seeking to resolve only one issue relevant to a plaintiff's claims to be entirely inappropriate under any provision of Rule 56."); *HBC Ventures, LLC v. Holt MD Consulting, Inc.*, Nos. 5:06-CV-190-F, 5:07-CV-342-F, 2011 WL 13233177, at *13-14 (E.D.N.C. Apr. 15, 2011) (finding that a "request for judgment on 'issues'" relating to the termination of certain agreements was "an improper use of Rule 56"); *LM Ins. Corp. v. Associated Transp., Inc.*, No. CV409-042, 2010 WL 11537539, at *1-2 (S.D. Ga. Mar. 24, 2010) (dismissing summary judgment motions on a claim for breach of contract because even if granted, "a material issue of fact will remain as to whether the workers are independent contractors or employees," thus making it impossible for such motions to "be made pursuant to the Federal Rules of Civil Procedure and established caselaw"). Even if Zest's motion were granted in its entirety, judgment could not be entered in Zest's favor on either of Counts I or II of the Complaint, because there are still disputes as to multiple other elements of the test for misappropriation. It is therefore improper and should be denied on that basis alone.

6

### C.   Rule 56(g) Does Not Permit Summary Judgment on Discrete Factual Issues

Although Rule 56(g) permits a Court to enter an order "stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case," that provision does not authorize Zest's motion. Fed. R. Civ. P. 56(g). Relief under Rule 56(g) is only available where a proper Rule 56(a) motion seeking dispositive judgment has been filed. *Powers*, 2017 WL 4102752, at *2 (rejecting "a request for summary judgment on factual issues, rather than claims" because it was not supported by Rule 56(g)); *City of Wichita v. U.S. Gypsum Co.*, 828 F. Supp. 851, 869 (D. Kan. 1993) (finding that Rule 56(g) "does not authorize an independent motion to establish certain facts as true but merely serves to salvage some constructive result from the judicial effort expended in denying a proper summary judgment motion"), *aff'd in part, rev'd in part*, 72 F.3d 1491 (10th Cir. 1996); *Hawkinson v. Montoya*, No. CIVA04CV01271–EWNBNB, 2007 WL 776674, at *2 (D. Colo. March 12, 2007) ("[A] motion such as Plaintiff's, which seeks to resolve only specified issues relevant to his claims, is entirely inappropriate under *any provision* of Rule 56.").

Given that Zest has not moved for summary judgment on a claim or a part of a claim as required by Rule 56, Zest's motion should be dismissed in its entirety.

## II.   ZEST HAS NOT ESTABLISHED THAT ANY PORTIONS OF THE BOHLING APPLICATION ARE NOT GENERALLY KNOWN AND NOT READILY ASCERTAINABLE

Even if the Court were willing to consider issuing partial summary judgment that certain information in the Bohling Application was "not generally known and not readily ascertainable" at some unspecified time, the evidence Zest cites does not support such a determination.

7

**A.   The Portions of the Bohling Application on Which Judgment Is Sought**

Zest identifies three portions of the Bohling Application as the basis for its motion:

- Figure 3:  This is one of seven figures included in the Bohling Application and it depicts an algorithm for adjusting projected shelf-life for an item of produce.

*FIG. 3*

- Paragraphs 60-64:  These five paragraphs describe the algorithm of Figure 3, along with, for example, generally known information relating to a product's baseline shelf-life, machine learning, and feedback loops, as shown below.

[0060]  The weighting may be dynamic and may be based upon machine learning on a feedback loop. In the example of FIG. 3, a baseline "rule of thumb" may be obtained from industry sources on how particular products are impacted by a variety of factors and used to generate baseline models for each particular produce. An initial calculation (before machine learning) of days of life at market (shelf life) may be made for a product based on the corresponding baseline model.

[0061]  In the example of FIG. 3, actual data points for three lots of produce, such as strawberries for example, are input and calculated against the baseline model to generate freshness indicator values for each individual lot. The freshness indicator values for each lot are then used by shelf life predictor 244 to calculate a shelf life prediction for each lot. The system receives market feedback on the actual shelf life at market for each lot, which is used by machine learning component 256 to refine freshness model 266 of freshness indicator 236 and by machine learning component 264 to refine shelf life predictor 244.

[0062]  As seen in the sample data sets, Lot-1, Lot-2, and Lot-3 all have the same baseline shelf life projection (8 days), as each of these sample lots are for the same type or produce in this example. The data inputs for Lot-1 include a null input at a pre-inspection stage, which may be a pre-harvest data point for example. The null input may indicate that pre-harvest data is in alignment with ideal pre-harvest conditions, for example, which would not affect the baseline projection, and accordingly the output of 8 days

would remain consistent at that data point. A harvest data point input indicates there was rain present during harvest of Lot-1, and the system weights this data point at a −1, which adjust the baseline projection down to 7 days. A next data point may be from post-harvest data, such as data obtained during the packing/cooling facility stage, which may also be considered supply chain data in some examples. The data input for Lot-1 indicates this selection of produce was cooled properly, which does not affect the system weighting for that data point. Likewise, the subsequent data point from transportation data, which may also be considered supply chain data, indicates that temperature of the produce was properly maintained during transport, and the weighting is not affected by this data either. A condition data input, which may be considered inspection data, indicates a −1 score, which may be due to a detected or identified characteristic during inspection. Here, the −1-weighting applied adjusts the projection to 6 days for shelf life of this particular lot of produce. The transportation data, or supply chain data, obtained for the transport stage from a distribution center to market, and the inspection data obtained at an arrival stage of the product at market, both indicate conditions within parameters, or no weighting applied for Lot-1. Here, the predicted shelf life is calculated at 6 days, based on the factors considered and data obtained, and at market arrival the 6-day shelf life prediction is output by the system. At a final touch point at market, which may be a removal from shelf due to end of shelf life in some examples or an

additional inspection at market in other examples, a −1 weighting is applied, which may indicate a detected characteristic for Lot-1 that impacts predicted shelf life and updates the actual shelf life Lot-1 to 5 days. This market feedback is used as feedback to the system as actual shelf life at market being 5 days compared against the predicted 6 days, and is used to refine the system algorithms for future predictions.

[0063]  The additional data sets for Lot-2 and Lot-3 illustrate different data points or data inputs at various stages of the product life cycle which impact the calculated freshness indicator values and the shelf life prediction accordingly. As with Lot-1, the market feedback continues to refine the system and is used as a feedback loop for the machine learning components of the system.

[0064]  With multiple data points, the calculations/weighting can be triangulated and improved with additional feedback from the system. In addition, the feedback may be used to validate portions of the calculations while refining other portions of that calculations. For example, as shown in the data set of Lot-3, the algorithm is validated for pre-inspection (or pre-harvest) and harvest variable calculations used for Lot-1 and Lot-2, indicating that the weighting in Lot-1 and Lot-2 for distribution center (DC) condition/quality issues may be further refined. The algorithm may therefore increase the weighting for that input in the final calculation, improving the accuracy for the next lots of the same produce.

- "The systems and methods claimed in the Walmart Application": Zest does not define this term, but it appears to include the entirety of all pending claims:

| | | |
|---|---|---|
| 1. A computing system for dynamically generating product freshness indicators, the computing system comprising: a memory device storing computer-executable instructions for a freshness indicator; and a processor communicatively coupled to the memory device and configured to execute the computer-executable instructions for the freshness indicator to: obtain pre-harvest product-specific data associated with a product, the pre-harvest data comprising at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data; obtain harvest product-specific data associated with the product; obtain sensor data from one or more sensors associated with the product post-harvest; calculate a first set freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data; generate a shelf life prediction for the product based on the first set of freshness indicator values; obtain inspection data for the product from an inspection system; and generate a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values. <br> 2-3. (canceled) <br> 4. The computing system of claim 1, wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to determine at least one of the following based on the generated shelf life prediction: priority of placement of the product in inventory, selection of a distribution center for the product, transaction value of the product, inspection criteria for the product, and quality metrics associated with one or more suppliers of the product. <br> 5. (canceled) <br> 6. The computing system of claim 1, wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to: generate an updated shelf life prediction for the product based on the second set of freshness indicator values and the first set of freshness indicator values. <br> 7. The computing system of claim 1, wherein the processor is further configured to execute the computer-executable instructions to: obtain supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point; obtain additional inspection data associated with the final touch point; and generate a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values. | 8. The computing system of claim 7, wherein the processor is further configured to execute the computer-executable instructions to: generate an updated shelf life prediction for the product based on the third set of freshness indicator value and the second set of freshness indicator values. <br> 9. A computer-implemented method for generating product freshness indicators, the computer-implemented method comprising: obtaining pre-harvest product-specific data associated with a product, the pre-harvest data comprising at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data; obtaining harvest product-specific data associated with the product; obtaining sensor data from one or more sensors associated with the product post-harvest; calculating a first set of freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data; generating a shelf life prediction for the product based on the first set of freshness indicator values; obtaining inspection data for the product from an inspection system; and generating a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values. <br> 10-11. (canceled) <br> 12. The computer-implemented method of claim 9, wherein the generated shelf life prediction is used to determine at least one of: priority of placement of the product in inventory, selection of a distribution center for the product, transaction value of the product, inspection criteria for the product, and quality metrics associated with one or more suppliers of the product. <br> 13. (canceled) <br> 14. The computer-implemented method of claim 9, further comprising: obtaining supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point; obtaining additional inspection data associated with the final touch point; and generating a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values. | 15. One or more computer storage media having computer-executable instructions stored thereon for generating product freshness indicators, that upon execution by a processor, causes the processor to: obtain pre-harvest product-specific data associated with a product, the pre-harvest data comprising at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data; obtain harvest product-specific data associated with the product; obtain sensor data from one or more sensors associated with the product post-harvest; and generate a first set of freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data; generate a shelf life prediction for the product based on the first set of freshness indicator values; obtain inspection data for the product from an inspection system; and generate a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values. <br> 16-18. (canceled) <br> 19. The one or more computer storage devices of claim 15, that upon execution by the processor, causes the processor to: obtain supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point; obtain additional inspection data associated with the final touch point; and generate a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values. <br> 20. The computing system of claim 19, wherein the processor is further configured to execute the computer-executable instructions to: generate an updated shelf life prediction for the product based on the third set of freshness indicator values and the second set of freshness indicator values. |

## B.     The Scope of the Legal Terms "Not Generally Known" and "Not Readily Ascertainable"

"Not generally known" and "not readily ascertainable" are legal terms used in the ATSA and DTSA. Ark. Code Ann. §4-75-601(2); 18 U.S.C. §1839(5). "What constitutes information that is readily ascertainable through proper means is heavily fact specific." *Tryco, Inc. v. U.S. Med. Source, L.L.C.*, 80 Va. Cir. 619, 626 (Cir. Ct. 2010). "'The trier of fact, especially in very technical cases such as the present case, should be given the discretion to decide the difficult issue of whether information is generally known or readily ascertainable.'" *SL Montevideo Tech., Inc. v. Eaton Aero., LLC*, No. 03-3302 (RHK/FLN), 2005 WL 1923811, at *11 (D. Minn.

Aug. 11, 2005) (quoting *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 900 n.11 (Minn. 1983)). The Comments to the Uniform Trade Secrets Act state that "[i]nformation is readily ascertainable if it is available in trade journals, reference books, or published materials," and provide a list of proper means by which an alleged trade secret may be readily ascertainable:

1. Discovery by independent invention;

2. Discovery by "reverse engineering". . .;

3. Discovery under a license from the owner of the trade secret;

4. Observation of the item in public use or on public display; and

5. Obtaining the trade secret from published literature.[6]

Unif. Trade Secrets Act § 1 cmt. (Nat'l Conf. of Comm'rs on Unif. State Laws amended 1985). Zest does not analyze any of the foregoing factors, or provide any analysis whatsoever as to whether any particular information in the Bohling Application was "generally known or reasonably ascertainable" at any time.[7] Instead, Zest relies entirely on misquoting Dr. Hutt's expert report, and on misinterpreting the legal effect of standard inventor oaths.

### C.  Zest Has Not Established that Any Portion of the Bohling Application Meets the Definition of "Not Generally Known" and "Not Readily Ascertainable"

Zest cites to limited deposition testimony from Dr. Hutt and to the Bohling Application inventors' oaths, then unjustifiably asks the Court to conclude that the cited portions of the

---

[6]       Of note, Walmart's expert Dr. Hutt has provided an expert report detailing how the alleged trade secrets could be obtained from published literature. (Dkt. 199, Ex. A, at 65-215.)

[7]       Mr. Lanning equated "███████████████" to ███████████ " citing *Vigoro Indus. v. Crisp*, 82 F.3d 785 (8th Cir. 1996). (Omnibus Ex. No. 26, ¶ 125; *see also id.*, ¶ 23.) To the extent Zest is using the same definition here, *Vigoro* does not support that reading. While the court in that case noted that the particular alleged trade secrets at issue "could be easily discovered," the court never identified "easily discoverable" as the standard for evaluating "readily ascertainable." *Id.* at 790. On the contrary, the court noted that "[t]he issue is fact intensive." *Id.* Other courts have interpreted "readily ascertainable" to mean, for example, "'capable of being acquired by competitors or the general public without undue difficulty or hardship.'" *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 626 (E.D. Mich. 2005) (quoting *Kubik, Inc. v. Hull*, 224 N.W.2d 80, 87 (Mich. Ct. App. 1974)).

Bohling Application must therefore meet the definitions of "not generally known" and "not readily ascertainable" as a matter of law.  These conclusions are stated as fact in the "Statement of Undisputed Material Facts" section in Zest's brief (Pl. Br. at 3-6) as well as in Zest's co-filed Statement of Material Facts on Which There is No Genuine Dispute (Dkt. 207).  Dr. Hutt did not testify that the particular portions of the Bohling Application on which Zest seeks judgment were "not generally known and readily ascertainable," and the inventors likewise have said nothing about those portions of the Bohling Application, in either deposition testimony or in the inventor declarations.

### 1.   Dr. Hutt Does Not Opine that the Cited Portions of the Bohling Application Are Not Generally Known or Readily Ascertainable

Dr. Hutt opines that " ███████████████████████████████████████████ ██████████████████ " which she identifies as an inventive contribution from the inventors.  (Dkt. 199, Ex. A, ¶¶ 157-58.)  She states that that unique calculation is " ██████████ " (but is not the entirety of) " ████████████████████████████████████ ██████████████████ " (*Id.*, ¶ 158.)  Dr. Hutt further explains that this particular calculation is unique and was independently developed by Walmart in ¶ 196 of her report:



(*Id.*, ¶ 196; *see also id.,* ¶ 352.)  Thus, Dr. Hutt has opined that the ███████████ is using eight particular factors, each of which may result in the subtraction of a complete day from the baseline shelf-life.  Notably, this is a very different calculation format than that used by Zest. (*Id.*, ¶ 353; Omnibus Ex. No. 57 at 210:19-212:12.)

Accordingly, Dr. Hutt's opinion is, at most, that **the unique calculation** reflected in Figure 3, paragraphs 60-64, and the ██████████ identified in each claim of the Bohling Application was not generally known before the named inventors came up with it and disclosed it in the Bohling Application.  Indeed, even the cited testimony in Zest's brief makes clear that Dr. Hutt's opinion was confined to the ██████████ disclosed in the Bohling Application, as opposed to the entirety of Figure 3, the entirety of paragraphs 60-64, and every ██████████ ██████ claimed in the Bohling Application:



(Omnibus Ex. No. 57 at 27:6-20.)  When prodded to expand her opinion beyond the unique calculation reflected in Figure 3, Dr. Hutt repeatedly emphasized the narrowness of her opinion:



(*Id.* at 29:15-30:16.)



(*Id.* at 36:23-38:16.)



(*Id.* at 48:19-50:10.)



(*Id.* at 161:12-162:11.)  Accordingly, Dr. Hutt's opinion on the uniqueness of the calculation

reflected in Figure 3 is very narrow—and certainly does not give rise to the expansive legal

conclusion, as sought in Zest's motion, that the entirety of "Figure 3, paragraphs 60-64, and the

systems and methods claimed in the [Bohling] Application were not generally known or readily

ascertainable."[8]  (Pl. Br. at 1.)  Moreover, Dr. Hutt's opinion never mentions "the systems and methods claimed in the Walmart Application."  While Dr. Hutt states that the unique calculation of the Bohling Application is reflected in three locations—"███████████████████████████

██████████████████████████████████" (Dkt. 199, Ex. A, ¶ 158)—she never expands her opinion to "the systems and methods claimed in the [Bohling] Application."

Though Dr. Hutt offered no opinion in her report on whether the unique calculation of Figure 3 was "readily ascertainable," she was questioned on that issue during her deposition.  As cited in Zest's brief, Dr. Hutt was asked the following objected-to questions about whether various aspects of the Bohling Application were "readily ascertainable":



---

[8]      Nor have Plaintiffs ever before taken the position that the portions of the Bohling Application that are the basis of Zest's motion—Figure 3, paragraphs 60-64, and all "the systems and methods claimed in the Walmart Application" (Pl. Br. at 1)—are not generally known or readily ascertainable.  Plaintiffs did not specifically identify the cited portions of the Bohling Application as trade secrets in any of its responses to Interrogatory 1.  (Omnibus Ex. No. 33 at 8-61.)  Mr. Lanning likewise offered no allegations regarding Figure 3, (*compare* Omnibus Ex. No. 26, ¶ 476 *with id.,* ¶¶ 477-78; *see also* Dkt. 199, Ex. A, ¶ 353), and only argues that paragraphs 60-64 used—but do not "disclose"—Zest Confidential Information.  (Omnibus Ex. No. 26, ¶¶ 478, 484, 488, 496-97, 500.)

(Omnibus Ex. No. 57 at 28:13-19; 39:18-24.)  As is apparent from the transcript, Dr. Hutt was

questioned on the narrow topic of whether the unique "algorithm disclosed in Figure 3 and

paragraphs 60 through 64," and how that algorithm was reflected in the patent application

claims, was "readily ascertainable."  To the extent that Dr. Hutt's responses to these two yes/no

questions are a sufficient basis to attribute a new opinion to her,[9] that opinion is limited to the

unique calculation.  Any attempt to apply these answers to the entirety of Figure 3, the entirety of

paragraphs 60-64, and every "system and method" claimed in the Application is beyond the

scope of any testimony or opinions from Dr. Hutt.

### 2. The Inventors of the Bohling Application Never Stated That Any of Its Portions Are Not Generally Known or Readily Ascertainable

Likewise, the inventors of the Bohling Application have never represented that Figure 3,

paragraphs 60-64, and all "the systems and methods claimed in the Walmart Application," (Pl.

Br. at 1), are not "generally known" or "readily ascertainable."  The inventors each signed an

oath swearing to his own belief that he is an original joint inventor of a claimed invention in the

Bohling Application.  (*See* Pl. Br. at 2 (Fact 1.f.(2)); Omnibus Ex. No. 25, ¶ 42.)  But the

inventors did not specify in that oath what they believe the novel aspect of their invention to be.

(Zest Ex. D.)[10]  Nor did Plaintiffs' counsel ever ask Mr. Bohling—over the course of two days of

deposition—what he believed the novel element of his invention to be.  Because a patentable

invention need only have one inventive element, and may even consist of a combination of old

elements, no inferences about what specific aspect of the application the inventors believe to be

---

[9]      Ironically, in their co-filed Brief in Support of Plaintiffs' Motion to Exclude the Testimony of Walmart's Expert Witness Dr. Catherine Adams Hutt (Dkt. 199), Plaintiffs argued that any opinions provided by Dr. Hutt outside the four corners of her expert report, including any opinions given in her deposition, should be excluded. (Dkt. 200 at 19-23.)

[10]      Cites to "Zest Ex. __" in this brief refer to Zest's Exhibits to their Motion for Partial Summary Judgment That Information in Walmart's Patent Application was Not Generally Known or Readily Ascertainable (Dkt. 201).

new can be gleaned from the oath. *B-K Lighting, Inc. v. Vision3 Lighting,* No. CV 06-02825MMM(PLAx), 2008 WL 4811176, at *19 (C.D. Cal. Mar. 13, 2008) ("Thus, it was error for the district court to conclude that the means limitations for the aerating system could only cover new elements of the preferred embodiment." (quoting *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.,* 206 F.3d 1440, 1446 (Fed. Cir. 2000)); *see also id.* ("[T]he general rule is 'that combination claims can consist of combinations of old elements as well as new elements'"). And certainly, the inventors never provided information on what they believe to be "generally known" or "readily ascertainable."[11] But even if Mr. Bohling and his fellow inventors had sworn to their belief that Figure 3, paragraphs 60-64, and the systems and methods claimed in the application were not generally known or readily ascertainable, that would still not be sufficient evidence to find, as a matter of law, that such belief is true. If it were, there would be no need for the U.S. Patent Office to review applications.

### D.    Issues of Material Fact Preclude Summary Judgment

There are multiple genuine issues of material fact that preclude the relief sought by Zest's motion. As an initial matter, the experts cannot even agree on what information is contained in Figure 3 (and paragraphs 62-63) of the Bohling Application. Additionally, Zest broadly seeks an order that entire sections of the Bohling Application were not generally available and not readily

---

[11]    Walmart's patent expert Stephen Kunin pointed out in his report that the inventors' oaths include no representation about the state of the art:

> 84.    First, as noted above, and as evidenced by the quotation in paragraph 47 of Mr. Dickinson's report, the oath or declaration that was submitted in connection with the '974 Application includes no sworn statement regarding what was or was not known or in the public domain at the time the oath or declaration was executed. *See also* MPEP § 602.01(a). Signing the oath or declaration is only an acknowledgement that applicants have a duty to disclose material information that is known to them at that time. There is no requirement that the applicants perform a prior art search, or make any representations regarding the state of the prior art. *See* 37 C.F.R. §§ 1.97(g) and (h).

(Zest Ex. E, ¶ 84.) Plaintiffs' expert Q. Todd Dickinson conceded as much in his deposition. (Omnibus Ex. No. 54 at 97:19-98:12.)

ascertainable—but for each such section, Dr. Hutt has offered testimony that at least parts of that section were indeed publicly available.

> **1.      There is a Genuine Issue of Material Fact as to the Information Disclosed in Figure 3 and Paragraphs 62-63**

Figure 3 of the Bohling Application is as follows:

*FIG. 3*

| Lot 1 | Lot 2 | Lot 3 |
|---|---|---|
| 8 days baseline = 8 | 8 days baseline = 8 | 8 days baseline = 8 |
| -0 Pre-inspection OK = 8 | -1 Pre-inspection bad = 7 | -1 Pre-inspection bad = 7 |
| -1 Raining at harvest = 7 | -0 Clear skies at harvest = 7 | -1 Raining at harvest = 6 |
| -0 Cooled properly = 7 | -0 Cooled properly = 7 | -0 Cooled properly = 6 |
| -0 Transit temp OK = 7 | -0 Transit temp OK = 7 | -0 Transit temp OK = 6 |
| -1 cond. Issues @dc = 6 | -1 cond. @dc bad = 6 | -0 Quality @dc OK = 6 |
| -0 Transit to market OK = 6 | -0 Transit to market OK = 6 | -0 Transit to market OK = 6 |
| -0 Quality @market OK = 6 | -0 Quality @market OK = 6 | -0 Quality @market OK = 6 |
| -1 Quality at last touch = 5 | -1 Quality at last touch = 5 | -0 Quality at last touch = 6 |
| Initially 6 projected days, market feedback is only 5 days remain, algorithm needs refined accordingly. | Initially 6 projected days, market feedback is only 5 days remain, algorithm needs refined accordingly. | Initially 6 projected days, market feedback is 6 days remain, algorithm validated for pre-inspection & harvest. |

(Omnibus Ex. No. 29, Fig. 3 (emphasis added).)  The Bohling Application describes what is depicted in Figure 3 as: "actual data points for three **lots** of produce, such as strawberries for example, are input and calculated against the baseline model to generate freshness indicator values for each individual **lot**." (*Id.*, ¶ 61 (emphasis added).)  As explained by Dr. Hutt, ██████

████████████████████████████████████████████████████

███████████████████ (Dkt. 199, Ex. A, ¶ 262.)

Mr. Lanning takes the position that, though Figure 3 and paragraphs 62-63 explicitly refer to "lots," such language actually refers to ███████ which are individual shipping units (and happen to be a particular focus of the Zest Fresh product):



(Omnibus Ex. No. 26, ¶ 487.) Dr. Hutt disagrees, and opines that "lot" as used in Figure 3 and

paragraphs 62-63 refers to                                                   and that it cannot refer

to a        given the context provided in Figure 3 and paragraphs 62-63:



(Dkt. 199, Ex. A, ¶ 357.)

Given that the experts cannot even agree on what information is contained in Figure 3

and paragraphs 62-63—especially when Plaintiffs' expert is advocating an unconventional

reading—it is premature for Zest to seek summary judgment that such disputed information is

"not generally known" and "not readily ascertainable" as a matter of law. *See, e.g., B-K*

*Lighting, Inc. v. Fresno Valves & Castings, Inc.*, 375 F. App'x 28, 32 (Fed. Cir. 2010)

19

("[C]onflict in expert declarations . . . created a genuine issue of material fact that made summary judgment inappropriate."). It is black-letter law that summary judgment shall only be granted if "there is no genuine dispute as to any material fact," and that is not the case here. Fed. R. Civ. P. 56(a).

> **2.  There is a Genuine Issue as to Whether Portions of Figure 3, Paragraphs 60-64, and the Systems and Methods Claimed in The Bohling Application Were Not Generally Known or Readily Ascertainable**

In her report, Dr. Hutt rebutted Mr. Lanning's opinions that Walmart used or disclosed alleged Zest Confidential Information, including by opining that such information was already publicly available. (Dkt. 199, Ex. A, at pp. 65-215.)  In her report and at her deposition, Dr. Hutt explained that aspects of Figure 3, paragraphs 60-64, and the systems and methods claimed in the Bohling Application were publicly available.  For example, Dr. Hutt testified that, '█

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████' (Omnibus Ex. No. 57 at pp. 161:12-162:11.)  Likewise, Dr. Hutt opined that *each of* paragraph 60, paragraph 61, paragraph 62, paragraph 63, and paragraph 64 disclosed information that was available in public sources. (Dkt. 199, Ex. A, ¶¶ 355, 356, 358, 360-62 (each citing earlier paragraphs); *see also* Omnibus Ex. No. 57 at 29:6-14; 48:19-50:10.)  Finally, Dr. Hutt explained at length her opinion that various aspects of the Bohling Application's claims include information that is publicly available. (Dkt. 199, Ex. A, ¶¶ 164-222; *see also* Omnibus Ex. No. 57 at 29:15-30:16; 36:23-38:16; 38:25-39:9.)  Given Zest's broad request that the Court determine as a matter of law that *__all__* of Figure 3, paragraphs 60-64, and the systems and methods claimed in the Bohling Application were not generally known or readily ascertainable, Dr. Hutt's

contradictory opinions on aspects of those sections of the application preclude the relief sought,

and are alone reason enough to deny Zest's motion.

## III.   CONCLUSION

Zest has moved for partial summary judgment on an issue that is not a part of or

dispositive of any claim in this case, and thus is inappropriate for summary judgment. Moreover,

the evidence that Zest cites fails to establish that Figure 3, paragraphs 60-64, and the systems and

methods claimed in the Bohling Application were not generally known or readily ascertainable,

and instead reveals disputes on material facts. Accordingly, Zest's motion should be denied.


Dated:  March 20, 2020

P. Anthony Sammi (*Pro Hac Vice*)
Douglas R. Nemec (*Pro Hac Vice*)
Edward L. Tulin (*Pro Hac Vice*)
Rachel R. Blitzer (*Pro Hac Vice*)
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-2419
Facsimile: (917) 777-2419
anthony.sammi@skadden.com
douglas.nemec@skadden.com
edward.tulin@skadden.com
rachel.blitzer@skadden.com

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
jtull@qgtlaw.com
ryounger@qgtlaw.com

By: _____
    John E. Tull III (84150)
    R. Ryan Younger (2008209)

*Attorneys for Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc.*

21

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March 2020, I served a true and correct copy of the foregoing, *via* electronic mail and U.S. mail, upon the following counsel of record:

Dustin B. McDaniel
Scott Richardson
Bart Calhoun
McDaniel, Richardson & Calhoun PLLC
1020 West 4th Street, Suite 410
Little Rock, Arkansas 72201
dmcdaniel@mrcfirm.com
scott@mrcfirm.com
bcalhoun@mrcfirm.com

Fred I. Williams
Michael Simons
Todd E. Landis
Jonathan L. Hardt
Williams Simons & Landis PLLC
327 Congress Avenue, Suite 490
Austin, Texas 78701
fwilliams@wsltrial.com
msimons@wsltrial.com
tlandis@wsltrial.com
jhardt@wsltrial.com

Ross David Carmel
Carmel, Milazzo & DiChiara LLP
55 West 39th Street, 18th Floor
New York, New York 10018
rcarmel@cmdllp.com