PUBLIC VERSION

███████████████████████████

FILED
U. S. DISTRICT COURT
ASTERN DISTRICT ARKANSAS

FEB 2 8 2020

JAMES W. McCORMACK, CLERK
By:_____
                              DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| ZEST LABS, INC. f/k/a INTELLEFLEX CORPORATION; and ECOARK HOLDINGS, INC. | § § § § | **FILED UNDER SEAL** |
| Plaintiffs, | § § | |
| v. | § § § | Civil Action No. 4:18-cv-500-JM |
| WALMART INC. f/k/a WAL-MART STORES, INC. | § § § | JURY TRIAL DEMANDED |
| Defendant. | § § | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY
OF WALMART'S EXPERT WITNESS, DR. CATHERINE ADAMS HUTT**

## TABLE OF CONTENTS

I.     **INTRODUCTION**.................................................................................................1

II.    **ARGUMENT** ......................................................................................................2

    A.    *Dr. Hutt's Expert Option Should Be Excluded For Failure To Apply The Legal Standards Under The ATSA And DTSA* ...............................2

        1.    Federal Rule of Evidence 702 and *Daubert* Require the Exclusion or a Limitation to Dr. Hutt's Testimony. ...................................2

        2.    Dr. Hutt Fails to Apply The Proper Definition For "Misappropriation" Under the DTSA and ATSA....................................3

            a)    Both the DTSA and ATSA Define Misappropriation as "Disclosure or Use." ......................................................4

            b)    Dr. Hutt Ignores Walmart's Disclosure of Zest's Confidential Information ..........................................5

        3.    Dr. Hutt Fails to Properly Apply the Law on "Use."...............7

    B.    *Dr. Hutt Should be Precluded from Offering an Opinion on System Architecture.* ...........................................................................10

        1.    Trial Courts Must Limit Expert Testimony to the Areas in Which the Expert is Qualified. ..............................................10

        2.    Dr. Hutt Cannot Provide A Reliable Opinion on System Architecture Because She Is Not A System Architecture Expert. ..........11

        3.    Dr. Hutt Has Not Disclosed Any Reliable Opinion Regarding System Architecture..............................................................16

    C.    *Dr. Hutt's Expert Opinion Should be Limited to the Opinions Actually Set Forth In Her Report* ......................................................19

        1.    District Courts Routinely Limit Expert Testimony At Trial To The Opinions Properly Disclosed In The Expert Report. ...........................19

        2.    Dr. Hutt Openly Admits That She Intends To Conduct Additional Review And Use At Trial Any Number Of References As Undisclosed Bases For Her Current Conclusions ..................................20

III.    **CONCLUSION** ...............................................................................................24

PUBLIC VERSION

# TABLE OF AUTHORITIES

## Cases

*Am. Med. Sys. v. Laser Peripherals, LLC*,
  712 F. Supp. 2d 885 (D. Minn. 2010)...................................................................... 3

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*,
  829 F. Supp. 2d 802 (D. Minn. 2011)...................................................................... 2

*Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*,
  584 F.2d 946 (10th Cir. 1978) ................................................................................ 9

*Bonner v. ISP Techs., Inc.*,
  259 F.3d 924 (8th Cir. 2001) .................................................................................. 3

*Braun v. Menard Inc.*,
  No. 4:11-cv-051, 2013 WL 123712 (D.N.D. Jan. 9, 2013) .................................... 19

*Carlson v. C.H. Robinson WW, Inc.*,
  2005 U.S. Dist. LEXIS 5677, 2005 WL 758601 (D. Minn. Mar. 30, 2005) ............................ 3

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993), 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ..................................... *passim*

*Falcone v. Union Pac. R.R. Co.*,
  No. 4:14-cv-573 JM, 2016 U.S. Dist. LEXIS 156609 (E.D. Ark. Feb. 24, 2016).................... 2

*Fu v. Owens*,
  622 F.3d 880 (8th Cir. 2010) .................................................................................. 19

*Glastetter v. Novartis Pharms. Corp.*,
  252 F.3d 986 (8th Cir. 2001) .................................................................................. 2

*Goodman v. Harris County*,
  571 F.3d 388 (5th Cir. 2009) .................................................................................. 11

*Hebert v. Lisle Corp.*,
  99 F.3d 1109  (Fed. Cir. 1996). .............................................................................. 3

*Honey-Love v. United States*,
  664 F. App'x 358 (5th Cir. 2016) ........................................................................... 19

*In re Innovative Constr. Sys., Inc.*,
  793 F.2d 875 (7th Cir. 1986) .................................................................................. 9

*In re M&M Wireline & Offshore Servs., LLC*,
  2016 U.S. Dist. LEXIS 120542 (E.D. La. Sep. 7, 2016) ........................................ 11

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) .................................................................................. 9

*Lauzon v. Senco Prods., Inc.*,
  270 F.3d 681 (8th Cir. 2001) ............................................................................ 2, 16

*Mangren Research & Dev. Corp. v. National Chem. Co.*,
   87 F.3d 937 (7th Cir. 1996) ............................................................................................ 8

*National Union Fire Ins. Co. v. Midwestern General Brokerage, Inc.*,
   No. 06-0782-CV-W-NKL, 2007 WL 1529011 (W.D. Mo. May 23, 2007) ........................... 19

*Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*,
   Case No. 6:12-cv-33-Orl-28DAB, Dkt. 328 at 19 (M.D. Fla. Jan. 4, 2013) ........................ 3

*Paris v. Union Pac. R.R. Co.*,
   No. 4:04-cv-0656-JLH, 2006 U.S. Dist. LEXIS 97190 (E.D. Ark. Aug. 11, 2006) ............... 16

*Ridgeway v. Wal-Mart Stores, Inc, et al*,
   No. 3:08-cv-05221 (N.D. Cal.), Dkt. No. 324) ................................................................ 20

*Salgado v. General Motors Corp.*,
   150 F.3d 735 (7th Cir. 1998) ........................................................................................ 19

*Smith v. Conair Corp.*,
   2005 U.S. Dist. LEXIS 40803, No. 8:03CV277, 2005 WL 2488441 (D. Neb. Oct 7, 2005)... 10

*Sw. Energy Co. v. Eickenhorst*,
   955 F. Supp. 1078 (W.D. Ark. 1997) .............................................................................. 4

*Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*,
   47 F.3d 277 (8th Cir. 1995) .......................................................................................... 19

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*,
   No. 15-CV-211 (LGS) (RLE), 2016 WL 5338550 (S.D.N.Y. Sep. 23, 2016) ................. 4, 5

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*,
   No. 5:14-cv-5262, 2018 WL 1597976 (W.D. Ark., Mar. 31, 2018) ..................................... 4

*Waymo LLC v. Uber Techs., Inc.*,
   No. C 17-00939 WHA, 2018 WL 466510 (N.D. Cal. Jan. 18, 2018) ................................. 9

*Williams v. Jackson*,
   No. 2:07-cv-00110-JTK, 2011 U.S. Dist. LEXIS 32569 (E.D. Ark. Mar. 14, 2011) ............. 18

**Statutes**

Arkansas Trade Secrets Act (A.C.A. §4-75-601) .............................................................. passim

Fed. R. Civ. P. 26 ............................................................................................ 19, 23, 24

Fed. R. Civ. P. 37(c) ...................................................................................... 19, 20, 23

Fed. R. Evid. 702 ............................................................................................... passim

Federal Defend Trade Secrets Act (18 U.S.C. § 1839) .......................................................... passim

Fed. R. Evid. 703 ............................................................................................... passim

PUBLIC VERSION

## I.    INTRODUCTION

Walmart served the report of Dr. Catherine Adams Hutt on November 27, 2019.  Dr. Hutt's

Report states that she was retained by Walmart to respond to the expert report of Plaintiffs' experts

Mark Lanning and Dr. Diane Beckles.  *See* Ex. A, Excerpts of the Nov. 27, 2019 Expert Report of

Dr. Catherine Adams Hutt (hereafter, "Hutt Report") at 1.  Dr. Hutt's report includes

- more than 300 pages including exhibits;

- 29 pages of "Materials Considered" outlining more than 100 documents, articles, and whitepapers;

- 131 pages disclosing her opinions as to whether Walmart's U.S. Patent Application Publication No. 2019/0137396 A1 ("Walmart Application") discloses Zest Confidential Information; and

- sections disclosing her opinions on Walmart's alleged "use" of Zest Confidential Information.

This motion asks the Court to exclude portions of Dr. Hutt's expert testimony under Federal

Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), on four

grounds:

- (1)    Dr. Hutt failed to apply the correct definition of "misappropriation" as defined by the Federal Defend Trade Secrets Act (18 U.S.C. § 1839, et seq.) ("DTSA") and the Arkansas Trade Secrets Act (A.C.A. §4-75-601, et seq.) ("ATSA");

- (2)    Dr. Hutt failed to apply the correct law on "use" of a trade secret;

- (3)    Dr. Hutt's opinions relating to system architecture are unqualified, unreliable, and unsupported;

1

(4)     At her deposition, Dr. Hutt impermissibly attempted to expand her opinions

beyond those disclosed in her expert report.

## II.   ARGUMENT

### A.   *Dr. Hutt's Expert Opinion Should Be Excluded For Failure To Apply The Legal Standards Under The ATSA and DTSA.*

#### 1.   Federal Rule of Evidence 702 and *Daubert* Require the Exclusion or a Limitation to Dr. Hutt's Testimony.

The Court serves an important "gatekeeping" function in determining, prior to accepting

the testimony of an expert witness, whether the expert's opinion is both relevant and reliable.  *See*

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90, 113 S. Ct. 2786, 125 L. Ed. 2d 469

(1993); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 820 (D. Minn.

2011).  As this Court has noted, "the district court's gatekeeping role separates expert opinion

evidence based on 'good grounds' from subjective speculation that masquerades as scientific

knowledge." *Falcone v. Union Pac. R.R. Co.*, No. 4:14-cv-573 JM, 2016 U.S. Dist. LEXIS

156609, at *4-6 (E.D. Ark. Feb. 24, 2016) (*quoting Glastetter v. Novartis Pharms. Corp.*, 252 F.3d

986, 988-89 (8th Cir. 2001)).

Federal Rule of Evidence 702 governs the admission of expert testimony and dictates that

an expert may only testify if (1) her scientific, technical, or other specialized knowledge will help

the fact-finder to understand the evidence or determine a fact in issue; (2) the testimony is based

on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and

(4) the expert has reliably applied those principles and methods to the facts of the case.  *See Lauzon*

*v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001); *see also* Fed. R. Evid. 702.

When examining an expert opinion under *Daubert* and Rule 702, the courts apply a general

rule that "the factual basis of an expert opinion goes to the credibility of the testimony, not the

2

PUBLIC VERSION

admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation and quotation omitted). But "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," then the opinion must be excluded. *Id.* at 930.

This gatekeeping function applies not only to expert opinions lacking reliable scientific methodology, but also to opinions that are premised on incorrect legal standards. *See e.g.,* (Ex. C) *Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, Case No. 6:12-cv-33-Orl-28DAB, Dkt. 328 at 19, 22–23 (M.D. Fla. Jan. 4, 2013) (holding that, where an expert's opinions are based on application of an incorrect legal test, those opinions "are not appropriate and must be excluded."); *Am. Med. Sys. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 901 (D. Minn. 2010) (finding expert opinion inadmissible when based on incorrect legal standards); *Carlson v. C.H. Robinson WW, Inc.*, 2005 U.S. Dist. LEXIS 5677, 2005 WL 758601, at *4 (D. Minn. Mar. 30, 2005) (striking expert opinion that relied on incorrect, more stringent standard than applicable one, because the mistake "renders her conclusions unreliable"). As the Federal Circuit has stated, "[i]ncorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1115-17 (Fed. Cir. 1996).

 2. ***Dr. Hutt Fails To Apply The Proper Definition For "Misappropriation" Under the DTSA and ATSA.***

Dr. Hutt's report states



Exhibit A Hutt Report at ¶23.

3

███████████████████████████████

That is the wrong legal standard for assessing trade secret misappropriation under both the DTSA and ATSA.  Dr. Hutt considers only whether ████████████████████████ She fails to consider Walmart's <u>disclosure</u> of Zest Confidential Information under the DTSA and ATSA.

> a)     **Both The DTSA And ATSA Define Misappropriation As "Disclosure or Use."**

The DTSA is found in 18 U.S.C. § 1839, et seq.   The DTSA defines the term "misappropriation" in 18 U.S.C. §1839(5):

> (5) the term "misappropriation" means—
>> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>> (B) ***disclosure or use*** of a trade secret of another without express or implied consent by a person who . . . .
>
> *Id.* (emphasis added).

The ATSA is found at A.C.A. §4-75-601, et seq.   The ATSA similarly defines "misappropriation" as including either the "[d]isclosure or use" of the trade secret:

> (2) "Misappropriation" means:
>
> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) ***Disclosure or use*** of a trade secret of another without express or implied consent by a person who . . . .
>
> A.C.A. §4-75-601(2)

The "disclosure or use" language in both statutes must be addressed to determine whether "misappropriation" has occurred in this case.  It is well-settled that "'the statute separates 'use' from 'disclosure' and either or both may support an action.'" *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 5:14-cv-5262, 2018 WL 1597976 at *7 (W.D. Ark., Mar. 31, 2018) (quoting *Sw. Energy Co. v. Eickenhorst*, 955 F. Supp. 1078, 1084 (W.D. Ark. 1997)); *see also Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15-CV-211 (LGS) (RLE), 2016 WL 5338550

4

███████████████████████████████████████

at *20 (S.D.N.Y. Sep. 23, 2016) ("The plain language of the Act defines misappropriation to include 'disclosure **_or use_** of a trade secret without the consent of another.'") (emphasis in original).

          **b)**      **Dr. Hutt Ignores Walmart's Disclosure Of Zest's Confidential Information.**

Dr. Hutt's report and testimony demonstrate that she limits her opinions to <u>use</u> of Zest's Confidential Information and fails to analyze the disclosure prong of the ATSA and DTSA.  Dr. Hutt's report states that she understands that ███████████████████ requires that ████ ███████████████████████████  *See* Exhibit A, Hutt Report at ¶23 (emphasis added).  During her deposition, Dr. Hutt confirmed that she has applied a standard for misappropriation that does not acknowledge the disclosure prong of the DTSA and ATSA.  For example, she testified that, because the statutes are written with the phrasing "disclosure or use," she thinks she was free to base her opinion on only one of those prongs (and she chose "use"):

PUBLIC VERSION



Exhibit B, Hutt Tr. at 121-124.

In fact, Dr. Hutt's testimony confirms that she ignored the disclosure prong of the test for

misappropriation, and instead relied on her evaluation of whether ██████████████████████

████████ as her only ████████████ test for misappropriation:

PUBLIC VERSION



Exhibit B, Hutt Tr. at 117:19-25.

Dr. Hutt's opinions apply only her "use" threshold. Her opinions on misappropriation therefore only assess whether Walmart has <u>used</u> Zest Confidential Information. For example, she titles Section XI of her report, ███████████████████████████████████████████ ████████████████ Exhibit A, Hutt Report at 200 (emphasis added). She then provides an analysis that is limited to opining on whether Walmart used Zest Confidential Information in developing the Eden system. *See* Exhibit A, at 200-210. Indeed, all of her subheadings in that section are directed solely to ██████

████████████████████████████████████████████████████
██████
████████████████████████████████████████████████████
██████
████████████████████████████████████████████████████
██████████ (Exhibit A, at 208.) (emphasis added).

Given her failure to analyze the disclosure prong of misappropriation, Dr. Hutt should be precluded from offering any opinions to the jury about whether Walmart <u>disclosed</u> Zest Confidential Information.

### 3. *Dr. Hutt Fails to Properly Apply the Law on "Use."*

Dr. Hutt's definition of "use" is limited to █████████████████████████ Two examples in her report illustrate this point. In ¶ 172, she states,

PUBLIC VERSION



Exhibit A at ¶ 172.  In this example, Dr. Hutt finds no "use" by Walmart because the exact terminology of the Walmart Application does not appear verbatim in a particular Zest document.

The other example appears in ¶390 of the report:



Exhibit A at ¶ 390.  In this example, Dr. Hutt finds no "use" because Zest Confidential Information was purportedly not deployed in two Walmart applications.

Those opinions fail to apply the correct test for misappropriation and "use" under trade secret law.  Under the law, Walmart's misappropriation and disclosure of the trade secrets can take many forms besides being copied verbatim or inserted into a deployed product.

For example, one form of trade secret misappropriation is creating a new product that could not have been done without using the trade secret.  *See Mangren Research & Dev. Corp. v. National Chem. Co.*, 87 F.3d 937, 944 (7th Cir. 1996) (holding that defendants "misappropriated Mangren's trade secrets even if defendants created a new product if defendants could not have done so without use of Mangren's trade secret").  Another form of trade secret misappropriation

8

PUBLIC VERSION

is using the trade secrets as a helpful starting point for developing the processes implemented in the defendant's system. *See Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d 946 (10th Cir. 1978) ("Based on the evidence, a jury could reasonably infer that [the trade secret] was helpful to Smalling as a starting point for his calculations . . . . If nothing else, a jury could find that Smalling did not have to experiment with the broad range of disclosed coefficients to determine the proper starting point.").

Another form of trade secret misappropriation is applying the lessons learned from the trade secrets in developing the defendant's product or system. *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2018 WL 466510, at *10 (N.D. Cal. Jan. 18, 2018) ("Of course, a defendant need not copy the underlying technology to use the misappropriated trade secret. For example, a defendant might use a negative know-how trade secret by taking its lesson to avoid developing apparently fruitless technology. Such theories, however, remain grounded in defendants' alleged use of trade secrets . . . ."); *see also Lamb-Weston, Inc. v. McCain Foods*, *Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained.").

Walmart's attempt to have its experts to opine that there was no misappropriation of trade secrets—merely because they opine that there has been no verbatim copying or insertion into limited parts of the defendant's deployed system—is an incorrect and impermissibly inflexible interpretation of the law. *See In re Innovative Constr. Sys., Inc*., 793 F.2d 875, 887 (7th Cir. 1986) ("Were the law of trade secrets not flexible enough to reach the modifications in the instant case, when it is evident that the formulas were substantially derived from Innovative's, it would indeed

9



be hollow.").  Dr. Hutt's opinions on use of the Zest Confidential Information should therefore be excluded from the trial.

> **B.    Dr. Hutt Should Be Precluded From Offering An Opinion On System Architecture.**

Although Walmart served a separate report by Dr. David P. Dobkin to provide expert

██████████████████████████████████████████████████████████████

████████████████ it also appears that Dr. Hutt intends to offer an opinion at trial regarding the system architecture of Zest and/or Walmart.  *See, e.g.*, Exhibit A, at ¶306 (██████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████).  Dr. Hutt's opinions regarding system architecture should be excluded from the trial because she has no expertise in system architecture and, even if she did, she has not reviewed or relied on any documents or information regarding system architecture that could provide a reliable basis for those opinions in this case.

> **1.    Trial Courts Must Limit Expert Testimony To The Areas In Which The Expert Is Qualified.**

In assessing F.R.E. 702, the Supreme Court in *Daubert* noted that the rule does not include the ordinary requirement that witnesses have personal knowledge of the facts, based on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline."  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  It follows that expert testimony must be limited to the areas in which the expert possesses actual expertise.  *Smith v. Conair Corp.*, 2005 U.S. Dist. LEXIS 40803, No. 8:03CV277, 2005 WL 2488441 (D. Neb. Oct 7, 2005) ("In light of *Daubert* . . . and *Kumho* . . . this court must

PUBLIC VERSION

screen proffered expert testimony for relevance and reliability. . . . ensur[ing] that a particular expert has sufficient specialized knowledge to assist jurors, and limits such testimony so that it remains within the scope of the witnesses' established expertise."); *see also Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009) ("Nor, may an expert go beyond the scope of his expertise in giving his opinion."); *In re M&M Wireline & Offshore Servs*., LLC, 2016 U.S. Dist. LEXIS 120542, at *29-30 (E.D. La. Sep. 7, 2016) ("[S]tatements outside the expertise of a witness would amount to little more than speculation or hearsay.")

### 2.    Dr. Hutt Cannot Provide A Reliable Opinion On System Architecture Because She Is Not A System Architecture Expert.

Dr. Hutt does not possess systems architect expertise, has no other expertise in the general technology area, and has no experience developing system architectures in any relevant technological field.  Her background is in food science, food safety, and nutrition.  *See* Exhibit A, at ¶¶3-4.  She testified that she is not a computer science expert and does not have a degree in systems engineering or programming experience:



Exhibit B, at 201:6-17.

She is also not an expert in machine learning, artificial intelligence, or neural networks:

PUBLIC VERSION



Exhibit B, at 213:6-14.

She has no experience building a system architecture for a freshness indicator:



Exhibit B, at 202:4-7.

She is not an algorithm expert and has never written an algorithm for freshness indicators or shelf-life predictors:



.Exhibit B, at 202:25-203:8.

Dr. Hutt's report makes no reference to having reviewed Dr. Dobkin's report or otherwise speaking to Dr. Dobkin about the relevant system architecture in this case. *See* Exhibit A, at

Exhibit B "Materials Considered" (hereafter "Materials Considered").  She confirmed this at her deposition:



Exhibit B, at 201:18-202:3.

Dr. Hutt claims to have experienced one instance where she was involved in the design of a system architecture, but she concedes that (1) she had no contact with the programmers of the system; and (2) there was an actual system architect who worked on the project with her:



████████████████████████████████████████

Exhibit B, at 200:17-201:5.

She also testified that it was the system engineers and programmers who ultimately designed the functionality of that system, and that she is ████████████████████████████



Exhibit B, at 219:13-220:10.

In the one experience where Dr. Hutt claims she was involved in ██████████████████ ████████ she also testified that all she provided the system design team were descriptions of ████ ████ functionality that she desired in the overall system:



Exhibit B, at 220:11-221:13.

Dr. Hutt ultimately conceded that she merely ▮▮▮▮▮▮▮▮▮▮ to the system architect, and the system architect designed the system architecture:



15

Exhibit B, at 221:14-21.

Dr. Hutt has no skills, knowledge, experience, or training in the design or implementation of system architectures. She should not be allowed to testify as an expert about the system architecture aspects of this case because any such testimony would be unreliable and fail to meet the standard for expert testimony under F.R.E. 702 and 703.

### 3. Dr. Hutt Has Not Disclosed An Admissible Opinion Regarding System Architecture.

Even if she did possess expertise in computer software or system architecture, Dr. Hutt should not be allowed to provide an expert opinion on the design or functionality of either Walmart's or Zest Labs' system architecture because she has not reviewed any evidence that could reliably support such an opinion. *See Paris v. Union Pac. R.R. Co*., No. 4:04-cv-0656-JLH, 2006 U.S. Dist. LEXIS 97190, at *7 (E.D. Ark. Aug. 11, 2006) (finding that "courts after *Daubert* have noted additional relevant factors, including 'whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.'") (*quoting Lauzon v. Senco Prods., Inc*., 279 F.3d 681, 694 (8th Cir. 2001)).

Dr. Hutt's testimony and report demonstrate that she did not review the testimony of Zest engineer Scott Durgin, who designed much of Zest's system architecture and provided an in-depth presentation to Walmart Labs employees (including the supervisors of Josh Bohling) about the Zest system architecture. Her report does not mention Mr. Durgin besides a single quote (borrowed from Mr. Lanning's report) that happens to mention Mr. Durgin and another Zest employee by name. *See* Exhibit A, at 158. And while Dr. Hutt's list of "materials considered"

PUBLIC VERSION

states that she considered 25 deposition transcripts, her list does not Mr. Durgin's deposition.  *See*

Materials Considered at 1-2.



Exhibit B, at 196:10-20.

Moreover, Dr. Hutt provides no analysis or opinion relating to the key system architecture

documentation that Zest provided to Walmart.  For example, the system architecture presentation

that Mr. Durgin presented to key Walmart Labs personnel was produced at

ZEST_ECOARK0060326-60345.  Dr. Hutt's report provides no description or analysis of that

document.  The only passing reference in her report is in ¶303, where she summarizes the evidence

in Mr. Lanning's report that supports <u>his</u> opinion that the Walmart Application discloses Zest

System Architecture as described in the document.  Dr. Hutt has not provided any opinions relating

to that document or any other Zest system architecture information, and she should not be allowed

to provide any opinions on system architecture at trial.

The same is true for Dr. Hutt's review of Walmart's information on its system architecture.

Dr. Hutt testified that she did not have any detailed conversations with Josh Bohling or the other

inventors on the Walmart Application:



Exhibit B, at 154:3-14.

Dr. Hutt's testimony is that she only spoke to Mr. Bohling about ████████████ And

even then, she fails to disclose in her report any facts she learned from Mr. Bohling about any

system architecture. The only instances in her report where she cites to the ████████████

████████████████████████████████████████████████ (¶¶53; 79; 83-84;

402; 404).

Dr. Hutt has no reliable basis to support any opinion on Zest's system architecture; whether

it was used by Walmart in the Walmart Application; or on Walmart's system architecture. For

those reasons Dr. Hutt's opinions on system architecture should be excluded from the trial. *See*

*Williams v. Jackson*, No. 2:07-cv-00110-JTK, 2011 U.S. Dist. LEXIS 32569, at *4 (E.D. Ark.

Mar. 14, 2011) (finding that an expert "will not be permitted to testify concerning the specific facts

surrounding this case, since he has no knowledge of the conditions under which the Plaintiff was

exposed and no knowledge of injuries suffered by the Plaintiff.").

PUBLIC VERSION

████████████████████████████████

**C.    *Dr. Hutt's Expert Opinion Should Be Limited To The Opinions Actually Disclosed In Her Report.***

**1.    District Courts Routinely Limit Expert Testimony At Trial To The Opinions Properly Disclosed In The Expert Report.**

The expert report requirements of Rule 26 exist for "the elimination of unfair surprise to the opposing party and the conservation of resources." *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 283 (8th Cir. 1995). In addition to the requirements of Rule 26, Rule 37(c)(1) provides "an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed."[1] *Id.* The advisory committee notes to Rule 37(c) describe this remedy as "a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion [for sanctions]." *See* Fed. R. Civ. P. 37(c) advisory committee's note to 1993 amendment.

This self-executing sanction immediately shifts the burden to Walmart as "[t]he offending party . . . to demonstrate their conduct was substantially justified or harmless." *See Braun v. Menard Inc.*, No. 4:11-cv-051, 2013 WL 123712, at *9 (D.N.D. Jan. 9, 2013) (*citing Fu v. Owens*, 622 F.3d 880 (8th Cir. 2010)). Thus, the Rule 37 sanction "put[s] teeth into the rule" of expert disclosures. *National Union Fire Ins. Co. v. Midwestern General Brokerage, Inc.*, No. 06-0782-CV-W-NKL, 2007 WL 1529011, at *2 (W.D. Mo. May 23, 2007) (*quoting Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998)); *see also Honey-Love v. United States*, 664 F. App'x 358, 362 (5th Cir. 2016) (quoting Rule 37(c) in noting "the presumptive sanction for failing

---

[1] As Rule 37(c)(1) states, "*Failure to Disclose or Supplement*. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

19

PUBLIC VERSION

to . . . supply a required expert report or summary disclosures is to exclude or limit the expert's testimony unless the failure was substantially justified or harmless").

Walmart is fully aware of the importance of the expert disclosure requirements, having previously argued in favor of excluding expert opinions for even slight omissions from its opponent's expert's report. In *Ridgeway v. Wal-Mart Stores, Inc, et al.*, Walmart filed a motion for summary judgment on damages issues based, in part, on the argument that opposing experts should not be able to testify beyond the four corners of their report. *See* Exhibit C, (Walmart's Motion for Summary Judgment, 3:08-cv-05221 (N.D. Cal.), Dkt. No. 324). Walmart argued there that

> The purpose of the Rule 26(a)(2) requirement is to "prevent[] the expert from 'lying in wait' with new, last-minute opinions." *Harrelson v. Dupnik*, No. CV-11-00411-TUC-FRZ (BPV), 2014 WL 2510530, at \*4 (D. Ariz. March 12, 2014). For that reason, expert testimony at trial should be limited to the report timely served. *See U.S. Fidelity & Guar. Co. v. Lee Inv. LLC*, 641 F.3d 1126, 1138 (9th Cir. 2011) ("A district court does not abuse its discretion in limiting expert testimony to the expert's area of expertise and the subjects contained in the expert's disclosure."); *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2037732, at \*4 (N.D. Cal. May 12, 2008) (describing the "paramount rule that all experts will be limited on direct examination to the four corners of their report").

*Id.* at 22.

The reasoning of Walmart's past arguments applies here: limiting Dr. Hutt to the four corners of her report prevents Walmart from ambushing Plaintiffs at the trial by "'lying in wait' with new, last-minute opinions." *See id.*

### 2.    Dr. Hutt Freely Admits That She Intends To Conduct Additional Analysis And Then Use At Trial Any Number Of References As Undisclosed Bases For Her Current Conclusions.

Unfortunately, Dr. Hutt refuses to limit her opinions to what she disclosed in her report, instead indicating her intent to ambush Plaintiffs at trial with any number of references or

███████████████████████████████

publications for which she has not offered any opinions in her report.  For example, in ¶111 of her

report, Dr. Hutt states, ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Exhibit A, at 45 (emphasis added); *see also id.* Exhibit A, at ¶¶159 & 393 (████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████); *id.* at ¶393 (containing a nearly identical statement).

Dr. Hutt's deposition testimony further demonstrates this strategy of obscuring her true

opinions in order to present new, undisclosed opinions or bases at trial.  For example, in disclosing

her opinion on whether the concepts in Paragraph 25 of the Walmart Application were publicly

known, Dr. Hutt's report cites a limited set of Zest documents (and cited no non-Zest publications

or third-party public information).  *See* Exhibit A at 139-142.  But when confronted with these

facts at her deposition, Dr. Hutt refused to identify the universe of documents on which she would

ultimately base her opinion.  She instead insisted that she ████████████████████████

████████████████████████ at trial:





Exhibit B at 190:19-191:15.

Elsewhere she reiterated her plan to support her opinions at trial using any number of other references that may have been cited elsewhere in her report of nearly 300 pages:



Exhibit B at 193:21-194:22.

22

PUBLIC VERSION

████████████████████████

Dr. Hutt ultimately testified that she could not identify the opinions she will present at trial

and will instead conduct ██████████ of the various materials cited in her report to create her trial

testimony:



Exhibit B at 184:11-185:4.

Walmart and Dr. Hutt have apparently developed a plan to ambush Plaintiffs at trial with

any number of references inconspicuously referenced in her voluminous report or, as Dr. Hutt put

it, other █████████████████████████ That is the precise tactic that Rules 26 and 37

are designed to avoid.  As a result, any opinions from Dr. Hutt that are not disclosed in her written

report as required by Rule 26 should be excluded from the trial.

## III.    CONCLUSION

Dr. Hutt's expert opinions are based on application of incorrect legal principles, they offer testimony on subject matter over which she lacks any expertise or reliable basis, and she otherwise seeks to introduce opinions at trial that were not properly disclosed in her written report.  Plaintiffs respectfully ask the Court to exclude Dr. Hutt's testimony to the extent she attempts to offer testimony:

- That Walmart has not misappropriated Zest's trade secrets by disclosure;

- That Walmart has not used Zest's trade secrets;

- On any aspect of the system architecture of Zest Labs, Walmart, or the disclosures in the Walmart Application;

- Beyond those opinions disclosed in her written report as required by Rule 26.

Dated: February 28, 2020          Respectfully submitted,

By: */s/ Fred I. Williams*
Fred I. Williams (*pro hac vice*)
Texas State Bar No. 00794855
Michael Simons (*pro hac vice*)
Texas State Bar No. 24008042
Todd E. Landis (*pro hac vice*)
Texas State Bar No. 24030226
Jonathan L. Hardt (*pro hac vice*)
Texas State Bar No. 24039906
WILLIAMS SIMONS & LANDIS PLLC
327 Congress Ave., Suite 490
Austin, TX 78701
512.543.1354
fwilliams@wsltrial.com
msimons@wsltrial.com
tlandis@wsltrial.com
jhardt@wsltrial.com

Dustin B. McDaniel, Bar # 99011

24

███████████████████████████

Scott Richardson, Bar # 2001208
Bart Calhoun, Bar # 2011221
McDaniel, Richardson, & Calhoun PLLC
1020 West 4th St., Suite 410
Little Rock, AR 72201
501.235.8336
501.588.2104 fax
dmcdaniel@mrcfirm.com
scott@mrcfirm.com
bcalhoun@mrcfirm.com

Ross David Carmel, Esq. *(pro hac vice)*
New York State Bar No. 4686580
CARMEL, MILAZZO & DiCHIARA LLP
55 West 39th Street, 18th Floor
New York, New York 10018
(212) 658-0458 telephone
(646) 838-1314 facsimile
rcarmel@cmdllp.com

*Attorneys for Plaintiffs Zest Labs, Inc. f/k/a
Intelleflex Corporation, and Ecoark Holdings, Inc.*

PUBLIC VERSION

████████████████████████████████████████████

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2020, the foregoing document was served on all counsel of record, via electronic mail and the Court's CM/ECF system, pursuant to the Federal Rules of Civil Procedure.


   <u>/s/ Michael Simons</u>
   Michael Simons

**<u>Exhibit List to Brief in Support of Plaintiffs' Motion to Exclude the Testimony of<br>Walmart's Expert Witness, Dr. Catherine Adams Hutt</u>**

A – Filed Under Seal

B – Filed Under Seal

C – Public

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PACIFIC COAST MARINE
WINDSHIELDS LIMITED, a foreign
corporation,**

**Plaintiff,**

**-vs-**                                                    Case No.  6:12-cv-33-Orl-28DAB

**MALIBU BOATS, LLC,  a California
limited liability company, MARINE
HARDWARE, INC.,  TRESSMARK, INC.,
MH WINDOWS, LLC,  JOHN F. PUGH,
OWNER, PRESIDENT & CEO DARREN
BACH**

**Defendants.**
_____/

### ORDER

This cause came on for consideration without oral argument on the following motions filed

herein:

| | |
|---|---|
| **MOTION:** | **MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT WITNESSES (Doc. No. 223)** |
| **FILED:** | **August 3, 2012** |
| _____ | |
| **THEREON** it is **ORDERED** that the motion is **GRANTED** in part and **DENIED** in part. | |
| **MOTION:** | **MOTION TO EXCLUDE EXPERT OPINIONS (Doc. No. 246)** |
| **FILED:** | **August 15, 2012** |
| _____ | |
| **THEREON** it is **ORDERED** that the motion is **GRANTED** in part and **DENIED** in part. | |

In this dispute over marine windshield design and technology, Plaintiff Pacific Coast Marine Windshields Limited ("PCMW") seeks to exclude from trial the opinions of two of the identified experts for Defendant Malibu Boats LLC ("Malibu Boats")[1] citing the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993). Malibu, in turn, has filed its own motion seeking to exclude PCMW's three experts.

To the extent the parties seek to exclude the testimony of experts Lorraine Barrick and Philip Green, who opine on damages using opposing damages models, the Court will **DEFER** any such ruling on the applicable damages methodology to the presiding District Judge consistent with his ruling on the parties cross-motions for summary judgment on this precise issue. *See* Docs. 176, 211.

Accordingly, this Court's *Daubert* analysis and rulings are limited to the parties' arguments as to the expert testimony of Robert Anders, Fred Smith, and Jeffrey Seyler. Because the Court finds that Robert Anders' expert testimony is based on the correct formulation of the test for infringement and validity, and otherwise reliable, it will not be excluded. Because the Court finds that Fred Smith's expert testimony is in large part based on the wrong standard for infringement and validity, or otherwise unreliable, the Court finds that most of it should be excluded. As to Jeffrey Seyler's opinions, the Court finds (with the exception of certain matters deferred to the District Judge) that they are not subject to exclusion.[2]

# I. Background

---

[1] The Court will refer to Defendants Malibu Boats LLC and Tressmark, Inc. collectively as Malibu Boats.

[2] Necessarily, the rulings herein are limited to the record presented on the motions. Should the issues and evidence develop differently at trial, reconsideration may be necessary. As well, for the allowed opinions to be considered properly by the jury, tailored and specific instructions (based on Federal Circuit case law) may be useful for these and other expert opinions in the case. The parties may even wish to propose such instructions for use in conjunction with the testimony of certain witnesses and not just at the conclusion of the trial.

PCMW filed suit against Defendants alleging infringement of three patents, two utility patents and a design-patent, claiming sole ownership of a corner post marine windshield design.[3] PCMW also asserts claims for copyright infringement, trade secret misappropriation, tortious interference, trade libel, and deceptive and unfair trade practices. PCMW contends that during 2005, Darren Bach, the president and founder of PCMW, conceived of a novel assembly and ornamental design for marine windshields. Mr. Bach is listed as the only inventor of all three patents, which he subsequently exclusively licensed to PCMW. PCMW alleges Defendants have infringed these Patents with their manufacture, importation, application, and sale of similar windshields made in China.

In its counterclaims, Malibu alleges that its employee, Dan Gasper – and not Mr. Bach – conceived of the windshield design covered by the '070 and '510 Patents in October 2005. Defendants contend that the Patents are invalid because they omit as a co-inventor Dan Gasper, a Malibu boat designer[4].

PCMW seeks to exclude Defendants' expert Fred Smith, who intends to offer a number of opinions in his reports concerning infringement and invalidity of PCMW's '070 Patent. Malibu seeks to exclude the testimony of two of PCMW's experts, Robert Anders and Jeffrey Seyler, who intend to testify as to the infringement of PCMW's patents.

# II. Standards of Law

Federal Evidence Rule 702 governs the admission of expert testimony in federal court, and provides:

---

[3]The windshield at issue is covered by two utility patents and a design patent. Doc. No. 69 at 34-38. The design patent for the marine windshield design is identified by United States Patent Number D555,070 (the "'070 patent"). The utility patents are identified with United States Patent Numbers 7,418,917 ("the '917 Patent") and 7,441,510 ("the '510 Patent").

[4]Malibu has asserted counterclaims for infringement of U.S. Patent No. 6,647,915 ("the '915 patent") (also relating to marine windshield technology), conversion, unfair competition, breach of contract, and for declaratory judgment of non-infringement and invalidity with respect to PCMW's patent infringement claims.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 compels courts to perform a "gatekeeping" function—specifically, to determine whether the proffered expert testimony is reliable and relevant. *Oliver v. City of Orlando*, Case No. 6:06-cv-1671-Orl-28DAB, 2011 WL 2174010, *2 (M.D. Fla. May 31, 2011) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n. 7, 590–91, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)), *aff'd*, 456 Fed. Appx. 815 (11th Cir. Jan. 31, 2012); *Securities and Exchange Comm. v. Big Apple Consulting USA, Inc.,* 2011 WL 3753581, *2 (M.D. Fla. Aug. 25, 2011). The Eleventh Circuit has highlighted the importance of *Daubert*'s gatekeeping function; it is because expert witnesses are free to opine without firsthand knowledge, while relying upon inadmissible hearsay, that courts must carefully judge the intellectual rigor employed by the expert. *Oliver*, 2011 WL 2174010, at *2 (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)); *Finestone v. Florida Power and Light Co.,* 272 Fed.Appx. 761, 767 (11th Cir. 2008) (internal citation omitted).

The Eleventh Circuit requires "a rigorous three-part inquiry." *Frazier*, 387 F.3d at 1260. In order for expert testimony to be admissible, a district court must determine that (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Id.* (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The burden of laying the proper foundation for the admission of expert testimony rests with the party offering the expert. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) ("The burden of

-4-

laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence."); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

# III. General Contentions as to Witnesses

## A. Robert Anders

Malibu argues that the opinion of PCMW's expert Robert Anders that Malibu has infringed the '070 Patent should be excluded. They argue Mr. Anders' opinion should be excluded because he is not qualified to opine on how the ordinary observer views marine windshields; he applied the wrong legal standards; his method is unreliable; and his opinion would not assist the trier of fact. Malibu argues his opinion on copyright infringement should also be excluded.

## B. Fred Smith

PCMW seeks to exclude the testimony of Malibu's expert Fred Smith, who intends to offer a number of opinions concerning infringement and invalidity of PCMW's '070 Patent. PCMW argues that Mr. Smith's testimony should be excluded because he lacks the training and relevant experience to qualify him as an expert in design patents, ornamental design, or industrial design; he applied the wrong legal standard in forming his opinions; he employed the wrong legal tests and incorrectly analyzed anticipation and obviousness; he admittedly did not know the legal standard used by the examiner; and he offered opinions concerning copyright infringement despite a lack of relevant experience and understanding of the legal standard for infringement. Additionally, PCMW objects to Mr. Smith's opinions because he intends to offer testimony concerning matters that were not addressed in his reports. PCMW asserts that Mr. Smith is not qualified to testify regarding design patents, the marine industry and copyright infringement because he has no relevant expertise. Doc. 223.

## C. Jeffrey Seyler

Malibu seeks to exclude the opinion of Jeffrey Seyler on "the impetus behind Malibu's boat sales," arguing his opinions are unsupportable, unreliable, and unhelpful to the jury. Malibu also argues that Mr. Seyler is not sufficiently qualified in the "recreational boats" market.

# IV. Analysis:  Qualifications

Malibu contends that Mr. Anders is not qualified to opine on how the "ordinary observer" views marine windshields because Ander is not familiar with products in the field at issue or how the ordinary observer would differentiate them from one another.  PCMW points out that Mr. Anders has more than 50 years experience as a practicing professional in the art and science of industrial design, which includes the ornamental aspects of the design of consumer and industrial products.; he was a professor of industrial design for more than 12 years at the Pratt Institute. See Doc. No. 234-4 at 6-11; Doc. 260.  **Mr. Anders is _qualified_ to opine on the design of the marine windshield.  Because Malibu's challenge relates to how the "ordinary observer" in this case should be defined, it is addressed in detail below.**

PCMW argues that Mr. Smith has no training or experience with respect to design patents, or in the field of industrial design; it also argues that nothing in his credentials qualifies him as an expert in copyright infringement matters.  PCMW argues that although Mr. Smith offered a number of opinions regarding the marine industry, he had no training or experience that qualified him as an expert in that industry, other than the ownership of a ski boat and his replacement of a single pane of glass on a boat windshield.  PCMW contends that the mere ownership and repair of a consumer product does not qualify him as an expert in the industry of that product.

Malibu responds that Mr. Smith has decades-long, first-hand experience in mechanical design, including ornamental design, having produced hundreds of products at his company; and he is also a current and long-time owner of ski boats and is familiar with the interests of other ski-boat buyers. A mechanical engineer is not categorically precluded from testifying regarding a design patent, as being only familiar with the functional aspects of product development and not the aesthetics of ornamental design. *See, e.g., Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 137, 148 (E.D. N.Y. 2007) (expert witness who was a mechanical engineer, had knowledge, skill, experience, training, or education sufficient to offer his expertise on design patent for bus mirrors).

Mr. Smith is the president of Alpine Engineering & Design, has approximately 32 years of experience in the fields of mechanical engineering and structural and mechanical design, and has participated in the design and manufacture of numerous products. Doc. 224-1, Smith expert Rep. at 4. He is "an expert in the fields of mechanical design, structural design, design of fiberglass, design of plastics, aluminum extrusions and manufacturing, and [has] had significant experience with the patent process and in reading patent claims. Doc. 223, Ex. A at 5. Mr. Smith identifies at least five product designs "in which the ornamental design was a primary consideration" that he personally designed. Doc. 251-3 at 43, 46-55, 63. Mr. Smith is has owned ski-boats for at least 25 years. *Id.* at 59. **Mr. Smith is *qualified* to testify about the industrial design of the marine windshield.**

Malibu contends that Mr. Seyler is not qualified to testify about what drives Malibu's sales of boats. PCMW intends to offer Jeffrey Seyler as an expert in the marine industry and in computer assisted drawing ("CAD") design[5]. Malibu's challenge is really not to Mr. Seyler's expertise in those fields. Mr. Seyler has a B.A. in Mechanical Engineering and a master's degree in Naval Architecture

---

[5]Defendants apparently do not contest Mr. Seyler's opinions regarding analyses of CAD files, or his opinions on misappropriation of trade secrets, since they redacted those portions of his report and believe these portions are "unnecessary to the Court's decision." *See* Doc. 246 at 36 n. 10.

and Marine Engineering, plus more than 40 years of experience in all aspects of recreational boat

design, including the design of boats used for water skiing, and 30 years of experience working with

CAD software. Doc. 257-2 at 4-5. Mr. Seyler also has designed and manufactured marine windshields

and has managed, owned and operated boat manufacturing companies. Doc. 237-7 at 4-5. He has also

decades of experience and expertise in understanding the market factors that affect a boat

manufacturer's design decisions. **Mr. Seyler is *qualified* to testify as an expert in the marine**

**industry and CAD design.**

# V. Standards:   Methodology and Reliability

As Judge Antoon has observed, accepting an expert's qualification to testify competently does

not guarantee that his testimony is admissible. *See Oliver*, 2011 WL 2174010, at *2. *Daubert* and

Rule 702 require that courts apply their gatekeeping function to each expert to determine if the

testimony is scientifically valid and whether the reasoning or methodology can be applied to the facts

at issue. *Id*. (citing *Daubert*, 509 U.S. at 592).

"District courts 'have substantial discretion in deciding how to test an expert's reliability.'"

*Rink v. Cheminova, Inc*., 400 F.3d 1286, 1292 (11th Cir. 2005) (quoting *United States v. Majors*, 196

F.3d 1206, 1215 (11th Cir. 1999)).   Courts have consistently utilized four guideposts set out by

*Daubert* 's reliability prong. They include, but are not limited to:

> In addressing the reliability of expert methodology, "[d]istrict courts 'have substantial
> discretion in deciding how to test an expert's reliability.' " *Rink v. Cheminova, Inc.*, 400
> F.3d 1286, 1292 (11th Cir.2005) (quoting *United States v. Majors*, 196 F.3d 1206, 1215
> (11th Cir.1999)). In *Daubert*, the Supreme Court set out four non-exclusive criteria for
> reliability determinations: "(1) whether the expert's methodology has been tested or is
> capable of being tested; (2) whether the technique has been subjected to peer review
> and publication; (3) the known and potential error rate of the methodology; and (4)
> whether the technique has been generally accepted in the proper scientific community."
> *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S.
> at 595). These factors may guide a district court's reliability inquiry, but the district

court ultimately has "broad latitude" as to how it determines reliability. *Kumho Tire*, 526 U.S. at 152.[6]

*Wilson v. Taser Intern., Inc,*. 2008 WL 5215991, *4 (11th Cir. Dec. 16, 2008) (unpublished).

"Whatever factors are considered, the Court's focus should be solely on principles and methodology, not the conclusions they generate." *McDowell*, 392 F.3d at 1298; *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (internal quotes omitted).

Another judge of the Middle District has cautioned:

> It is therefore error to conflate admissibility with credibility, as by considering the relative weight of competing experts and their opinions. *Quiet Technology,* 326 F.3d at 1341[7]. . . . With respect to the third reliability criterion of Rule 702, errors in an expert's application of a reliable method generally implicate credibility rather than reliability. *See Quiet Technology*, 326 F.3d at 1345-46 (using incorrect numbers in a reliable formula is not grounds for exclusion under *Daubert)*.

*Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F.Supp.2d 1126, 1130 (M.D. Fla. 2007) (Fawsett, J.).

# VI. Analysis: Anders

## A. Application of "Ordinary Observer" Test

Malibu's challenge to Mr. Anders' application of the "ordinary observer test" challenges his use of the "end user" or retail boat buyer as the "ordinary observer" rather than the boat manufacturer. PCMW's challenge to Malibu's expert Mr. Smith center upon the inapplicable "points of novelty" test that he employed in reaching his opinions; Malibu contends that Mr. Smith misstated the wrong standard but correctly applied the "ordinary observer" test. The parties agree that the "ordinary observer" test, as set forth by the Federal Circuit in *Egyptian Goddess*, is the controlling standard in

---

[6] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

[7]*Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333 (11th Cir. 2003).

this case, and *not* the former "point of novelty" test. *See Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665, 678 (Fed. Cir. 2008).  As the Federal Circuit defined the test:

> We hold that the "ordinary observer" test should be the sole test for determining whether a design patent has been infringed. Under that test, as this court has sometimes described it, infringement will not be found unless the accused article "embod[ies] the patented design or any colorable imitation thereof." *Goodyear Tire & Rubber Co.,* 162 F.3d at 1116-17; *see also Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.,* 501 F.3d 1314, 1319 (Fed.Cir.2007).

*Id.,* 543 F.3d at 678.  To show infringement under the proper test, an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design.  *Crocs, Inc. v. International Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2012) ("ordinary observer" test – without any "point of novelty" perspective – is the sole test for determining whether a design patent has been infringed).  Although the parties agree on the governing test, they disagree on *who* the "ordinary observer" is for purposes of the design patent infringement analysis. They also disagree as to whether Mr. Smith could properly consider the "points of novelty" as "part" of an infringement analysis.

Mr. Anders defines the ordinary observer as being "a consumer or purchaser of small marine crafts and/or accessories."  Malibu argues that the ordinary observer for purposes of the design patent infringement analysis is the boat builder who incorporates windshields into his boats, not the end user, as Mr. Anders opines.  PCMW argues that the Supreme Court has rejected the notion that the test for patent infringement is whether there is substantial similarity "in view of the observation of a person versed in designs in the particular trade in question-of the person engaged in the manufacture or sale of articles containing such designs – of a person accustomed to compare such designs one with another, and who sees and examines the articles containing them side by side."  Doc. 256 at 13-14 (citing *Gorham*, 81 U.S. at 527).

-10-

Malibu relies heavily on *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.,* 501 F.3d 1314, 1319 (Fed. Cir. 2007), in which the accused products were shrouds for spray-trigger devices used on bottles such as window cleaning fluid. The court there found that the ordinary observer was the purchaser of the spray-trigger devices, who assembled the spray trigger with the bottle, the bottle cap, and the liquid contained in the bottle to create the final product. *Id.* at 1318. PCMW argues that in this case there is no such "market" for the patented windshields because Malibu specifically had the infringing windshields made to order by the other Defendants after providing PCMW's CAD files to Marine Hardware, and no other boat manufacturer purchases the accused windshields; thus, there is no boat manufacturing market in which the accused windshields are being sold. As PCMW argues, it makes no sense to ask the question of whether Malibu, as the "ordinary observer," would be deceived into purchasing the accused windshields instead of the patented design when Malibu itself caused the accused windshields to be made for the boats.

Even apart from the fact that *Arminak* has been modified by *Egyptian Goddess,* which rejected the "points of novelty" as an independent test, the holding of the case is inapposite to the circumstances of this case. *Arminak* applied the Supreme Court's test from *Gorham v. White*, which characterized the ordinary observer test as whether there is substantial similarity "in the eyes of men generally, of observers of ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which men of ordinary intelligence give." 81 U.S. 511, 527 (1871). The Federal Circuit then explained that in its prior *Goodyear* decision – which dealt with patented tire tread designs commercially embodied on Goodyear's truck tires – the focus of the "ordinary observer" test was "on the actual product that is presented for purchase, and the ordinary purchaser of that product." *Arminak,* 501 F.3d at 1319 (citing *Goodyear,* 162 F.3d at 1116-17). The court found that the ordinary observer of the patented tread designs was "a truck driver and

-11-

a truck fleet operator because the products containing the patented and accused designs were tires used on trucks, even though the design patent at issue was not limited to truck tires." *Id*. The *Arminak* court's reliance on *Goodyear* and other language in its decision, actually support the finding that the "ordinary observer" is, in this case, the boat "driver" and the ultimate boat purchaser:

> [T]he appropriate hypothetical ordinary observer fits squarely with our precedent that the ordinary observer is a person who is either a purchaser of, or sufficiently interested in, the item that displays the patented designs and who has the capability of making a reasonably discerning decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent.

*Arminak*, 501 F.3d 1323. The product in *Arminak* is also distinguishable because it was a small "trigger spray shroud" assembled into a more sizeable end product. The "industrial purchaser" of the trigger sprayer shrouds for manufacturing assembly used the shrouds to cover trigger sprayer mechanisms that are assembled with the bottle, the bottle's cap, the liquid contained in the bottle, and the label on the bottle, all of which assembled together create the final retail product. *Id*. For that reason, the court held that the "ordinary observer" was the shroud buyer for an industrial purchaser or contract filler, rather the final consumer who bought the end products that incorporated the shrouds. *Id*.

> As one court recently explained "the ordinary observer" test:

> The case law makes clear that the "ordinary observer" is not an expert in the field. As the Supreme Court said in Gorham, "[e]xperts . . . are not the persons to be deceived." *Gorham*, 81 U.S. at 528. The "ordinary observer" is likewise not a patent lawyer "who inspects the designs critically to highlight each and every perceivable difference between them." *Durdin v. Kuryakyn Holdings, Inc.*, 440 F.Supp.2d 921, 933–34 (W.D.Wis.2006); *see also Tappan Co. v. Gen. Motors Corp*., 248 F.Supp. 978, 980 (N.D.Ohio 1965) ("The Supreme Court has said [in Gorham] that sameness of effect upon the eye is the main test of substantial identity of design, but it is not essential that the appearance should be the same to the eye of the expert. It is sufficient if it is the same to the ordinary observer.").

> The notional "ordinary observer" is, instead, someone who—while not an expert in the product—is not entirely ignorant of it, and indeed has some degree of familiarity with it. The "ordinary observer" thus includes someone who has purchased, or shopped for,

a like item in the past. *See, e.g., Henry Hanger & Display Fixture Corp. of Am. v. Sel–O–Rak Corp.,* 270 F.2d 635, 641 (5th Cir. 1959) (" '[T]he ordinary purchaser of revolving racks, who was acquainted with the patented design would, upon viewing any of defendants' racks, including the wrought iron rack, . . . assume that he was viewing an identical or slightly modified version of the patented design.' ") (quoting *Sel–O–Rak Corp. v. Henry Hanger & Display Fixture Corp. of Am.*, 159 F.Supp. 769, 773 (S.D.Fla. 1958)); *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.*, 67 F.2d 428, 430 (6th Cir .1933) ("[T]he ordinary observer is not any observer, but one who, with less than the trained faculties of the expert, is 'a purchaser of things of similar design,' or 'one interested in the subject.'"); *Graff, Washbourne & Dunn v. Webster*, 195 F. 522, 524 (2d Cir. 1912) ("Having seen the complainant's design in a show case or shop window, the ordinary buyer would be very likely to mistake the defendants' design for it, if seen in a similar environment. This is the real test of infringement of design patents. If the ordinary buyer, having seen one of the complainant's dishes and wishing to procure one like it, would be induced to buy one of the defendants' dishes instead, it is enough."); *Minka Lighting. Inc. v. Maxim Lighting Int'l, Inc.*, No. Civ. A. 3:06–CV–995–K, 2009 WL 691594 (N.D.Tex. Mar.16, 2009) ("The ordinary observer is therefore a member of the public who is currently shopping for or has recently purchased lighting fixtures—indeed, a 'purchaser of things of similar design.'"); *Arminak & Assocs., Inc. v. Saint–Gobain Calmar, Inc.*, 424 F.Supp.2d 1188, 1196 (C.D.Cal.2006) ("[The ordinary] observer is not a person who has never seen the type of item the patent describes, 'but one who, though not an expert, has reasonable familiarity with such objects, and is capable of forming a reasonable judgment when confronted with a design therefor as to whether it presents to his eye distinctiveness from or similarity with those which have preceded it.'") (quoting *Applied Arts*, 67 F.2d at 430).

*Hutzler Mfg. Co., Inc. v. Bradshaw Intern., Inc.,* No. 11-civ-7211PGG, 2012 WL 3031150, *6 (S.D. N.Y. July 25, 2012) (ordinary observer was a "typical consumer" who had seen, shopped for, or purchased food storage items); *cf. Spotless Enterprises, Inc. v. A & E Products Group L.P.,* 294 F.Supp.2d 322, 347 (E.D. N.Y. 2003) (holding the ordinary observer was not the general public, but the sophisticated buyer for the garment manufacturer, who purchased the hangers, because consumers "would not notice a variation among the hangers that would interfere with the aesthetic display of apparel"). In a case involving the design patent of a dresser which was sold to a retailer in the chain before being sold to the end-user consumer, the defendant argued the "ordinary observer" was the buyer for the retail seller, not the end consumer. *Ashley Furniture Ind. Inc. v. Lifestyle Enter. Inc.,* 574

-13-

F.Supp.2d 920 (W.D. Wis. 2008). The court concluded that the "ordinary observer" was the ultimate consumer, and not the intermediary retail buyer, because:

> The point of a design patent is to protect against deception in the marketplace for the product, that is, deception of those who "buy and use" the product. *Id.* The relevant concern in bedroom furniture design is whether household consumers are likely to purchase defendant's furniture believing it to be plaintiff's design. Defendant's reliance on *Goodyear*, 162 F.3d at 1117, for a contrary definition of an ordinary observer is misplaced. Goodyear held that a trucker was the ordinary observer of a design for tire treads used exclusively on truck tires. This is because truckers were the ordinary purchasers and users of tires with the patented tread design. *Id.* Goodyear did not hold that a tire retailer who resold to truckers was the appropriate ordinary observer. Here the product to which the design is applied is a bedroom set; the ordinary purchaser and user of a bedroom set is a homeowner. Accordingly, the proper question is whether a reasonable jury could find that the resemblance between the patented designs and defendant's furniture is such that an ordinary household consumer would be deceived into believing that the accused furniture employed the patented design.

*Id.* at 928.

In this case, the issue is whether the ordinary recreational boat buyer would be deceived into believing that the accused marine windshield employed the patented design. As PCMW points out, Malibu's position is further weakened by the fact that Fred Smith, Malibu's own expert, in his Rebuttal report, did not challenge Mr. Anders' use of the end consumer as the "ordinary observer" in his own opinions on infringement and validity. Doc. 257-1 ¶ 46.

Malibu also argues that Mr. Anders' opinions should be excluded because they are based on an incorrect legal standard and that he misapplied the ordinary observer test by conducting a three-way comparison between the patent, the accused product, and prior near art, which led him to conclude that Malibu's windshields infringed PCMW's patent. Doc. 234-4, Anders Expert Report, at Part B at 13. Malibu also argues that Mr. Anders opinion should be excluded because it offers "nothing but his unreasoned conclusion" that the accused product "appears substantially more similar" to the '070 patent than the prior art, and that the windshields on the boats depicted on Malibu's website, "if not identical, are substantially similar" to the PCMW's patent. Doc. 234-4, Anders Expert Report, at Part

-14-

B at 11-15, Part C at 11-13. Malibu contends that Mr. Anders' opinion "simply jumps from the images to his conclusion with no intermediary reasoning," not even research in the form of consumer surveys, which render his opinions inadmissible.

PCMW argues that Mr. Anders properly applied the test for design patent infringement from *Egyptian Goddess*, *Inc.* As set forth in his report, Mr. Anders examined each of the figures of the '070 Patent and conducted a survey of prior art windshields, then created a visual chart which made a three-way comparison showing each figure of the '070 Patent, the correlative view of the accused windshield and the closest prior art design. Mr. Anders follows the method set forth by the Federal Circuit set forth in *Egyptian Goddess*, 543 F.3d at 676 (analysis requires a "comparison of the features of the patented designs with the prior art and the accused designs"). In addition, Mr. Anders also performed the same comparison with PCMW's commercial embodiment, the accused product, and the prior art.

Based on these comparisons, Mr. Anders offered his opinion on three factual issues: (1) the differences between the accused design and the patented design are insubstantial; (2) the accused design is closer to the patented design than it is to the closest prior art design; (3) the ordinary observer with knowledge of the prior art would believe that the accused product infringes the design depicted in the '070 Patent. Doc. No. 234-4 at 41-42. He concludes that "[b]ecause there are insubstantial differences in the overall appearance of the accused product when compared to each and every view of the '070 Patent, it is clear that an ordinary observer, with knowledge of the prior art would find the accused product to infringe that patent." *Id.* at 44. Malibu focuses only on the second prong of Mr. Anders' opinion and ignores the other portions of Mr. Anders' opinion which compared the accused windshield with the patented design and find the differences are insubstantial and Mr. Anders' ultimate

-15-

conclusion.  **The Court concludes that Mr. Anders' analysis properly followed the guidelines of** *Egyptian Goddess*.

## B. Functional Elements and Design Comparison

Malibu also argues that Mr. Anders improperly factored out what he characterized as functional features of the accused product, the prominent black frame in Malibu's windshield, that distinguishes it from the patented design.  Malibu contends that, in assessing infringement, the functional aspects of the *patented* design should be factored out to limit the scope of the claimed invention, but that does not require the functional aspects of the *accused product* which distinguish it from the patented design to be ignored.  Doc. 246 (citing *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010)).  It is well-settled that a party is entitled to a design patent whose scope is limited to ornamental aspects alone and does not extend to any functional elements of the claimed article; thus the functional items are excluded.  *Richardson*, 597 F.3d at 1293; *Amini Innovation Corp. v. Anthony Calif., Inc.*, 439 F.3d 1365, 1372 (Fed. Cir. 2006) ("the trial court is correct to factor out the functional aspects of various design elements").  As PCMW points out, if PCMW had claimed the functional black ceramic coating in its design patent, the Court would be required to instruct the jury to disregard it in its infringement analysis.

Malibu also argues that Mr. Anders should not have found the "thick black frame-like outlines of the accused windshields" to be "functional" as either required to protect the UV-resistant adhesive or to support the glass without more evidence.  PCMW contends that "there is no question that the black ceramic frit found in both the accused products as well as PCMW's commercial embodiment of the patented design is purely functional" because the glass panels in the accused windshield are glued to the frame behind the glass using a urethane adhesive and a ceramic coating must be used to

-16-

protect the adhesive from UV radiation when using the urethane adhesive to bond to glass.[8]   The "functionality" of this feature must be decided based on the evidence as presented at trial; **Mr. Anders will be subject to cross-examination on this point.**

Malibu's argument that Mr. Anders' opinion is unreliable because he should not have compared the accused product to the patented design and not to the commercial embodiment is unavailing, since Mr. Anders also made the comparison to the patented design. Doc. 234-4 at 40-41. In his report, Mr. Anders also made a comparison of the six figures of the patent with six correlative views of PCMW's commercial windshield, concluding that there is no significant distinction between PCMW's commercial embodiment and the ornamental design claimed in the '070 Patent. Doc. No. 234-4 at 33-34.  In addition, as PCMW argues, "when no significant distinction in design has been shown between the patent drawing and its physical embodiment, it is not error for the court to view them both, and to compare the embodiment of the patented design with the accused devices." *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1189 (Fed. Cir. 1988); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1125-26 (Fed. Cir 1993) (holding that comparison of  the patentee's and the accused articles directly is not erroneous when the patented design and the design of the article sold by the patentee are substantially the same).  **These issues can also be addressed in cross-examination.**

## C. Assistance to the Jury

Malibu contends that Mr. Anders' opinion should be excluded because his testimony on infringement and substantial similarity will not assist the jury at trial and offers no expert assistance to the jury.  Malibu further argues that, assuming boat purchasers are the "ordinary observers" at issue in the infringement analysis with respect to the '070 patent, jurors are just as capable as Mr. Anders

---

[8]Malibu's expert, Mr. Smith, testified that the black ceramic coating protects the adhesive from UV radiation, and provides a bonding surface.  Doc. 257-6 at 69-72.

of comparing the accused windshields and the patented design in view of the prior art to determine infringement. Malibu cites cases holding that expert testimony is unnecessary for "facts that people of common understanding can easily comprehend."  Having Mr. Anders take the witness stand to describe how he views various windshields, Malibu argues, would permit Mr. Anders to improperly influence the jury and waste valuable courtroom time.

PCMW responds that Mr. Anders is qualified to offer opinions on the hypothetical ordinary observer test.  As a professional and former professor in the field of industrial design, PCMW argues, Mr. Anders is exceptionally well qualified to opine on the "degree of observation" which a person of ordinary acuteness – the hypothetical ordinary observer from *Egyptian Goddess* – gives to the design of articles of manufacture. PCMW points out that Mr. Anders has extensive experience in the field of industrial design, which concerns the appearance of products to consumers and users, and in designing and managing exhibitions, and the evidence in this case shows that boat show exhibitions are of primary importance to boat manufacturers in marketing and selling their boats; he also has had extensive responsibility as a professional for consumer point of purchase displays, and more than 20 years of experience examining and reviewing design patents and the drawing conventions they use. Doc. 234-4 at 9, 18. Although specific boat industry experience is not required, Mr. Anders has designed a marine vessel that had windows, something defendants' expert did not do, and was a power boat owner.  *Id*. at 9.

PCMW contends that Mr. Anders' testimony will be helpful to the trier of fact because the ordinary observer is presumed to be familiar with the prior art, and ordinary consumers of marine craft are highly unlikely to be familiar with the prior art; thus, surveys of boat purchasers would be of marginal relevance. PCMW also argues that the infringement comparison is between the accused device and the line drawings of the patent and the prior art (also likely in the form of patent drawings),

-18-

and Mr. Anders' testimony will be helpful since actual boat consumers do not typically conduct comparisons between line drawings and the actual product when making their purchase decision. PCMW also distinguishes and points out the reversal of one of the cases on which Malibu relies to argue that Mr. Anders' testimony has been excluded before. According to PCMW, Mr. Anders has been retained in more than 50 design patent and copyright cases and his testimony has never been excluded on FRE 702 grounds. Doc. 260.

**The Court finds that Mr. Anders' comparison of the design patent, the commercial embodiment, and accused product, and his analysis of the prior art (with appropriate instructions) may assist the jury in deciding PCMW's infringement claims.[9] The issues as raised by Malibu with regard to Mr. Anders' statements on validity as of the '070 Patent, and Darren Bach as sole inventor, overlap with those presented to Judge Antoon in the parties' cross-motions for summary judgment. For this reason, those issues will be DEFERRED to Judge Antoon, to be decided consistently with his summary judgment rulings.**

# VII. Analysis: Smith

## A. Infringement and Invalidity–"Points of Novelty"

PCMW argues that the testimony of Malibu's expert Fred Smith on the infringement and invalidity of the '070 Patent should be excluded because he applied the wrong legal standard. In Mr. Smith's Rebuttal Report on infringement, he states that "the final step in determining whether a design patent has been infringed is that the accused design must have appropriated the point(s) of novelty of

---

[9] Malibu also argues that Mr. Anders' opinion that the copyrighted design are substantially similar should be excluded because he was unable at deposition to articulate in a meaningful way the standard he applied in coming to that conclusion. Doc. 234-5, Anders Dep. at 83-84. Malibu also contends that his methodology is faulty because he did not conduct a side-by-side comparison of the allegedly copied Defendant CAD files and the copyrighted PCMW CAD file. *Id.* at 85-86. PCMW did not specifically respond to this argument; however, these issues are best left for cross-examination in the context of the trial.

the patented design which distinguishes the patented design over the prior art. *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F. 2d 1423, 1424 (Fed. Cir. 1984)."  Doc. 224-2 at 19 ¶ 55.  Mr. Smith also testified that he applied the points of novelty test in providing his opinion on infringement of the '070 Patent. Smith Dep. at 162.  PCMW correctly cites the Federal Circuit's *Egyptian Goddess* decision which eliminated the points of novelty test as an independent test in 2008.  *Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F. 3d 665 (Fed. Cir. 2008).

Malibu concedes that Mr. Smith "misstated part of the legal standard," but argues that he actually applied the points of novelty test *after* applying the ordinary observer test, thus it was an additional basis for his opinion and can be ignored.  Doc. 250 at 17 (citing Doc. 251-4, Smith rebuttal report ¶ 53, 55).  Although Mr. Smith cites *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.,* 162 F.3d 1113, 1117 (Fed. Cir. 1998), and the ordinary observer test derived from *Gorham Co. v. White*, 81 U.S. 511, 528, 20 L.Ed. 731 (1872), Mr. Smith does state very clearly that the "final step in determining whether a design patent has been infringed is that the accused design must have appropriated the point(s) of novelty," citing the Federal Circuit's 1984 *Litton Systems* case.  Nowhere in his Rebuttal Report (Doc. 251-4) does Mr. Smith rely on the 2008 *Egyptian Goddess* case[10] or any post-2008 progeny which correctly sets forth the current standard.

The en banc Federal Circuit clearly rejected the "points of novelty" test of *Litton Systems* in *Egyptian Goddess* noting:

> In a number of cases decided after *Litton Systems*, this court has interpreted the language quoted [from *Litton Systems*] above to require that the test for design patent infringement consider *both* the perspective of the ordinary observer and the particular novelty in the claimed design . . . . It has not been until much more recently that this court has described the ordinary observer and point of novelty tests as "two distinct tests" and has stated that "[t]he merger of the point of novelty test and the ordinary observer test is legal error.

---

[10]Mr. Smith does cite *Egyptian Goddess*, but in the context of disagreeing with Mr. Anders, and there is no substantive analysis in that section.  Doc. 251-4 ¶ 60.

-20-

* * *

On the basis of the foregoing analysis, *we hold that the "point of novelty" test should no longer be used in the analysis of a claim of design patent infringement*. Because we reject the "point of novelty" test, we also do not adopt the "non-trivial advance" test, which is a refinement of the "point of novelty" test. Instead, in accordance with *Gorham* and subsequent decisions, we hold that the "ordinary observer" test should be the sole test for determining whether a design patent has been infringed. Under that test, as this court has sometimes described it, infringement will not be found unless the accused article "embod[ies] the patented design or any colorable imitation thereof." *Goodyear Tire & Rubber Co.*, 162 F.3d at 1116-17; *see also Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (Fed.Cir.2007).

*Egyptian Goddess*, 543 F.3d at 671, 678 (emphasis added).

Malibu attempts to discount the impact of Mr. Smith's reliance on the "points of novelty" test by arguing that "consideration of a patented design's novel features still has a proper place in an infringement analysis" and Mr. Smith "did not actually apply or rely upon the points of novelty test." Malibu argues that Mr. Smith made no mention of the "points of novelty" test in his initial expert report, and in his Rebuttal Report he "unambiguously applied the ordinary observer test when addressing infringement." Doc. 250 at 18-19.

As PCMW points out, in his deposition Mr. Smith confirmed that he applied the "points of novelty" test in providing his opinion on infringement of the '070 Patent. At his deposition, Mr. Smith was asked to look at paragraphs 48 through 55 in his rebuttal report, and he testified those paragraphs are "where he set forth his understanding of the law of infringement" for design patents. Doc. 224-4 at 30, Smith Dep. at 162. He testified those paragraphs – including paragraph 55 which discussed the final step, *i.e.*, the "points of novelty" test of *Litton Systems* – comprised the law he applied in obtaining his opinions regarding infringement of the design patent. *Id*. Mr. Smith similarly testified that he relied on the "points of novelty" test as to the invalidity analysis.[11] *See id.* at 168-70.

---

[11]Malibu responds by quoting a longer portion of Mr. Smith's deposition, however, the additional testimony does not minimize the fact that Mr. Smith applied the "points of novelty" test.

Malibu argues in a circuitous fashion that, even if Mr. Smith had at the end of his analysis applied the points-of-novelty test, his infringement conclusion based on the ordinary-observer test would still be admissible because he could rely on the analysis of *either* test to independently opine that there was no infringement. Malibu argues that, even if Mr. Smith's conclusion of non-infringement did rely on the points of novelty test, his "subsidiary opinion" that the ordinary observer would not be confused between the accused product and the patented design would still be admissible. Doc. 250 at 19. Unfortunately, that is not the law under *Egyptian Goddess*, which holds that the "ordinary observer" is the sole independent test – not "subsidiary" to some other test – "points of novelty" is no longer (after 2008) the appropriate test, and the two tests cannot be "merged" or assessed side by side as if they are given equal weight. *Egyptian Goddess*, 543 F.3d at 671 ("merger of the point of novelty test and the ordinary observer test is legal error"); 678 ("the 'ordinary observer' test should be the sole test for determining whether a design patent has been infringed").

Malibu argues that Mr. Smith was allowed to consider the "points of novelty" as "part" of an infringement analysis based on the Federal Circuit's clarification in *Egyptian Goddess:*

> Our rejection of the point of novelty test does not mean, of course, that the differences between the claimed design and prior art designs are irrelevant. To the contrary, examining the novel features of the claimed design can be an important component of the comparison of the claimed design with the accused design and the prior art. But the comparison of the designs, including the examination of any novel features, must be conducted as part of the ordinary observer test, not as part of a separate test focusing on particular points of novelty that are designated only in the course of litigation.

*Id*. at 678. Malibu's argument that Mr. Smith considered a few "novel features" as just a part of his analysis is not well taken, given the statement in his Rebuttal Report that he applied the "points of novelty" test of *Litton Systems* and the confirmation of his position at his deposition. **Because Mr. Smith's opinion on infringement and invalidity are based on the "points of novelty" test of *Litton***

*Systems*, **which the Federal Circuit squarely rejected as a separate test in 2008 in** *Egyptian Goddess*, **Mr. Smith's opinions in this respect are not appropriate and must be excluded.**

## B. Copyright

PCMW argues that Mr. Smith should also not be allowed to testify as to copyright infringement, since he testified at his deposition, "I don't know that I do know the standard for copyright infringement." Doc. 224-4, Smith Dep. at 181. Malibu responds that it does not intend to offer Mr. Smith as an expert on copyright infringement, but merely to rebut Mr. Anders' or Mr. Seyler's assertions concerning subsidiary issues, such as whether certain CAD files are identical to PCMW's files (which PCMW says are copyrighted). Doc. 250 at 19. Malibu contends that, if PCMW's experts are allowed to opine as to the alleged similarity between Defendants' CAD files and the copyrighted files, Mr. Smith – who is qualified to analyze CAD files–should be permitted to offer rebuttal opinions on this subject. **The Court leaves the relevancy and admissibility determinations on this issue to the District Judge to decide at trial.**

## C. Obviousness

PCMW argues that Mr. Smith failed to perform the correct obviousness analysis of the '070 Patent, and his opinion should be excluded because his entire obviousness analysis consists of four sentences:

> 128. If the '070 patent is not anticipated by the Ford Shelby windshield, it is clearly obvious over the Ford Shelby windshield in view of U.S. Patent No. D331,560 ("the '560 patent"). The '560 patent shows a corner post on a curved marine windshield with three rectangular vent holes. The Ford shows the thick and tapered corner post. Should PCMW make the assertion that the shape and number of vent holes is not important, the combination of the Shelby and the '560 patent makes the design obvious.

Doc. 224-2 at 63, ¶ 128. PCMW argues that, in Mr. Smith's four-sentence opinion, he failed to perform the requisite analysis for an obviousness opinion in a design patent case. Invalidity due to

obviousness based on a combination of references, PCMW argues, must cite a primary reference having design characteristics that are basically the same as the claimed design.

Malibu argues that PCMW is incorrect in objecting that Mr. Smith's obviousness analysis fails to identify a primary prior art reference because, in ¶ 127 of Mr. Smith's expert report, he states that his primary reference is the Ford Shelby car windshield, with the '560 design patent as a secondary reference. Doc. 224-1, Smith expert report at ¶ 127. That is not true. In actuality, Mr. Smith only mentions the Ford Shelby car windshield:

> 127. If PCMW takes the position that the number of the holes is not important, then the '070 design patent is anticipated by the windshield on the 2004 Ford Shelby Concept car. As shown below, the windshield on the Ford Shelby has a thick and tapered corner post, with a hidden top windshield rail, and they have chosen to put zero holes in the corner post.

In the following paragraph, ¶ 128 as quoted above, Mr. Smith talks about both the Ford Shelby windshield and the '560 Patent without explicitly specifying which is primary and which is secondary. In arguing that Mr. Smith has failed to met the standards required, PCMW cites the Federal Circuit's opinion in *In re Harvey*, which requires:

> In ornamental design cases, a proper obviousness rejection based on a combination of references requires that the visual ornamental features (design characteristics) of the claimed design appear in the prior art in a manner which suggests such features as used in the claimed design. If, however, the combined teachings suggest only components of a claimed design, but not its overall appearance, an obviousness rejection is inappropriate.

12 F.3d 1061, 1063 (Fed. Cir 1996). The designs of other references may only be relied on for modification of the basic design when they are so related that the appearance of ornamental features in one would have suggested application of those features to another. *Id.*

PCMW contends that although Mr. Smith does not indicate whether the Ford Shelby windshield or the corner post disclosed in the '560 Patent is his primary reference, neither has design characteristics that are basically the same as the claimed design. It also argues that Mr. Smith provides

no explanation as to why one of ordinary skill in the art would combine the two references, or what a combination of the '560 Patent and the Ford Shelby windshield would look like. Mr. Smith also provides no comparison of hypothetical prior art to the patented design, PCMW argues.

Malibu contends that Mr. Smith's report is "perfectly clear as to the characteristics shared by these references and the '070 design: a thick and tapered corner post with a hidden top windshield rail (the Ford Shelby car), and a curved marine windshield with three, vertically oriented, rectangular corner post vent holes (the '560 patent). *Id.* at ¶¶ 127-28. Malibu argues that PCMW can probe the weaknesses in Mr. Smith's analysis through cross-examination. **The Court agrees that while Mr. Smith's opinion on obviousness is not as clear as might be, he nonetheless does include both prior art references in his opinion in ¶¶ 127-128, and he will be subject to cross-examination on these opinions.**

## D. Patent Examiner Actions

PCMW also argues that Mr. Smith employed the wrong legal standard for his opinions on the patent examiner's actions in ¶ 126 of his Report —that the patent examiner found windshield corner posts with different numbers of holes to be "patentably distinct." Mr. Smith's report comments on the meaning of the examiner's determination of a restriction requirement. Doc. 224-1, at 22. At Mr. Smith's deposition, he testified that he understood that the examiner used the "ordinary observer" test for infringement to determine what was "patentably distinct." Doc. 224-4, Smith Dep. at 140-41.

PCMW argues that the examiner used a completely different test. The parties dispute which standard is used, even though they both cite to MPEP 1504.05 II. As the Manual of Patent Examining Procedure explains, various embodiments are patentably indistinct when:

> the differences between the embodiments [are] either . . . *de minimis* and unrelated to their overall aesthetic appearance or . . . obvious to a designer of ordinary skill in view of the analogous prior art.

MPEP § 1504.05.

Mr. Smith's single-sentence opinion is very unclear how he formulated his opinion. Malibu argues that Mr. Smith's opinion was based on the "ordinary observer" test, but for the reasons expressed above, Mr. Smith's application of the test was not proper. Alternatively, it appears that he made an assumption about the patent examiner's decision that was not clearly based on whether it was "obvious to a designer of ordinary skill" and is deficient for that reason. **Under either basis, Mr. Smith's opinion about the patent examiner's determination must be excluded.**

# VIII. Analysis: Seyler

## A. Sales Drivers

Malibu challenges Mr. Seyler's opinion that "it is the accused windshield which drives Malibu's boat sales," arguing that it is not reliable because it lacks support. Doc. 234-7, Seyler expert report at 14 (Malibu's accused windshield "sell Malibu's boats"); *see also id.* at 15, 18 (stating that there is an "obvious" or "clear" relationship between Malibu's sales and its use of the accused windshield). Malibu also faults Mr. Seyler for opining on Malibu's sales, arguing that he cannot properly do so without acquiring data, conducting studies, surveys, or observing the target market and the product or feature at issue.

PCMW contends that Mr. Seyler reviewed numerous records, pleadings, deposition transcripts, manufacturing drawings, CAD files, marketing materials, Malibu's website, Malibu's Dealer Survey and numerous documents produced through discovery, as well as information found on the websites of Malibu's competitors, and went "through the different models and [took] a look at them and what they do" in forming his opinions. Doc. 257-4 at 55. Malibu concedes that Mr. Seyler does rely on deposition testimony and documents in formulating his opinions, but argues these could not give

support to some of his opinions. However, Malibu contends that Mr. Seyler should not have relied on the Malibu Dealer Survey, because he "did not speak with any of the participants in that survey." *Id.* at 153-54. PCMW argues that Malibu takes out of context a statement in his deposition that he "didn't make up the survey. I don't know what was going through the people's mind that did." (*Id.* at 153).

Malibu argues that Mr. Seyler's opinions concerning which features drive demand in the boat industry proffered by PCMW in support of its contention that it can collect damages based on sales of entire boats, under the entire market value rule, should be excluded. Because Mr. Seyler's opinion that the accused windshield drives the sale of Malibu's boats[12] relates directly to the issue of calculation of damages from Malibu's sale of boats with the accused windshield – argued in the parties' cross-motions for summary judgment – **this Court will DEFER ruling on the exclusion of Mr. Seyler's opinion on the market demand for Malibu's boats to the presiding District Judge, Judge Antoon, consistent with his ruling on the parties' cross-motions for summary judgment on the proper measure of computation of damages.** *See* Docs. 176, 211.

Malibu argues that Mr. Seyler's opinions about Malibu's motives for its business decisions – such as "Malibu's decision to incorporate the frameless windshield design on 75 percent of its product line evidences the fact that Malibu indeed believes that the patented design is the key factor driving the consumer demand for its boats"[13] – should be excluded because it is "not helpful to the jury" and is contradicted by other explanations concerning economics of inventory management.

---

[12]Malibu also challenges Mr. Seyler's similar opinions about the boat industry which are tied to the summary judgment issue on damages, such as: "In the recreational power boat industry, design aesthetics drive boat sales more than any functional aspect of the boat[.]"; "The cost of a single component, like the windshield, has absolutely no effect on the customer's decision to ultimately purchase a Malibu boat as opposed to one of its competitor's."; "The cost of implementing a given windshield design has absolutely no relationship to the measure of profits generated by the increase in boat sales attributable to the windshield design[.]" Doc. 234-7, Seyler Expert Report at 5, 6 .

[13]Doc. 234-7 at 5, 14

PCMW argues that there is adequate foundation for Mr. Seyler's opinions, which it argues are based on his extensive review of the record and his relevant experience. PCMW argues that Malibu has taken snippets from Mr. Seyler's deposition out of context or mischaracterized his testimony in the transcript. In forming his opinions, PCMW argues, Mr. Seyler drew on his background and experience, but also reviewed information found on the websites of Malibu's competitors, and went "through the different models and [took] a look at them and what they do" in forming his opinions. Doc. 257-4 at 55. PCMW cites portions of Mr. Seyler's deposition which illustrate how he formed his opinions:

> Q. So your opinion that the windshield is the key feature on the Malibu Boats is based on what you've read in deposition testimony?
>
> A. My opinion is based on the unique different styling of the windshield based on the fact that Malibu had a very difficult time introducing it into the market, and it would have been very easy -- it would have been less costly for them to replace it with the old style windshield. Yet, the CEO of the company in his deposition stated that it is a key feature. In a memo that he sent out he said, "That the effort that we went through will all be worth it. This will set us apart from the market." In addition to that, in the next three years they put that same windshield style on 75 percent of the boats and they increased their sales by approximately 25 percent after doing that. And as far as I can see, that windshield was the key feature that did it. And this is in a market where boat sales have dropped 30, 50, 70 percent. All their competition has been retracting while they've been growing. So yes, I've come to the conclusion that [the accused] windshield is very definitely a major feature that incurred -- that increased in sales.

Doc. 257-4 at 59-60 (objection omitted). PCMW also cites Mr. Seyler's testimony that he had spoken to hundreds of customers and over 100 dealers, and observed consumer behavior at boat shows to help him determine what drives consumer demand in the recreational boating industry. *Id*. at 26-27. Mr. Seyler also considered the admission of Malibu's CEO that "I am confident that this new windshield design will set us apart from the competition at boat shows." Doc. No. 146-1 at 36.

PCMW argues that Mr. Seyler's specialized knowledge will be helpful to the jury in understanding why, from the perspective of the boat manufacturer, it is important to utilize aesthetic

design elements, like the accused windshield design, to distinguish your products from the competition at boat shows. Doc. 256 at 29 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156(1999) ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")). Mr. Seyler testified:

> Q. Do you have an opinion as to whether the patented windshield design led to the sales of any of the boats sold by Malibu with that patented windshield design?
>
> A. My opinion on that's based on the testimony of Mr. Wilson and Mr. Alkema stating that it was a key factor and that since they put that windshield on the boats their sales have increased while the competition sales decreased. So therefore I would say yes, it did have a relationship.
>
> * * *
>
> Q. Apart from deposition testimony you've read, setting that aside, is it your opinion that the patented windshield led to the sales of any boats sold by Malibu with the patented windshield?
>
> A. I know from experience that many boats are sold because of a key component that sets them apart. This windshield is a key component and it sets it apart from the competition, and I infer from that that that windshield has helped in the sale of the boat.

Doc. 257-4 at 88-89 (objection omitted). Malibu's objections to Mr. Seyler's testimony go to the weight to be given the evidence and not to its admissibility. *See Carnegie Mellon University v. Marvell Technology Group, Ltd.*, No. 09-290, 2012 WL 3686693, *5 (W.D. Pa. Aug. 24, 2012) (holding expert's testimony based on personal knowledge and experience in hard disk drive industry was admissible and would be helpful to the trier of fact; opposing party's arguments that expert incorrectly defined the relevant industry would be subject to cross-examination under *Daubert* standards). **Mr. Seyler's opinions on what drives Malibu's sales are properly a topic for cross-examination and will not be excluded.**

## B. Copyright

Malibu also argues that the court should exclude Mr. Seyler's opinion that defendants engaged in copying of PCMW's copyrighted files because he has no first-hand knowledge as to any of the events of the case. Doc. 234-7 at 5, 15-18. PCMW contends that before forming his opinion that Malibu copied PCMW's CAD files, Mr. Seyler performed a detailed analysis of the evidence, which is included in his report in determining that Malibu had copied PCMW's copyrighted CAD file. Doc. 257-2 at 19-29. Mr. Seyler reached the conclusion that "each of these files originated from one drawing and are copies of each other" based on his analysis which revealed that the glass surfaces in the files were perfectly aligned. *Id*. at 24. Malibu concedes that Mr. Seyler is qualified to opine as to the level of similarity between the copyrighted file and the accused products. **Mr. Seyler's experience with CAD files and his comparison and detailed analysis of the CAD files is an appropriate basis for opining on Malibu's alleged copying. His testimony on the issue will not be excluded.**

## C. Trade Secrets

Malibu also seeks exclusion of Mr. Seyler's opinion that Malibu misappropriated PCMW's "trade secrets," arguing that he is unqualified to reach such a legal conclusion. Malibu argues that Mr. Seyler misunderstands the *legal* standard for trade secret protection, as evidenced by his admission that he does not know whether a manufacturing technique (like many of PCMW's purported trade secrets) being readily ascertainable from products in the public domain would impact the trade secret status of that technique. Doc. 234-3, Seyler Dep. at 123-24. Malibu is critical of Mr. Seyler's use of "facts" PCMW owner Darren Bach "fed" him, which Malibu argues were not independently verified. *Id.* at 126-27.

PCMW point to Mr. Seyler's deposition testimony to show that he was able to recite specific facts from the record to support his opinions concerning PCMW's trade secrets.

Q. Were parts of that overall process known to the industry?

A. All the windshield glass is tempered. He tempered his glass, so that was known. They're all assembled in jigs. He assembled them in jigs so that was known. But the way he tempered the glass was not normal. The reasons he did it in his way was particular to this windshield.

The jigs that he used in the assembly of the windshield was not normal because it was a different style of windshield. Without a frame capturing the end, only the glass adhered to the surface of the frame. The material he used to adhere the glass to the frame is used but the particular method in which he did it and the reasons he did it for were not generally known.

*Id.* at 125; *see also* 140-41 (citing the testimony of Malibu's former CEO as supportive of his opinions concerning PCMW's trade secrets). **Mr. Seyler had a factual basis to reach his opinion concerning his trade secret misappropriation opinion, and the opinion will not be excluded on that basis alone.**

### D. Licensing

Malibu argues that the Court should exclude Mr. Seyler's opinion as to the scope and effect of an alleged Malibu-PCMW license relating to the '915 Patent, which is one of the issue that the parties raised in summary judgment briefing. Aside from noting that PCMW does not specifically respond to Malibu's argument on this issue, **the Court will DEFER any ruling on Mr. Seyler's opinion regarding trade secret misappropriation to Judge Antoon in light of his summary judgment ruling on the issue.**

# IX. Barrick and Green

**To the extent the parties seek to exclude the testimony of experts Lorraine Barrick and Philip Green, who opine on damages using opposing damages models, the Court will DEFER any such ruling on the applicable damages methodology to the presiding District Judge, consistent with his ruling on the parties cross-motions for summary judgment on this precise issue in the computation of damages.** *See* Docs. 176, 211.

# X. Conclusions

As noted above, certain issues relating to specific portions of the various expert opinion evidence are intertwined with consideration of the proper standard for damages and matters argued at length in other motions pending before the District Judge. Those issues are accordingly deferred to him. Other specific opinions may require consideration in full context of trial and are likewise deferred. Subject to those deferrals and remembering that appropriate jury instructions are needed for proper consideration of these expert analyses, the Court finds that Robert Anders' expert testimony is based on the correct formulation of the test for infringement and validity, and otherwise reliable, and it will not be excluded. Because the Court finds that Fred Smith's expert testimony was in large part based on the wrong standard for infringement and validity, or otherwise unreliable, the Court finds that most of it should be excluded as detailed above. Except for deferred issues, Mr. Seyler's opinions may be offered.

**DONE** and **ORDERED** in Orlando, Florida on January 4, 2013

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record