PUBLIC VERSION

█████████████████████

**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 2 8 2020

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| ZEST LABS, INC. f/k/a INTELLEFLEX CORPORATION; and ECOARK HOLDINGS, INC. | § § § § | **FILED UNDER SEAL** |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 4:18-cv-500-JM |
| WALMART INC. f/k/a WALMART STORES, INC. | § § § § | JURY TRIAL DEMANDED |
| Defendant. | § § | |

**ZEST LABS INC.'S BRIEF IN SUPPORT OF ITS MOTION
FOR PARTIAL SUMMARY JUDGMENT THAT
WALMART USED AND DISCLOSED ZEST LABS' INFORMATION
IN THE WALMART APPLICATIONS**



PUBLIC VERSION

██████████████████████████████████

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................1

II.   STATEMENT OF UNDISPUTED FACTS...............................................................2

      1.    *Walmart's Patent Filings.*............................................................................2

      2.    *Walmart Received Information from Zest.*..................................................2

      3.    *Walmart acquired Zest's information under a non-disclosure agreement.*..........3

      4.    *The inventors of the Walmart Applications had access to Zest information.* .......6

      5.    *Walmart used Zest information to create the Walmart Applications* ..................6

III.  ARGUMENT.....................................................................................................12

      A.    *Relevant Legal Standards* .......................................................................12

            1.    Summary Judgment Standards...................................................12

            2.    "Misappropriation" under the Arkansas Trade Secrets Act and the
                  Defend Trade Secrets Act  ......................................................13

            3.    There is no genuine dispute that Walmart used Zest information, without
                  the express or implied consent of Zest, in preparing the contents of the
                  Walmart Applications.  ...........................................................15

            4.    There is no genuine dispute that Walmart disclosed the contents of the
                  Walmart Application to the public when it allowed the Walmart
                  Application to publish and did so without Zest's consent.  ....................16

            5.    "There is no genuine dispute that Walmart knew that it owed a duty to
                  keep Zest's information secret or limit its use......................................16

IV.   CONCLUSION ..................................................................................................17

████████████████

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................. 12, 13

*Brown v. ADFA*,
   2016 U.S. Dist. Lexis 47663...................................................................................... 12

*Celotex v. Catrett*,
   477 U.S. 317 (1986).................................................................................................. 13

*Matsushita Electric v. Zenith Radio*,
   475 U.S. 574 (1986).................................................................................................. 13

*National Bank of Commerce v. Dow Chemical*,
   165 F.3d 602 (8th Cir. 1999) .................................................................................... 13

*United States v. Porter*,
   581 F.2d 698 (8th Cir. 1978) .................................................................................... 13

**Statutes**

Arkansas Trade Secret Act........................................................................................... 1, 13, 14

Defend Trade Secrets Act (18 U.S.C. § 1839)..................................................... 1, 13, 14

Fed. R. Civ. P. 56......................................................................................................... 12

Local Rule 56.1(a) ....................................................................................................... 2

PUBLIC VERSION

████████████████████████████████████

## I.    INTRODUCTION

Walmart filed a provisional patent application on "predicting shelf life based on item specific metrics" on November 10, 2017 (the "Walmart Provisional Application"), and then filed a substantively identical non-provisional patent application on August 27, 2018 (the "Walmart Application")(collectively the "Walmart Applications").

To prove misappropriation, both the Arkansas Trade Secret Act and the Defend Trade Secrets Act require a showing (1) that the trade secrets exist; (2) use or disclosure by Walmart without consent; and (3) a duty by Walmart to maintain secrecy or limit use.  Zest Labs, Inc. ("Zest") files this motion for partial summary judgment on issues (2) and (3) only.  Zest moves for summary judgment on these issues because there is no genuine dispute that Zest information was used to prepare the contents of the Walmart Applications.

There is no genuine dispute on the following issues:

1. Walmart used Zest information, without the express or implied consent of Zest, in preparing the contents of the Walmart Applications.

2. Walmart disclosed the contents of the Walmart Application to the public when it allowed the Walmart Application to publish and did so without Zest's consent.

3. Walmart knew that it owed a duty to keep Zest's information secret or limit its use.

Given these undisputed facts, Zest is entitled to judgment as a matter of law that Walmart used and disclosed Zest's information in the Walmart Applications without Zest's consent, while under a duty to keep the information secret or limit its use.

1

**II.    STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1(a), Zest Labs has filed with its motion and outlines below a short and concise statement of the material facts as to which there is no genuine dispute to be tried.

*1.  Walmart's Patent Filings*

    a.  Walmart filed the Walmart Provisional Application on November 10, 2017.  *See* Exhibit A: United States Provisional Patent Application No. 62/584,396, filed on Nov 10, 2017.

    b.  Walmart filed the non-provisional Walmart Patent Application on August 27, 2018.  *See* Exhibit B, (United States Patent Application Publication No. 2019/0147396 (*see* cover page)).

    c.  The Walmart Application is substantively identical to the Walmart Provisional Application.  *See* Exhibit C, (Expert Report of Mark Lanning Regarding Walmart's Misappropriation of Zest's Confidential Information ("Lanning Report")), p.46 at ¶122.

    d.  The Walmart Application published on May 16, 2019, as U.S. Patent Application Publication No. 2019/0147396.  *See* Exhibit B (*see* cover page).

*2.  Walmart Received Information from Zest.*

    a.  Walmart received information and presentations from Zest regarding Zest's technology including the Zest Fresh system (the "Zest Solution").  *See* Exhibit C, at pp. 26-40 and 56-254 at ¶¶ 84-107, 141-530 ; *see also* Exhibit D, (Walmart produced documents that show Zest information received by Walmart and found in the Walmart Application); Exhibit E, (Zest produced documents that

show Zest information provided to Walmart and found in the Walmart Application).

b. Walmart's expert Dr. Catherine Hutt conceded that Walmart received information and presentations from Zest regarding the Zest Solution:



Exhibit F (Deposition of Dr. Catherine Hutt ("Hutt Depo.")) at p.151:3-16.

3. ***Walmart acquired Zest's information under a non-disclosure agreement.***

a. Zest[1] and Walmart[2] entered into a contract on July 21, 2015 (the "Contract"). *See* Exhibit G at p. 2.

b. In the Contract, Walmart promised to ███████████████████████████ *Id.* at ¶ 2(a).

---

[1] When the contract was signed, Zest Labs, Inc. was named Intelleflex Corporation.  The company's name changed to Zest Labs, Inc. in 2016.  *See* Exhibit N, Deposition of Russell Shikami at 11:11-16.

[2] When the agreement was signed, Walmart, Inc. was named Wal-Mart Stores, Inc.  The company's name changed to Walmart, Inc. in 2017.  *See* Exhibit O, https://corporate.walmart.com/newsroom/2017/12/05/walmart-changes-its-legal-name-to-reflect-how-customers-want-to-shop

3

PUBLIC VERSION

██████████████████████████████████

c.  In the Contract, Walmart promised ███████████████████████

████████████████████████████████" with Zest.  *Id.* at ¶

2(a).

d.  In the Contract, Walmart promised to "███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████" *Id.* at ¶ 2(c).

e.  The Contract defines ████████████████ as ████████████

████████████████████████████████████

████████████████████████

████████████████████████████████████████

████████████████████████████████████████

*Id.* at ¶ 1 (emphasis added).

f.  Zest provided its information, including presentations and emails, and

conducted its meetings, including Walmart's visits to Zest's facilities, under the

Contract.  *See* Exhibit E at E10 (ZEST_ECOARK0017471); Exhibit H,

(ZEST_ECOARK0082369, Series of Emails between Peter Mehring and

Denise Sharpe); Exhibit I, (Deposition of Denise Sharpe at 50:16-20):

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

4

g. Walmart has a global ethics policy that required third-party vendor information received by Walmart to be treated as confidential, as though it was trade secret information of Walmart. This fact was confirmed by the CEO of Walmart USA, Mr. Greg Foran:



*See* Exhibit J (Deposition of Greg Foran ("Foran Depo.")) at 32:16-25; and Exhibit K, (Walmart's Global Statement of Ethics).

h. Mr. Foran also testified that he expects all Walmart USA employees to honor the Global Statement of Ethics:



████████████████████████████████

Exhibit J at 24:24-25:1 and 25:7-17.

**4.  *The inventors of the Walmart Applications had access to Zest information.***

a.  The inventors of the Walmart Applications had access to Zest presentations. *See* Exhibit C, at ¶¶ 548-551; 558-564.

b.  The inventors of the Walmart Applications had access to Walmart personnel who made site visits to Zest and learned Zest information from interactions with Zest personnel and observations and use of Zest's technology.  *See* Exhibit C, at ¶¶ 91, 105-107, and 531-564.

c.  Walmart's expert Dr. Hutt does not know what Zest information the inventors of the Walmart Applications received:



Exhibit F at 153:11-154:2.

**5.  *Walmart used Zest information to create the Walmart Applications.***

PUBLIC VERSION

a. Zest's expert Mr. Lanning, throughout his report, opines that the Zest information provided to Walmart is found in the Walmart Applications. No Walmart witness or expert disputed these facts. *See* Exhibit C, at ¶¶ 141-530.

b. Mr. Lanning, throughout his report, opines that the Zest information was used to prepare the disclosures of the Walmart Application. No Walmart witness or experts disputed these facts. *Id.*

c. Walmart's expert Dr. Dobkin repeatedly conceded that he offered no opinions on whether the inventors of the Walmart Application used Zest information in creating the disclosures of Walmart Application:



Exhibit L, (Deposition of Dr. David Dobkin) at 131:11-24.



*Id.* at 142:9-18.



*Id.* at 162:17-163:3.



*Id.* at 176:23-177:12.



*Id*. at 200:24-201:13.



*Id*. at 215:23-216:14.





*Id.* at 247:19-248:6.



*Id.* at 253:10-24.

d. Walmart's other expert Dr. Gary Gaukler testified that he did not provide any opinion on whether Walmart used Zest information in creating the disclosures of the Walmart Application:



Exhibit M, (Deposition of Gary Gaukler) at 37:13-19.



*Id*. at 37:20-38:2.



*Id*. at 38:3-9.



*Id*. at 38:10-15.

e.  Walmart's expert Dr. Hutt offered no opinion on whether the inventors of the
    Walmart Application used Zest information in creating the disclosures of the
    Walmart Application:



Exhibit F at 146:4-18.

## III.    ARGUMENT

### A.    *Relevant Legal Standards*

#### 1.    Summary Judgment Standards

Rule 56 specifically provides that summary judgment shall be entered when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, "show[] that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  A scintilla of evidence in support of the nonmoving party's claim is not sufficient to successfully block summary judgment and, instead, "there must be evidence on which the jury could reasonably find for the party opposing the motion." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986). The nonmoving party must meet proof with proof. *Brown v. ADFA*, 2016 U.S. Dist. Lexis 47663.

Although reasonable inferences from the facts are to be drawn in favor of the nonmoving party, the nonmoving party "must do more than simply show that there is some metaphysical doubt

as to the material facts." *Matsushita Electric v. Zenith Radio*, 475 U.S. 574 (1986). If the opposing party's evidence is not significantly probative or creates a factual dispute that is irrelevant to the determination of the issues presented, that does not prevent summary judgment. *See Celotex v. Catrett*, 477 U.S. 317, 323-4 (1986).

To survive summary judgment, the nonmoving party must not only provide material facts sufficient to create a disputed issue of fact on an essential element, but must also show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Matsushita Electric v. Zenith Radio*, *supra*; *Anderson v. Liberty Lobby, Inc.*, *supra*. Furthermore, "a case founded on speculation or suspicion is insufficient to survive a Motion for Summary Judgment." *National Bank of Commerce v. Dow Chemical*, 165 F.3d 602 (8th Cir. 1999). When there is no genuine issue of material fact, "summary judgment is a useful tool" to avoid trying issues that can be resolved without a trial. *United States v. Porter*, 581 F.2d 698 (8th Cir. 1978).

2. **"Misappropriation" under the Arkansas Trade Secrets Act and the Defend Trade Secrets Act**

The Arkansas Trade Secrets Act ("ATSA") defines "misappropriation:"

(2) "Misappropriation" means:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(a) Derived from or through a person who had utilized improper means to acquire it;

(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake;

PUBLIC VERSION

The Defend Trade Secrets Act (18 U.S.C. § 1839) defines "misappropriation:"

**(5)** the term "misappropriation" means—

> **(A)** acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> **(B)** disclosure or use of a trade secret of another without express or implied consent by a person who—
>
>> **(i)** used improper means to acquire knowledge of the trade secret;
>>
>> **(ii)** at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>>
>>> **(I)** derived from or through a person who had used improper means to acquire the trade secret;
>>>
>>> **(II)** acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>>
>>> **(III)** derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> **(iii)** before a material change of the position of the person, knew or had reason to know that—
>>
>>> **(I)** the trade secret was a trade secret; and
>>>
>>> **(II)** knowledge of the trade secret had been acquired by accident or mistake;

Proving "misappropriation" is essentially the same under the ATSA and DTSA. One way to prove "misappropriation" is by showing (a) disclosure or use of a trade secret of another without express or implied consent by a person who (b) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret. In essence, Zest must prove

> (1)     the trade secrets exist;
> (2)     use or disclosure by Walmart without consent; and
> (3)     a duty by Walmart to maintain secrecy or limit use.

This motion seeks partial summary judgment only on issues (2) and (3).

**3.     There is no genuine dispute that Walmart used Zest information, without the express or implied consent of Zest, in preparing the contents of the Walmart Applications.**

There is no genuine dispute that Walmart received Zest information during the parties' business dealings. Walmart received confidential documents containing Zest information and oral presentations and visual presentations. Statement of Material Facts ("SOMF") at ¶ 2a. Walmart's expert Dr. Hutt concedes that Walmart received Zest information, including presentations. *Id.* at ¶ 2b.

There is no genuine dispute that the inventors of the Walmart Applications had access to Zest information. SOMF at ¶¶ 4a, 4b. Dr. Hutt does refute this point; in fact, she does not even know what Zest information the inventors received. *Id.* at ¶ 4c.

There is no genuine dispute that Zest information was used in the process of developing—and is now found in—the Walmart Applications. *Id.* at ¶¶ 5a, 5b. Again Dr. Hutt offers no opinions to the contrary. *Id.* at ¶ 5e. Likewise, Walmart's other experts, Drs. Dobkin and Gaukler, offer no opinions on the use of Zest information in creating the Walmart Applications. *Id.* at ¶¶ 5c and 5d.

Given these undisputed facts, there is no genuine dispute that (1) Walmart received Zest information; (2) the inventors of the Walmart Applications had access to that information; (3) Zest information was used to create the Walmart Applications; and (4) Zest information is found in the Walmart Applications.

███████████████████████████████████████████████

**4.**     **There is no genuine dispute that Walmart disclosed the contents of the Walmart Application to the public when it allowed the Walmart Application to publish and did so without Zest's consent.**

It is undisputed that the Walmart Application was published on May 16, 2019. SOMF at ¶ 1d. The publication of the Walmart Application made its contents available to the public—not just in the United States but around the world. Walmart does not and cannot dispute this fact. It is also undisputed that Walmart allowed the Walmart Application to publish without Zest's consent.

**5.**     **There is no genuine dispute that Walmart knew that it owed a duty to keep Zest's information secret or limit its use.**

Walmart began using Zest information to create the Walmart Application at the latest on November 10, 2017—when Walmart filed the provisional patent application that led to the Walmart Application. SOMF at ¶ 1a. Walmart and Zest had entered into the Contract before that provisional filing. *Id.* at ¶ 3a. Under the Contract, Walmart was obligated to ████████████████ ████████████████████████████████████████████████████ *Id.* at ¶ 2b. Walmart promised ███████████████████████████████████████████████ ███████████████████████ with Zest.   *Id.* at ¶ 2c. Walmart agreed to ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████   *Id.* at ¶ 2d. Zest provided its documents and presentations, including site visits and oral presentations, under the terms of the Contract.   *Id.* at ¶ 3f.

In addition, Walmart's global ethics policy required Walmart to treat all Zest information as confidentially as if it were Walmart confidential information.   *Id.* at ¶ 3g. The CEO of Walmart

16

USA conceded that all of his employees are expected to honor that policy. *Id.* at ¶ 3h. The confidentiality obligations of the Contract were in full effect at the time of the creation and publication of the Walmart Application.

There is no genuine dispute that, when Walmart used the Zest information to create the content of the Walmart Applications, it knew that it owed a duty to Zest to keep that information secret and to limit its use. It is beyond genuine dispute that the terms of the Contract did not permit Walmart to use Zest's information to create Walmart's patent applications. Likewise, when the Walmart Application published, Walmart knew that it had a continuing duty to maintain Zest's information in secret and to limit the use under the Contract and under its Global Statement on Ethics.

## IV.    CONCLUSION

Given the foregoing, Zest respectfully submits that the Court should grant partial summary judgment that (1) Walmart used and disclosed Zest's information without consent in preparing, filing, and publishing the contents of the Walmart Applications; and (2) Walmart had a duty to maintain the secrecy of Zest's information, and to limit its use, when it prepared, filed, and published the contents of the Walmart Applications.

Dated: February 28, 2020          Respectfully submitted,

By: */s/* Michael Simons
Fred I. Williams (*pro hac vice*)
Texas State Bar No. 00794855
Michael Simons (*pro hac vice*)
Texas State Bar No. 24008042
Todd E. Landis *(pro hac vice)*
Texas State Bar No. 24030226
Jonathan L. Hardt (*pro hac vice*)
Texas State Bar No. 24039906

17

WILLIAMS SIMONS & LANDIS PLLC
327 Congress Ave., Suite 490
Austin, TX 78701
512.543.1354
fwilliams@wsltrial.com
msimons@wsltrial.com
tlandis@wsltrial.com
jhardt@wsltrial.com

Dustin B. McDaniel, Bar # 99011
Scott Richardson, Bar # 2001208
Bart Calhoun, Bar # 2011221
McDaniel, Richardson, & Calhoun PLLC
1020 West 4th St., Suite 410
Little Rock, AR 72201
501.235.8336
501.588.2104 fax
dmcdaniel@mrcfirm.com
scott@mrcfirm.com
bcalhoun@mrcfirm.com

Ross David Carmel, Esq. *(pro hac vice)*
New York State Bar No. 4686580
CARMEL, MILAZZO & DiCHIARA LLP
55 West 39th Street, 18th Floor
New York, New York 10018
(212) 658-0458 telephone
(646) 838-1314 facsimile
rcarmel@cmdllp.com

*Attorneys for Plaintiffs Zest Labs, Inc. f/k/a
Intelleflex Corporation, and Ecoark Holdings, Inc.*

18

███████████████████████████████████

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on February 28, 2020, the foregoing document was served on all counsel of record, via electronic mail and the Court's CM/ECF system, pursuant to the Federal Rules of Civil Procedure.


                             */s/* Michael Simons
                               Michael Simons

PUBLIC VERSION

**Exhibit List to Zest Labs Inc.'s Brief in Support of its Motion for Partial Summary Judgment that Walmart Used and Disclosed Zest Labs' Information in the Walmart Applications**

A – Public

B – Public

C – Filed Under Seal

D – Filed Under Seal

E – Filed Under Seal

F – Filed Under Seal

G – Filed Under Seal

H – Filed Under Seal

I – Filed Under Seal

J – Filed Under Seal

K – Filed Under Seal

L – Filed Under Seal

M – Filed Under Seal

N – Filed Under Seal

O – Public

# EXHIBIT A



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/584,396 | 11/10/2017 | Joshua Bohling | 3220US01 |

101379
Barta, Jones & Foley, P.C.
(Patent Group - Walmart Apollo, LLC)
2805 Dallas Parkway
Suite 222
Plano, TX 75093

**CONFIRMATION NO. 7965**
**POWER OF ATTORNEY NOTICE**


*OC000000103100881*

Date Mailed: 10/17/2018

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 10/09/2018.

• The Power of Attorney to you in this application has been revoked by the applicant. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/nbekele/

CONFIDENTIAL                                                                                           WM00119037



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/584,396 | 11/10/2017 | Joshua Bohling | 8842-144082-USPR_3220US01 |

**CONFIRMATION NO. 7965**

122573
Fitch, Even, Tabin & Flannery, LLP/Walmart Apollo
120 South LaSalle Street
Suite 2100
Chicago, IL 60603-3406

**POA ACCEPTANCE LETTER**

*OC000000103100900*

Date Mailed: 10/17/2018

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 10/09/2018.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/nbekele/

page 1 of 1

CONFIDENTIAL                                                                            WM00119038

Doc Code: PA
Document Description: Power of Attorney

PTO/AIA/82A (07-13)
Approved for use through 11/30/2014. OMB 0651-0051
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FOR POWER OF ATTORNEY TO ONE OR MORE REGISTERED PRACTITIONERS

NOTE: This form is to be submitted with the Power of Attorney by Applicant form (PTO/AIA/82B) to identify the application to which the Power of Attorney is directed, in accordance with 37 CFR 1.5, unless the application number and filing date are identified in the Power of Attorney by Applicant form. If neither form PTO/AIA/82A nor form PTO/AIA82B identifies the application to which the Power of Attorney is directed, the Power of Attorney will not be recognized in the application.

| | |
|---|---|
| Application Number | 62/584,396 |
| Filing Date | 2017-11-10 |
| First Named Inventor | Joshua Bohling |
| Title | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
| Art Unit | TBD |
| Examiner Name | TBD |
| Attorney Docket Number | 8842-144082-USPR_3220US01 |

## SIGNATURE of Applicant or Patent Practitioner

| Signature | /scott j. menghini/ | Date (Optional) | 2018-10-9 |
|---|---|---|---|
| Name | Scott J. Menghini | Registration Number | 42880 |
| Title (if Applicant is a juristic entity) | | | |

| Applicant Name (if Applicant is a juristic entity) | Walmart Apollo, LLC |
|---|---|

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. If more than one applicant, use multiple forms.

☑ *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

CONFIDENTIAL

Doc Code: PA..
Document Description: Power of Attorney

PTO/AIA/82B (07-13)
Approved for use through 01/31/2018. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

# POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in either the attached transmittal letter or the boxes below.

| Application Number | Filing Date |
|---|---|
| | |

(Note: The boxes above may be left blank if information is provided on form PTO/AIA/82A.)

[✓] I hereby appoint the Patent Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above:

OR

122573

[ ] I hereby appoint Practitioner(s) named in the attached list (form PTO/AIA/82C) as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the patent application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above. (Note: Complete form PTO/AIA/82C.)

**Please recognize or change the correspondence address for the application identified in the attached transmittal letter or the boxes above to:**

[✓] The address associated with the above-mentioned Customer Number
OR
[ ] The address associated with Customer Number:
OR

| [ ] Firm or Individual Name | |
|---|---|
| Address | |
| City | State | Zip |
| Country | |
| Telephone | Email |

I am the Applicant (if the Applicant is a juristic entity, list the Applicant name in the box):

## Walmart Apollo, LLC

[ ] Inventor or Joint Inventor (title not required below)

[ ] Legal Representative of a Deceased or Legally Incapacitated Inventor (title not required below)

[✓] Assignee or Person to Whom the Inventor is Under an Obligation to Assign (provide signer's title if applicant is a juristic entity)

[ ] Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document) (provide signer's title if applicant is a juristic entity)

### SIGNATURE of Applicant for Patent

The undersigned (whose title is supplied below) is authorized to act on behalf of the applicant (e.g., where the applicant is a juristic entity).

| Signature | | Date (Optional) | |
|---|---|---|---|
| Name | Craig Sharkey | | |
| Title | President, Walmart Apollo, LLC | | |

**NOTE:** Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. If more than one applicant, use multiple forms.

[ ] Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

CONFIDENTIAL                                                                                    WM00119040

PTO/AIA/82C (07-13)
Approved for use through 01/31/2018. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

# POWER OF ATTORNEY BY APPLICANT

No more than ten (10) patent practitioners total may be appointed as set forth below by name and registration number. This page need not be submitted if appointing the Patent Practitioner(s) associated with a Customer Number (see form PTO/AIA/82B):

| Name | Registration Number |
|------|---------------------|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

CONFIDENTIAL

WM00119041

# Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

CONFIDENTIAL                                                                                        WM00119042

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 33962084 |
| **Application Number:** | 62584396 |
| **International Application Number:** | |
| **Confirmation Number:** | 7965 |
| **Title of Invention:** | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
| **First Named Inventor/Applicant Name:** | Joshua Bohling |
| **Customer Number:** | 101379 |
| **Filer:** | Scott J Menghini/Nicolas Pogliano |
| **Filer Authorized By:** | Scott J Menghini |
| **Attorney Docket Number:** | 3220US01 |
| **Receipt Date:** | 09-OCT-2018 |
| **Filing Date:** | 10-NOV-2017 |
| **Time Stamp:** | 20:11:18 |
| **Application Type:** | Provisional |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Power of Attorney | 3220US01_144082-USPR_AIA82AB_sjm.pdf | 405816 <br> 06271c5d6210afbcae18ac1cdaaf035999cd46c0 | no | 4 |

**Warnings:**

CONFIDENTIAL                                                                                                  WM00119043

Case 4:18-cv-00500-JM    Document 284    Filed 04/21/20    Page 32 of 165

| Information: | | |
|---|---|---|
| **Total Files Size (in bytes):** | 405816 |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**
**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**
**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

CONFIDENTIAL                                                                                          WM00119044



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/584,396 | 11/10/2017 | Joshua Bohling | 3220US01 |

**CONFIRMATION NO. 7965**

101379
Barta, Jones & Foley, P.C.
(Patent Group - Walmart Apollo, LLC)
2805 Dallas Parkway
Suite 222
Plano, TX 75093

**POA ACCEPTANCE LETTER**

*OC000000098434479*

Date Mailed: 04/02/2018

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 03/28/2018.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/byemane/

CONFIDENTIAL

WM00119045



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/584,396 | 11/10/2017 | | 260 | 3220US01 | | |

**CONFIRMATION NO. 7965**

101379

**CORRECTED FILING RECEIPT**

Barta, Jones & Foley, P.C.
(Patent Group - Walmart Apollo, LLC)
2805 Dallas Parkway
Suite 222
Plano, TX 75093

OC000000098434492

Date Mailed: 04/02/2018

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Joshua Bohling, Centerton, AR;
Terry Osbon, Fayetteville, AR;
Craig Trudo, Centerton, AR;
Riley Turben, Bentonville, AR;
Brandon Elliot Johnsen, Rogers, AR;

**Applicant(s)**

Walmart Apollo, LLC, Bentonville, AR;

**Power of Attorney:** The patent practitioners associated with Customer Number 101379

**Permission to Access Application via Priority Document Exchange:** Yes

**Permission to Access Search Results:** Yes

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 12/13/2017

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/584,396**

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No

page 1 of 3

CONFIDENTIAL

WM00119046

**Title**

PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

# PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

## LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier

CONFIDENTIAL                                                                                    WM00119047

license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

## **NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

CONFIDENTIAL                                                                                   WM00119048

**To:**         uspto@dockettrak.com,docket@bjfip.com,
**From:**       PAIR_eOfficeAction@uspto.gov
**Cc:**         PAIR_eOfficeAction@uspto.gov
**Subject:**    Private PAIR Correspondence Notification for Customer Number 101379

Apr 02, 2018 03:46:22 AM

Dear PAIR Customer:

Barta, Jones & Foley, P.C.
(Patent Group - Walmart Apollo, LLC)
2805 Dallas Parkway
Suite 222
Plano, TX 75093
UNITED STATES

The following USPTO patent application(s) associated with your Customer Number, 101379 , have new outgoing correspondence. This correspondence is now available for viewing in Private PAIR.

The official date of notification of the outgoing correspondence will be indicated on the form PTOL-90 accompanying the correspondence.

Disclaimer:
The list of documents shown below is provided as a courtesy and is not part of the official file wrapper. The content of the images shown in PAIR is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 62584396 | N570 | 04/02/2018 | 3220US01 |
| | APP.FILE.REC | 04/02/2018 | 3220US01 |

To view your correspondence online or update your email addresses, please visit us anytime at https://sportal.uspto.gov/secure/myportal/privatepair.

If you have any questions, please email the Electronic Business Center (EBC) at EBC@uspto.gov with 'e-Office Action' on the subject line or call 1-866-217-9197 during the following hours:

   Monday - Friday 6:00 a.m. to 12:00 a.m.

Thank you for prompt attention to this notice,

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT APPLICATION INFORMATION RETRIEVAL SYSTEM

CONFIDENTIAL                                                    WM00119049

**PATENT**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re patent application of:

| | | | |
|---|---|---|---|
| Applicant: | Walmart Apollo, LLC | Examiner: | unknown |
| Serial No.: | 62/584,396 | Art Unit: | unknown |
| Filing Date: | November 10, 2017 | Conf. No.: | 7965 |
| Title: | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | Docket No.: | 3220US01 |

**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**

### REQUEST TO UPDATE THE NAME OF APPLICANT

Sir:

In order to update the name of the Applicant, the following documents have been submitted:

1. Supplemental Application Data Sheet;

2. Statement Under 37 CFR 3.73(c); and

3. Power of Attorney from the new Applicant to the undersigned.

The new name of the Applicant is as follows: Walmart Apollo, LLC.

**Applicant respectfully requests that the name of the Applicant be updated and that an Updated Filing Receipt be issued showing the name of the new Applicant.**

Although no fees are believed to be required for this submission, the Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.P.R. § § 1.16 1.17, or credit any overpayment, to Deposit Account No. 50-6982.

Respectfully submitted,

/Sarah B. Foley/
Sarah B. Foley
Registration No. 63,321
Barta, Jones & Foley, P.C.

CONFIDENTIAL                                        WM00119050

Doc Code: PA..
Document Description: Power of Attorney

PTO/AIA/82B (07-13)
Approved for use through 01/31/2018. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

## POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in either the attached transmittal letter or the boxes below.

| Application Number | Filing Date |
|---|---|
| 62/584396 | 11/10/2017 |

(Note: The boxes above may be left blank if information is provided on form PTO/AIA/82A.)

[✓] I hereby appoint the Patent Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above:  101379

OR

[ ] I hereby appoint Practitioner(s) named in the attached list (form PTO/AIA/82C) as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the patent application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above. (Note: Complete form PTO/AIA/82C.)

**Please recognize or change the correspondence address for the application identified in the attached transmittal letter or the boxes above to:**

[✓] The address associated with the above-mentioned Customer Number

OR

[ ] The address associated with Customer Number: 

OR

| [ ] Firm or Individual Name | |
|---|---|
| Address | |
| City | State | Zip |
| Country | |
| Telephone | Email |

I am the Applicant (if the Applicant is a juristic entity, list the Applicant name in the box):

## Walmart Apollo, LLC

[ ] Inventor or Joint Inventor (title not required below)

[ ] Legal Representative of a Deceased or Legally Incapacitated Inventor (title not required below)

[✓] Assignee or Person to Whom the Inventor is Under an Obligation to Assign (provide signer's title if applicant is a juristic entity)

[ ] Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document) (provide signer's title if applicant is a juristic entity)

### SIGNATURE of Applicant for Patent

The undersigned (whose title is supplied below) is authorized to act on behalf of the applicant (e.g., where the applicant is a juristic entity).

| Signature | | Date (Optional) | 3-1-18 |
|---|---|---|---|
| Name | Holly Lar | | |
| Title | Associate Counsel | | |

**NOTE:** Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. If more than one applicant, use multiple forms.

[ ] Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2

CONFIDENTIAL

WM00119051

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | <u>62/584,396</u> |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

# Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

# Inventor Information:

**Inventor 1**    [Remove]

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Joshua | | Bohling | |

**Residence Information (Select One)** ● US Residency ○ Non US Residency ○ Active US Military Service

| City | Centerton | State/Province | AR | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 1451 Forest Drive |
|---|---|
| Address 2 | |

| City | Centerton | State/Province | AR |
|---|---|---|---|
| Postal Code | 72719 | Country i | US |

**Inventor 2**    [Remove]

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Terry | | Osbon | |

**Residence Information (Select One)** ● US Residency ○ Non US Residency ○ Active US Military Service

| City | Fayetteville | State/Province | AR | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 2136 Lisa Lane |
|---|---|
| Address 2 | |

| City | Fayetteville | State/Province | AR |
|---|---|---|---|
| Postal Code | 72703 | Country i | US |

**Inventor 3**    [Remove]

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Craig | | Trudo | |

**Residence Information (Select One)** ● US Residency ○ Non US Residency ○ Active US Military Service

EFS Web 2.2.12

CONFIDENTIAL                                                                                         WM00119052

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
| | Application Number | <u>62/584,396</u> |
| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | |

| City | Centerton | State/Province | AR | Country of Residence | US |

**Mailing Address of Inventor:**

| Address 1 | 1230 Cottonwood Road | | |
| Address 2 | | | |
| City | Centerton | State/Province | AR |
| Postal Code | 72719 | Country | US |

Inventor    4                                                    [ Remove ]

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Riley | | Turben | |

| Residence Information (Select One) | ● US Residency | ○ Non US Residency | ○ Active US Military Service |

| City | Bentonville | State/Province | AR | Country of Residence | US |

**Mailing Address of Inventor:**

| Address 1 | 401 SW A Street, #307 | | |
| Address 2 | | | |
| City | Bentonville | State/Province | AR |
| Postal Code | 72712 | Country | US |

Inventor    5                                                    [ Remove ]

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Brandon | Elliot | Johnsen | |

| Residence Information (Select One) | ● US Residency | ○ Non US Residency | ○ Active US Military Service |

| City | Rogers | State/Province | AR | Country of Residence | US |

**Mailing Address of Inventor:**

| Address 1 | 3001 S 28th Place Apt 6 | | |
| Address 2 | | | |
| City | Rogers | State/Province | AR |
| Postal Code | 72758 | Country | US |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.    [ Add ]

## Correspondence Information:

| Enter either Customer Number or complete the Correspondence Information section below. For further information see 37 CFR 1.33(a). |
| ☐ An Address is being provided for the correspondence Information of this application. |

EFS Web 2.2.12

CONFIDENTIAL                                                    WM00119053

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | 62/584,396 |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

| Customer Number | 101379 | | |
|---|---|---|---|
| Email Address | | Add Email | Remove Email |

## Application Information:

| Title of the Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | | |
|---|---|---|---|
| Attorney Docket Number | 3220US01 | **Small Entity Status Claimed** | ☐ |
| Application Type | Provisional | | |
| Subject Matter | Utility | | |
| **Total Number of Drawing Sheets (if any)** | 7 | **Suggested Figure for Publication (if any)** | 1 |

### Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

☐ Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☐ **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ⦿ Customer Number | ○ US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 101379 | | |

EFS Web 2.2.12

CONFIDENTIAL

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | 62/584,396 |
| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.

When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| | | | |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Remove Access Code[i] (if applicable) |
|---|---|---|---|
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

EFS Web 2.2.12

CONFIDENTIAL

WM00119055

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
| | Application Number | 62/584,396 |
| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | |

# Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**: This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application. After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s). Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1. Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A. Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2) any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B. Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2. Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐ A. Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed. If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐ B. Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:** Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

EFS Web 2.2.12

CONFIDENTIAL                                                                                    WM00119056

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | 62/584,396 |
| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | |

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

## Applicant    1

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| ● Assignee | ○ Legal Representative under 35 U.S.C. 117 | ○ Joint Inventor |
|---|---|---|
| ○ Person to whom the inventor is obligated to assign. | ○ Person who shows sufficient proprietary interest | |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

| Name of the Deceased or Legally Incapacitated Inventor: | |
|---|---|

| If the Applicant is an Organization check here. | ☒ |
|---|---|

| Organization Name | ~~Wal-Mart Stores, Inc.~~    Walmart Apollo, LLC |
|---|---|

**Mailing Address Information For Applicant:**

| **Address 1** | 702 S.W. 8th Street | | |
|---|---|---|---|
| Address 2 | | | |
| **City** | Bentonville | **State/Province** | AR |
| **Country** | US | Postal Code | 72716-0520 |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Applicant Data may be generated within this form by selecting the Add button.

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

EFS Web 2.2.12

CONFIDENTIAL

WM00119057

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | 62/584,396 |
| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | |

## Assignee  1

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

If the Assignee or Non-Applicant Assignee is an Organization check here.    ☐

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| **Address 1** | |
|---|---|
| Address 2 | |

| **City** | | **State/Province** | |
|---|---|---|---|
| **Country** | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.

# Signature:

**NOTE:** This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the INITIAL filing of the application and either box A or B is not checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| **Signature** | /Sarah B. Foley/ | | | Date  (YYYY-MM-DD) | 2018-03-25 |
|---|---|---|---|---|---|
| First Name | Sarah B. | Last Name | Foley | Registration Number | 63321 |

Additional Signature may be generated within this form by selecting the Add button.

CONFIDENTIAL    WM00119058

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | 62/584,396 |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.2.12

CONFIDENTIAL

WM00119059

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.2.12

CONFIDENTIAL

WM00119060

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 32167598 |
| **Application Number:** | 62584396 |
| **International Application Number:** | |
| **Confirmation Number:** | 7965 |
| **Title of Invention:** | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
| **First Named Inventor/Applicant Name:** | Joshua  Bohling |
| **Customer Number:** | 101379 |
| **Filer:** | Sarah Beth Foley |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | 3220US01 |
| **Receipt Date:** | 28-MAR-2018 |
| **Filing Date:** | 10-NOV-2017 |
| **Time Stamp:** | 14:56:40 |
| **Application Type:** | Provisional |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Assignee showing of ownership per 37 CFR 3.73 | USAssignment.pdf | 1178407<br><br>0ea8edd9b4d7bba059a70c11376f317200c03b3b | no | 7 |

**Warnings:**

CONFIDENTIAL

WM00119061

| Information: | | | | | |
|---|---|---|---|---|---|
| 2 | Assignee showing of ownership per 37 CFR 3.73 | 3220US01_373c.pdf | 119780<br><br>9df753fcc9059c8e7b07d4ae48898335b7b3606d | no | 3 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Request for Corrected Filing Receipt | 3220US01_Request-to-Update-Applicant.pdf | 193956<br><br>d30c97eb47b725d624587f6ecf5897e1e9f490dc | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Request for Corrected Filing Receipt | 3220US01_Request.pdf | 116836<br><br>303009da22a2ec45ccd92cfa332980717deade75 | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Power of Attorney | 3220US01_Power.pdf | 338769<br><br>4237b41958c6fd4b8fda59e134e54ca5e415b5e1 | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 6 | Application Data Sheet | 3220US01_ADS.pdf | 1603955<br><br>12dafab756a72758e9caeb17bbb238ac754337ac | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied ADS fillable form | | | | | |
| | | **Total Files Size (in bytes):** | 3551703 | | |

CONFIDENTIAL

WM00119062

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

CONFIDENTIAL

WM00119063

# PATENT ASSIGNMENT

This PATENT ASSIGNMENT ("**Patent Assignment**"), effective as of January 31, 2018, is made by and between Wal-Mart Stores, Inc., 702 Southwest 8th Street, Bentonville, Arkansas 72716, USA, ("**Assignor**"), and Walmart Apollo, LLC, 702 Southwest 8th Street, Bentonville, Arkansas 72716, USA, ("**Assignee**"), the assignee of certain assets of Assignor pursuant to the INTERCOMPANY AGREEMENT by and between Assignee and Assignor, dated as of January 31, 2018 (the "**Patent Agreement**").

WHEREAS, under the terms of the Patent Agreement, Assignor has conveyed, transferred and assigned and does hereby convey, transfer and assign to Assignee, certain intellectual property of Assignor as listed on Schedule 1, and has agreed to execute and deliver this Patent Assignment, for recording with governmental authorities;

NOW THEREFORE, the parties agree as follows:

Assignment. In consideration for the execution of the Patent Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor has conveyed, transferred, and assigned and does hereby convey, transfer and assign to Assignee, and Assignee hereby accepts, all of Assignor's right, title and interest in and to the following (the "**Assigned Patents and Applications**"):

the patents and patent applications set forth in Schedule 1 hereto and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals thereof;

all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions and otherwise throughout the world.

Recordation and Further Actions. Assignor authorizes any other governmental officials to record and register this Patent Assignment upon request by Assignee. Assignor shall take such steps and actions following the date hereof, including the execution of any documents, files, registrations, or other similar items, to ensure that the Assigned Patents and Applications are properly assigned to Assignee, or any assignee or successor thereto.

Terms of the Patent Agreement. The terms of the Patent Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Assigned Patents and Applications are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Patent Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Patent Agreement and the terms hereof, the terms of the Patent Agreement shall govern.

CONFIDENTIAL

WM00119064

Counterparts. This Patent Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Patent Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Patent Assignment.

Successors and Assigns. This Patent Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE PAGE FOLLOWS]

CONFIDENTIAL                                                                                          WM00119065

IN WITNESS WHEREOF, Assignor has duly executed and delivered this Patent Assignment as of the date first above written.

Wal-Mart Stores, Inc.
702 Southwest 8th Street
Bentonville, Arkansas 72716
USA

By: _Gordon Y Allison_

Name: Gordon Allison
Title: Vice President and General Counsel, Corporate

State of _Arkansas_ )
                     ) ss:
County of _Benton_ )

On this, the _19th_ day of _March_, 2018, before me, a notary public, the undersigned officer, personally appeared _Gordon Allison_, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires: _1/15/2028_

ELIZABETH WITHEE
Notary Public - Arkansas
Washington County
Commission #12703099
My Commission Exp. 01/15/2028

Page 3 of 7

CONFIDENTIAL

WM00119066

IN WITNESS WHEREOF, Assignee has duly executed and delivered this Patent Assignment as of the date first above written.

Walmart Apollo, LLC
702 Southwest 8th Street
Bentonville, Arkansas 72716
USA

By: _____

Name: Craig Sharkey
Title: President

State of Arkansas )
) ss:
County of Benton )

On this, the 19th day of March, 2018, before me, a notary public, the undersigned officer, personally appeared Craig Sharkey, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires: 1/15/2028

ELIZABETH WITHEE
Notary Public - Arkansas
Washington County
Commission #12703099
My Commission Exp. 01/15/2028

CONFIDENTIAL

WM00119067

## SCHEDULE 1

### Assigned Patents and Applications

| Ref. No. | Title | Application No. | Patent No. |
|---|---|---|---|
| 757US01 | BANDWIDTH THROTTLING | 62/206713 | |
| 757US02 | BANDWIDTH THROTTLING | 15/747757 | |
| 1031US01 | ENTITY-SPECIFIC VALUE OPTIMIZATION TOOL | 15/188,775 | |
| 1039US01 | PAIRING A MOBILE DEVICE WITH A MERCHANT TRANSACTION DEVICE | 62585523 | |
| 1250US01 | MANAGING PRODUCT RETURNS ASSOCIATED WITH A USER DEVICE | 62/437,389 | |
| 1250US02 | MANAGING PRODUCT RETURNS ASSOCIATED WITH A USER DEVICE | 15/782730 | |
| 131US01 | SYSTEM AND METHOD FOR PRICE MATCHING AND COMPARISON | 13/754620 | |
| 1344US01 | CONTEXT-SPECIFIC FORECASTING DEVICE | 62311392 | |
| 1344US02 | CONTEXT-SPECIFIC FORECASTING DEVICE | 15/462910 | |
| 1478US01 | ANONYMIZED ALLOCATIONS-BASED WORKFORCE MANAGEMENT SYSTEM | 62/522492 | |
| 1584US01 | DIGITAL PRODUCT LABEL GENERATION USING MODULAR SCALE DEVICES | 62/622829 | |
| 1591US01 | SENSOR-BASED ITEM MANAGEMENT TOOL | 62/373,911 | |
| 1591US02 | SENSOR-BASED ITEM MANAGEMENT TOOL | 15/668240 | |
| 1652US01 | LOCATION-AWARE DEVICE TRACKING SYSTEM | 62/455,587 | |
| 1652US02 | LOCATION-AWARE DEVICE TRACKING SYSTEM | 15/880524 | |
| 1668US01 | CRITICAL INVENTORY REPORTING TOOL | 62/372,294 | |
| 1668US02 | CRITICAL INVENTORY REPORTING TOOL | 15/646895 | |
| 1671US01 | CUSTOMIZED YARD MONITORING SYSTEM | 62/508941 | |
| 1744US01 | AUTHENTICATION SYSTEM FOR THIRD PARTY AUTHORIZATION | 62/508388 | |
| 1902US01 | AUTOMATED SMART PEG SYSTEM MONITORING ITEMS | 62/507155 | |
| 1906US01 | WEB SERVICES-BASED DATA TRANSFERS FOR ITEM MANAGEMENT | 62/507159 | |
| 1932US01 | SYSTEM FOR AUGMENTED APPAREL DESIGN | 62/622825 | |
| 1968US01 | AUTOMATED RESUME SCREENING | 15/475128 | |
| 2076US01 | SYSTEM FOR MONITORING AN OPEN CONTAINER | 62/456,656 | |
| 2076US02 | SYSTEM FOR MONITORING AN OPEN CONTAINER | 15/880486 | |
| 2079US01 | SYSTEM FOR AUTOMATED CHECKOUT USING METAL DETECTION | 62/456,663 | |
| 2079US02 | SYSTEM FOR AUTOMATED CHECKOUT USING METAL DETECTION | 15/880498 | |
| 2080US01 | AUTOMATED OPENING DEVICE FOR PLASTIC SHOPPING BAGS ON CAROUSELS | 62/456,661 | |
| 2080US02 | AUTOMATED OPENING DEVICE FOR PLASTIC SHOPPING BAGS ON CAROUSELS | 15/880510 | |

CONFIDENTIAL

WM00119068

| | | | |
|---|---|---|---|
| 2087US01 | DATABOT VALUE NEGOTIATOR | 62/470,140 | |
| 2087US02 | DATABOT VALUE NEGOTIATOR | 15/881678 | |
| 2120US01 | SYSTEM FOR CUSTOMIZED INTERACTIONS-RELATED ASSISTANCE | 62/622821 | |
| 2273US01 | AUTOMATED SYSTEM FOR COORDINATING TARGETED CHARITABLE RELIEF AID | 62/535205 | |
| 2335US01 | SYSTEM FOR AUTONOMOUS CONFIGURATION OF PRODUCT DISPLAYS | 62492890 | |
| 2530US01 | MANAGING SMART APPLIANCES USING BLOCKCHAIN TECHNOLOGY | 62/451,184 | |
| 2530US02 | MANAGING SMART APPLIANCES USING BLOCKCHAIN TECHNOLOGY | 15/881705 | |
| 2533US01 | MANAGING DISTRIBUTED CONTENT USING LAYERED PERMISSIONS | 62/451,648 | |
| 2533US02 | MANAGING DISTRIBUTED CONTENT USING LAYERED PERMISSIONS | 15/881709 | |
| 2534US01 | MANAGING PARTICIPATION IN A MONITORED SYSTEM USING BLOCKCHAIN TECHNOLOGY | 62/451,424 | |
| 2534US02 | MANAGING PARTICIPATION IN A MONITORED SYSTEM USING BLOCKCHAIN TECHNOLOGY | 15/881715 | |
| 2753US01 | SYSTEM FOR DYNAMIC PALLET-BUILD INSTRUCTION GENERATION | 62/609067 | |
| 2975US01 | CUSTOMIZED AUTHENTICATION AND DISBURSEMENT SYSTEM | 62/622832 | |
| 3070US01 | SYSTEM FOR CUSTOMIZED UNREQUESTED ITEM RESOLUTION | 62/536137 | |
| 3148US01 | CAMP AIR CHAIR | 62/562158 | |
| 3149US01 | CUSTOMIZABLE CAMP CHAIR COVER | 62/562235 | |
| 3150US01 | CAMP CHAIR WITH BLANKET | 62/562251 | |
| 3220US01 | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | 62/584396 | |
| 3271US01 | AUTOMATED INSPECTION SYSTEM | 62/509,945 | |
| 3454US01 | SYSTEM FOR RELATIONAL-IMPACT BASED TASK MANAGEMENT | 62/615704 | |
| 3456US01 | CUSTOMIZED SCHEDULE ALLOCATION DEVICE | 62/536185 | |
| 3469US01 | CONFIGURABLE ROLLING PALLET TRAY SYSTEM | 62/537538 | |
| 3471US01 | CUSTOMIZED PRIORITY-BASED TASK MAPPING | 62/535215 | |
| 3476US01 | IMPROVING WORKER TASK PERFORMANCE SAFETY | 62/574976 | |
| 3508US01 | DYNAMIC FLEX-SPACE ALLOCATION SYSTEM | 62/622,828 | |
| 3720US01 | SYSTEM FOR CROWDSOURCED ITEM SELECTION | 62/615966 | |
| 3721US01 | CUSTOMIZED CART MANAGEMENT SYSTEM | 62/583729 | |
| 4095US01 | VIRTUAL CART OPTIMIZATION TOOL | 62/614193 | |
| 4174US01 | CUSTOMIZED ACTIVITY-BASED REWARD GENERATION | 15/838357 | |
| 4190US01 | ORGANIZATIONAL STORAGE TRAY | 15/603,424 | |
| 4291US01 | DETACHABLE CARD READER MOUNTING SYSTEM | 62/539430 | |
| 4349US01 | PERPETUAL INVENTORY RECONCILIATION | 62/579116 | |
| 4405US01 | REMOVABLE DEBIT READER STAND (DESIGN) | 29/612369 | |

CONFIDENTIAL                                                                 WM00119069

| 4431US01 | ANALYTICAL DETERMINATION OF COMPETITIVE INTERRELATIONSHIP BETWEEN ITEM PAIRS | 15/834054 | |
| 4435US01 | BAG CAROUSEL COVER | 62/565909 | |
| 4473US01 | SMART CONTAINER INVENTORY MANAGEMENT SYSTEM | 62/624192 | |
| 4620US01 | SYSTEM FOR CAPTURING ITEM DEMAND TRANSFERENCE | 15/877388 | |
| 4689US01 | SYSTEM FOR COLD-CHAIN COMPLIANT ITEM SELECTION | 62/615960 | |
| 4699US01 | BOOMBOX | 29/629686 | |

CONFIDENTIAL

WM00119070

PTO/AIA/96 (08-12)
Approved for use through 01/31/2013. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(c)

Applicant/Patent Owner: Walmart Apollo, LLC

Application No./Patent No.: 62/584,396                    Filed/Issue Date: November 10, 2017

Titled: PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS

Walmart Apollo, LLC                                          , a corporation

(Name of Assignee)                    (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that, for the patent application/patent identified above, it is (choose **one** of options 1, 2, 3 or 4 below):

1. [✔] The assignee of the entire right, title, and interest.

2. [ ] An assignee of less than the entire right, title, and interest (check applicable box):

    [ ] The extent (by percentage) of its ownership interest is _____%. Additional Statement(s) by the owners holding the balance of the interest <u>must be submitted</u> to account for 100% of the ownership interest.

    [ ] There are unspecified percentages of ownership. The other parties, including inventors, who together own the entire right, title and interest are:

    Additional Statement(s) by the owner(s) holding the balance of the interest <u>must be submitted</u> to account for the entire right, title, and interest.

3. [ ] The assignee of an undivided interest in the entirety (a complete assignment from one of the joint inventors was made). The other parties, including inventors, who together own the entire right, title, and interest are:

    Additional Statement(s) by the owner(s) holding the balance of the interest <u>must be submitted</u> to account for the entire right, title, and interest.

4. [ ] The recipient, via a court proceeding or the like (*e.g.*, bankruptcy, probate), of an undivided interest in the entirety (a complete transfer of ownership interest was made). The certified document(s) showing the transfer is attached.

The interest identified in option 1, 2 or 3 above (not option 4) is evidenced by either (choose **one** of options A or B below):

A. [ ] An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

B. [✔] A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

    1. From: Inventors                              To: Wal-Mart Stores, Inc.

    The document was recorded in the United States Patent and Trademark Office at

    Reel 044616 , Frame 0153 , or for which a copy thereof is attached.

    2. From: Wal-Mart Stores, Inc.                   To: Walmart Apollo, LLC

    The document was recorded in the United States Patent and Trademark Office at

    Reel _____, Frame _____, or for which a copy thereof is attached.

[Page 1 of 2]

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

CONFIDENTIAL                                                              WM00119071

PTO/AIA/96 (08-12)
Approved for use through 01/31/2013. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(c)

3. From: _____  To: _____

      The document was recorded in the United States Patent and Trademark Office at

      Reel _____, Frame _____, or for which a copy thereof is attached.

4. From: _____  To: _____

      The document was recorded in the United States Patent and Trademark Office at

      Reel _____, Frame _____, or for which a copy thereof is attached.

5. From: _____  To: _____

      The document was recorded in the United States Patent and Trademark Office at

      Reel _____, Frame _____, or for which a copy thereof is attached.

6. From: _____  To: _____

      The document was recorded in the United States Patent and Trademark Office at

      Reel _____, Frame _____, or for which a copy thereof is attached.

☐   Additional documents in the chain of title are listed on a supplemental sheet(s).

☑   As required by 37 CFR 3.73(c)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

      [NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

| | |
|---|---|
| /Sarah B. Foley/ | 2018-03-25 |
| Signature | Date |
| Sarah B. Foley | 63,321 |
| Printed or Typed Name | Title or Registration Number |

[Page 2 of 2]

CONFIDENTIAL

WM00119072

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

CONFIDENTIAL                                                                                           WM00119073

Doc Code: R46C.REQ
Document Description: Request under 37 CFR 1.46(c) to correct, update or change the applicant.

PTO/AIA/41 (04-15)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **REQUEST TO CORRECT OR UPDATE THE NAME OF THE APPLICANT UNDER 37 CFR 1.46(c)(1), OR CHANGE THE APPLICANT UNDER 37 CFR 1.46(c)(2)** (FOR USE ONLY IN APPLICATIONS FILED ON OR AFTER SEPTEMBER 16, 2012) | | |
|---|---|---|
| Application Number | 62/584,396 | |
| Filing Date | November 10, 2017 | |
| First Named Inventor | Joshua Bohling | |
| Art Unit | | |
| Examiner Name | | |
| Practitioner Docket Number | **3220US01** | |

To:    Commissioner for Patents
       P.O. Box 1450
       Alexandria, VA  22313-1450

Applicant hereby **requests that the name of the applicant be corrected or updated under 37 CFR 1.46(c)(1), or that the applicant be changed under 37 CFR 1.46(c)(2),** in the above-identified application. **Requests under 37 CFR 1.46(c)(1) or (c)(2) cannot be submitted after payment of the issue fee or if the application has been patented.**

Please check the applicable box(es) below.

☐  1. This request is to **correct or update the name of the applicant (under 37 CFR 1.46(c)(1))** and includes:

   ☐  An application data sheet (ADS) in accordance with 37 CFR 1.76(c) with the corrected or updated information shown with markings (*e.g.*, underlining for insertions, strikethrough for deletions). A Corrected Web-based ADS may be used.

      **Note:** Requests under 37 CFR 1.46(c)(1) may be filed to correct typographical errors in the name of the § 1.46 applicant, or for updating the name of the § 1.46 applicant (*i.e.*, where there is no change in the applicant itself but just in the applicant's name). See the Manual of Patent Examining Procedure (MPEP) section 605.01.

☑  2. This request is to **change the applicant (under 37 CFR 1.46(c)(2))** and includes:

   ☑  An application data sheet (ADS) in accordance with 37 CFR 1.76(c) that identifies the changes with proper markings (underlining for insertions and strikethrough for deletions). A Corrected Web-based ADS may be used.

   ☑  A Statement Under 37 CFR 3.73(c) (Form PTO/AIA/96 or equivalent). See MPEP 325.

I am the

☐ applicant*          ☐ attorney or agent of record          ☑ attorney or agent acting under 37 CFR 1.34
                      Registration number _____          Registration number 63321

Signature  /Sarah B. Foley/

Typed or printed name  Sarah B. Foley

Date  2018-03-25

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. *Juristic entities must be represented by a patent practitioner (See 37 CFR 1.31, applicable to any paper filed on or after September 16, 2012 that is presented on behalf of a juristic entity, regardless of application filing date). Submit multiple forms if more than one signature is required, see below**.

☐  ** Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.36. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

CONFIDENTIAL                                                                                    WM00119074

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

CONFIDENTIAL

WM00119075

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/584,396 | 11/10/2017 | | 260 | 3220US01 | | |

**CONFIRMATION NO. 7965**

101379
Barta, Jones & Foley, P.C.
(Patent Group - Wal-Mart Stores, Inc.)
2805 Dallas Parkway
Suite 222
Plano, TX 75093

**FILING RECEIPT**



Date Mailed: 12/14/2017

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Joshua Bohling, Centerton, AR;
Terry Osbon, Fayetteville, AR;
Craig Trudo, Centerton, AR;
Riley Turben, Bentonville, AR;
Brandon Elliot Johnsen, Rogers, AR;

**Applicant(s)**

Wal-Mart Stores, Inc., Bentonville, AR;

**Power of Attorney:**
Sarah Foley--63321

**Permission to Access Application via Priority Document Exchange:** Yes

**Permission to Access Search Results:** Yes

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 12/13/2017

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/584,396**

**Projected Publication Date:** None, application is not eligible for pre-grant publication
**Non-Publication Request:** No
**Early Publication Request:** No

page 1 of 3

CONFIDENTIAL                                                                                      WM00119076

**Title**

PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

# PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier

CONFIDENTIAL

WM00119077

license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

## NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

CONFIDENTIAL                                                                                                    WM00119078

**To:**           uspto@dockettrak.com,docket@bjfip.com,
**From:**         PAIR_eOfficeAction@uspto.gov
**Cc:**           PAIR_eOfficeAction@uspto.gov
**Subject:**      Private PAIR Correspondence Notification for Customer Number 101379

Dec 14, 2017 03:53:28 AM

Dear PAIR Customer:

Barta, Jones & Foley, P.C.
(Patent Group - Wal-Mart Stores, Inc.)
2805 Dallas Parkway
Suite 222
Plano, TX 75093
UNITED STATES

The following USPTO patent application(s) associated with your Customer Number, 101379 , have new outgoing correspondence. This correspondence is now available for viewing in Private PAIR.

The official date of notification of the outgoing correspondence will be indicated on the form PTOL-90 accompanying the correspondence.

Disclaimer:
The list of documents shown below is provided as a courtesy and is not part of the official file wrapper. The content of the images shown in PAIR is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 62584396 | APP.FILE.REC | 12/14/2017 | 3220US01 |

To view your correspondence online or update your email addresses, please visit us anytime at https://sportal.uspto.gov/secure/myportal/privatepair.

If you have any questions, please email the Electronic Business Center (EBC) at EBC@uspto.gov with 'e-Office Action' on the subject line or call 1-866-217-9197 during the following hours:

      Monday - Friday 6:00 a.m. to 12:00 a.m.

Thank you for prompt attention to this notice,

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT APPLICATION INFORMATION RETRIEVAL SYSTEM

CONFIDENTIAL                                                                              WM00119079

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2  (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

**Inventor 1**                                                                        Remove
**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Joshua | | Bohling | |

Residence Information (Select One)    ● US Residency    Non US Residency    Active US Military Service

| City | Centerton | State/Province | AR | Country of Residence i | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 1451 Forest Drive |
|---|---|
| Address 2 | |

| City | Centerton | State/Province | AR |
|---|---|---|---|
| Postal Code | 72719 | Country i | US |

**Inventor 2**                                                                        Remove
**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Terry | | Osbon | |

Residence Information (Select One)    ⦿ US Residency    Non US Residency    Active US Military Service

| City | Fayetteville | State/Province | AR | Country of Residence i | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 2136 Lisa Lane |
|---|---|
| Address 2 | |

| City | Fayetteville | State/Province | AR |
|---|---|---|---|
| Postal Code | 72703 | Country i | US |

**Inventor 3**                                                                        Remove
**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Craig | | Trudo | |

Residence Information (Select One)    ⦿ US Residency    Non US Residency    Active US Military Service

EFS Web 2.2.12

CONFIDENTIAL                                                                        WM00119080

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
|  | Application Number |  |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

| City | Centerton | State/Province | AR | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 1230 Cottonwood Road | | |
|---|---|---|---|
| Address 2 | | | |
| City | Centerton | State/Province | AR |
| Postal Code | 72719 | Country i | US |

| Inventor | 4 | Remove |
|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
|  | Riley |  | Turben |  |

**Residence Information (Select One)** ● US Residency    Non US Residency    Active US Military Service

| City | Bentonville | State/Province | AR | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 401 SW A Street, #307 | | |
|---|---|---|---|
| Address 2 | | | |
| City | Bentonville | State/Province | AR |
| Postal Code | 72712 | Country i | US |

| Inventor | 5 | Remove |
|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
|  | Brandon | Elliot | Johnsen |  |

**Residence Information (Select One)** ● US Residency    Non US Residency    Active US Military Service

| City | Rogers | State/Province | AR | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 3001 S 28th Place Apt 6 | | |
|---|---|---|---|
| Address 2 | | | |
| City | Rogers | State/Province | AR |
| Postal Code | 72758 | Country i | US |

| All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button. | Add |
|---|---|

## Correspondence Information:

| **Enter either Customer Number or complete the Correspondence Information section below.** **For further information see 37 CFR 1.33(a).** |
|---|
| ☐  **An Address is being provided for the correspondence Information of this application.** |

EFS Web 2.2.12

CONFIDENTIAL

WM00119081

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

| **Customer Number** | 101379 | | |
|---|---|---|---|
| **Email Address** | | Add Email | Remove Email |

## Application Information:

| Title of the Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS | | |
|---|---|---|---|
| Attorney Docket Number | 3220US01 | **Small Entity Status Claimed** | ☐ |
| Application Type | Provisional | | ▾ |
| Subject Matter | Utility | | ▾ |
| **Total Number of Drawing Sheets (if any)** | 7 | **Suggested Figure for Publication (if any)** | 1 |

## Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

| | Request Early Publication (Fee required at time of Request 37 CFR 1.219) |
|---|---|
| ☐ | |

| ☐ | **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing. |
|---|---|

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32). Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ● Customer Number | US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 101379 | | |

EFS Web 2.2.12

CONFIDENTIAL

WM00119082

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
| | Application Number | |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.

When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| | | | |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.   [Add]

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application.  Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55.  When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2).  Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| | | | Remove |
|---|---|---|---|
| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.   [Add]

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

EFS Web 2.2.12

CONFIDENTIAL

WM00119083

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

# Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**:  This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application.  After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s).  Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1.  Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A.  Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2)  any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B.  Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2.  Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

     A.  Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant
☐  application-as-filed.  If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

     B.  Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent
☐  application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:**  Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

CONFIDENTIAL                                                  WM00119084

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

| **Applicant** | 1 | Remove |
|---|---|---|

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| ● Assignee | Legal Representative under 35 U.S.C. 117 | Joint Inventor |
|---|---|---|
| Person to whom the inventor is obligated to assign. | Person who shows sufficient proprietary interest | |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

[                                                    ▼]

| Name of the Deceased or Legally Incapacitated Inventor: | |
|---|---|

| If the Applicant is an Organization check here. | ☒ |
|---|---|

| Organization Name | Wal-Mart Stores, Inc. |
|---|---|

**Mailing Address Information For Applicant:**

| Address 1 | 702 S.W. 8th Street | | |
|---|---|---|---|
| Address 2 | | | |
| City | Bentonville | State/Province | AR |
| Country | US | Postal Code | 72716-0520 |
| Phone Number | | Fax Number | |
| Email Address | | | |

| Additional Applicant Data may be generated within this form by selecting the Add button. | Add |
|---|---|

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

CONFIDENTIAL                                                                                                          WM00119085

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

---

**Assignee** 1

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

Remove

If the Assignee or Non-Applicant Assignee is an Organization check here. ☐

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| Address 1 | |
|---|---|
| Address 2 | |

| City | | State/Province | |
|---|---|---|---|
| Country i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.    Add

---

## Signature:

Remove

**NOTE:** This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the <u>INITIAL</u> filing of the application <u>and</u> either box A or B is <u>not</u> checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| Signature | /Sarah B. Foley/ | | | Date (YYYY-MM-DD) | 2017-11-10 |
|---|---|---|---|---|---|
| First Name | Sarah B. | Last Name | Foley | Registration Number | 63321 |

Additional Signature may be generated within this form by selecting the Add button.    Add

EFS Web 2.2.12

CONFIDENTIAL

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 3220US01 |
|---|---|---|
| | Application Number | |

| Title of Invention | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.2.12

CONFIDENTIAL

WM00119087

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent CooperationTreaty.

6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.2.12

CONFIDENTIAL

WM00119088

Doc Code: **TR.PROV**
Document Description: Provisional Cover Sheet (SB16)

PTO/SB/16 (11-08)
Approved for use through 05/31/2015. OMB 0651-0032
U.S. Patent and Trademark Office:  U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

## Provisional Application for Patent Cover Sheet
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c)

## Inventor(s)

**Inventor 1**                                                    Remove

| Given Name | Middle Name | Family Name | City | State | Country ¡ |
|---|---|---|---|---|---|
| Joshua | | Bohling | Centerton | AR | US |

**Inventor 2**                                                    Remove

| Given Name | Middle Name | Family Name | City | State | Country ¡ |
|---|---|---|---|---|---|
| Terry | | Osbon | Fayetteville | AR | US |

**Inventor 3**                                                    Remove

| Given Name | Middle Name | Family Name | City | State | Country ¡ |
|---|---|---|---|---|---|
| Craig | | Trudo | Centerton | AR | US |

**Inventor 4**                                                    Remove

| Given Name | Middle Name | Family Name | City | State | Country ¡ |
|---|---|---|---|---|---|
| Riley | | Turben | Bentonville | AR | US |

**Inventor 5**                                                    Remove

| Given Name | Middle Name | Family Name | City | State | Country ¡ |
|---|---|---|---|---|---|
| Brandon | Elliot | Johnsen | Rogers | AR | US |

All Inventors Must Be Listed – Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.          Add

| **Title of Invention** | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
|---|---|
| Attorney Docket Number (if applicable) | 3220US01 |

## Correspondence Address

Direct all correspondence to (select one):

⊙ The address corresponding to Customer Number        ◯ Firm or Individual Name

| Customer Number | 101379 |
|---|---|

EFS  -  Web 1.0.1

CONFIDENTIAL                                                          WM00119089

Doc Code: **TR.PROV**
Document Description: Provisional Cover Sheet (SB16)

PTO/SB/16 (11-08)
Approved for use through 05/31/2015. OMB 0651-0032
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

| |
|---|
| The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government. |
| ● No. |
| Yes, the invention was made by an agency of the United States Government.  The U.S. Government agency name is: |
| Yes, the invention was under a contract with an agency of the United States Government. The name of the U.S. Government agency and Government contract number are: |

EFS - Web 1.0.1

CONFIDENTIAL

WM00119090

Doc Code: **TR.PROV**
Document Description: Provisional Cover Sheet (SB16)

PTO/SB/16 (11-08)
Approved for use through 05/31/2015. OMB 0651-0032
U.S. Patent and Trademark Office:  U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

**Entity Status**
**Applicant asserts small entity status under 37 CFR 1.27 or applicant certifies micro entity status under 37 CFR 1.29**

○ Applicant asserts small entity status under 37 CFR 1.27

○ Applicant certifies micro entity status under 37 CFR 1.29. Applicant must attach form PTO/SB/15A or B or equivalent.

⦿ No

**Warning**

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft.  Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application.  If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to USPTO.  Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent.  Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR1.14).  Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

**Signature**

Please see 37 CFR 1.4(d) for the form of the signature.

| Signature | /Sarah B. Foley/ | | | Date (YYYY-MM-DD) | 2017-11-10 |
|---|---|---|---|---|---|
| First Name | Sarah B. | Last Name | Foley | Registration Number (If appropriate) | 63321 |

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **This form can only be used when in conjunction with EFS-Web. If this form is mailed to the USPTO, it may cause delays in handling the provisional application.**

EFS - Web 1.0.1

CONFIDENTIAL                                                                                                                        WM00119091

# Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or paten. Accordingly, pursuant to the requirements of the Act, please be advised that : (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, t o a n other federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

CONFIDENTIAL

WM00119092

3220US01

ABSTRACT

Examples of the disclosure provide for a freshness indicator and shelf life prediction system. Product-specific data is obtained for a product and an environment associated with the product from various information sources and sensors. The obtained product-specific data is used to calculate freshness indicator values for a given product. The calculated freshness indicator values are used to calculate a shelf life prediction for the given product.

CONFIDENTIAL

WM00119093

3220US01

CLAIMS

WHAT IS CLAIMED IS:

1.    A computing system for dynamically generating product freshness indicators, the computing system comprising:


       a memory device storing computer-executable instructions for a freshness indicator; and

       a processor communicatively coupled to the memory device and configured to execute the computer-executable instructions for the freshness indicator to:

              obtain pre-harvest product-specific data associated with a product;

              obtain harvest product-specific data associated with the product;

              obtain sensor data from one or more sensors associated with the product post-harvest; and

              calculating a first set freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data.


2.    The computing system of claim 1, wherein the pre-harvest product-specific data comprises at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data.


3.    The computing system of claim 1, wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to:

CONFIDENTIAL

WM00119094

3220US01

generate a shelf life prediction for the product based on the first set of freshness indicator values.

4.      The computing system of claim 3, wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to determine at least one of the following based on the generated shelf life prediction: priority of placement of the product in inventory, selection of a distribution center for the product, transaction value of the product, inspection criteria for the product, and quality metrics associated with one or more suppliers of the product.

5.      The computing system of claim 1, wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to:

obtain inspection data for the product from an inspection system; and

generate a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values.

6.      The computing system of claim 5, wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to:

generate an updated shelf life prediction for the product based on the second set of freshness indicator values and the first set of freshness indicator values.

7.      The computing system of claim 5, wherein the processor is further configured to execute the computer-executable instructions to:

obtain supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point;

-41-

CONFIDENTIAL                                                                    WM00119095

3220US01

obtain additional inspection data associated with the final touch point; and

generate a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values.

8.    The computing system of claim 7, wherein the processor is further configured to execute the computer-executable instructions to:

generate an updated shelf life prediction for the product based on the third set of freshness indicator value and the second set of freshness indicator values.

9.    A computer-implemented method for generating product freshness indicators, the computer-implemented method comprising:

obtaining pre-harvest product-specific data associated with a product;

obtaining harvest product-specific data associated with the product;

obtaining sensor data from one or more sensors associated with the product post-harvest; and

calculating a first set of freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data.

10.    The computer-implemented method of claim 9, wherein the pre-harvest product-specific data comprises at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data.

-42-

CONFIDENTIAL                                                      WM00119096

3220US01

11.    The computer-implemented method of claim 9, further comprising:

generating a shelf life prediction for the product based on the first set of freshness indicator values.

12.    The computer-implemented method of claim 11, wherein the generated shelf life prediction is used to determine at least one of: priority of placement of the product in inventory, selection of a distribution center for the product, transaction value of the product, inspection criteria for the product, and quality metrics associated with one or more suppliers of the product.

13.    The computer-implemented method of claim 9, further comprising:

obtaining inspection data for the product from an inspection system; and

generating a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values.

14.    The computer-implemented method of claim 13, further comprising:

obtaining supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point;

obtaining additional inspection data associated with the final touch point; and

generating a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values.

-43-

CONFIDENTIAL                                                                     WM00119097

3220US01

15.     One or more computer storage media having computer-executable instructions stored thereon for generating product freshness indicators, that upon execution by a processor, causes the processor to:

obtain pre-harvest product-specific data associated with a product;

obtain harvest product-specific data associated with the product;

obtain sensor data from one or more sensors associated with the product post-harvest; and

generate a first set of freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data.

16.     The one or more computer storage devices of claim 15, wherein the pre-harvest product-specific data comprises at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data.

17.     The computing system of claim 19, wherein the processor is further configured to execute the computer-executable instructions to:

generate a shelf life prediction for the product based on the first set of freshness indicator values.

18.     The one or more computer storage devices of claim 15, that upon execution by the processor, causes the processor to:

obtain inspection data for the product from an inspection system; and

-44-

CONFIDENTIAL                                           WM00119098

3220US01

generate a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values.

19.    The one or more computer storage devices of claim 18, that upon execution by the processor, causes the processor to:

obtain supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point;

obtain additional inspection data associated with the final touch point; and

generate a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values.

20.    The computing system of claim 19, wherein the processor is further configured to execute the computer-executable instructions to

generate an updated shelf life prediction for the product based on the third set of freshness indicator values and the second set of freshness indicator values.

-45-

CONFIDENTIAL

WM00119099

3220US01

# PREDICTING SHELF LIFE BASED ON ITEM
# SPECIFIC METRICS

## BACKGROUND

[0001]    Product shelf life is one factor used in inventory management. Shelf life may vary from product to product based on a number of factors. Systems and methods that identify freshness for a perishable product, for example, may enable a better predictor of shelf life for fresh items.

## SUMMARY

[0002]    Examples of the disclosure provide for a computing system for generating a freshness indictor value for produce, the computing system comprising at least one input device, a memory device storing computer-executable instructions, and a processor configured to execute the computer-executable instructions to receive pre-harvest produce specific parameter data associated with a produce at least once prior to harvesting of the produce via the at least one input device, compare the received pre-harvest produce specific parameter data with at least one pre-harvest produce threshold associated with the produce, and generate a first value of a freshness indicator associated with the produce based on the comparison at a freshness value generator.

[0003]    Still other examples provide one or more computer storage devices storing computer-executable instructions for inspecting produce. The computer-executable instructions are executed by a computer to cause the computer to perform operations, including identifying produce and gathering information about the produce, obtaining data by a computing device regarding the produce; processing the data to determine freshness indicators and shelf life; and generating an alert responsive to the freshness of the produce.

[0004]    This summary is provided to introduce a selection of concepts in a simplified form that are further described below in the Detailed Description.  This Summary is not intended to identify key features or essential features of the claimed

-1-

CONFIDENTIAL

WM00119100

3220US01

subject matter, nor is it intended to be used as an aid in determining the scope of the claimed subject matter.

BRIEF DESCRIPTION OF THE DRAWINGS

[0005]    FIG. 1 is an exemplary process diagram illustrating systems and methods for obtaining product data during a product life cycle for use in determining freshness and/or predicting shelf life for the product in accordance with the disclosure.

[0006]    FIG. 2 is an exemplary computing device configured to perform embodiments of the systems and methods described herein in accordance with the disclosure.

[0007]    FIG. 3 is an exemplary chart of one embodiment of an output of a shelf life predictor in accordance with the disclosure.

[0008]    FIG. 4 is an exemplary block diagram illustrating a set of sensors for gathering environmental and produce data in accordance with the disclosure.

[0009]    FIG. 6 is an exemplary flow chart of a process for determining freshness and predicting shelf life of produce in accordance with the disclosure.

[0010]    FIG. 7 is an exemplary illustration of a device identifying freshness information about a piece of produce in accordance with the disclosure.

[0011]    FIG. 8 is an exemplary embodiment of a computing environment for implementing processes and methods described herein in accordance with the disclosure.

[0012]    Corresponding reference characters indicate corresponding parts throughout the drawings.

-2-

CONFIDENTIAL

WM00119101

DETAILED DESCRIPTION

[0013]    Predicting shelf life of produce is a factor in selling produce to the public. Appropriately predicting shelf life prevents waste and minimizes the chances of customers dissatisfaction with the produce. Additionally, fresh produce often tastes better and provides a competitive advantage.

[0014]    To predict shelf life, produce may be inspected throughout its life cycle, including during pre-harvesting, harvesting, and transport from growing/producing areas, distribution centers, and/or consumer markets. Products such as produce may be inspected, or product data collected, throughout acquisition, production, transportation, storage, and/or sales to identify current product characteristics.  For example, produce may have or may acquire certain characteristics that are used to determine freshness and/or predict shelf life for that produce. In addition, environmental factors associated with a product, such as temperature, may also impact the products characteristics and/or life cycle. Environmental factors associated with a product may be identified, collected, tracked, and/or obtained to aid in freshness determinations and/or shelf life predictions.

[0015]    Products, such as produce for example, must also meet certain regulation standards before they may be offered to the public. In addition to government regulations, many corporations and/or industries have their own standards. For instance, some companies may only want to provide produce grown or produced locally. The company may use such selectivity as a differentiating factor when comparing itself to its competitors.

[0016]    Inspecting produce is often a time consuming, labor intensive, and technologically challenging endeavor. The logistics involved in gathering the relevant data, making the appropriate decisions based on the data, and implementing the decision pose a significant challenge for many corporations. Additionally, the regulations and standards may change periodically or with very little notice, and changes may only affect some produce and not others. Suppliers, distributors, and retailers are required to keep abreast of the changes. While human monitors may use

-3-

CONFIDENTIAL

WM00119102

3220US01

certain types of equipment to assist, the overall process is manually labor intensive and prone to error.

[0017]   Referring to the figures, examples of the disclosure enable systems and methods for monitoring and collecting product data throughout various stages of a product life cycle and using the product data to determine a freshness value for a product and/or to predict shelf life of a product, using item-specific criteria. In some examples, a freshness component is provided for automatic analysis of product data using specific criteria associated with the product by analyzing sensor data received from at least one of a set of sensors.  Inspection data may also be obtained by the freshness component, including information about identified characteristics associated with an inspected product, in order to determine an updated freshness value or indicator for the product based on the inspection data.

[0018]   Referring to FIG. 1, an exemplary process diagram illustrates systems and methods for obtaining product data during a product life cycle for use in determining freshness and/or predicting shelf life for the product.  In the examples herein, produce is used for illustrative purposes to describe a product life cycle and data capture and analysis for the product. The examples herein are not intended to limit aspects of this disclosure in any way, and it should be understood that products other than produce are within the scope of this disclosure.

[0019]   During pre-harvest stage 101, pre-harvest product data may be obtained from various sources. Pre-harvest product data may include, without limitation, crop data, field data, growth rate data, geolocation data, quality metrics, environmental data, condition data, and the like, for example. Environmental data or condition data, may include information such as weather data for the geo-location associated with the pre-harvest product. In some examples, the environmental data may be obtained separately from other product data, and correlated with the product data based on geolocation and timestamp data, for example. The pre-harvest product data may be captured and/or collected, and transmitted and/or stored, incrementally or continuously throughout the pre-harvest stage and into the harvesting stage as well. The various sources may include grower databases, field and/or crop tracking technologies

-4-

                                                    WM00119103

implemented by a grower, public sources, and/or observational data inputs. For example, growers may use a number of different sensors and systems implemented in their fields and/or growing areas to monitor and track crop and field data, which may be obtained by the systems described herein as pre-harvest data for the associated product. Growing areas may include greenhouses, fields, orchards, gardens, hothouses, barns, coops, pens, pastures, and/or any other suitable product development area. Public data, such as weather data, may be obtained by the system described herein for the geo-location associated with the product as data associated with the product.

[0020]   In other examples, observers may survey a growing area, such as a field, for subjective data on a product and use a mobile computing device to input pre-harvest data points. For example, an observer may compare the automated crop projections, generated based on the other pre-harvest data or industry projections, against observed crop development to provide additional inputs that may be used adjust crop projections and/or harvest projections. One or more mobile applications implementing an inspection component may be used to record real-time data, including information about crop progress, geolocation, environmental factors, and quality/condition characteristics of the product. Other data may also be recorded depending on the circumstances. In some examples, a mobile application may be configured to obtain pre-harvest product-specific data associated with a particular product at least once prior to harvesting of the produce. For example, the particular product may be a crop of strawberries, and pre-harvest data for that particular crop of strawberries may be the associated product-specific data. In other words, the product-specific data associated with a product is for a specific batch, crop, or set of the product type. In these examples, the mobile application may provide the obtained pre-harvest product-specific data at a user interface for comparison and/or evaluation by an observer, in order to prompt user confirmation of actual conditions.

[0021]   At harvest stage 102, produce may be packed into cases marked with lot numbers, or global location numbers, along with date and/or timestamps corresponding to the pack date, or harvest date, for the produce. Environmental factors associated with the produce, such as rain, dew point, temperature, and UV index for example, may be obtained by the system described herein from public sources, such as

-5-

WM00119104

the National Oceanic and Atmospheric Association's (NOAA) weather network, and correlated to the pack date and lot numbers of the cases. The system may store the correlated lot numbers, pack date and environmental information as harvest product-specific data for that produce, for example. A sensor or probe may be activated and placed inside at least one case per pallet. The sensor may be a Wi-Fi-enabled temperature sensor in some examples. In other examples, one or more different types of sensors may be used, including without limitation, a temperature sensor, humidity sensor, pressure sensor, and/or any other suitable sensor for detection conditions associated with the packed produce. The system obtains condition data associated with the produce from the sensor or probe.

[0022]   At transfer event 103, the pallets and/or cases of packed produce are transferred to a cooling and/or packing facility. The cooling and/or packing facility may be a grower facility or a third-party facility, in some examples. The sensor or probe from harvest event 102 remains with the cases and continues to collect environmental, temperature, and humidity data, including rate of cooling, which may be obtained by the system and used along with the pre-harvest and harvest product-specific data to calculate a set of freshness indicator values. It should be appreciated that the sensors or probes may detect and/or transmit other data such as pressure, air quality, and the like. The sensor data may be separately stored by the system as supply chain product-specific data. In some examples, a freshness indicator value may be calculated prior to receipt of a product at a packing facility, and an updated freshness indicator value or set of values may be calculated based on the sensor data acquired during a time period between harvest and arrival at a packing facility. The system may be configured to obtain supply chain product-specific data associated with the product during a time period extending from post-harvest through inspection of the product at a final touch point, and incrementally update freshness indicator values at set intervals or dynamically.

[0023]   At transport event 104, the produce may be loaded onto a transport vehicle for transition from a packing facility to a distribution center. Each sensor, such as a temperature probe, associated with the cases of produce continues to detect and/or transmit data. In addition, one or more other sensors implemented within one or more

-6-

   WM00119105

cases, or implemented within a transportation vehicle associated with the cases of produce, may detect and/or transmit geolocation and environmental data. In some examples, product transportation vehicles may be equipped with on-board computing devices that provide geolocation, route, and associated environmental data. The path of travel corresponding to the transport vehicle may also be obtained for additional association with environmental factors. This data may be stored by the system as part of the supply chain product-specific data, for example. The supply chain product-specific data may include transportation data associated with the produce post-harvest.

[0024]    At distribution center stage 105, the product arrives at a distribution center. The product may be inspected using an inspection system, such as an inspection system implemented on a mobile device with a mobile application for example. The inspection system may implement USDA and entity-specific or industry-specific specifications for inspection of a product type. At initial inspection stage 106, the inspection system generates inspection data, which the system obtains for use in determining updated freshness indicator values for the product. In some examples, the system may prompt the inspection system, or an inspector, to confirm quality and/or condition issues on the incoming lot based on the pre-harvest data, harvest data, supply chain data, and/or the initial generated freshness indicator value or set of values. The inspection system may assign the produce an inspection score by lot number, which is then associated to each case corresponding to that lot number. The freshness indicator system may then calculate updated freshness indicator values for the produce based at least in part on the inspection score.

[0025]    In some examples, the inspection stage 106 occurs at a distribution center before transport to market. The freshness score assigned at this stage may be used by markets to prioritize placement of the product, and feedback from the markets on inspections performed at a final touchpoint of the product may be used by the system as feedback to refine freshness indicator models and shelf life prediction models. In some examples, training data may be generated for the system to train a machine learning component of the system to calculate freshness indicator values and shelf life predictions. The training data may be generated using a retention sampling application, in some examples. The retention sampling application may inspect a sample sub-set of

-7-

CONFIDENTIAL

WM00119106

a product as described for initial inspection stage 106, to generate a freshness score or freshness indicator value. The sample sub-set may then be maintained at the distribution center, in this example, at the preferred storage conditions and monitored by the system to identify data points of the products life cycle, such as a duration of time that the item remains at various freshness points, a duration of time at which the item reaches the end of shelf life, and the like. These data points obtained by the system from the retention sampling application may be used to refine models for freshness indicators, shelf life prediction, and obtain data points on optimal environmental conditions for shelf life extension, for example. The system may combine the data points obtained on optimal environmental conditions with real-time data associated with actual environmental factors corresponding to a product to calculate differentials used for adjusting calculations, for example.

[0026]    At supply chain optimization stage 107, the system determines how to prioritize the movement of the produce case through the remaining supply chain. The original temperature sensor or probe may be removed from the pallet.  A systemically chosen case or cases may be transferred to a new pallet for delivery to a designated market. A new sensor, such as a temperature probe or sensor, may be placed inside the new pallet for environmental monitoring on route to market. At transport event 108, the produce transferred to the new pallet is loaded onto a transport vehicle for transition to the market. Each sensor continues to detect and/or transmit data, which the system may use to update a freshness indicator value or set of values. In addition, geolocation and environmental data associated with the transport may be obtained by the system and used in determining an updated freshness indicator value as well.

[0027]    At market event 109, the product arrives at the market. The sensors associated with the cases on the pallets that arrive at market may continue to detect and/or transmit data, which may be used to determine information, such as how long a pallet of product sits in ambient temperatures before moving to a cold storage, how long the product remains in cold storage and at what temperatures, when a product goes out onto the floor from cold storage, and so on, for example. At inspection event 110, the product is inspected upon market intake using the inspection system, which may be another instance of the inspection system at 106, such as a mobile application which

-8-

WM00119107

combines USDA and entity-specific specifications to generate product-specific inspection criteria. The system may also prompt the inspection system, or an inspector, as to quality/condition issues on the incoming produce based on the obtained supply chain product-specific data. A new or updated freshness indicator value or score may be calculated. At prediction event 111, a shelf life predictor estimates the shelf life of the product based on the one or more calculated freshness scores. The system may then inform a market where in the picking/placement order the newly received product should be placed.

[0028]    At placement event 112, the produce is picked from the back room of the market and placed on display. In some examples, a market associate may use a mobile application to make a final inspection of the product at this final touchpoint. This inspection data may be used to refine the system weighting of environmental factors, NOAA information, geolocation data, pre-harvest data, harvest data, supply chain data, and associated freshness indicator scores. The predicted shelf life may be displayed on signage for marketing or pricing purposes. In some examples, the signage may include a digital or electronic display, which may provide consumer-facing information about the product based on the data obtained by the system, the freshness indicator values calculated by the system, and the shelf life prediction generated by the system. For example, a product display may provide information about a product, such as a selection of strawberries, including the predicted shelf life for the selection, a duration of time since the selection was harvested, an origin of the selection, or any other desirable information identified by the system. Shelf life, as used herein, refers to a sell by date, or otherwise an indicator of how fresh a product may be relative to an expected life cycle for the product. The system described herein calculates freshness scores and predicts shelf life, which may be used in any number of produce related activities such as, without limitation, priority of placement of the produce in a store from an inventory of produce type associated with the produce, selection of a distribution center for the produce, pricing of the produce, inspection criteria for the produce; safety stock number of the produce at the store, shelf life of the produce, quality metrics associated with different suppliers of the produce type, and determining impact of weather on the quality of the produce type, for example.

-9-

CONFIDENTIAL

WM00119108

3220US01

[0029]    In some examples, the freshness indicator values, or freshness scores, and/or the shelf life predictions generated for a product may be used for dynamic inventory management and optimization, dynamic supplier/distributer alignment, tiered valuation, proactive inspection criteria, flexible safety stock determinations, predictive cooler dwell inspections, increasingly effective supplier negotiations, and the like. Dynamic inventory management may be impacted by the outputs of the system described herein, such as by a "first expired first out" optimization model rather than a "first inventoried first out" model. Dynamic supplier/distributer alignment may be impacted by using the outputs of the system described herein to intelligently route product selections based on historical transit issues, route information, and the freshness score prioritization, such as by routing lower freshness scores to nearby distributers to reduce transportation time for example.

[0030]    Tiered valuation may be accomplished using outputs of the system described herein, which may reduce throwaways and markdowns at the market. Proactive inspection criteria may be provided to the inspection system from the system described herein in order to enable insights for the inspection system to prompt particular inspection criteria for specific product selections. Flexible safety stock determinations may be made based on outputs of the system described herein to spin safety stock numbers up and down depending on observed weather patterns and initial freshness indicators, for example. Predictive cooler dwell inspections may use outputs of the system described herein, such as the freshness indicators, to predict and highlight days of life for at-risk product at distribution center coolers, for example. Comparative freshness indicator data for products obtained from different suppliers may provide insights and data points into quality of products originating from specific locations, the impact of weather events on quality and/or condition of products, and other gaps in the product life cycle that may impact shelf life, for example.

[0031]    Referring to FIG. 2, an exemplary computing device configured to perform embodiments of the systems and methods is described. Computing device 202 is configured to perform embodiments of the systems and methods described herein. The computing device 202 communicates with information sources 224 and a

-10-

CONFIDENTIAL

WM00119109

3220US01

set of sensors 220 to obtain data associated with produce item 262 and/or a set of produces 260.

[0032]   The computing device 202 represents any device executing instructions (e.g., as application programs, operating system functionality, or both) to implement the operations and functionality associated with the computing device 202. In some examples, computing device 202 may be a cloud-based device implemented across one or more processors, such as processor(s) 210. In other examples, the computing device 202 may represent a group of processing units or other computing devices.

[0033]   In some examples, the computing device 202 includes one or more processor(s) 210, a memory 204, a communications component 212, and a user interface component 214.  The one or more processor(s) include any quantity of processing units.  At least one processor of the one or more processors(s) 210 is programmed to execute computer-executable instructions 206 for implementing the examples herein.  The computer-executable instructions 206 may be performed by the processor or by multiple processors within the computing device 202, or performed by a processor external to the computing device 202.  In some examples, the processor is programmed to execute instructions such as those illustrated in the figures (e.g., FIG. 4 and FIG. 6).

[0034]   In some examples, the one or more processor(s) represent an implementation of analog techniques to perform the operations described herein. For example, the operations may be performed by an analog computing device and/or a digital computing device.

[0035]   The computing device 202 may include one or more computer readable media such as the memory 204.  The memory 204 includes any quantity of media associated with or accessible by the computing device 202.  The memory 204 may be internal to the computing device (as shown in FIG. 2), external to the computing device (e.g. external server 252), or both. In some examples, the memory

-11-

CONFIDENTIAL

WM00119110

204 includes read-only memory and/or memory wired into an analog computing device.

[0036]    The memory 204 stores data, such as one or more applications.  The applications, when executed by the processor, operate to perform functionality on the computing device.  The applications may communicate with counterpart applications or services such as web services accessible via a network.  For example, the applications may represent downloaded client-side applications that correspond to server-side services executing in a cloud. Exemplary applications may include product inspector 208, freshness indicator 230 and shelf life predictor 244.

[0037]    The memory 204 may include one or more computer-executable components.  Exemplary components include communications component 212 and user interface component 214.  In other examples, the memory 204 includes an analysis engine, sensor data, image capture data, and/or processed sensor data.

[0038]    In some examples, the product inspector 208, when executed by the processor of the computing device 202, causes the processor to obtain product-specific data corresponding to a product for inspection, such as sensor data from sensors associated with an inspection system, process the obtained product-specific data to identify a type of product, such as a type of produce for example, and determine whether the identified product meets inspection criteria thresholds. Product inspector 208 may further comprise product data used to identify products and product types being inspected, regulatory requirements, industry requirements, and/or any other entity-specific criteria for inspection. In some instances, product data may be stored in database 218 or external server 252, and retrieved by product inspector 208. Product inspector 208 generates product-specific inspection data 242 for each product or set of products that is inspected.

[0039]    Although product inspector 208 is depicted as implemented on computing device 202 for illustrative purposes, it should be understood that product inspector 208 may be implemented remotely from computing device 202 in some examples, such as on a remote computing device that is local to set of produce 260 or

-12-

CONFIDENTIAL                                                            WM00119111

3220US01

other products being inspected, for example. When implemented remote from computing device 202, product inspector 208 may communicate with computing device 202 via network 250, for example.

[0040]    The set of sensors 220 is a set of one or more sensors associated with set of produce 260 or an environment corresponding to the set of produce 260.  The set of sensors may include one or more types of sensors, such as, without limitation, temperature sensors, image capture devices, hygrometers, barometers, motion sensors, spectrometers, proximity sensors, or any other type of sensor.  An image capture device may include an analog camera, a digital camera, an IR camera, or other type of camera. The set of sensors 220 may include one or more sensors integrated within the computing device 202 in some examples.  In other examples, the set of sensors 220 includes one or more sensors exterior to the computing device 202. The product inspector 208 and freshness indicator 230 may obtain sensor data from the set of sensors 220, for example.

[0041]    Although product inspector 208, freshness indicator 220, and shelf life predictor 244 are depicted as integrated with computing device 202 for illustrative purposes, these applications may be separately implemented on different computing devices, remote from computing device 202, in some examples. In other examples, product inspector 208 may be separately implemented on a remote computing device relative to computing device 202, as part of an inspection system, and communicatively coupled to computing device 202 having freshness indicator 220 and shelf life predictor 244.

[0042]    Computing device 202, in some examples, communicates with external devices, cloud infrastructure, and networks via communications component 212. External server 252 and computing device 202 are communicatively coupled to network 250. Networks may include, without limitation, a local area network (LAN), such as an Ethernet connection, or a wide area network (WAN), such as the Internet. Networks may be a wired network or a wireless network, such as WI-FI. In other examples, the product inspector 208 requests sensor data from the set of sensors 220 via the network 250.  The set of sensors may transmit sensor data via the network in

-13-

                                                                 WM00119112

3220US01

response to a request from an inspection system, such as product inspector 208. In other examples, the set of sensors automatically transmits sensor data to the product inspector 208 in real time as the sensor data is generated. In still other examples, the sensor data is sent to computing device 202 at regular intervals or in response to a predetermined event.

[0043]    Communications component 212 may include a network interface card and/or computer-executable instructions (e.g., a driver) for operating the network interface card. Communication between the computing device and other devices may occur using any protocol or mechanism over any wired or wireless connection. In some examples, the communications interface is operable with short range communication technologies such as by using near-field communication (NFC) tags.

[0044]    Product inspector 208 may generate an alert or notification if the sensor data obtained indicates a product does not meet one or more of a set of rules or inspection criteria. For example, one rule for an item may be the absence of any puncture or hole. Another rule may be a certain threshold percentage of defects permitted over the surface of a produce. In some examples, if product inspector analysis of the sensor data indicates the identified defects of a produce exceeds the rule (higher or lower than the threshold), an alert is generated and output via the user interface component 214.

[0045]    In some examples, an alert is generated and output to one or more user interfaces via user interface component 214. A user interface may be a screen that displays the alert to a user or a speaker that generates an audible sound which the user can hear. Other user interfaces are also possible. Examples of other interfaces are command line prompts, graphical user interfaces, augmented reality, tactile and feedback interfaces, digital menus, and the like. User interface component 214 may output generated alerts to user interface displays of remote computing systems communicatively coupled to computing device 202, in some examples, such as a remote handheld device (not shown) communicatively coupled to computing device 202 via network 250, for example.

-14-

CONFIDENTIAL

WM00119113

[0046]    Data storage devices(s) 216 may include one or more databases, such as database 218.  Database 218 may store information regarding products and product types, such as information about produce and produce types, which may be used by the product inspector 208 to identify produce item 262 and/or set of produce 260 from the obtained sensor data 248.

[0047]    In other examples, the data storage may also be implemented externally to mobile computing device 202 such as in external server 252 and accessed via network 250. The data storage device(s) may include rotational storage, such as a disk.  The data storage device(s) may also include non-rotational storage media, such as a solid-state drive (SSD) or flash memory.  In some non-limiting examples, the data storage device(s) provide a shared data store accessible by two or more hosts in a cluster.  For example, the data storage device may include a hard disk, a redundant array of independent disks (RAID), a flash memory drive, a storage area network (SAN), or other data storage device.

[0048]    The set of sensors 220 may include one or more sensors implemented in various locations and throughout various stages of the produce life cycle. For example, one or more sensors from the set of sensors 220 may obtain environmental data associated with the set of produce 260. The set of sensors 220 may include one or more sensors for detecting characteristics of the produce and/or the environment within and/or around the produce.  In this example, the set of sensors 220 incudes at least one temperature probe (not shown). The temperature probe may record temperature of the produce or environmental temperature associated with the produce. In other examples, the set of sensors 220 may include one or more sensors implemented in a growing area, such as a field, to detect growth conditions, one or more sensors implemented in cases of post-harvest produce to detect environmental conditions associated with the produce post-harvest and/or characteristics of the produce post-harvest, one or more sensors implemented in a transport vehicle to detect environmental conditions associated with transport of the produce, one or more sensors implemented in a facility, such as a packing facility, cooling facility, distribution center, or market, to detect environmental conditions associated with the produce during its duration at each facility, and so on. Any number of sensors, and

-15-

CONFIDENTIAL

WM00119114

any number of different types of sensors, may be contemplated by aspects of this disclosure for detecting and/or transmitting sensor data of products and environmental conditions associated with the products.

[0049]    The set of sensors 220 may transmit and/or provide sensor data 248 to computing system 202, and in particular directly to one or more of product inspector 208 or freshness indicator 230, in some examples. In other examples, set of sensors 220 may transmit sensor data 248 to a storage device, such as data storage devices 218, external server 252, or another storage device configured to be accessed by computing device 202. In some examples, one or more sensors in set of sensors 220 may have integrated storage for local storage of sensor data until the sensor data is transmitted and/or obtained by a computing device. In some examples, sensor data 248 may include pre-harvest data 234, harvest data 236, supply chain data 238, and environmental data 240, which may be obtained by freshness indicator 230.  In other examples, sensor data 248 may be obtained by and/or stored at one or more information sources 224, which may generate pre-harvest data 234, harvest data 236, supply chain data 238, and environmental data 240. In these examples, freshness indicator 230 may obtain pre-harvest data 234, harvest data 236, supply chain data 238, and environmental data 240 from information sources 224. In yet other examples, a hybrid approach may be contemplated where pre-harvest data 234, harvest data 236, supply chain data 238, and environmental data 240 are generated by freshness indicator 230 based in part on obtained sensor data 248 and based in part on obtained data from information sources 224. For example, sensor data 248 may indicate product characteristics for a crop pre-harvest, which may be combined with obtained weather data for the geolocation associated with the crop from information sources 224, and used to generate pre-harvest data 234 for that crop of product.

[0050]    Information sources 224 may include, without limitation, sensors, such as set of sensors 220, public sources, such as NOAA application programming interfaces (APIs) and other public information sources, transport vehicle on-board computing systems, third-party TMS APIs, crop data technology APIs, field data technology APIs, grower data technology APIs, inspection system APIs, market applications, and/or any other suitable information source associated with a product or

-16-

CONFIDENTIAL

WM00119115

product environment. Freshness indicator 230 may obtain input from information sources 224 via APIs and assign each data input a weight in freshness model 266 when calculating against a baseline model 256, which may be "best case" or "ideal" scenario for a given product. In other words, baseline model 256 provides optimal freshness indicator values for a given product based on ideal growth, harvest, transport, packing, storage, and inspection conditions, which freshness indicator 230 calculates actual obtained data points for the product against in freshness model 266 to determine the freshness indicator values for that product. Machine learning component 258 may obtain and/or receive market feedback on realized shelf life at market for the product and/or inspection feedback on realized freshness or other characteristics of the product that may be used as a feedback loop to refine freshness model 266.

[0051]   The set of sensors may be part of the computing system in some examples, or used independently to gather data in other examples. Sensors may be implemented within part of storage facilities, used in the fields or where the produce is grown, or implemented within part of transportation vehicles. In some cases, sensors are implemented in part of the pallets that are used to transport the produce. The set of sensors may be one instrument implementing different sensors, or different instruments implementing discrete sensors. In some examples, the sensor data may include temperature data, timestamp data, barometer data, hygrometer data, change of state data, IR digital video data, non-IR digital video data, analog video data, still images, light properties or other data generated by one or more sensors. In still other examples, the sensor data 248 may include IR camera still images, IR camera video images, digital video output, or other image data.  For example, the sensor data 248 may include Moving Pictures Experts Group (MPEG) video output.

[0052]   Freshness indicator 230 also obtains product data 232 from database 218. Product data 232 is any data pertaining to the product in general, rather than data about a specific set of the product. Product data may include general characteristics of the product, expected origins of the product, size range for the product, weight range for the product, crop progress expectations for the product within ideal conditions, geolocations associated with the product, such as where the product is grown or

-17-

WM00119116

supplied, quality/condition parameters for the product, and any other criteria or information defined by regulatory authorities and/or industry standards. Product data 232 may be integrated as part of product inspector 208, in some examples, or obtained by product inspector 208 in other examples, for use in generating inspection data 242. Freshness indicator 230 obtains inspection data 242 from product inspector 208 in some examples, for use in determining freshness indicator values for inspected products. In other examples, product inspector 208 transmits generated inspection data 242 to freshness indicator.

[0053]    The freshness indicator 230 uses one or more of pre-harvest data 234, harvest data 236, supply chain data 238, environmental data 240, and inspection data 242 to calculate freshness indicator values 254. Freshness indicator 230 may include a customized algorithm, a set of rules, and/or a set of criteria and parameters to determine the freshness indicator values based on the data obtained at various intervals throughout a product life cycle. The freshness indicator values 254 may be specific to a particular piece of product or a set of products at a given time or stage in the product life cycle. For example, a first freshness indicator value may be calculated based on pre-harvest data 234 and harvest data 236 at the stage where the product arrives at a packing facility post-harvest. A second freshness indicator value may be calculated for the same product based on the first freshness value calculated and supply chain data 238 at the stage where the product arrives at a distribution center, for example. Another freshness indicator value may be calculated for the same product based on the previous assigned freshness value calculated and inspection data 242, for example. The order and process described herein is not meant to imply a singular process flow, but rather is provided for illustrative purposes only. A freshness indicator value may be calculated based on available data at any point in the products life cycle, from pre-harvest to a final touch point at a market display, using the system described herein.

[0054]    Freshness indicator 230 may be used to generate a freshness indicator value for a sample selection of product from a set of products, or to individual products in a batch or set or products. In some examples, freshness indicator 230 may be specific to a particular store, group of stores, region, or other location, to provide

-18-

                                        WM00119117

customized freshness indicator values in accordance with a particular store specification or regional specification. It should be appreciated by one of skill in the art that freshness indicator 230 may be customized in a variety of ways to address the specifications of specific stores, institutions, inspections, personnel, agencies, management, or the like.

[0055]   Freshness indicator 230 may also be used to determine whether a product is acceptable. Any attribute of a product that may be sensed or calculated from a sensor or measured is thus an attribute that may be used as a basis or parameter of the algorithm used to determine freshness indicator values 254. By way of example, a computing device implementing a freshness indicator component with sensor data obtained from a temperature probe may use temperature in the algorithm. As another example, freshness indicator 230 obtaining sensor data from an image capture device may analyze image data to determine factors for use in the algorithm to calculate the freshness indicator value. Freshness indicator 230 may also obtain and/or receive inspection data 242 from product inspector 208, which determines whether the product has any defects, such as a puncture for example, which may be used as a factor in the algorithm that calculates the freshness indicator values.

[0056]   The product inspector and/or the freshness indicator may generate an alert based on any number of factors detected and/or identified from the obtained data. For example, an alert may be generated during inspection of produce upon the determination that a foreign substance is present on the produce. The presence of a foreign substance may be determined by inspecting produce and determining the presence of a substance on the surface of the produce that is not related to the produce based on the produce data retrieved. For example, based on identifying characteristics, such as color or texture, the foreign substance may be determined to be mold. The alert may identify one or more users associated with the inspection system to perform a secondary inspection and/or remove produce from a set of produces being inspected, in some examples.

[0057]   Shelf life predictor 244 uses freshness indicator values 254 generated by freshness indicator 230 to calculate shelf life predictions 246 for a product, or a set

-19-

CONFIDENTIAL                                                                                                                    WM00119118

of products, during various stages of the products life cycle. Shelf life predictor 244 may also use one or more of product data 232 and environmental data 240, in combination with the generated freshness indicator values, to calculate the shelf life predictions 246. For example, shelf life predictor 244 may obtain a first freshness indicator value from freshness indicator 230 at a stage where a product arrives at a distribution center, and may calculate the current shelf life prediction based on the first calculated freshness indicator value at that stage. Upon obtaining an updated freshness indicator value for the same product at a later stage, shelf life predictor 244 may calculate an updated shelf life prediction based on the earlier shelf life prediction and the updated freshness indicator value. In addition, shelf life predictor 244 may obtain environmental data that is used to adjust the calculation of shelf life predictions 246. For example, shelf life predictor 244 may obtain a freshness indicator value for a product as it arrives at a market, in addition to environmental data for that particular market that indicates environmental conditions that will impact the shelf life of the product, and may calculate an updated shelf life prediction for that product based on both the freshness indicator value and the obtained environmental data. It should be appreciated that the freshness indicator values may be generated multiple times, iteratively throughout the life cycle or product stages through a supply chain, and the shelf life predictions may also be generated multiple times or updated iteratively depending on the circumstances and data obtained. For example, a piece of produce that must undergo a long transportation process may have its freshness indicator value recomputed several times during transport, where a piece of produce grown locally may only need to have the freshness indicator generated once or a twice before it reaches market.

[0058]    Other criteria may be used to generate freshness indicator values and shelf life predictions and may include inspection data such as visible defects, unusual markings, temperature, indications of damage such as tears or punctures, smell, color consistency, packaging imperfections, and presence of other substances such as mold. These examples are non-limiting. Any attribute of a product that may be detected by a sensor, directly or indirectly, or calculated based on sensor data, may be a basis for calculation of a products freshness, and in turn used to calculate a shelf life prediction.

-20-

CONFIDENTIAL

WM00119119

3220US01

Different criteria may be used for different products, and different criteria may be used for the same product type based on variances such as product origin, for example. Criteria may also be combined in making determinations or generating freshness indicator values and calculating shelf life predictions.

[0059]    FIG. 3 is an exemplary chart of one embodiment of an output of shelf life predictions based on calculated freshness indicator values and a feedback loop that refines the shelf life prediction model. The freshness component will take input from data sources, such as information sources 224 in FIG. 2, via one or more APIs and assign each data input a weight when calculating against a baseline "best case" scenario for a given produce. The baseline "best case" or "ideal" scenario for a given product may be a base model of ideal growth, harvest, transport, packing, storage, and inspection conditions, with an associated optimal result, such as optimal freshness values and/or optimal shelf life duration. Freshness indicator 230 may use this baseline for calculating against actual data points received from information sources 224 for the product being evaluated to determine the freshness indicator value for that product, which in turn is used to calculate the shelf life prediction for that product.

[0060]    The weighting may be dynamic and may be based upon machine learning on a feedback loop. In the example of FIG. 3, a baseline "rule of thumb" may be obtained from industry sources on how particular products are impacted by a variety of factors and used to generate baseline models for each particular product. An initial calculation (before machine learning) of days of life at market (shelf life) may be made for a product based on the corresponding baseline model.

[0061]    In the example of FIG. 3, actual data points for three lots of produce, such as strawberries for example, are input and calculated against the baseline model to generate freshness indicator values for each individual lot. The freshness indicator values for each lot are then used by shelf life predictor 244 to calculate a shelf life prediction for each lot. The system receives market feedback on the actual shelf life at market for each lot, which is used by machine learning component 258 to refine freshness model 266 of freshness indicator 230 and by machine learning component 264 to refine shelf life predictor 244.

-21-

CONFIDENTIAL

WM00119120

[0062]    As seen in the sample data sets, Lot-1, Lot-2, and Lot-3 all have the same baseline shelf life projection (8 days), as each of these sample lots are for the same type or produce in this example. The data inputs for Lot-1 include a null input at a pre-inspection stage, which may be a pre-harvest data point for example. The null input may indicate that pre-harvest data is in alignment with ideal pre-harvest conditions, for example, which would not affect the baseline projection, and accordingly the output of 8 days would remain consistent at that data point. A harvest data point input indicates there was rain present during harvest of Lot-1, and the system weights this data point at a -1, which adjust the baseline projection down to 7 days. A next data point may be from post-harvest data, such as data obtained during the packing/cooling facility stage, which may also be considered supply chain data in some examples. The data input for Lot-1 indicates this selection of produce was cooled properly, which does not affect the system weighting for that data point. Likewise, the subsequent data point from transportation data, which may also be considered supply chain data, indicates that temperature of the produce was properly maintained during transport, and the weighting is not affected here either. A condition data input, which may be considered inspection data, indicates a -1 score, which may be due to a detected or identified characteristic during inspection. Here, the -1-weighting applied adjusts the projection to 6 days for shelf life of this particular lot of produce. The transportation data, or supply chain data, obtained for the transport stage from a distribution center to market, and the inspection data obtained at an arrival stage of the product at market, both indicate conditions within parameters, or no weighting applied for Lot-1. Here, the predicted shelf life is calculated at 6 days, based on the factors considered and data obtained, and at market arrival the 6-day shelf life prediction is output by the system. At a final touch point at market, which may be a removal from shelf due to end of shelf life in some examples or an additional inspection at market in other examples, a -1 weighting is applied, which may indicate a detected characteristic for Lot-1 that impacts predicted shelf life and updates the actual shelf life for Lot-1 to 5 days. This market feedback is used as feedback to the system as actual shelf life at market being 5 days compared against the predicted 6 days, and is used to refine the system algorithms for future predictions.

-22-

CONFIDENTIAL

WM00119121

3220US01

[0063]   The additional data sets for Lot-2 and Lot-3 illustrate different data points or data inputs at various stages of the product life cycle which impact the calculated freshness indicator values and the shelf life prediction accordingly. As with Lot-1, the market feedback continues to refine the system and is used as a feedback loop for the machine learning components of the system.

[0064]   With multiple data points, the calculation/weighting can be triangulated and improved with additional feedback from the system. In addition, the feedback may be used to validate portions of the calculations while refining other portions of the calculations. For example, as shown in the data set of Lot-3, the algorithm is validated for pre-inspection (or pre-harvest) and harvest variable calculations used for Lot-1 and Lot-2, indicating that the weighting in Lot-1 and Lot-2 for distribution center (DC) condition/quality issues may be further refined. The algorithm may therefore increase the weighting for that input in the final calculation, improving the accuracy for the next lots of the same produce.

[0065]   FIG. 4 is an exemplary block diagram illustrating a set of sensors for gathering environmental and product data.  The set of sensors 400 is a set of one or more sensors.  In some cases, set of sensors 400 may be part of computing device 202. In other cases, set of sensors 400 may be communicatively coupled to computing device 202. The set of sensors 400 may be used to detect or obtain data associated with products and/or the product environments. The set of sensors 400 in some examples includes one or more thermometer(s) 402, one or more barometer(s) 404, one or more hygrometer(s) 406, one or more change of state sensor(s) 408, a spectrometer(s) 409, and/or one or more image capture device(s) 410.  In some examples, the image capture device(s) 410 includes at least one IR camera 412. The sensors are used to generate or obtain sensor data, including product data and environmental data related to products. In some cases, sensors may work together or with other devices.

[0066]   For instance, a GPS system may be used to identify the location of a thermometer or temperature sensor associated with a product, which may aid the freshness indicator system in identifying additional environmental data corresponding

-23-

CONFIDENTIAL

WM00119122

3220US01

to the location or route of travel for the product. For example, a particular environmental condition might be present in a certain geographic area, and the freshness indicator system may be configured to analyze and factor in the environmental conditions with other obtained data corresponding to the product when calculating freshness indicator values. The sensor data generated by set of sensors 400 may be obtained or acquired by the product inspector 208, freshness indicator 230, and/or shelf life predictor 244 in FIG. 2, for example. The sensor data may then be used to generate other data, such as pre-harvest data, harvest data, supply chain data, environmental data, inspection data, and the like, which is used by the system to calculate freshness indicator values and predict shelf life of a product.

[0067]    A change of state sensor is a non-electrical, non-reversing sensor that monitors a change of state of the produce, such as a change in temperature, a change in a state of matter, a change in a moisture level or texture, etc. A change of state of matter includes a change from ice to water, a change from water to steam, etc. A spectrometer is used to determine information about an object or substance through analysis of its light properties.

[0068]    Sensor data from the thermometer(s) 402, barometer(s) 404, hygrometer(s) 406, and/or change of state sensor(s) 408, spectrometer(s) 409, may be stored and/or transmitted in concert with image capture data generated by image capture device(s) 410 for evaluation of a product or product environment. For example, hygrometer data indicating moisture levels of produce may be sent with IR image data to product inspector component for analysis during inspection. The product inspector component may analyze the moisture data and IR data to determine whether a produce item is moist or drying out, for example.

[0069]    FIG. 5 is an exemplary flow chart of a process for determining freshness and shelf life of a product. The process shown in FIG. 5 may be performed by a shelf life predictor and a freshness indicator component executing on a computing device, such as, but not limited to, freshness indicator 230 and shelf life predictor 244 in FIG. 2. One or more computer-readable storage media storing

-24-

CONFIDENTIAL

WM00119123

computer-readable instructions may execute to cause at least one processor to implement the operations illustrated in FIG. 5.

[0070]    The process beings at operation 501. The process may be triggered by any number of events such as receipt of product, scheduled intervals, or any other suitable factor. In some cases, the process may be manually triggered, for example, at a field inspection of produce, such as during a pre-harvest stage for example. In other cases, the process may be automated such as upon scanning of a received package from a supplier. In still other cases, it may be based upon periodic updates, which may happen when a package is in transit. A determination is made as to whether product data has been received from one or more sources at operation 502.  Product data, in some examples, include one or more stored characteristics of the product type, pre-harvest product-specific data, harvest product-specific data, supply chain product-specific data, transportation product-specific data, inspection product-specific data, and the like. In some aspects, the sources of product data may be external to the computing device, such as a remote server or cloud infrastructure. In other aspects, the sources may be local to the device or added to the device using a USB drive or similar device. If the product data has not been received, product data is obtained at operation 504 by a freshness indicator component, such as freshness indicator 230 in FIG. 2 for example, or another similar component.  Product data may be obtained from a number of different data sources, such as information sources 224 and/or set of sensors 220 in FIG. 2, for example.

[0071]    At operation 506, a determination is made as to whether environmental data is needed from one or more sources.  This determination may be based on the product stage at which the calculations are being performed. For example, during transportation, environmental data may be needed. However, upon reaching the store, environmental data may not be a factor, yet inspection data may be desired. Environmental data in some examples include information from one or more sensors and/or information from public sources, such as weather services or government agencies. In some aspects, the sources of environmental data may be external to the computing device, such as networked servers or drives. As with product data, environmental data may be obtained from web servers, web services,

-25-

WM00119124

internet servers, remote databases, and the like. In other aspects, the environmental data sources may be local to the device or added to the device using a USB drive or similar device. If the environmental data is desired then at operation 508, a determination is made as to whether it has been received. If the environmental data has not been received, environmental data is obtained at operation 510 by a freshness component, such as freshness indicator 230 in FIG. 2 for example, or another similar component.  In one example, environmental data may include harvest product-specific data associated with the product and obtained via one or more sensors at a growing location and/or one or more grower technology APIs.

[0072]   A determination is made as to whether additional data is needed from one or more sources at operation 512.  Additional data in some examples include data from third party applications or from transportation databases. In other cases, additional data may be thresholds or the like associated with products or other aspects of the process. In some aspects, the sources of additional data may be external to the computing device, such as networked servers or drives. As with product data, additional data may be from web servers, web services, internet servers, remote databases, and the like. In other aspects, the additional data sources may be local to the device or added to the device using a USB drive or similar device. If the additional data is desired, then at operation 514, a determination is made as to whether it has been received. If the additional data has not been received, additional data is obtained at operation 516 by a freshness component, such as freshness indicator 230 in FIG. 2 for example, or another similar component.  The additional data, if obtained, and the environmental data, if obtained, is used together with the product data obtained to calculate freshness indicator values at operation 518 for the product.

[0073]   At operation 520, data shelf life prediction is calculated based on the calculated freshness indicator values, and the process iteratively repeats for a next stage of the product life cycle, or terminates thereafter. It should be appreciated that only a subset of the listed data may be needed to generate a freshness score, or freshness indicator value, in some instances. Freshness scores may be specific to a particular produce or type of produce. In one example, the freshness score is based on

-26-

CONFIDENTIAL

WM00119125

comparing the pre-harvest product-specific data and the harvest product-specific data with at least one product-specific threshold associated with the product.

[0074]    The process of generating freshness indicator values may be repeated as necessary. The generated freshness indicator values are then used to calculate shelf life predications, which may also be updated as new freshness indicator values are calculated and provided.

[0075]    While the operations illustrated in FIG. 5 are performed by a computing device, aspects of the disclosure contemplate performance of the operations by other entities or multiple entities working in concert or independently. For example, a cloud service may perform one or more of the operations.

[0076]    FIG. 6 is an exemplary illustration of a device obtaining information about a product.  Such information retrieval may be used by a market associate prior to placing products on display, or while products are on display at market, for example. In other examples, the exemplary information retrieval may be performed as part of an inspection process at one or more stages of a product life cycle.

[0077]    Device 601 is an illustrative example of a computing device, such as computing device 202 in FIG. 2, for example. Device 601 comprises image sensor 602 and touchscreen 603. Touchscreen 603 may be an integrated touch sensing element and display element, for example. Additionally, device 601 may comprise other sensors 604. Device 601 may use image sensor 602 to obtain sensor data regarding produce 610. Sensor data may be analyzed by a shelf life predictor, such as shelf life predictor 244 in FIG. 2, implemented on device 601. The shelf life predictor application may output shelf life prediction 606 to a display of device 601, in one example. In other example, shelf life predictor may be implemented remote from device 601, and device 601 may communicate with shelf life predictor at a back-end server to obtain shelf life prediction 606 for produce 610.

[0078]    In some examples, additional produce metrics 607 may be displayed for produce 610. Produce metrics 607 may be generated by a freshness indicator component implemented on device 601, such as freshness indicator 230 in FIG. 2, or

-27-

                    WM00119126

by some other component using the freshness indicator values calculated by a freshness component for produce 610. In some instances, the shelf life predictor and/or freshness component may reside on a remote computing device or remote server such as external server 252 in FIG. 2. In some instances, shelf life prediction 606 and produce metrics 607 may be presented to a user via touchscreen 603. In other instances, shelf life prediction 606 and produce metrics 607 may be transmitted for further analysis, such as to external server 252 in FIG. 2. In addition to shelf life prediction 606 and produce metrics 607, any data associated with the produce may be retrieved. Although shown with regards to a device with a touchscreen, other implementations are also possible. Additionally, discrete aspects may be implemented in other methods. For example, shelf life prediction 606 may be displayed on a smart display or user interface adjacent to a product display where product 610 is placed, which a consumer may access to obtain product information. Alternatively, a display may use a dynamic QR code associated with produce 610 which may be scanned by a customer to obtain product-specific data for produce 610.

[0079]    For example, a dynamic QR code may be updated with current product information corresponding to the products currently on display adjacent to the QR code. Scanning the QR code may present a consumer with product information about the current product on display, that is, the selection or lot of produce most recently placed on display with that code for example. In this illustrative example, a lot of apples may be on display and the dynamic QR code may provide product information such as the geographic location of origin for the lot of apples, the predicted shelf life or a freshness indicator for the lot of apples, the number of days the lot of apples have been at market, grower information for the lot of apples (supplier information), growth data for the lot of apples (such as organic or sustainable farming practices for example), and any other desirable product information. As a new lot of apples is placed on display, the dynamic QR code may be updated with product-specific information obtained from the freshness component system for that new lot. A consumer may use device 601 to scan a dynamic QR code in this example to obtain a shelf life prediction 606 and produce metrics 607.

CONFIDENTIAL

WM00119127

3220US01

[0080]    Device 601 may also generate an alert 608 based on obtained data for produce 610. In some examples, where a market associate uses device 601 to obtain data on product 610, the inspection system or freshness component system may generate alert 608 to notify a market associate of additional inspection needed, criteria to look for and confirm/deny related to a detected characteristic during inspection or a predicted characteristic based on product data obtained, and the like. In some examples, a market associated may use device 601 as part of an inspection system to obtain image data or other sensor data on produce 610 in order to generate inspection data.

Additional Examples

[0081]    At least a portion of the functionality of the various elements in FIG. 2, FIG. 4, and FIG. 6 may be performed by other elements in FIG. 2, FIG. 4, and FIG. 6, or an entity (e.g., processor, web service, server, application program, computing device, etc.) not shown in FIG. 2, FIG. 4, or FIG. 6.

[0082]    In some examples, the operations illustrated in FIG. 1 and FIG. 5, may be implemented as software instructions encoded on a computer readable medium, in hardware programmed or designed to perform the operations, or both. For example, aspects of the disclosure may be implemented as a system on a chip or other circuitry including a plurality of interconnected, electrically conductive elements. Operations may be performed on a single device, or multiple devices communicatively coupled together. Aspects of the disclosure may be performed at one location or different locations communicatively coupled together. Additionally, results of some operations may be sent as copies to different devices. For instance, a network server may be used to generate a freshness indicator or shelf life. The generated freshness indicator or shelf life may then be sent to a plurality of computing devices. Additionally, aspects of the disclosure such as notifications and alerts may be sent to a single device, multiple devices or used by other applications or programs.

-29-

CONFIDENTIAL

WM00119128

[0083]    Product data, environmental data, or any other data, may be obtained from a variety of sources, such as, but without limitation, historical data collected by companies, industries, trade groups, or other such organizations. Data associated with a product may be manually input by users or those with knowledge of the product in some examples. Information gathered by sensors may be used not only to predict shelf life but also to determine whether a produce is acceptable for market. Other determinations may include expiration date, use-by dates, sell-by dates etc. For instance, bananas stored in special rooms may be treated with temperature and/or gas to ripen or delay ripening, which may adjust or otherwise affect shelf life predictions.

[0084]    Communication and storage may be accomplished by a variety of devices and through a variety of means. Communication may be over wireless networks such as BLUETOOTH or Wi-Fi or over wired networks such as ethernet and phone lines. Communication may be direct through devices, through corporate intranets, the internet, cloud based services or the like. Similarly, storage of data and components may be on computing devices, local servers, network servers, remote servers, cloud applications and devices, mobile devices, kiosks etc.

[0085]    While the aspects of the disclosure have been described in terms of various examples with their associated operations, a person skilled in the art would appreciate that a combination of operations from any number of different examples is also within scope of the aspects of the disclosure.

[0086]    Alternatively, or in addition to the other examples described herein, examples include any combination of the following:

– wherein the pre-harvest product-specific data comprises at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data;

– generate a shelf life prediction for the product based on the first set of freshness indicator values;

-30-

CONFIDENTIAL                                                                WM00119129

3220US01

&ndash; wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to determine at least one of the following based on the generated shelf life prediction: priority of placement of the product in inventory, selection of a distribution center for the product, transaction value of the product, inspection criteria for the product, and quality metrics associated with one or more suppliers of the product;

&ndash; obtain inspection data for the product from an inspection system;

&ndash; generate a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values;

&ndash; generate an updated shelf life prediction for the product based on the second set of freshness indicator values and the first set of freshness indicator values;

&ndash; obtain supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point;

&ndash; obtain additional inspection data associated with the final touch point;

&ndash; generate a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values;

&ndash; generate an updated shelf life prediction for the product based on the third set of freshness indicator value and the second set of freshness indicator values;

[0087]    The term "Wi-Fi" as used herein refers, in some examples, to a wireless local area network using high frequency radio signals for the transmission of

-31-

CONFIDENTIAL    WM00119130

3220US01

data. The term "BLUETOOTH" as used herein refers, in some examples, to a wireless technology standard for exchanging data over short distances using short wavelength radio transmission. The term "cellular" as used herein refers, in some examples, to a wireless communication system using short-range radio stations that, when joined together, enable the transmission of data over a wide geographic area. The term "NFC" as used herein refers, in some examples, to a short-range high frequency wireless communication technology for the exchange of data over short distances.

Example Operating Environment

[0088]    FIG. 7 is a block diagram illustrating an example operating environment 700 for a computing device (e.g., computing device 202 in FIG. 2). The computing system environment 700 is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the disclosure. Neither should the computing environment 700 be interpreted as having any dependency or requirement relating to any one or combination of components illustrated in the example operating environment 700.

[0089]    The disclosure is operational with numerous other general purpose or special purpose computing system environments or configurations. Examples of well-known computing systems, environments, and/or configurations that may be suitable for use with the disclosure include, but are not limited to: personal computers, desktop computers, laptop computers, tablet devices, netbooks, handheld devices, mobile telephones, wearables, gaming devices, portable media players, server computers, kiosks, set top boxes, tabletop devices, multiprocessor systems, microprocessor-based systems, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

[0090]    The disclosure may be described in the general context of computer-executable instructions, such as program modules, being executed by a computer. Generally, program modules include routines, programs, objects, components, data structures, and so forth, which perform particular tasks or implement particular

-32-

                                                                WM00119131

3220US01

abstract data types. The disclosure may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in local and/or remote computer storage media including memory storage devices and/or computer storage devices. As used herein, computer storage devices refer to hardware devices.

[0091]    With reference to FIG. 7, an example system for implementing various aspects of the disclosure may include a general-purpose computing device in the form of a computer 710. Components of the computer 710 may include, but are not limited to, a processing unit 720, a system memory 725, and a system bus 730 that couples various system components including the system memory to the processing unit 720. The system bus 730 may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. By way of example, and not limitation, such architectures include Industry Standard Architecture (ISA) bus, Micro Channel Architecture (MCA) bus, Enhanced ISA (EISA) bus, Video Electronics Standards Association (VESA) local bus, and Peripheral Component Interconnect (PCI) bus also known as Mezzanine bus.

[0092]    The computer 710 typically includes a variety of computer-readable media. Computer-readable media may be any available media that may be accessed by the computer 710 and includes both volatile and nonvolatile media, and removable and non-removable media. By way of example, and not limitation, computer-readable media may comprise computer storage media and communication media. Computer storage media includes volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer-readable instructions, data structures, program modules or the like. Read only memory (ROM) 731 and random-access memory (RAM) 732 are examples of computer storage media. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other

-33-

CONFIDENTIAL

WM00119132

3220US01

medium which may be used to store the desired information, and which may be accessed by the computer 710. Computer storage media does not, however, include propagated signals. Rather, computer storage media excludes propagated signals. Any such computer storage media may be part of computer 710.

[0093]    Communication media typically embodies computer-readable instructions, data structures, program modules or the like in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limitation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media.

[0094]    The system memory 725 includes computer storage media in the form of volatile and/or nonvolatile memory such as ROM 731 and RAM 732. A basic input/output system 733 (BIOS), containing the basic routines that help to transfer information between elements within computer 710, such as during start-up, is typically stored in ROM 731. RAM 732 typically contains data and/or program modules that are immediately accessible to and/or presently being operated on by processing unit 720. By way of example, and not limitation, FIG. 7 illustrates operating system 734, application programs, such as application programs 735 (e.g., appliance management environment), other program modules 736 and program data 737.

[0095]    The computer 710 may also include other removable/non-removable, volatile/nonvolatile computer storage media. By way of example only, FIG. 7 illustrates a hard disk drive 741 that reads from or writes to non-removable, nonvolatile magnetic media, a universal serial bus (USB) port 743 that provides for reads from or writes to a removable, nonvolatile memory 744, and an optical disk drive 745 that reads from or writes to a removable, nonvolatile optical disk 746 such as a CD ROM or other optical media. Other removable/non-removable, volatile/nonvolatile computer storage media that may be used in the example

-34-

CONFIDENTIAL

WM00119133

3220US01

operating environment include, but are not limited to, magnetic tape cassettes, flash memory cards, digital versatile disks, digital video tape, solid state RAM, solid state ROM, and the like. The hard disk drive 741 is typically connected to the system bus 730 through a non-removable memory interface such as interface 747, and USB port 743 and optical disk drive 745 are typically connected to the system bus 730 by a removable memory interface, such as interface 750.

[0096]   The drives and their associated computer storage media, described above and illustrated in FIG. 7, provide storage of computer-readable instructions, data structures, program modules and other data for the computer 710. In FIG. 7, for example, hard disk drive 741 is illustrated as storing operating system 754, application programs 755 (e.g., an appliance management environment), other program modules 756 and program data 757. Note that these components may either be the same as or different from operating system 734, application programs 735, other program modules 736, and program data 737. Operating system 754, application programs 755, other program modules 756, and program data 757 are given different numbers herein to illustrate that, at a minimum, they are different copies.

[0097]   A user may enter commands and information into the computer 710 through input devices such as a tablet, or electronic digitizer, 761, a microphone 762, a keyboard 763 and pointing device 764, commonly referred to as mouse, trackball or touch pad. Other input devices not shown in FIG. 7 may include a joystick, game pad, digital camera, scanner, or the like. These and other input devices are often connected to the processing unit 720 through a user input interface 765 that is coupled to the system bus, but may be connected by other interface and bus structures, such as a parallel port, game port or a universal serial bus (USB). A monitor 766 or other type of display device is also connected to the system bus 730 via an interface, such as a video interface 767. The monitor 766 may also be integrated with a touchscreen panel or the like. Note that the monitor and/or touchscreen panel may be physically coupled to a housing in which the computing device 710 is incorporated, such as in a tablet device. In addition, computers such as the computing device 710 may also include other peripheral output devices such as speakers 767 and printer 769, which may be connected through an output peripheral interface 770 or the like.

-35-

                                                                              WM00119134

[0098]    The computer 710 may operate in a networked environment using logical connections to one or more remote computers, such as a remote computer 770. The remote computer 770 may be a personal computer, a server, a router, a network PC, a peer device or other common network node, and typically includes many or all of the elements described above relative to the computer 710, although only a memory storage device 771 has been illustrated in FIG. 7. The logical connections depicted in FIG. 7 include one or more local area networks (LAN) 772 and one or more wide area networks (WAN) 773, but may also include other networks. Such networking environments are commonplace in offices, enterprise-wide computer networks, intranets and the Internet.

[0099]    When used in a LAN networking environment, the computer 710 is connected to the LAN 772 through a network interface controller or adapter 774. When used in a WAN networking environment, the computer 710 typically includes a modem 775 or other means for establishing communications over the WAN 773, such as the Internet. The modem 775, which may be internal or external, may be connected to the system bus 730 via the user input interface 760 or other appropriate mechanism. A wireless networking component such as comprising an interface and antenna may be coupled through a suitable device such as an access point or peer computer to a WAN or LAN. In a networked environment, program modules depicted relative to the computer 710, or portions thereof, may be stored in the remote memory storage device. By way of example, and not limitation, FIG. 7 illustrates remote application programs 775 as residing on memory device 771. It may be appreciated that the network connections shown are exemplary and other means of establishing a communication link between the computers may be used.

[00100]    The examples illustrated and described herein as well as examples not specifically described herein but within the scope of aspects of the disclosure constitute an example appliance management environment. For example, the elements illustrated in FIG. 1, FIG. 2, FIG. 4, FIG. 6 and FIG. 7, such as when encoded to perform the operations illustrated in FIG. 5, constitute exemplary means for obtaining data pertaining to a product, exemplary means for calculating a set of freshness

-36-

    WM00119135

3220US01

indicator values for a product, and exemplary means for calculating shelf life predictions for a product.

[00101]   The order of execution or performance of the operations in examples of the disclosure illustrated and described herein is not essential, unless otherwise specified. That is, the operations may be performed in any order, unless otherwise specified, and examples of the disclosure may include additional or fewer operations than those disclosed herein. For example, it is contemplated that executing or performing a particular operation before, contemporaneously with, or after another operation is within the scope of aspects of the disclosure.

[00102]   When introducing elements of aspects of the disclosure or the examples thereof, the articles "a," "an," "the,"" and "said" are intended to mean that there are one or more of the elements. The terms "comprising," "including," and "having" are intended to be inclusive and mean that there may be additional elements other than the listed elements. The term "exemplary" is intended to mean "an example of." The phrase "one or more of the following: A, B, and C" means "at least one of A and/or at least one of B and/or at least one of C."

[00103]   Having described aspects of the disclosure in detail, it will be apparent that modifications and variations are possible without departing from the scope of aspects of the disclosure as defined in the appended claims. As various changes could be made in the above constructions, products, and methods without departing from the scope of aspects of the disclosure, it is intended that all matter contained in the above description and shown in the accompanying drawings shall be interpreted as illustrative and not in a limiting sense.

[00104]   While the disclosure is susceptible to various modifications and alternative constructions, certain illustrated examples thereof are shown in the drawings and have been described above in detail. It should be understood, however, that there is no intention to limit the disclosure to the specific forms disclosed, but on the contrary, the intention is to cover all modifications, alternative constructions, and equivalents falling within the spirit and scope of the disclosure. Exemplary computer

-37-

CONFIDENTIAL

WM00119136

readable media include flash memory drives, digital versatile discs (DVDs), compact discs (CDs), floppy disks, and tape cassettes. By way of example and not limitation, computer readable media comprise computer storage media and communication media. Computer storage media include volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules and the like. Computer storage media are tangible and mutually exclusive to communication media. Computer storage media are implemented in hardware and exclude carrier waves and propagated signals. Computer storage media for purposes of this disclosure are not signals per se. Exemplary computer storage media include hard disks, flash drives, and other solid-state memory. In contrast, communication media typically embody computer readable instructions, data structures, program modules, or the like, in a modulated data signal such as a carrier wave or other transport mechanism and include any information delivery media.

[00105]    Although described in connection with an exemplary computing system environment, examples of the disclosure are capable of implementation with numerous other general purpose or special purpose computing system environments, configurations, or devices.

[00106]    Examples of well-known computing systems, environments, and/or configurations that may be suitable for use with aspects of the disclosure include, but are not limited to, mobile computing devices, personal computers, server computers, hand-held or laptop devices, multiprocessor systems, gaming consoles, microprocessor-based systems, programmable consumer electronics, mobile telephones, mobile computing and/or communication devices in wearable or accessory form factors (e.g., watches, glasses, headsets, or earphones), network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like. Such systems or devices may accept input from the user in any way, including from input devices such as a keyboard or pointing device, via gesture input, proximity input (such as by hovering), and/or via voice input.

-38-

                                                          WM00119137

[00107]    Examples of the disclosure may be described in the general context of computer-executable instructions, such as program modules, executed by one or more computers or other devices in software, firmware, hardware, or a combination thereof. The computer-executable instructions may be organized into one or more computer-executable components or modules. Generally, program modules include, but are not limited to, routines, programs, objects, components, and data structures that perform particular tasks or implement particular abstract data types. Aspects of the disclosure may be implemented with any number and organization of such components or modules.  For example, aspects of the disclosure are not limited to the specific computer-executable instructions or the specific components or modules illustrated in the figures and described herein. Other examples of the disclosure may include different computer-executable instructions or components having more or less functionality than illustrated and described herein.

[00108]    In examples involving a general-purpose computer, aspects of the disclosure transform the general-purpose computer into a special-purpose computing device when configured to execute the instructions described herein.

[00109]    Having described aspects of the disclosure in detail, it will be apparent that modifications and variations are possible without departing from the scope of aspects of the disclosure as defined in the appended claims. As various changes could be made in the above constructions, products, and methods without departing from the scope of aspects of the disclosure, it is intended that all matter contained in the above description and shown in the accompanying drawings shall be interpreted as illustrative and not in a limiting sense.

CONFIDENTIAL

WM00119138

Case 4:18-cv-00500-JM    Document 284    Filed 04/21/20    Page 127 of 165



FIG. 1

= Data gathering/transmission to cloud service

WM00119139

Case 4:18-cv-00500-JM    Document 284    Filed 04/21/20    Page 128 of 165



FIG. 2

WM00119140

CONFIDENTIAL

# FIG. 3

PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS
BOHLING, ET AL.
3220US01

| **Lot 1** | **Lot 2** | **Lot 3** |
|---|---|---|
| 8 days baseline = 8 | 8 days baseline = 8 | 8 days baseline = 8 |
| -0 Pre-inspection OK = 8 | -1 Pre-inspection bad = 7 | -1 Pre-inspection bad = 7 |
| -1 Raining at harvest = 7 | -0 Clear skies at harvest = 7 | -1 Raining at harvest = 6 |
| -0 Cooled properly = 7 | -0 Cooled properly = 7 | -0 Cooled properly = 6 |
| -0 Transit temp OK = 7 | -0 Transit temp OK = 7 | -0 Transit temp OK = 6 |
| -1 cond. issues @dc = 6 | -1 cond. @dc bad = 6 | -0 Quality @dc OK = 6 |
| -0 Transit to market OK = 6 | -0 Transit to market OK = 6 | -0 Transit to market OK = 6 |
| -0 Quality @market OK = 6 | -0 Quality @market OK = 6 | -0 Quality @market OK = 6 |
| -1 Quality at last touch = 5 | -1 Quality at last touch = 5 | -0 Quality at last touch = 6 |
| **Initially 6 projected days, market feedback is only 5 days remain, algorithm needs refined accordingly.** | **Initially 6 projected days, market feedback is only 5 days remain, algorithm needs refined accordingly.** | **Initially 6 projected days, market feedback is 6 days remain, algorithm validated for pre-inspection & harvest.** |

WM00119141

CONFIDENTIAL

## FIG. 4

SET OF SENSORS <u>400</u>

THERMOMETER(S) <u>402</u>

BAROMETER(S) <u>404</u>

IMAGE CAPTURE DEVICE(S) <u>410</u>

IR CAMERA <u>412</u>

HYGROMETER(S) <u>406</u>

CHANGE OF STATE SENSOR(S) <u>408</u>

SPECTROMETER(S) <u>409</u>

WM00119142

# FIG. 5



CONFIDENTIAL



FIG. 6

CONFIDENTIAL



FIG. 7

CONFIDENTIAL

WM00119145

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
| **First Named Inventor/Applicant Name:** | Joshua Bohling |
| **Filer:** | Sarah Beth Foley/Eden Stright |
| **Attorney Docket Number:** | 3220US01 |

Filed as Large Entity

**Filing Fees for   Provisional**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| PROVISIONAL APPLICATION FILING | 1005 | 1 | 260 | 260 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |

CONFIDENTIAL

WM00119146

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | 260 |

CONFIDENTIAL
WM00119147

# Electronic Acknowledgement Receipt

| EFS ID: | 30918342 |
|---|---|
| Application Number: | 62584396 |
| International Application Number: | |
| Confirmation Number: | 7965 |
| Title of Invention: | PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS |
| First Named Inventor/Applicant Name: | Joshua  Bohling |
| Customer Number: | 101379 |
| Filer: | Sarah Beth Foley/Eden Stright |
| Filer Authorized By: | Sarah Beth Foley |
| Attorney Docket Number: | 3220US01 |
| Receipt Date: | 10-NOV-2017 |
| Filing Date: | |
| Time Stamp: | 15:54:49 |
| Application Type: | Provisional |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | CARD |
| Payment was successfully received in RAM | $260 |
| RAM confirmation Number | 111317INTEFSW15555200 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

WM00119148

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Application Data Sheet | 3220US01_ADS.pdf | 1823086 <br><br> 607997d40e7c15cda2212612635e18b9563e7b3a | no | 9 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Provisional Cover Sheet (SB16) | 3220US01_CoverSheet.pdf | 1477244 <br><br> 3a9cc2084d234363ea6170c58ec560144134b7b4 | no | 4 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 3 | | 3220US01_Application.pdf | 367805 <br><br> 192205767b4c413661372598f096e7f8406c536c | yes | 46 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Abstract | 46 | 46 |
| Claims | 40 | 45 |
| Specification | 1 | 39 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 4 | Drawings-only black and white line drawings | 3220US01_Drawings.pdf | 1000611 <br><br> e946ba1734e3821002caa58737c5bf8ef86be008 | no | 7 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 5 | Fee Worksheet (SB06) | fee-info.pdf | 29601 <br><br> 6a8eb8341b09a3821130ec63df2293025c9df659 | no | 2 |

CONFIDENTIAL

WM00119149

| Warnings: | |
|---|---|
| Information: | |
| Total Files Size (in bytes): | 4698347 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

CONFIDENTIAL                                                                                          WM00119150

# EXHIBIT B



US 20190147396A1

(19) **United States**

(12) **Patent Application Publication**    (10) Pub. No.: **US 2019/0147396 A1**

Bohling et al.    (43) **Pub. Date:    May 16, 2019**

(54) **PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS**

(71) Applicant: **Walmart Apollo, LLC**, Bentonville, AR (US)

(72) Inventors: **Joshua Bohling**, Centerton, AR (US); **Terry Osbon**, Fayetteville, AR (US); **Craig Trudo**, Centerton, AR (US); **Riley Turben**, Bentonville, AR (US); **Brandon Elliot Johnsen**, Rogers, AR (US)

(21) Appl. No.: **16/112,974**

(22) Filed:    **Aug. 27, 2018**

**Related U.S. Application Data**

(60) Provisional application No. 62/584,396, filed on Nov. 10, 2017.

**Publication Classification**

(51) **Int. Cl.**
    *G06Q 10/08*    (2006.01)
    *G06N 5/04*    (2006.01)

(52) **U.S. Cl.**
    CPC ............. *G06Q 10/087* (2013.01); *G06N 5/04* (2013.01)

(57)    **ABSTRACT**

Examples of the disclosure provide for a freshness indicator and shelf life prediction system. Product-specific data is obtained for a product and an environment associated with the product from various information sources and sensors. The obtained product-specific data is used to calculate freshness indicator values for a given product. The calculated freshness indicator values are used to calculate a shelf life prediction for the given product.







FIG. 1

200 ——

*FIG. 2*



**FIG. 3**

**Lot 1**
8 days baseline = 8
-0 Pre-inspection OK = 8
-1 Raining at harvest = 7
-0 Cooled properly = 7
-0 Transit temp OK = 7
-1 cond. issues @dc = 6
-0 Transit to market OK = 6
-0 Quality @market OK = 6
-1 Quality at last touch = 5
Initially 6 projected days, market feedback is only 5 days remain, algorithm needs refined accordingly.

**Lot 2**
8 days baseline = 8
-1 Pre-inspection bad = 7
-0 Clear skies at harvest = 7
-0 Cooled properly = 7
-0 Transit temp OK = 7
-1 cond. @dc bad = 6
-0 Transit to market OK = 6
-0 Quality @market OK = 6
-1 Quality at last touch = 5
Initially 6 projected days, market feedback is only 5 days remain, algorithm needs refined accordingly.

**Lot 3**
8 days baseline = 8
-1 Pre-inspection bad = 7
-1 Raining at harvest = 6
-0 Cooled properly = 6
-0 Transit temp OK = 6
-0 Quality @dc OK = 6
-0 Transit to market OK = 6
-0 Quality @market OK = 6
-0 Quality at last touch = 6
Initially 6 projected days, market feedback is 6 days remain, algorithm validated for pre-inspection & harvest.

Patent Application Publication    May 16, 2019    Sheet 4 of 7    US 2019/0147396 A1

## FIG. 4

SET OF SENSORS 400

THERMOMETER(S) 402

BAROMETER(S) 404

IMAGE CAPTURE DEVICE(S) 410

IR CAMERA 412

HYGROMETER(S) 406

CHANGE OF STATE SENSOR(S) 408

SPECTROMETER(S) 409



FIG. 5

Patent Application Publication    May 16, 2019  Sheet 6 of 7      US 2019/0147396 A1



FIG. 6



FIG. 7

US 2019/0147396 A1

May 16, 2019

1

## PREDICTING SHELF LIFE BASED ON ITEM SPECIFIC METRICS

### BACKGROUND

[0001] Product shelf life is one factor used in inventory management. Shelf life may vary from product to product based on a number of factors. Systems and methods that identify freshness for a perishable product, for example, may enable a better predictor of shelf life for fresh items.

### SUMMARY

[0002] Examples of the disclosure provide for a computing system for generating a freshness indictor value for produce, the computing system comprising at least one input device, a memory device storing computer-executable instructions, and a processor configured to execute the computer-executable instructions to receive pre-harvest produce specific parameter data associated with a produce at least once prior to harvesting of the produce via the at least one input device, compare the received pre-harvest produce specific parameter data with at least one pre-harvest produce threshold associated with the produce, and generate a first value of a freshness indicator associated with the produce based on the comparison at a freshness value generator.

[0003] Still other examples provide one or more computer storage devices storing computer-executable instructions for inspecting produce. The computer-executable instructions are executed by a computer to cause the computer to perform operations, including identifying produce and gathering information about the produce, obtaining data by a computing device regarding the produce; processing the data to determine freshness indicators and shelf life; and generating an alert responsive to the freshness of the produce.

[0004] This summary is provided to introduce a selection of concepts in a simplified form that are further described below in the Detailed Description. This Summary is not intended to identify key features or essential features of the claimed subject matter, nor is it intended to be used as an aid in determining the scope of the claimed subject matter.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0005] FIG. 1 is an exemplary process diagram illustrating systems and methods for obtaining product data during a product life cycle for use in determining freshness and/or predicting shelf life for the product in accordance with the disclosure.

[0006] FIG. 2 is an exemplary computing device configured to perform embodiments of the systems and methods described herein in accordance with the disclosure.

[0007] FIG. 3 is an exemplary chart of one embodiment of an output of a shelf life predictor in accordance with the disclosure.

[0008] FIG. 4 is an exemplary block diagram illustrating a set of sensors for gathering environmental and produce data in accordance with the disclosure.

[0009] FIG. 5 is an exemplary flow chart of a process for determining freshness and predicting shelf life of produce in accordance with the disclosure.

[0010] FIG. 6 is an exemplary illustration of a device identifying freshness information about a piece of produce in accordance with the disclosure.

[0011] FIG. 7 is an exemplary embodiment of a computing environment for implementing processes and methods described herein in accordance with the disclosure.

[0012] Corresponding reference characters indicate corresponding parts throughout the drawings.

### DETAILED DESCRIPTION

[0013] Predicting shelf life of produce is a factor in selling produce to the public. Appropriately predicting shelf life prevents waste and minimizes the chances of customers dissatisfaction with the produce. Additionally, fresh produce often tastes better and provides a competitive advantage.

[0014] To predict shelf life, produce may be inspected throughout its life cycle, including during pre-harvesting, harvesting, and transport from growing/producing areas, distribution centers, and/or consumer markets. Products such as produce may be inspected, or product data collected, throughout acquisition, production, transportation, storage, and/or sales to identify current product characteristics. For example, produce may have or may acquire certain characteristics that are used to determine freshness and/or predict shelf life for that produce. In addition, environmental factors associated with a product, such as temperature, may also impact the products characteristics and/or life cycle. Environmental factors associated with a product may be identified, collected, tracked, and/or obtained to aid in freshness determinations and/or shelf life predictions.

[0015] Products, such as produce for example, must also meet certain regulation standards before they may be offered to the public. In addition to government regulations, many corporations and/or industries have their own standards. For instance, some companies may only want to provide produce grown or produced locally. The company may use such selectivity as a differentiating factor when comparing itself to its competitors.

[0016] Inspecting produce is often a time consuming, labor intensive, and technologically challenging endeavor. The logistics involved in gathering the relevant data, making the appropriate decisions based on the data, and implementing the decision pose a significant challenge for many corporations. Additionally, the regulations and standards may change periodically or with very little notice, and changes may only affect some produce and not others. Suppliers, distributors, and retailers are required to keep abreast of the changes. While human monitors may use certain types of equipment to assist, the overall process is manually labor intensive and prone to error.

[0017] Referring to the figures, examples of the disclosure enable systems and methods for monitoring and collecting product data throughout various stages of a product life cycle and using the product data to determine a freshness value for a product and/or to predict shelf life of a product, using item-specific criteria. In some examples, a freshness component is provided for automatic analysis of product data using specific criteria associated with the product by analyzing sensor data received from at least one of a set of sensors. Inspection data may also be obtained by the freshness component, including information about identified characteristics associated with an inspected product, in order to determine an updated freshness value or indicator for the product based on the inspection data.

[0018] Referring to FIG. 1, an exemplary process diagram illustrates systems and methods for obtaining product data during a product life cycle for use in determining freshness

US 2019/0147396 A1

May 16, 2019

2

and/or predicting shelf life for the product. In the examples herein, produce is used for illustrative purposes to describe a product life cycle and data capture and analysis for the product. The examples herein are not intended to limit aspects of this disclosure in any way, and it should be understood that products other than produce are within the scope of this disclosure.

[0019] During pre-harvest stage 101, pre-harvest product data may be obtained from various sources. Pre-harvest product data may include, without limitation, crop data, field data, growth rate data, geolocation data, quality metrics, environmental data, condition data, and the like, for example. Environmental data or condition data, may include information such as weather data for the geo-location associated with the pre-harvest product. In some examples, the environmental data may be obtained separately from other product data, and correlated with the product data based on geolocation and timestamp data, for example. The pre-harvest product data may be captured and/or collected, and transmitted and/or stored, incrementally or continuously throughout the pre-harvest stage and into the harvesting stage as well. The various sources may include grower databases, field and/or crop tracking technologies implemented by a grower, public sources, and/or observational data inputs. For example, growers may use a number of different sensors and systems implemented in their fields and/or growing areas to monitor and track crop and field data, which may be obtained by the systems described herein as pre-harvest data for the associated product. Growing areas may include greenhouses, fields, orchards, gardens, hothouses, barns, coops, pens, pastures, and/or any other suitable product development area. Public data, such as weather data, may be obtained by the system described herein for the geo-location associated with the product as data associated with the product.

[0020] In other examples, observers may survey a growing area, such as a field, for subjective data on a product and use a mobile computing device to input pre-harvest data points. For example, an observer may compare the automated crop projections, generated based on the other pre-harvest data or industry projections, against observed crop development to provide additional inputs that may be used adjust crop projections and/or harvest projections. One or more mobile applications implementing an inspection component may be used to record real-time data, including information about crop progress, geolocation, environmental factors, and quality/condition characteristics of the product. Other data may also be recorded depending on the circumstances. In some examples, a mobile application may be configured to obtain pre-harvest product-specific data associated with a particular product at least once prior to harvesting of the produce. For example, the particular product may be a crop of strawberries, and pre-harvest data for that particular crop of strawberries may be the associated product-specific data. In other words, the product-specific data associated with a product is for a specific batch, crop, or set of the product type. In these examples, the mobile application may provide the obtained pre-harvest product-specific data at a user interface for comparison and/or evaluation by an observer, in order to prompt user confirmation of actual conditions.

[0021] At harvest stage 102, produce may be packed into cases marked with lot numbers, or global location numbers, along with date and/or timestamps corresponding to the pack date, or harvest date, for the produce. Environmental factors associated with the produce, such as rain, dew point, temperature, and UV index for example, may be obtained by the system described herein from public sources, such as the National Oceanic and Atmospheric Association's (NOAA) weather network, and correlated to the pack date and lot numbers of the cases. The system may store the correlated lot numbers, pack date and environmental information as harvest product-specific data for that produce, for example. A sensor or probe may be activated and placed inside at least one case per pallet. The sensor may be a Wi-Fi-enabled temperature sensor in some examples. In other examples, one or more different types of sensors may be used, including without limitation, a temperature sensor, humidity sensor, pressure sensor, and/or any other suitable sensor for detection conditions associated with the packed produce. The system obtains condition data associated with the produce from the sensor or probe.

[0022] At transfer event 103, the pallets and/or cases of packed produce are transferred to a cooling and/or packing facility. The cooling and/or packing facility may be a grower facility or a third-party facility, in some examples. The sensor or probe from harvest event 102 remains with the cases and continues to collect environmental, temperature, and humidity data, including rate of cooling, which may be obtained by the system and used along with the pre-harvest and harvest product-specific data to calculate a set of freshness indicator values. It should be appreciated that the sensors or probes may detect and/or transmit other data such as pressure, air quality, and the like. The sensor data may be separately stored by the system as supply chain product-specific data. In some examples, a freshness indicator value may be calculated prior to receipt of a product at a packing facility, and an updated freshness indicator value or set of values may be calculated based on the sensor data acquired during a time period between harvest and arrival at a packing facility. The system may be configured to obtain supply chain product-specific data associated with the product during a time period extending from post-harvest through inspection of the product at a final touch point, and incrementally update freshness indicator values at set intervals or dynamically.

[0023] At transport event 104, the produce may be loaded onto a transport vehicle for transition from a packing facility to a distribution center. Each sensor, such as a temperature probe, associated with the cases of produce continues to detect and/or transmit data. In addition, one or more other sensors implemented within one or more cases, or implemented within a transportation vehicle associated with the cases of produce, may detect and/or transmit geolocation and environmental data. In some examples, product transportation vehicles may be equipped with on-board computing devices that provide geolocation, route, and associated environmental data. The path of travel corresponding to the transport vehicle may also be obtained for additional association with environmental factors. This data may be stored by the system as part of the supply chain product-specific data, for example. The supply chain product-specific data may include transportation data associated with the produce post-harvest.

[0024] At distribution center stage 105, the product arrives at a distribution center. The product may be inspected using an inspection system, such as an inspection system implemented on a mobile device with a mobile application for example. The inspection system may implement USDA and

US 2019/0147396 A1

May 16, 2019

3

entity-specific or industry-specific specifications for inspection of a product type. At initial inspection stage **106**, the inspection system generates inspection data, which the system obtains for use in determining updated freshness indicator values for the product. In some examples, the system may prompt the inspection system, or an inspector, to confirm quality and/or condition issues on the incoming lot based on the pre-harvest data, harvest data, supply chain data, and/or the initial generated freshness indicator value or set of values. The inspection system may assign the produce an inspection score by lot number, which is then associated to each case corresponding to that lot number. The freshness indicator system may then calculate updated freshness indicator values for the produce based at least in part on the inspection score.

[0025]   In some examples, the inspection stage **106** occurs at a distribution center before transport to market. The freshness score assigned at this stage may be used by markets to prioritize placement of the product, and feedback from the markets on inspections performed at a final touch-point of the product may be used by the system as feedback to refine freshness indicator models and shelf life prediction models. In some examples, training data may be generated for the system to train a machine learning component of the system to calculate freshness indicator values and shelf life predictions. The training data may be generated using a retention sampling application, in some examples. The retention sampling application may inspect a sample sub-set of a product as described for initial inspection stage **106**, to generate a freshness score or freshness indicator value. The sample sub-set may then be maintained at the distribution center, in this example, at the preferred storage conditions and monitored by the system to identify data points of the products life cycle, such as a duration of time that the item remains at various freshness points, a duration of time at which the item reaches the end of shelf life, and the like. These data points obtained by the system from the retention sampling application may be used to refine models for freshness indicators, shelf life prediction, and obtain data points on optimal environmental conditions for shelf life extension, for example. The system may combine the data points obtained on optimal environmental conditions with real-time data associated with actual environmental factors corresponding to a product to calculate differentials used for adjusting calculations, for example.

[0026]   At supply chain optimization stage **107**, the system determines how to prioritize the movement of the produce case through the remaining supply chain. The original temperature sensor or probe may be removed from the pallet. A systemically chosen case or cases may be transferred to a new pallet for delivery to a designated market. A new sensor, such as a temperature probe or sensor, may be placed inside the new pallet for environmental monitoring on route to market. At transport event **108**, the produce transferred to the new pallet is loaded onto a transport vehicle for transition to the market. Each sensor continues to detect and/or transmit data, which the system may use to update a freshness indicator value or set of values. In addition, geolocation and environmental data associated with the transport may be obtained by the system and used in determining an updated freshness indicator value as well.

[0027]   At market event **109**, the product arrives at the market. The sensors associated with the cases on the pallets that arrive at market may continue to detect and/or transmit

data, which may be used to determine information, such as how long a pallet of product sits in ambient temperatures before moving to a cold storage, how long the product remains in cold storage and at what temperatures, when a product goes out onto the floor from cold storage, and so on, for example. At inspection event **110**, the product is inspected upon market intake using the inspection system, which may be another instance of the inspection system at **106**, such as a mobile application which combines USDA and entity-specific specifications to generate product-specific inspection criteria. The system may also prompt the inspection system, or an inspector, as to quality/condition issues on the incoming produce based on the obtained supply chain product-specific data. A new or updated freshness indicator value or score may be calculated. At prediction event **111**, a shelf life predictor estimates the shelf life of the product based on the one or more calculated freshness scores. The system may then inform a market where in the picking/placement order the newly received product should be placed.

[0028]   At placement event **112**, the produce is picked from the back room of the market and placed on display. In some examples, a market associate may use a mobile application to make a final inspection of the product at this final touchpoint. This inspection data may be used to refine the system weighting of environmental factors, NOAA information, geolocation data, pre-harvest data, harvest data, supply chain data, and associated freshness indicator scores. The predicted shelf life may be displayed on signage for marketing or pricing purposes. In some examples, the signage may include a digital or electronic display, which may provide consumer-facing information about the product based on the data obtained by the system, the freshness indicator values calculated by the system, and the shelf life prediction generated by the system. For example, a product display may provide information about a product, such as a selection of strawberries, including the predicted shelf life for the selection, a duration of time since the selection was harvested, an origin of the selection, or any other desirable information identified by the system. Shelf life, as used herein, refers to a sell by date, or otherwise an indicator of how fresh a product may be relative to an expected life cycle for the product. The system described herein calculates freshness scores and predicts shelf life, which may be used in any number of produce related activities such as, without limitation, priority of placement of the produce in a store from an inventory of produce type associated with the produce, selection of a distribution center for the produce, pricing of the produce, inspection criteria for the produce, safety stock number of the produce at the store, shelf life of the produce, quality metrics associated with different suppliers of the produce type, and determining impact of weather on the quality of the produce type, for example.

[0029]   In some examples, the freshness indicator values, or freshness scores, and/or the shelf life predictions generated for a product may be used for dynamic inventory management and optimization, dynamic supplier/distributer alignment, tiered valuation, proactive inspection criteria, flexible safety stock determinations, predictive cooler dwell inspections, increasingly effective supplier negotiations, and the like. Dynamic inventory management may be impacted by the outputs of the system described herein, such as by a "first expired first out" optimization model rather than a "first inventoried first out" model. Dynamic supplier/distrib-

Case 4:18-cv-00500-JM    Document 284    Filed 04/21/20    Page 151 of 165

uter alignment may be impacted by using the outputs of the system described herein to intelligently route product selections based on historical transit issues, route information, and the freshness score prioritization, such as by routing lower freshness scores to nearby distributers to reduce transportation time for example.

[0030] Tiered valuation may be accomplished using outputs of the system described herein, which may reduce throwaways and markdowns at the market. Proactive inspection criteria may be provided to the inspection system from the system described herein in order to enable insights for the inspection system to prompt particular inspection criteria for specific product selections. Flexible safety stock determinations may be made based on outputs of the system described herein to spin safety stock numbers up and down depending on observed weather patterns and initial freshness indicators, for example. Predictive cooler dwell inspections may use outputs of the system described herein, such as the freshness indicators, to predict and highlight days of life for at-risk product at distribution center coolers, for example. Comparative freshness indicator data for products obtained from different suppliers may provide insights and data points into quality of products originating from specific locations, the impact of weather events on quality and/or condition of products, and other gaps in the product life cycle that may impact shelf life, for example.

[0031] Referring to FIG. 2, an exemplary computing device configured to perform embodiments of the systems and methods is described. Computing device 202 is configured to perform embodiments of the systems and methods described herein. The computing device 202 communicates with information sources 224 and a set of sensors 220 to obtain data associated with produce item 262 and/or a set of produces 260.

[0032] The computing device 202 represents any device executing instructions (e.g., as application programs, operating system functionality, or both) to implement the operations and functionality associated with the computing device 202. In some examples, computing device 202 may be a cloud-based device implemented across one or more processors, such as processor(s) 210. In other examples, the computing device 202 may represent a group of processing units or other computing devices.

[0033] In some examples, the computing device 202 includes one or more processor(s) 210, a memory 204, a communications component 212, and a user interface component 214. The one or more processor(s) include any quantity of processing units. At least one processor of the one or more processors(s) 210 is programmed to execute computer-executable instructions 206 for implementing the examples herein. The computer-executable instructions 206 may be performed by the processor or by multiple processors within the computing device 202, or performed by a processor external to the computing device 202. In some examples, the processor is programmed to execute instructions such as those illustrated in the figures (e.g., FIG. 4 and FIG. 6).

[0034] In some examples, the one or more processor(s) represent an implementation of analog techniques to perform the operations described herein. For example, the operations may be performed by an analog computing device and/or a digital computing device.

[0035] The computing device 202 may include one or more computer readable media such as the memory 204. The memory 204 includes any quantity of media associated with or accessible by the computing device 202. The memory 204 may be internal to the computing device (as shown in FIG. 2), external to the computing device (e.g. external server 252), or both. In some examples, the memory 204 includes read-only memory and/or memory wired into an analog computing device.

[0036] The memory 204 stores data, such as one or more applications. The applications, when executed by the processor, operate to perform functionality on the computing device. The applications may communicate with counterpart applications or services such as web services accessible via a network. For example, the applications may represent downloaded client-side applications that correspond to server-side services executing in a cloud. Exemplary applications may include product inspector 208, freshness indicator 230 and shelf life predictor 244.

[0037] The memory 204 may include one or more computer-executable components. Exemplary components include communications component 212 and user interface component 214. In other examples, the memory 204 includes an analysis engine, sensor data, image capture data, and/or processed sensor data.

[0038] In some examples, the product inspector 208, when executed by the processor of the computing device 202, causes the processor to obtain product-specific data corresponding to a product for inspection, such as sensor data from sensors associated with an inspection system, process the obtained product-specific data to identify a type of product, such as a type of produce for example, and determine whether the identified product meets inspection criteria thresholds. Product inspector 208 may further comprise product data used to identify products and product types being inspected, regulatory requirements, industry requirements, and/or any other entity-specific criteria for inspection. In some instances, product data may be stored in database 218 or external server 252, and retrieved by product inspector 208. Product inspector 208 generates product-specific inspection data 242 for each product or set of products that is inspected.

[0039] Although product inspector 208 is depicted as implemented on computing device 202 for illustrative purposes, it should be understood that product inspector 208 may be implemented remotely from computing device 202 in some examples, such as on a remote computing device that is local to set of produce 260 or other products being inspected, for example. When implemented remote from computing device 202, product inspector 208 may communicate with computing device 202 via network 250, for example.

[0040] The set of sensors 220 is a set of one or more sensors associated with set of produce 260 or an environment corresponding to the set of produce 260. The set of sensors may include one or more types of sensors, such as, without limitation, temperature sensors, image capture devices, hygrometers, barometers, motion sensors, spectrometers, proximity sensors, or any other type of sensor. An image capture device may include an analog camera, a digital camera, an IR camera, or other type of camera. The set of sensors 220 may include one or more sensors integrated within the computing device 202 in some examples. In other examples, the set of sensors 220 includes one or more sensors exterior to the computing device 202. The

US 2019/0147396 A1

May 16, 2019

5

product inspector 208 and freshness indicator 230 may obtain sensor data from the set of sensors 220, for example.

[0041] Although product inspector 208, freshness indicator 220, and shelf life predictor 244 are depicted as integrated with computing device 202 for illustrative purposes, these applications may be separately implemented on different computing devices, remote from computing device 202, in some examples. In other examples, product inspector 208 may be separately implemented on a remote computing device relative to computing device 202, as part of an inspection system, and communicatively coupled to computing device 202 having freshness indicator 220 and shelf life predictor 244.

[0042] Computing device 202, in some examples, communicates with external devices, cloud infrastructure, and networks via communications component 212. External server 252 and computing device 202 are communicatively coupled to network 250. Networks may include, without limitation, a local area network (LAN), such as an Ethernet connection, or a wide area network (WAN), such as the Internet. Networks may be a wired network or a wireless network, such as WI-FI. In other examples, the product inspector 208 requests sensor data from the set of sensors 220 via the network 250. The set of sensors may transmit sensor data via the network in response to a request from an inspection system, such as product inspector 208. In other examples, the set of sensors automatically transmits sensor data to the product inspector 208 in real time as the sensor data is generated. In still other examples, the sensor data is sent to computing device 202 at regular intervals or in response to a predetermined event.

[0043] Communications component 212 may include a network interface card and/or computer-executable instructions (e.g., a driver) for operating the network interface card. Communication between the computing device and other devices may occur using any protocol or mechanism over any wired or wireless connection. In some examples, the communications interface is operable with short range communication technologies such as by using near-field communication (NFC) tags.

[0044] Product inspector 208 may generate an alert or notification if the sensor data obtained indicates a product does not meet one or more of a set of rules or inspection criteria. For example, one rule for an item may be the absence of any puncture or hole. Another rule may be a certain threshold percentage of defects permitted over the surface of a produce. In some examples, if product inspector analysis of the sensor data indicates the identified defects of a produce exceeds the rule (higher or lower than the threshold), an alert is generated and output via the user interface component 214.

[0045] In some examples, an alert is generated and output to one or more user interfaces via user interface component 214. A user interface may be a screen that displays the alert to a user or a speaker that generates an audible sound which the user can hear. Other user interfaces are also possible. Examples of other interfaces are command line prompts, graphical user interfaces, augmented reality, tactile and feedback interfaces, digital menus, and the like. User interface component 214 may output generated alerts to user interface displays of remote computing systems communicatively coupled to computing device 202, in some

examples, such as a remote handheld device (not shown) communicatively coupled to computing device 202 via network 250, for example.

[0046] Data storage devices(s) 216 may include one or more databases, such as database 218. Database 218 may store information regarding products and product types, such as information about produce and produce types, which may be used by the product inspector 208 to identify produce item 262 and/or set of produce 260 from the obtained sensor data 248.

[0047] In other examples, the data storage may also be implemented externally to mobile computing device 202 such as in external server 252 and accessed via network 250. The data storage device(s) may include rotational storage, such as a disk. The data storage device(s) may also include non-rotational storage media, such as a solid-state drive (SSD) or flash memory. In some non-limiting examples, the data storage device(s) provide a shared data store accessible by two or more hosts in a cluster. For example, the data storage device may include a hard disk, a redundant array of independent disks (RAID), a flash memory drive, a storage area network (SAN), or other data storage device.

[0048] The set of sensors 220 may include one or more sensors implemented in various locations and throughout various stages of the produce life cycle. For example, one or more sensors from the set of sensors 220 may obtain environmental data associated with the set of produce 260. The set of sensors 220 may include one or more sensors for detecting characteristics of the produce and/or the environment within and/or around the produce. In this example, the set of sensors 220 incudes at least one temperature probe (not shown). The temperature probe may record temperature of the produce or environmental temperature associated with the produce. In other examples, the set of sensors 220 may include one or more sensors implemented in a growing area, such as a field, to detect growth conditions, one or more sensors implemented in cases of post-harvest produce to detect environmental conditions associated with the produce post-harvest and/or characteristics of the produce post-harvest, one or more sensors implemented in a transport vehicle to detect environmental conditions associated with transport of the produce, one or more sensors implemented in a facility, such as a packing facility, cooling facility, distribution center, or market, to detect environmental conditions associated with the produce during its duration at each facility, and so on. Any number of sensors, and any number of different types of sensors, may be contemplated by aspects of this disclosure for detecting and/or transmitting sensor data of products and environmental conditions associated with the products.

[0049] The set of sensors 220 may transmit and/or provide sensor data 248 to computing system 202, and in particular directly to one or more of product inspector 208 or freshness indicator 230, in some examples. In other examples, set of sensors 220 may transmit sensor data 248 to a storage device, such as data storage devices 218, external server 252, or another storage device configured to be accessed by computing device 202. In some examples, one or more sensors in set of sensors 220 may have integrated storage for local storage of sensor data until the sensor data is transmitted and/or obtained by a computing device. In some examples, sensor data 248 may include pre-harvest data 234, harvest data 236, supply chain data 238, and environmental data 240, which may be obtained by freshness indicator 230.

US 2019/0147396 A1

May 16, 2019

6

In other examples, sensor data 248 may be obtained by and/or stored at one or more information sources 224, which may generate pre-harvest data 234, harvest data 236, supply chain data 238, and environmental data 240. In these examples, freshness indicator 230 may obtain pre-harvest data 234, harvest data 236, supply chain data 238, and environmental data 240 from information sources 224. In yet other examples, a hybrid approach may be contemplated where pre-harvest data 234, harvest data 236, supply chain data 238, and environmental data 240 are generated by freshness indicator 230 based in part on obtained sensor data 248 and based in part on obtained data from information sources 224. For example, sensor data 248 may indicate product characteristics for a crop pre-harvest, which may be combined with obtained weather data for the geolocation associated with the crop from information sources 224, and used to generate pre-harvest data 234 for that crop of product.

[0050] Information sources 224 may include, without limitation, sensors, such as set of sensors 220, public sources, such as NOAA application programming interfaces (APIs) and other public information sources, transport vehicle on-board computing systems, third-party TMS APIs, crop data technology APIs, field data technology APIs, grower data technology APIs, inspection system APIs, market applications, and/or any other suitable information source associated with a product or product environment. Freshness indicator 230 may obtain input from information sources 224 via APIs and assign each data input a weight in freshness model 266 when calculating against a baseline model 256, which may be "best case" or "ideal" scenario for a given product. In other words, baseline model 256 provides optimal freshness indicator values for a given product based on ideal growth, harvest, transport, packing, storage, and inspection conditions, which freshness indicator 230 calculates actual obtained data points for the product against in freshness model 266 to determine the freshness indicator values for that product. Machine learning component 258 may obtain and/or receive market feedback on realized shelf life at market for the product and/or inspection feedback on realized freshness or other characteristics of the product that may be used as a feedback loop to refine freshness model 266.

[0051] The set of sensors may be part of the computing system in some examples, or used independently to gather data in other examples. Sensors may be implemented within part of storage facilities, used in the fields or where the produce is grown, or implemented within part of transportation vehicles. In some cases, sensors are implemented in part of the pallets that are used to transport the produce. The set of sensors may be one instrument implementing different sensors, or different instruments implementing discrete sensors. In some examples, the sensor data may include temperature data, timestamp data, barometer data, hygrometer data, change of state data, IR digital video data, non-IR digital video data, analog video data, still images, light properties or other data generated by one or more sensors. In still other examples, the sensor data 248 may include IR camera still images, IR camera video images, digital video output, or other image data. For example, the sensor data 248 may include Moving Pictures Experts Group (MPEG) video output.

[0052] Freshness indicator 230 also obtains product data 232 from database 218. Product data 232 is any data pertaining to the product in general, rather than data about a specific set of the product. Product data may include general characteristics of the product, expected origins of the product, size range for the product, weight range for the product, crop progress expectations for the product within ideal conditions, geolocations associated with the product, such as where the product is grown or supplied, quality/condition parameters for the product, and any other criteria or information defined by regulatory authorities and/or industry standards. Product data 232 may be integrated as part of product inspector 208, in some examples, or obtained by product inspector 208 in other examples, for use in generating inspection data 242. Freshness indicator 230 obtains inspection data 242 from product inspector 208 in some examples, for use in determining freshness indicator values for inspected products. In other examples, product inspector 208 transmits generated inspection data 242 to freshness indicator.

[0053] The freshness indicator 230 uses one or more of pre-harvest data 234, harvest data 236, supply chain data 238, environmental data 240, and inspection data 242 to calculate freshness indicator values 254. Freshness indicator 230 may include a customized algorithm, a set of rules, and/or a set of criteria and parameters to determine the freshness indicator values based on the data obtained at various intervals throughout a product life cycle. The freshness indicator values 254 may be specific to a particular piece of product or a set of products at a given time or stage in the product life cycle. For example, a first freshness indicator value may be calculated based on pre-harvest data 234 and harvest data 236 at the stage where the product arrives at a packing facility post-harvest. A second freshness indicator value may be calculated for the same product based on the first freshness value calculated and supply chain data 238 at the stage where the product arrives at a distribution center, for example. Another freshness indicator value may be calculated for the same product based on the previous assigned freshness value calculated and inspection data 242, for example. The order and process described herein is not meant to imply a singular process flow, but rather is provided for illustrative purposes only. A freshness indicator value may be calculated based on available data at any point in the products life cycle, from pre-harvest to a final touch point at a market display, using the system described herein.

[0054] Freshness indicator 230 may be used to generate a freshness indicator value for a sample selection of product from a set of products, or to individual products in a batch or set or products. In some examples, freshness indicator 230 may be specific to a particular store, group of stores, region, or other location, to provide customized freshness indicator values in accordance with a particular store specification or regional specification. It should be appreciated by one of skill in the art that freshness indicator 230 may be customized in a variety of ways to address the specifications of specific stores, institutions, inspections, personnel, agencies, management, or the like.

[0055] Freshness indicator 230 may also be used to determine whether a product is acceptable. Any attribute of a product that may be sensed or calculated from a sensor or measured is thus an attribute that may be used as a basis or parameter of the algorithm used to determine freshness indicator values 254. By way of example, a computing device implementing a freshness indicator component with

7

sensor data obtained from a temperature probe may use temperature in the algorithm. As another example, freshness indicator 230 obtaining sensor data from an image capture device may analyze image data to determine factors for use in the algorithm to calculate the freshness indicator value. Freshness indicator 230 may also obtain and/or receive inspection data 242 from product inspector 208, which determines whether the product has any defects, such as a puncture for example, which may be used as a factor in the algorithm that calculates the freshness indicator values.

[0056]    The product inspector and/or the freshness indicator may generate an alert based on any number of factors detected and/or identified from the obtained data. For example, an alert may be generated during inspection of produce upon the determination that a foreign substance is present on the produce. The presence of a foreign substance may be determined by inspecting produce and determining the presence of a substance on the surface of the produce that is not related to the produce based on the produce data retrieved. For example, based on identifying characteristics, such as color or texture, the foreign substance may be determined to be mold. The alert may identify one or more users associated with the inspection system to perform a secondary inspection and/or remove produce from a set of produces being inspected, in some examples.

[0057]    Shelf life predictor 244 uses freshness indicator values 254 generated by freshness indicator 230 to calculate shelf life predictions 246 for a product, or a set of products, during various stages of the products life cycle. Shelf life predictor 244 may also use one or more of product data 232 and environmental data 240, in combination with the generated freshness indicator values, to calculate the shelf life predictions 246. For example, shelf life predictor 244 may obtain a first freshness indicator value from freshness indicator 230 at a stage where a product arrives at a distribution center, and may calculate the current shelf life prediction based on the first calculated freshness indicator value at that stage. Upon obtaining an updated freshness indicator value for the same product at a later stage, shelf life predictor 244 may calculate an updated shelf life prediction based on the earlier shelf life prediction and the updated freshness indicator value. In addition, shelf life predictor 244 may obtain environmental data that is used to adjust the calculation of shelf life predictions 246. For example, shelf life predictor 244 may obtain a freshness indicator value for a product as it arrives at a market, in addition to environmental data for that particular market that indicates environmental conditions that will impact the shelf life of the product, and may calculate an updated shelf life prediction for that product based on both the freshness indicator value and the obtained environmental data. It should be appreciated that the freshness indicator values may be generated multiple times, iteratively throughout the life cycle or product stages through a supply chain, and the shelf life predictions may also be generated multiple times or updated iteratively depending on the circumstances and data obtained. For example, a piece of produce that must undergo a long transportation process may have its freshness indicator value recomputed several times during transport, where a piece of produce grown locally may only need to have the freshness indicator generated once or a twice before it reaches market.

[0058]    Other criteria may be used to generate freshness indicator values and shelf life predictions and may include inspection data such as visible defects, unusual markings, temperature, indications of damage such as tears or punctures, smell, color consistency, packaging imperfections, and presence of other substances such as mold. These examples are non-limiting. Any attribute of a product that may be detected by a sensor, directly or indirectly, or calculated based on sensor data, may be a basis for calculation of a products freshness, and in turn used to calculate a shelf life prediction. Different criteria may be used for different products, and different criteria may be used for the same product type based on variances such as product origin, for example. Criteria may also be combined in making determinations or generating freshness indicator values and calculating shelf life predictions.

[0059]    FIG. 3 is an exemplary chart of one embodiment of an output of shelf life predictions based on calculated freshness indicator values and a feedback loop that refines the shelf life prediction model. The freshness component will take input from data sources, such as information sources 224 in FIG. 2, via one or more APIs and assign each data input a weight when calculating against a baseline "best case" scenario for a given produce. The baseline "best case" or "ideal" scenario for a given product may be a base model of ideal growth, harvest, transport, packing, storage, and inspection conditions, with an associated optimal result, such as optimal freshness values and/or optimal shelf life duration. Freshness indicator 230 may use this baseline for calculating against actual data points received from information sources 224 for the product being evaluated to determine the freshness indicator value for that product, which in turn is used to calculate the shelf life prediction for that product.

[0060]    The weighting may be dynamic and may be based upon machine learning on a feedback loop. In the example of FIG. 3, a baseline "rule of thumb" may be obtained from industry sources on how particular products are impacted by a variety of factors and used to generate baseline models for each particular product. An initial calculation (before machine learning) of days of life at market (shelf life) may be made for a product based on the corresponding baseline model.

[0061]    In the example of FIG. 3, actual data points for three lots of produce, such as strawberries for example, are input and calculated against the baseline model to generate freshness indicator values for each individual lot. The freshness indicator values for each lot are then used by shelf life predictor 244 to calculate a shelf life prediction for each lot. The system receives market feedback on the actual shelf life at market for each lot, which is used by machine learning component 258 to refine freshness model 266 of freshness indicator 230 and by machine learning component 264 to refine shelf life predictor 244.

[0062]    As seen in the sample data sets, Lot-1, Lot-2, and Lot-3 all have the same baseline shelf life projection (8 days), as each of these sample lots are for the same type or produce in this example. The data inputs for Lot-1 include a null input at a pre-inspection stage, which may be a pre-harvest data point for example. The null input may indicate that pre-harvest data is in alignment with ideal pre-harvest conditions, for example, which would not affect the baseline projection, and accordingly the output of 8 days would remain consistent at that data point. A harvest data point input indicates there was rain present during harvest of Lot-1, and the system weights this data point at a −1, which adjust the baseline projection down to 7 days. A next data

US 2019/0147396 A1

May 16, 2019

8

point may be from post-harvest data, such as data obtained during the packing/cooling facility stage, which may also be considered supply chain data in some examples. The data input for Lot-1 indicates this selection of produce was cooled properly, which does not affect the system weighting for that data point. Likewise, the subsequent data point from transportation data, which may also be considered supply chain data, indicates that temperature of the produce was properly maintained during transport, and the weighting is not affected here either. A condition data input, which may be considered inspection data, indicates a −1 score, which may be due to a detected or identified characteristic during inspection. Here, the −1-weighting applied adjusts the projection to 6 days for shelf life of this particular lot of produce. The transportation data, or supply chain data, obtained for the transport stage from a distribution center to market, and the inspection data obtained at an arrival stage of the product at market, both indicate conditions within parameters, or no weighting applied for Lot-1. Here, the predicted shelf life is calculated at 6 days, based on the factors considered and data obtained, and at market arrival the 6-day shelf life prediction is output by the system. At a final touch point at market, which may be a removal from shelf due to end of shelf life in some examples or an additional inspection at market in other examples, a −1 weighting is applied, which may indicate a detected characteristic for Lot-1 that impacts predicted shelf life and updates the actual shelf life for Lot-1 to 5 days. This market feedback is used as feedback to the system as actual shelf life at market being 5 days compared against the predicted 6 days, and is used to refine the system algorithms for future predictions.

[0063] The additional data sets for Lot-2 and Lot-3 illustrate different data points or data inputs at various stages of the product life cycle which impact the calculated freshness indicator values and the shelf life prediction accordingly. As with Lot-1, the market feedback continues to refine the system and is used as a feedback loop for the machine learning components of the system.

[0064] With multiple data points, the calculation/weighting can be triangulated and improved with additional feedback from the system. In addition, the feedback may be used to validate portions of the calculations while refining other portions of the calculations. For example, as shown in the data set of Lot-3, the algorithm is validated for pre-inspection (or pre-harvest) and harvest variable calculations used for Lot-1 and Lot-2, indicating that the weighting in Lot-1 and Lot-2 for distribution center (DC) condition/quality issues may be further refined. The algorithm may therefore increase the weighting for that input in the final calculation, improving the accuracy for the next lots of the same produce.

[0065] FIG. 4 is an exemplary block diagram illustrating a set of sensors for gathering environmental and product data. The set of sensors 400 is a set of one or more sensors. In some cases, set of sensors 400 may be part of computing device 202. In other cases, set of sensors 400 may be communicatively coupled to computing device 202. The set of sensors 400 may be used to detect or obtain data associated with products and/or the product environments. The set of sensors 400 in some examples includes one or more thermometer(s) 402, one or more barometer(s) 404, one or more hygrometer(s) 406, one or more change of state sensor(s) 408, a spectrometer(s) 409, and/or one or more

image capture device(s) 410. In some examples, the image capture device(s) 410 includes at least one IR camera 412. The sensors are used to generate or obtain sensor data, including product data and environmental data related to products. In some cases, sensors may work together or with other devices.

[0066] For instance, a GPS system may be used to identify the location of a thermometer or temperature sensor associated with a product, which may aid the freshness indicator system in identifying additional environmental data corresponding to the location or route of travel for the product. For example, a particular environmental condition might be present in a certain geographic area, and the freshness indicator system may be configured to analyze and factor in the environmental conditions with other obtained data corresponding to the product when calculating freshness indicator values. The sensor data generated by set of sensors 400 may be obtained or acquired by the product inspector 208, freshness indicator 230, and/or shelf life predictor 244 in FIG. 2, for example. The sensor data may then be used to generate other data, such as pre-harvest data, harvest data, supply chain data, environmental data, inspection data, and the like, which is used by the system to calculate freshness indicator values and predict shelf life of a product.

[0067] A change of state sensor is a non-electrical, non-reversing sensor that monitors a change of state of the produce, such as a change in temperature, a change in a state of matter, a change in a moisture level or texture, etc. A change of state of matter includes a change from ice to water, a change from water to steam, etc. A spectrometer is used to determine information about an object or substance through analysis of its light properties.

[0068] Sensor data from the thermometer(s) 402, barometer(s) 404, hygrometer(s) 406, and/or change of state sensor(s) 408, spectrometer(s) 409, may be stored and/or transmitted in concert with image capture data generated by image capture device(s) 410 for evaluation of a product or product environment. For example, hygrometer data indicating moisture levels of produce may be sent with IR image data to product inspector component for analysis during inspection. The product inspector component may analyze the moisture data and IR data to determine whether a produce item is moist or drying out, for example.

[0069] FIG. 5 is an exemplary flow chart of a process for determining freshness and shelf life of a product. The process shown in FIG. 5 may be performed by a shelf life predictor and a freshness indicator component executing on a computing device, such as, but not limited to, freshness indicator 230 and shelf life predictor 244 in FIG. 2. One or more computer-readable storage media storing computer-readable instructions may execute to cause at least one processor to implement the operations illustrated in FIG. 5.

[0070] The process beings at operation 501. The process may be triggered by any number of events such as receipt of product, scheduled intervals, or any other suitable factor. In some cases, the process may be manually triggered, for example, at a field inspection of produce, such as during a pre-harvest stage for example. In other cases, the process may be automated such as upon scanning of a received package from a supplier. In still other cases, it may be based upon periodic updates, which may happen when a package is in transit. A determination is made as to whether product data has been received from one or more sources at operation 502. Product data, in some examples, include one or

US 2019/0147396 A1

May 16, 2019

9

more stored characteristics of the product type, pre-harvest product-specific data, harvest product-specific data, supply chain product-specific data, transportation product-specific data, inspection product-specific data, and the like. In some aspects, the sources of product data may be external to the computing device, such as a remote server or cloud infrastructure. In other aspects, the sources may be local to the device or added to the device using a USB drive or similar device. If the product data has not been received, product data is obtained at operation 504 by a freshness indicator component, such as freshness indicator 230 in FIG. 2 for example, or another similar component. Product data may be obtained from a number of different data sources, such as information sources 224 and/or set of sensors 220 in FIG. 2, for example.

[0071] At operation 506, a determination is made as to whether environmental data is needed from one or more sources. This determination may be based on the product stage at which the calculations are being performed. For example, during transportation, environmental data may be needed. However, upon reaching the store, environmental data may not be a factor, yet inspection data may be desired. Environmental data in some examples include information from one or more sensors and/or information from public sources, such as weather services or government agencies. In some aspects, the sources of environmental data may be external to the computing device, such as networked servers or drives. As with product data, environmental data may be obtained from web servers, web services, internet servers, remote databases, and the like. In other aspects, the environmental data sources may be local to the device or added to the device using a USB drive or similar device. If the environmental data is desired then at operation 508, a determination is made as to whether it has been received. If the environmental data has not been received, environmental data is obtained at operation 510 by a freshness component, such as freshness indicator 230 in FIG. 2 for example, or another similar component. In one example, environmental data may include harvest product-specific data associated with the product and obtained via one or more sensors at a growing location and/or one or more grower technology APIs.

[0072] A determination is made as to whether additional data is needed from one or more sources at operation 512. Additional data in some examples include data from third party applications or from transportation databases. In other cases, additional data may be thresholds or the like associated with products or other aspects of the process. In some aspects, the sources of additional data may be external to the computing device, such as networked servers or drives. As with product data, additional data may be from web servers, web services, internet servers, remote databases, and the like. In other aspects, the additional data sources may be local to the device or added to the device using a USB drive or similar device. If the additional data is desired, then at operation 514, a determination is made as to whether it has been received. If the additional data has not been received, additional data is obtained at operation 516 by a freshness component, such as freshness indicator 230 in FIG. 2 for example, or another similar component. The additional data, if obtained, and the environmental data, if obtained, is used together with the product data obtained to calculate freshness indicator values at operation 518 for the product.

[0073] At operation 520, data shelf life prediction is calculated based on the calculated freshness indicator values, and the process iteratively repeats for a next stage of the product life cycle, or terminates thereafter. It should be appreciated that only a subset of the listed data may be needed to generate a freshness score, or freshness indicator value, in some instances. Freshness scores may be specific to a particular produce or type of produce. In one example, the freshness score is based on comparing the pre-harvest product-specific data and the harvest product-specific data with at least one product-specific threshold associated with the product.

[0074] The process of generating freshness indicator values may be repeated as necessary. The generated freshness indicator values are then used to calculate shelf life predictions, which may also be updated as new freshness indicator values are calculated and provided.

[0075] While the operations illustrated in FIG. 5 are performed by a computing device, aspects of the disclosure contemplate performance of the operations by other entities or multiple entities working in concert or independently. For example, a cloud service may perform one or more of the operations.

[0076] FIG. 6 is an exemplary illustration of a device obtaining information about a product. Such information retrieval may be used by a market associate prior to placing products on display, or while products are on display at market, for example. In other examples, the exemplary information retrieval may be performed as part of an inspection process at one or more stages of a product life cycle.

[0077] Device 601 is an illustrative example of a computing device, such as computing device 202 in FIG. 2, for example. Device 601 comprises image sensor 602 and touchscreen 603. Touchscreen 603 may be an integrated touch sensing element and display element, for example. Additionally, device 601 may comprise other sensors 604. Device 601 may use image sensor 602 to obtain sensor data regarding produce 610. Sensor data may be analyzed by a shelf life predictor, such as shelf life predictor 244 in FIG. 2, implemented on device 601. The shelf life predictor application may output shelf life prediction 606 to a display of device 601, in one example. In other example, shelf life predictor may be implemented remote from device 601, and device 601 may communicate with shelf life predictor at a back-end server to obtain shelf life prediction 606 for produce 610.

[0078] In some examples, additional produce metrics 607 may be displayed for produce 610. Produce metrics 607 may be generated by a freshness indicator component implemented on device 601, such as freshness indicator 230 in FIG. 2, or by some other component using the freshness indicator values calculated by a freshness component for produce 610. In some instances, the shelf life predictor and/or freshness component may reside on a remote computing device or remote server such as external server 252 in FIG. 2. In some instances, shelf life prediction 606 and produce metrics 607 may be presented to a user via touchscreen 603. In other instances, shelf life prediction 606 and produce metrics 607 may be transmitted for further analysis, such as to external server 252 in FIG. 2. In addition to shelf life prediction 606 and produce metrics 607, any data associated with the produce may be retrieved. Although shown with regards to a device with a touchscreen, other implementations are also possible. Additionally, discrete

US 2019/0147396 A1

May 16, 2019

10

aspects may be implemented in other methods. For example, shelf life prediction 606 may be displayed on a smart display or user interface adjacent to a product display where product 610 is placed, which a consumer may access to obtain product information. Alternatively, a display may use a dynamic QR code associated with produce 610 which may be scanned by a customer to obtain product-specific data for produce 610.

[0079] For example, a dynamic QR code may be updated with current product information corresponding to the products currently on display adjacent to the QR code. Scanning the QR code may present a consumer with product information about the current product on display, that is, the selection or lot of produce most recently placed on display with that code for example. In this illustrative example, a lot of apples may be on display and the dynamic QR code may provide product information such as the geographic location of origin for the lot of apples, the predicted shelf life or a freshness indicator for the lot of apples, the number of days the lot of apples have been at market, grower information for the lot of apples (supplier information), growth data for the lot of apples (such as organic or sustainable farming practices for example), and any other desirable product information. As a new lot of apples is placed on display, the dynamic QR code may be updated with product-specific information obtained from the freshness component system for that new lot. A consumer may use device 601 to scan a dynamic QR code in this example to obtain a shelf life prediction 606 and produce metrics 607.

[0080] Device 601 may also generate an alert 608 based on obtained data for produce 610. In some examples, where a market associate uses device 601 to obtain data on product 610, the inspection system or freshness component system may generate alert 608 to notify a market associate of additional inspection needed, criteria to look for and confirm/deny related to a detected characteristic during inspection or a predicted characteristic based on product data obtained, and the like. In some examples, a market associated may use device 601 as part of an inspection system to obtain image data or other sensor data on produce 610 in order to generate inspection data.

### Additional Examples

[0081] At least a portion of the functionality of the various elements in FIG. 2, FIG. 4, and FIG. 6 may be performed by other elements in FIG. 2, FIG. 4, and FIG. 6, or an entity (e.g., processor, web service, server, application program, computing device, etc.) not shown in FIG. 2, FIG. 4, or FIG. 6.

[0082] In some examples, the operations illustrated in FIG. 1 and FIG. 5, may be implemented as software instructions encoded on a computer readable medium, in hardware programmed or designed to perform the operations, or both. For example, aspects of the disclosure may be implemented as a system on a chip or other circuitry including a plurality of interconnected, electrically conductive elements. Operations may be performed on a single device, or multiple devices communicatively coupled together. Aspects of the disclosure may be performed at one location or different locations communicatively coupled together. Additionally, results of some operations may be sent as copies to different devices. For instance, a network server may be used to generate a freshness indicator or shelf life. The generated freshness indicator or shelf life may then be sent to a

plurality of computing devices. Additionally, aspects of the disclosure such as notifications and alerts may be sent to a single device, multiple devices or used by other applications or programs.

[0083] Product data, environmental data, or any other data, may be obtained from a variety of sources, such as, but without limitation, historical data collected by companies, industries, trade groups, or other such organizations. Data associated with a product may be manually input by users or those with knowledge of the product in some examples. Information gathered by sensors may be used not only to predict shelf life but also to determine whether a produce is acceptable for market. Other determinations may include expiration date, use-by dates, sell-by dates etc. For instance, bananas stored in special rooms may be treated with temperature and/or gas to ripen or delay ripening, which may adjust or otherwise affect shelf life predictions.

[0084] Communication and storage may be accomplished by a variety of devices and through a variety of means. Communication may be over wireless networks such as BLUETOOTH or Wi-Fi or over wired networks such as ethernet and phone lines. Communication may be direct through devices, through corporate intranets, the internet, cloud based services or the like. Similarly, storage of data and components may be on computing devices, local servers, network servers, remote servers, cloud applications and devices, mobile devices, kiosks etc.

[0085] While the aspects of the disclosure have been described in terms of various examples with their associated operations, a person skilled in the art would appreciate that a combination of operations from any number of different examples is also within scope of the aspects of the disclosure.

[0086] Alternatively, or in addition to the other examples described herein, examples include any combination of the following:

[0087] wherein the pre-harvest product-specific data comprises at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data;

[0088] generate a shelf life prediction for the product based on the first set of freshness indicator values;

[0089] wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to determine at least one of the following based on the generated shelf life prediction: priority of placement of the product in inventory, selection of a distribution center for the product, transaction value of the product, inspection criteria for the product, and quality metrics associated with one or more suppliers of the product;

[0090] obtain inspection data for the product from an inspection system;

[0091] generate a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values;

[0092] generate an updated shelf life prediction for the product based on the second set of freshness indicator values and the first set of freshness indicator values;

[0093] obtain supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point;

11

[0094]  obtain additional inspection data associated with the final touch point;

[0095]  generate a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values;

[0096]  generate an updated shelf life prediction for the product based on the third set of freshness indicator value and the second set of freshness indicator values;

[0097]  The term "Wi-Fi" as used herein refers, in some examples, to a wireless local area network using high frequency radio signals for the transmission of data. The term "BLUETOOTH" as used herein refers, in some examples, to a wireless technology standard for exchanging data over short distances using short wavelength radio transmission. The term "cellular" as used herein refers, in some examples, to a wireless communication system using short-range radio stations that, when joined together, enable the transmission of data over a wide geographic area. The term "NFC" as used herein refers, in some examples, to a short-range high frequency wireless communication technology for the exchange of data over short distances.

Example Operating Environment

[0098]  FIG. 7 is a block diagram illustrating an example operating environment 700 for a computing device (e.g., computing device 202 in FIG. 2). The computing system environment 700 is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the disclosure. Neither should the computing environment 700 be interpreted as having any dependency or requirement relating to any one or combination of components illustrated in the example operating environment 700.

[0099]  The disclosure is operational with numerous other general purpose or special purpose computing system environments or configurations. Examples of well-known computing systems, environments, and/or configurations that may be suitable for use with the disclosure include, but are not limited to: personal computers, desktop computers, laptop computers, tablet devices, netbooks, handheld devices, mobile telephones, wearables, gaming devices, portable media players, server computers, kiosks, set top boxes, tabletop devices, multiprocessor systems, microprocessor-based systems, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

[0100]  The disclosure may be described in the general context of computer-executable instructions, such as program modules, being executed by a computer. Generally, program modules include routines, programs, objects, components, data structures, and so forth, which perform particular tasks or implement particular abstract data types. The disclosure may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in local and/or remote computer storage media including memory storage devices and/or computer storage devices. As used herein, computer storage devices refer to hardware devices.

[0101]  With reference to FIG. 7, an example system for implementing various aspects of the disclosure may include a general-purpose computing device in the form of a computer 710. Components of the computer 710 may include, but are not limited to, a processing unit 720, a system memory 725, and a system bus 730 that couples various system components including the system memory to the processing unit 720. The system bus 730 may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. By way of example, and not limitation, such architectures include Industry Standard Architecture (ISA) bus, Micro Channel Architecture (MCA) bus, Enhanced ISA (EISA) bus, Video Electronics Standards Association (VESA) local bus, and Peripheral Component Interconnect (PCI) bus also known as Mezzanine bus.

[0102]  The computer 710 typically includes a variety of computer-readable media. Computer-readable media may be any available media that may be accessed by the computer 710 and includes both volatile and nonvolatile media, and removable and non-removable media. By way of example, and not limitation, computer-readable media may comprise computer storage media and communication media. Computer storage media includes volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer-readable instructions, data structures, program modules or the like. Read only memory (ROM) 731 and random-access memory (RAM) 732 are examples of computer storage media. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which may be used to store the desired information, and which may be accessed by the computer 710. Computer storage media does not, however, include propagated signals. Rather, computer storage media excludes propagated signals. Any such computer storage media may be part of computer 710.

[0103]  Communication media typically embodies computer-readable instructions, data structures, program modules or the like in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limitation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media.

[0104]  The system memory 725 includes computer storage media in the form of volatile and/or nonvolatile memory such as ROM 731 and RAM 732. A basic input/output system 733 (BIOS), containing the basic routines that help to transfer information between elements within computer 710, such as during start-up, is typically stored in ROM 731. RAM 732 typically contains data and/or program modules that are immediately accessible to and/or presently being operated on by processing unit 720. By way of example, and not limitation, FIG. 7 illustrates operating system 734, application programs, such as application programs 735 (e.g., appliance management environment), other program modules 736 and program data 737.

US 2019/0147396 A1

May 16, 2019

12

[0105] The computer 710 may also include other removable/non-removable, volatile/nonvolatile computer storage media. By way of example only, FIG. 7 illustrates a hard disk drive 741 that reads from or writes to non-removable, nonvolatile magnetic media, a universal serial bus (USB) port 743 that provides for reads from or writes to a removable, nonvolatile memory 744, and an optical disk drive 745 that reads from or writes to a removable, nonvolatile optical disk 746 such as a CD ROM or other optical media. Other removable/non-removable, volatile/nonvolatile computer storage media that may be used in the example operating environment include, but are not limited to, magnetic tape cassettes, flash memory cards, digital versatile disks, digital video tape, solid state RAM, solid state ROM, and the like. The hard disk drive 741 is typically connected to the system bus 730 through a non-removable memory interface such as interface 747, and USB port 743 and optical disk drive 745 are typically connected to the system bus 730 by a removable memory interface, such as interface 750.

[0106] The drives and their associated computer storage media, described above and illustrated in FIG. 7, provide storage of computer-readable instructions, data structures, program modules and other data for the computer 710. In FIG. 7, for example, hard disk drive 741 is illustrated as storing operating system 754, application programs 755 (e.g., an appliance management environment), other program modules 756 and program data 757. Note that these components may either be the same as or different from operating system 734, application programs 735, other program modules 736, and program data 737. Operating system 754, application programs 755, other program modules 756, and program data 757 are given different numbers herein to illustrate that, at a minimum, they are different copies.

[0107] A user may enter commands and information into the computer 710 through input devices such as a tablet, or electronic digitizer, 761, a microphone 762, a keyboard 763 and pointing device 764, commonly referred to as mouse, trackball or touch pad. Other input devices not shown in FIG. 7 may include a joystick, game pad, digital camera, scanner, or the like. These and other input devices are often connected to the processing unit 720 through a user input interface 765 that is coupled to the system bus, but may be connected by other interface and bus structures, such as a parallel port, game port or a universal serial bus (USB). A monitor 766 or other type of display device is also connected to the system bus 730 via an interface, such as a video interface 767. The monitor 766 may also be integrated with a touchscreen panel or the like. Note that the monitor and/or touchscreen panel may be physically coupled to a housing in which the computing device 710 is incorporated, such as in a tablet device. In addition, computers such as the computing device 710 may also include other peripheral output devices such as speakers 767 and printer 769, which may be connected through an output peripheral interface 770 or the like.

[0108] The computer 710 may operate in a networked environment using logical connections to one or more remote computers, such as a remote computer 770. The remote computer 770 may be a personal computer, a server, a router, a network PC, a peer device or other common network node, and typically includes many or all of the elements described above relative to the computer 710, although only a memory storage device 771 has been illustrated in FIG. 7. The logical connections depicted in FIG. 7 include one or more local area networks (LAN) 772 and one or more wide area networks (WAN) 773, but may also include other networks. Such networking environments are commonplace in offices, enterprise-wide computer networks, intranets and the Internet.

[0109] When used in a LAN networking environment, the computer 710 is connected to the LAN 772 through a network interface controller or adapter 774. When used in a WAN networking environment, the computer 710 typically includes a modem 775 or other means for establishing communications over the WAN 773, such as the Internet. The modem 775, which may be internal or external, may be connected to the system bus 730 via the user input interface 760 or other appropriate mechanism. A wireless networking component such as comprising an interface and antenna may be coupled through a suitable device such as an access point or peer computer to a WAN or LAN. In a networked environment, program modules depicted relative to the computer 710, or portions thereof, may be stored in the remote memory storage device. By way of example, and not limitation, FIG. 7 illustrates remote application programs 775 as residing on memory device 771. It may be appreciated that the network connections shown are exemplary and other means of establishing a communication link between the computers may be used.

[0110] The examples illustrated and described herein as well as examples not specifically described herein but within the scope of aspects of the disclosure constitute an example appliance management environment. For example, the elements illustrated in FIG. 1, FIG. 2, FIG. 4, FIG. 6 and FIG. 7, such as when encoded to perform the operations illustrated in FIG. 5, constitute exemplary means for obtaining data pertaining to a product, exemplary means for calculating a set of freshness indicator values for a product, and exemplary means for calculating shelf life predictions for a product.

[0111] The order of execution or performance of the operations in examples of the disclosure illustrated and described herein is not essential, unless otherwise specified. That is, the operations may be performed in any order, unless otherwise specified, and examples of the disclosure may include additional or fewer operations than those disclosed herein. For example, it is contemplated that executing or performing a particular operation before, contemporaneously with, or after another operation is within the scope of aspects of the disclosure.

[0112] When introducing elements of aspects of the disclosure or the examples thereof, the articles "a," "an," "the," and "said" are intended to mean that there are one or more of the elements. The terms "comprising," "including," and "having" are intended to be inclusive and mean that there may be additional elements other than the listed elements. The term "exemplary" is intended to mean "an example of" The phrase "one or more of the following: A, B, and C" means "at least one of A and/or at least one of B and/or at least one of C."

[0113] Having described aspects of the disclosure in detail, it will be apparent that modifications and variations are possible without departing from the scope of aspects of the disclosure as defined in the appended claims. As various changes could be made in the above constructions, products, and methods without departing from the scope of aspects of the disclosure, it is intended that all matter contained in the

US 2019/0147396 A1

May 16, 2019

13

above description and shown in the accompanying drawings shall be interpreted as illustrative and not in a limiting sense.

[0114]  While the disclosure is susceptible to various modifications and alternative constructions, certain illustrated examples thereof are shown in the drawings and have been described above in detail. It should be understood, however, that there is no intention to limit the disclosure to the specific forms disclosed, but on the contrary, the intention is to cover all modifications, alternative constructions, and equivalents falling within the spirit and scope of the disclosure. Exemplary computer readable media include flash memory drives, digital versatile discs (DVDs), compact discs (CDs), floppy disks, and tape cassettes. By way of example and not limitation, computer readable media comprise computer storage media and communication media. Computer storage media include volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules and the like. Computer storage media are tangible and mutually exclusive to communication media. Computer storage media are implemented in hardware and exclude carrier waves and propagated signals. Computer storage media for purposes of this disclosure are not signals per se. Exemplary computer storage media include hard disks, flash drives, and other solid-state memory. In contrast, communication media typically embody computer readable instructions, data structures, program modules, or the like, in a modulated data signal such as a carrier wave or other transport mechanism and include any information delivery media.

[0115]  Although described in connection with an exemplary computing system environment, examples of the disclosure are capable of implementation with numerous other general purpose or special purpose computing system environments, configurations, or devices.

[0116]  Examples of well-known computing systems, environments, and/or configurations that may be suitable for use with aspects of the disclosure include, but are not limited to, mobile computing devices, personal computers, server computers, hand-held or laptop devices, multiprocessor systems, gaming consoles, microprocessor-based systems, programmable consumer electronics, mobile telephones, mobile computing and/or communication devices in wearable or accessory form factors (e.g., watches, glasses, headsets, or earphones), network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like. Such systems or devices may accept input from the user in any way, including from input devices such as a keyboard or pointing device, via gesture input, proximity input (such as by hovering), and/or via voice input.

[0117]  Examples of the disclosure may be described in the general context of computer-executable instructions, such as program modules, executed by one or more computers or other devices in software, firmware, hardware, or a combination thereof. The computer-executable instructions may be organized into one or more computer-executable components or modules. Generally, program modules include, but are not limited to, routines, programs, objects, components, and data structures that perform particular tasks or implement particular abstract data types. Aspects of the disclosure may be implemented with any number and organization of such components or modules. For example, aspects of the disclosure are not limited to the specific computer-executable instructions or the specific components or modules illustrated in the figures and described herein. Other examples of the disclosure may include different computer-executable instructions or components having more or less functionality than illustrated and described herein.

[0118]  In examples involving a general-purpose computer, aspects of the disclosure transform the general-purpose computer into a special-purpose computing device when configured to execute the instructions described herein.

[0119]  Having described aspects of the disclosure in detail, it will be apparent that modifications and variations are possible without departing from the scope of aspects of the disclosure as defined in the appended claims. As various changes could be made in the above constructions, products, and methods without departing from the scope of aspects of the disclosure, it is intended that all matter contained in the above description and shown in the accompanying drawings shall be interpreted as illustrative and not in a limiting sense.

1. A computing system for dynamically generating product freshness indicators, the computing system comprising:
   a memory device storing computer-executable instructions for a freshness indicator; and
   a processor communicatively coupled to the memory device and configured to execute the computer-executable instructions for the freshness indicator to:
      obtain pre-harvest product-specific data associated with a product, the pre-harvest data comprising at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data;
      obtain harvest product-specific data associated with the product;
      obtain sensor data from one or more sensors associated with the product post-harvest;
      calculate a first set freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data;
      generate a shelf life prediction for the product based on the first set of freshness indicator values;
      obtain inspection data for the product from an inspection system; and
      generate a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values.

2-3. (canceled)

4. The computing system of claim 1, wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to determine at least one of the following based on the generated shelf life prediction: priority of placement of the product in inventory, selection of a distribution center for the product, transaction value of the product, inspection criteria for the product, and quality metrics associated with one or more suppliers of the product.

5. (canceled)

6. The computing system of claim 1, wherein the processor is further configured to execute the computer-executable instructions for the freshness indicator to:
   generate an updated shelf life prediction for the product based on the second set of freshness indicator values and the first set of freshness indicator values.

US 2019/0147396 A1

May 16, 2019

14

7. The computing system of claim 1, wherein the processor is further configured to execute the computer-executable instructions to:

obtain supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point;

obtain additional inspection data associated with the final touch point; and

generate a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values.

8. The computing system of claim 7, wherein the processor is further configured to execute the computer-executable instructions to:

generate an updated shelf life prediction for the product based on the third set of freshness indicator value and the second set of freshness indicator values.

9. A computer-implemented method for generating product freshness indicators, the computer-implemented method comprising:

obtaining pre-harvest product-specific data associated with a product, the pre-harvest data comprising at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data;

obtaining harvest product-specific data associated with the product;

obtaining sensor data from one or more sensors associated with the product post-harvest;

calculating a first set of freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data;

generating a shelf life prediction for the product based on the first set of freshness indicator values;

obtaining inspection data for the product from an inspection system; and

generating a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values.

10-11. (canceled)

12. The computer-implemented method of claim 9, wherein the generated shelf life prediction is used to determine at least one of: priority of placement of the product in inventory, selection of a distribution center for the product, transaction value of the product, inspection criteria for the product, and quality metrics associated with one or more suppliers of the product.

13. (canceled)

14. The computer-implemented method of claim 9, further comprising:

obtaining supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point;

obtaining additional inspection data associated with the final touch point; and

generating a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values.

15. One or more computer storage media having computer-executable instructions stored thereon for generating product freshness indicators, that upon execution by a processor, causes the processor to:

obtain pre-harvest product-specific data associated with a product, the pre-harvest data comprising at least one of growth rate data, field data, crop data, geolocation data, quality data, environmental data, or condition data;

obtain harvest product-specific data associated with the product;

obtain sensor data from one or more sensors associated with the product post-harvest; and

generate a first set of freshness indicator values for the product based on the obtained pre-harvest product-specific data, the obtained harvest product-specific data, and the obtained sensor data;

generate a shelf life prediction for the product based on the first set of freshness indicator values;

obtain inspection data for the product from an inspection system; and

generate a second set of freshness indicator values for the product based on the inspection data and the first set of freshness indicator values.

16-18. (canceled)

19. The one or more computer storage devices of claim 15, that upon execution by the processor, causes the processor to:

obtain supply chain product-specific data associated with the product and corresponding to a time period between a harvest stage and an inspection of the product at a final touch point;

obtain additional inspection data associated with the final touch point; and

generate a third set of freshness indicator values for the product based on the obtained supply chain product-specific data, the additional inspection data, and the second set of freshness indicator values.

20. The computing system of claim 19, wherein the processor is further configured to execute the computer-executable instructions to

generate an updated shelf life prediction for the product based on the third set of freshness indicator values and the second set of freshness indicator values.

*    *    *    *    *

# EXHIBIT O

# Walmart Changes its Legal Name to Reflect How Customers Want to Shop

**BENTONVILLE, Ark., Dec. 6, 2017** – Reflecting its growing status as an omni-channel retailer Walmart today announced plans to change the company's legal name from Wal-Mart Stores, Inc. to Walmart Inc. effective Feb. 1, 2018. The name change chiefly demonstrates the company's growing emphasis on serving customers seamlessly however they want to shop: in stores, online, on their mobile device, or through pickup and delivery.

"Our customers know us as Walmart and today they shop with us not only in our stores but online and with our app as well," said Doug McMillon, Walmart president and CEO. "While our legal name is used in a limited number of places, we felt it was best to have a name that was consistent with the idea that you can shop us however you like as a customer. Looking ahead, we'll continue to invest in and strengthen our stores around the world and expand our eCommerce capabilities as we help save customers' time and money. As time goes on, customers will increasingly just think of and see one Walmart."

Walmart operates under nearly 60 different banners around the world, including eCommerce sites, and has more than 11,600 stores and clubs in 28 countries. The company opened its first international location in Mexico City in 1991 and launched Walmart.com in 2000. Walmart will continue to trade on the NYSE as WMT and the company name should be referenced as Walmart.

Walmart's formal legal name when it incorporated on Oct. 31, 1969, was Wal-Mart, Inc. It was changed to Wal-Mart Stores, Inc., on Jan. 9, 1970 and has remained in place the past 47 years since Walmart went public that same year. The company has been using the current Walmart logo in its operations since June 2008.



$i$  ☁       ‹  1 of 3  ›                      ⠿

**About Walmart**
Wal-Mart Stores, Inc. (NYSE: WMT) helps people around the world save money and live better - anytime and anywhere - in retail stores, online, and through their mobile devices. Each week, over 260 million customers and members visit our more than 11,600 stores under nearly 60 banners in 28 countries and eCommerce websites. With fiscal year 2017 revenue of $485.9 billion, Walmart employs approximately 2.3 million associates worldwide. Walmart continues to be a leader in sustainability, corporate philanthropy and employment opportunity. Additional information about Walmart can be found by visiting http://corporate.walmart.com, on Facebook at http://facebook.com/walmart and on Twitter at http://twitter.com/walmart.

# Additional News

### Walmart to Present at Both the Raymond James Institutional Investors Conference and the UBS Global Consumer and Retail Conference

February 26, 2020



### If You Build It (Together), They Will Come: Walmart Introduces New Fulfillment Service Built with Sellers, for Sellers

February 25, 2020



### The Best Possible Start Starts at Walmart

February 25, 2020



Social

    

| | | | |
|---|---|---|---|
| Our Story | Global Responsibility | Careers | Shop Walmart.com |
| Newsroom | Investors | Walmart Museum | Shop SamsClub.com |
| Ask Walmart | Suppliers | @Walmart Labs | |

Case 4:18-cv-00500-JM   Document 284   Filed 04/21/20   Page 165 of 165

Privacy & Security  |  Fraud  |  California Privacy Rights  |  California Supply Chains Act  |  Frequently Asked Questions

 |  Contact Us  |  Policies  |  Recalls  |  Terms of Use  |  Do Not Sell My Personal Information

 |  Request My Personal Information

© 2020 Walmart Inc.