PUBLIC VERSION


FILED
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 2 0 2020

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| ZEST LABS, INC. f/k/a INTELLEFLEX CORPORATION; and ECOARK HOLDINGS, INC. | § § § § | **FILED UNDER SEAL** |
| Plaintiffs, | § § | Civil Action No. 4:18-cv-500-JM |
| v. | § § § | |
| WALMART INC. f/k/a WAL-MART STORES, INC. | § § § | JURY TRIAL DEMANDED |
| Defendant. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

████████████████████████

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................1

II.   STATEMENT OF DISPUTED FACTS..................................................................2

III.  RELEVANT LEGAL STANDARDS .....................................................................3

IV.   ARGUMENT AND AUTHORITIES......................................................................3

      A.    **Plaintiff's Claims Related to Information Before July 21, 2015 Are Not Barred**. ..................................................................................................3

            1.    Walmart knew it had an obligation to maintain the secrecy and limit the use of Zest's information under Walmart's Global Statement of Ethics............................................................................................4

            2.    In the 2014 NDA, Walmart acknowledged that Zest had confidential information that Walmart might access. .......................................9

            3.    The 2015 NDA superseded the 2014 NDA, and as a result, all the information that Zest provided to Walmart prior to July 2015 is governed solely by the 2015 NDA...........................................................10

      B.    **Oral Disclosures of Confidential Information to Walmart Can Support Plaintiff's Claims for Misappropriation and Breach of Contract.**...................12

            1.    The 2015 NDA specifically contemplates protecting oral disclosures of Confidential Information. ......................................................12

            2.    Zest's oral disclosures were accompanied by written disclosures that confirmed the confidential nature of the oral information.........................13

      C.    **Plaintiff's Claims Related to Information after January 16, 2016, Are Not Barred.**.................................................................................................15

            1.    The 2016 MSA cannot supersede the 2015 NDA because the parties and the subject matters are different. .........................................................17

            2.    Walmart specifically affirmed in 2017, that the 2015 NDA was still in effect and governed the relationship between Zest and Walmart..........19

            3.    Direct benefit estoppel has not been recognized by any Arkansas Court and is directly contrary to the terms of the 2016 MSA....................22

      D.    **Walmart does not own Zest Confidential Information related to the 2016 Proof of concept the 2017 RFI Response, or the 2018 SOW.**...................26

            1.    Walmart cannot claim to own Zest's Technology from the POC based on the 2016 Statement of Work. ......................................................26

            2.    Walmart specifically Affirmed in 2017, that the 2015 NDA was still in effect and governed the relationship between Zest and Walmart.........28

3.    Walmart cannot claim to own Zest's Technology based on the 2018 Statement of Work. ...................................................................................28

4.    Walmart's own policies prevent it from claiming ownership of Zest's Confidential Information submitted in Zest's RFI Response. ........29

E.    **Plaintiffs' Damages Were Proximately Caused by Walmart's Misappropriations, Breach, and Fraud.** .............................................32

1.    Walmart Did Not Know How to Solve or Even Address Its Multi-Billion-Dollar Fresh Food Problem (aka "Fresh") Before It Met Zest...................................................................................................37

2.    Zest taught Walmart everything about the Zest end-to-end solution (from farm to store)—including how use an automated QC process to gain visibility into its supply chain and improve product quality..........40

3.    Walmart received Zest's confidential information and trade secrets, while at the same time, Walmart Secretly, Designed, Developed, and Began Implementing Eden/Muse—Walmart's Stolen System for Reducing Fresh Food Loss...................................................................52

4.    Walmart published the details of Zest's trade secrets and confidential information in the Walmart Application...............................57

5.    Now, on the eve of trial, Walmart claims that it abandoned plans to deploy some aspects of the trade secrets—but only after using and disclosing them to the world. ...................................................................60

6.    Walmart attempts to avoid trial on compensable damages by creating a false construct on misappropriation. ........................................66

7.    Given the scope of Walmart's misconduct (including misappropriation by use and disclosure, breaches, fraud and other misdeeds), it is beyond reasonable dispute that Zest has been damaged in an amount that must be determined by a jury. ......................68

8.    Plaintiffs' unjust enrichment damages were proximately caused by Walmart.................................................................................................74

9.    Plaintiffs' actual losses were proximately caused by Walmart. ................93

10.    Plaintiff's reasonable royalty damages were proximately caused by Walmart.................................................................................................99

11.    Walmart's Discovered Misappropriations, Breaches, and Frauds Are Already Complete, Regardless of Its Current Decision to Abandon Further Deployments Before Trial. .........................................104

F.    **Plaintiffs' Claims for Conversion, Unfair Competition, Fraud, And Unjust Enrichment (Counts IV, V, VI, and VII) are not preempted by Plaintiffs' ATSA claim.**...................................................................105

███████████████████████████

1.      Preemption does not apply unless the information at issue qualifies for protection as a trade secret, and the question of whether information qualifies for protection as a trade secret is a question of fact for the jury......................................................................................105

2.      Plaintiffs' tort claims are based on information and acts that are different from the information and acts supporting Zest's ATSA claim..........................................................................................................110

G.      **Beyond Preemption, there are other genuine issues of material fact on Plaintiffs' Claims for Fraud, Unjust Enrichment, Exemplary Damages and attorneys' Fees.** ......................................................................................121

1.      Plaintiffs' Fraud Claim (Count VI) Is Not Defective. ...........................121

2.      Plaintiffs' Unjust Enrichment Claim (Count VII) Is Not Defective. .......124

3.      Plaintiffs' Claims for Exemplary Damages, Attorneys' Fees and Injunctive relief (Counts IX and X) Should not be Dismissed. ...............125

V.      CONCLUSION.............................................................................................................128

████████████████████████████

# TABLE OF AUTHORITIES

**Cases**

*A&E TV Networks, LLC v. Pivot Point Entm't, LLC*,
  2013 U.S. Dist. LEXIS 43775, 2013 (S.D. N.Y. 2013) ........................................................... 16

*A. L. Labs. Inc. Philips Roxane, Inc.,* 803 F.2d 378 (8th Cir. 1986) ............................................. 3

*Baldor Electric. Co. v. Sunguard* 2006 WL 3735980 (W.D. Ark Dec. 15, 2006) ........................ 16

*Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*,
  584 F.2d 946 (10th Cir. 1978) ................................................................................ 67, 96

*Brown v. Chapman Farms, Inc*., 289 Ark. 88, 709 S.W.2d 404 (1986) .................................. 125

*Burbank Grease Services, LLC v. Sokolowski*,
  294 Wis. 2d 274, 2006 WI 103, 717 N.W.2d 781, 2006 WL 1911997 (Wis. 2006) ....... 106

*C&A Const. Co., Inc. v. Benning Const. Co.,* 256 Ark. 621 (1974) .......................................... 18

*Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.,* 214 F.3d 1030 (9th Cir. 2000) ...... 120

*Callaway Golf v. Dunlop Slazenger Group Americas*,
  295 F. Supp. 2d 430 (D. Del. 2003) .................................................................................. 106

*Combined Metals of Chicago Ltd. v. Airtek, Inc.*, 985 F. Supp. 827 (N.D. Ill. 1997); ....... 106

*Contracts Materials Processing, Inc. v. Kata Leuna GmbH Catalysts*,
  164 F. Supp. 2d 520 (D. Md. 2001) ..................................................................................... 3

*CreditSights, Inc. v. Ciasullo*, 2007 U.S. Dist. LEXIS 25850, (S.D. N.Y. 2007) ...................... 16

*Dixon Ticonderoga Co. v. Winburn Tile Mfg*. Co., 324 Ark. 266, 920 S.W.2d 829 (1996) .... 125

*DWB, LLC v. D&T Pure Trust*, 2018 Ark. App. 283, 550 S.W.3d 420 .................................. 125

*Farhang v. Indian Inst. of Tech., Kharagpur*,
  No. C-08-02658 RMW, 2010 (N.D. Cal. June 1, 2010) ........................................................ 16

*Farm Bureau Policy Holders & Members v. Farm Bureau Mut. Ins.Co.*,
  335 Ark. 285, 984 S.W.2d 6, 1998 Ark. LEXIS 652 (Supreme Ct. of Ark. 1998) ............ 10, 16

*Friends of Children v. Marcus*,
  46 Ark. App. 57, 876 S.W.2d 603 Ark. App. LEXIS 293 ............................................. 122, 123

*In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346 (N.D. Ga. 2003) ..................................... 3

*In re Innovative Constr. Sys., Inc*., 793 F.2d 875 (7th Cir. 1986) ........................................ 68, 97

*In re Iowa Freedom of Information Council*, 724 F.2d 658 (8th Cir. 1983) ........................ passim

*InnoSys, Inc. v. Mercer*, 364 P.3d 1013  (Utah 2015) ........................................................... 58, 93

*Interstate Freeway Serv., Inc. v. Houser*, 310 Ark. 302, 835 S.W.2d 872 (1992) ................... 125

*Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 385 N.E.2d 1349 (Mass. 1979) .............. 102

*Lamb-Weston, Inc. v. McCain Foods*, *Ltd*., 941 F.2d 970 (9th Cir. 1991) ............................ 68, 97

*LaPointe v. New Tech., Inc.*, 2014 Ark. App. 346 (Ark. App. 2014) ............................................. 4

*Laser Dynamics, Inc. v. Quanto computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012) .......................... 99

*Lou v. Smith*, 285 Ark. 249, 685 S.W.2d 809 (1985) ............................................................. 125

*Mangren Research & Dev. Corp. v. National Chem. Co.*, 87 F.3d 937 (7th Cir. 1996) ........ 67, 96

*McGlothlin,* 2012 WL 1768098 (E.D. Ark. May 16, 2012) ....................................................... 107

*Mortgage Specialists, Inc. v. Davey*, 153 N.H. 764, 904 A.2d 652 (N.H. 2006) ................ 106

*Mounce v. CHSPSC, LLC.* 2015 U.S. Dist. LEXIS 171795 ..................................... 22, 23, 24, 25

*Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 1998 Iowa Sup. LEXIS 130 (Iowa 1998) .............. 102

*Precision Plating & Metal Finishing Inc. v. Martin-Marietta Corp.*,
    435 F.2d 1262 (5th Cir. 1970) ........................................................................ 58, 93

*R.K. Enterprise, LLC v. Pro-Comp Mgmt., Inc.*, 158 S.W.3d 685 (2004)............................. passim

*Russell v. Energy Exch. Corp.,* 646 F. Supp. 173 (S.D. W. Va. 1986)........................................ 16

*Sandlin v. Johnson,* 152 F. 2d 8, 1945 U.S. App. Lexis 4558 (8th Cir. 1945) .............................. 3

*Smith v. O'Donnell*,
    288 S.W.3d 417, 2009 Tex. LEXIS 455, 52 Tex. Sup. J. 958 (Tex. 2009) .............................. 33

*Solutia Inc. v. FMC Corp*., 456 F. Supp. 2d 429 (S.D.N.Y. 2006).......................................... 120

*Southwestern Energy Co. v. Eickenhorst*, 955 F. Supp. 1078 (W.D. Ark. Mar. 18, 1997) *aff'd
    mem.* 175 F.3d 1025 (8th Cir. 1999)....................................................... 58, 67, 92, 96

*Stone Castle v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652 (E.D. Va. 2002);
    .................................................................................................................... 106

*Transcon. Ins. Co. v. Edwards*, 139 F.3d 1185 (8th Cir. 1998).................................................. 15

*United States ex rel. Costner v. United States*, 317 F.3d 883 (8th Cir. 2003)............................. 121

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552 (8th Cir. 2006) ...................... 121

*V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120 (D. Nev. 2013).................................................. 58, 93

*Vigoro Industries, Inc. v. Cleveland Chemical Co.*,
    866 F. Supp. 1150 (E.D. Ark. 1994) ............................................................ 104, 105, 106

*Viking Ins. Co. of Wis. v. Jester*, 310 Ark. 317, 836 S.W.2d 371 (1992) ................................ 125

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*,
    No. 5:14-CV-5262, 2018 WL 1597976  (W.D. Ark. Mar. 31, 2018)........................................ 3

*Waymo LLC v. Uber Techs., Inc.*,
    No. C 17-00939 WHA, 2018 WL 466510 (N.D. Cal. Jan. 18, 2018) .............................. 67, 96

*Web Commc'ns Grp., Inc. v. Gateway 2000, Inc.,* 889 F. Supp. 316 (N.D. Ill. 1995).................... 3

*Zitan Techs., LLC v. Liang Yu,*
 2019 U.S. Dist. LEXIS 3067, 2019 WL 95779 (D. Nev. Jan. 3, 2019)................ 58, 66, 92, 101

**Statutes**

A.C.A. § 4-75............................................................................................................... 124

Arkansas Trade Secret Act.......................................................................................... *passim*

DTSA 18 U.S. Code §1836............................................................................................ 123

Federal Rule of Civil Procedure 54(d)(2)(A) ............................................................... 125

Local Rule 56.1 ................................................................................................................. 2

PUBLIC VERSION

███████████████████████████████

Plaintiffs Zest Labs, Inc. and Ecoark Holdings, Inc.[1] file the Opposition to Walmart's Motion for Summary Judgment.

## I.     INTRODUCTION

Walmart's Motion for Summary Judgment (the "Motion") does not substantively address the key issues in the case:

- Zest owns the claimed trade secrets.

- Zest's trade secrets are confidential (they are neither generally known nor readily ascertainable).

- Walmart misappropriated Zest's trade secrets.

- Walmart breached the NDA.

- Walmart defrauded Zest.

- Walmart committed other torts against Zest.

No.   Walmart does the only thing it can do in the Motion—it throws a Hail Mary—an attempt to convince the Court that all of Zest's claims should be governed by a single contract—the 2016 MSA.

That contract was not signed by Zest, it does not mention Zest, it was not drafted by Zest, and it was not negotiated by Zest.  Those facts do not deter Walmart.  No.  Walmart presses on, claiming that Zest should be estopped from arguing its status as a stranger to the 2016 MSA.

---

[1] Plaintiff's Zest Labs, Inc. "Zest" and Ecoark Holdings, Inc. "Ecoark Holdings" are collectively referred to as "Plaintiffs."

1

Walmart brings this theory to the Court without citing a single case applying Arkansas law.     It does so because Arkansas law decisively rejects all of Walmart's legal theories, while supporting Zest's construction of the actual contracts between Zest and Walmart.

Walmart's complaints about Zest's damages model suffer in the same vacuum as its theory on contracts—Arkansas law does not support them.  In essence, Walmart asks the Court to find that Walmart can string Zest along for years, secretly design and develop an internal system using Zest's trade secret and confidential information, use that pilfered system to gain market share and cost savings, publish Zest's trade secrets to the world while seeking a 20 year monopoly on them in the process—all without paying Plaintiffs anything and without any repercussions to Walmart— simply because Zest had no opportunity to turn a profit in the wake of Walmart's treachery and theft.

That is Walmart's motion.  Genuine material factual disputes demonstrate that Walmart is wrong. Plaintiffs respectfully submit that the Court should inform Walmart it is wrong and deny Walmart's motion as a matter of law.

## II.     STATEMENT OF DISPUTED FACTS

Pursuant to Local Rule 56.1 Plaintiffs have filed with this Response a separate response to Defendant's purported Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.  This Response is also supported by (1) Plaintiff's Opposition to Walmart's Statement of Undisputed Facts; (2) the Declaration of Michael Simons; (3) the Declaration of Peter Mehring; and (4) Plaintiffs' Response Exhibits 1- 87,  these exhibits are referred to as Plaintiffs' Response Exhibit ("P.R.E. ___").   Each of these documents is incorporated herein by reference. There are material issues of fact related to every single claim on which Walmart seeks summary

judgment, and that alone is sufficient basis for denying Defendant's motion. Zest also incorporates by reference Dkt. Nos. 193, 194, 205, 200, 204, 207, 208, 209, and 211 (Plaintiffs' motions for summary judgment, briefs and related exhibits) as if fully set forth herein.

## III.    RELEVANT LEGAL STANDARDS

The summary judgment standard has already been briefed extensively by both parties in Dkt. No. 183, 204, 205, 209. Specific aspects of the relevant standards are referenced below in this opposition where they relate to a particular claims or issues.

## IV.    ARGUMENT AND AUTHORITIES

### A.    Plaintiffs' Claims Related to Information Before July 21, 2015 Are Not Barred.

Walmart incorrectly asserts that any information Walmart received before July 21, 2015 cannot be the basis for Zest's misappropriation claims, because the 2015 NDA did not exist. But the cases Walmart cites do not support its assertion. *See Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, No. 5:14-CV-5262, 2018 WL 1597976, at \*11 (W.D. Ark. Mar. 31, 2018); *In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1376 (N.D. Ga. 2003); *Contracts Materials Processing, Inc. v. Kata Leuna GmbH Catalysts*, 164 F. Supp. 2d 520, 534-35 (D. Md. 2001); *Web Commc'ns Grp., Inc. v. Gateway 2000, Inc.,* 889 F. Supp. 316, 320-21 (N.D. Ill. 1995). Indeed, the existence or absence of a nondisclosure agreement is not the determining factor in any of these cases.

A nondisclosure agreement is not required to support a misappropriation claim where Walmart knew that it had an obligation to protect confidential information of Zest's regardless of

3

PUBLIC VERSION

█████████████████████████████████

whether or not a nondisclosure agreement existed.  *See Sandlin v. Johnson,* 152 F. 2d 8, 1945 U.S. App. Lexis 4558 (8th Cir. 1945) (stating that "the disclosure of matter, which has been kept a trade secret, to one seeking to effect licensing arrangements… will ordinarily be regarded as being confidential by general implication" without an NDA);  *A. L. Labs. Inc. Philips Roxane, Inc.,* 803 F.2d 378 (8th Cir. 1986)(holding that the question is simply whether B knew that the information of A was a trade secret disclosed in confidence. Certain disclosures can then be confidential by general implication, without an NDA).  Even before Zest signed the 2015 NDA with Walmart, Walmart knew it had an obligation to protect that information.  The absence of a mutual NDA early in the relationship does not negate that obligation given the relationship that existed between Zest and Walmart.  *See LaPointe v. New Tech., Inc.*, 2014 Ark. App. 346 (Ark. App. 2014)(affirming a preliminary injunction that prevented defendant from disclosing trade secrets despite lack of a confidentiality agreement).

Walmart incorrectly claims that it ████████████████████████████████ ████████████████████████████ before July 21, 2015.  But (1) Walmart knew it had an obligation to maintain the secrecy of and limit the use of Zest's information under its Global Statement of Ethics; (2) in the 2014 NDA, Walmart acknowledged that Zest had confidential information that it might to provide to Walmart; and (3) Zest and Walmart's 2015 NDA superseded the 2014 NDA, and as a result, all the information that Zest provided to Walmart prior to July 21, 2015 is governed by the 2015 NDA.

      **1.**      ***Walmart knew it had an obligation to maintain the secrecy and limit the use of Zest's information under Walmart's Global Statement of Ethics.***

Even in the absence of an agreement, Walmart had an obligation to treat documents from a vendor like Zest as confidential under Walmart's Global Statement of Ethics.  *See* Breach of

4

PUBLIC VERSION

████████████████████████████████████████████

Contract MSJ Exhibit 23, Plaintiff's Exhibit 327 (Walmart Global Statement of Ethics).  Walmart USA's CEO at the time, Greg Foran testified that Walmart's Global Statement of Ethics applies to all Walmart employees.



P.R.E. 6, Deposition of Greg Foran at 24:24-25:9.  Mr. Foran further testified that Walmart's Global Statement of Ethics requires information received from vendors like Zest to be treated as confidential.



Zest Breach of Contract MSJ Ex. 22, Deposition of Greg Foran at 30:11-31:5; Breach of Contract

MSJ Exhibit 23, Plaintiff's Exhibit 327 (Walmart Global Statement of Ethics).   Mr. Foran

confirmed that using a vendor's confidential information for internal Walmart projects violates

Walmart's Global Statement of Ethics:



Zest Breach of Contract MSJ Ex. 22, Deposition of Greg Foran at 33:11-17.

PUBLIC VERSION



He also confirmed that sharing one vendor's information with another vendor or anyone else, violates Walmart's Global Statement of Ethics:



Zest Breach of Contract MSJ Ex. 22, Deposition of Greg Foran at 30:11-31:5.  Mr. Foran also testified that Mr. Doug McMillon (CEO of Walmart Inc.) expected his reports to ██████ Walmart's Global Statement on Ethics.



*Id.* at 25:19-26:1.

For example, Walmart erroneously claims that it was free to use in any way it chose, a Zest presentation that was provided to Walmart on June 11, 2015, simply because one page of the

7

████████████████████████████████████████████████

document mentions the word ██████████ Walmart MSJ at 19 (████████████████████████

████████████████████████████████████████).  But looking at the document it is clear

Walmart should have known that the information contained within was confidential and Zest

expected Walmart to keep it confidential.

First, every page of the document was clearly labeled ████████████████████████

██████████ In addition, the sentence that contains the word ██████████ actually says that the

information provided by Zest was ████████████████████████████████ and that Zest

████████████████████████████ in protecting the sensitive and confidential nature of that

information.   Walmart MSJ Omnibus Ex. 43 at 2 (emphasis added).

Even before Zest and Walmart signed any NDA, Walmart had an obligation under its Global Statement of Ethics to protect the confidentiality of Zest's information, not to use that information for its own internal projects, and not to disclose that information to third parties. Even if the 2015 NDA never existed, Walmart could not escape liability for its improper actions related to information it received before July 21, 2015, because it voluntarily assumed a duty to Zest under its publicly available Global Statement of Ethics.

*See* https://www.walmartethics.com/content/walmartethics/en_us/statement-of-ethics.html

Walmart's motion for summary judgment should be denied, because there is, at the very least, a material fact issue as to whether Walmart had an obligation to maintain the confidentiality of Zest's information that Walmart received prior to July 21, 2015, with or without the existence of any NDA.

### 2. *In the 2014 NDA, Walmart acknowledged that Zest had confidential information that Walmart might access.*

In addition to Walmart's obligations under its Global Statement of Ethics, Walmart specifically acknowledged that Zest had confidential information that Walmart would likely access after the 2014 NDA was signed. The 2014 NDA acknowledges that both Zest and Walmart have ███████████████████████████████████████████████████████ It also states that ██████████████████████████████████████████████████████

████████████

9



Walmart's MSJ, Omnibus Ex. 1 at 1.  So in 2014, Walmart knew Zest had confidential information that Walmart might access.  Under Walmart's Global Statement of Ethics, Walmart was obligated to protect the confidentiality of Zest's information, not use that information for its own internal projects, and not disclose that information to third parties.

Walmart's motion for summary judgment should be denied, because there is, at the very least, a material fact issue as to whether Walmart had an obligation to maintain the confidentiality of Zest's information that Walmart received prior to July 21, 2015, based on the 2014 NDA and Walmart's Global Statement of Ethics.

> **3.      *The 2015 NDA superseded the 2014 NDA, and as a result, all the information that Zest provided to Walmart prior to July 2015 is governed solely by the 2015 NDA.***

Arkansas law is clear, an agreement can only supersede another agreement if (1) it has an integration clause, (2) the parties are the same, and (3) the subject matter is the same.  "Merger happens when the ***same parties*** to an earlier agreement later enter into a ***written integrated agreement*** covering the ***same subject matter***." *Farm Bureau Policy Holders & Members v. Farm Bureau Mut. Ins.Co.*, 335 Ark. 285, 984 S.W.2d 6, 1998 Ark. LEXIS 652 (Supreme Ct. of Ark. 1998)(emphasis added).   When Walmart drafted the 2015 NDA, it included a merger clause that caused the 2015 NDA to supersede and cancel ██████████████

████████████████████████████████████████████

████████████████████████████████████████ Walmart's MSJ, Omnibus Exhibit 2 at ¶11.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Walmart cannot deny that the parties to the 2014 NDA and the 2015 NDA are the same – Zest (Intelleflex) and Walmart. Walmart also cannot deny that the 2014 NDA and the 2015 NDA both relate to the same subject matter – ███████████████████████████████████ Both the 2014 NDA and the 2015 NDA have whereas clauses that describe this same subject matter. The 2014 NDA has a "whereas" clause describing the purpose of the 2014 NDA as relating to the parties needing ███████████████████████████████████ Walmart MSJ Omnibus Ex. No. 1 (the 2014 NDA)

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

The 2015 NDA has a similar "whereas clause describing the same subject matter as the 2014 NDA. Walmart's MSJ, Omnibus Exhibit 2 at 1 (the 2015 NDA).

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

As a result, under Arkansas law the 2015 NDA superseded the 2014 NDA, and the relationship between Walmart and Zest is and has been governed exclusively by the 2015 NDA. Walmart cannot present any competent summary judgment evidence to dispute these facts, or the law. For this reason alone, Walmart's motion for summary judgment should be denied. There is, at the very least, a material fact issue as to whether Walmart had an obligation to maintain the confidentiality

11

███████████████████████

of Zest's information that Walmart received prior to July 21, 2015, because the 2015 NDA superseded the 2014 NDA.

**B.    Oral Disclosures of Confidential Information to Walmart Can Support Plaintiff's Claims for Misappropriation and Breach of Contract.**

Plaintiffs' claims for misappropriation and breach of contract can rest on oral disclosures because (1) the 2015 NDA specifically contemplates protecting oral disclosures of Confidential Information, and (2) Zest's oral disclosures were accompanied by written disclosures that confirmed the confidential nature of the oral information.

**1.    *The 2015 NDA specifically contemplates protecting oral disclosures of Confidential Information.***

Walmart admits that the 2015 NDA specifically anticipates the oral disclosure of confidential information, and protects that orally disclosed confidential information. Walmart's MSJ, Omnibus Exhibit 2 at ¶1; *see also* Walmart SUMF No. 22.[2]



---

[2] Walmart's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment is referred to herein as "Walmart's SUMF."

████████████████████████████████████

**2.**    ***Zest's oral disclosures were accompanied by written disclosures that confirmed the confidential nature of the oral information.***

Over the course of the multi-year relationship between Zest and Walmart, there were many meetings where presentations were given to Walmart.  As is typical, the oral presentation referred to the written document and expanded on and explained the words and concepts in the written materials.  Zest typically then provided Walmart with a copy of the written presentation either in person or by email.  For example, on June 7, 2017, a group of Walmart employees visited Zest's offices and profiling lab in California.  During the meetings they were given a presentation.  The presentation was accompanied by what Walmart called a ██████████████ of Zest's technology that "████████████████████████████



P.R.E. 3, Deposition of Nikhil Cherian at 145:10-22.  The presentation, which was marked confidential was sent to Walmart after the meeting.  The presentation was marked "Zest Labs Confidential" on each page.  *See* P.R.E. 13, Plaintiff's Deposition Exhibit 162 at 7.

13

PUBLIC VERSION



The confidential presentation was then circulated internally throughout Walmart. P.R.E. 3, Deposition of Nikhil Cherian at 147:20-22.



████████████████████████████████

Walmart seeks to escape liability for information it received during such ████████████

by pointing to a provision in the 2015 NDA that says ████████████████████████

████████████████████████████████████████████████████

████████████   The agreement does not define "████   and courts should "use a commonsense

approach" to contract interpretation and "give effect to the words used as they would be generally

understood in their ordinary sense." *Transcon. Ins. Co. v. Edwards*, 139 F.3d 1185, 1187 (8th Cir.

1998).  In today's world where few formal ████████ are sent via regular mail, common sense tells

us that an email attaching a copy of the presentation and marking the information confidential would

be encompassed in the common-sense definition of ████████ in the agreement.  Furthermore, it

cannot be the case that Walmart can take detailed oral explanations of written material that is

marked confidential and try to remove those explanations from the confidential category because

Zest sent an email confirming the confidentiality rather than mailing a ████████  Even if they did

not, all of Walmart's associates would still be obligated to keep the oral disclosures confidential

under Walmart's Global Statement of ethics.

Walmart's motion for summary judgment should be denied, because there is, at the very

least, a material fact issue as to whether the emails and other written materials provided to Walmart

qualify as ████████ under the 2015 NDA.

**C.     Plaintiff's Claims Related to Information after January 16, 2016, Are Not Barred.**

Walmart falsely asserts that the 2016 MSA between Walmart and ***Ecoark, Inc.*** supersedes

the 2015 NDA between ***Zest*** and Walmart.  Tellingly, Walmart does not cite a single case where

a court applies Arkansas law on whether one contract supersedes another.  The lone case that

Walmart cites from an Arkansas federal court is an unpublished case that applies Pennsylvania

15

██████████████████

law, not Arkansas law. *See Baldor Electric. Co. v. Sunguard* 2006 WL 3735980 *9 (W.D. Ark Dec. 15, 2006) ("section D.10 of the Agreement provides that the Agreement is to be 'GOVERNED BY PENNSYLVANIA LAW.'" (emphasis in original). Walmart chose to have the contracts between Walmart and Zest, and the contracts between Walmart and Ecoark Inc. governed by Arkansas law. Walmart tries to abandon this choice by citing a variety of cases from other jurisdictions applying other states law. Walmart fails to even mention the controlling Arkansas Supreme Court case on the subject. *See* Walmart's Motion at 21-22.

Arkansas law is clear, an agreement can only supersede another agreement if (1) it has an integration clause, (2) the parties are the same, and (3) the subject matter is the same. "Merger happens when the ***same parties*** to an earlier agreement later enter into a ***written integrated agreement*** covering the ***same subject matter***." *Farm Bureau Policy Holders & Members v. Farm Bureau Mut. Ins. Co.*, 335 Ark. 285, 984 S.W.2d 6, 1998 Ark. LEXIS 652 (Supreme Ct. of Ark. 1998)(emphasis added).[3]

---

[3] See also *A&E TV Networks, LLC v. Pivot Point Entm't, LLC*, 2013 U.S. Dist. LEXIS 43775, 2013 (S.D. N.Y. 2013)(a subsequent contract must have "definitive language that it revokes, cancels, or supersedes that specific prior contract"); *CreditSights, Inc. v. Ciasullo*, 2007 U.S. Dist. LEXIS 25850 (S.D. N.Y. 2007)("a subsequent contract not pertaining to "precisely the same subject matter" will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contact."). The cases cited by Walmart are inapplicable because they are cases where the parties to the subsequent contract are the same, and where provisions of the prior contract are in direct conflict or the new agreement specifically revokes the prior agreement. *See Baldor Elec. Co. v. Sungard Recovery Servs. LP, No. 2:06-CV-02135, 2006 (W.D. Ark. Dec. 15, 2006); Russell v. Energy Exch. Corp.*, 646 F. Supp. 173, 174-76 (S.D. W. Va. 1986)*; Farhang v. Indian Inst. of Tech., Kharagpur, No. C-08-02658 RMW, 2010 (N.D. Cal. June 1, 2010).*

█████████████████████████

Plaintiffs' claims related to Zest confidential information provided to Walmart after January 16, 2016, are not barred. The 2016 MSA cannot and does not supersede the 2015 NDA because (1) the parties to the agreements are different; and (2) the subject matters of the agreements are different. Additionally, (3) the 2016 MSA does not address Zest; (4) Walmart specifically affirmed in 2017, that the 2015 NDA was still in effect and governed the relationship between Zest and Walmart; and (5) direct benefit estoppel does not apply to bind non-party Zest to the 2016 MSA.

1. ***The 2016 MSA cannot supersede the 2015 NDA because the parties and the subject matters are different.***

        *a. The parties to the 2016 MSA are not the same as the parties to the 2015 NDA.*

The January 18, 2016 Master Services Agreement ("2016 MSA") is between ████████ ███████████████████████████████████████████████████████████ and ████████████ only. Walmart MSJ Omnibus Ex. 3 at 1 (emphasis added).



17

███████████████████████████████████

Ecoark Inc. is a separate company from Zest, and it is *not* a party to this litigation.[4]   The

agreement is not ambiguous, it governs certain aspects of the relationships between ***Walmart***

and ***Ecoark, Inc***. *See C&A Const. Co., Inc. v. Benning Const. Co.,* 256 Ark. 621, 622 (1974)

(rejecting the inclusion of parol evidence to interpret the "plain, obvious, and unambiguous

language of the contract").   If Walmart had intended to draft this agreement to include any

company other than Ecoark, Inc., it could easily have done so.   Walmart could have defined the

Service Provider as including subsidiaries and affiliates of ***Ecoark, Inc.***, just as Walmart did for

itself (████████████████████████████████████████

████████████████████).   It did not.

Similarly, the 2015 NDA was between Walmart and Zest only.   Again, Walmart could have

included Zest affiliates in the definitions in the 2015 NDA.   It did not.   No companies affiliated

with Zest are parties to the 2015 NDA.   *See* Walmart MSJ Omnibus Exhibit 2 at 1.



_____

[4] Similarly, the September 21, 2016 Statement of Work ("2016 SOW") is between ████████████
█████████████████████████████████████████████████████████
██████████

████████████████████████████████████████████

     b. *The subject matter of the 2016 MSA is not the same as the subject matter of the 2015 NDA.*

The subject matter of the 2015 NDA (and the 2014 NDA) is ███████████████████ ████████████████ The subject matter of the 2016 MSA is ████████████████ ████████████████████████████ *See* Walmart MSJ Omnibus Ex. 3 at 1.

     c. *The 2016 MSA does not address Zest.*

The integration clause of the 2016 MSA does not mention Zest.  The 2016 MSA applies by its terms only to agreements between ██████████████████████████████████ Walmart MSJ Omnibus Ex. 3 at 1 (emphasis added).



The 2016 MSA itself confirms that it does not supersede agreements with other parties (Zest) or ████████████████████████████████).  The 2016 MSA between ***Ecoark, Inc.*** and Walmart cannot and does not supersede the 2015 NDA between Walmart and **Zest.**

    **2.**    ***Walmart specifically affirmed in 2017, that the 2015 NDA was still in effect and governed the relationship between Zest and Walmart."***

In 2017, Walmart itself recognized that the 2015 NDA was the agreement that governed the relationship between Zest and Walmart.  On June 29, 2017, as Zest was preparing for another pilot with Walmart, Walmart executive Denise Sharpe and Zest's CEO Peter Mehring had a

PUBLIC VERSION

lengthy email discussion about the agreement that governed the relationship.  *See* Zest's MSJ on Breach of Contract, Exhibit 10, Deposition of Denise Sharpe at 51:4 – 57:1 and Exhibits 11- 13,  Plaintiffs Deposition Exhibits 91, 92 and 93.  During the exchange Mr. Mehring made it crystal clear that the 2015 NDA governed the parties relationship and that Zest would not execute any agreement unless it included a provision that ███████████████  ████████████████████████  *See* Zest's MSJ



on Breach of Contract, Exhibit 13.



Ms. Sharpe understood this issue and responded that no additional agreement was needed and that the 2015 NDA that governed the previous pilot would continue to govern the

████████████████████████████████

party's relationship in 2017.  Walmart and Zest will continue to "██████████████

████████████████████████████████████████████████████████

██████  *See* Zest's MSJ on Breach of Contract, Exhibit 12.

　　　To make sure there was no confusion, Mr. Mehring asked for further clarification that Ms. Sharpe's reference to the ████████████████ meant the 2015 NDA. *Id.*  Ms. Sharpe responded unequivocally ████████████ *Id.*

████████████████████████████████████████████████

As a result, it was clear as of July 2017, that the 2015 NDA (1) governed the original Zest pilot, (2) was still in effect, (3) was not superseded by the 2016 MSA, and (4) governed the 2017 Zest pilot.

3.      *Direct benefit estoppel has not been recognized by any Arkansas Court and is directly contrary to the terms of the 2016 MSA.*

Implicitly recognizing that Zest is not a party to the 2016 MSA, and that the 2016 MSA did not supersede the 2015 NDA, Walmart desperately argues that Zest should be bound to the terms of the 2016 MSA as a third party under the theory of direct benefit estoppel.

Walmart selected Arkansas law as the applicable law for the 2016 MSA, so any discussion of direct benefit estoppel related to the 2016 MSA has to start and end with an analysis of Arkansas law. But Walmart's argument completely fails to reference or analyze Arkansas law – instead pointing to cases from other states that apply other states' law. *See* Walmart MSJ motion at pages 22-29 (Citing to cases from District of South Carolina, Delaware Chancery Court, 5th Circuit, Southern District of Iowa, Southern District of New York, Ohio Court of Appeals).

Perhaps Walmart avoided a discussion of Arkansas law because no Arkansas court has ever done what Walmart is asking this Court to do in this case - adopt the theory of direct benefit estoppel to bind a non-signatory to a contract. The only case from Arkansas that examined this issue was a case from the Western District of Arkansas, *Mounce v. CHSPSC, LLC*. That court faced a similar situation when trying to decide if direct benefit estoppel should be used to bind a nonparty to an arbitration clause in an agreement. 2015 U.S. Dist. LEXIS 171795. In that case, the Court looked at Arkansas law on the topic and determined that "***no Arkansas court has weighed in on this particular issue***, and thus ***it remains unresolved whether Arkansas would, if pressed, ascribe to such a theory to bind an unwilling non-signatory***." *Id*. (emphasis added).

"State contract law determines which claims are enforceable under § 3 [of the FAA]." *Id.* (citing *Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630-31, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009))*. It follows, therefore, that this Court would look to Arkansas contract law, which controls the claims at issue here, to determine whether the direct benefits estoppel theory Defendants have articulated has been recognized in Arkansas as a means to bind non-signatories to arbitration agreements. After some investigation, the Court agrees with the parties that no Arkansas court has weighed in on this particular issue, and it thus remains unresolved whether Arkansas would, if pressed, ascribe to such a theory to bind an unwilling non-signatory. Without clear guidance from Arkansas courts on this issue, the Court "must attempt to predict how the highest [state] court would resolve the issue, with decisions of intermediate state courts being persuasive authority." *Progressive N. Ins. Co. v. McDonough, 608 F.3d 388, 390 (8th Cir. 2010)*.

Because no Arkansas court has adopted the theory of direct benefit estoppel, this Court would need to attempt to predict how the Arkansas Supreme Court "would resolve the issue." *Id.* The court in *Mounce* undertook that very analysis. In *Mounce*, that Defendants' arguments were identical to those made by Walmart here – you cannot benefit from an agreement on the one hand and then refuse to accept the negative aspects of the agreement on the other. But a key aspect of the Court's reasoning in *Mounce* and the "obvious flaw in Defendants' reasoning" is also directly applicable here. *Id.* In *Mounce*, the agreement that the Defendant was trying to apply had a provision that specifically stated that the agreement "***did not create or establish third party beneficiary status or rights***" for anyone else. *Id.* at * 15 (emphasis added).

23

PUBLIC VERSION

> Defendants' theory for binding Mounce to arbitration is grounded in the notion that Mounce has sought to avail herself of the benefits of the provider agreement—by filing this lawsuit and pointing out the existence of the agreement and its relevant terms, and by complaining that Defendants did not follow the agreement—but now refuses to accept the detriment of the agreement: the arbitration provision. Defendants essentially contend that Mounce seeks to have her cake and eat it, too. [*15] But the obvious flaw in Defendants' reasoning is that the language of the agreement itself forecloses Mounce from obtaining benefits or rights under it. *See* Provider Agreement, Doc. 27-4, p. 17 ("there is no intent by either party to create or establish third party beneficiary status or rights as to any patient"). Defendants would rather the Court not consider this relevant fact in the arbitration analysis. *See* Defendants' Reply Brief, Doc. 31, p. 7 n.2 ("Defendants agree with

The 2016 MSA has precisely the same language. Walmart and Ecoark, Inc. ███████ ███████████████████████████████████████████████████ " *See* Walmart MSJ Omnibus Ex. 3 at ¶ (J) (emphasis added).

The *Mounce* court ultimately determined that it was unlikely that the Arkansas Supreme Court would use this doctrine to bind a non-signatory to a contract. *Id.* And the fact pattern in *Mounce* favored estoppel more than the fact pattern here. The plaintiff in *Mounce* was attempting to enforce certain aspects of the agreement in the lawsuit, which caused the Defendant to seek to enforce the agreements arbitration clause and invoke the strong presumption in favor of arbitration.

Even with those facts, the Court in *Mounce* did not believe the Arkansas Supreme Court would

apply direct benefit estoppel, and the *Mounce* court refused to apply the doctrine. *Id*. at \*19.

> The fact that Mounce's case does not fit into either condition described in *DuPont* above provides firmer support for the Court's conclusion that direct benefits estoppel does not properly apply here. Moreover, the Court is unconvinced that Arkansas' highest court would apply direct benefits estoppel to bind a non-signatory, like Mounce, to binding arbitration, given the facts set forth by the parties. Ordering a non-signatory to a contract to abide by the contract's terms is not an act to be taken lightly, particularly when doing so would result in the non-signatory's loss of a constitutional right. "It is elementary that the *Seventh Amendment* right to a jury is fundamental and that its protection can only be relinquished knowingly and intentionally." *Nat'l Equipment Rental, Ltd. v. Hendrix, 565 F.2d 255, 258 (2d Cir.1977)*. The strong presumption in favor of arbitration is grounded in respect for the parties' right to contract as they see fit—including to contract away the right to trial by jury. But there **[*20]** is no such underpinning here. And since no justification otherwise exists for depriving Mounce of her fundamental right to a jury trial, the matter will not be sent to arbitration.

That logic is even more compelling here where (1) Zest is not seeking to enforce any aspect

of the 2016 MSA; (2) there is no presumption in favor of enforcing the contract (like that favoring

arbitration), and (3) the 2016 MSA has a clear statement that it does not confer third party

beneficiary status on any person or entity.

Walmart's efforts to apply out-of-state law to ensnare Zest with the 2016 MSA should be

rejected.  Arkansas law is clear, and it is the only law that applies in this case.  Walmart's motion

for summary judgment should be denied.

████████████████████████████████████████

### D.    Walmart does not own Zest Confidential Information related to the 2016 Proof of concept the 2017 RFI Response, or the 2018 SOW.

Perhaps recognizing the weakness of its arguments about the 2015 NDA and estoppel, Walmart desperately seeks to use other speculative avenues to claim ownership of Zest's confidential information. But Walmart does not own Zest's Confidential Information related to the 2016 proof of concept, the 2017 RFI response or the 2018 SOW because (1) Zest was not a party to the 2016 Statement of Work; (2) Walmart's own policies prevent it from claiming ownership of Confidential Information submitted in an RFI Response; and (3) Walmart specifically affirmed in 2017, that the 2015 NDA was still in effect and governed the relationship between Zest and Walmart at all relevant times.

#### 1.    *Walmart cannot claim to own Zest's Technology from the POC based on the 2016 Statement of Work.*

First, Zest was not a party to the Walmart/Ecoark, Inc. 2016 MSA (*see* section IV.C.1-2 above) and Zest was not a party to the Walmart/Ecoark, Inc. 2016 SOW. Both were between Walmart and Ecoark, Inc. only. Walmart cannot use direct benefit estoppel to bind Zest to the 2016 MSA (*see* section IV.C.3 above) or the 2016 SOW.

Second, any claim that Walmart owns any technology based on the 2016 MSA or any SOW under it is contrary to the explicit language of the 2016 MSA. The 2016 MSA specifically says that ████████████████████████████████████████ The 2016 MSA

26

PUBLIC VERSION

████████████████████████████████

specifically states that ██████████████████████████████████████████

█████████ Walmart MSJ Omnibus Exhibit 3 at ¶ 9(B). (emphasis added).

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Any allegation that the 2016 SOW somehow gives Walmart ownership of any Zest intellectual property would be directly at odds with the 2016 MSA with governs the 2016 SOW. If there is a conflict between the 2016 SOW and the 2016 MSA, the 2016 MSA controls. The 2016 MSA states that ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Walmart MSJ Omnibus

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Exhibit 3 at ¶ 2(B). The 2016 SOW has no provision that ██████████████████

██████████████████████████████████ For all of these reasons, Walmart cannot and does not own any Zest technology via the 2016 SOW.

2.    *Walmart specifically Affirmed in 2017, that the 2015 NDA was still in effect and governed the relationship between Zest and Walmart.*

The 2015 NDA governed the relationship between Walmart and Zest during the 2016 proof of concept (*see* section IV.A.1-2 above).  When Zest and Walmart signed the 2015 NDA, it superseded the 2014 NDA and became the only operative agreement between Zest and Walmart (*see* section IV.A.3 above).  The 2015 NDA continued to be the only operative agreement between Zest and Walmart in 2016.  In 2017 Walmart affirmed that the 2015 NDA continued to govern the relationship between Zest and Walmart (*see* section IV.C.2 above).  The 2015 NDA controls the relationship between Zest and Walmart from 2014 through the present.  Walmart cannot use the 2016 MSA, the 2016 SOW, or any other agreement to try to claim that it owns Zest technology from Walmart's 2014, 2015, 2016 or 2017 interactions with Zest.

3.    *Walmart cannot claim to own Zest's Technology based on the 2018 Statement of Work.*

Walmart cannot claim ownership to any Zest technology under the 2018 SOW that has fatal flaws that were caused by Walmart's own actions.  The 2018 SOW says that it is ███████ a Master Services Agreement effective as of September 28, 2016.  It is undisputed that no MSA existed with an effective date of September 28, 2016.



P.R.E. 21, (Tilmon 30(b)(6) depo. at 263:14-17).[5]

---

[5] *See* also Plaintiffs' response to Walmart's Statement of Undisputed Materials facts at para. 69-75.

In addition, Walmart never paid the ██████████ as it was supposed to pay under the 2018 SOW.

P.R.E. 10, Deposition of Peter Mehring, Vol. 2 at 467:12-486:12.  Walmart cannot use a flawed

agreement that even Walmart refused to comply with as a basis for claiming ownership of

Plaintiffs' technology.

**4.    *Walmart's own policies prevent it from claiming ownership of Zest's Confidential Information submitted in Zest's RFI Response.***

It is shocking that Walmart now impermissibly claims that it would own third-party

technology that was described in response to a Request for Information ("RFI").  Such a claim is

directly contrary to Walmart's Global Statement of Ethics, as well as the language of Zest's RFI

Response.  Walmart's Global Statement of Ethics prohibits Walmart from claiming ownership

over technology that is disclosed to Walmart in an RFI response or other submission to Walmart.

PUBLIC VERSION



Zest Breach of Contract MSJ Ex. 22, Deposition of Greg Foran at 30:11-31:5; Breach of Contract

MSJ Exhibit 23, Plaintiff's Exhibit 327 (Walmart Global Statement of Ethics).   Mr. Foran also

testified that engaging with another company under the guise of a business opportunity in an effort

to obtain and use that company's confidential information would be



P.R.E. 6, Deposition of Greg Foran at 29:15-24. Each and every page of the Zest RFI response was marked "Zest Confidential Information." *See* Dkt. No. 205 – Trade Secret MSJ Brief Ex. D22, Plaintiffs' Deposition Exhibit 165.



Mr. Foran confirmed that engaging a third party to test a product and then claiming ownership of the third party's information and using the information for internal Walmart projects violates Walmart's Global Statement of Ethics:



Zest Breach of Contract MSJ Ex. 22, Deposition of Greg Foran at 33:11-17. Walmart's claims the RFI gives them the right to take possession of Zest's technology is outrageous. Such a claim directly violates Walmart's Global Statement of Ethics. Any employee or other representative of Walmart making such a claim is subject to discipline under the Global Statement of Ethics. The policy provides that the appropriate discipline for violating the ethics policy can include

termination of the associate responsible for the violation.  Breach of Contract MSJ Exhibit 23, Plaintiff's Exhibit 327 at 6.

Walmart does not own third-party technology that is described in an RFI response that Walmart requested.  Any employee who claims it does, should be investigated and terminated under Walmart's Global Statement of Ethics.

Based on all of the above, there can be no argument that the only agreement that has governed the relationship between Zest and Walmart during the relevant time period is the 2015 NDA.  Any arguments by Walmart to the contrary are inconsistent with Arkansas law and the facts of this case.  Walmart's motion for summary judgment should be denied.

**E.      Plaintiffs' Damages Were Proximately Caused by Walmart's Misappropriations, Breach, and Fraud.**

It is fitting that Walmart postures the damages and causation section of its brief as a "no evidence" motion, <u>because the motion wholly fails to prove any undisputed material facts that could possibly support Walmart's requested relief from damages</u>.  In fact, the lynchpin of Walmart's brief on these issues—paragraph 59 of its statement of (supposedly) undisputed material facts—is completely unsupported in the summary judgment record. Walmart cites  only to a few paragraphs from Zest's <u>damages</u> (not technical) expert report – an inadmissible, hearsay

document. Those paragraphs do not prove, or even support the factual assertion for which Walmart cites them. *See* Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, which is incorporated by reference as if fully set forth herein. Having failed to present any competent summary judgment facts as to which there is no genuine dispute, Walmart's motion for summary judgment on damages and causation issues must be denied. "If the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, a no-evidence summary judgment cannot properly be granted." *Smith v. O'Donnell*, 288 S.W.3d 417, 424, 2009 Tex. LEXIS 455, 52 Tex. Sup. J. 958 (Tex. 2009).

Setting aside Walmart's failures, the record amply shows genuine issues of material fact that (1) allow Zest to present its damages case to the jury, and (2) show that Walmart's motion for summary judgment on damages is frivolous.

To begin, Zest's damages claims are not confined to the technology that Walmart has deployed to date in its distribution centers ("DCs"). Zest's claims seek redress for every act of misappropriation, breach of contract, fraud, and other misconduct by Walmart. Zest seeks damages for all compensable harms. The limited definition of "Eden/Muse" that Walmart now seeks to apply is irrelevant to the damages case and undermines the Motion throughout. Zest seeks recovery for all of Walmart's misappropriations and misconduct in its development, design, deployment, modification, and use efforts, inside and outside the Eden/Muse ecosystem. Zest also seeks damages for every actionable publication, act, and omission by Walmart, to the full extent permitted by the law.

As shown below, Walmart's attempt to focus its motion on its "Inspect" and "Almanac" applications is meritless and insufficient to support the Motion. Walmart's own publications confirm this fact: when Walmart VP of Supply Chain Technology Parvez Musani announced to

PUBLIC VERSION

████████████████████████████

the world on March 1, 2018, that Eden/Muse is "The Tech That's Bringing Fresher Groceries to You," he made clear that he was not talking only about two applications. He was explicitly talking about "improving the quality and flow of fresh groceries **_from farm to shelf_**." Exhibit P.R.E. 15, Plaintiff's Depo Ex. 52 at 1 (emphasis added). He also announced that the goal of Eden/Muse is to "figure out the best way to keep track of food freshness **_all the way from the farms to our stores_**." *Id.* In doing so he emphasized the need "**_to create a freshness algorithm that prioritizes the flow of perishable goods worldwide_**." *Id.* In other words, Walmart announced that it had misappropriated Zest's end-to-end (from farm to store) technology along with its benefits of "end to end quality visibility … comprehensive analytics … [and] improved consistency & productivity." It was not just two applications running on handheld computers within Walmart DCs, as the motion now asserts. Rather Here is how Walmart has illustrated the impact to the supply chain from Eden/Muse:



*See* P.R.E. 17, WM00017269-282 at 17271; *see also* P.R.E. 30, WM00016917-931 at 16919.

Ultimately, Walmart's treachery culminated in the filing of a provisional patent application, from which a nonprovisional application was filed and was ultimately published to the world by the USPTO.[6]  Walmart announced its coup in its  March 1 publication stating that Josh Bohling has "filed two patents" and "Eden is now the cornerstone of Walmart's move to improve the quality of fresh produce for sale to our customers."  P.R.E. 15, Plaintiffs' Depo Ex. 52.  The March 1 Publication demonstrates that the Eden/Muse ecosystem is designed to

- Use "machine learning" and a "suite of apps [that] helps Walmart associates better monitor and care for fresh fruits and vegetables that are ***waiting to be shipped from distribution centers*** to stores."  *Id.*

- Predict "***the shelf life of tomatoes while they're still on the vine***."  *Id.*

- Prioritize "the flow of green grocery items ***from the back of the store to the shelf***."  *Id.*

- ***Recalculate the freshness factor and re-route the shipment immediately***.

In the same publication, Walmart announced that "Eden is being used in 43 distribution centers and has prevented $86 million in waste," with a "***goal to eliminate $2 billion in waste over the next five years***."  *Id.*

The Motion's singular focus on Inspect and Almanac is fatal.  Genuine issues of material fact exist, and they show how Walmart's misappropriations, breaches, fraud, and misconduct have proximately damaged Plaintiffs.  Multiple genuine issue of material fact and the evidence

---

[6] Walmart filed a provisional patent application on "predicting shelf life based on item specific metrics" on November 10, 2017 (the "Walmart Provisional Application"), and then filed a substantively identical non-provisional patent application on August 27, 2018 (the "Walmart Application")(collectively the "Walmart Applications").

██████████████████████████████████

demonstrating them are discussed in sections 1-7 below, and the nexus between those facts and the damage to Zest are detailed in sections 8-10:

- Walmart did not know how to solve or even address its multi-billion-dollar fresh food problem (aka "Fresh") before it met Zest;

- Zest taught Walmart everything about the Zest end-to-end solution (from farm to store)—including how to use an automated QC process to gain visibility into its supply chain and improve product quality;

- Walmart received Zest's confidential information and trade secrets, while at the same time Walmart secretly designed, developed, and began implementing Eden/Muse—Walmart's stolen system for reducing fresh food loss (from farm to store);

- Walmart published the details of Zest's trade secrets and confidential information in the Walmart Application;

- Now, on the eve of trial, Walmart claims that it has abandoned its plans to deploy some aspects of the trade secrets—but only after using and disclosing them to the world;

- Walmart's false construct on misappropriation is insufficient to avoid the triable issues on compensable damages;

- Given the scope of Walmart's misconduct (including misappropriation by use and disclosure, breaches, fraud and other misdeeds), it is beyond reasonable dispute that Zest has been damaged in an amount that must be determined by a jury;

- Plaintiffs' unjust enrichment damages were proximately caused by Walmart's misconduct;

PUBLIC VERSION

██████████████████████████████████

- Plaintiffs' actual losses (lost profits) were proximately caused by Walmart's misconduct; and

- Plaintiffs' reasonable royalty damages were proximately caused by Walmart's misconduct.

### 1.    *Walmart Did Not Know How to Solve or Even Address Its Multi-Billion-Dollar Fresh Food Problem (aka "Fresh") Before It Met Zest.*

Walmart began meeting with Zest around 2014. From 2014 through 2016 Walmart concedes that

- Its own systems in 2014 were ████████ P.R.E. 2, Boyle Depo at Vol. 1 p33.  ; P.R.E. 11, Musani Depo at 52, 59, 271.

- *It was still using pencil and paper* to perform its quality control process when fresh food trucks arrived at its DCs.  P.R.E. 21, Tilmon Depo at 23-24; P.R.E. 2, Boyle Depo, Vol. 1 at 33; P.R.E. 11, Musani Depo at 53.  Temperature monitoring, if it occurred, was done by placing a removable sensor in the nose, middle and tail section of trailers  P.R.E. 21, Tilmon Depo at 82:18-23.

- To check temperature information, Walmart had to take a sensor from the truck in question and plug it into a printer to get a reading of the temperature history during transit.  P.R.E. 21, Tilmon Depo at 147:21-148:7.

- Walmart did not have any applications that were dedicated to managing the quality of the fresh food it was selling.  P.R.E. 21, Tilmon Depo at 64-67; P.R.E. 18, Pradhan Depo at 63.

- Walmart had no computer programs dedicated to its Fresh.  *Id.*

37

████████████████████████████████

When Greg Foran was named CEO of Walmart USA in 2014—the day after he met with Zest—Walmart had no work underway to improve food freshness. At the time, Walmart had a desperate technology need and Zest satisfied it. That is the reason why Mr. Foran was excited about Zest and its potential to alter the landscape of fresh food at Walmart. *See* WM00065879. Zest had the technology that Walmart needed.

By 2014, Zest had already spent  years and was well on its way to spending ████████ developing its proprietary technology, confidential information, and trade secrets. *See* ZEST_ECOARK0011734 at 11754. Zest had built an "end-to-end solution" for improving fresh food quality and consistency as well as supply chain visibility—with the ████████████ ████████████ to address anyone's' multi-billion-dollar fresh food problem. *Id.* at 11735, 11754. It was not ██████████████████████████████████████████ ████████████████████████ *Id.* at 11754. Zest's technology addressed specific product freshness based on real measurements—using both variety- and grower-specific freshness models, and a freshness quality model, with real-time prescriptive feedback for minimizing food-product quality issues that helped growers, suppliers, and retailers maintain consistent quality of fresh food. *Id.* at 11737. Zest's technology was designed to alert quality control ("QC") personnel whenever freshness fell below established standards (as early as when the supplier was loading the food onto the trailer). *Id.* at 11737. This functionality improved efficiency and gave more visibility in the supply chain.

Not surprisingly—after meeting with Zest, learning about its technology, and observing it in the field—Walmart had a new ██████████████████████████

38



P.R.E. 29, WM00009544-546.  Zest enabled that vision – taking Walmart from its ███████

a ██████████████████████████████████████████████ and moving it ███████

███████████████" so that it could continue to use Zest's offering:  ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████ *Id.* at 9545:

PUBLIC VERSION

███████████████████████████████████████████

To be sure, Walmart's new ██████████████████████████ was not the mere digitization of USDA standards at the Walmart DC, as shown below.

> **2.      *Zest taught Walmart everything about the Zest end-to-end solution (from farm to store)—including how use an automated QC process to gain visibility into its supply chain and improve product quality.***

Zest spent years teaching Walmart how to improve and maximize its food freshness at each step of the supply chain.  For example, Zest taught Walmart how to

a. Use predictive and prescriptive analytics to provide real time ████████████████ to improve freshness in the Walmart system;

b. Enable a manage-by-exception approach using automated data capture;

c. Improve Walmart's ██████████████████████████████ by creating ████████ ████████████████████████████████████████████ and

d. Establish a dynamic quality program that enables ███████████████████████ ████████████ allowing Walmart's workers to have ███████████████████████ ██████████████████████████

ZEST_ECOARK0011734 at 11738.

To be clear, the Zest technology disclosed to Walmart ██████████████████ of the freshness-improvement process, including QC ████████████████████████████████ ████████████ to the process. *Id.* at 11739.  Zest also showed Walmart how to ████████████████████ ███████████████████████████████████████████████████████████████████████ *Id.* And Zest showed Walmart how to ████████████████████████████████████████ ███████████████████████ *Id.*    The product freshness model that Zest taught to Walmart uses ███████████████████████████████████████ and it includes a prescriptive "████████████

████ to track actual performance against the predictive model and match ████████

█████████ *Id.*

Zest's also showed Walmart how to manage QC and freshness from farm to store:



ZEST_ECOARK0021549.

It is indisputable that Zest's teachings to Walmart also included instructions on how to improve and digitize Walmart's paper-and-pencil QC process.  In fact, Walmart asked Zest to provide information to perform an entire revamp of Walmart's QC system in 2015.  P.R.E. 9, May Depo at 136-37;  P.R.E. 5, Defendant's Depo. Ex. 91.  As shown in the slide immediately above, Zest taught Walmart how to do its QC process at the "Retail DC" as well as other locations  Exhibit P.R.E. 68, ZEST_ECOARK0012549.  The teachings included how to achieve ████████

████████

PUBLIC VERSION

████████████████████████████████████████

████████████████████████████████ *Id.* Zest disclosed to Walmart how to improve the QC (also referred to as "Quality Management") process between Walmart and its suppliers/growers by ████████████████████████████████████████████

████████████████████████████████████████████████

within and across the Walmart supply chain:

████████████████████

P.R.E. 67, ZEST_ECOARK0011734 at 11740.  In fact, Zest taught Walmart about managing its

food-freshness ████████████████████

████████████████████

████████████████████

████████████████████

*Id.* at 11741.  Zest provided Walmart the approach for managing Walmart's supply chain and QC

in real time:



███████████████████████████████████████████

*Id.* at 11741; Omnibus Ex. No.43, ZEST_ECOARK0012162.

Zest also taught Walmart how to ███████████████████████████████

████████████████████████████████████████████████████████



Dkt. No. 205 – Trade Secret MSJ Brief Ex. E7, ZEST_ECOARK0015200.  The same Zest slide

shows ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████    *Id.*  The same Zest slide shows ████████████████████████████████

████████████████████████████████████  Walmart's" publicly announced vision for

███████████████████████████████████████

Eden/Muse.  *Compare id*. to P.R.E. 15, Plaintiffs' Depo Ex. 52 at 1 (███████████████████████

██████████████████████████████████████████████).

Zest also taught Walmart to define its product freshness requirements:



P.R.E. 67, ZEST_ECOARK0011734 at 11742.

Zest taught Walmart to define its QC sampling requirements:



*Id.* at 11743.

Zest taught Walmart how to use an automated QC process to gain visibility into its supply chain and improve product quality:"



███████████████████████████████████

*Id.* at 11745-46.  Zest taught Walmart the use of ██████████████████████

████████████████████████████████████████████████████ *Id.*

at 11746.

Zest taught Walmart how to manage its ██████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Id.* at 11748.

████████████████████████████████████████

And Zest taught Walmart that the Zest technology was useful for ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ *Id.*

at 11749. Zest also taught Walmart about RFID, Bluetooth, and WiFi sensor technologies for

accomplishing Walmart's QC and freshness objectives. *Id.*

It is thus apparent that Zest used its confidential information and trade secrets to teach

Walmart how to improve Walmart's archaic processes. At the time, Walmart conceded that it

lacked ███████████████████ and wanted technology beyond just ███████████████

███████████████████ given the issues present in Walmart's supply chain. *See* Dkt. No.

205 – Trade Secret MSJ Brief Ex. E8, ZEST_ECOARK0015763.

Walmart's summary judgment motion seeks to distinguish between two of its QC

applications ("Inspect" and "Almanac") and its other related efforts to design, develop, and deploy

an ecosystem that had at its heart a "freshness indicator" for use by a shelf life

predictor/model/algorithm. But the summary judgment record is clear: Eden/Muse is and has

been Walmart's effort to reduce fresh food loss through all means, including QC, shelf life

prediction, intelligent routing, freshness indicator, etc. And it is clear that Walmart's efforts are

not limited to QC at its DCs. Walmart's contemporaneous documents confirm that it developed a

solution from the farms/suppliers to the Walmart DCs to the Walmart stores:



P.R.E. 17, WM00017269-282 at 17271; *see also* P.R.E. 30, WM00016917-931 at 16919.

Based on the teachings in Zest's confidential information, Walmart designed Eden's applications to have the ability to predict shelf life at the DC. *See* P.R.E. 29, WM00009544-546:

███████████████████████████████████████

Beginning in 2016, Walmart started evaluating how to integrate Zest with Walmart's Eden system.  *See* P.R.E. 71, ZEST_ECOARK0028775.  When that effort first began around August 1, 2016, Eden was not functional.  *See* P.R.E.57, WM00085261; Dkt. No. 205 – Trade Secret MSJ Brief Ex. D16, WM00060621.   In fact, Eden was not even tested until September 30, 2016.  *See* P.R.E. 1, Bohling Deposition at 163:19-21.   And around that same time Walmart was testing Eden at the same locations that Zest technology was being tested. *See* P.R.E. 47, WM00069182 at 185 (October 17, 2016 Core Working Group Meeting, slide presentation).



Walmart spent several months before launching Eden to gather detailed information about the Zest Solution under the pretext of integrating Zest with Eden.  *See* P.R.E. 86, WM00061621.

**3.**     ***Walmart received Zest's confidential information and trade secrets, while at the same time, Walmart Secretly, Designed, Developed, and Began Implementing Eden/Muse—Walmart's Stolen System for Reducing Fresh Food Loss.***

For years, Walmart had extensive access to Zest's confidential information, including Zest's trade secrets. *See* Dkt. 211 (Zest's Contract MSJ SOMF) at ¶ 1(a)-(f); Dkt. No. 206 (Zest's Trade Secret MSJ SOMF) at ¶¶ 2-4; Dkt. No. 209 (Zest's Trade Secret MSJ Brief) at 15; Dkt. No. 207 (Zest's Confidentiality MSJ SOMF) at ¶ 2.  During that time, Walmart has developed, designed, and implemented its Eden/Muse ecosystem, which included QC designed to enable data and workflow management from a single device, decrease manual processes, assist in predicting shelf life at the DC, and assist in risk based inspection.  *See* WM00009544-546:



The following graphic shows some of the unfettered access that Walmart personnel—including VP of QC Tilmon, VP of Supply Chain Technology Musani,

"Walmart Labs" Program Manager Terry Shiery, and the named inventors on the Walmart

Applications had to Zest's confidential and trade secret information[7]:



[7] P.R.E. 45 (1. WM00067657); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D12 (WM00035711); Dkt. No. 205 – Trade Secret MSJ Brief Ex. E3 (3. ZEST_ECOARK0012362); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D15 (4. WM00060591); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D31 (6. WM00082112); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D18 (7. WM00063358); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D10 (8. WM00028510); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D4 (9. WM00001948); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D24 (10. WM00071410); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D32 (11. WM00138818); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D33 (12. WM00173718); Dkt. No. 205 – Trade Secret MSJ Brief Ex. E14 (13. ZEST_ECOARK0022853); Dkt. No. 205 – Trade Secret MSJ Brief Ex. D9 (14. WM00016731); Dkt. No. 205 – Trade Secret MSJ Brief Ex. E14 (15. ZEST_ECOARK0022853); Dkt. No. 205 – Trade Secret MSJ Brief Ex. E10 (16. ZEST_ECOARK0017471); Dkt. No. 205 – Trade Secret MSJ Brief Ex. E9 (17. ZEST_ECOARK0016685); Dkt. No. 209 – Breach of Contract MSJ Brief Ex. 8 (18. WM00075959); P.R.E. 7 Jeff Kerbs Depo at 117:5-18.

PUBLIC VERSION

███████████████████████████████████████████

Under the 2015 NDA, Walmart was required to ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ Dkt. No. 211, Contract MSJ SOMF at ¶ 1(a)-(f).

But Walmart improperly used Zest's confidential information without Zest's consent or

knowledge. Dkt. No. 211, Contract MSJ SOMF at ¶ 3 (a)-(h); *see also* Zest's Contract MSJ Brief

at 4-9. Walmart improperly disclosed Zest's confidential information to third parties in violation

of the contract. Dkt. No. 209, Contract MSJ SOMF at ¶ 4(a)-(c); Dkt. No. 211, Contract MSJ

Brief at 9-13; Dkt. No. 209, Confidentiality MSJ SOMF at ¶ 1-2; Dkt. No. 207, Trade Secret MSJ

SOMF at ¶¶ 1-4. And Walmart improperly disclosed Zest's confidential information to Walmart

personnel who were not evaluating Walmart's transaction with Zest. Dkt. No. 211, Contract SJ

SOMF at ¶ 5(a)-(e); Dkt. No. 194, Trade Secret SOMF at ¶ 4.

Walmart gained access to Zest's confidential information, including information about

Zest's ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ *See* Dtk. No. 205 and 194 (Zests MSJ Brief and related statement of

undisputed facts).

Walmart specifically conceded the following:

███████████████████████████████████████

- Walmart did not ████████████████ than Zest to affect both ██████████

  ████████████████████████████████████████████

  P.R.E. 27, WM00005381;

- Zest is the ████████████ in Walmart's ████████████████████████ P.R.E.

  38 WM00047788;

- Walmart USA CEO Foran ████████████████████████████████████

  ██████ given that—at the time—Walmart had ████████████████████████

  WM00065879 (emphasis added);

- Walmart realized that ████████████████████████████████████████

  P.R.E. 44, WM00065879 (emphasis added); and

- Walmart was not confident that it could independently develop a shelf life

  algorithm without Zest (████████████████████████████████████████

  ██████████████████████████████████ Dkt. No. 205

  – Trade Secret MSJ Brief Ex. D13, WM00058111.

Through it all, Walmart persisted in accessing and using Zest's confidential information and

trade secrets:

- ████████████████████████████████████████████████

  ██████████████████████████████ P.R.E. 35, WM00040675;

- ████████████████████████████████████████████████

  ██████████████████████████████ P.R.E. 40, WM00059316;

- ████████████████████████████████████████████

  ██████████████████████ P.R.E. 41, WM0060446.

55

●  ███████████████████████████████████████████

███  P.R.E. 53, WM00075211.

In doing so, Walmart continued to violate the law of trade secrets, contracts, fraud, and other torts by repeatedly misusing Zest's confidential information and misappropriating Zest's trade secrets.  As additional examples, the record shows that Walmart

- Used Zest's confidential and trade secret information in its internal efforts to develop a freshness indicator.  Dkt No. 211, Contract MSJ SOMF at ¶ 3(a);

- Planned from the beginning to feed its freshness indicator data into its revamped QC system and process.  *See* Walmart Omnibus Ex. 35 at 2;

- Used Zest's confidential and trade secret information in its internal Dynamic Shelf Life Program.  Dkt No. 211, Contract MSJ SOMF at ¶ 3(b);

- Used Zest's confidential and trade secret information to create Walmart's retention sampling guidelines.  Dkt No. 211, Contract MSJ SOMF at ¶ 3(c)-(g);

- Used Zest's confidential and trade secret information in preparing the contents of the Walmart Applications filed at the United States Patent Office in 2017 and 2018.  *See* Dkt No. 205, Trade Secret MSJ Brief at 15-17;

- Disclosed Zest's confidential and trade secret information to third parties at Walmart vendor AT Kearney.   Dkt No. 211, Contract MSJ SOMF at ¶ 4;

- Disclosed Zest's confidential and trade secret information in the Walmart Applications filed at the United States Patent Office in 2017 and 2018, the latter of which was published in 2019.  Dkt No. 205, Trade Secret MSJ Brief at 16; Dkt No. 194, Trade Secret MSJ SOMF at ¶¶ 1-5;

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

- Serially violated its own Global Policy on Ethics by misusing and disclosing Zest's confidential information, including Zest's trade secrets.  *See* Dkt. No. 211, Contract MSJ SOMF at ¶¶ 1, 3, 5; Dkt. No. 205, Trade Secret MSJ Brief at 16-17.

Internal documents show that Walmart understood the legal disaster created by its use of Zest confidential information and trade secrets in designing, developing, implementing, and publishing disclosures about the Eden/Muse ecosystem:

- Walmart internally ■■■■■■■■■■■■■■■■■■■■ ■■■■■■■ P.R.E. 50, WM00069918 (emphasis added); and

- Walmart was ■■■■■■■■■■■■■■■■■■■■■■■■■■■■ P.R.E. 51, WM00073926 (emphasis added);

Walmart also conceded that its March 1, 2018 publication about saving $2 billion with Eden/Muse over five years led to ■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■ with Zest.  P.R.E. 32, WM00017936 (emphasis added).

### 4. *Walmart published the details of Zest's trade secrets and confidential information in the Walmart Application.*

Walmart's misappropriations were not limited to using Zest's confidential information and trade secrets in designing, developing, and implementing Eden/Muse. Walmart also misappropriated Zest's confidential information and trade secrets in preparing and filing the Walmart Applications in 2017 and 2018, the latter of which was published in 2019.  *See* Dkt. No. 205, Trade Secret MSJ Brief at 15-17; Dkt. No. 194, Trade Secret MSJ SOMF at ¶¶ 1-5.

The publication of the Walmart Application containing Zest trade secrets caused the ultimate damage to the trade secrets – it destroyed them.  *See In re Iowa Freedom of Information*

57

*Council*, 724 F.2d 658, 662 (8th Cir. 1983) ("Trade secrets are a peculiar kind of property. Their only value consists in their being kept private. If they are disclosed or revealed, they are destroyed."); *Zitan Techs., LLC v. Liang Yu*, 2019 U.S. Dist. LEXIS 3067, *9-10, 2019 WL 95779 (D. Nev. Jan. 3, 2019) ("Public disclosure of a trade secret destroys the information's status as a trade secret.  This harms the trade secret owner by both depriving him of a property interest . . . and by allowing his competitors to reproduce his work without an equivalent investment of time and money. Disclosure of non-trade secret confidential information is similarly recognized as a serious harm."); *Southwestern Energy Co. v. Eickenhorst*, 955 F. Supp. 1078, 1085 (W.D. Ark. Mar. 18, 1997) ("The comments to the Act make clear that the 'use/disclosure' vein of the misappropriation definition allows for either aspect to qualify. The comments explain that 'because the trade secret can be destroyed through public knowledge, the unauthorized disclosure of a trade secret is also a misappropriation.'").  "[C]ourts have acknowledged that 'it is axiomatic that unprotected disclosure of a trade secret destroys the secret….' And they have consistently noted that the impact on the value of a trade secret 'often will not be readily compensable in damages because of the difficulties involved in valuing the consequences of the destruction of a trade secret.'"  *InnoSys, Inc. v. Mercer*, 364 P.3d 1013, 1021 (Utah 2015) (citations omitted); *see V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120, 1126 (D. Nev. 2013) ("Specifically, '[p]ublic disclosure of a trade secret destroys the information's status as a trade secret.'  Such destruction causes irreparable harm to the trade secret owner 'by both depriving him of a property interest and by allowing his competitors to reproduce his work without an equivalent investment of time and money.'") (citation omitted); *Precision Plating & Metal Finishing Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262, 1263 (5th Cir. 1970) (public disclosure of a secret process can amount to "complete destruction of the value of the process").

58

███████████████████████████████████

To provide one example of the devastating effect of Walmart's disclosures, Zest had taught

Walmart the need for obtaining field-level data, such as ████████████████████████

████████████████████████████████████████████████

██████████████████████████████████



P.R.E. 25, WM00002651.

And Walmart disclosed that information to the world:  the lead inventor on the Walmart

Applications admitted under oath that the slide above (in the pre-harvest box) describes the pre-

harvest data in Paragraph 19 of his Walmart Application. P.R.E. 1, Bohling Depo at 231:8-232:5.

The importance of this information to Zest – and the depth of Walmart's theft - is shown by

Walmart's copying and re-use of the slides shown above in "Walmart" presentations.  These

presentations copy the slides word for word,  except that Walmart, replaces Zest Heading and

"confidential" label with <u>Walmart headings and Walmart "confidential" labels</u>:

59



P.R.E. 34, WM00032712 at 731.

**5.**     *Now, on the eve of trial, Walmart claims that it abandoned plans to deploy some aspects of the trade secrets—but only after using and disclosing them to the world.*

After learning the value and importance of determining remaining shelf life (i.e. freshness of a product) from Zest, Walmart incorporated a freshness indicator into the design of its Eden/Muse ecosystem—so that Walmart could ███████████████████████ ████████████████ i.e., from farm to store.

60



P.R.E. 59, WM00093867 at 76.



███████████████████████████████████

As Walmart acknowledged before the lawsuit was filed, ██████████████████

████████████████████████████████████████████████████

P.R.E. 59, WM00093867 at 77.  Indeed Walmart dubbed the freshness indicator as the ██████

████" of Eden/Muse.



P.R.E. 14, Plaintiffs' Deposition Exhibit 398 at WM00017277.  This freshness indicator that is the

████████████ of Eden/Muse comprises the Zest trade secrets disclosed by the Walmart Application,

as illustrated in figure 1 of the Walmart Application and the following slide.

62



*See* P.R.E. 14, Plaintiffs' Deposition Exhibit 398 at WM00017276. The first named inventor on the Walmart Application testified that it is Walmart's goal to deploy Eden's ███████ – the freshness indicator:



63

P.R.E. 1, Deposition of Joshua Bohling at 109:1-11.



P.R.E. 1, Deposition of Joshua Bohling at 187:24-188:11.

As shown above, Walmart used Zest's confidential and trade secret information in its freshness indicator development efforts. *See* Dkt. No. 211, Contract MSJ SOMF at ¶ 3(a). Walmart's Dynamic Shelf Life Program also made use of the Zest technology. Dkt. No. 211, Contract MSJ SOMF at ¶ 3(b). Walmart so valued these aspects of Zest's confidential information and trade secret information that it filed the Walmart Applications on them—to obtain a 20-year monopoly on the technology. Filing the Walmart Application disclosed the Zest confidential information and trade secrets to the U.S. Patent Office. Causing the Patent Office to publish the Walmart Application disclosed the technology to the world. *See* Dkt. No. 205, Trade Secret MSJ Brief at 15-17; Dkt. No. 194, Trade Secret MSJ SOMF at ¶¶ 1-5.

As silently as it had stolen the freshness indicator technology, Walmart now tries to use its damages expert to announce that it has no "current" plans to deploy the freshness indicator during the litigation. But "use" under the ATSA and DTSA does not require deployment, and Walmart's

damages expert Dr. Choi was unable to confirm whether Walmart is actually currently using Zest's

confidential and trade secret information in further development of its freshness indicator:



P.R.E. 4, Choi Depo 87:14-20; 88:4-23.  As shown above, the purported "inventor" of Walmart's

freshness indicator has testified repeatedly that it is still Walmart's goal to install the freshness

indicator as the ███████████ of Eden/Muse.

Walmart's decision to postpone the full deployment of the freshness indicator has no effect

on Zest's damages in this case.  *See In re Iowa Freedom of Information Council*, 724 F.2d 658,

662 (8th Cir. 1983) ("Trade secrets are a peculiar kind of property. Their only value consists in

their being kept private. If they are disclosed or revealed, they are destroyed."); *Zitan Techs., LLC

v. Liang Yu*, 2019 U.S. Dist. LEXIS 3067, *9-10, 2019 WL 95779 (D. Nev. Jan. 3, 2019) ("Public

disclosure of a trade secret destroys the information's status as a trade secret.  This harms the trade

secret owner by both depriving him of a property interest . . . and by allowing his competitors to

reproduce his work without an equivalent investment of time and money. Disclosure of non-trade

secret confidential information is similarly recognized as a serious harm.").

### 6.    *Walmart attempts to avoid trial on compensable damages by creating a false construct on misappropriation.*

Given the foregoing evidence, Walmart's motion for summary judgment should be denied

because its false construct on misappropriation seeks to obscure the triable issues on compensable

damages.  Walmart's assertion that it did not "use" Zest's trade secrets merely because Walmart

claims that it has not yet "deployed" a product incorporating <u>all</u> of Zest's trade secrets does not

resolve the genuine fact disputes over the scope of (and impact/damages from) Walmart's

widespread misappropriation of trade secrets, misuse of confidential information, breaches, fraud,

and other misconduct.  Walmart's false construct flies in the face of both the ATSA and the DTSA,

both of which recognize separate and distinct claims – one based on "use" and the other based on

66

"disclosure" of the trade secrets.   Walmart's completely ignores the disclosure prong of Plaintiffs'

misappropriation claims.   "The statute separates 'use' from 'disclosure' and either or both may

support an action."  *Southwestern Energy Co. v. Eickenhorst*, 955 F. Supp. 1078, 1084 (W.D. Ark.

1997), *aff'd, mem.* 175 F.3d 1025 (8th Cir. 1999).

Under the law, Walmart has used Zest's trade secrets in many ways other than  copying

them verbatim into a deployed product.  For example, one form of trade secret use is creating a

new product—like Eden/Muse—that could not have been created without using the trade secret,

regardless of whether the product incorporates every aspect of the trade secret.  *See Mangren*

*Research & Dev. Corp. v. National Chem. Co*., 87 F.3d 937, 944 (7th Cir. 1996) (holding that

defendants "misappropriated Mangren's trade secrets even if defendants created a new product if

defendants could not have done so without use of Mangren's trade secret").  Another form of trade

secret use is relying on or consulting the trade secrets as a helpful starting point for the

development process.  *See Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584

F.2d 946 (10th Cir. 1978) ("Based on the evidence, a jury could reasonably infer that [the trade

secret] was helpful to Smalling as a starting point for his calculations . . . . If nothing else, a jury

could find that Smalling did not have to experiment with the broad range of disclosed coefficients

to determine the proper starting point.").  Another form of trade secret use is applying the lessons

the defendant learned from the trade secrets in developing the defendant's product or system.  *See*

*Waymo LLC v. Uber Techs., Inc*., No. C 17-00939 WHA, 2018 WL 466510, at *10 (N.D. Cal. Jan.

18, 2018) ("Of course, a defendant need not copy the underlying technology to use the

misappropriated trade secret. For example, a defendant might use a negative know-how trade

secret by taking its lesson to avoid developing apparently fruitless technology. Such theories,

however, remain grounded in defendants' alleged use of trade secrets . . . .");  *see also Lamb-*

67

*Weston, Inc. v. McCain Foods*, *Ltd*., 941 F.2d 970, 974 (9th Cir. 1991) ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained.").

Walmart's current position—that there is no compensable damage because its experts opine that Walmart has not copied Zest's trade secrets verbatim into a deployed product or system—is an incorrect and impermissibly inflexible interpretation of the law. *See In re Innovative Constr. Sys., Inc*., 793 F.2d 875, 887 (7th Cir. 1986) ("Were the law of trade secrets not flexible enough to reach the modifications in the instant case, when it is evident that the formulas were substantially derived from Innovative's, it would indeed be hollow.").

In this case, Walmart's misappropriations (by use and disclosure), breaches, frauds and other misconduct are extensive.  Which brings us to the question of damages:  how Zest should be compensated for the loss of use of its trade secrets, the misuse of its confidential information and trade secrets, the loss of the benefit of the bargain under the parties' NDA, and Walmart's fraud throughout the relationship.

> **7.     *Given the scope of Walmart's misconduct (including misappropriation by use and disclosure, breaches, fraud and other misdeeds), it is beyond reasonable dispute that Zest has been damaged in an amount that must be determined by a jury.***

Given the foregoing, Walmart's motion for summary judgment should be denied because Plaintiffs have plainly been damaged and their estimates of that damage are reasonable in light of the available evidence. The scope of Walmart's misconduct in this case calls for a remedy in damages, and the amount of damages will need to be decided by a jury at trial.

It is undisputed that ███████████████████████████████████████ and that—before the lawsuit was filed—Walmart believed about $2 billion of that loss each year ██ ████████



P.R.E. 59, WM00093868.  To achieve those billions of dollars in savings, Walmart used Zest's confidential information and trade secrets to develop Eden/Muse, including the development of its "Freshness Indicator. "  P.R.E. 59, WM00093875.

The $2 billion savings repeatedly estimated and embraced by Walmart, including by its VP of Supply Chain Development on March 1, 2018, is truly a conservative estimate of the benefits to Walmart from its massive and pervasive misconduct in this case.   *See* P.R.E. 15, Plaintiff's Depo Ex. 52.  Walmart has repeatedly estimated that Eden/Muse would generate $2 billion in savings to Walmart over five years—or at least $400 million per year on average.  *See* P.R.E. 15, Plaintiff's Depo Ex. 52;  P.R.E. 37, WM00042804-815; at -805; P.R.E. 59, WM00093867-879; -868.  And Mr. Bohling testified that Walmart ████████████████████████ ███████████████████████████████ P.R.E. 1, Bohling Depo at 305-06.

PUBLIC VERSION

█████████████████████████████████████████

In fact, the $2 billion figure that Walmart repeatedly embraces may significantly understate the value of Zest's technology to Walmart.   After Walmart ranked 67th out of 68 retailers in a 2015 freshness study by *Consumer Reports*, Walmart concluded that ██████████████████ ████████████████████████████ *See* P.R.E. 36, WM00042212-250 at 42214.



██████████████████████████████████████████████████████

Walmart admitted that it ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ P.R.E. 36, WM00042212-250 at 42214.  Walmart recognized that it stood to gain

a ██████████ coming from improvements in Fresh.  *Id*.; *see also* WM00170300-362177 (emphasis

added).  Walmart has also admitted that ████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ P.R.E. 66, WM00170300-362 at 170309.  In fact, Walmart admitted its

need for █████████████████████████████████████████████████████

████████████████████████████████████████████████████████ P.R.E.

62,  WM00108039-089; *see also* P.R.E. 39, WM00057355-392.    And Walmart recognized that

its massive size and unlimited resources were ██████████ given that its competitors were already

████████████████

71

PUBLIC VERSION



P.R.E. 62, WM00108039-089 at 108047.

Walmart knew that enhancing its reputation for produce quality would give it enormous financial benefits.  One Walmart ▮▮▮▮▮▮▮▮ presentation in May 2015 stated that the ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ WM00170300-362 at 170314-16 (emphasis added).  A July 2016 Walmart presentation stated that sales can increase by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ P.R.E. 36, WM00042212-250 at 42214.  Specifically, Walmart expected not just a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮.  Notably, Walmart expected that, of the ▮▮▮▮▮▮ in new sales from grocery sales, it expected ▮▮▮▮ would be driven by ▮▮▮▮▮▮▮▮ and ▮▮



██████ of that would be driven by ██████████ *Id.* Walmart has also been pursuing its ██████ ██████████ to bring its market share in Fresh departments up to its overall food market share. P.R.E. 61, WM00098370-417 at 98377. As of December 2016, Walmart estimated that reaching that objective ████████████████████████████ P.R.E. 61, WM00098370-417 at 98377. Another ██████████ presentation in May 2017 estimated that Walmart has the potential for ████████████████████████ ████████████████████████ P.R.E. 62, WM00108039-089 at 108041, 108043, 108051; *see also* P.R.E. 39, WM00057355-392.

To assist the jury in assessing damages, Plaintiffs submitted the expert testimony of Dr. Stephen Becker and Mark Lanning. Mr. Lanning has testified that Walmart received **at least** a three-year head start in its Eden/Muse development efforts due to the misappropriation and misuse of Zest confidential information. Lanning Depo at 278:16-282:18. Those years of saved time represent the benefit to Walmart of eliminating a significant portion of the research, development, and design time (and trial-and-error processes that were) required for the Eden/Muse ecosystem. *Id.*

To calculate the damages, Dr. Becker did <u>not</u> multiply Walmart's own estimates of the annual benefits of winning in "Fresh" technology—the ██████████, the ██████████ the ██████████ or the ██████████ cited above—by three years. He was much more conservative, using Walmart's financial and sales data, Zest's pricing and business plans, other evidence produced in the case, and uncontroverted economic principles to opine on three alternative measures of Zest's damages: (1) how much benefit Walmart has unjustly obtained from its misconduct; (2) the amount of Zest's actual losses from Walmart's misconduct; and (3) the amount of a reasonable royalty to compensate for Walmart's misconduct. The calculations in measure (1) and (3) are informed by

73

████████████████████████████████

the aforementioned three-year head start that Walmart got from its misconduct. The summary judgment record on each measure is discussed in turn below, each of which confirms the existence of genuine issues of material fact requiring a trial on damages.

**8.    *Plaintiffs' unjust enrichment damages were proximately caused by Walmart.***

Defendant's motion for summary judgment should be denied because the evidence presented by Zest confirms that there are genuine disputes of material fact regarding Walmart's unjust enrichment. Many of the facts that Walmart asserts are undisputed are, in fact, disputed. The following assertions of fact on pages 32-34 of Walmart's motion are squarely in dispute:

- "Those applications were developed after Zest was eliminated … because Zest did not even pitch a QC digitization solution." Motion at 32-33.

  - This alleged fact is disputed, *see* Zest's Response to SUMF #15 and #16. *See also supra* at IV.E.2 and below.

- "Inspect and Almanac were independently developed in 2015 and were rolled out to Walmart's DCs in early 2017. That was before Zest made many of its alleged disclosures of trade secrets to Walmart." Motion at 33.

  - This alleged fact is disputed, *see* Zest's Response to SUMF #58. *See also supra* at IV.E.2-3 and below.

- "As Mr. Lanning … admitted, Inspect and Almanac are ████████████████ ████████████████████████████ and he offered no opinion that the use or development of those applications implicates any Zest trade secrets." Motion at 33.

██████████████████████████████████

- o This alleged fact is disputed, *see* Zest's Response to SUMF #56. *See also supra* at IV.E.2-3 and below.

- "There is no genuine dispute that Inspect and Almanac were developed independently of, and without using, any of the alleged trade secrets, none of which are directed to 'automating the QC paper process.'" Motion at 33.

  - o This alleged fact is disputed, *see* Zest's Response to SUMF #59. *See also supra* at IV.E.2-3, and below.

- "Dr. Becker relied entirely on the alleged waste savings that were attributable to Walmart's use of Inspect and Almanac—two applications that indisputably do not use the alleged trade secrets and were not created using any of the trade secrets." Motion at 33.

  - o This alleged fact is disputed, *see* Zest's Response to SUMF #59. *See also supra* at IV.E.2-3 and below.

- "Walmart's use of Inspect and Almanac is the sole measure of Plaintiff's unjust enrichment damages." Motion at 32.

  - o Defendant provided no support for this in its Statement of Undisputed Material Facts. Despite Walmart's failure, this alleged fact is disputed, *see supra* at IV.E.4 and 6 and below.

- "The benefits that Walmart received from [Inspect and Almanac] could not have caused any injury to Plaintiffs." Motion at 33.

  - o Defendant provided no support for this in its Statement of Undisputed Material Facts. Despite Walmart's failure, this alleged fact is disputed, *see supra* at IV.E.2-3 and 6 and below.

███████████████████████████████████████████████████

- ● "Dr. Becker admitted that his unjust enrichment damages analysis was conducted

███████████████████████████████████████████████████

   ████████  Motion at 33

   - o Defendant provided no support for this in its Statement of Undisputed

      Material Facts.  Despite that, this alleged fact is disputed, *see* section IV.E.2

      and 8 above.  Dr. Becker simply assumed liability, as is appropriate for a

      damages expert under the law.  Walmart's damages expert stated that he

      did the same.  Choi Depo at 266:12-267:14.

Walmart's entire argument is based on the premise that "there is no genuine dispute that Inspect and almanac were developed independently of and without using any of the alleged trade secrets, none of which are directed to 'automating the QC paper process.'"  Walmart MSJ at 33. As shown above, that issue is disputed, *see supra* at IV.E.2-3 and 8.   But Walmart insupportedly concludes that the "benefits that Walmart received from those applications thus could not have caused any injury to Plaintiffs."  Walmart MSJ at 33.   But Walmart has presented no evidence on that assertion, and thus because Plaintiffs have presented evidence showing a genuine issue of material fact as to the use of Zest confidential information in the development of Eden/Muse or Inspect or Almanac, then Walmart's motion must be denied.  "If the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, a no-evidence summary judgment cannot properly be granted." *Smith v. O'Donnell*, 288 S.W.3d 417, 424, 2009 Tex. LEXIS 455, 52 Tex. Sup. J. 958 (Tex. 2009).  Plaintiff has advanced much more than a scintilla of evidence here.  There is a genuine dispute of material fact on these issues:  on February 7, 2017, Terry Shiery emailed Josh Bohling and Riley Turben (inventors on the Walmart

PUBLIC VERSION

Application, and Eden/Muse developers) two slides showing Chuck Tilmon's (Walmart's Vice President of Quality Control) vision for Eden:



*See* P.R.E. 29, WM000009544.  Mr. Tilmon's ▇▇▇ for Eden is depicted in the second slide of the attached presentation:



*See* P.R.E. 29, WM000009546. Mr. Tilmon first states that ███████████████████

██████████████████████████████  According to Walmart's Motion, Inspect and

Almanac are only deployed for QC at the DC. But Mr. Tilmon's vision states that EDEN will be

developed for the entire supply chain, exactly as taught by Zest's confidential information and

trade secrets. Each element of Mr. Tilmon's vision for EDEN uses Zest confidential information

provided to Walmart.

The first element for EDEN is labeled ██████████  Mr. Tilmon describes that aspect of

Eden as advanced shipment notifications and product traceability.

Zest provided Walmart with confidential information regarding advance shipment

notification and how those notifications integrate and interact with Walmart's other systems in

Dkt. No. 205 – Trade Secret MSJ Brief Ex. E7, ZEST_ECOARK0015198-220 at 218-19 (below).

PUBLIC VERSION



Zest provided Walmart with confidential information regarding product traceability in

Dkt. No. 205 – Trade Secret MSJ Brief E13, ZEST_ECOARK0021544-58 at 49 (below):



The second element for EDEN is labeled ██████████ Mr. Tilmon describes that aspect of Eden as including real-time supplier quality data and field quality inspection information. Zest provided Walmart with confidential information regarding real-time supplier quality data and field quality inspection information in Omnibus Ex. No. 43, ZEST_ECOARK0012155 at 62 (below):



The third element for EDEN is labeled ███████████████ Mr. Tilmon describes that aspect of Eden as including more accurate inventory quality pull and temperature recorder uploads. Zest provided Walmart with confidential information regarding more accurate inventory quality pull in the form of directed QC including alerts for out of compliance shipments in P.R.E. 67, ZEST_ECOARK0011734 at 11748 (below):

81



Zest provided Walmart with confidential information regarding temperature recorder uploads in Dkt. No. 205 – Trade Secret MSJ Brief Ex. E7, ZEST_ECOARK0015198-220 at 218 (below):

PUBLIC VERSION



Zest provided Walmart with confidential information regarding temperature recorder uploads in Dkt. No. 205 – Trade Secret MSJ Brief Ex. E13, ZEST_ECOARK0021544-58 at 49 (below):

PUBLIC VERSION



The fourth element for EDEN is labeled ██████ Mr. Tilmon describes that aspect of Eden as including communications with Sourcing and buying teams regarding quality issues.  Zest provided Walmart with confidential information regarding communications with Sourcing and buying teams regarding quality issues (which include GLS and GRS systems) in Dkt. No. 205 – Trade Secret MSJ Brief Ex. E7, ZEST_ ECOARK0015198-220 at 218-19 (below):

84

PUBLIC VERSION



As demonstrated above, all of the aspects of Mr. Tilmon's development plan for Eden are derived from confidential information that Zest shared with Walmart before to Mr. Tilmon articulated his new vision for Eden to Mr. Bohling and Mr. Turben.  But Mr. Tilmon also emphasized the then-current operations of Eden, which he labeled Quality Control with an arrow labeled "Now:"



Those current aspects of Quality Control that were housed in Inspect and Almanac include the four bullet points in the box next to Quality Control as well as the items in the box in the center of the diagram. Many of these items were also learned by access to Zest confidential information and trade secrets:

- ████████████████████ See Dkt. No. 205 – Trade Secret MSJ Brief Ex. E11, ZEST_ ECOARK00019320 at 327 (RSL at DC receiving equals predicted remaining shelf life at DC receiving):

PUBLIC VERSION



- Exception management.  See Dkt. No. 205 – Trade Secret MSJ Brief Ex. E11, ZEST_ ECOARK00019320 at 331:



- Risk based inspections in the form of enhanced QC. *See* Dkt. No. 205 – Trade Secret MSJ Brief Ex. E7, ZEST_ECOARK0015198-220 at 218; and WM00076417 (below):

PUBLIC VERSION



- Data and workflow managed through a single device. See Dkt. No. 205 – Trade Secret MSJ Brief Ex. E13, ZEST_ECOARK0021544-58 at 49 (below):

PUBLIC VERSION



- Exception alerting. *See* Dkt. No. 205 – Trade Secret MSJ Brief Ex. E8, ZEST_ECOARK00015761 at 771 (below):



- Image Capture. *See* Dkt. No. 205 – Trade Secret MSJ Brief Ex. E8, ZEST_ECOARK00015761 at 771 (below):



PUBLIC VERSION

And around that same time, Walmart was testing Eden/Muse at the same locations that Zest technology was being tested. *See* P.R.E. 47, WM00069182 at 185 (October 17, 2016 Core Working Group Meeting, slide presentation).  While Walmart claims that the only portions of Eden/Muse that were deployed were Inspect and Almanac, Walmart desired to test Eden in parallel with Zest:



It is beyond reasonable dispute that, as of February 2017, Eden/Muse and its applications were designed and deployed using Zest confidential and trade secret information.  Walmart's entire

92

causation argument is based on the false premise that "there is no genuine dispute that Inspect and Almanac were developed independently of and without using any of the alleged trade secrets, none of which are directed to 'automating the QC paper process.'" Walmart MSJ at 33. As shown above, there is ample evidence and a genuine issue of material fact that Inspect and Almanac were developed using Zest confidential information and trade secrets. There is no credible summary judgment argument from Walmart: genuine fact issues exist that require the jury to decide Zest's unjust enrichment damages case.

### 9.    *Plaintiffs' actual losses were proximately caused by Walmart.*

Defendant's motion for summary judgment should be denied because genuine disputes of material fact exist on Plaintiffs' claim for lost profits, many of them confirmed by the lack of <u>any</u> purported undisputed fact in Walmart's proffered statement of facts. The following assertions of fact on pages 35-36 of Walmart's motion are squarely in dispute:

- "Notably, Dr. Becker does not identify any instance when Walmart actually used any [misappropriated] information."

  o Defendant provided no support for this assertion in its Statement of Undisputed Material Facts or in its Motion. Despite that, this alleged fact is disputed, *see* section IV.E.2-3, 5-6 and 8 above. Setting aside Walmart's strawman inference that it was <u>Dr. Becker's</u> (the <u>damages</u> expert's) duty to identify Walmart's acts of misappropriation—and Walmart's repeated failure to recognize that the law defines misappropriation as much broader than just deployment, Walmart's argument still raises genuine issues of material fact. Walmart's actual use of misappropriated information is

93

████████████████████████

proven and discussed *supra*. And to be clear, as is appropriate, Dr. Becker assumed liability and then proceeded to assess damages. Walmart's damages expert stated that he did the same thing. Choi Depo at 266: 12-267:14. That is what damages experts do.

- "There is no nexus between Walmart's activities with respect to the Bohling Application and any lost profits to Plaintiffs …." Motion at 35.

  o Defendant provided no support for this assertion in its Statement of Undisputed Material Facts or in its Motion. This assertion is not actually a fact; it is legal argument with no factual support provided. And it is a disputed assertion because the damage to Zest from Walmart's disclosure of Zest's trade secret and confidential information is axiomatic under the law. Walmart's publication in the Walmart Application caused the ultimate damage to Zest– it destroyed the trade secrets. *See In re Iowa Freedom of Information Council*, 724 F.2d 658, 662 (8th Cir. 1983) ("Trade secrets are a peculiar kind of property. Their only value consists in their being kept private. If they are disclosed or revealed, they are destroyed."); *Zitan Techs., LLC v. Liang Yu*, 2019 U.S. Dist. LEXIS 3067, *9-10, 2019 WL 95779 (D. Nev. Jan. 3, 2019) ("Public disclosure of a trade secret destroys the information's status as a trade secret. This harms the trade secret owner by both depriving him of a property interest . . . and by allowing his competitors to reproduce his work without an equivalent investment of time and money. Disclosure of non-trade secret confidential information is similarly recognized as a serious harm."); *Southwestern Energy Co. v. Eickenhorst*,

94

███████████████████

955 F. Supp. 1078, 1085 (W.D. Ark. Mar. 18, 1997) ("The comments to the Act make clear that the 'use/disclosure' vein of the misappropriation definition allows for either aspect to qualify. The comments explain that 'because the trade secret can be destroyed through public knowledge, the unauthorized disclosure of a trade secret is also a misappropriation.'"). "[C]ourts have acknowledged that 'it is axiomatic that unprotected disclosure of a trade secret destroys the secret….' And they have consistently noted that the impact on the value of a trade secret 'often will not be readily compensable in damages because of the difficulties involved in valuing the consequences of the destruction of a trade secret.'" *InnoSys, Inc. v. Mercer*, 364 P.3d 1013, 1021 (Utah 2015) (citations omitted); *see V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120, 1126 (D. Nev. 2013) ("Specifically, '[p]ublic disclosure of a trade secret destroys the information's status as a trade secret.' Such destruction causes irreparable harm to the trade secret owner 'by both depriving him of a property interest and by allowing his competitors to reproduce his work without an equivalent investment of time and money.'") (citation omitted); *Precision Plating & Metal Finishing Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262, 1263 (5th Cir. 1970) (public disclosure of a secret process can amount to "complete destruction of the value of the process"). Walmart's destruction of the trade secrets is its own nexus:  the harm to Zest is readily compensable, and it may take the form of lost profits to give Zest the benefits it would have received in the but-for world, in exchange for

██████████████████████████████████████████

Walmart's purchase of the Zest technology, although that measure may not fully compensate Zest for the destruction of its trade secrets.

- "Walmart has not implemented any of the technology in the Bohling Application …." Motion at 35.

  o Defendant provided no support for this assertion in its Statement of Undisputed Material Facts. Despite Walmart's failure, this alleged fact is disputed, *see supra* at IV.E.4, 8.

- "There is no evidence that Dr. Becker's assumption of ████████████████████ ██████████████████████ would have given Walmart any access to any information disclosed in the Bohling Application." Motion at 35.

--and—

- "[E]ntering into such an agreement would not have given Walmart access to any of the information in the Bohling Application." Motion at 36.

  o Defendant provided no support for these assertions in its Statement of Undisputed Material Facts. Despite Walmart's failure, these alleged facts are disputed. As shown above, in the real world, Walmart obtained unfettered access to the confidential and trade secret information that it used and disclosed in the Walmart Applications. *See id.* The false assumption in Walmart's Motion (that Walmart would need to gain access to Zest's trade secrets in the but-for scenario of lost profits, *see* Motion at 35-36) is also irrelevant to the experts' damages analysis and the Court's analysis of the Motion. In the but-for scenario, Walmart does not need full access to the trade secrets because it is using Zest as a solutions provider and getting

96

████████████████████████████████

all of the requisite and appropriate benefits from the technology—as a Zest customer, while paying for the service. That is all the ████████████ ████████████ that Dr. Becker discusses in his report. *See* Walmart's Omnibus Ex. 24 at ¶ 79 ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████

- The "only benefits from the Eden project that had been achieved by January 1, 2017 were due to the Inspect and Almanac applications." Motion at 36.
  - o Defendant provided no support for this assertion in its Statement of Undisputed Material Facts. Despite Walmart's failure, this alleged fact is disputed, *see supra* at IV.E.2-3.

As Walmart has done elsewhere in the case, Walmart's again erects its false construct of what constitutes "misappropriation" in order to argue that proximate cause does not exist for Plaintiffs' lost profits claim. Walmart develops its false construct by arguing that there is no nexus between Walmart's activities with respect to the Walmart Application and any lost profits. Motion at 35.

97

First, Walmart claims it has not implemented any of the technology in the Walmart Application (i.e. Walmart has not used Zest trade secrets in a deployed product), and second Walmart claims that Insect and Almanac do not incorporate Zest technology. Both of Walmart's reasons for arguing no nexus exists fail to account for a simple truth – under both the ATSA and the DTSA, both of which recognize separate and distinct claims – one based on use and the other based on disclosure of a trade secret as they are separate and distinct claims. "The statute separates 'use' from 'disclosure' and either or both may support an action." *Southwestern Energy Co. v. Eickenhorst*, 955 F. Supp. 1078, 1084 (W.D. Ark. 1997), *aff'd, mem.* 175 F.3d 1025 (8th Cir. 1999).

Under the law, can misappropriate Zest's trade secrets in many ways other than merely copying them verbatim into a deployed product. For example, one form of trade secret use is creating a new product—like Eden/Muse—that could not have been created without using the trade secret, regardless of whether the product incorporates every aspect of the tradesecret. *See Mangren Research & Dev. Corp. v. National Chem. Co*., 87 F.3d 937, 944 (7th Cir. 1996) (holding that defendants "misappropriated Mangren's trade secrets even if defendants created a new product if defendants could not have done so without use of Mangren's trade secret"). Another form of trade secret use is relying on or consulting the trade secrets as a helpful starting point for the development process. *See Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d 946 (10th Cir. 1978) ("Based on the evidence, a jury could reasonably infer that [the trade secret] was helpful to Smalling as a starting point for his calculations . . . . If nothing else, a jury could find that Smalling did not have to experiment with the broad range of disclosed coefficients to determine the proper starting point."). Another form of trade secret use is applying the lessons the defendant learned from the trade secrets in developing the defendant's product or system. *See*

*Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2018 WL 466510, at *10 (N.D. Cal. Jan. 18, 2018) ("Of course, a defendant need not copy the underlying technology to use the misappropriated trade secret. For example, a defendant might use a negative know-how trade secret by taking its lesson to avoid developing apparently fruitless technology. Such theories, however, remain grounded in defendants' alleged use of trade secrets . . . ."); *see also Lamb-Weston, Inc. v. McCain Foods*, *Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained.").

Walmart's position—that there is no compensable damage because its experts opine that Walmart has not copied verbatim Zest's trade secrets into a deployed product or system—is an incorrect and impermissibly inflexible interpretation of the law. *See In re Innovative Constr. Sys., Inc.*, 793 F.2d 875, 887 (7th Cir. 1986) ("Were the law of trade secrets not flexible enough to reach the modifications in the instant case, when it is evident that the formulas were substantially derived from Innovative's, it would indeed be hollow.").

The nexus in this case is quite simple. Zest sought a contract to implement its system at Walmart. Walmart feigned interest and then refused to enter into that agreement, while at the same time using Zest's trade secrets to advance its internal projects, all in violation of the parties' NDA and applicable law. As a result, Zest has been damaged, including by Walmart's destruction of the trade secrets by disclosure and publication, which also damaged Zest by impairing its ability to protect its technology from competitors and attract customers. The fact issues abound, and they should be decided by the jury.

> **10.** **Plaintiff's reasonable royalty damages were proximately caused by Walmart.**

99

████████████████████████

Defendant's motion for summary judgment should be denied because it presents genuine disputes of material fact regarding Plaintiffs' reasonable royalty damages, many of them confirmed by the lack of <u>any</u> purported undisputed fact in Walmart's proffered statement of facts.   The following assertions of fact on pages 36-38 of Walmart's motion are squarely in dispute:

- "It is undisputed that the only applications of the Eden/Muse ecosystem that existed at that time (Inspect and Almanac) did not use and were not created using the alleged trade secrets."  Motion at 36-37.

  o This alleged fact is disputed, *see* Zest's Response to SUMF #59.  *See also supra* at IV.E.2-3, 5 and 8.

- "Walmart never made it past the initial planning stages for the development of any shelf-life algorithm, and those efforts have been completely abandoned."  Motion at 37.

—and—

- "Walmart has not implemented any of the concepts or technology discussed in the Bohling Application."  Motion at 37.

  o Defendant provided no support for these assertions in its Statement of Undisputed Material Facts.  The evidence that Walmart cites for the first assertion at page 37 of its brief is inadmissible and Plaintiffs object to that evidence.  *See* Zest's Response to SUMF #14.  In addition, Walmart's assertions on this point are disputed because Walmart actually did make "it past the initial planning stages for the development of any shelf-life algorithm" and "implemented" the concepts and technology when it filed two patent applications, representing to the U.S.P.T.O. and the world that

100

███████████████████████████████████████

the inventions were ready for patenting and had been reduced to practice. In other words, the filing of the Walmart Applications was Walmart's admission that its "inventors" had "(1) constructed an embodiment or performed a process that met all the limitations and (2) determined that the invention would work for its intended purpose." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1322 (Fed. Cir. 2019) (citing *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008)). And whether Walmart's efforts to deploy its freshness indicator have been "completely" abandoned is also in dispute; Walmart's expert Dr. Choi stated that there are no ████████ deployment plans and said that ███████████ is not the right word to describe the situation. Choi Depo 87:14-20; 88:4-23. These alleged facts are disputed, *see supra* at IV.E.5 and 8.

- "[A]ny proposed royalty for the use of Retain would need to be calculated with a hypothetical negotiation date of March 2019, as that is the first alleged use of that technology" and so "there is no basis for any pre-March 2019 reasonable royalty damages attributable" to it. Motion at 37.

  o Defendant provided no support for this assertion in its Statement of Undisputed Material Facts. Despite Walmart's failure, this alleged fact is disputed because Dr. Becker selected the date of the hypothetical negotiation correctly and based on the available evidence showing that January 1, 2017, as the date by which Walmart's use of the trade secret and confidential information had begun. Walmart Omnibus Ex. 24 at ¶ 78 & n.148. Courts have disallowed expert opinions that use multiple dates for

████████████

the hypothetical negotiations. *See, Laser Dynamics, Inc. v. Quanto computer, Inc.*, 694 F.3d 51, 61 (Fed. Cir. 2012) ("it makes sense that in each case there should only be a single hypothetical negotiation date, not separate dates."). Walmart's attempt to introduce a second date for the hypothetical negotiation is improper, does not establish the absence of genuine fact disputes, and is a basis for cross-examination—not judgment as a matter of law.

- "The publication of the Bohling Application cannot have proximately caused any loss of business to Zest starting in January 1, 2017 … because the Bohling Application did not publish until … May 16, 2019." Motion at 37.

  o Defendant provided no support for this assertion in its Statement of Undisputed Material Facts. Despite Walmart's failure, this alleged fact is disputed because Walmart was using Zest's technology before the application published. *See supra* at IV.E.2-3. Walmart's assertion on this point does not establish the absence of genuine fact disputes. It is ground for cross-examination—not judgment as a matter of law.

- "The only evidence of record therefore indicates that the publication of the Bohling Application has proximately caused no loss of business to Plaintiffs, and thus Plaintiffs are not entitled to double the per-pallet royalty on that basis." Motion at 38.

  o Defendant provided no support for this assertion in its Statement of Undisputed Material Facts. Despite Walmart's failure, this alleged fact is disputed, because it is axiomatic under the law that Walmart's disclosure

102

███████████████████████████████████████████

and publication of the trade secrets and confidential information destroyed the trade secrets. Walmart's publication in the Walmart Application caused the ultimate damage to Zest– it destroyed the trade secrets. *See In re Iowa Freedom of Information Council*, 724 F.2d 658, 662 (8th Cir. 1983) ("Trade secrets are a peculiar kind of property. Their only value consists in their being kept private. If they are disclosed or revealed, they are destroyed."); *Zitan Techs., LLC v. Liang Yu*, 2019 U.S. Dist. LEXIS 3067, *9-10, 2019 WL 95779 (D. Nev. Jan. 3, 2019) ("Public disclosure of a trade secret destroys the information's status as a trade secret. This harms the trade secret owner by both depriving him of a property interest . . . and by allowing his competitors to reproduce his work without an equivalent investment of time and money. Disclosure of non-trade secret confidential information is similarly recognized as a serious harm."). *See also supra* at at IV.E.4. The law thus repudiates Walmart's only substantive argument on reasonable royalty damages—that the royalty should not be doubled because Zest cannot show specific business opportunities lost because of the publication of the Walmart Application.

Walmart's destruction of the trade secrets demonstrates the basis for the ███████ royalty rate in this case, and it justifies the enhanced royalty at the same time. Walmart makes no other suggestion on how to compensate Plaintiffs adequately for Walmart's destruction of the trade secrets. Walmart's argument on the ███████ royalty rate point does not establish the absence of genuine fact disputes. It is ground for cross-examination—not judgment as a matter of law.

PUBLIC VERSION

While Walmart's theory might have applicability to other claims for damages, it is not applicable to Zest's claim for a reasonable royalty, and Walmart's citation to *Firetrace, USA* is misplaced. For a claim based on a reasonable royalty, Zest does not have to prove any loss of business. "Such flexibility in determining a reasonable royalty is imperative in cases involving business torts such as misappropriation of trade secrets. This is because 'public policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injury they have suffered." *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 385 N.E.2d 1349, 1356 (Mass. 1979). "This is especially important where (1) a defendant has destroyed the value of plaintiff's secret through publication and has not enjoyed any profits and (2) the plaintiff is hard-pressed to show any loss." *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 311, 1998 Iowa Sup. LEXIS 130 (Iowa 1998).

> **11.** ***Walmart's Discovered Misappropriations, Breaches, and Frauds Are Already Complete, Regardless of Its Current Decision to Abandon Further Deployments Before Trial.***

Plaintiffs' damages claims and model do not seek damages for Walmart's future plans to engage in more development efforts using Zest's confidential information and trade secrets, in violation of the NDA and applicable law. The widespread misappropriations, breaches, and frauds shown above suffice to establish Plaintiffs' claim to damages, without the need for more. Walmart's concerns about "unspecified future uses" on page 38-39 of the Motion are, therefore, irrelevant and present no basis for summary judgment in Walmart's favor. *See Jet Spray Cooler, supra.*

104

███████████████████████████████

**F.      Plaintiffs' Claims for Conversion, Unfair Competition, Fraud, And Unjust Enrichment (Counts IV, V, VI, and VII) are not preempted by Plaintiffs' ATSA claim.**

There is a material issue of fact that prevents summary judgment on Counts IV, V, VI, and VII because  (1) preemption does not apply unless the information at issue qualifies for protection as a trade secret, and the question of whether information qualifies for protection as a trade secret is a question of fact for the jury; and (2) even if preemption could be decided at this point in the case, Plaintiff's tort claims are based on information and acts different from Plaintiff's trade secret claims and thus are not preempted.

**1.      *Preemption does not apply unless the information at issue qualifies for protection as a trade secret, and the question of whether information qualifies for protection as a trade secret is a question of fact for the jury.***

d.   *Controlling precedent on ATSA preemption holds that preemption does not apply unless the information at issue qualifies for protection as a trade secret.*

Walmart cites *R.K. Enterprise, LLC v. Pro-Comp Mgmt., Inc.*, 158 S.W.3d 685 (2004) in its Motion, and Plaintiffs agree that *R.K. Enterprise* is the controlling precedent.  It is the only case where the Arkansas Supreme Court analyzed and ruled on preemption under the ATSA.  The context and details of the ruling are important.  First, the question at issue in *R.K. Enterprise* was whether damage based on tort claims are preempted by the ATSA.  *Id.* at 686.

[**686] [*568] RAY THORNTON, Justice. This case presents an issue of first impression whether a determination of damages on the basis of tortious conversion and conspiracy to convert and to use trade secrets and confidential information is displaced or preempted by the language of the Arkansas Trade Secrets Act ("Trade Secrets Act"), codified at Ark. Code Ann. § 4-75-601 et seq. (Repl. 2001). Because we conclude that HN1[↑] the Trade Secrets Act prescribes an exclusive remedy for damages for misappropriation of trade secrets, we hold that the trial court's award of damages for tortious conversion and conspiracy was reversible error, and we reverse and remand.

Importantly, the ruling occurred on appeal after the trial of the case. *Id.* at 690. The Arkansas Supreme Court determined that allowing a plaintiff to elect damages based on a tort claim that arose "under a claim for misappropriation of trade secrets" was improper, that the claim was preempted and that the case should be remanded for a determination of damages under the ATSA claim.

Therefore, based upon the plain language of Ark. Code Ann. § 4-75-602, we conclude that the statutory language of the Trade Secret Act displaces or preempts

the award of damages based upon tort claims for conversion of trade secrets, as well as other tort claims such as conspiracy, that may arise under a claim for misappropriation of trade secrets. Accordingly, the trial court committed reversible error in its award of damages for tortious conversion and conspiracy.

In making its ruling, the Arkansas Supreme Court relied approvingly on a 1994 case from the Eastern District of Arkansas, *Vigoro Industries, Inc. v. Cleveland Chemical Co.*, 866 F. Supp. 1150 (E.D. Ark. 1994). The portion of *Vigoro* quoted in *R.K. Enterprise* is particularly relevant here because it indicates that if a particular piece of information does not qualify as

a trade secret, then preemption does not apply to claims based on that information. *Id.* at 689.

The Court noted that because the particular information at issue in the *Vigoro* case did not

qualify for trade secret protection, ATSA preemption did not apply.

> While the statutory [***10] language appears to be plain and unambiguous, we note that we have not interpreted or applied this displacement provision of our Trade Secrets Act. However, the [*573] United States District Court for the Eastern District of Arkansas considered that issue in *Vigoro Industries, Inc. v. Cleveland Chemical Co., 866 F. Supp. 1150 (E.D. Ark. 1994)* (affirmed in part; reversed in part on other grounds in *Vigoro Industries, Inc. v. Crisp, 82 F.3d 785 (8th Cir. 1996))*. The federal district court stated:
>
> > The Court notes that HN8[⬆] the Arkansas Trade Secrets Act ("the Act"), *Ark. Code Ann. § 4-75-601 et seq.*, is Vigoro's exclusive remedy for the Defendants' alleged misappropriation of Vigoro's trade secrets. . . . Accordingly, were the Court to determine that the information Vigoro seeks to protect as a trade secret qualified as such, and that the Defendants misappropriated those trade secrets, then Vigoro's exclusive remedy for improper use of that information would be pursuant to the Arkansas Trade Secrets Act. In that situation, Vigoro would not be able to rely on the acts constituting misappropriation of a trade secret to support its other [***11] causes of action. That situation does not arise here, however, because the Court concludes that the information that Vigoro seeks to protect as a trade secret is not entitled to protection as such under the Arkansas Trade Secrets Act.
>
> *Vigoro, supra.*

Importantly, the *Vigoro* case (like *R.K Enterprise.*) was decided on appeal, so the decision

of whether or not the claim was preempted was made after the determination by the jury that

a particular piece of information was or was not a trade secret.  At that stage of the case, the

███████████████████████████

court of appeals in *Vigoro* was still able to say that because the information at issue was determined not to be a trade secret, the tort claims based on that information were not preempted.

Walmart is urging this Court in this case to adopt a different standard. Walmart recognizes in its Motion that there are two competing lines of caselaw elsewhere in the country related to preemption under state versions of the Uniform Trade Secrets Act ("UTSA"). Walmart's Motion at 39-42. The first line of cases hold that the UTSA preempts all common law tort claims based on misappropriation of information, whether or not it meets the statutory definition of a trade secret. *See, e.g Mortgage Specialists, Inc. v. Davey*, 153 N.H. 764, 776, 904 A.2d 652 (N.H. 2006) (New Hampshire Supreme Court analyzing New Hampshire Trade Secrets Act). In the competing line of cases other courts have held that common law and statutory claims are not preempted by the UTSA if they involve information that does not meet the statutory definition of a trade secret. *See*, e.g., *Callaway Golf v. Dunlop Slazenger Group Americas*, 295 F. Supp. 2d 430, 437 (D. Del. 2003); *Stone Castle v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 659 (E.D. Va. 2002); *Combined Metals of Chicago Ltd. v. Airtek, Inc.*, 985 F. Supp. 827, 830 (N.D. Ill. 1997); *see also Burbank Grease Services, LLC v. Sokolowski*, 294 Wis. 2d 274, 2006 WI 103, 717 N.W.2d 781, 2006 WL 1911997, at *3-*8 (Wis. 2006) (hereinafter Burbank Grease II).

*R.K. Enterprise* and *Vigoro* are more in line with the competing line of cases, than the first. The fact patterns that exist in *R.K. Enterprise* and *Vigoro* only exist because the appellate courts were making a determination about whether the facts that supported the tort claim met the statutory definition of trade secrets after the trial on the merits had occurred. In the section of *Vigoro* that was block-quoted in *R.K. Enterprise,* the Vigoro trial court

108

(Eastern District of Arkansas) found that no preemption took place because "***the information that Vigoro seeks to protect as trade secrets is not entitled to protection as such under the Arkansas Trade Secrets Act***.   *R.K. Enterprise* at 689 (emphasis added).

> secrets, then Vigoro's exclusive remedy for improper use of that information would be pursuant to the Arkansas Trade Secrets Act. In that situation, Vigoro would not be able to rely on the acts constituting misappropriation of a trade secret to support its other [***11] causes of action. That situation does not arise here, however, because the Court concludes that the information that Vigoro seeks to protect as a trade secret is not entitled to protection as such under the Arkansas Trade Secrets Act.

The Arkansas Supreme court in *R.K. Enterprise* approved this reasoning, (*Id.* at 690) and this is the standard that this Court should apply in this case.

> e.   *Whether a particular piece of information qualifies as a trade secret is a question of fact.*

Even if Plaintiff's ATSA claim and one of Plaintiff's other tort claims were based on Walmart's use of a single piece of information, the initial question that must be answered before preemption can be determined is whether that information qualifies for protection as a trade secret under the ATSA.  But the assessment of whether a piece of information meets the definition of a trade secret and qualifies for protection under the ATSA, is a question of fact.  *See McGlothlin*, 2012 WL 1768098 at *5 (E.D. Ark. May 16, 2012) ("Whether a particular type of information constitutes a trade secret is a question of fact…" ); *see also In re Iowa Freedom of Info. Council*, 724 F. 2d at 663 (8th Cir. 1983) (holding that the existence of a trade secret is a question of fact).

As a result, it is impossible at the pleading stage to undertake the factual inquiry that would be necessary to determine which pieces of information qualify for protection and which pieces of information do not. At the summary judgment stage, preemption would only be allowed if there is no genuine materials dispute as to whether a piece of information qualifies for protection under the ATSA. Here, Walmart is not conceding that any of the information in this case qualifies as a trade secret under the ATSA. As a result, there is a material factual dispute as to whether the information in this case qualifies for protection under the ATSA, and summary judgment should be denied.

### 2. *Plaintiffs' tort claims are based on information and acts that are different from the information and acts supporting Zest's ATSA claim.*

Walmart engaged in a campaign from 2014 to the fall of 2017 that strung Zest along and extracted as much information as possible from Zest. But by the fall of 2017, Walmart had extracted enough information from Zest to change its primary focus to eliminating Zest. That moment is one of the primary dividing lines between Plaintiff's misappropriation claims (which focus on Walmart's activity from 2014 to the fall of 2017), and Plaintiffs' tort claims (which focus on activity just prior to, during and after the POC).

The "bake-off" was a rigged competition with the goal of eliminating Zest. A month prior to the start of the actual tests, Walmart executive Ed Oldham sent an email to another Walmart executive Charles Redfield explaining that then CEO Greg Foran wanted Zest out of his office.

PUBLIC VERSION



P.R.E. 46, (WM00069114-69116) at WM00069114.  Mr. Foran confirmed that he was the Greg

F. in the email.  P.R.E. 6, Foran Deposition at 108:21-109:4.



PUBLIC VERSION

At this time, personnel within Walmart set out to eliminate Zest by rigging the Proof of Concept against Zest.  This is shown an email between Denise Sharpe and Kelly Boyle dated September 29, 2017.



 P.R.E. 33, WM00028659.  In this email, Ms. Sharpe explains to Ms. Boyle that she wants to recommend the ██ ███████████████████████████ despite not currently having <u>any</u> data points for that sensor.  *Id.*   Ms. Boyle then uses information provided by Ms. Sharpe to prepare a slide deck for Ed Oldham concerning the ████████████

112

PUBLIC VERSION



P.R.E. 42, (WM00062537).  Mr. Oldham, Ms. Boyle and others then iterate this slide deck until it reaches its final form for presentation to Mr. Foran, Walmart's CEO at the time.  That presentation contained the following slide.



Dkt. No. 205 – Trade Secret MSJ Brief Ex. E15, (Plaintiffs' deposition Ex. 335) at slide 6.

According to this slide, Walmart placed Zest in third for the POC when presenting the results to

Mr. Foran. But when confronted with the underlying data, Mr. Foran admitted that the results

were not supporttable. For example, when examining the ███████████████████████

███████ Mr. Foran admitted that there was not underlying data for ██████████████████

███████████████████████████ P.R.E. 6, (Foran Depo.) at 138:5-140:11.

114



Mr. Foran also had to admit that the underlying data showed that Zest sensors cost ▮▮▮▮▮ less

than ▮▮▮▮▮▮



*Id*. at 146:15-22.  Mr. Foran also had to admit that the only vendor for whom Administrative

Equipment and Administrative Costs were input was Zest.

115



*Id.* at 140:23-141:24.  Additionally, slide 6 from the deck presented to Mr. Foran also failed to

inform Mr. Foran that the ███████████████████████ were only tested ████████ compared to

███████████████████████████

████████████ for the Zest tags.  This is shown in the original slides from the deck from which Ms.

Boyle created the deck given to Mr. Foran.



P.R.E. 28, (WM00008245-8256) at WM00008255.   Ms. Sharpe testified that the  ███████

████████████████████████████



117



P.R.E. 20, (Sharpe Depo.) at 313:21-315:1. *See also Id.* at 317:7-22; P.R.E. 2, (8/13/19 Deposition

of Kelly Boyle Volume II ("Boyle Depo. II") at 293:4-294:15, 295:2-25.

On November 9, 2017, at the end of this fraudulent process, Walmart set a meeting with Zest. Zest imagined that the meeting was to close a deal and proceed to implementation. Instead, Walmart told Zest that things were not going to go the way Zest expected, and told Zest it was not interested in Zest's technology. Little did Zest know that the very next day Walmart's true interest in Zests technology would be on display when Walmart filed a provisional patent application that was followed by the Walmart Application. This rigged process with a predetermined outcome designed to eliminate Zest, is one of the series of fraudulent and tortious acts that form the basis of Zests tort claims including fraud, conversion, and unfair competition.

> f.  *Plaintiffs' Fraud Claim (Count VI) Is Not Dependent On Whether Walmart Misappropriated Zest's Trade Secrets, And Is Therefore Not Preempted.*

Plaintiffs have pled a claim for fraud that is independent of the trade secret claims. Walmart argues that Plaintiffs' claim is "based on the same acts" as the trade secret misappropriation claim. But the evidence demonstrates that Walmart's fraudulent activities went further than its representations about Zest trade secrets. As explained above, Walmart engaged Plaintiffs in a rigged competition so that it could manufacture "evidence" to justify eliminating Zest. That evidence was massaged and packaged for Mr. Foran to convince him to sign off on the elimination of Zest. After the fact, Mr. Foran admitted that the materials he was presented were not supported by the facts. Instead they were designed to mislead him resulting in him terminating the relationship with Zest. There is a material fact issue as to whether Plaintiffs' fraud claim is dependent on the same facts as Plaintiffs' ATSA claim, and as a result, Walmart's motion for summary judgment should be denied.

119

███████████████████████████████████████

g.  *Plaintiffs' Unjust Enrichment Claim (Count VIII) Is Not Dependent On A Finding That Walmart Misappropriated Zest's Trade Secrets, And Is Therefore Not Preempted.*

Plaintiffs have pled a claim for unjust enrichment that is independent of the trade secret claim.  For example, by unfairly engaging Zest in a rigged process and eliminating Zest from the opportunity to fairly compete for Walmart's business, Walmart was unfairly and unjustly enriched by being free to proceed with its development of Eden without any compensation to Plaintiffs.  This rigged "competition" forced Zest to expend, time, labor, and resources on attempting to persuade Walmart to select Zest as its vendor, even though Walmart had already predetermined the outcome.  Walmart forced Zest into this situation without compensating Zest for its time labor and resources. Accepted as true, there exists a material issue of fact as to whether Plaintiff's unjust enrichment claim is or is not predicated on the alleged misappropriation of trade secrets. Under these circumstances, Plaintiff's unjust enrichment claim is not preempted.

h.  *Plaintiffs' Unfair Competition Claim (Count V) Does Not Depend On A Finding That Walmart Misappropriated Zest's Trade Secrets, And Is Therefore Not Preempted.*

Plaintiffs have brought forth facts sufficient to state a claim for unfair competition that is not predicated Plaintiff's ATSA claim. The Complaint alleges that Walmart engaged in an unfair method of competition by forcing Zest to participate in multiple pilot programs, forcing Ecoark, Inc. to pay Walmart's hired consultant approximately ███████ forcing Zest to determine how to integrate its technology into Walmart's quality control system, all before

120

ultimately betraying Plaintiffs in an unfair manner.    The evidence demonstrates that, by improperly engaging Plaintiff in an unfair manner, that was designed to take advantage of Plaintiffs, Walmart has gained a competitive advantage by not incurring the expense, time, labor, or resources that Zest was forced to incur.

Accepted as true, these facts demonstrate a material issue of fact as to whether Plaintiffs' unfair competition claim is predicated entirely on the alleged misappropriation of trade secrets. Under these circumstances, an unjust enrichment claim should not be preempted.

> i.   *Plaintiffs' Conversion Claim (Count IV) Does Not Depend On A Finding that Walmart Misappropriated Zest's Trade Secrets, And Is Therefore Not Preempted.*

The fact supporting Zest claim for conversion are independent of the trade secret claim. For example, Zest has alleged conversion of property that goes beyond its trade secrets, including confidential information and know-how that Walmart has unlawfully retained and used.

Here, Zest has provided evidence that crates a material issue of fact as to whether Plaintiffs' is based on acts other than those that form the basis of Plaintiffs' ATSA claim under these circumstances, a conversion claim is not preempted.

**G.    Beyond Preemption, there are other genuine issues of material fact on Plaintiffs' Claims for Fraud, Unjust Enrichment, Exemplary Damages and Attorneys' Fees.**

**1.    *Plaintiffs' Fraud Claim (Count VI) Is Not Defective.***

Walmart's efforts to examine Plaintiffs' fraud claim based on the Complaint alone under Rule 9(B) are a misdirected application of the wrong legal standard, which yields a predictably

flawed result.  When analyzing a fraud claim on summary judgment, the evidence uncovered in discovery, not the pleadings is what the Court should consider.  *See Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.,* 214 F.3d 1030, 1038 (9th Cir. 2000).

> was prime support for this contention. The district court, however, ruled it insufficiently particular. [**20] The district court objected that Woodruff did not identify whether, when he reconfirmed the agreement on behalf of Sanders, he spoke to Kirk or to Clark Hollingsworth. But it was not material whether he spoke to the one or the other. He was the representative of Sanders conveying a message to CCT. The district court, in addition, appears to have inappropriately applied *Fed. R. Civ. P. 9(b)*, requiring particularity in the pleading of fraud, to a summary judgment motion where evidence, not pleading, was to be considered. We have already quoted portions of Woodruff's declaration which, if believed by the jury, would permit the jury to know with sufficient certainty what fraud Sanders had engaged in.

Courts have held that it is inappropriate to restrict a plaintiff to its pleadings at the summary judgment stage, because that would prevent a Plaintiff from relying on the materials obtained during discovery, which were by definition not available when the lawsuit was filed.  *See Solutia Inc. v. FMC Corp.,* 456 F. Supp. 2d 429, 450 (S.D.N.Y. 2006).

> FMC is entitled to understand the nature of the claims asserted against it and the evidence on which Solutia intends to rely. However, *Rule 9(b)* is typically invoked on motions to dismiss. It is not the appropriate device to vindicate FMC's rights at this stage of the proceedings. Among other things, invocation of *Rule 9(b)* would work severe hardship on Solutia and prevent it from utilizing evidence obtained in discovery as part of its claims. Accordingly, FMC's *Rule 9(b)* motion is denied.

The two cases cited by Walmart as articulating the standard for pleading a fraud claim are cases decided at the motion to dismiss stage, not at the summary judgment stage.  Both those cases were Qui Tam cases under the False Claims Act, which has special pleading requirements because of the potential for the United States Government to intervene in the case.  *See* Walmart's Motion at 47, citing *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (motion to dismiss Qui Tam case under the False Claims Act); *see also United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003) (motion to dismiss Qui Tam case under the False Claims Act).

Analyzing Plaintiffs' complaint under rule 9(b) would be particularly inappropriate here. Defendants filed a motion to dismiss (Dkt. 46), which the Court converted to a motion for summary judgment because of the extraneous evidence that Walmart chose to include (Dkt. 73). The Court gave Walmart an opportunity to be heard on that motion, and Walmart chose to  withdraw that motion in favor of the present motion for summary judgment. (Dkt. 182.).  If the court had found Plaintiffs' fraud claims lacked particularity at the motion to dismiss stage, the appropriate remedy would have been to give Plaintiffs an opportunity to re-plead its fraud claim.  It would be prejudicial to apply Rule 9(b) to Plaintiff's complaint at this stage of the case.

As explained in section ▉▉ above Plaintiffs have brought forward substantial evidence to support their fraud case.  Walmart engaged Zest in a rigged competition so that it could manufacture "evidence" to justify eliminating Zest.  That evidence was massaged and packaged for Mr. Foran to convince him to approve eliminating Zest.  After the fact, Mr. Foran admitted that the materials he was presented were not supported by the facts.  They were designed to lead him to approve the termination of the relationship with Zest.  The evidence supporting Plaintiffs'

123

fraud claim is more than sufficient to create a material fact issue that requires resolution by a jury and as a result, Walmart's motion for summary judgment should be denied.

### 2.   Plaintiffs' Unjust Enrichment Claim (Count VII) Is Not Defective.

"The mere fact that there is a contract between parties does not prevent the grant of restitution in an appropriate case.... An action based on unjust enrichment is maintainable in all cases where one person has received money under such circumstances that, in equity and good conscience, he ought not to retain it." *Friends of Children v. Marcus*, 46 Ark. App. 57, 876 S.W.2d 603, 1994 Ark. App. LEXIS 293.

In *Frigillana v. Frigillana*, 266 Ark. 296, 584 S.W.2d 30 (1979), the court said that HN3[↑] in unjust enrichment cases "the simple, but comprehensive, question is whether the circumstances are such that equitably defendant [**606] should restore to plaintiff what he has received[,]" (quoting 77 C.J.S. *Restitution* 322). The *Restatement of Restitution § 1* states simply, "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." An action based on unjust enrichment is maintainable in all cases where one person has received money under such circumstances that, in equity and good conscience, he ought not to retain it. *Frigillana, supra at 307*. The remedy is neither given nor withheld automatically, [***7] but is awarded as a matter of judgment. See Dobbs, *supra*, § 4.3 at 256; *Frigillana, 266 Ark. at 306*.

In *Friends of Children*, an adoption agency ended up being paid by two different couples for the adoption of the same child. The first couple sued to recover their fee, under an agreement as well as for unjust enrichment. The court awarded unjust enrichment damages. The award was upheld even though the agreement had exculpatory language that the defendant argued

barred such an award. The court held that there were certain sets of circumstances not covered

by the exculpatory language and that an award of unjust enrichment was appropriate to fill in

> We agree with the chancellor that the exculpatory clauses will not prevent an award of restitution. The clauses, by their own terms, relate to liability based on events occurring at or before the time the Placement Agreement was signed. Restitution in this case is based on events occurring after the contract was executed, such as the discovery of the child's neurological deficit, the agreement between the parties to dissolve the interlocutory decree of adoption, the agreement of the Marcuses to return the child, and the subsequent placement of the child by Friends. Furthermore, fault is not a prerequisite to an award of restitution. See Dobbs, supra, §§ 4.3 and 4.4.

those gaps. *Id.*

Here, there are genuine disputes about what agreements control the relationship between

the parties at various times, and Walmart claims that there are certain periods of time when the

parties were interacting that might not be covered by any agreement at all. Depending on how

those fact issues are resolved, there may be situations where unjust enrichment would be an

appropriate method to fill in the gaps between the parties' agreements.

### 3. *Plaintiffs' Claims for Exemplary Damages, Attorneys' Fees and Injunctive Relief (Counts IX and X) Should Not be Dismissed.*

The DTSA includes provisions for exemplary damages, attorney's fees and injunctive

relief. See DTSA 18 U.S. Code §1836 (3)(A-B).

████████████████████████████████████████████

(3) REMEDIES.—In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—

(A) grant an injunction—

(i) to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not—

(I) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or

(II) otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;

(ii) if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and

(iii) in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited;

(B) award—

(i)

(I) damages for actual loss caused by the misappropriation of the trade secret; and

(II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

(ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

(C) if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B); and

(D) if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party.

The ATSA includes provisions for injunctive relief and attorneys' fees. *See* A.C.A. §§ 4-75-604 and 4-75-607.

§ 4-75-604. Injunctive relief.

(a) Actual or threatened misappropriation may be enjoined.

(b) Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist; however, the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

(c) If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(d) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

§ 4-75-607. Attorneys' fees.

The court may award reasonable attorneys' fees to the prevailing party if:

(1) A claim of misappropriation is made in bad faith;

(2) A motion to terminate an injunction is made or resisted in bad faith; or

(3) Willful and malicious misappropriation exists.

In Arkansas, punitive damages have been held to be recoverable in a variety of circumstance. *See generally*, e.g., *Dixon Ticonderoga Co. v. Winburn Tile Mfg*. Co., 324 Ark. 266, 920 S.W.2d 829 (1996) (deceit); *Viking Ins. Co. of Wis. v. Jester*, 310 Ark. 317, 836 S.W.2d 371 (1992) (bad faith); *Interstate Freeway Serv., Inc. v. Houser*, 310 Ark. 302, 835 S.W.2d 872 (1992) (fraud in employment contract); *Brown v. Chapman Farms, Inc*., 289 Ark. 88, 709 S.W.2d 404 (1986) (trespass and intentional destruction of crops); *Lou v. Smith*, 285 Ark. 249, 685 S.W.2d 809 (1985) (pharmacist's intentional changing of physician's prescription for patient); *DWB, LLC v. D&T Pure Trust*, 2018 Ark. App. 283, 550 S.W.3d 420 (conversion).

Federal Rule of Civil Procedure 54(d)(2)(A) states that claims for attorneys' fees should be made by motion, unless the recovery of attorneys' fees is an element of damages to be proven at trial. Defendant appears to be making a similar argument for punitive damages and injunctive relief. Defendant appears to claim that Plaintiffs' requests for attorneys' fees, punitive damages and injunctive relief fall under Federal Rule of Civil Procedure 54(d)(2)(A) or are covered by a similar concept. If this is correct Defendants should stipulate that Plaintiff will be permitted to submit jury issues and motions during and after trial to secure whatever injunctive relief, damages or attorneys' fees are available in this case under applicable statues or common law. If Defendant so stipulate, Plaintiff will consider withdrawing these claims. However, if Defendant is now seeking to dismiss these claims because they are remedies, but will later seek to prevent

Plaintiffs from pursuing  punitive damages, injunctive relief or attorneys' fees then Defendant's

motion should be denied.

## V.    CONCLUSION

The multitude of genuine material fact issues that exist on each of Plaintiffs' claims leads

to only one outcome – Walmart's motion for summary judgment must be denied.

Dated: March 20, 2020                          Respectfully submitted,

                                               By: /s/ Michael Simons
                                               Fred I. Williams (*pro hac vice)*
                                               Texas State Bar No. 00794855
                                               Michael Simons (*pro hac vice*)
                                               Texas State Bar No. 24008042
                                               Todd E. Landis *(pro hac vice)*
                                               Texas State Bar No. 24030226
                                               Jonathan L. Hardt (*pro hac vice*)
                                               Texas State Bar No. 24039906
                                               WILLIAMS SIMONS & LANDIS PLLC
                                               327 Congress Ave., Suite 490
                                               Austin, TX 78701
                                               512.543.1354
                                               fwilliams@wsltrial.com
                                               msimons@wsltrial.com
                                               tlandis@wsltrial.com
                                               jhardt@wsltrial.com


                                               Dustin B. McDaniel, Bar # 99011
                                               Scott Richardson, Bar # 2001208
                                               Bart Calhoun, Bar # 2011221
                                               McDaniel, Richardson, & Calhoun PLLC
                                               1020 West 4th St., Suite 410
                                               Little Rock, AR 72201
                                               501.235.8336
                                               501.588.2104 fax
                                               dmcdaniel@mrcfirm.com
                                                   128

scott@mrcfirm.com
bcalhoun@mrcfirm.com

Ross David Carmel, Esq. *(pro hac vice)*
New York State Bar No. 4686580
CARMEL, MILAZZO & DiCHIARA LLP
55 West 39th Street, 18th Floor
New York, New York 10018
(212) 658-0458 telephone
(646) 838-1314 facsimile
rcarmel@cmdllp.com

*Attorneys for Plaintiffs Zest Labs, Inc. f/k/a*
*Intelleflex Corporation, and Ecoark Holdings, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2020, the foregoing document was served on all counsel of record, via electronic mail and the Court's CM/ECF system, pursuant to the Federal Rules of Civil Procedure.

*/s/* Michael Simons
Michael Simons

**<u>Exhibit List to Plaintiffs' Response to Defendant's Motion for Summary Judgment</u>**

| | |
|---|---|
| P.R.E. 1 – Filed Under Seal | P.R.E. 44 – Filed Under Seal |
| P.R.E. 2 – Filed Under Seal | P.R.E. 45 – Filed Under Seal |
| P.R.E. 3 – Filed Under Seal | P.R.E. 46 – Filed Under Seal |
| P.R.E. 4 – Filed Under Seal | P.R.E. 47 – Filed Under Seal |
| P.R.E. 5 – Filed Under Seal | P.R.E. 48 – Filed Under Seal |
| P.R.E. 6 – Filed Under Seal | P.R.E. 49 – Filed Under Seal |
| P.R.E. 7 – Filed Under Seal | P.R.E. 50 – Filed Under Seal |
| P.R.E. 8 – Filed Under Seal | P.R.E. 51 – Filed Under Seal |
| P.R.E. 9 – Filed Under Seal | P.R.E. 52 – Filed Under Seal |
| P.R.E. 10 – Filed Under Seal | P.R.E. 53 – Filed Under Seal |
| P.R.E. 11 – Filed Under Seal | P.R.E. 54 – Filed Under Seal |
| P.R.E. 12 – Filed Under Seal | P.R.E. 55 – Filed Under Seal |
| P.R.E. 13 – Filed Under Seal | P.R.E. 56 – Filed Under Seal |
| P.R.E. 14 – Filed Under Seal | P.R.E. 57 – Filed Under Seal |
| P.R.E. 15 – Filed Under Seal | P.R.E. 58 – Filed Under Seal |
| P.R.E. 16 – Filed Under Seal | P.R.E. 59 – Filed Under Seal |
| P.R.E. 17 – Filed Under Seal | P.R.E. 60 – Filed Under Seal |
| P.R.E. 18 – Filed Under Seal | P.R.E. 61 – Filed Under Seal |
| P.R.E. 19 – Filed Under Seal | P.R.E. 62 – Filed Under Seal |
| P.R.E. 20 – Filed Under Seal | P.R.E. 63 – Filed Under Seal |
| P.R.E. 21 – Filed Under Seal | P.R.E. 64 – Filed Under Seal |
| P.R.E. 22 – Filed Under Seal | P.R.E. 65 – Filed Under Seal |
| P.R.E. 23 – Filed Under Seal | P.R.E. 66 – Filed Under Seal |
| P.R.E. 24 – Filed Under Seal | P.R.E. 67 – Filed Under Seal |
| P.R.E. 25 – Filed Under Seal | P.R.E. 68 – Filed Under Seal |
| P.R.E. 26 – Filed Under Seal | P.R.E. 69 – Filed Under Seal |
| P.R.E. 27 – Filed Under Seal | P.R.E. 70 – Filed Under Seal |
| P.R.E. 28 – Filed Under Seal | P.R.E. 71 – Filed Under Seal |
| P.R.E. 29 – Filed Under Seal | P.R.E. 72 – Filed Under Seal |
| P.R.E. 30 – Filed Under Seal | P.R.E. 73 – Filed Under Seal |
| P.R.E. 31 – Filed Under Seal | P.R.E. 74 – Filed Under Seal |
| P.R.E. 32 – Filed Under Seal | P.R.E. 75 – Filed Under Seal |
| P.R.E. 33 – Filed Under Seal | P.R.E. 76 – Filed Under Seal |
| P.R.E. 34 – Filed Under Seal | P.R.E. 77 – Filed Under Seal |
| P.R.E. 35 – Filed Under Seal | P.R.E. 78 – Filed Under Seal |
| P.R.E. 36 – Filed Under Seal | P.R.E. 79 – Filed Under Seal |
| P.R.E. 37 – Filed Under Seal | P.R.E. 80 – Filed Under Seal |
| P.R.E. 38 – Filed Under Seal | P.R.E. 81 – Filed Under Seal |
| P.R.E. 39 – Filed Under Seal | P.R.E. 82 – Filed Under Seal |
| P.R.E. 40 – Filed Under Seal | P.R.E. 83 – Filed Under Seal |
| P.R.E. 41 – Filed Under Seal | P.R.E. 84 – Filed Under Seal |
| P.R.E. 42 – Filed Under Seal | P.R.E. 85 – Filed Under Seal |
| P.R.E. 43 – Filed Under Seal | P.R.E. 86 – Filed Under Seal |