PUBLIC VERSION



FILED
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

MAR 20 2020

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

ZEST LABS, INC. f/k/a INTELLEFLEX
CORPORATION; and ECOARK
HOLDINGS, INC.

     Plaintiffs,

     v.

WALMART INC. f/k/a
WAL-MART STORES, INC.

     Defendant.

§
§
§
§
§
§
§
§
§
§
§
§

**FILED UNDER SEAL**

Civil Action No. 4:18-cv-500-JM

**JURY TRIAL DEMANDED**

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
TESTIMONY OF DAMAGES EXPERT STEPHEN L. BECKER, PH.D.**

217

████████████████████████

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     DISCUSSION OF RELEVANT FACTS ............................................................2

III.    ARGUMENT AND AUTHORITIES.................................................................10

        A.      Dr. Becker's Proffered Testimony Regarding Plaintiffs' Actual Losses/Lost Profits Should Not Be Excluded From The Trial. ................................................11

                1.      A ████ Margin Is Reasonable and Appropriate. .........................................12

                2.      The ████████ License Term Is Reasonable and Appropriate.....................21

                3.      No One Assumes That Walmart Is Currently Using Pallet-Level Monitoring. ..................................................................................................24

                4.      It Is Clear That Growers and Suppliers Would All Pay for Walmart's Use of Zest's Technology—Because That's What Walmart Requested. ................................................................................................35

        B.      Dr. Becker's Proffered Testimony On Unjust Enrichment Should Not Be Excluded From The Trial........................................................................................36

                1.      Dr. Becker's Use of Walmart's ████ Waste Reduction Figure Is Correct and Appropriate, As Confirmed by Dr. Becker's Independent Analysis...................................................................................37

                2.      Dr. Becker's Use of Walmart's Waste Reduction Data Is Correct and Appropriate. .................................................................................40

        C.      Dr. Becker's Proffered Testimony On Reasonable Royalty Damages Should Not Be Excluded From The Trial. ..........................................................................41

IV.     CONCLUSION..................................................................................................47

# TABLE OF AUTHORITIES

**Cases**

*Boellner v. Clinical Study Centers, LLC*, 2011 Ark. 83, 378 S.W.3d 745 (2011) ........................ 19

*Craig v. Xlear, Inc.,* 2019 WL 1119429 (D. Utah Mar. 11, 2019) ............................................. 20

*Elcock v. Kmart Corp.*, 233 F.3d 734 (2000) ............................................................................. 37

*Hudson v. Cook*, 82 Ark. App. 246, 105 S.W.3d 821 (2003) ...................................................... 19

*In re Iowa Freedom of Information Council*, 724 F.2d 658 (8th Cir. 1983) ............................... 42

*InnoSys, Inc. v. Mercer*, 364 P.3d 1013 (Utah 2015) .................................................................. 43

*Ishie v. Kelley*, 302 Ark. 112, 788 S.W.2d at 226 (1990) .......................................................... 19

*Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 385 N.E.2d 1349 (Mass. 1979) ............... 47

*Jim Halsey Co. v. Bonar*, 284 Ark. 461, 683 S.W.2d 898 (1985) .................................. 19, 20, 24

*JRL Enterprises v. Procorp Assocs. Inc. v. Procorp. Assocs., Inc.*,
    2003 WL 21284020 (E.D. La. June 3, 2002) ......................................................................... 21

*King-Ind. Forge v. Millennium Forge, Inc.*, 2009 WL 3187865 (S.D. Ind. Sept. 29, 2009) ........ 21

*Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 1998 Iowa Sup. LEXIS 130 (Iowa 1998) ................. 47

*Precision Plating & Metal Finishing Inc. v. Martin-Marietta Corp.*,
    435 F.2d 1262 (5th Cir. 1970) ............................................................................................... 43

*Reed v. Williams*, 247 Ark. 314, 445 S.W.2d 90 (1969) ........................................................ 19, 20

*Southwestern Energy Co. v. Eickenhorst*, 955 F. Supp. 1078 (W.D. Ark. Mar. 18, 1997) ......... 42

*Spann v. Lovett & Co., Ltd.*, 2012 Ark. App. 107, 389 S.W.3d 77 (2012) .................................. 19

*V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120 (D. Nev. 2013) ....................................................... 43

*Zitan Techs., LLC v. Liang Yu*,
    2019 U.S. Dist. LEXIS 3067, 2019 WL 95779 (D. Nev. Jan. 3, 2019) .................................. 42

**Statutes**

Ark. Code Ann. ¶ 16-64-131 ....................................................................................................... 20

Plaintiffs respond as follows to Walmart's Motion to Exclude Testimony of Damages Expert Stephen L. Becker, Ph.D. (the "Motion"):

## I.    INTRODUCTION

For the past five years, Walmart has engaged in massive fraud, theft, and violation of Zest's confidentiality, property, and trade secret rights so that the world's largest company could gain access to Zest's most sensitive technologies.  Walmart then used Zest's confidential information and trade secrets to develop Walmart's Eden/Muse ecosystem and published them to the world in an effort to take ownership of them, which entirely destroyed their value.  Along the way, Walmart charged Zest ███████ for the privilege of doing business with Walmart and evaluating its own technology, while Walmart secretly stole it.  And then Walmart discarded Zest, leaving it to wither and die without the resources to pursue other customers and without the value of its confidential information and trade secrets.

Now Walmart asserts in the Motion that the technology it stole from Zest should be devalued because (1) the technology never worked anyway, (2) no one ever licensed the technology, and (3) Zest did not turn a profit even after Walmart decided to steal the technology instead of pay for it.  That first assertion is demonstrably false, and second and third are conditions clearly caused by Walmart's theft.[1]

---

[1] It is also clear that Walmart breached its non-disclosure agreement with Zest and misused Zest's confidential information and trade secrets.  *See* Zest's Contract MSJ SOMF (Docket No. 211) ¶¶ 3-5; Zest's Contract MSJ Brief (Docket No. 209) at 4-13; Zest's Confidentiality MSJ SOMF (Docket No. 207) at ¶¶ 1-2; Trade Secret MSJ SOMF (Docket No. 194) at ¶¶ 1-4.

PUBLIC VERSION

███████████████████████████████

## II.    DISCUSSION OF RELEVANT FACTS

The key issue presented by the Motion is how to assess the damages given Walmart's misconduct, the amount of Walmart's unjust enrichment, and the immense harm done to Plaintiffs.

First, let us review Walmart's desperate need for Zest's technology. For the past 30 years, Walmart has had a multi-billion-dollar problem in "Fresh:" it ████████████████████████ ████████ every year because Walmart could not assess food freshness in an effective way. For example, it is undisputed that ██████████████████████████████████████ and that Walmart believes that about $2 billion of that loss each year ████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

WM00093868.   To achieve those billions of dollars in annual savings, Walmart used Zest's confidential information and trade secrets in developing Eden/Muse, including its "Freshness Indicator," all of which allows Walmart to ████████████████████████████████████████

██████████████

PUBLIC VERSION



WM00093875.

The $2 billion savings repeatedly embraced by Walmart (including by VP of Supply Chain Development Musani on March 1, 2018, *see* Ex. 1, (Plaintiff's Deposition 52)), is a conservative estimate of the benefits of solving Walmart's problems in "Fresh."   Walmart has repeatedly estimated that Eden/Muse would generate $2 billion in savings over five years—or <u>at least</u> $400 million per year on average.  *See id.* (Plaintiff's Deposition 52); Ex. 2 (WM00042804-815) at -805; Ex. 3 (WM00093867-879) at -868.  And Walmart's corporate representative Josh Bohling testified that Walmart ███████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 4 (8/16/19 Corporate Representative Deposition of Josh Bohling ("Bohling Corp. Rep. Depo.") at 305-06.

In fact, the $2 billion figure that Walmart repeatedly embraces may significantly understate the value of Zest's technology to Walmart.  After Walmart ranked 67th out of 68 retailers in a 2015 freshness study by *Consumer Reports*, the world's largest company concluded that ████████████ ███████████████████████████████████████ *See* Ex. 5 (ZEST_ECOARK0036361) at 36362; Ex. 6 (WM00042212-250) at 42214.  Walmart admitted that it ██████████████████

3

PUBLIC VERSION

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Ex. 6 (WM00042212-250) at

42214; *see also* Ex. 7 (WM00170300-362177) (emphasis added).  Walmart has also admitted that

t███████████████████████████████████████████████

████████████████████████████████████ Ex. 7 (WM00170300-362) at

170309.  In fact, Walmart admitted its need for ████████████████████

████████████████████████████████████████████████

██████████████████████ Ex. 8 (WM00108039-089); *see also* Ex. 9 (WM00057355-

392).   Walmart recognized that █████████████████ resources were ████████████

█████████████████████████████

WM00108039-089 at 108047.

Walmart knew that enhancing its reputation for produce quality would give it enormous

financial benefits.  One Walmart ████████████ presentation in May 2015 stated that the ████

████████████████████████████████████████████████

██████████ Ex. 7 (WM00170300-362) at 170314-16 (emphasis added).  A July 2016 Walmart

presentation stated that sales can increase by **over** ███████████ if Walmart could ███████████

█████████ Ex. 6 (WM00042212-250) at 42214.  Specifically, Walmart expected not just a ████

██████████████ in its grocery products, but that "Fresh" growth could drive another ███

███████████████ *Id.*  Notably, Walmart expected that, of the ███████████ in new

sales from grocery products, ████████████ would be driven by ██████████████ and ███████████ of that

would be driven by ████████████ *Id.*  Walmart has also been pursuing its ████████████

█████████████████████████████████████████████.  Ex. 10

(WM00098370-417) at 98377.  As of December 2016, Walmart estimated that reaching that

4

PUBLIC VERSION

████████████████████████████████████████████████████

objective ██████████████████████████████████████ Ex. 10 (WM00098370-417) at 98377.  Another ████████████ presentation in May 2017 estimated that Walmart has the

potential for ████████████████████████████████████████████████

████████████████████████████████████████ Ex. 8 (WM00108039-089) at

108041, 108043, 108051; *see also* Ex. 9 (WM00057355-392).  Walmart's experts ████████

████████████████████████████████████████████████████

████████████ for Walmart.  Ex. 11 (WM00011681-695) at 11685.

Second, let us look at what the Zest technology delivered to Walmart—and how Walmart

valued and praised Zest's technology, while secretly working to steal it.  Walmart concedes that

its systems before meeting with Zest in 2014 were ████████ Ex. 12 (Boyle Depo, Vol 1) at 32:25-

33:6; Ex. 13 (Musani Depo) at 52:4-11, 59:10-17.  Not surprisingly, after meeting with Zest,

Walmart had a new ████████████████████ Ex. 14 (WM00009543-45).  That vision,

enabled by Zest, took Walmart from its ████████████████████████████

████████████████████████ and moved it ████████████████ so that Walmart could

continue the technology it learned from Zest: ████████████████████

████████████████████████████████████████████████████

████████████████ *Id.* at 9545.

Walmart's use of the Zest confidential information and trade secrets was extensive and

widespread, as shown more fully in Plaintiffs' Opposition to Walmart's Motion for Summary

Judgment, which is hereby incorporated as by reference.  So while Walmart was secretly working

on Eden/Muse, Walmart VP of Supply Chain Technology Musani was conceding that Zest was

████████████████████████████ Ex. 15 (Lanning Expert Report) at ¶ 109.

And Walmart Senior VP of Fresh Foods Shawn Baldwin, discussing Zest, said ████████████

PUBLIC VERSION

███████████████████████████████████████████

████████████████ *Id.*  And Walmart's expert █████████████████ exclaimed that ████████████████

██████████████████████████ *Id.*  Speaking of Zest, Walmart VP of Food Safety Frank

Yiannas conceded, ███████████████████████████████████████████████ *Id*.

Walmart USA CEO Foran agreed that Zest is ████████████████████████ Ex. 16

(WM000074817).  Walmart conceded that it did not ████████████████ than Zest to affect

both (1) the amount of fresh food it was throwing away (aka "throws") and (2) "██████████

████  Ex. 17 (WM00005381).  In fact, Walmart admitted that Zest is the ████████████  in

Walmart's ████████████████████████  Ex. 18 (WM00047788).  CEO Foran ████████

████████████████████████████████ given that—at the time—Walmart had ████████

████████████████  Ex. 19 (WM00065879).  And so Walmart realized that ████████████

████████████████████████████" *Id*.

While the Motion asserts that Zest "never achieved any demonstrable waste savings,"

Walmart's own experts ████████ prove that that is demonstrably false.  As ████████ confirmed in

its evaluation, Zest's technology gave Walmart significant accuracy gains ████████████████

████████████████, labeled ███████████████████████████

PUBLIC VERSION



Ex. 20 (WM00001001-002).  CEO Foran testified that that level of improvement is good.  Ex. 21 (Foran Depo) at 190:1-7.  And a June 2019 analysis with Costco showed that Zest eliminated store waste and provided significant improvements in managed shelf life—and overall customer experience:



Ex. 22 (ZEST_ECOARK0270509-514) at 513.

At the same time, Walmart realized that it was playing a dangerous game with Zest's confidential information and trade secrets, acknowledging █████████████████████████████ ███████████████████████████████████████ Ex. 23 (WM00062760) (emphasis added). Months later, Walmart was not confident that it could independently develop a shelf life algorithm without Zest—and so Walmart chose to use Zest's information to do it: ████ ███████████████████████████████████████████ ███████████████ Ex. 24 (WM00058111). Walmart's own documents show that it understood the problems created by its use of Zest confidential information and trade secrets:

PUBLIC VERSION

██████████████████████████████████████████

Walmart conceded the desire to ████████████████████████████████████████
████████ Ex. 25 (WM00069918).  And one employee said, ██████████████████████
██████████████████████ Ex. 26 (WM00073926).

     Third, let us look at Zest's damages model and supporting methodology.  To assist the jury

in assessing damages, Plaintiffs submitted the expert opinions and testimony of Dr. Stephen

Becker and Mark Lanning.  Mr. Lanning has testified that Walmart received **at least** a three-year

head start in its Eden/Muse development efforts due to the misappropriation and misuse of Zest

confidential information and trade secrets.  Ex. 27 (Lanning Depo) at 278:16-282:18.  Those three

years of saved time represent the benefit to Walmart of eliminating a significant portion of the

research, development, and design time (and trial-and-error processes that were) required for the

Eden/Muse ecosystem.  *Id.*

     Walmart's three-year head start is informed by Zest's own development timeline.  By the

time it met Walmart, Zest had spent years and was well on its way to spending ████████████ to

develop its proprietary systems, technology, confidential information, and trade secrets.  *See* Ex.

28 (ZEST_ECOARK0011734) at 11754.  Zest had built an ██████████████████ for improving

fresh food quality and consistency—with the ██████████████████████████ to address

Walmart's (and everyone else's) multi-billion-dollar fresh food problem.  *Id.* at 11735, 11754.  It

was not ████████████████████████████████████████████████████████████

██████████████████ *Id.* at 11754.  Zest's technology addressed specific product freshness

based on real measurements—using both variety- and grower-specific freshness models, and a

freshness quality model, with real-time prescriptive feedback for minimizing the mishandling of

food to help retailers and their suppliers maintain consistent quality of fresh food.  *Id.* at 11737.

██████████████████████████████

And Zest's technology was capable of alerting Walmart's quality control ("QC") system and personnel whenever freshness was below Walmart's standards (as early as when the supplier was loading the food onto the trailer). *Id.* at 11737.  That improved efficiency and offered Walmart more visibility and recovery time when freshness problems arose in the supply chain.  *Id.*  It is not surprising, therefore, that Walmart had a new ████████████████████ after learning about and then observing Zest's technology in action.  To value the resulting three-year head start and other benefits to Walmart required the application of established, reliable economic analysis, which has been provided by Dr. Becker.

To calculate damages, Dr. Becker did not multiply Walmart's own estimates of the annual benefits of the winning in "Fresh" technology—the ████████ the ████████ the ████████, or the ████████ cited above—by three years.  His approach was extraordinarily conservative, using Walmart's own financial and sales/volume data, Zest's pricing and business plans, other evidence produced in the case, and uncontroverted economic principles to opine on three alternative measures of Zest's damages from Walmart's pervasive misconduct:  (1) how much Walmart has been unjustly enriched; (2) the amount of Zest's actual losses (lost profits); and (3) the amount of a reasonable royalty to compensate Zest for Walmart's misconduct.  Notwithstanding the arguments in Walmart's Motion, Dr. Becker did so based on appropriate analysis and without "unsupported speculation," "counterfactual assumptions," or any "failure to apportion damages."  The bases for and propriety of each measure of damages are discussed in turn below, each of them confirming the soundness, reliability, and admissibility of Dr. Becker's proffered testimony.

## III.    ARGUMENT AND AUTHORITIES

Dr. Becker's damages analysis is properly based on the assumption that liability has been established and Walmart is therefore required to answer in damages for having breached the NDA,

misappropriated the trade secrets, misused Zest's confidential information, and defrauded Plaintiffs. Walmart Omnibus Ex. 24 at ¶¶ 73-74. It is ironic that Walmart argues that Zest's "accumulated deficit" and lack of historical profits should preclude Dr. Becker from testifying on the value of Zest's technology, *see* Walmart Brief at 7, given that the vast majority of that deficit was incurred in spending over ███████ developing the Zest technology at issue. *See* ZEST_ECOARK0011734 at 11754. The significant expense in developing the Zest technology actually supports the value of the trade secrets and technology, contrary to Walmart's assertions that the deficit indicates that the technology is not valuable.

Certainly some of the Motion's complaints are ripe for cross-examination of Dr. Becker at trial, but none present a basis for excluding his testimony. Each of the Motion's complaints is misplaced and unfounded, as shown below.

### A. Dr. Becker's Proffered Testimony Regarding Plaintiffs' Actual Losses/Lost Profits Should Not Be Excluded From The Trial.

Dr. Becker's lost profits analysis is based on the reasonable assumption that, but for Walmart's misconduct, Zest would have made sales to Walmart and derived associated profits from those sales. That is a reasonable assumption given that Walmart had an undeniable need for and confirmed interest in Zest's technology, as shown above (and discussed more fully in Plaintiffs' Opposition to Walmart's Motion for Summary Judgment, incorporated by reference here. Walmart had an annual multi-billion-dollar food-loss problem that had persisted for 30 years, demonstrating that Walmart was not capable of solving the problem by itself. Walmart's lunch was being eaten by 66 of its 67 competitors. It needed the "███████████████ After all, it was already illegally using Zest as the ██████████ "in its ████████████████

Furthermore, there is no evidence in the record that any other individual or company could have

██████████████████████████████████████████████

supplied the stolen technology to Walmart.  *See* Ex. 32, Choi Depo at 43:2-25.  So it is imminently reasonable for Dr. Becker to conclude that "but-for" Walmart's misconduct—and in order to gain access to the needed technology and otherwise obtain the benefits of the Zest trade secrets and other confidential information—Walmart would have been required to move forward with Zest as a solutions provider at market pricing.  *See* Walmart Omnibus Ex. 24 at ¶¶ 79-81.  Zest's loss of that business is directly attributable to Walmart's misconduct.  *See id.*  That provides the basis for Dr. Becker's opinions and calculation of lost profits. All of Walmart's complaints about the lost profits calculation present insufficient basis for excluding Dr. Becker's testimony.

        1.     A ████ Margin Is Reasonable and Appropriate.

Dr. Becker's analysis of Zest's business model and pricing uses generally accepted economic and damages methodologies.  First, he analyzed Zest's relevant documentation and financial data to ascertain Zest's pricing and revenue structures.  As Dr. Becker explained in his expert report and deposition, the Zest business model is structured to generate revenue based on two income streams: ████████████████████████████████████████████████████
███████████████ And Zest bases its pricing ████████████████████████████████████ Ex. 29 (ECOARK0024279-311) at 14305.  Typically, the growers and suppliers are charged a fee of ██████ per pallet, which includes ████████████████████████████████████████
████████████████ Ex. 29 (ECOARK0024279-311) at 24305. ██████████████████████
████████████████████████████████ Ex. 30 (ZEST_ECOARK0041260-272) at 41267. ████
████████████████████████████████████████████████████ Walmart Omnibus Ex. 24 at ¶ 43.

███████████████████████████████████████████

The Motion incorrectly asserts, with no basis, that Dr. Becker did not independently analyze or verify that the bases for the ██ profit margin he projects in the damages model "were economically sound."  Walmart Brief at 8.  In fact, Walmart's counsel confirmed with Dr. Becker at his deposition that he <u>did</u> analyze the ██ profit margin:



Ex. 31, Becker Depo at 272:14-22.  Walmart's counsel chose not to ask any follow-up questions to explore or test Dr. Becker's analysis of the efficacy of the ██ profit margin.  Even so, Dr. Becker has cited to underlying documentation in his report and testified that the Zest business with Walmart was designed to operate at a ██ margin, that the margin is confirmed in Zest's business plan and presentations to investors, and that the margin is also informed by the business experience and expectations of Zest's CEO, Mr. Mehring.  Walmart Omnibus Ex. 24 at ¶¶ 45, 95, 161.  Dr. Becker also testified about the sources and independent calculation of the ██ margin:

PUBLIC VERSION



Becker Depo at 139:17:140:11.

PUBLIC VERSION

█████████████████████████████

The ████ margin also appropriately includes over ██████████ dollars in <u>costs</u> that

Zest would incur to scale up and serve Walmart's business and distribution centers:



PUBLIC VERSION





PUBLIC VERSION



So Dr. Becker's analysis of the profit margin and economic effects of Walmart's misconduct (and how to compensate Zest properly) is not, as Walmart asserts, "unproven and speculative" or the product of "no independent analysis to verify" its economic soundness.  Dr. Becker's opinions are based on his independent analysis and verification of the facts of the case, the available evidence, and sound economic principles.

In contrast, Walmart offers no suggested profit margin in response to Dr. Becker's profit margin, apparently on the theory that Zest could not have made any profit because it did not have historical profits.  If Walmart had stolen the trade secret for Harlan Sanders' "Original Recipe" in 1950 before he franchised the business successfully, they would argue that Colonel Sanders should not get lost profits because his product had insufficient profit history.  That is not the law in Arkansas, nor should it be.

It is telling that Walmart fails to cite to any Arkansas law anywhere in the lost profits section of Walmart's Brief.  In Arkansas, lost profits are recoverable in both tort and contract cases when proved with reasonable certainty.  *Ishie v. Kelley*, 302 Ark. 112, 788 S.W.2d at 226 (1990). The plaintiff must present a reasonably complete set of figures to the fact-finder, who should not be left to speculate as to whether there could have been any profits.  *Boellner v. Clinical Study Centers, LLC*, 2011 Ark. 83, 378 S.W.3d 745 (2011).  <u>But less certainty is required to calculate the amount of lost profits than is required to establish that such profits were lost and are recoverable.</u>  *Reed v. Williams*, 247 Ark. 314, 445 S.W.2d 90, 91 (1969).  "Where it is reasonably certain that profits would have resulted, then the complaining party is entitled to recover lost profits….   The loss may be determined in any manner which is reasonable under the circumstances."  *Hudson v. Cook*, 82 Ark. App. 246, 105 S.W.3d 821, 829 (2003) (citations omitted); *Spann v. Lovett & Co., Ltd.*, 2012 Ark. App. 107, 389 S.W.3d 77, 91 (2012) ("The fact that a party can state the amount of damages he suffered only approximately is not a sufficient reason for disallowing damages if, from the approximate estimates, a satisfactory conclusion can be reached.  It has also been held that damages may be approximated; that a damage figure will be upheld if an amount approximating that figure can be ascertained from the evidence; and that a damage award need not correspond in amount to the proof adduced by either party.  When, from the nature of the case, the amount of damages cannot be estimated with certainty, or only a part of them can be estimated, the question should go to the jury.") (citations omitted).

As the Arkansas Supreme Court found in *Jim Halsey Co. v. Bonar*, 284 Ark. 461, 683 S.W.2d 898, 903 (1985), the "rule that damages which are uncertain or contingent can not be recovered, does not apply to uncertainty as to the value of the benefits to be derived from performance, <u>but to uncertainty as to whether any benefit would be derived at all.</u>  If it is reasonably

19

certain that profits would have resulted had the contract been carried out, then the complaining party is entitled to recover." (emphasis added).[2] Dr. Becker's proffered testimony plainly complies with the standard set by the court in *Jim Halsey Co.*

Under Arkansas law, it is certainly clear that Plaintiffs have been damaged by Walmart's misconduct and that the but-for business opportunity with Walmart would have led to benefits and profits for Zest. So less certainty is required to calculate the exact amount of the damages. *See Reed*, 445 S.W.2d at 91. All that is required here is a reasonable estimate of the damage, and Dr. Becker's ███ margin—based on Zest's own business planning, Dr. Becker's analysis, and the available evidence—is the most reasonable estimate available. Dr. Becker has confirmed that Zest's business with Walmart was projected to operate at a ███ margin, a fact that Dr. Becker analyzed and found reasonable. Although Walmart does not agree with the ███ margin, it offers no estimate of its own.

Walmart's citations to law from other jurisdictions are irrelevant and plainly distinguishable. Arkansas law applies here. Unlike the expert in *Craig v. Xlear, Inc.*, 2019 WL 1119429 (D. Utah Mar. 11, 2019), Dr. Becker did not rely on any <u>growth</u> projections; he verified and applied the business model profit margin. And Walmart does not contest the amount of growth that Zest would experience in the but-for scenario: everyone concedes that Walmart receives and ships millions of pallets of fresh food each year—the dispute here is to what extent Zest would

---

[2] And the recoverability of lost profits is available even to new businesses without established profitability: "there is no absolute denial of damages for lost profits to a newly established business" and lost profits are potentially available to all businesses based on the same standard of proof. *See* Ark. Code Ann. ¶ 16-64-131.

████████████████████████████████████

operate profitably while solving Walmart's multi-billion-dollar problem in Fresh.  Unlike the

experts in *King-Ind. Forge v. Millennium Forge, Inc.*, 2009 WL 3187865 (S.D. Ind. Sept. 29,

2009), and *JRL Enterprises v. Procorp Assocs. Inc. v. Procorp. Assocs., Inc.*, 2003 WL 21284020

(E.D. La. June 3, 2002), Dr. Becker did not "parrot" information provided to him by a party—he

independently analyzed and verified the information and data with multiple sources and confirmed

its reliability.  He should be permitted to testify about his opinions, and Walmart is free to cross-

examine him.

        2.      The ████ License Term Is Reasonable and Appropriate.

Despite Walmart's assertion, Dr. Becker's opinion on a ████ license term is not

"arbitrary" or "unsupported," nor is it "ipse dixit."  To be clear, Dr. Becker's model assesses

damages on both ██████████ timelines, to assist the jury.  He reasonably opines that the

horizon of the parties' "but-for" business relationship would extend beyond the initial ████████

contemplated in Walmart's Request for Information.  And that opinion is based on non-

controversial facts and the economic realities of the parties' situation:  from an economic

perspective, it is reasonable to assume that once the Zest technology was integrated across

Walmart's supply chain, Walmart would be averse to incurring the switching costs associated with

a relatively immediate change.  Walmart Omnibus Ex. 24 at § 90.  That conclusion is based on

Walmart's demonstrated history of using the same logistics systems for periods well beyond three

years.  *Id.*  In fact, in dealing with Zest, Walmart stressed the importance of Zest's technology

integrating with Walmart's Global Logistics System, which has been in place at Walmart for more

than 20 years.  *Id.*  So, given Walmart's demonstrated need for Zest's technology, the billions of

dollars to be saved (and made) by Walmart, and Walmart's expressed interest in acquiring and

integrating Zest technology into Walmart's Global Logistics System, Dr. Becker's finding that the

PUBLIC VERSION

█████████████████████████████████████████████

parties' relationship would extend for an additional ████████████████████████—is reasonable and soundly based on the facts and economic realities.  *Id.*  In this situation, Walmart is also unlikely to switch providers freely because there is no other source from which it can access the relevant technology in the marketplace.  Ex. 32 (Choi Depo) at 43:2-25

In fact, Dr. Becker described the economic realities to Walmart, in detail, at his deposition. Ex. 31 (Becker Depo) at 184:18-189:25.  As part of his explanation, he compared Walmart's switching options to those of a natural gas-consuming business, which can switch immediately and without significant expense at the moment its current supply contract ends.

████████████████████████████████████████████████████████



*Id.* at 187:18-189:1.

The rationale for applying a ▮▮▮▮▮ term is also supported by Walmart's effort to secure a patent right over the Zest technology in 2017 and 2018, which is an effort to acquire exclusive rights over the claimed technology for <u>20 years—not</u> ▮▮  *See* Ex. (Choi Depo) at 67:17-20.  Dr. Becker's opinion is also supported by the experience of Walmart's expert Dr. Choi, who has never opined on behalf of a patentee that it was not entitled to damages through the end of the patent's life.  *See* Choi Depo at 68:12-24.

PUBLIC VERSION

███████████████████████████████

The Arkansas Supreme Court has approved damage models seeking ████ lost profits

damages on the same type of factual bases that Dr. Becker provides here:

> The appellee offered the following evidence as to lost profits.  He maintained that he would
> have received a profit of $ 15,193.75 if Rick Nelson had appeared.  The $ 15,193.75 figure
> was based on 85% capacity at the stadium, with half of the tickets sold to adults for $ 7.00
> and half to children for $ 4.00.  Half of the partial capacity seating was then multiplied by
> $ 4.00 and the other half by $ 7.00.  These two gross revenues were then added.  That total
> was multiplied by 25%, Bonar's contractual share of the ticket sale.  The total equalled $
> 15,193.75.
>
> ***
>
> Baker testified as to the amount of income the appellee will lose as a result of the damage
> to his reputation.  The witness stated that a promoter can expect to put on at least one
> concert a year.  He then figured a reasonable income from that concert based on a formula
> which included the number of seats at the local stadium, a typical ticket price, and
> reasonable ticket sales based on an average vacancy rate.  He subtracted concert expenses
> and arrived at a new yearly income for the promoter of $ 31,880.00.
>
> A second witness testified as to the present value calculation of that annual income over
> periods of three, five, and ten years

*See Jim Halsey Co.,* 683 S.W.2d at 903.  Arkansas law militates for the same result in this case:

the jury should determine the lost profits damages from Dr. Becker's ████████████ models

after Walmart has the opportunity to cross-examine on the bases for both.

> 3.    No One Assumes That Walmart Is Currently Using Pallet-Level
>       Monitoring.

No one, including Dr. Becker, assumes that Walmart is currently using pallet-level

monitoring—although Walmart's internal documents make clear that pallet-level monitoring (and

the freshness indicator that requires it) is part of Walmart's design and development of Eden/Muse.

Ex. 33 (Walmart Application).  In fact, the per-pallet analysis in Dr. Becker's report is merely the

relevant pricing to model Zest's revenue in the but-for scenario where Walmart is required to

engage Zest as a solutions provider:



Walmart Omnibus Ex. 24 at ¶ 43 (emphasis added).

And the record shows that ***Walmart actually requested that Zest structure its pricing on a per-pallet basis***. Ex. 28 (ZEST_ECOARK0011724-754) at 11753.  Nothing in Dr. Becker's report requires Walmart to perform pallet-level monitoring, nor does he assume that Walmart is currently performing pallet-level monitoring.  But in the but-for world where Walmart has engaged Zest as a solutions provider, Walmart would get immediate access to pallet-level monitoring and achieve all of the savings available for the end-to-end, farm-to-store solution that Zest offers (and that Walmart has designed for itself in Eden/Muse).  In the real-world, ███████████████ ████████████████████ but it is undeniably part of the Eden/Muse design and development. Ex. 33 (Walmart Application); Ex. 34 (WM00005499-5511) at 5507-08.  Dr. Becker explained these issues in detail in his deposition, so it is not new information to Walmart.  Yet it is not mentioned in Walmart's Brief, which leads Walmart to assert incorrectly that Dr. Becker made a "false assumption" or "counterfactual assertion."  Specifically, Dr. Becker explained his entire methodology, showing why Walmart's complaint about pallet-level monitoring is a red herring (and explaining why ████████████████████████████ does not alter the lost profits model):

25





PUBLIC VERSION









PUBLIC VERSION



Ex. 31 (Becker Depo) at 197:20-201:25.  In other words, whether Zest's price is per-pallet (because

Walmart is using pallet-level monitoring) or per-truck (with no pallet-level monitoring, but where

the per-truck price is approximately 30 times the per-pallet price because each truck holds roughly

30 pallets), the end result in damages is essentially the same.

It is vital to remember—because Walmart's Brief ignores it—that Dr. Becker's lost profits

calculation is in the but-for scenario where Walmart is required to pay Zest for the use of the Zest

technology.  As demonstrated throughout the record, that use has been pervasive and devastating.

In this but-for scenario, Walmart is not permitted to haggle with Zest over how much of the

technology is being used in the current real-world—it is paying for commercial access to the full

suite of Zest technology.  The but-for scenario is, by definition, a scenario about events that never

happened:  Walmart has never agreed to pay Zest for use of the technology, Walmart has never

PUBLIC VERSION

acknowledged its misappropriations, Walmart has never respected Zest's property rights, and so far Walmart has never performed pallet-level monitoring on a commercial basis. But it must still pay the market price for commercial access to Zest's technology in the but-for scenario. And the legally approved and economically sound approach to lost profits in the but-for world is to calculate the damages as if Walmart had done all of those things, because that was the basis of the bargain that Walmart chose to avoid in favor of theft. Walmart is aware of the soundness of Dr. Becker's but-for analysis but omitted it from its Brief:





Ex. 31 (Becker Depo) at 202:16-203:20.

Given the foregoing, the jury should hear Zest's basis for its damages and Dr. Becker's opinions, including on pallet-level monitoring.  Walmart can then have the opportunity to cross-examine Dr. Becker as it sees fit.

        4.       It Is Clear That Growers and Suppliers Would All Pay for Walmart's Use of Zest's Technology—Because That's What Walmart Requested.

Walmart's complaint about grower/supplier fees is ironic because, as the world's largest company and most notorious retailer, Walmart is famous for dictating onerous terms to its suppliers, including Zest in this case.  *See* Ex. 35 ([https://www.cips.org/en/supply-management/news/2017/march/wal-mart-to-squeeze-suppliers-to-win-discount-chain-price-war-/](https://www.cips.org/en/supply-management/news/2017/march/wal-mart-to-squeeze-suppliers-to-win-discount-chain-price-war-/)).  So it is bold for Walmart's Brief to defend the rights of the growers and suppliers who sell fresh food to Walmart.  But the credibility and weight of Walmart's complaint on this issue is zero, ***because Walmart asked Zest to charge the fees to its growers on a per-pallet basis***:



Ex. 28 (ZEST_ECOARK0011724-754) at 11753.  In fact, the evidence shows that Zest's pricing

to Walmart was ███████ at Walmart's request to involve lower hardware expense, with per-pallet

prices at Walmart's request to be paid by the growers and suppliers.  *Id.*  As with Walmart's other

complaints about Dr. Becker's proffered testimony, this complaint may arise in cross-examination,

but it is not a ground for excluding his testimony.

        B.      **Dr. Becker's Proffered Testimony On Unjust Enrichment Should Not Be Excluded From The Trial.**

     In this section of its Brief, Walmart seeks to rehash several of the same complaints from

the lost profits section.  As shown above, those complaints are all ineffective and insufficient to

exclude any of Dr. Becker's proffered testimony.  And Walmart's complaints about Dr. Becker's

unjust enrichment analysis should meet the same fate.

███████████████████████████████████

      1.      Dr. Becker's Use of <u>Walmart'███</u> Waste Reduction Figure Is Correct and Appropriate, As Confirmed by Dr. Becker's Independent Analysis.

Walmart's complaint about Dr. Becker's use of <u>Walmart's own estimate and admissions</u> about how much it has saved from technology stolen from Zest—because it supposedly is "not the product of independent analysis"—is nonsensical and incorrect. First, both of the cases cited by Walmart for excluding an expert opinion for failure to provide independent analysis involved an expert who admittedly did no analysis after receiving data <u>from his client</u>. That is not the situation here: Dr. Becker is using the <u>admission of a Walmart senior executive</u> estimating Walmart's measured savings at ███, which Dr. Becker then independently analyzed, before using the admission as a basis for his opinions on unjust enrichment. And, in fact, Walmart itself has used the same ███ in its own business calculations. Ex. 31 (Becker Depo) at 232:1-8. Walmart's two cases are thus distinguishable and irrelevant.

In any event, Dr. Becker did independently analyze the accuracy of Walmart's ███ admission by running it on Walmart's actual financial data to show total savings in fiscal year 2018 of ███████ which is not materially different from Walmart's previous sworn admission that its savings in that year were ███████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

Walmart Omnibus Ex. 24 at n.287. So the estimate checks out against Walmart's financial results.

Walmart's reliance on the Third Circuit's opinion in *Elcock v. Kmart Corp.*, 233 F.3d 734 (2000), is likewise ineffective. In that case (as Walmart's Brief concedes at page 14), an expert on disability assessment was excluded for assuming "100 percent disability, when the actual evidence demonstrated a much lower disability percentage." In this case, the only actual evidence

████████████████████████

produced by Walmart confirms that Walmart's admission of ████ savings is accurate and correct, as confirmed by Dr. Becker in his report.  *See id.*  And it is so accurate and reliable that Walmart has used the ████ estimate in its own business calculations.  *See* Ex. 31 (Becker Depo) at 232:1-8.

Dr. Becker has already testified to his understanding and independent analysis of Walmart's ████ estimate, including the fact that Walmart's own internal calculations used the same estimate to calculate its ██████ savings in fiscal year 2018:





Ex. 31 (Becker Depo) at 231:15-232:13

Walmart's complaint about Dr. Becker's analysis and use of Walmart's ███ estimate (at page 13 of the Brief) is misleading and based on an incomplete quote from the deposition.  It is notable that Walmart's block quote of Dr. Becker's testimony ends with an ellipsis.  After Walmart's ellipsis, Dr. Becker's answer continues for two full paragraphs:



Ex. 31 (Becker Depo) at 236:16-237:3.  So all of the evidence produced by Walmart indicates the propriety of Walmart's estimate of ██ savings.

Because Dr. Becker's independent analysis confirms the ██ estimate and admission by Walmart as factually correct and consistent with all of the evidence in the case, Walmart's complaint on this issue does not present a ground for exclusion.  Walmart is free to cross-examine the witness on the issue at trial.

        2.     Dr. Becker's Use of Walmart's Waste Reduction Data Is Correct and Appropriate.

Dr. Becker's projections for Walmart's increasing annual savings are neither speculative nor unsupported.   In fact, Walmart's Brief cites two separate bases for the projections:

████████████████████████████████████████████████

(1) Walmart's demonstrated "growth in savings Year 1 to Year 2;" and (2) Walmart's stated goal of reducing waste by $2 billion per year over five years.  Brief at 15.  Additional bases include Walmart's repeated projections about the size of its achievable cost savings (and other expected financial benefits) from ████████████████  *See supra* at pages 2-5.  Another basis is the testimony of Walmart's damages expert Dr. Choi, who confirmed that there is no documentation or testimony in the record to suggest that Walmart is <u>not</u> going to meet its goal of $2 billion savings in five years.  Ex. 32 (Choi Depo) 153:2-10, 197:14-198:5.  Given that Walmart's savings in year 1 were ████████ and there is no evidence that Walmart will not achieve $2 billion in savings by year 5, it is reasonable and appropriate to conclude that the rate of Walmart's savings will accelerate (and likely already has accelerated) through year 5, just as Dr. Becker concludes.

While Walmart's Brief suggests there could be other inputs to Walmart's savings rates (Brief at 15), Walmart's expert does not offer any opinions quantifying any of those potential influences, so Walmart will be left to its cross-examination of Dr. Becker if it wants to elicit expert testimony on other potential influences.  In the meantime, Walmart's disagreement with Dr. Becker's assumption of increasing savings from Walmart's misconduct is not grounds for excluding his testimony.

C.   **Dr. Becker's Proffered Testimony On Reasonable Royalty Damages Should Not Be Excluded From The Trial.**

Dr. Becker's enhancement of the applicable royalty rate—to account for Walmart's destruction of trade secret value from Walmart's disclosure and publication of them—is reasonable and appropriate under applicable law:



Walmart Omnibus Ex. 24 at ¶ 228.

It is axiomatic that the publication of the Walmart Application containing Zest trade secrets caused the ultimate damage to the trade secrets – it destroyed them.  *See In re Iowa Freedom of Information Council*, 724 F.2d 658, 662 (8th Cir. 1983) ("Trade secrets are a peculiar kind of property. Their only value consists in their being kept private. If they are disclosed or revealed, they are destroyed."); *Zitan Techs., LLC v. Liang Yu*, 2019 U.S. Dist. LEXIS 3067, *9-10, 2019 WL 95779 (D. Nev. Jan. 3, 2019) ("Public disclosure of a trade secret destroys the information's status as a trade secret.  This harms the trade secret owner by both depriving him of a property interest . . . and by allowing his competitors to reproduce his work without an equivalent investment of time and money. Disclosure of non-trade secret confidential information is similarly recognized as a serious harm."); *Southwestern Energy Co. v. Eickenhorst*, 955 F. Supp. 1078, 1085 (W.D. Ark. Mar. 18, 1997) ("The comments to the Act make clear that the 'use/disclosure' vein of the misappropriation definition allows for either aspect to qualify. The comments explain that 'because the trade secret can be destroyed through public knowledge, the unauthorized disclosure of a trade secret is also a misappropriation.'").  "[C]ourts have acknowledged that 'it is axiomatic that unprotected disclosure of a trade secret destroys the secret....' And they have consistently noted that the impact on the value of a trade secret 'often will not be readily compensable in damages because of the difficulties involved in valuing the consequences of the destruction of a

███████████████████████████████████████

trade secret.'"  *InnoSys, Inc. v. Mercer*, 364 P.3d 1013, 1021 (Utah 2015) (citations omitted); *see V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120, 1126 (D. Nev. 2013) ("Specifically, '[p]ublic disclosure of a trade secret destroys the information's status as a trade secret.'  Such destruction causes irreparable harm to the trade secret owner 'by both depriving him of a property interest and by allowing his competitors to reproduce his work without an equivalent investment of time and money.'") (citation omitted); *Precision Plating & Metal Finishing Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262, 1263 (5th Cir. 1970) (public disclosure of a secret process can amount to "complete destruction of the value of the process").

As shown in Plaintiffs' Opposition to Walmart's Motion for Summary Judgment, filed contemporaneously herewith at section IV.E.5, the freshness indicator/shelf life prediction/temperature monitoring trade secrets in the Walmart Applications inform the other key facets of Eden/Muse and Zest's claimed trade secrets.  In these circumstances, there is no need or duty to further apportion the reasonable royalty, and Walmart cites to no law that would require any further apportionment here.   In fact, Walmart's expert Dr. Choi performs no further apportionment, other than disagreeing with the ██ enhancement that Dr. Becker properly applied. In fact, given Walmart's disclosure and publication of Zest's technology, the posture of the parties' hypothetical negotiation essentially becomes one between competitors and/or requiring an exclusive license (both because the patent applications represent an effort by Walmart to establish exclusive ownership rights over the Zest technology and because other potential customers of Zest will no longer need to license Zest's technology because Walmart has published it to the world). All of this justifies Dr. Becker's reasoned and reasonable opinion on enhancing the royalty rate by ██





PUBLIC VERSION



Ex. 31 (Becker Depo) at 69:9-71:9

 Finally, Dr. Becker's opinion that Zest has been grievously injured by Walmart's disclosure and publication of the trade secrets is based on Walmart's destructive disclosure of Zest trade secrets.  That affected not just Zest's ability to do business with Walmart, but also its ability to do business with the rest of the addressable market.  Because of Walmart's misconduct, Zest's— and Walmart's—competitors can now access Zest's technology on the U.S. Patent Office website and design their own system using Zest's former trade secrets and confidential information.  And if the patent issues, Walmart will have the right to exclude everyone—ironically, including Zest— from using the Zest technology.

Given the foregoing, Dr. Becker clearly applied an objective methodology to all available evidence arriving at his conclusions. None of the law cited by Walmart requires that Dr. Becker identify which market opportunities have been lost due to Walmart's disclosure and publication, because the law is based on the axiom that disclosed trade secrets are destroyed trade secrets. For a its reasonable royalty claim, Zest does not have to prove any loss of business. "Such flexibility in determining a reasonable royalty is imperative in cases involving business torts such as misappropriation of trade secrets. This is because 'public policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injury they have suffered." *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 385 N.E.2d 1349, 1356 (Mass. 1979). "This is especially important where (1) a defendant has destroyed the value of plaintiff's secret through publication and has not enjoyed any profits and (2) the plaintiff is hard-pressed to show any loss." *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 311, 1998 Iowa Sup. LEXIS 130 (Iowa 1998).

Walmart's issues do not represent a basis for excluding Dr. Becker's proffered testimony.

## IV.   CONCLUSION

Given the foregoing, Plaintiffs respectfully submit that the Court should deny Walmart's motion to exclude Dr. Becker's proffered testimony on every ground raised by the motion.

Dated: March 20, 2020                    Respectfully submitted,

By: */s/ Fred I. Williams*
Fred I. Williams (*pro hac vice*)
Texas State Bar No. 00794855
Michael Simons (*pro hac vice*)
Texas State Bar No. 24008042
Todd E. Landis *(pro hac vice)*
Texas State Bar No. 24030226
Jonathan L. Hardt (*pro hac vice*)
Texas State Bar No. 24039906
WILLIAMS SIMONS & LANDIS PLLC
327 Congress Ave., Suite 490
Austin, TX 78701
512.543.1354
fwilliams@wsltrial.com
msimons@wsltrial.com
tlandis@wsltrial.com
jhardt@wsltrial.com

Dustin B. McDaniel, Bar # 99011
Scott Richardson, Bar # 2001208
Bart Calhoun, Bar # 2011221
McDaniel, Richardson, & Calhoun PLLC
1020 West 4th St., Suite 410
Little Rock, AR 72201
501.235.8336
501.588.2104 fax
dmcdaniel@mrcfirm.com
scott@mrcfirm.com
bcalhoun@mrcfirm.com

Ross David Carmel, Esq. *(pro hac vice)*
New York State Bar No. 4686580
CARMEL, MILAZZO & DiCHIARA LLP
55 West 39th Street, 18th Floor
New York, New York 10018
(212) 658-0458 telephone
(646) 838-1314 facsimile
rcarmel@cmdllp.com

*Attorneys for Plaintiffs Zest Labs, Inc. f/k/a*
*Intelleflex Corporation, and Ecoark Holdings, Inc.*

48

PUBLIC VERSION

### **CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2020, the foregoing document was served on all counsel of record, via electronic mail and the Court's CM/ECF system, pursuant to the Federal Rules of Civil Procedure.


_/s/ Fred I. Williams_
Fred I. Williams

**<u>Exhibit List to Plaintiffs' Opposition to Defendant's Motion to Exclude Testimony of Damages Expert Stephen L. Becker, PH.D.</u>**

| | |
|---|---|
| 1 – Public | 19 – Filed Under Seal |
| 2 – Filed Under Seal | 20 – Filed Under Seal |
| 3 – Filed Under Seal | 21 – Filed Under Seal |
| 4 – Filed Under Seal | 22 – Filed Under Seal |
| 5 – Filed Under Seal | 23 – Filed Under Seal |
| 6 – Filed Under Seal | 24 – Filed Under Seal |
| 7 – Filed Under Seal | 25 – Filed Under Seal |
| 8 – Filed Under Seal | 26 – Filed Under Seal |
| 9 – Filed Under Seal | 27 – Filed Under Seal |
| 10 – Filed Under Seal | 28 – Filed Under Seal |
| 11– Filed Under Seal | 29 – Filed Under Seal |
| 12 – Filed Under Seal | 30 – Filed Under Seal |
| 13 – Filed Under Seal | 31 – Filed Under Seal |
| 14 – Filed Under Seal | 32 – Filed Under Seal |
| 15 – Filed Under Seal | 33 – Filed Under Seal |
| 16 – Filed Under Seal | 34 – Filed Under Seal |
| 17 – Filed Under Seal | 35 – Public |
| 18 – Filed Under Seal | |

# EXHIBIT 1



**Walmart ☀ T☺DAY**

⋮⋮ ALL TOPICS   🔍

⋮ Topics ≡

INNOVATION

# Eden: The Tech That's Bringing Fresher Groceries to You

By Parvez Musani
Vice President – Supply Chain Technology, Walmart
March 1, 2018



## *What's for dinner tonight?*

No matter the answer, there are some givens: It has to taste good, be good for you, and be affordable. But when you're shopping with limited time, how can you be sure you're buying the freshest apples, milk that will last, or perfectly ripe bananas?

We think our new intelligent food system called Eden can help. Developed in just six months by our own associates, it is improving the quality and flow of fresh groceries from farm to shelf.

Eden is the result of a friendly competition, or hackathon, among the engineers on our fresh merchandising teams. Our goal was to figure out the best way to keep track of food freshness all the way from the farms to our stores. The winning team determined that building a digital library of food standards was the answer. So they gathered the many chapters of food product specifications set by the USDA, layered on Walmart's own rigorous product standards, and combined all of this information with more than a million photos to create a freshness algorithm that prioritizes the flow of perishable goods worldwide.



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
52



As a result, Josh Bohling, senior designer of associate experience design, and I have filed two patents for Walmart, and Eden is now the cornerstone of Walmart's move to improve the quality of fresh produce for sale to our customers.

Eden leverages sophisticated technologies such as machine learning, but we've made it simple enough for all of our associates to use. Eden's suite of apps helps Walmart associates better monitor and care for fresh fruits and vegetables that are waiting to be shipped from distribution centers to stores. That could mean more efficiently ripening bananas, predicting the shelf life of tomatoes while they're still on the vine, or prioritizing the flow of green grocery items from the back of the store to the shelf.

For example, take everybody's favorite, the banana. This tasty fruit is consistently among the best-selling grocery items in Walmart's U.S. stores. Bananas travel from seven countries in Latin America to over 4,000 stores in the U.S. On such a long road, what happens to those bananas if temperatures in the container trucks exceed acceptable ranges? In the future, Eden will be able to recalculate the freshness factor and re-route the shipment immediately. The bananas end



up in a closer store to optimize freshness, consumers take home a delicious bunch, and everyone is happy.

Eden also helps eliminate food waste. Our goal is to eliminate $2 billion in waste over the next five years. Already, Eden is being used in 43 distribution centers and has prevented $86 million in waste from happening.

What was once a manual inspection process is now more efficient and thorough than ever. We're proud to say that we're the very first retailer who has digitized this entire process. Thanks to the power of technology, we're able to bring you and your loved ones the freshest food, even faster.

SHARE   f   t   in   ✉

👍 Like   69 people like this. Sign Up to see what your friends like.

# EXHIBIT 35

Case 4:18-cv-00500-JM   Document 288   Filed 04/21/20   Page 59 of 63

# Wal-Mart squeezes suppliers in price war

posted by *Su-San Sit*
in *Supply chain*
31 March 2017

**_Wal-Mart_ has increased pressure on its suppliers to cut costs in an effort to regain its spot as the US's low-price leader.**

Last month Wal-Mart held a summit near its headquarters in Arkansas with their product suppliers, including *Johnson & Johnson*, *Unilever* and *Kraft Heinz*, to demand they reduce the costs they charge the retailer by 15%, according to *Reuters*.

Suppliers who attended the summit told Reuters that during its presentation, Wal-Mart said they expected suppliers to help the company beat rivals on head-to-head pricing 80% of the time.

To accomplish the retailer's demands, the suppliers said they would have to cut their wholesale prices or make other cost adjustments to shave the required 15%.

When asked about the claims, Wal-Mart's communications department told Consumerist it was "investing in price".

"We continuously look for ways to deliver savings to our customers—it's part of our DNA," it said.

"But we're not in a position to share our strategy for competitive reasons."

The move follows a price comparison test the retail giant launched last month in 1,200 US stores to find the right price point against Germany-based discount grocery chain *Aldi* and domestic rivals *Kroger*, according to *Fortune*.

*Wolfe Research* estimates that Wal-Mart controls about 22% of the US grocery market but its prices have been as much as 20% higher than Aldi's prices on many grocery staples.

A supplier of consumer goods to Wal-Mart told Fortune that the retailer had cut prices on some his company's products by as much as 30% in some stores over the past few months.

"It helped them figure out the sweet spot that drives traffic," he said.

The sources who attended the summit also revealed Wal-Mart wanted suppliers to make logistics improvements that would help them get $1bn more in sales by working harder on shipping orders in full and on-time, which would trim delivery costs, reduce re-orders, and reduce out-of-stock problems.

Jason Goldberg, the head of commerce practice at *SapientRazorFish*, a digital agency working with large brands and retailers, said the brands who agreed to play ball with Wal-Mart could expect better distribution and more strategic help, while those who chose not to would see their distribution limited.

"Once every three or four years, Wal-Mart tells you to take the money you're spending on marketing initiatives and invest it in lower prices," he said.

"They sweep all the chips off the table and drill you down on price."

Wal-Mart's new focus on price competition comes as *Amazon* has increased its aggressiveness in its pricing on the same branded goods it distributes alongside Wal-Mart.

Amazon has invited some of the world's biggest brands to its Seattle headquarters in May to persuade them to start shipping products directly to online shoppers and bypass chains like Wal-Mart, according *Bloomberg*.

In an invitation, seen by Bloomberg, the online retailer said it aimed to rework the supply chain to focus on designing products that can be shipped quickly to customers' doorsteps.

"Times are changing," the invitation said. "Amazon strongly believes that supply chains designed to serve the direct-to-customer business have the power to bring improved customer experiences and global

efficiency.

"To achieve this requires a major shift in thinking."

Ken Cassar, analyst at *Slice Intelligence*, told Bloomberg that despite the long relationships between brands and traditional "bricks and mortar" stores, Amazon had leverage to convince manufacturers to rethink their operations.

Cassar added that the online retailer had 300m shoppers and it could make its own products if brands were not willing to sell on its marketplace.

"Fear, more than anything else may compel these companies to pay attention."

☞ **Want to stay up to date with the news?** *Sign up to our daily bulletin.*

| Amazon | Food and Drink | Pricing | Retail | Walmart |

## NOW READ

› **Ocado to spend £600m opening robotic warehouses**

› **Case study: gamifying Whistles' shop floor challenge**

› **Whole Foods hit by supplier closure**

› **Joules hit by 'stock availability issues'**

› **'Our supply chain requires improvement', says M&S boss**

*SIGN UP TO OUR DAILY GLOBAL*
# NEWS BULLETINS

Email address     GO

**GET** SUPPLY
MANAGEMENT
*MAGAZINE*

JOIN CIPS



  

# SUPPLY MANAGEMENT



CLOSE
FOOTER

## Events

CIPS UK Conference 2020

## Magazine

March

February

December

October

September

## Information

Contact Us

Privacy Statement

Terms & Conditions

About us

Sitemap



Developed by