```
1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
2
                     Case No. 4:18CV00500-JM
3
   ZEST LABS, INC. AND ECOARC    )
4  HOLDINGS, LLC,                )
                                 )
5       PLAINTIFFS,              )
                                 )
6       -v-                      )
                                 )
7  WALMART, INC.,                )
                                 )
8       DEFENDANT.               )   Little Rock, Arkansas
                                 )   March 31, 2021
9  _____)

10

11               VOLUME 3 – PAGES 62 – 88

12          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13         BEFORE THE HONORABLE JAMES M. MOODY, JR.

14               UNITED STATES DISTRICT JUDGE

15  Appearances:

16  FOR THE PLAINTIFFS       Michael Simons, ESQ.,
                             Todd Landis, ESQ.,
17                           Fred Williams, ESQ.,
                             Sarah Tishler, ESQ., and
18                           Jonathan Hardt, ESQ.,
                             Williams, Simons & Hardt, PLCC
19                           327 Congress Avenue, Suite 490
                             Austin, Texas  78701
20  -and-
                             Scott P. Richardson, ESQ.
21                           McDaniel, Wolff & Benca, PLCC
                             1307 West Fourth Street
22                           Little Rock, AR  72201

23                           (Continuing)

24     Proceedings reported by machine stenography, and
    transcript prepared utilizing computer-aided transcription.
25
```

```
 1   Appearances (Cont.'d):

 2   FOR THE DEFENDANTS        John R. Keville, ESQ.
                               Robert L. Green, ESQ., and
 3                             Chante Westmoreland, ESQ.
                               Winston & Strawn, LLP
 4                             800 Capitol Street
                               Suite 2400
 5                             Houston, Texas  77002
     -and-
 6                             John E. Tull, III, ESQ., and
                               R. Ryan Younger, ESQ.
 7                             Quattlebaum, Grooms & Tull, PLCC
                               111 Center Street
 8                             Suite 1900
                               Little Rock, AR  72201
 9
                                  *  *  *  *  *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to the order of the Court at 8:21 a.m.)

 2              MR. YOUNGER:  All right, Your Honor.  Good morning.

 3              THE COURT:  Good morning.

 4              MR. YOUNGER:  This morning I handed you a copy of

 5      the deposition transcript of Aubree Rankin, and it has the

 6      deposition designations marked in it.  I've got two flags on

 7      there.  I think there are two issues to address this morning.

 8      The first issue in terms of order is plaintiff's issue, so

 9      I'll defer to them on the first one.

10              MR. HARDT:  Sure.  I believe Mr. Younger's referring

11      to what's on page 115, Your Honor.

12              THE COURT:  I'm there.  Got a pink --

13              MR. HARDT:  You do.  The pink designates a counter-

14      designation.

15              THE COURT:  Uh-huh.

16              MR. HARDT:  And this relates to her knowledge,

17      Ms. Rankin's knowledge of the shelf life API within Eden or

18      Muse, and she says that she's never worked on that.

19              THE COURT:  What is the shortcut for API?

20              MR. HARDT:  It should be application programming

21      interface.

22              THE COURT:  Got it.

23              MR. HARDT:  It's sort of the back end of the

24      computer program.

25              THE COURT:  Okay.  Thank you.
```

 1          MR. HARDT:  And, Your Honor, we think this is beyond

 2    the scope of any designation that we've made here, and it

 3    might lead to some confusion.  The reason for that is that she

 4    is involved.  In fact, she's the primary developer of several

 5    retention sampling applications and other applications within

 6    the Eden system.  This relates to a shelf life API that we

 7    don't otherwise have any testimony about from her, and we

 8    don't want there to be any confusion about whether or not

 9    she's involved in the rest of Eden.

10          THE COURT:  Is that addressed anywhere else in the

11    designations or in the deposition where we could designate?  I

12    guess I haven't read any of this.

13          MR. HARDT:  Understood, Your Honor.

14          I think as it's specific to shelf life API, this is

15    the only instance of that that would be in the designations,

16    and I don't believe there's any discussion of that elsewhere

17    in the --

18          THE COURT:  I guess I thought your concern was that

19    it would confuse the jury that Ms. Rankin didn't work on other

20    parts of Eden or Muse, and I guess that my question was, is it

21    going to be apparent from other designations that she did.

22          MR. HARDT:  Yes, Your Honor.

23          THE COURT:  Okay.  Do you know off the top of your

24    head where that is so I can kind of compare the two?  Because

25    I'm literally stone cold with this.

```
 1              MR. HARDT:  Sure.  I understand.

 2              Not to be flippant about it, but in many ways it's

 3    going to be most of the other designations.

 4              THE COURT:  No, that's fair.

 5              MR. HARDT:  I think our concern is confusing the

 6    jury with the same question that you asked, which is what is

 7    an API, and it relates to something that's, you know, I

 8    suppose technical in nature, and therefore, may be confusing

 9    to them as to when she's saying for the rest of the transcript

10    that she worked on the retaining application or that she

11    worked on the Sizl application, what does it mean when she did

12    no work on the shelf life API.

13              MR. YOUNGER:  Your Honor, it might help for me to

14    respond.  Do you want to continue?

15              THE COURT:  Well, I have one question before I get

16    to you, Mr. Younger.  I'm not sure I can distinguish in my

17    mind this morning the difference between shelf life generally

18    and shelf life API, but it seems like most of y'all's case is

19    that the trade secrets that were used in Eden and Muse dealt

20    with shelf life, because this whole lawsuit deals with shelf

21    life, and so it's difficult without me reading in.

22              I'm going to listen to Mr. Younger, and then I'm

23    probably going to read through all of the designations, since

24    we're not about to literally play this into the record, so I

25    can get a context for this.
```

1           But Mr. Younger, what do you want to say?

2           MR. YOUNGER:  So, first to address, I think some of

3    the Court's concern, on 115, I think we add to the designation

4    starting at line 8, which is:  "And the next one says average

5    days of life."

6           And then if you follow that for the next few lines.

7           THE COURT:  Page 8?  I don't see a designation.

8           MR. YOUNGER:  I'm sorry, page 115, line 8.

9           THE COURT:  Okay.  I'm there.  You're adding to that

10   designation?  Because I don't have any further designation on

11   page 115.

12          MR. YOUNGER:  Yes, Your Honor.  I think the addition

13   of lines 8 through 13 would address some of the initial

14   concerns that have been addressed.  And with that I'll give

15   the context for the counter-designation that we've provided,

16   as soon as the Court's ready.

17          THE COURT:  Go ahead.  No, I see.  I didn't have to

18   go far, but go ahead.

19          MR. YOUNGER:  Okay.  So the story here starts on

20   page 111, at line 14.  And so what plaintiffs do is they

21   introduce plaintiff's exhibit 380.

22          THE COURT:  Okay.

23          MR. YOUNGER:  So I had initially objected to that

24   because the deponent is not on the e-mails being transmitted,

25   there's not a foundation laid for introducing that.  But as we

1    go through the questioning, there was a wrap-up question at

2    113, page 20 -- I'm sorry, page 113, line 20 through 23 about

3    the presentation that's attached to an e-mail.

4         And so Mr. Hardt argued to me that that wrap-up is a

5    question to her about the spreadsheet or the presentation, she

6    agrees with it.  So I said, okay, I'll withdraw my objection.

7         But my counter to that --

8         THE COURT:  The objection to exhibit 380?

9         MR. YOUNGER:  Correct.

10        THE COURT:  Okay.

11        MR. YOUNGER:  So, but the counter to that is, but

12   she doesn't know about everything in there, and so the

13   questioning about this presentation continues, and we get to

14   this point where they're still asking about the presentation

15   that's in, and she doesn't know about it.  So that's the

16   designation.

17        THE COURT:  Okay.  Just before y'all get to Aubree

18   Rankin, or preferably when you get to a break in the action

19   that precedes you thinking you're going to get to Aubree

20   Rankin in the next session, y'all will remind me that I owe

21   you a decision on that.

22        And then the second one?

23        MR. YOUNGER:  Yes, Your Honor.  This one is mine.

24        THE COURT:  Right.

25        MR. YOUNGER:  Page 116.

```
 1                  THE COURT:  I'm there.
 2                  MR. YOUNGER:  First line.  So I also handed you this
 3    morning exhibit 381, that's the deposition exhibit that's
 4    referenced.
 5                  THE COURT:  Okay.
 6                  MR. YOUNGER:  And Your Honor will see that
 7    Ms. Rankin is not on this correspondence with this
 8    presentation.  And so --
 9                  THE COURT:  So let me -- and maybe this is -- I'm
10    reading 381, which is different than 380, I'm sure, and the
11    deposition reference, you mean the deposition is referencing
12    381?  Because . . .
13                  MR. YOUNGER:  Yes.  The line of questioning at issue
14    starts at line 1:  "Ms. Rankin, I'm going to hand you what I'm
15    marking as exhibit 381."
16                  THE COURT:  Got it.
17                  MR. YOUNGER:  Okay.  So she's not on it.
18                  And then the questioning, which I'll just ask Your
19    Honor to review, it runs through --
20                  THE COURT:  Well, summarize.  Does the questioning
21    of exhibit 381 deal with the attachment or the exhibit itself?
22                  MR. YOUNGER:  It deals with the attachment, but it
23    is simply counsel reading the attachment to the deponent or
24    asking the deponent to read the attachment.  So unlike with
25    exhibit 380 where there's this wrap-up question, like, "so,
```

1    what do you know about it," here it's just, could you read

2    that, does it say that, and nothing more.  And so that's the

3    objection.  There's never a foundation laid for it.

4         THE COURT:  Mr. Hardt, what's -- because it's

5    getting put in the same, I'm going to get to this at a break

6    later, but do you have anything you want me to carry into

7    that?

8         MR. HARDT:  Let me take a crack at this, and maybe

9    I'm overly optimistic, but we might be able to resolve all

10   this at once.

11        I'm going to back up to exhibit 380, the first one

12   that he identified.

13        THE COURT:  Okay.  And that's on --

14        MR. HARDT:  This is --

15        THE COURT:  -- page 111, roughly?

16        MR. HARDT:  Roughly.  But if you look at it, it's

17   the same scenario.  It's Josh Bohling to Chuck Tilmon.  You

18   don't see Ms. Rankin on the cover e-mail.

19        She was examined over this attachment, which I

20   believe you can see that.  It says Muse product Q3 SteerCo.

21   That's their steering committee at senior management; and she

22   was examined over this.

23        THE COURT:  Where are you reading?

24        MR. HARDT:  I'm sorry, I'm on the ELMO, Your Honor.

25        THE COURT:  She'll get it on for you.

1          MR. HARDT:  While that fires up I can just

2    summarize.

3          THE COURT:  It's fired up with me.  Do you have it

4    on your screen around the corner there?  No, literally the

5    screen that's sitting on there.

6          MR. HARDT:  Yes, Your Honor.

7          THE COURT:  Okay.  If you want to -- that's what I

8    see.

9          MR. HARDT:  Okay.

10         THE COURT:  Go ahead.

11         MR. HARDT:  So this is 380.  There's no objection to

12   this coming in.  She's not on the cover e-mail, of course, but

13   this relates to a Q3 SteerCo, and a lot of what's in here

14   relates to their retention sampling applications.

15         THE COURT:  Okay.

16         MR. HARDT:  That's what she was examined about,

17   that's what she has knowledge about, and the first half of her

18   deposition is about her work and her knowledge and involvement

19   in the retention sampling processes that Walmart was putting

20   into place.

21         THE COURT:  Or shorthand, exhibit 380.

22         MR. HARDT:  That's correct.

23         Now, let me show you 381 that is at issue now.  The

24   same scenario, we've got a cover e-mail.  She's not on it.

25   But if we go to the cover of the exhibit, now it is the Q4

1    SteerCo.  It's just, it's the same presentation, it's just the

2    next iteration of it one quarter later.  And what she's being

3    asked about is this particular page, and you see here is

4    "tend".  This is what they called at that time retention

5    sampling application.  They changed the name to this to retain

6    later, but that's neither here nor there.

7              But it is the same issue as the rest of the

8    deposition.  She is the employee that is most familiar with

9    this, and she's being examined about a document that if she

10   did not draft those slides for, she would have been most

11   familiar about the back-end details of what is reflected in

12   those slides.  So we don't see any reason that that should be

13   left out.

14             I told you at the beginning I think we can maybe

15   resolve this.

16             THE COURT:  Okay.

17             MR. HARDT:  I hope we can.  I think if we were to

18   designate on page 115, 8 through 16, as Mr. Younger proposed,

19   and then we had both of these exhibits in the record along

20   with our designations, I think that would be sufficient

21   context to put this in context for the jury, and either party

22   can argue what they need to argue based on the testimony when

23   we get to that point.

24             THE COURT:  When you figure out if you can resolve

25   it without me, let me know.  Otherwise, I'll get to it and get

1    back with you.  My forecast didn't have Aubree Rankin on

2    today's lineup, but I will look at it, and I appreciate that.

3              MR. HARDT:  Thank you, Your Honor.

4              THE COURT:  Anything else?

5              MR. HARDT:  A couple housekeeping matters.  In some

6    ways you just touched on it.

7              We've been looking at the timing, we've been

8    considering what happened at the end of the day yesterday, and

9    we are probably going to have some reshuffling of the order of

10   the witnesses.

11             THE COURT:  Okay.

12             MR. HARDT:  Ms. Rankin would be one of those that we

13   would play possibly late today by deposition designation.

14   Again, it's all contingent on how long they take with

15   Mr. Mehring and those sorts of things.

16             THE COURT:  So you're going to --

17             MR. HARDT:  So we may play Ms. Rankin today, if we

18   get to it.  We may also play other depositions, like

19   Mr. Musani, who's a Walmart employee, and Mr. Cherian, who's a

20   Walmart employee.

21             We have exchanged designations and counter

22   designations.  We have their objections on all those.  What we

23   have not done is met and conferred to resolve those

24   objections.

25             THE COURT:  Or given them to me.

1          MR. HARDT:  Or given them to you, Your Honor.

2          THE COURT:  Just making sure there wasn't an e-mail

3    I missed.

4          MR. HARDT:  No, sir.

5          So I think what we would propose is if you could

6    order us over the long lunch today because I believe you have

7    a criminal hearing, to sit down with each other and meet and

8    confer on those, I think we can, in short order, get these

9    ready to go, and then those videos can be played today so that

10   everything goes in the right order in terms of what's going to

11   be required based on the developments of the last 24 hours.

12         THE COURT:  So I can have a long lunch.  I

13   anticipated an early lunch but not necessarily a longer lunch.

14   But if it would shorten things, I can extend the lunch.

15   That's kind of . . . anyway, it doesn't matter whether it's an

16   hour or an hour and a half, because honestly we probably need

17   the hour off.

18         And so we'll go from 11:30 to 1:00.  Y'all can work

19   out what you can, I will do the best I can to field what you

20   can't work out in the context of today's deal, which brings me

21   to another point.  Do we need to start going to 5:30 to

22   accommodate some -- build in an hour or two based on where

23   this is going, because I've all but promised Mr. Chase he's

24   going to make Jamaica, one way or the other.

25         MR. HARDT:  Your Honor, this is a reshuffling of

1    some order to an extent.  I'm actually confident we're not

2    going to need a hundred percent of the trial time.  If we

3    could keep this streamlined --

4              THE COURT:  And this is not necessarily connected to

5    the reshuffling, this was just a, we're still on witness one,

6    and that doesn't necessarily mean anything, but I'm just

7    trying to ask you, Mr. Hardt, having seen how far we've gotten

8    so far, generally you think we're good on time?

9              MR. HARDT:  Your Honor, I think we are good on time.

10   We've been timing it out, and I think we're cautiously

11   optimistic that we're going to rest at some point early Friday

12   morning, and to that same end it might help just to keep

13   things streamlined and moving on Friday, if we could get an

14   understanding from the defense side who they plan to call

15   first on Friday so that we can be prepared for that witness.

16             THE COURT:  I suspect your comment's got them

17   wondering who they might call on Friday, since they may be

18   ready to start on Monday, but I don't know that.  But, yes,

19   they can think about that today as things go and try to let us

20   know, because we're probably moving a lot of proof forward, if

21   that's the case.  I don't know, I didn't have any notion on

22   when you might be done, so they may have.

23             MR. HARDT:  I hate to be the one that has to stand

24   up on Friday morning and say we still have three quarters of a

25   day to go, but that's currently how it looks like it's going

1    to time out.

2              MR. YOUNGER:  Your Honor --

3              THE COURT:  That's why they sent you out early,

4    Mr. Hardt.

5              MR. HARDT:  I think that's why they're not here,

6    Your Honor.

7              MR. YOUNGER:  Your Honor, if I may?

8              THE COURT:  Mr. Younger, go ahead.

9              MR. YOUNGER:  This is the first we've heard about

10   the new, I guess shuffling of the order, and I'm going to ask

11   if we can have the actual list of who you're calling and when.

12   I'm not clear on whether you're trying to fit in, say, Rankin

13   today, whether you're not playing Foran, when you're calling

14   Mr. May.

15             So if we're going to do this, could you please give

16   us the order of witnesses?

17             THE COURT:  So let me shortcut part of that.

18   They're going to do that for you, because they're going to

19   have to do it for me.  I had understood that you were still

20   going to play Foran next, and then it was whoever might be

21   coming behind him, as opposed to May.

22             MR. HARDT:  That's correct.  After Mr. Mehring is

23   done, Mr. Foran's video will be next.  I'm almost certain that

24   Ms. Rankin's video will be after that.  I'm not certain

25   whether Cherian or Musani's video would be after that, but I

1    would expect one of those two to be the ones after that, and I

2    suspect that would get us to the end of the day today.

3              THE COURT:  All right.  And I'm -- yeah, I'm

4    thinking that at a minimum it will get us to the end of the

5    day, if it gets us to either one of them, but does that answer

6    your question, Mr. Younger?

7              MR. YOUNGER:  Yes, Your Honor, thank you.

8              MR. HARDT:  Your Honor, if you don't mind, one other

9    very brief housekeeping matter?

10             THE COURT:  I don't mind at all.

11             MR. HARDT:  Yesterday we had an issue with one of

12   the exhibits.

13             THE COURT:  There's actually three that are pending

14   in my mind.

15             MR. HARDT:  So I'm referring to the one where there

16   is a question about the Excel spreadsheet, whether it was

17   produced in native.

18             THE COURT:  1301.

19             MR. HARDT:  Yes, Your Honor.

20             So with regard to that, we want to just attempt to

21   resolve that objection, if we can.  I e-mailed the other side

22   yesterday during the hearing -- or during the trial the actual

23   native e-mail that was sent to Walmart, which shows when it

24   was originally sent in the ordinary course of business it had

25   the native attachments.  We confirmed that when we produced it

1   in discovery, the native attachments were produced to Walmart.

2          We've confirmed that both our exhibit list and their

3   exhibit list contain this e-mail, which is the underlying.

4   This one happens to be 1300, but 1301 is just a forward of

5   this.  This one has the same attachments.

6          THE COURT:  Can you slide it down a little bit?

7   Because the attachments are off my radar.

8          Go ahead.  Thank you.

9          MR. HARDT:  Yes, Your Honor.  Sorry about that.

10          So these are the same attachments produced to the

11   other side.  This document is both on our exhibit list and

12   their may-call exhibit list.  So I don't think there's any

13   doubt that they have these spreadsheets or that they were able

14   to examine witnesses over them or anything of those natures.

15   It was clearly within the scope of discovery, the scope of

16   ordinary course of business.

17          It appears that the only error here was that a

18   vendor, when they were stamping everything, put the formal

19   stamp on a copy of the exhibit that just says, "this Bates

20   number was produced natively," instead of putting the native

21   in the exchange folder when we exchanged exhibits.

22          THE COURT:  Mr. Younger, are you the guy responding

23   to?  I'm sorry, I looked down and then I looked.  It's like a

24   magic trick.

25          MR. GREEN:  Rob Green for Walmart.

```
 1              THE COURT:  Yes, Mr. Green, go ahead.
 2              MR. GREEN:  I think we might have gotten to the
 3    bottom of it in looking at it.  There are two attachments to
 4    the e-mail, and I'm not sure what they intended to put up, but
 5    the Bates number that was given yesterday, before they put up
 6    the native, is of a spreadsheet that has one tab, and the
 7    issue yesterday was they had a second tab on the spreadsheet
 8    they were showing.  I believe they showed the other
 9    spreadsheet with a different Bates number.
10              It's like 73 and the next one is 74.  And I don't
11    have the record in front of me but I was looking at it last
12    night, and I know Mr. Simons said, for the record, it's da da
13    da 73, which does not have the tab that was shown to the jury.
14              So I don't know if they just put the wrong native up
15    or he said the wrong number, but I think that's where the
16    confusion came from yesterday.
17              THE COURT:  Is it clear now, though?
18              MR. GREEN:  It's -- I'm not sure, because there's no
19    way to tell what -- you know, he put it up on the screen.  All
20    I can do is read the record, he said the number.  So I'm not
21    even sure which one got entered versus what the jury saw.
22              I do think they put up the other one that was
23    attached, it's just not clear to me what they intended to put
24    up.
25              THE COURT:  Well, I wouldn't think it'd be much of a
```

step for them to recall on their computer what 1301 is and you

can see what they put on the screen.

I don't have -- maybe I do have a copy of the

exhibit somewhere, but if the concern is is whether or not you

received it or not, and I'd ask to have a comparison so I

could rule on it, and I'm happy to leave this up to you guys,

but this indicates that y'all got the document.

Whether or not it's the document that was shown or

not needs to be established, but y'all are going to have to

get together and either look over their shoulder and confirm

that the 1301 that was shown in court either has a bad Bates

number on it or doesn't correspond, and try to get to the

bottom of that either through what's been provided this

morning and let me know, yes, we got it, we went to a bad

reference to look for it, which I hear you saying may be the

case, because the reference that you got in the form of a

Bates number didn't send you to where you expected to see this

document.

MR. SIMONS:  Exactly.

THE COURT:  And I understand that, but I need y'all

to figure that one out, because the witness laid enough

foundation to get it in absent an issue of discovery, and it

would be for you to call somebody and say, I know you got to

prove a negative, but we didn't get this, as opposed to, we

don't think it ought to be admitted because we didn't receive

1    it in discovery, which is, you know, I was talking to

2    Mr. Keville about this, those are two different issues for me,

3    whether or not, absent a discovery issue, it would come in.

4            It's a different layer, and you're saying, we never

5    got this, we've never seen this, so that's why we think it

6    ought to be excluded.  I think it's the latter, that y'all are

7    arguing a discovery issue, not whether or not he said, I've

8    got an e-mail that said we sent this data, raw data-type

9    stuff, as I understood what 1301 was, as part of a pilot

10   project, or whatever they were doing.

11           So if y'all can get to the bottom of what it is and

12   whether or not y'all received it in discovery, then I can rule

13   on it, but I don't know when -- when that's going to happen.

14   It probably won't be an issue until we're through with

15   Mr. Keville's cross.  Is that fair?  I mean, you're not going

16   to use it again until then.

17           MR. HARDT:  I don't know how we would use it while

18   he's on their cross.

19           THE COURT:  I understood.  I was stating the

20   obvious.  So y'all, somebody work through that so we don't

21   have loose ends piling up on various breaks when it's time to

22   get back to 1301.

23           And I understand what you're telling me, Mr. Green,

24   and you may be getting handed some help, I don't know.

25           MR. GREEN:  Yes.  So the Bates number that

1   Mr. Simons said, he said:  "And just for the record, I think
2   the Bates number on this is Zest Ecoark 0029073."  And like I
3   said, I think the issue is when we went to look at that was
4   not the Excel sheet we were seeing up there, and in the moment
5   we did, you know, all we know is the document doesn't match
6   what we were just told was put up.
7          I do think it's possible that they put up the other
8   attachment to the e-mail, that's what we just need to confirm.
9          MR. HARDT:  I won't even --
10          THE COURT:  Mr. Rhodes, let me -- what I was going
11   to suggest, and then you can backfill with me, can you e-mail
12   us a copy of your 1301 and e-mail them, and then they'll have
13   it.  They won't have to look over your shoulder, they can see
14   what y'all put on the screen at 1301; and that's a start.
15          And now, what were you going to say?
16          MR. RHODES:  Your Honor, all I was going to say was
17   I believe --
18          THE COURT:  You're going to say, that's a great
19   idea.
20          MR. RHODES:  That's a great idea, Your Honor.
21   Mr. Green is correct that there were two attachments, and I
22   believe Mr. Simons put up one attachment and said the Bates
23   number for the other, so . . .
24          THE COURT:  So can you send them what you think the
25   answer to that rabbit hole is?

```
1              MR. RHODES:  Yes, Your Honor.

2              THE COURT:  What else?

3              MR. HARDT:  That's it, Your Honor.

4              THE COURT:  Back off the record.

5         (Discussion held off the record.)

6              THE COURT:  So we're back on the record out of the

7    hearing of most of the jury.  Jerry, the CSO, came and told me

8    that you had expressed some issues, and rather than summarize

9    them for you, I just want you to tell me kinda what's going

10   on, if you would.  And if you'll give me your name so we know

11   who you are, Mr. Riggins.

12             A JUROR:  My name is Brian Riggins.

13             THE COURT:  Okay.

14             A JUROR:  I had major back surgery April the 28th of

15   last year.

16             THE COURT:  Okay.

17             A JUROR:  For about three months I was great.  Ever

18   since then I can't sit for very long without excruciating

19   pain, I can't do anything hardly.  My wife and I have bought

20   three different recliners.  I can't get comfortable anywhere

21   other than in my bed, flat on my back.  It's the only place

22   that I have no pain.

23             I'm sure that someone noticed yesterday I couldn't

24   sit still.  I've been up all night.  My back, it just -- it's

25   just trashed.  I mean, I don't know what else to say about it.
```

1    And I thought I would be okay doing this, but I'm not.  I

2    talked to my doctor this morning on my way up here, and I

3    didn't -- you know, like I said, I thought I would be all

4    right, you know, because I was thinking, you know, whatever I

5    was thinking.  But he said that he would prepare a document

6    stating what I had done, and my doctors that I saw throughout

7    the -- I've been dealing with this for 30 years.  It's

8    something they say I was born with.

9              THE COURT:  Can you give me just an idea about

10   what -- I don't need a doctor's note, him telling you what you

11   did, what kind of surgery you had.  You can tell me that if

12   you know.  I mean . . .

13             A JUROR:  They called it spondylolisthesis, I think

14   I'm pronouncing that right.  What it is is you have vertebraes

15   that go around your spine all the way up, and they're supposed

16   to be connected to each other; mine weren't.

17             THE COURT:  So you had some kind of a fusion, is

18   that fair?

19             A JUROR:  They put two rods in there about that

20   long, bolts, screws.

21             THE COURT:  And all that's still in there?

22             A JUROR:  Yes, sir, it would be in there the rest of

23   my life.

24             THE COURT:  And that gives me an idea.

25             A JUROR:  And what it was doing is --

1          THE COURT:  And that's fine, I don't really need --

2    I was just trying to get a sense of how big of a deal you had

3    with your back, and I don't need the details about it, but --

4          A JUROR:  It's a major deal.

5          THE COURT:  I understand.  That's what I'm convinced

6    of, and I guess I'm trying to find out now, are you currently

7    on pain medication?

8          A JUROR:  I have pain medication.  I do not take it

9    unless I just, I'm crying.

10         THE COURT:  No, I understand.

11         A JUROR:  Because I, you know, I had to be on it for

12   close to a year before and after my surgery, but once I got to

13   the tolerable level, I threw them away.  I just, you know, but

14   I keep some, and last night they didn't work.  I've taken

15   stuff for so long for the last 30 years that I guess my body's

16   built up a tolerance to it.  I have to take double the amount

17   for what it would take a normal person to relieve my pain, and

18   my doctor says you don't need to do that.

19         I said, well, then I guess I'll just have to suffer,

20   you know, because, I mean, they -- I have 10 milligrams of

21   hydrocodone.  That 10 milligrams don't touch it.  And nothing

22   over the count -- it's just, I mean I don't want anybody here

23   to think I'm crying, because I'm a tough old boy, but it's

24   just I'm to that age and that point where I just can't hardly

25   do anything anymore.  I'm still working, but I'm in a

1   management position, so I can sit and move and, you know, as I

2   need to.  But I'm not planning on working but about another

3   year.

4                THE COURT:  If you were allowed to sit and get up

5   and sit and get up, would that make any difference?  And I

6   want you to be honest with me, because I'm just trying to

7   figure out --

8                A JUROR:  Not unless I can walk.

9                THE COURT:  Okay.

10               A JUROR:  And I don't mean from here to there, I

11  mean, you know . . .

12               THE COURT:  No, I understand.

13               A JUROR:  And I apologize to the Court and to

14  everybody here.  I'm sorry, I thought I could, you know, deal

15  with it, but I was up all night, you know, up and down, kept

16  my wife up, and she has to be at work at 5:30 in the morning.

17               THE COURT:  Let me stop you there just real quick,

18  Mr. Riggins.

19               Does anybody from the plaintiff's table want to ask

20  any questions?  And I'm getting a "no."

21               MR. SIMONS:  We're fine, Your Honor.

22               THE COURT:  Anybody?

23               MR. KEVILLE:  No, Your Honor.

24               THE COURT:  Okay.  Mr. Riggins, I'm going to ask you

25  to give us the room.  If Jerry can take you back there.

```
 1                 A JUROR:  Thank you.

 2                 THE COURT:  I appreciate you letting us know.

 3            (The juror exits the courtroom.)

 4                 THE COURT:  What's the plaintiff's position on

 5    Mr. Riggins?

 6                 MR. SIMONS:  Your Honor, I think if the Court feels

 7    like it's appropriate to allow him to go, then we don't have

 8    an objection.

 9                 THE COURT:  I'll rephrase it.

10                 Does the plaintiff have an objection to me excusing

11    Mr. Riggins?  I will make it a direct question.

12                 MR. SIMONS:  Plaintiff does not, Your Honor.

13                 THE COURT:  How about the defendant?

14                 MR. KEVILLE:  Walmart does not, Your Honor.

15                 THE COURT:  All right.  Well, I hate it that --

16    we're going to lose one already, but I'm going to excuse

17    Mr. Riggins because of his situation, and I'll let him know.

18    We'll just let him roll on out, and I guess I can explain to

19    the other 11 the reason he was let go was not for any reason

20    of misbehavior or otherwise, but because he's got some back

21    problems, and I'll just leave it at that unless somebody

22    objects to me telling them anything.

23                 All right.  Let me walk down the hall and let

24    Riggins go, and then we'll just have an empty chair.

25                 Jerry, tell Mr. Riggins he's free to go and thank
```

```
 1    you, and then let's bring the jury in.
 2            Mr. Simons, you kind of abandoned 619, or are you --
 3    I've got it just pending out there, hanging.  There was an
 4    objection that you were asking the witness something that he
 5    wasn't on the e-mail chain, and then you just kinda moved away
 6    from it.
 7            MR. SIMONS:  Your Honor, at this time, I don't plan
 8    to go back to it.  It's possible that, you know, in redirect,
 9    if it's appropriate, but for now, you know, we're not seeking
10    to admit that.  We'll come back to it later if it's
11    appropriate.
12            THE COURT:  I'm just going to put "pending" outside
13    of it, then.
14            Thank you.
15    * * * * * * * * * *
16                    CERTIFICATE OF REPORTER
17        I, Stephen W. Franklin, Registered Merit Reporter, and
18    Certified Realtime Reporter, certify that the foregoing is a
19    correct transcript, to the best of my ability, from the record
20    of proceedings in the above-entitled matter.
21        Dated this 31st day of MARCH, 2021.
22
23        /s/Stephen W. Franklin
          _____
24        Stephen W. Franklin, RMR, CRR
25
```