# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

N2N GLOBAL, INC,

 *Plaintiff,*

v.

WALMART INC. f/k/a
WAL-MART STORES, INC.,

 *Defendant.*

Case No. 5:24-cv-05110-TLB

---

# Complaint

---

**\* \* \* JURY TRIAL DEMANDED \* \* \***

Plaintiff N2N Global, Inc. ("Plaintiff") states:

1. This lawsuit seeks a finding of liability, an award of actual and exemplary damages, and the imposition of permanent injunctive relief to remedy the willful and malicious misappropriation of Plaintiff's valuable trade secrets in the field of Fresh Food Shrink by Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc. ("Walmart").

2. On May 21, 2021, a former Senior Business Process Manager at Walmart informed Plaintiff regarding Walmart's intentional theft of Plaintiff's proprietary intellectual property, providing factual details on the who, what, why, when, and how it happened.

## Parties

3.   Plaintiff is a Delaware Corporation having a registered address listed as 1209 Orange Street, Wilmington, Delaware 19801.

4.   Walmart is incorporated in Delaware but has its principal place of business and corporate headquarters in Arkansas, at 702 S.W. 8th Street, Bentonville, AR, 72716.

## Jurisdiction and Venue

5.   Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), Plaintiff is an owner of trade secrets misappropriated by Walmart. Because such trade secrets relate to a product or service used in, or intended for use in, interstate or foreign commerce, this Court has federal question subject matter jurisdiction of the action under 28 U.S.C. § 1331.

6.   Complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, so this Court has diversity subject matter jurisdiction of the action under 28 U.S.C. § 1332(a)(1), too.

7.   Plaintiff's state law claims bear a logical relationship to the aggregate core of operative facts of Plaintiff's federal question Defend Trade Secrets Act claims, so this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.   Walmart conducts business in the state of Arkansas, engages in substantial and non-isolated activity within the state of Arkansas, and has committed tortious acts within the state of Arkansas, so this Court has both general and specific personal jurisdiction over Walmart.

9.   The Parties executed a  wherein the Parties agreed Arkansas courts have exclusive jurisdiction and venue for any dispute arising from the ▮▮▮. **Exhibit 1**.

10.  Venue is proper in this Court by virtue of the parties' express agreement, 28 U.S.C. § 1391(b)(1) (where defendant resides), and 28 U.S.C. § 1391(b)(2) (substantial part of events giving rise to claim occurred).

## Common Facts to All Causes of Action

11.  Walmart sells groceries and other perishable food items online and across its store locations in the United States, including Arkansas, and around the world.

12.  Unconsumed and wasted food is known as "Fresh Food Shrink." This waste drastically impacts food supply wholesalers and retailers.

13.  The Economic Research Service of the U.S. Department of Agriculture ("USDA") estimates 31 percent of the available food supply at the retail and consumer levels is unconsumed, meaning that $162 billion dollars of food in the United States is wasted annually.

14.  At all relevant times to these claims, Plaintiff has been in the software and business process consulting business.

15.  Plaintiff invests heavily in proprietary innovative solutions, including software, to help clients develop integrated supply chain management systems to maximize productivity and minimize waste.

16.  Plaintiff's proprietary systems include cloud-based software and mobile applications combined with business intelligence solutions.

17.  Plaintiff has extensive expertise in the food safety, quality assurance, quality control, and food freshness arenas.

18.  Walmart's fresh food inspection systems needed overhaul, so Walmart issued a ██████████████████████.

19.  Prior to ████████████, Walmart's inefficient fresh food inspection processes was a patch work of outdated systems and was largely paper-driven, time-intensive, and unautomated. Walmart's existing process made comprehensive reporting across all

locations and suppliers very manual or impossible. Today this functionality will be required for the Food Safety Modernization Act's Section 204, going into effect in January 2026.

20. Walmart invited Plaintiff to ████████████ and ████████████ ████████████ after which Walmart would award a very generous software services and consulting contract worth many millions of dollars for the initial project alone and much more for the full breadth of the Quality Control requests.

21. Walmart's ██ represented a substantial business opportunity for Plaintiff but likewise required substantial investment on the part of Plaintiff.

22. To protect all proprietary and confidential information communicated between one another, the Parties executed a ████████████ on or around July 14, 2015. **Exhibit 1**.

23. The Parties' ██ prescribed an extremely broad definition of "Confidential Information" which was to remain safe and protected by the ██:





24. In reliance on Walmart's promises to respect and preserve the confidentiality of Plaintiff's intellectual property, Plaintiff worked extensively to develop and refine its proprietary system of supply chain management to meet and exceed Walmart's ███ ███████████████████ with the expectation it would be awarded a lucrative contract.

25. Subject to the very broad protections of confidentiality, as defined by Walmart and as set forth in the Parties' ████, Plaintiff responded to Walmart's ████ using proprietary systems known collectively as Plaintiff's Partner Management solution, ("Plaintiff's PM").

26. Without disclosing the source code and other enabling aspects of Plaintiff's trade secrets, Plaintiff describes the aspects of Plaintiff's PM in results and methodology, below.

27. Plaintiff's PM systematically collects substantive, reliable data to build a profile of factors that maximize the efficiency of fresh food inspections.

28. Plaintiff's PM and related graphical user interface ("GUI") provides an inspector with quick access to USDA standards and a database Plaintiff built that includes USDA parameters layered with customer defined standards called specifications or "Specs", and doing so helps facilitate accurate analysis of the condition of food products.

29. Plaintiff's PM then selectively assesses data, aggregates data, and subjects such datasets to proprietary analytics and reporting across a secure software platform for relevant market participants.

30. Plaintiff's PM is an original and proprietary quality control solution that includes original software code, together with data management and process workflow procedures and data storage systems, to establish and provide a specific data flow and

central storage location across all locations for quality control, logistics, replenishment, and for Walmart and other supply chain partners to post and access information related to product inspections, product specifications, and supplier and location scorecards with the ability to access business intelligence reporting on demand.

31.  Plaintiff's PM includes a refined graphical user interface experience which is driven both by original software code and having intuitive controls, input systems, and complex image handling for mobile devices, including tablets.

32.  Plaintiff installed an enabling version of Plaintiff's PM on several Samsung branded tablets for use in connection with responding to Walmart's RFP.

33.  Plaintiff's PM constitutes a business trade secret under Arkansas law and pursuant to the Walmart-prepared ███, **Exhibit 1**.

34.  At all relevant times, Plaintiff has taken commercially reasonable steps to ensure and preserve the confidentiality of these business assets and trade secrets.

35.  Plaintiff trusted Walmart when responding to Walmart's ███ and invitations.

36.  Upon signature by Plaintiff of the Walmart-prepared ███, and upon approval by Walmart IT Security team, Walmart granted Plaintiff the opportunity to work confidentially with Walmart at a pilot program using Walmart's Bartlesville, Oklahoma distribution center location.

37.  Subject to the protections of the parties' ███, Plaintiff began working with Senior Business Process Manager and authorized agent of Walmart, Ms. Susan Akin ("Akin").

38.  Akin served as Walmart's Quality Control Regional Manager of the West Division. One of her roles at Walmart was to oversee the use of Plaintiff's PM at the pilot program at the Bartlesville, Oklahoma Walmart distribution center and to review and test the solution.



39.  During this ██████████, Akin and other Walmart quality control employees and persons associated at the Bartlesville location utilized Plaintiff's PM to evaluate its capabilities.

40.  Subject to the protections of the ████, Plaintiff also provided Plaintiff's PM to Walmart's authorized agent and Vice President of Quality Control, Chuck Tilmon ("Tilmon").

41.  Over the course of the ██████, Walmart's quality control employees had direct access to Plaintiff's trade secret programing, know-how, show-how, and Plaintiff's PM as they used it every day for months at their Bartlesville, Oklahoma facility across 5-6 Walmart quality control associates.

42.  Plaintiff made a comprehensive presentation and enabling disclosure of Plaintiff's PM to Walmart's team which included as many as 20 quality control employees and persons with Walmart at the Walmart Home Office. Plaintiff included in the presentation a hands-on demonstration using Samsung tablets to prove the functionality, stability, and elegant solution being offered by Plaintiff in response to Walmart's ████.

43.  Walmart's authorized agents responded to these demonstrations in Bartlesville, Oklahoma offering extremely positive reviews of Plaintiff's PM.

44.  Also as part of the discussions surrounding the ████, Walmart demanded from Plaintiff its highly confidential computer data and including specific field values for the Plaintiff's PM to conduct a "security review" by its Information Technologies department.

45.  The security review was not typical to Plaintiff's past business practices, and Plaintiff was skeptical of the need for such disclosure.

46.  In response, Walmart gave express assurances to Plaintiff that such proprietary information would remain fully protected by the Parties' ████ but claimed this

extremely valuable and sensitive information was necessary to perform Walmart's internal security review.

47.  Walmart represented to Plaintiff that—without the disclosure of this highly confidential computer data and specific field values—Walmart would not conduct a mandatory security review and, consequently, Plaintiff would not be approved by Walmart to begin any pilot program nor award of any ███████ .

### Plaintiff's Partner Management Solution

48.  Plaintiff's PM is not generally available to the public and is not readily known. It fits squarely within the definition of Confidential defined by the Parties' NDA.

49.  At all relevant times, Plaintiff took commercially reasonable measures to ensure the secrecy of Plaintiff's PM.

50.  Plaintiff's PM was reasonably considered confidential and/or proprietary by Plaintiff, the Disclosing Party, and it is Confidential pursuant to the Parties' ███ , **Exhibit 1**.

51.  Plaintiff's PM was an elegant solution to Walmart's problems with Quality Control and Fresh Food Shrink, and it was responsive to the requirements outlined in Walmart's ███ .

52.  Plaintiff's PM software is multi-functional in purpose and is implemented using complex computer code to implement software, business process, and database analytics systems.

53.  Plaintiff's PM, which is embodied in a combination of computer code, know-how, and show-how, established a broad software platform to enable mobile based inspections thereby granting Walmart's employees instant access to USDA guidelines in a structured data format not available through public means and references materials to increase speed, accuracy, and effectiveness of fresh food inspections.

54.  Plaintiff's PM is a multi-level cloud-based data and digital platform.

55.  Plaintiff's PM is designed to enable Walmart employees to upload contemporaneous fresh food inspection data into a uniform, stable, interconnected, and secure server(s).

56.  Plaintiff's PM has capacity to automatically generate compliance reports for Walmart relating to purchase order information, out of stock or short positions, pulls of degraded products, credits from suppliers for items falling below the standard product quality. Plaintiff also provided prototypes for ripening management solutions.

57.  Plaintiff's PM utilizes mobile based inspections that remove the need for paper records and the creation of paper records.

58.  Plaintiff's PM permits a user quick access to reference material to assist a food inspector in properly evaluating the most up-to-date requirements for the specific food item before Walmart accepts the product at the Distribution Center. Food specific requirements may arise from federal inspection standards or internal standards of quality or freshness.

59.  Plaintiff's PM serves to reduce the amount of time spent on paper-based inspection from 30–45 minutes to 10–15 minutes or less.

60.  Plaintiff's PM integrates with larger data systems and provides real-time information on purchase orders and shipments to prevent out-of-stock or "short" positions, which can help grow retail sales.

61.  Plaintiff's PM serves to enable evaluation of inspector capability to properly assess product quality at DC receipt while also training the inspector on a continuous basis with positive reinforcement using positive behaviors.

62.  Plaintiff's PM better facilitates and manages critical features including ripening of ██████████████ (bananas) as well as other key purchase items (*e.g.*, pineapples, avocadoes, pears, etc.) to ensure optimal quality, which can increase sales by as much as 15% to achieve greatest customer satisfaction.

63.  Plaintiff's PM automates supplier performance scorecards using enhanced, accurate, fact-based metrics that aggregate data using as many available data points as possible to provide a holistic view of the relationship.

64.  Plaintiff's PM enhances document compliance and ensures compliance with the Food and Drug Administrations' Hazard Analysis and Critical Control Points (HACCP) standards.

65.  Plaintiff's PM provides responsive information regarding a Sustainability Index, on-time deliveries, specification compliance, pulls, store credits, and purchase order conformance, to name a few options.

66.  Plaintiff's PM improves the inspection process and accelerates throughput of inspections by allowing the inspector to take pictures directly from the tablet with a compressed file that does not put as much strain on the network as today's large files generated from a stand-alone Canon camera.

67.  Plaintiff's PM tracks loss of product (Pulls & Store Credits) back to each supplier after delivery, which can be evidence of improper handling prior to acceptance by Walmart, saving Walmart as much as 1% of sales.

68.  Plaintiff's PM significantly reduces internal email messages and replaces with role appropriate system notifications without human intervention.

69.  Plaintiff's PM supports International DC (IDC) receipts with a more accurate process to catch quality and condition issues prior to receipt of produce by Walmart.

70.  Plaintiff's PM scans the supplier's PTI labels (GS1 compliant label), thereby reducing human input errors while also speeding data entry.

71.  Plaintiff's PM provides detailed item- and specification-level data to Walmart's suppliers (*e.g.*, commodity, variety, sub-variety, pack, label, grade, size, lot, pack date).

72.  Plaintiff's PM reduces the time to handle and process inspections as well as to generate reporting.

73.  Plaintiff's PM permits Managers and other authorized stakeholders' ability to "validate" inspections results remotely or electronically from any supported device.

74.  Plaintiff's PM removes or decreases the use of paper for the quality control ("QC") documentation process and auto-generate reports and notifications.

75.  Plaintiff's PM is fully enabled, and not conceptual, and uses Plaintiff's proven software processes which reliably query databases to provide an intuitive user experience.

76.  Plaintiff's PM operates in a secure environment.

77.  Plaintiff's PM fit Walmart's needs and conformed in all material respects to Walmart's ▮▮▮.

78.  Plaintiff anticipated it would be awarded the ▮▮▮▮ with Walmart following the ▮▮▮ given the extremely positive reviews and requests for implementation of additional user-interface features of the GUI.

79.  On June 10, 2016, Walmart's Regional Quality Control Manager, Keith Mitchell ("Mitchell"), notified Plaintiff of Walmart's decision not to use Plaintiff ▮▮▮▮▮. This was a surprise to Plaintiff.

80.  Mitchell's termination of Walmart's relationship with Plaintiff ended Plaintiff's access to Walmart's quality control team.

81.  Notwithstanding Walmart's decision not to select Plaintiff in responding to Walmart's RFP, the Parties' ▮▮▮, **Exhibit 1**, at ¶ 2(a), obligated Walmart to:



82.  In the year following, Walmart announced it created and implemented an inhouse software solution to its Fresh Food Shrink problem.

83.  Walmart did not make available its inhouse software solution to the public, and Plaintiff had no way of knowing the extent to which Walmart used Plaintiff's information, if any.

## Walmart's Zest Labs Litigation

84.  In August 2018, Walmart was sued by Zest Labs, Inc. for theft of trade secrets over the release and use of Walmart's inhouse software pertaining to food safety and fresh food shrink software technology.

85.  Virtually all substantive pleadings were sealed from public view pursuant to a strict protective order. Protective Order at 5, *Zest Labs, Inc. v. Walmart Inc.*, Case No. 4:18-cv-00500-JM (E.D. Ark. Jan. 25, 2019), ECF No. 87.

86.  The use of a Protective Order in the Zest Labs case prohibited Plaintiff from reasonably assessing the extent to which Walmart misappropriated Zest Labs' (or Plaintiff's) software and trade secrets.

87.  The fact of Zest Labs suing Walmart reasonably suggested to Plaintiff that Walmart's software was developed using Zest Labs' trade secrets, not Plaintiff's trade secrets.

88.  A federal jury returned a $115 million verdict in favor of Zest Labs and against Walmart on claims of theft of Zest Labs' trade secrets pertaining to food safety and fresh food shrink software technology.

89.  Walmart's demand for a Protective Order in the *Zest Labs* suit served to prohibit Plaintiff from understanding the true nature and development of Walmart's in-house freshness tracking system.

90.  The computer source code at issue in the *Zest Labs* case was subjected to a RESTRICTED CONFIDENTIAL–SOURCE CODE label, which was so tightly controlled, in fact, that viewing such material was permitted only on a "single computer configured without Internet access or network access to any other computers. The single computer

will be password protected and made available in a secure, locked viewing room."
Protective Order at 5, *Zest Labs, Inc. v. Walmart Inc.*, Case No. 4:18-cv00500-JM (E.D.
Ark. Jan. 25, 2019), ECF No. 87.

91. Plaintiff did not participate in the *Zest Labs* federal lawsuit.

92. Plaintiff was unable to ascertain the extent of Walmart's use of Walmart's
freshness tracking system Eden software at that point in time.

## Plaintiff's Discovery of Walmart's Theft

93. Approximately six weeks following the jury verdict against Walmart in *Zest
Labs* for $115 million, on May 21, 2021, Akin, a Walmart former Senior Business Process
Manager having firsthand knowledge, alerted Plaintiff to the fact of Walmart's past
intentional misappropriation of Plaintiff's trade secrets.

94. On May 21, 2021, Akin informed Plaintiff of the *when* of Walmart's
misappropriation: Walmart's theft took place on May 25, 2016.

95. On May 21, 2021, Akin informed Plaintiff of the *where* of Walmart's
misappropriation: Walmart's theft of Plaintiff's Samsung tablet on which Plaintiff's PM
was installed took place at the Home Office in Bentonville, Arkansas.

96. On May 21, 2021, Akin specifically detailed for Plaintiff the *who* acted on behalf
of Walmart: Walmart's Quality Control Regional Manager, Gary Foster ("Foster"),
retained Plaintiff's Samsung tablet.

97. On May 21, 2021, Akin specifically detailed for Plaintiff an additional bad actor
on behalf of Walmart: Walmart's Foster personally handed Plaintiff's Samsung tablet to
Tilmon.

98. On May 21, 2021, Akin informed Plaintiff of the *how* of Walmart's
misappropriation: Tilmon provided the Plaintiff's Samsung tablet to one or more
inhouse developer for use as a template for Walmart's inhouse software solution.

99.  Akin confirms that Plaintiff's PM was responsive to Walmart's ████ and that Plaintiff would have been able to provide the consulting services to Walmart.

100.  Further, Akin had access to both software solutions and she confirms the presentation and working aspects of Plaintiff's PM and Walmart's inhouse solution are substantially similar.

101.  Plaintiff had worked with Akin extensively in the past.

102.  Plaintiff knows Akin to be extremely credible and reliable.

103.  Plaintiff has no reason to distrust Akin or the information about Walmart's willful misconduct as reported to them on May 21, 2021.

104.  Walmart, through the past actions of its authorized agents, specifically Tilmon, furtively planned and secretly executed a positive act of fraud to keep Plaintiff's cause of action concealed.

105.  Foster, in not returning the Samsung tablet initially on the day of the meeting perpetuated an affirmative act of fraud that the fraud concealed itself.

106.  Tilmon, in receiving the Samsung tablet from Foster, continued Walmart's affirmative act of fraud in a way that the fraud concealed itself.

107.  Walmart's Eden software code and graphical user interface is not available to the public.

108.  Plaintiff was not able to access or otherwise inspect the Eden software using reasonable due diligence.

109.  Absent Akin's confession of Walmart's bad conduct, Plaintiff could never have discovered Walmart's fraud and misappropriation of Plaintiff's trade secret and proprietary Plaintiff's PM software.

110.  Walmart's Akin informed Plaintiff that Walmart's software offered the same features and solutions as Plaintiff's PM and affirmatively stated that following Plaintiff's pilot and demonstration Walmart IT developed a software solution having little to no

consultation with Walmart QC Associate users yet the software was very specific to the exact use cases identified during the pilot and demonstration.

111.  Plaintiff's proprietary technology has been directly copied and integrated into Walmart's Eden. This stands in violation of law, the ███, and Walmart's own business ethics policies.

112.  Akin declared to Plaintiff that Walmart used, and continues to use Plaintiff's PM. This is done without Plaintiff's authorization or compensation.

113.  Plaintiff's technology is extremely valuable and provides authorized users of Plaintiff's PM with a competitive advantage in the fresh food industry.

114.  The business opportunity presented by Walmart's licensing of Plaintiff's PM constitutes a valid business expectancy.

115.  The use of the software for many months at Bartlesville, Oklahoma under auspices of a "product pilot" as a clearing house prior to software purchase along with the concealment of actual theft of Plaintiff's Samsung Tablet, establish Walmart intentionally misled Plaintiff to gain a commercial or competitive advantage in the relevant marketplace.

116.  The use of Plaintiff's PM software for many months at Bartlesville, Oklahoma under the auspices of a "product pilot" as a clearing house prior to software purchase along with the concealment, theft, and misappropriation of the contents stored on Plaintiff's Samsung Tablet, together with the subsequent extraction and unauthorized use of Plaintiff's PM code constitutes willful misappropriation of Plaintiff's valuable business property and intellectual property. This comprises Plaintiff's trade secrets, know-how, show-how, and related proprietary assets.

117.  Plaintiff has made written demand upon Walmart for the return of all Confidential information, software, including Plaintiff's PM; for the return of Plaintiff's Samsung tablet; and for agreement to refrain from use of any of Plaintiff's Confidential information; and for the destruction of all Plaintiff's Confidential information.

118.   Walmart has refused, neglected, or failed to respond to Plaintiff's formal demand to return Plaintiff's Samsung tablet.

## Count One — Declarative Relief as to Ownership

119.   Prior factual statements are incorporated by reference.

120.   Walmart's claims exclusive authorship of its Eden software platform and versions thereof.

121.   There is an actual controversy arising under federal law, and Plaintiff seeks a determination of the parties' federal intellectual property rights pursuant to 28 U.S.C. § 2201, including a declaration that Plaintiff is the exclusive owner of the technology and related works derivative of Plaintiff's PM, know-how, and show-how.

122.   Walmart has refused to return Plaintiff's trade secrets and refuses to cease using Plaintiff's trade secret protected technology.

123.   Plaintiff seeks this Court's help in identifying the extent to which Walmart claims ownership of certain intellectual property which, in fact, originated with Plaintiff.

## Count Two — Misappropriation of trade secrets in violation of 18 U.S.C. § 1836

124.   Plaintiff incorporates by reference all prior allegations.

125.   Walmart violated the Defend Trade Secrets Act codified at 18 U.S.C. § 1836.

126.   The federal Defend Trade Secrets Act permits civil actions filed within 3 years after the date on which the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. 18 U.S.C. § 1836(d).

127.   Pursuant to 18 U.S.C. § 1836(b), Plaintiff has a civil right of action against Walmart in that Plaintiff is the owner of a trade secret as described above, including but not limited to Plaintiff's PM and trade secrets installed on Plaintiff's Samsung tablet, which Walmart secretly retained and used to develop its own software solution referred to as Eden.

128.  In conformity with 18 U.S.C. § 1836(b), Plaintiff's trade secrets relate to a product or service used in, or intended for use in, interstate or foreign commerce. Plaintiff's trade secrets concern the sale, transport, distribution, and delivery of fresh food products from Defendant's distribution centers to its more than 5,000 stores nationwide and more globally, as managed by Plaintiff's software solutions.

129.  Federal law defines that trade secret includes forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing. 18 U.S.C. § 1839.

130.  Plaintiff has an extensive background in USDA standards, HAACP Compliance, company product specifications, product quality management, quality management business processes, computer processes and data-driven solutions.

131.  Plaintiff is an owner of other trade secrets reflected in communications and made by Plaintiff to Walmart in connection with Plaintiff responding to Walmart's RFP for food safety and freshness systems and protocols.

132.  Plaintiff has invested millions of dollars in its trade secrets relating to this technology and in pursuit of Walmart's RFP.

133.  In conformity with 18 U.S.C. § 1839, Plaintiff has taken reasonable measures to keep such information secret; and Plaintiff's PM derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

134.  Plaintiff has at all relevant times taken commercially reasonable steps to ensure and preserve the integrity of its trade secrets and confidential information by having in place a comprehensive NDA with Walmart, together with internal protocols

which required use of NDAs with its contract software employees and independent contractors.

135.  Plaintiff's software solutions and trade secrets are not easily replicated and are subjected to reasonable efforts by Plaintiff to ensure and preserve the confidential nature of such trade secrets.

136.  Despite Plaintiff's stringent precautions and protections against unauthorized use or disclosure, Walmart, through improper means, willfully misappropriated Plaintiff's intellectual property, hardware, trade secrets, know-how and show-how.

137.  In violation of 18 U.S.C.A. § 1839, Walmart acquired and used Plaintiff's trade secrets; Walmart's authorized quality control managers and agents Tilmon and Foster knew or had reason to know that secretly retaining and using Plaintiff's Samsung tablet on which Plaintiff's valuable trade secrets were stored, constituted improper means.

138.  In violation of 18 U.S.C.A. § 1839, Walmart likewise acquired Plaintiff's trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, namely, the Walmart-prepared NDA served to protect Plaintiff's information and Walmart was not authorized to use such trade secret information without compensation.

139.  Plaintiff was not able to learn the extent to which Walmart misappropriated Plaintiff's intellectual property and trade secrets and Plaintiff's PM and related programming due to the fraudulent concealment and continued efforts by Walmart to prevent the disclosure of the Eden software.

140.  It was not until May 21, 2021 that Plaintiff, exercising reasonable diligence, discovered Walmart's bad acts and intentional misappropriation.

141.  Defendant's misappropriation is willful and malicious and thereby entitles Plaintiff to an award of exemplary damages pursuant to 18 U.S.C § 1836(b)(3)(C).

## Count Three — Misappropriation of trade secrets in violation of Ark. Code Ann. § 4-65-601 et seq

142.  Plaintiff incorporates by reference all prior allegations.

143.  Walmart violated the Arkansas Trade Secrets Act codified at Ark. Code Ann. § 4-65-601 *et seq*.

144.  The Arkansas Trade Secrets Act provides that an action for misappropriation must be brought within three (3) years after the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered. Ark. Code Ann. § 4-75-603.

145.  The Arkansas Trade Secrets Act ("ATSA") defines trade secret as information that: (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Ark. Code Ann. § 4-75-601(4).

146.  The Arkansas Supreme Court has set forth six factors to consider when determining whether information is a trade secret: (1) the extent to which it is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard its secrecy; (4) its value to the company and competitors; (5) the amount of effort or money the company expended in developing it; and (6) the ease or difficulty with which others could properly acquire or duplicate it. *Saforo & Assocs., Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117, 120-22 (1999); *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1108–09 (8th Cir. 2020).

147.  Plaintiff discovered Walmart's theft and misconduct no earlier than May 21, 2021, when Walmart former Senior Business Process Manager Akin informed Plaintiff that Foster and Tilmon secretly retained Plaintiff's Samsung computer tablet and

confirmed Walmart's continued use of Plaintiff's Confidential information and Plaintiff's trade secrets.

148.  Plaintiff acted at all relevant times in a commercially reasonable manner when believing Walmart would honor its promises and obligations of confidentiality and nonuse of Plaintiff's proprietary information as set forth in the parties' NDA.

149.  Plaintiff's trade secrets set forth in the Plaintiff's PM and related programming comprise a formula, pattern, compilation, program, device, method, technique, or process, which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

150.  Plaintiff protected its Plaintiff's PM and related programming using a nondisclosure agreement with Walmart.

151.  Plaintiff protected its Plaintiff's PM and related programming using passwords and nondisclosure agreements with its employees and independent contractors, and such protections are commercially reasonable in the relevant industry.

152.  Plaintiff possessed valuable trade secrets related to the tracking and optimization for physical inspections and ripening management of fresh food.

153.  Specifically, Plaintiff possessed the software, algorithms, data field inputs, and the application to optimize quality control inspections and fresh food ripening management programs.

154.  Plaintiff took reasonable precautions to maintain and protect the secrecy of its trade secret information, which included internal restrictions to the information, and the use of non-disclosure agreements with third parties. Plaintiff disclosed the information in this case to Walmart under an agreement that Walmart drafted, and which promised mutual confidentiality and non-disclosure of proprietary information, including trade secrets.

155. Plaintiff disclosed information to Walmart under the expectation that Walmart would abide by the terms of the NDA, would maintain the confidentiality of such information, and would not use such information for Walmart's own pecuniary benefit.

156. Plaintiff's confidential information includes trade secrets and/or other proprietary information that derives independent economic value from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

157. Walmart misappropriated Plaintiff's valuable intellectual property and trade secrets for Walmart's own use in connection with Walmart's Eden technology.

158. Walmart acquired such information from Plaintiff with reason to know that the trade secret was acquired by improper means, *i.e.*, Tilmon retained Plaintiff's Samsung computer tablet and Foster thereafter delivered it to Walmart's internal IT department with direction to obtain a software copy of Plaintiff's PM and programming.

159. Tilmon was Walmart's authorized agent, and he used improper means to acquire knowledge of Plaintiff's trade secrets.

160. Foster was Walmart's authorized agent, and he used improper means to acquire knowledge of Plaintiff's trade secrets.

161. Upon information and belief, and after a reasonable recent investigation of Walmart's food traceability programs through Plaintiff's discussions with various discussion panels regarding the Food Safety Modernization Act, Walmart has further misappropriated Plaintiff's trade secrets for its own use in connection with Walmart's traceability plan that is now required from retailers pursuant to Section 204 of the Food Safety Modernization Act.

162. Walmart's misappropriation of Plaintiff's confidential and trade secret information has caused substantial injury.

163. Pursuant to Ark. Code Ann. § § 4-75-606(a), Plaintiff is entitled to recover from Walmart damages for the actual loss caused by the misappropriation.

164. Pursuant to Ark. Code Ann. § § 4-75-606(a), Plaintiff is also entitled to recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

165. Pursuant to Ark. Code Ann. § 4-75-607, Walmart's misappropriation was made in bad faith, and Walmart's misappropriation was willful and malicious.

166. Consequently, Plaintiff is entitled to its reasonable attorneys' fees.

## Count Four — Arkansas Deceptive Trade Practices Act

167. Plaintiff incorporates by reference all prior allegations.

168. The Arkansas Deceptive Trade Practices Act (ADTPA) contains a catch-all provision providing a private right of action for all deceptive trade practices in any business. Walmart violated the Arkansas Deceptive Trade Practices Act codified at Ark. Code Ann. § 4-88-101 *et seq*.

169. Ark. Code Ann. § 4-88-107(a)(10) prohibits "unconscionable, false, or deceptive act or practice in business, commerce, or trade."

170. "An act is unconscionable if it affronts the sense of justice, decency, and reasonableness." *GulfCo of Louisiana, Inc. v. Brantley*, 2013 Ark. 367, 430 S.W.3d 7 (2013).

171. Walmart's conduct, as alleged herein, violated Ark. Code Ann. § 4-88-107(a)(10) by unconscionably, falsely, and deceptively informing Plaintiff that Walmart planned to use a different provider for its quality control project while covertly exploiting Plaintiff's proprietary technology for an in-house development using Plaintiff's intellectual property.

172. Walmart's conduct, as alleged herein, violated Ark. Code Ann. § 4-88-107(a)(10) by unconscionably, falsely, and deceptively soliciting requests for proposals from various service provides, including Plaintiff, on false premise to obtain information and solutions that Walmart secretly to integrate into an in-house version.

173.  Due to Walmart's unconscionable, false, and deceptive acts, Plaintiff has suffered an actual financial loss as a result of not being adequately compensated by Walmart for its use of Plaintiff's PM.

## Count Five — Unjust Enrichment

174.  Plaintiff incorporates by reference all prior allegations.

175.  Walmart has been unjustly enriched by retaining the benefits of Plaintiff's PM without providing Plaintiff with proper compensation.

176.  Walmart avoided a tremendous amount of costs of development by misappropriating Plaintiff's intellectual property.

177.  By way of retaining the benefits of Plaintiff's PM without providing Plaintiff with proper compensation, Walmart has been unjustly enriched by receiving at least the following benefits without payment therefor:

(1)  Through the mobilization of inspections, Plaintiff's PM reduced the time spent on Walmart's prior paper-based inspections from 30-45 minutes to 10-15 minutes.

(2)  Plaintiff's PM provided a stable software and network environment which would have taken Walmart substantial time to develop independently from Plaintiff's know-how and show-how.

(3)  Through the integrated platform with its suppliers, Plaintiff's PM provided real time information on purchase orders and shipments to help prevent out of stock items, which could help grow sales by as much as 1%.

(4)  Plaintiff's PM helped evaluate inspector capability to properly assess product quality at distribution centers, while also training the inspector on a continuous basis with positive reinforcement for positive behaviors.

(5)  Through Plaintiff's PM integrated platform, Walmart was able to automate supplier performance scorecards with accurate, fact-based metrics that aggregate as many available data points as possible to provide a holistic view of the relationship.

(6) Through the mobilization of the inspection process, Walmart was able to improve its inspection process and accelerate the output of inspections by directly taking pictures from the tablet with a compressed file that does not put as much strain on Walmart's prior network system.

(7) Through Plaintiff's PM integrated platform, Walmart could track loss of its products back to its suppliers after delivery, which can save as much as 1% on Walmart's sales.

(8) Through the mobilization of the inspection process, Plaintiff's PM removed the use of paper for quality control documentation and created auto-generated reports and notifications that are critical to Walmart's fresh food inspections and quality control.

178. According to Walmart's own statement, Project Eden, as of March 2018 had already prevented $86 million in food waste and was projected to prevent $2 billion in waste by 2023.

179. It is inequitable for Walmart to retain the benefit of using Plaintiff's technology without adequately compensating Plaintiff.

180. It is inequitable for Walmart to leverage Plaintiff's technology to avoid research and development costs.

## Count Six — Conversion

181. Plaintiff incorporates by reference all prior allegations.

182. At all relevant times, Plaintiff was the owner of all the intellectual property, confidential information, trade secrets, electronic data, and/or know-how used to create and develop Plaintiff's PM.

183. Walmart has deceptively and unlawfully obtained Plaintiff's PM and other related programming under the guise of a bona fide request for proposal.

184. Walmart deceptively and unlawfully established dominion and control over Plaintiff's PM.

185. Walmart's actions denied Plaintiff the right to their property and violates the rights of Plaintiff in Plaintiff's PM.

186.  Walmart's conversion has caused Plaintiff damages in the form of lost profits and other related licensing fees that Plaintiff would have received had Walmart not deceptively and unlawfully established dominion and control over Plaintiff's PM.

## Count Seven — Fraud

187.  Plaintiff incorporates by reference all prior allegations.

188.  Through its conduct in requesting a proposal from Plaintiff, Walmart falsely represented that it would maintain Plaintiff's confidential information and that Walmart would not use Plaintiff's confidential information without Plaintiff's authorization.

189.  After obtaining Plaintiff's confidential information, Walmart falsely represented that Walmart planned on using different service provider to decline work with Plaintiff.

190.  Upon information and belief, Walmart knew that these representations were false because Walmart had always intended to develop its own quality control system but did not have the available technology at the time.

191.  Upon information and belief, Walmart intended Plaintiff to rely on these false representations in an effort to fraudulently induce Plaintiff to provide its valuable and trade secret information to Walmart.

192.  Upon information and belief, Walmart intended Plaintiff to rely on its false representation that Walmart was proceeding with a different servicer in an effort to dissuade Plaintiff from realizing that Walmart was now using Plaintiff's confidential information to create its own quality control program.

193.  Plaintiff's reliance on these misrepresentations were justified because of Walmart's initial commitment to the trial programming, because of the parties' nondisclosure agreement, because of positive reviews associated with Plaintiff's presentation and work at the Bartlesville distribution center and based on positive communications made by Walmart employees.

194. As a result of Plaintiff's justified reliance on Walmart's fraudulent misrepresentations, Plaintiff has suffered and will continue to suffer damages.

## Count Eight — Breach of Contract

195. Plaintiff incorporates by reference all prior allegations.

196. Plaintiff and Defendant entered into the ███. **Exhibit 1.**

197. The ███ was supported by legal consideration.

198. Pursuant to the terms of the ███, Walmart was obligated to "███████████████████████████████████████████████████" and was further required to keep "███████████████████████████████████.█████████." **Exhibit 1,** ███.

199. The ███ prohibited Walmart's "██████████████████████████████.█████" **Exhibit 1,** ███.

200. Walmart breached ███████ by (1) using Plaintiff's confidential information for its own use and (2) by failing to maintain the confidentiality of Plaintiff's confidential information.

201. As a result of Walmart's breach, Plaintiff has suffered actual damages in an amount to be determined by the trier of fact.

## Count Nine — Punitive Damages

202. Prior factual statements are incorporated by reference.

203. Due to the egregious, fraudulent, and intentional misconduct of Defendant Walmart described above, Plaintiff is entitled to punitive damages in an amount to be determined by the jury.

204. In addition to being intentional, Defendants knew or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in damage to Plaintiff.

205. Walmart nonetheless continued such conduct with malice and/or reckless disregard of the consequences from which malice may be inferred.

## Count Ten — Permanent Injunctive Relief

206. Plaintiff incorporates by reference all prior allegations.

207. The decision whether to grant permanent injunctive relief is committed to this Court's equitable discretion. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiff has suffered an irreparable injury in that it has provided Walmart with an exceptional solution to a major problem impacting billions of dollars in savings, yet Plaintiff has irretrievably lost the business opportunity to leverage its success with Walmart across other retail suppliers.

208. Relative to future unauthorized use by Walmart, Plaintiff does not have remedies available at law for continued use. Plaintiff's remedy is limited to monetary damages for past unauthorized use, which is inadequate to compensate Plaintiff for prospective injury.

209. Considering the balance of hardships between Plaintiff, a company who has invested tremendous time and effort and expertise to solve a substantial problem for Walmart, and Walmart, the largest retailer in the world who secretly stole a Samsung tablet and directed its IT team to immediately copy the source code, user interface, and related know-how, a remedy in equity is warranted.

210. The public interest would not be disserved by a permanent injunction, as it would encourage innovation for entrepreneurs and problem-solvers such as Plaintiff to be rewarded for its investment in responding to RFPs in circumstances where large corporate entities likewise agree to the non-disclosure provisions.

211. The Court should issue a permanent injunction to forever prevent Walmart from utilizing all source code derived from the direct copying of Plaintiff's software solutions.

212. The Court should issue a permanent injunction to forever prevent Walmart from utilizing the know-how and show-how accompanying Plaintiff's PM having the functions, features, and design aspects identified by Plaintiff to Walmart under non-disclosure and confidentiality agreements.

WHEREFORE, Plaintiff prays:

(a) For the Court to declare the ownership interest of Plaintiff's trade secret technology and related computer software, including all processes contemplated and embodied within Plaintiff's PM software and GUI;

(b) For the Court to issue a permanent injunction of proper scope;

(c) For the Court to award Plaintiff its attorneys' fees and costs, pursuant to 18 U.S.C. § 1836(b)(3)(B) and Ark. Code Ann. § 4-75-607(3);

(d) For the Court to fix exemplary damages, including but not limited to pursuant to 18 U.S.C. § 1836(b)(3)(C), upon a finding that Walmart "willfully and maliciously misappropriated" Plaintiffs trade secrets and business property;

(e) For a jury to award actual damages, both past and future for the enumerated torts, fraud, and business tort claims;

(f) For a jury to award and fix breach of contract damages;

(g) For a jury to award the accounting for, and damages comprising disgorgement of any profit or benefits to Walmart obtained as a result of Walmart's misappropriation of Plaintiff's trade secrets, pursuant to 18 U.S.C. § 1836(b)(3)(B) and Ark. Code Ann. § 4-75-606(b);

(h) For a jury or judge to award avoided costs for trade secret misappropriation;

(i) For the Court to award all other amounts to which Plaintiff is entitled under the Arkansas Trade Secrets Act, the Defend Trade Secrets Act, the Arkansas Deceptive Trade and Practices Act, and/or Arkansas law; and

(j) Any other remedy to which this Court deems just and appropriate.

PLAINTIFF N2N GLOBAL, INC.

_____

Mark Murphey Henry, Ark. Bar No. 97170
Otto M. Bartsch, Ark. Bar No. 2022264
HENRY LAW FIRM
P.O. Box. 4800
Fayetteville, Arkansas 72702
Telephone: (479) 368-0555
mark@henry.us
otto@henry.us

## VERIFICATION

I have read the foregoing and investigated the claims made against the defendant Walmart and the facts on which the claims are based, and I verify the facts as alleged, and verify them to be true and correct to the best of my knowledge.

May 17, 2024

_Angela Nardone_

Angela Nardone
Authorized Agent of N2N Global, Inc.