# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

ZEST LABS, INC. f/k/a INTELLEFLEX
CORPORATION; ZEST LABS
HOLDINGS LLC; AND RISKON
INTERNATIONAL, INC.,

       Plaintiffs,

       v.                             No. 4:18-cv-500-JM

WALMART INC. f/k/a
WAL-MART STORES INC.,

       Defendant.

_____/


## PLAINTIFFS' REDACTED BRIEF IN OPPOSITION TO

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  SUMMARY OF ARGUMENT .................................................................................... 1

II.  FACTS AND PROCEDURAL HISTORY ................................................................ 7

III.  LEGAL STANDARDS .......................................................................................... 11

IV.  ARGUMENT .......................................................................................................... 12

    A.  Zest Has Viable Claims for Both Liability and Damages Completely Independent of Walmart's Disclosures in the '396 Bohling Application. ............. 15

        1.  A Jury Could Reasonably Find That Walmart Misappropriated Zest's Trade Secrets Regardless of Whether the '396 Bohling Application Published. ............................................................................... 15

            a.  A Jury Could Find Walmart's Use of Zest Trade Secrets in its Internal Development of the Eden System Misappropriated Zest's Trade Secrets. ......................................... 17

            b.  A Jury Could Find Walmart's Use of Zest's Trade Secrets to Prepare the '396 Bohling Application Misappropriated Zest's Trade Secrets. ................................... 19

            c.  A Jury Could Find Walmart's Filing of the '020 and '325 Patents Misappropriated Zest's Trade Secrets (and Would Have Inevitably Disclosed Them). ................................................. 20

            d.  A Jury Could Find Walmart's Filing of the International Patents Misappropriated Zest's Trade Secrets. .............................. 23

        2.  Walmart's Liability for its Earlier Acts of Misappropriation Does Not Depend on Zest's Reasonable Efforts to Stop Publication of the '396 Bohling Application. ..................................................................... 25

        3.  Walmart's Misappropriations Beyond the '396 Bohling Application Support Zest's Damages Claims. ........................................... 26

    B.  There Is at Minimum a Dispute of Fact over Whether Zest Should Have Reasonably Believed It Needed to Take Additional Measures to Try to Stop Publication of the '396 Bohling Application. ................................................. 28

        1.  Zest's Extensive Efforts to Protect its Trade Secrets at Minimum Give Rise to a Dispute of Material Fact. ...................................... 30

        2.  The Additional Steps Walmart Now Suggests Would Not Have Been Effective. ................................................................................... 34

            a.  Walmart Would Not and Could Not Have Abandoned the '396 Bohling Application Before Publication at Zest's Request. .......................................................................................... 35

i

b.      Zest Was Not Required to Ask Walmart to Pursue an Extraordinary and Untimely Petition Under Sections 182 or 183...................................................................................38

c.      It Was Reasonable for Zest Not to Ask This Court to Enjoin Publication by the PTO. .....................................39

C.      Walmart Cannot Capitalize on its Own Misconduct. ...........................................42

V.      CONCLUSION..............................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Micro Devices, Inc. v. Feldstein*,
  No. CV 13-40007-TSH, 2013 WL 10944934 (D. Mass. May 15, 2013) ...............................30

*Allen v. Johar, Inc.*,
  308 Ark. 45 (1992)........................................................................................................13

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................11, 36

*AT&T Commc'ns of California, Inc. v. Pac. Bell*,
  238 F.3d 427 (9th Cir. 2000) ........................................................................................28

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*,
  663 F.3d 966 (8th Cir. 2011) ........................................................................................28

*B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*,
  No. 16-62364-CIV, 2017 WL 8751747 (S.D. Fla. Nov. 14, 2017) ........................................13

*Bradshaw v. Alpha Packaging, Inc.*,
  2010 Ark. App. 659 (2010)............................................................................................12

*Bull v. United Parcel Service, Inc.*,
  665 F.3d 68 (3d Cir. 2012)............................................................................................43

*Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*,
  139 F.3d 1396 (11th Cir. 1998) .................................................................................12, 28

*Centrifugal Acquisition Corp., Inc. v. Moon*,
  2012 U.S. Dist. LEXIS 28259, 2012 WL 718999 (E.D. Wisc. March 5, 2012)...............40, 41

*Centrifugal Acquisition Corp., Inc. v. Moon*,
  849 F. Supp. 2d 814 (E.D. Wis. 2012)..............................................................................41

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*,
  838 F.2d 268 (8th Cir. 1988) ........................................................................................12

*Erie R. Co. v. Tompkins*,
  304 U.S. 64 (1938)......................................................................................................34

*Freeman v. Brown Hiller, Inc.*,
  102 Ark. App. 76 (2008)................................................................................................13

*Gasperini v. Ctr. for Humanities, Inc.*,
   518 U.S. 415 (1996) ................................................................................................. 34

*Gen. Universal Sys., Inc. v. HAL, Inc.*,
   500 F.3d 444 (5th Cir. 2007) ..................................................................................... 18

*Godwin Pumps of Am., Inc. v. Ramer*,
   No. 8:11-CV-580-T-24-AEP, 2012 WL 1110068 (M.D. Fla. Apr. 3, 2012) ............ 12

*Gray v. BNSF Ry. Co.*,
   No. 2:22CV103 JM, 2023 WL 2972658 (E.D. Ark. Apr. 17, 2023) (Moody,
   J.) ......................................................................................................................... 11, 12

*Gronholz v. Sears, Roebuck & Co.*,
   869 F.2d 390 (8th Cir. 1989) ........................................................................ 2, 4, 12, 28

*Hanks v. Anderson*,
   No. 2:19-CV-00999-DBB-JCB, 2024 WL 4092949 (D. Utah Sept. 5, 2024) ....... 5, 30

*Hanna v. Plumer*,
   380 U.S. 460 (1965) ................................................................................................. 34

*HotSamba, Inc. v. Caterpillar Inc.*,
   No. 01 C 5540, 2004 WL 609797 (N.D. Ill. Mar. 25, 2004) ..................................... 29

*Hunton Energy Holdings, LLC v. HL Seawater Holdings, LLC*,
   539 F. Supp. 3d 685 (S.D. Tex. 2021) ..................................................................... 26

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
   342 F.3d 714 (7th Cir. 2003) ................................................................................... 42

*Luv n' Care, Ltd. v. Laurain*,
   98 F.4th 1081, 1094 (Fed. Cir. 2024) ....................................................................... 43

*Masimo Corp. v. Apple Inc.*,
   No. SACV2048JVSJDEX, 2021 WL 925885 (C.D. Cal. Jan. 6, 2021) ............ 4, 30, 32

*Niemi v. NHK Spring Co.*,
   543 F.3d 294 (6th Cir. 2008) ................................................................................... 12

*Orthofix Inc. v. Gordon*,
   No. 113CV01463SLDTSH, 2016 WL 1170896 (C.D. Ill. Mar. 24, 2016) ............... 29

*Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*,
   No. 3:16-CV-024-CHB, 2022 WL 4687025 (W.D. Ky. Sept. 30, 2022) ................. 30

*Poff v. Brown*,
   374 Ark. 453 (2008) ................................................................................................. 44

*Quigley v. United Airlines, Inc.*,
    2021 WL 2590147 (N.D. Cal. June 24, 2021) .......................................................30

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
    925 F.2d 174 (7th Cir. 1991) ....................................................................13, 29

*Saforo & Assoc., Inc. v. Porocel Corp.*,
    337 Ark. 553 (1999)........................................................................................13

*Simmons Foods, Inc. v. Indus. Risk Insurers*,
    2014 WL 10936748 (W.D. Ark. Feb. 18, 2014).................................................34

*Taylor v. George*,
    212 S.W.3d 17 (Ark. Ct. App. 2005) ...............................................................36

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*,
    637 F.3d 604 (5th Cir. 2011) ..........................................................4, 16, 25

*Tyson Foods, Inc. v. Conagra, Inc.*,
    349 Ark. 469 (2002)........................................................................................13

*Ultimate Timing, L.L.C. v. Simms*,
    715 F. Supp. 2d 1195, 1207 (W.D. Wash. 2010), on reconsideration on other
    grounds, No. C08-1632-MJP, 2010 WL 2650705 (W.D. Wash. June 29,
    2010); ..............................................................................................16, 25, 29

*Voda v. Cordis Corp.*,
    476 F.3d 887 (Fed. Cir. 2007)..........................................................................24

*Wilson Aerospace LLC v. Boeing Co. Inc.*,
    No. 2:23-CV-00847-JHC, 2024 WL 4043469 (W.D. Wash. Sept. 4, 2024) ...............3, 15, 25

**Statutes**

Ark. Code Ann. § 4-75-601 .........................................................................................18

Ark. Code Ann. § 4-75-601(4)......................................................................................12

Ark. Code Ann. § 4-75-604 .........................................................................................34

Ark. Code § 4-75-605 ...........................................................................................4, 33, 34, 39

**Other Authorities**

37 C.F.R. §§ 1.182 ...................................................................................................38

2 POMEROY'S EQUITY JURISPRUDENCE § 397 (5th ed. 1941)..........................................44

Fed. R. Civ. P. 26(e) ................................................................................................23

Fed. R. Civ. P. 56(d) ...................................................................................................44

Federal Judicial Center, Trade Secret Case Management Judicial Guide, § 7.3.1.4 ....................13

James Pooley, Elements of a Trade Secret, Trade Secrets § 4.04[2] at 4-33................................13

Unclean Hands Doctrine, Practical Law Glossary Item 6-521-9533.............................................44

## I.    SUMMARY OF ARGUMENT

Walmart's Motion for Summary Judgment is a cynical effort to capitalize on its own wrongdoing. Walmart's argument depends on the faulty premise that a misappropriator can make its misappropriation worse through subsequent public disclosure, and then wipe the slate clean by blaming the victim for failing to stop the later disclosure. Indeed, Walmart's motion represents the evolution of its emerging strategy to manipulate the judicial process through the concealment of evidence, misrepresentation of facts, and mischaracterization of trade secret law. The Court should not accept Walmart's arguments that are unsupported by law and fly in the face of justice and equity.

At the core of Walmart's argument is the assertion that, as a matter of law, *all* Zest's claims of misappropriation must be dismissed because Zest allegedly failed to take reasonable steps to stop the publication of Walmart's '396 Bohling Application, which Zest asserts contained some of its trade secrets. But this argument fails for at least three distinct reasons:

**<u>First</u>**, despite Zest's reasonable efforts to protect its trade secrets, Walmart's own actions ensured that Zest's trade secrets would inevitably be misappropriated and publicly disclosed regardless of whether the '396 Bohling Application ever became public. Walmart's attempt to narrowly focus on only one aspect of its misappropriation—the May 16, 2019, publication of the '396 Bohling Application—strips Walmart's misappropriation out of context, rendering it myopic and unavailing. Walmart erroneously frames the issue as whether Zest could have stopped the publication of the '396 Bohling Application. But that's not the question the jury will be deciding. Instead, the jury will be deciding whether Zest made reasonable efforts to maintain the secrecy of its alleged trade secrets, considering the costs and benefits of potential additional efforts under the totality of the circumstances.

Walmart cites no authority supporting its claim that Zest's failure to prevent the publication of Walmart's patent application, taken alone and out of context, constitutes a lack of reasonable efforts to protect a trade secret as a matter of law. On the contrary, reasonableness is a question of degree for the factfinder to evaluate given all the relevant information. *See, e.g.*, *Gronholz v. Sears, Roebuck & Co.*, 869 F.2d 390, 393 (8th Cir. 1989). The publication of the '396 Bohling Application is only the tip of the iceberg of Walmart's misappropriation, and whether or how Zest could have tried to stop Walmart from publishing the '396 Bohling Application represents only one small part of the analysis of Zest's reasonable efforts at secrecy. And courts almost universally hold that reasonableness is nearly always a fact question for the jury that should not be decided on summary judgment. Here, Walmart has provided no reason for the Court to deviate from this judicial norm.

Here, no matter what Zest had done to try to stop publication of the '396 Bohling Application, Walmart also filed at least two *additional* patent applications containing Zest's trade secrets, the '020 and '325 patents. Walmart did not produce those patents or the related patent applications during discovery in this case. As a result, Zest had no knowledge that Walmart was pursuing those patents until they had already become public, so there was no conceivable step Zest could have taken to stop their publication. Further, Walmart filed *international* versions of many of the patents that contained Zest's trade secrets. No matter what had happened with the U.S. patents, Zest could not have reasonably stopped the publication of the international patents by the World Intellectual Property Organization (WIPO), over which this Court unquestionably lacked jurisdiction, distinguishing this case from Walmart's cited authority.

Moreover, in addition to all of Walmart's patent applications, Walmart repeatedly and willfully misappropriated Zest's trade secrets through its myriad employees who acquired, used,

and disclosed Zest's trade secrets within Walmart. Walmart used Zest's trade secrets in designing its Eden system in direct violation of the terms of its NDA and Master Services Agreement with Zest. Walmart became liable for misappropriation as soon as it internally disseminated Zest's confidential information to employees beyond the scope of those agreements, and the naturally flowing harms form a valid basis for damages. Further, Walmart's internal dissemination to unauthorized employees significantly increased the risk of additional *public* disclosures as well. Zest clearly could not have reasonably prevented those unknown individuals from possessing, using, and further disclosing Zest's trade secrets.

Thus, even had Zest taken steps to prevent the publication of the '396 Bohling Application, trade secrets would still have been misappropriated through Walmart's repeated internal disclosures and use. In fact, Walmart had *already* misappropriated Zest's trade secrets through those other avenues by the time that the '396 Bohling Application was published. For that reason, the Court can deny this motion without even *deciding* whether Zest could reasonably have stopped publication of the '396 Bohling Application. Even accepting for the sake of argument Walmart's assertions about the '396 Bohling Application, Zest could not have stopped all of Walmart's misappropriation which occurred *before* the '396 Bohling Application published, and so the Court can deny Walmart's motion on that basis alone. Those claims are still valid, no matter what could have been done to stop the '396 Bohling Application. Walmart argues—without legal support—that Walmart's eventual *public disclosure* of Zest's trade secrets (when the '396 Bohling Application became public) served to cure Walmart's earlier *uses* and *internal disclosures* of Zest's trade secrets in its internal development of the Eden system, in its pursuit of international patents, and in preparing and submitting its various patent applications. That is not the law. *See, e.g.*, *Wilson Aerospace LLC v. Boeing Co. Inc.*, No. 2:23-CV-00847-JHC, 2024 WL 4043469, at

*2 (W.D. Wash. Sept. 4, 2024); *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 612 (5th Cir. 2011).

**Second**, there remains a question of fact as to whether Zest took reasonable measures to protect its trade secrets and prevent the publication of the '396 Bohling Application. The jury will be presented with Zest's comprehensive and reasonable measures to safeguard its trade secrets, including executing a binding Non-Disclosure Agreement (NDA) and a Master Services Agreement with Walmart and other third-party customers, vendors, contractors and consultants; implementing strict physical and electronic security measures; requiring its employees to keep Zest's trade secrets confidential; and marking confidential materials appropriately. Zest also promptly initiated legal action upon discovering Walmart's misappropriation, filing a lawsuit on August 1, 2018, and moving for a preliminary injunction on August 7, 2018. *See, e.g.*, *Masimo Corp. v. Apple Inc.*, No. SACV2048JVSJDEX, 2021 WL 925885, at *7 (C.D. Cal. Jan. 6, 2021); Ark. Code § 4-75-605. Indeed, Zest's motion for a preliminary injunction, Dkt. 18, was pending when the '396 Bohling Application was filed, and when it published. There is at minimum a dispute of fact over whether those many efforts to prevent misappropriation were reasonable—a highly fact-intensive dispute that is almost never appropriately resolved on summary judgment. *See, e.g.*, *Gronholz*, 869 F.2d at 393.

The additional steps that Walmart contends Zest should have taken were not required as a matter of law to render Zest's actions reasonable. Far from it—Walmart's suggestions would have been futile. Two of Walmart's three suggestions assume that, if Zest had merely asked Walmart to try to withdraw its patent application, Walmart would have readily agreed. That claim is completely at odds with Walmart's conduct throughout this litigation, in which it has vigorously contested the existence and misappropriation of Zest's trade secrets. To this day, even in the

present motion, Walmart continues to doggedly allege that the '396 Bohling Application does not include Zest's trade secrets. Thus, it strains credulity that Walmart would have withdrawn the applications in 2019 if Zest had only asked. At the very minimum, whether Walmart would have withdrawn its patent applications is a question of fact that the jury can assess—if the Court even permits this issue to go to the jury considering Walmart's concealment. And in any event, Walmart waited so long to produce the '396 Bohling Application that it created another significant factual dispute as to whether there was sufficient time for Walmart to withdraw it, even had Zest asked and Walmart agreed.

Walmart's final suggestion is that Zest should have asked the Court to enjoin the PTO from publishing Walmart's patent application. But even assuming the Court would have done so, Zest did not act unreasonably in failing to seek such extraordinary relief. This is especially true because Zest already had a pending motion for a preliminary injunction on file, which the Court had not acted on—making a litigant in Zest's shoes unlikely to conclude that the Court would be inclined to grant any interim injunctive relief. At the least, there is an issue of fact whether a litigant in Zest's shoes would have reasonably thought it prudent or necessary to file a second request for injunctive relief while the first remained pending. The fact that Zest did not pursue every option Walmart can now dream up does not erase *any material factual dispute* over the reasonableness of Zest's efforts to stop Walmart's misappropriation in general. Nor does it change the fact that the patent never would have published but for Walmart filing it using Zest's misappropriated trade secrets. *See, e.g.*, *Hanks v. Anderson*, No. 2:19-CV-00999-DBB-JCB, 2024 WL 4092949, at *12 (D. Utah Sept. 5, 2024). These are all questions for the jury.

**__Third__**, Walmart's *own suppression of relevant evidence* directly prevented Zest from attempting to stop the publication of Zest's trade secrets contained in Walmart patent applications.

Zest served discovery requests in this case seeking Walmart's patents and patent applications related to its Eden system for managing the produce supply chain. Walmart agreed to produce those documents and was bound by the Federal Rules of Civil Procedure to continue to supplement its production. But, despite Walmart's promise and obligations, Walmart failed to produce the '020 and '325 patent applications which also incorporated Zest's trade secrets. Whether Walmart intentionally or inadvertently failed to produce these patent applications is a question for another day. For present purposes, it is enough that Walmart knew that it had failed to produce the '020 and '325 patent applications *when it filed this motion*. Yet, even now, fully aware that it had prevented Zest from potentially stopping publication of those patents through its own nondisclosure, Walmart seeks to benefit from its own failure to meet its discovery obligations. Walmart is attempting to erase its own liability by blaming Zest for its failure to stop Walmart from publishing patent applications that *Walmart itself concealed*. Egregiously, Walmart does not even acknowledge the existence of the concealed patent applications in its motion, rendering the motion improper and requiring that the Court deny the motion.

Ultimately, Walmart concedes that it capitalized on its own prior misappropriations by filing patent applications using Zest's trade secrets, which eventually led to their public disclosure—and yet, Walmart somehow concludes that its increasingly egregious wrongdoing can negate its past wrongs. Granting this motion would unjustly reward Walmart for its continued misappropriation of Zest's trade secrets, undermine the integrity of the judicial process, and set a troubling precedent that would encourage parties to exploit similar situations. When a defendant misappropriates trade secrets, it cannot absolve itself of liability by misappropriating more and more egregiously and then blaming the victim for failing to stop the ever-escalating offenses.

The Court should recognize Walmart's motion for what it is—a cynical attempt to manipulate the legal process to its advantage despite its knowledge of the fuller context that undermines its position. With the multitude of disputed facts at issue here, this case deserves—indeed, requires—another full and fair adjudication on its merits. A jury must be allowed to holistically assess all the evidence, including the newly discovered evidence that Walmart had concealed during the previous trial. Only through such a thorough examination can justice again be served and the true nature of Walmart's misappropriation be determined. Zest respectfully requests that the Court deny Walmart's Motion for Summary Judgment.

## II.    FACTS AND PROCEDURAL HISTORY

Zest was a pioneer in the development of new technologies to avoid food waste. ███████

████████████████████████████████████████████

████████████████████████████████████ *See* Dkt. 382, Trial Tr. Vol. 2-A at 95:10-98:6; *see also* Beckles Decl., ¶¶ 35-40, 45-63. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Dkt. 382 at 95:10-98:6; Beckles Decl., ¶¶ 35-40. By 2012, after investing █████████ in research and development, Zest had a fully operational version of its █████████ Dkt. 382 at 99:2-7, 102:9-12; Beckles Decl., ¶¶ 42-44.

In 2014, Zest began pitching its technology to Walmart. *See* Dkt. 382 at 105:22-107:16. Zest's CEO, Peter Mehring, met with Greg Foran, who was at the time a Walmart executive in Asia but shortly thereafter became Walmart's CEO. *Id.* Zest met with Mr. Foran and other Walmart executives again in early 2015, and Mr. Foran concluded that Walmart should pursue a pilot with

Zest, with the potential to deploy Zest more broadly throughout Walmart after the pilot. *Id.* at 129:25-131:25.

Zest and Walmart entered into a nondisclosure agreement in July 2015. *See* Zest's Statement of Additional Material Facts ("Zest SAMF"), ¶¶ 35-36. Believing that the nondisclosure agreement adequately protected it, Zest began discussing its trade secrets with Walmart and working on a proof of concept. For example, Mr. Mehring presented key aspects of Zest's system to Walmart employees in meetings and emails from 2015 to 2017. *See* Dkt. 382, Trial Tr. Vol. 2-A at 84:7-88:19, 140:3-142:17, 168:3-170:5, 170:24-175:18, 179:15-186:5, 212:6-214:9, 231:7-232:24, 239:11-240:21, 247:10-248:5. Zest marked the presentations it shared as "confidential." Zest SAMF, ¶ 39 (collecting exhibits). Zest also welcomed Walmart employees to visit Zest's offices on multiple occasions, and Zest executives provided yet more information about Zest's trade secret systems. Dkt. 382 at 162:21-168:2, 176:3-21, 178:13-179:1, 228:11-231:3, 232:25-233:11, 248:17-250:21; Mehring Decl., ¶¶ 19-21. In total, Zest conducted hundreds of meetings and thousands of communications with Walmart. Dkt. 382 at 269:18-270:7. In January 2016, Walmart and Ecoark also entered into a Master Services Agreement that likewise contained confidentiality provisions. Zest SAMF, ¶¶ 37-38.

In early 2016, Walmart approved a pilot project with Zest. Dkt. 382 at 151:9-12. At Walmart's request, Zest spent more than ▮▮▮▮▮▮ on consultants that Walmart selected to help deploy Zest's system. *Id.* at 156:8-157:16. In fall 2016, Zest and Walmart completed a pilot using lettuce, and the results showed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 188:10-12, 190:5-194:25, 202:23-203:18.

In December 2016, Walmart then demanded another round of testing, issuing a request for information (or "RFI") from vendors who could provide ███████████████████████████ ███████████████████████████████ *Id.* at 214:16-215:1. Zest promptly submitted a response in early January 2017, recognizing that what Walmart was seeking was ███████████████████████████ *Id.* at 215:3-27:21. ███████████████████████████ , *id.* at 223:4-████████████████████ *id.* at 252:11-254:8.

On November 9, 2017, Walmart and Zest held a meeting at Walmart's offices. Zest expected the purpose of the meeting was to negotiate an agreement for Walmart's ongoing use of Zest's technology. *Id.* at 254:9-255:2. But instead, Walmart blindsided Zest, terminating the relationship with Zest. *Id.* at 255:11-19. On November 10, 2017, Walmart filed the initial provisional application for the '396 Bohling application. *See* Dkt. 508-1 at 344.

On March 1, 2018, Walmart's Parvez Musani wrote in a blog post that Walmart had created Eden "in six months during a 'hackathon.'" Zest SAMF, ¶ 22. In reality, unbeknownst to Zest, Walmart had been surreptitiously using Zest's trade secrets internally for years, working to prepare competing software that would allow Walmart to replicate Zest's capabilities and replace Zest. *See id.*, ¶¶ 22-28. Indeed, the very same day that Walmart told Zest it would not be moving forward on a partnership, its employees were urgently circulating Zest's confidential documents to confirm ███████████████████████████ *Id.*, ¶ 27.

Zest sued Walmart on August 1, 2018. Dkt. 1. On August 7, 2018, Zest moved for a preliminary injunction. Dkt. 18. On August 27, 2018, while that motion was pending, Walmart filed with the U.S Patent and Trademark Office (PTO) the patent application known as the '396 Bohling Application. *See* Dkt. 508-1 at 344. Walmart also filed several additional patents related

to the Eden system. On October 17, 2018, Walmart/Bohling filed a provisional application (62/746,614) that led to the February 20, 2019, Walmart application (16/280,818) for the '020 patent (with Bohling as the sole inventor) that overlaps the '396 Bohling Application. *See* Zest SAMF, ¶ 2. On February 21, 2019, Walmart filed Patent Cooperation Treaty ("PCT") applications with WIPO for the '020 patent (international application number PCT/US2019/018882) and the '396 Bohling Application (international application number WO2019094085A1). *Id.*, ¶¶ 16, 18. *Also on February 21, 2019*, Walmart agreed to produce patent applications and patents related to its Eden system in response to Request for Production 101. *Id.*, ¶ 7. On February 25, 2019, Walmart filed a provisional application referenced by the '325 patent. *Id.*, ¶ 3.

On February 28, 2019, Walmart produced the '396 Bohling application to Zest within a production of 8,311 documents. Walmart Statement of Undisputed Material Facts, ¶ 5. Walmart did not produce documents or applications related to the '020 or '325 patents, despite (i) the content being related to the Eden System, and (ii) documents submitted by Walmart with the applications expressly discussing the Eden System. *See* Zest SAMF, ¶¶ 8-11; Stoll Decl., ¶ 11.

On July 30, 2019, Walmart filed the application for what became the '325 patent as well as a PCT application with WIPO. *See* Zest SAMF, ¶ 4. Walmart never produced those applications. *Id.*, ¶¶ 8-11. The timing of when Walmart filed its various patent applications, when it agreed to produce its patent applications, and when it produced the '396 Bohling Application, at a minimum, was suspect. That timing raises a factual issue of whether Walmart's conduct was an intentional effort to cause Zest to focus its attention on the '396 Bohling Application, which Walmart planned to abandon (and did), while it simultaneously was secretly attempting to obtain patents on Zest's trade secrets via two other patents that Walmart did not abandon.

The PTO published the '396 Bohling application on May 16, 2019. Walmart Statement of Undisputed Material Facts, ¶ 15. It is undisputed that Walmart produced the '396 Bohling application, and that Zest attorneys received it, before the PTO published it. *Id.*, ¶ 14. It is also undisputed that Walmart did not produce, and Zest did not have knowledge of the '020 or '325 patent filings before those applications were published by the PTO. Zest SAMF, ¶¶ 9-12, 14.

On February 26, 2020, the Court found Zest's motion for preliminary injunction to be moot without explanation. Dkt. 182.

The case went to trial in March 2021, after a year's delay due to COVID-19, and the jury returned its verdict in Zest's favor. Dkt. 368. The jury found that Walmart had willfully and maliciously misappropriated Zest trade secrets, awarding $60 million in compensatory damages and another $50 million in exemplary damages. *Id*. This Court entered judgment that same day. Dkt. 376. Post-trial motions and proceedings followed for years, eventually resulting in this Court granting a new trial. Dkt. 530. This Court denied Walmart's motion to dismiss. Tr. of Apr. 30, 2024 Hrg. at 7, 145. The new trial is set for January 21, 2025. Dkt. 532.

### III.    LEGAL STANDARDS

"Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds." *Gray v. BNSF Ry. Co.*, No. 2:22CV103 JM, 2023 WL 2972658, at *2 (E.D. Ark. Apr. 17, 2023) (Moody, J.) (citing *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues." *Gray*, 2023 WL 2972658, at *3 (citing *Inland Oil & Transp. Co. v. United States*, 600 F.2d 725 (8th Cir. 1979)). The party seeking summary judgment bears the initial burden to show "that the record does not disclose a genuine dispute on a material fact." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc*., 838 F.2d 268, 273 (8th Cir. 1988). "Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue." *Id*. at 274.

## IV.    ARGUMENT

Whether information meets the definition of a trade secret is a fact-intensive question. *Bradshaw v. Alpha Packaging, Inc.*, 2010 Ark. App. 659 (2010). A trade secret must be "the subject of reasonable efforts to maintain its secrecy." Ark. Code Ann. § 4-75-601(4); Jury Instruction 8.2. The reasonableness of a plaintiff's efforts "presents a question for the trier of fact." *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp*., 139 F.3d 1396, 1410 (11th Cir. 1998). This is a quintessentially "fact-intensive question[]" that is not typically amenable to summary judgment. *See, e.g.*, *Gronholz*, 869 F.2d at 393 (reversing grant of summary judgment because "[t]he issue of whether a plaintiff took reasonable steps under the circumstances to maintain the secrecy of information is an issue of fact"); *Niemi v. NHK Spring Co.*, 543 F.3d 294, 303 (6th Cir. 2008) (reversing grant of summary judgment because, "except where the evidentiary showing of reasonable efforts could not conceivably support a judgment in favor of the plaintiff, the reasonableness of the efforts is a question for the trier of fact"); *Godwin Pumps of Am., Inc. v. Ramer*, No. 8:11-CV-580-T-24-AEP, 2012 WL 1110068, at *7 (M.D. Fla. Apr. 3,

2012); *B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, No. 16-62364-CIV, 2017 WL 8751747, at *3 (S.D. Fla. Nov. 14, 2017); James Pooley, Elements of a Trade Secret, Trade Secrets § 4.04[2] at 4-33 (attached as Exhibit 13[1]) ("Reasonableness of the trade secret owner's efforts is a question of fact, and due to the fact-intensive nature of the inquiry, it is difficult to establish as a matter of law that 'reasonable efforts' have not been taken."). Thus, "only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that will vary from case to case …." *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991); *see also* Federal Judicial Center, Trade Secret Case Management Judicial Guide, § 7.3.1.4 (attached as Exhibit 25) (collecting cases denying summary judgment on reasonable efforts to maintain secrecy, and noting that typically there is some dispute of material fact regarding reasonable efforts).

"The Arkansas Trade Secrets Act requires *reasonable* measures to maintain secrecy." *Saforo & Assoc., Inc. v. Porocel Corp.*, 337 Ark. 553, 561 (1999) (holding nondisclosure agreements were sufficient to protect trade secrets). There is no hard-and-fast rule as to what constitutes reasonable efforts; rather, it must be evaluated on a case-by-case basis under the totality of the circumstances. *See* Pooley Decl., ¶¶ 15-23. For example, nondisclosure agreements are not necessarily required. *Tyson Foods, Inc. v. Conagra, Inc.*, 349 Ark. 469, 488 (2002). Physical limits on access to trade secrets can suffice. *Allen v. Johar, Inc.*, 308 Ark. 45, 49 (1992) ("Vienna testified that like his other competitors, he did not allow tours of the building.") Similarly, restricting access electronically can be considered. *Freeman v. Brown Hiller, Inc.*, 102

---

[1] All numbered exhibits refer to the exhibits to Zest's Statement of Additional Material Facts, filed herewith.

Ark. App. 76, 84 (2008) (considering that the plaintiff "made its computer system accessible only by password").

Here, Walmart has not demonstrated that this is an extreme case in which Zest's reasonable efforts at secrecy can be resolved as a matter of law on summary judgment. Walmart's brief does not address the extensive evidence demonstrating its misappropriation outside of the publication of the '396 Bohling Application—through Walmart's internal acquisition, use, and disclosure of Zest's trade secrets, in addition to its other patent applications both domestic and international—let alone explain why a party in Zest's position would have acted unreasonably, as a matter of law, in not taking any additional steps beyond what it did to protect in trade secrets. Even as to the '396 Bohling Application alone, there is more than enough evidence for a jury to conclude that Zest took reasonable measures to prevent misappropriation. Walmart's additional suggestions of what Zest might have been able to do were not *requirements* as a matter of law to meet the standard of reasonableness, and in fact would likely not have been effective in preventing the inevitable publication of Zest's trade secrets.

Essentially, Walmart attempts to win summary judgment by blaming Zest for failing to stop Walmart's own bad acts—acts that began a chain of events that inevitably led to the public disclosure of Zest's trade secrets. Walmart cannot publish Zest's trade secrets in a patent application and then claim its own publication of those trade secrets obviates its liability by rendering the information public. That result would be inconsistent with both logic and legal precedent. Walmart's motion should be summarily denied.

**A.**      **Zest Has Viable Claims for Both Liability and Damages Completely Independent of Walmart's Disclosures in the '396 Bohling Application.**

To prevail on its motion, Walmart would need to demonstrate that there is no dispute of *any* fact material to Zest's claims. Walmart necessarily fails to meet this burden because it wrongly focuses exclusively on whether Zest can state a claim for misappropriation based on Walmart's publication of the '396 Bohling Application. As discussed *infra*, Part IV(B), a jury could conclude based on all the facts that Zest did take reasonable measures to try to stop Walmart from publishing the '396 Bohling Application, and Zest has a valid claim on that basis. But the Court need not even reach that issue, because Zest has viable claims—even ignoring the publication of the '396 Bohling Application—based on Walmart's *other numerous* misappropriations that had already occurred *before* the '396 Bohling Application was published. A jury could find Walmart liable for those misappropriations no matter what happened afterwards. On that basis alone, Walmart's motion must be denied.

**1.**      **A Jury Could Reasonably Find That Walmart Misappropriated Zest's Trade Secrets Regardless of Whether the '396 Bohling Application Published.**

Walmart engaged in many forms of misappropriation—including independent acts of misappropriation that predated publication of the '396 Bohling Application. Any alleged failure on Zest's part to stop the publication of the '396 Bohling Application has no bearing on Walmart's liability for all these other acts of misappropriation. As discussed in more detail in Part IV(A)(2), *infra*, it is well-established that the publication of a trade secret (or conversely, the failure to take reasonable efforts to maintain the secrecy of a trade secret) does not absolve liability for *previous misappropriation* before that date. *See, e.g.*, *Wilson Aerospace*, 2024 WL

15

4043469, at *2; *Ultimate Timing, L.L.C. v. Simms*, 715 F. Supp. 2d 1195, 1207 (W.D. Wash. 2010), on reconsideration on other grounds, No. C08-1632-MJP, 2010 WL 2650705 (W.D. Wash. June 29, 2010); *Tewari De-Ox Sys.*, 637 F.3d at 612 (collecting cases allowing a claim when a defendant "gained knowledge of [the plaintiff's] processes while they were still trade secrets and those processes subsequently lost trade secret protection due to publication" in a patent). Here, Walmart engaged in at least four other distinct categories of misappropriation, all of which predate publication.

**First**, regardless of anything related to patent applications, Walmart misappropriated Zest's trade secrets when it allowed dozens of its employees—who had no role in the Zest pilot—to acquire, use, and disclose Zest's trade secrets both within Walmart and to Walmart's vendors. There is direct evidence that Walmart employees working on Walmart's internal technology for the produce supply chain—employees who had nothing to do with Walmart's business relationship with Zest—acquired, used, and disclosed Zest's trade secrets in order to develop Walmart's competing internal technology. These are all distinct acts of misappropriation that predate the publication of any of the Walmart patents.

**Second**, Walmart misappropriated Zest's trade secrets by acquiring and using Zest's confidential information for the wrongful purpose of preparing the '396 Bohling Application. Walmart misappropriated when it used Zest trade secrets to draft the patent applications. It again misappropriated the trade secrets when it filed those applications with the PTO, disclosing the trade secrets contained within the applications. Once again, these are separate acts of misappropriation that predate the publication of the '396 Bohling Application. Publishing the '396 Bohling Application is one of only many escalating acts of misappropriation for which the jury could conclude that Walmart is liable, but Walmart ignores everything else.

**Third**, Walmart misappropriated Zest's trade secrets when it acquired, used, and disclosed the trade secrets for the wrongful purpose of preparing and filing the additional '020 and '325 U.S. patents. Walmart concealed the '020 and '325 patent applications during discovery, despite its promise to produce them in discovery responses, rendering any effort to stop Walmart from publishing the '396 Bohling Application nugatory.

**Fourth**, Walmart used and disclosed Zest's trade secrets by filing international versions of the '396 Bohling Application and the additional patents. These are all separate and independent acts of misappropriation, and no matter what Zest had done with regard to the '396 Bohling Application, Zest could not have reasonably stopped Walmart from engaging in those additional categories of misappropriation.

a.    **A Jury Could Find Walmart's Use of Zest Trade Secrets in its Internal Development of the Eden System Misappropriated Zest's Trade Secrets.**

Even if Zest could somehow have stopped Walmart's publication of the '396 Bohling Application, that approach would have done nothing to undo Walmart's prior and ongoing misappropriation of Zest trade secrets in building Walmart's internal technology—technology it developed to replace Zest and avoid paying to license Zest's trade secret system. *See* Zest SAMF, ¶¶ 22-28.

Walmart's ultimate goal for much of its Eden project was to copy Zest's trade secrets. Walmart's initial vision for the Eden project was very narrow: simply to replace the pen-and-paper collection of data in distribution centers with a computerized input system. *See* Zest SAMF, ¶ 23; Lanning Decl., ¶ 37. But as it reviewed Zest's trade secrets, it realized the importance of ███████████████████████████████████ and it decided to

create its own █████████████████████████████████████████████████████
████████████████████. *Id.*, ¶ 24; Lanning Decl., ¶¶ 38-41. Those projects were attempts to

copy Zest's trade secret system, and Walmart's employees repeatedly acquired, used, and

disclosed Zest's trade secrets as they worked to develop Walmart's copied system. *Id.*, ¶ 25;

Lanning Decl., ¶¶ 43-103. As explained in more detail in Dr. Lanning's declaration, dozens of

Walmart employees—most of whom were not involved in Zest and Walmart's business

relationship—sent and received documents containing Zest trade secrets, including Zest

presentations summarizing its system, proprietary Zest data, and Zest's confidential training

materials. *Id.* These Walmart employees admitted that they used Zest's documents to build

Walmart's copied Eden system, including ████████████████████████████████████████
█████████. Indeed, the very same day that Walmart blindsided Zest by declining to move

forward with using the Zest system, its employees were emailing about whether they could use

the "information from Zest" to ██████████████████████████████████ *Id.*, ¶¶

73-76; *see also* Zest SAMF, ¶ 27.

  This pattern of events constituted repeated misappropriation by Walmart. To be clear,

misappropriation does not require public disclosure. Misappropriation includes the acquisition,

disclosure, or use of a trade secret. *See* Ark. Code Ann. § 4-75-601. It is well-established that

"any exploitation of the trade secret that is likely to result in injury to the trade secret owner or

enrichment to the defendant is a 'use,'" whether the defendant uses the trade secret to produce

products, assist in research and development, or for any other purpose. *Gen. Universal Sys., Inc.

v. HAL, Inc.*, 500 F.3d 444, 451 (5th Cir. 2007) (quoting Restatement Third of Unfair

Competition, § 40).

Walmart eventually publicly disclosed Zest's trade secrets through publication, but it had misappropriated them long before that public disclosure. Every time a Walmart employee sent Zest's trade secret documents to a coworker who had no role in Zest's pilot with Walmart, that disclosure was an act of misappropriation. Every time the recipients used the Zest trade secrets to conceptualize and develop Walmart's internal Eden system, that use was an act of misappropriation. Every time Walmart circulated and used Zest's trade secrets internally for unauthorized purposes, there was a legally cognizable, separate act of misappropriation. Any one of those acts of misappropriation is sufficient to allow a jury to find that Walmart misappropriated Zest's trade secrets. Nothing Zest could have done to try to stop the publication of Walmart's patents would have stopped Walmart from misappropriating Zest trade secrets to build Walmart's Eden system, long before the publication of the trade secrets contained within the '396 Bohling Application. Walmart's arguments about the '396 Bohling Application thus cannot warrant summary judgment on Zest's claims based on those separate acts of misappropriation.

> **b.** **A Jury Could Find Walmart's Use of Zest's Trade Secrets to Prepare the '396 Bohling Application Misappropriated Zest's Trade Secrets.**

Walmart also engaged in separate acts of misappropriation when it *prepared* the '396 Bohling Application and transmitted it to the PTO, long before it was ever published. By the time Walmart produced the '396 Bohling Application to Zest, those acts of misappropriation were complete. Even if the application had never published, that outcome would not eliminate the prior misappropriations. When Walmart acquired and used Zest's trade secrets to draft the '396 Bohling Application, it had already committed misappropriation. When Walmart shared

confidential Zest trade secret information with its patent counsel, that was a disclosure and thus

an additional misappropriation. When it sent the application to the PTO, that was yet another

disclosure and an additional misappropriation. Walmart has not suggested anything Zest could

have done to stop *those* acts of misappropriation, independent of the patent publication.

c.        **A Jury Could Find Walmart's Filing of the '020 and '325 Patents Misappropriated Zest's Trade Secrets (and Would Have Inevitably Disclosed Them).**

In addition to the '396 Bohling Application and all of Walmart's usage of Zest's trade

secrets in its own internal systems, Walmart secretly prepared and filed several other patent

applications riddled with Zest's trade secret information. *See* Zest SAMF, ¶¶ 1-5, 13; *see also*

Lanning Decl., ¶¶ 4-5, 133-266; Stoll Decl., ¶¶ 17-18, 42-54; Mehring Decl., ¶¶ 3-19.

Specifically, Walmart filed the '020 patent on February 20, 2019 and the '325 patent on July 30,

2019 (collectively, the "New Patents"). *See* Zest SAMF, ¶¶ 2-4.

Even if publication of the '396 Bohling Application had somehow been prevented, Zest's

confidential information *would still have been publicly disclosed* by publication of the New

Patents. *See* Stoll Decl., ¶¶ 10-11. There was nothing Zest could have done to stop the

publication of the New Patents because Walmart did not produce them to Zest before they were

published. *See* Zest SAMF, ¶¶ 6-12, 14. Significantly, patent applications filed with the USPTO

are confidential and inaccessible by the public between the time when they are filed and the time

when they are published. *See, e.g.*, Zest SAMF, ¶ 12; Stoll Decl., ¶¶ 9, 13, 83. Accordingly, Zest

could not have discovered the existence of the '020 and '325 patent applications until after they

were published. *Id*. Thus, due to Walmart's failure to produce the New Patent applications—

notwithstanding its discovery obligations under the Federal Rules of Civil Procedure and its

agreement to do so—Zest had no knowledge of the existence of the applications, and "it therefore would have been impossible for Zest to take any action to prevent their publication." Stoll Decl., ¶ 3.

It was reasonable for Zest to expect that Walmart would produce any such patent applications before publication, because Walmart had expressly agreed to do so in response to discovery requests in this case. On February 21, 2019, more than seven months before the fact discovery deadline of October 15, 2019, Walmart agreed to produce "[a]ll patents or patent applications relating to any element, component, or aspect of any past, current, or future implementation of the Eden System" in Response to Zest's Request for Production No. 101. *See* Stoll Decl., ¶ 12; Zest SAMF, ¶¶ 6-7. On February 20, 2019—just one day before Walmart agreed to produce responsive patent applications—it had filed the '020 patent application. Zest SAMF, ¶ 2. Yet when Walmart produced the '396 Bohling Application a few days later, it did not include the '020 application in the production. *Id.*, ¶¶ 9-11. Likewise, the '035 patent application was filed on July 30, 2019, based on a provisional application filed on February 25, 2019. *Id.*, ¶¶ 3-4. But when Walmart produced the '396 Bohling Application three days after filing the provisional application that led to the '035, it did not include the provisional application in its production. *Id.*

Walmart has *admitted* that it did not produce either of the New Patents or their related applications. Almost three months ago, Zest sent a letter to Walmart's counsel inquiring whether Walmart had produced documents related to the newly discovered '020 and '325 patents and, if Walmart had not done so, requesting an explanation for why it had not. *See* Zest SAMF, ¶ 9. While Walmart admitted that it "ha[d] not located the applications for U.S. Patent Nos. 11,078,020 and 11,388,325 in the production," it failed to offer any explanation or justification

for the concealment. *Id.*, ¶ 10. Zest filed its motion to allow limited discovery the following day. In its opposition filed concurrently with this motion for summary judgment, Walmart again admitted that the New Patent applications "do not appear to have been produced." Dkt. 582 at 8 & n.7; Zest SAMF, ¶ 11. This evidence should have been available to Zest at the first trial and should have been available to this Court in weighing the motion for a new trial and sanctions. Walmart's failure to explain its conduct is profoundly shocking to the undersigned, and Zest reserves its rights (and intends) to seek appropriate sanctions once all the facts are disclosed.

The critical nature of these unproduced patents and their responsiveness to Zest's discovery requests cannot be overstated. Both patent applications clearly fell within the scope of what Walmart had agreed to produce in response to Request for Production No. 101, which concerned patents related to "implementation of the Eden System." *See* Zest SAMF, ¶¶ 7-8; Stoll Decl., ¶ 11; Lanning Decl., ¶¶ 227-229, 260-266. The New Patents are related to the Eden system. *Id.*; *see also* Mehring Decl., ¶¶ 3-5. Indeed, Walmart itself submitted documentation related to the Eden system alongside its patent applications, thereby conceding that those documents "were related to the New Patents." *See* Stoll Decl., ¶ 11. Starkly, Walmart included over 400 references to the *Zest v. Walmart* case in its applications. And Walmart has *admitted* in post-trial briefing that these patent applications were related to the Eden system. *See* Dkt. 582 at 9 (describing the New Patents as "other work on Eden that had been patented").

Zest should have been able to rely on Walmart's representations in discovery that it would produce documents related to Eden patents, including any and all patent applications and patents. *See* Stoll Decl., ¶ 14 (opining "that Zest was reasonable in relying on Walmart's agreement to produce all patent applications and patents related to the Eden System, that Zest had no obligation to assume that Walmart lied in its response to the document request, and thus

Zest had no independent obligation to monitor the PTO for any Walmart patents, as all such applications and patents should have been produced as part of the discovery process"). Instead, Walmart concealed the New Patents, and then remained silent after they had published, despite its duty to supplement its discovery responses. *See* Fed. R. Civ. P. 26(e) (requiring supplementation if a party "learns that in some material respect" a response to a request for production "is incomplete").

Stunningly, Walmart does not even acknowledge the existence of the New Patents in its motion, let alone explain how summary judgment would be warranted on Zest's claims related to misappropriation evidenced by the New Patents.[2] These material facts present a genuine dispute as to Walmart's misappropriation of Zest's trade secrets.

> **d.      A Jury Could Find Walmart's Filing of the International Patents Misappropriated Zest's Trade Secrets.**

In addition to the publication of the New Patents, Walmart also sought international patents containing Zest's trade secrets. As discussed below, Walmart filed international versions of the '396 Bohling Application and both New Patents with the World Intellectual Property Organization (WIPO) under the Patent Cooperation Treaty (PCT).[3] These international applications have essentially identical content as their U.S. counterparts. Stoll Decl., ¶ 15.

---

[2] To be clear, Walmart is now undeniably aware that Zest contends those additional patent applications contained Zest trade secrets, because Zest raised that issue in its request for additional discovery. *See* Dkt. 568. Walmart filed this motion the same day it opposed Zest's request for additional discovery. *See* Dkt. 582, 583.

[3] WIPO is the World Intellectual Property Organization which was formed pursuant to the Patent Cooperation Treaty (PCT). The PTC is an international treaty with more than 150 contracting states, including the U.S. The PCT makes it possible to seek patent protection for an invention simultaneously in a large number of countries by filing a single "international" patent application instead of filing several separate national or regional patent applications. *See, e.g.*, https://www.uspto.gov/patents/basics/international-protection/patent-cooperation; *see also* Stoll Decl., ¶ 15, n.1.

Even if publication of the '396 Bohling Application in the U.S. could have somehow been prevented, Zest's trade secrets would still have been publicly disclosed by publication of these international patents, because there was nothing that Zest or this Court could reasonably have done to prevent publication of Walmart's international PCT applications. *See* Stoll Decl., ¶¶ 15-16, 87-91; Pooley Decl., ¶¶ 33-34. Publication of these international patent applications is governed by Article 21(2)(a) of the PCT, which requires that publication of an international application "shall be effected promptly after the expiration of 18 months from the priority date of that application." *Id*. In accordance with PCT rules, the international version of the '396 Bohling Application published on May 16, 2019 (the same day as publication in the U.S.). *Id.*, ¶¶ 16, 88. The international versions of the New Patents also published on the same day as their respective U.S. counterparts. *Id.*; Zest SAMF, ¶¶ 19-20. No applicable exceptions would have prevented publication. Stoll Decl., ¶ 88.

To the extent Walmart contends that Zest could have sought an Order from the Court preventing the USPTO from publishing the '396 Bohling Application *(see, e.g.*, Dkt. 585 at 12), this Court would not have jurisdiction over WIPO or otherwise have the authority or ability to order WIPO not to publish Walmart's WO2019/094085A1. *See, e.g.*, *Voda v. Cordis Corp.*, 476 F.3d 887, 901 (Fed. Cir. 2007) ("while the United States has entered into the Paris Convention, the PCT, and the Agreement on TRIPS, nothing in those treaties contemplates or allows one jurisdiction to adjudicate the patents of another."); Stoll Decl., ¶¶ 89-91.

Therefore, even if publication of the '396 Bohling Application in the U.S. had somehow been prevented, Zest's trade secrets would still, inevitably, have been publicly disclosed by the publication of Walmart's international version of the '396 Bohling Application, *i.e.*, WO2019/094085A1. *Id.*, ¶ 90. For this independent reason alone, as a matter of law, there were

no reasonable steps that Zest could have taken to prevent the public disclosure of its trade secrets. But in any event, the jury could reasonably conclude that a party in Zest's shoes had already done what was reasonable under the circumstances, and weighing all factors, nothing further need have been done by Zest.

> ## 2. Walmart's Liability for its Earlier Acts of Misappropriation Does Not Depend on Zest's Reasonable Efforts to Stop Publication of the '396 Bohling Application.

Anything Zest allegedly could have done to stop publication of the '396 Bohling Application is irrelevant to Walmart's liability for all these other acts of misappropriation. As many courts have concluded, even if a *plaintiff intentionally publishes* a trade secret, that does not erase prior liability for misappropriation that had already occurred before that date. For example, a Washington court recently considered a case in which the *plaintiff* published a patent application containing material it had previously protected as a trade secret. *Wilson Aerospace*, 2024 WL 4043469, at *2. The plaintiff argued that the defendant had misappropriated its trade secrets before they were published, and that the eventual publication did not affect *earlier* acts of misappropriation. *Id.* at *4. The court agreed, noting that until the patent was published, its contents "were subject to reasonable efforts under the circumstances to maintain their secrecy." *Id.*; *see also Ultimate Timing*, 715 F. Supp. 2d at 1207 (finding that even where trade secrets were eventually disclosed in the plaintiff's own patent application, he could still claim misappropriation before that date); *Tewari De-Ox Sys.*, 637 F.3d at 612.

If anything, the logic of cases like *Wilson Aerospace* applies with even more vigor here. *Wilson Aerospace* and *Ultimate Timing* hold that a plaintiff can claim misappropriation of trade secrets even if *the plaintiff itself* later decides to publish the trade secrets in its *own* patent

application. The same logic is all the more applicable here, where it was not Zest's choice to publish the trade secrets but rather the result of *additional misappropriation* on Walmart's part. *See, e.g.*, *Hunton Energy Holdings, LLC v. HL Seawater Holdings, LLC*, 539 F. Supp. 3d 685, 693 (S.D. Tex. 2021) ("Defendants cannot avoid trade secret liability by filing a patent application that destroys trade secret status"). Walmart's logic would perversely *reduce its liability* because of its additional acts of misappropriation, and that is not the law. *See infra*, Part IV(C).

Rather, Walmart's later acts of misappropriation—and any related argument about whether Zest could have somehow stopped those later acts—do not obviate Walmart's liability for all its earlier acts of misappropriation. By the time the '396 Bohling Application was published in May 2019, Walmart had already engaged in ample acts of misappropriation. It had repeatedly misappropriated Zest's trade secrets in its efforts to develop technology to replace Zest's system in Walmart's internal operations. It had also misappropriated Zest's trade secrets (i) to prepare the '396 Bohling Application itself, (ii) to prepare and file the '020 patent as early as October 17, 2019 (the filing date of the '020 provisional application), and (iii) to prepare the '325 patent as early as February 25, 2019 (the filing date of the '325 provisional application). The *later* publication of the '396 Bohling Application—without Zest's consent—does not eliminate Walmart's liability for all those earlier acts of misappropriation.

### 3. Walmart's Misappropriations Beyond the '396 Bohling Application Support Zest's Damages Claims.

Walmart mischaracterizes the damages model Zest presented at trial by its expert Stephen L. Becker, claiming that Zest's damages were entirely dependent on misappropriation through the publication of ██████████████████. *See* Dkt. 585 at 1 (incorrectly claiming that "the

only misappropriation theory Zest pursued was that ███████████████████████████

███████████████████████████████████████ As explained *supra*,

Part IV(A)(1), there are many other valid theories of misappropriation, including Walmart's

pursuit of other domestic and international patents and its use of Zest's trade secrets to develop

its internal technology.

Zest's damages model was not premised solely on misappropriation through publication

of ███████████████████ Mr. Becker's damages theory was based on a reasonable

royalty. Becker Decl., ¶ 20. As Mr. Becker explains, his damages opinion:



*Id.*, ¶ 19. Rather, Mr. Becker's opinion "relied on [his] consideration of the various Georgia-

Pacific factors and the outcome of a hypothetical negotiation." *Id.*, ¶ 21. The ███████ reasonable

royalty rate presented to the jury "was not dependent on the alleged destruction of the Zest Trade

Secrets that occurred when ██████████████████████████" *Id.*, ¶ 22; *see also id.*, ¶ 23

(explaining that his "opinion regarding the effective term (20 years) would have been the same

regardless of whether ████████████████████████████████████

████████). Thus, Mr. Becker's damages theory is not limited to Walmart's misappropriations

through ██████████████████. No matter what the Court decides about Walmart's

arguments regarding what Zest could or should have done to prevent the publication of that

patent, there are factual disputes about Walmart's *other* acts of misappropriation, and summary

judgment cannot be granted on Zest's claims in full.

**B.**          **There Is at Minimum a Dispute of Fact over Whether Zest Should Have Reasonably Believed It Needed to Take Additional Measures to Try to Stop Publication of the '396 Bohling Application.**

Walmart's ample misappropriation outside of the '396 Bohling Application—which Zest could not have reasonably stopped even if the Bohling Application had not published—gives rise to a material dispute no matter whether Zest could have stopped publication of the '396 Bohling Application. Nonetheless, if the Court reaches the question of whether Zest should reasonably have believed it had to take additional measures to try to stop publication of the '396 Bohling Application, the answer is clear: there is at least a dispute of fact over whether Zest acted reasonably.

As discussed *supra*, pp. 12-14, reasonableness is a "fact-intensive question[]", and it is not normally amenable to resolution on summary judgment. *See, e.g.*, *Gronholz*, 869 F.2d at 393; *Camp Creek*, 139 F.3d at 1410; *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 971 (8th Cir. 2011) (noting that although "the existence of a trade secret … is ultimately a question of law," it depends on "a fact-intensive inquiry").

The scope of "reasonable" efforts must consider "the costs and benefits of precautions in a particular commercial context." *AT&T Commc'ns of California, Inc. v. Pac. Bell*, 238 F.3d 427 (9th Cir. 2000). The tradeoffs between the costs and possible benefits of additional measures to protect a trade secret is an "issue[] of fact" that can be "determined on a motion for summary judgment" "only in an extreme case." *Id.* (reversing grant of summary judgment) (quoting *Rockwell*, 925 F.2d at 179). As the Seventh Circuit has explained, what is reasonable "depends on a balancing of costs and benefits that will vary from case to case and so require estimation and measurement by persons knowledgeable in the particular field of endeavor involved."

*Rockwell*, 925 F.2d at 179. There are always more costly steps a trade secret owner could have taken to protect the secrets, so "perfect security is not optimum security" within real-world constraints. *Id.* (concluding that "the question is whether the additional benefit in security would have exceeded that cost," and that the answer involves "contested factual issues" precluding summary judgment); *see also HotSamba, Inc. v. Caterpillar Inc.*, No. 01 C 5540, 2004 WL 609797, at *3 (N.D. Ill. Mar. 25, 2004); *Orthofix Inc. v. Gordon*, No. 113CV01463SLDTSH, 2016 WL 1170896, at *10 (C.D. Ill. Mar. 24, 2016); *Ultimate Timing*, 715 F. Supp. 2d at 1206. *See also* Pooley Decl., ¶ 15 (noting that "[w]hat businesses should do to protect their confidential information" depends in part on "the cost of various measures that could reduce or eliminate the risk"); *id.*, ¶ 27 (noting that reasonableness does not require "that companies commit unlimited resources"). "There is no one-size-fits-all approach to trade secret protection." Pooley Decl., ¶ 22.

Walmart does not engage in this fact-intensive inquiry or weigh the costs and benefits of any potential additional measures to protect the Zest trade secrets. Indeed, Walmart completely ignores all the steps Zest *did* take to protect its trade secrets, instead focusing exclusively on additional steps it contends Zest *should* have taken. None of Walmart's suggested additional measures would have been effective in preventing publication of the '396 Bohling Application. But even were there a slim chance that Walmart's proposals could have worked, that mere possibility is not enough to warrant summary judgment. Walmart cannot prevail merely by identifying some approaches that Zest conceivably could have tried to stop publication of the '396 Bohling Application. To warrant summary judgment, Walmart must show that there is *no genuine dispute of material fact*, and the jury cannot even consider whether Zest took reasonable efforts to protect its trade secrets under the totality of the circumstances. That is, Walmart must

prove that a jury could not deem Zest's extensive efforts to protect its trade secrets reasonable—that the *only reasonable course* would have been to take the extra measures Walmart now identifies, no matter the burden those measures would have imposed on Zest or how unlikely they would have been to succeed. Walmart has not met that burden.

       1.       **Zest's Extensive Efforts to Protect its Trade Secrets at Minimum Give Rise to a Dispute of Material Fact.**

In the fact-intensive analysis of whether a plaintiff's efforts to protect its trade secrets were reasonable, *all* of Zest's reasonable steps need to be considered. "Reasonable efforts does not mean all conceivable efforts, nor are heroic measures required. Thus, a plaintiff can meet this requirement even though a defendant manages to point out aspects of plaintiff's procedures that could have been stronger." *Hanks*, 2024 WL 4092949, at *12 (quotation omitted); *see also Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*, No. 3:16-CV-024-CHB, 2022 WL 4687025, at *24 (W.D. Ky. Sept. 30, 2022) (similarly noting that "reasonable efforts does not mean 'all conceivable efforts," and "conflicting evidence" about reasonable efforts "presents a question for the jury") (quotation omitted); *Advanced Micro Devices, Inc. v. Feldstein*, No. CV 13-40007-TSH, 2013 WL 10944934, at *8 n.14 (D. Mass. May 15, 2013). Rather, in analyzing misappropriation, the inquiry focuses on all the threads of its allegations woven together—the "whole gestalt" of the complaint or evidence, not each in isolation. *Quigley v. United Airlines, Inc.*, 2021 WL 2590147, at *5 (N.D. Cal. June 24, 2021); *see also Masimo*, 2021 WL 925885, at *7 (explaining that, in a trade secret case, "the Court must consider the entire sequence of events in context, and not the individual allegations in isolation").

In Walmart's singular focus on measures it contends Zest *should have* taken, Walmart entirely ignores everything Zest *did* do to protect its trade secrets—even though the jury found

those protections sufficient and reasonable at the previous trial. A jury could reasonably conclude that "Zest applied sufficient measures to implement security for its confidential business information, including the asserted trade secrets." Pooley Decl., ¶ 26; *id.* ¶¶ 14, 39.

**First**, Zest disclosed its trade secrets to Walmart only under the protection of a nondisclosure agreement entered into between the parties in July 2015 and a Master Services Agreement the following year. *See* Zest SAMF, ¶¶ 35-38. When Zest sent documents containing its trade secrets to Walmart, it marked them as confidential. *Id.*, ¶ 39. Zest similarly required a nondisclosure agreement with any other company or individual to whom it disclosed its trade secrets, including potential customers, investors, and vendors. *See* Zest SAMF, ¶ 29 (citing testimony that Zest had more than 400 nondisclosure agreements with customers and potential customers); Pooley Decl., ¶ 26. NDAs are commonly considered part of the reasonable efforts a trade secret owner undertakes to protect the secrecy of trade secrets while doing business. Pooley Decl., ¶ 23.

**Second**, Zest protected its trade secrets internally by requiring its employees to sign agreements to keep Zest's business information and trade secrets confidential. *See* Zest SAMF, ¶ 30. Zest also issued employee handbooks containing provisions that required employees to keep Zest's trade secrets confidential. *Id.*, ¶ 31; *see also* Pooley Decl., ¶ 26.

**Third**, Zest implemented physical and electronic security measures to protect its trade secrets. For example, Zest "implement[ed] physical security measures to protect [its] confidential information, including monitoring and limiting access to company locations." Zest SAMF, ¶ 34; Pooley Decl., ¶ 26. Zest also ensured digital security through a variety of means including password protection, encryption, and data backup management. Zest SAMF, ¶¶ 32-33; Pooley Decl., ¶ 26.

**Fourth**, the filing of this lawsuit was itself a reasonable step taken by Zest to prevent further misappropriation of its trade secrets. *See* Pooley Decl., ¶ 27. In *Masimo Corporation v. Apple Inc.*, the Court addressed an argument similar to the one Walmart makes here. In that case, Apple had allegedly hired the plaintiffs' employee and used his knowledge to file its own patent applications disclosing the plaintiffs' trade secrets. *Masimo*, 2021 WL 925885, at *7. Apple argued that the plaintiffs had failed to take "reasonable steps to maintain the secrecy of their trade secrets" because they had not "promptly object[ed] to Apple's disclosure of Plaintiffs' trade secrets." *Id.* at *6. The Court rejected this argument, explaining that once a party has filed suit "within the statute of limitations against a known appropriator," those claims cannot be dismissed just because "the owner does not take immediate action against that misappropriator" outside of filing suit. *Id.* The same logic applies here. Zest sued Walmart. It was not obligated to take other steps to stop Walmart from patenting Zest's trade secrets for itself.

**Fifth**, even though Zest was not *required* to take further steps outside of filing suit, Zest also moved for a Preliminary Injunction "to prevent [Walmart], from disclosing Zest Labs' trade secrets and ordering Walmart to establish appropriate and verifiable protections against improper disclosure of the trade secrets between now and the trial of this case." Dkt. 18 (Plaintiff's Motion for Preliminary Injunction) at 1. In support of its PI Motion, Zest offered a detailed declaration from its then CEO, Peter Mehring, that put Walmart on notice of types of confidential information that Zest contended constituted its trade secrets—that is, that the Eden system was directly related to Zest's trade secrets. Dkt. 22 (August 7, 2018 Declaration of Peter Mehring), at ¶ 20.[4] In fact, Mr. Mehring's declaration explaining exactly what constituted a Zest trade secret

---

[4] Further, in its supporting brief, Zest cited "[b]oth the Defend Trade Secrets Act ("DTSA") and the Arkansas Trade Secrets Act", explaining how they "expressly envision the entry of injunctive relief to prevent misappropriation of trade secrets." Dkt. 19 (Brief in Support

was filed on August 7, 2018—several weeks *before* Walmart filed the '396 Bohling Application

on August 27, 2018. Thus, by the time Walmart filed the application, Zest had already put

Walmart on notice that the material Walmart was applying to patent constituted a Zest trade

secret. *See* Lanning Decl., ¶¶ 284-86; Pooley Decl., ¶¶ 35-38. Zest's request for production of

Walmart patents related to the Eden system (and Walmart's agreement to produce), *see supra*,

pp. 21-22, further underscored the relationship between ███████████████████████████████

███████ The jury could conclude that, once Walmart was on notice that Zest contended ████████

██████████████████████████, it was *Walmart's* obligation not to file any additional

misappropriating patent applications and to take steps to stop the publication of any such patent

applications it had already filed. *See* Pooley Decl., ¶ 38. Zest acted reasonably by putting

Walmart on notice of the scope of its trade secret misappropriation and seeking injunctive relief

to stop further misappropriation.

Governing Arkansas law confirms that Zest's pursuit of injunctive relief constitutes a

reasonable effort to maintain the secrecy of its trade secrets. Arkansas law recognizes that one

way to protect a trade secret is to pursue litigation in which *a court shall* "preserve the secrecy of

an alleged trade secret by reasonable means, which may include granting protective orders in

connection with discovery proceedings, holding in camera hearings, sealing the records of the

action, and *ordering any person involved in the litigation not to disclose an alleged trade secret

without prior court approval*." Ark. Code § 4-75-605 (emphasis added). The Arkansas trade

secrets act specifically provides "actual or threatened misappropriation may be enjoined" and

---

of Plaintiffs' Motion for Preliminary Injunction) at 5 (citing 18 U.S.C. § 1836(b)(3)(A); A.C.A. §
4-75-604)). Zest also observed that "[c]ourts have routinely issued preliminary injunctive relief
in cases involving trade secrets and misappropriation of confidential business information." *Id.*,
at 5, n.1 (providing string cite).

even if a trade secret ceases to exist, "the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Ark. Code Ann. § 4-75-604. The Act even provides "affirmative acts to protect a trade secret may be compelled by court order." *Id.* These provisions are mandatory on this Court.[5]

In sum, Zest took reasonable steps to protect its trade secrets by executing nondisclosure agreements, maintaining physical and electronic security, and ultimately, filing suit against Walmart, seeking a preliminary injunction, and seeking discovery specifically about Walmart's patent applications and patents related to the technology. *See* Zest SAMF, ¶¶ 29-41. Whether those steps were sufficient under Arkansas law is at least a genuine issue of fact for the jury to decide.

### 2.       The Additional Steps Walmart Now Suggests Would Not Have Been Effective.

Walmart asserts three additional steps it claims Zest should have taken to try to stop publication of the '396 Bohling Application: asking Walmart to abandon the application,

---

[5] *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) requires the Court to apply Ark. Code § 4-75-605. *Erie* does not impede the power "to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules." *Hanna v. Plumer*, 380 U.S. 460, 473 (1965). But *Erie* problems cannot "be solved by reference to any traditional or common-sense substance-procedure distinction." *Id.* at 465-66. This is because failing to apply some rules classified as "procedural" causes "equal protection" and "forum shopping" problems. *Id.* at 468. For example, "[s]tatutes of limitations are generally considered to be procedural in nature." *Simmons Foods, Inc. v. Indus. Risk Insurers*, 2014 WL 10936748, at *2 (W.D. Ark. Feb. 18, 2014). Thus, "[c]lassification of a law as 'substantive' or 'procedural' for *Erie* purposes" is "guided by 'the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427-28 (1996). Here, refusal to apply § 4-75-605 would incentivize trade secret defendants to remove cases to federal courts. It would also "make rights enjoyed under . . . [Arkansas law] vary according to whether enforcement was sought in [a] state or in [a] federal court." *See Erie*, 304 U.S. at 74-75.

petitioning the PTO to stop publication, or asking the Court to enjoin the PTO from publication. None of these approaches would have been effective, let alone necessary as a matter of law to demonstrate Zest's reasonable efforts. At a minimum, they give rise to factual issues that the jury must decide.

Notably, all of Walmart's proposals for additional reasonable measures involve significant costs to gamble on—at best—unlikely benefits. Walmart contends the *only reasonable course of action* was for Zest's counsel to immediately review massive document productions, identify the '396 Bohling Application buried within a production, and demand that Walmart engage in extraordinary measures to withdraw the application—measures that Walmart surely would have vigorously contested. That approach would have drawn counsel's necessarily limited focus away from the many other issues in dispute during a busy fact discovery period. *See* Pooley Decl., ¶¶ 27, 29, 31. At minimum, a jury *could find* that Zest's counsel made reasonable choices in its priorities and litigation strategy, given the costs of pursuing Walmart's longshot suggestions. That alone is enough to preclude summary judgment.

> ### a.    Walmart Would Not and Could Not Have Abandoned the '396 Bohling Application Before Publication at Zest's Request.

Walmart contends that, "as a first option, Walmart *could have* expressly abandoned the application, which would have prevented publication" and "[a]s a second option, Walmart *could have* chosen not to abandon the application and instead directly petition the USPTO Director to prevent publication." Dkt. 585 at 13 (emphasis added). Walmart perfunctorily and erroneously states that "[e]ither option could have been done in sufficient time to avoid publication." *Id*. There are at least two problems with this option.

**First**, this option assumes that if Zest had simply asked nicely, Walmart would have abandoned its patent application—after Walmart had engaged in months of contentious litigation contesting Zest's claimed trade secrets. Zest had no reason to believe that Walmart would have simply agreed to withdraw its patent application on the grounds that it contained Zest trade secrets when Walmart vigorously disputed whether Zest even *had* any trade secrets. *See* Pooley Decl., ¶¶ 29-30, 34. Indeed, to this day, even after the jury found that Zest had trade secrets and that Walmart willfully and maliciously misappropriated them, Walmart continues to contend "Walmart does not concede that any information regarding ███████████ qualifies as a trade secret or that ████████████████████" Dkt. 585, n. 1.

Walmart's claim that it would have withdrawn the application at Zest's request is based on nothing more than Walmart's self-interested assurances. Even if Walmart's unsworn statements in a motion were evidence, one of the cases that Walmart relies upon states that "the testimony of an interested party is taken as disputed *as a matter of law*." *Taylor v. George*, 212 S.W.3d 17, 23 (Ark. Ct. App. 2005) (citing *Ester v. Nat'l Home Ctrs., Inc.,* 981 S.W.2d 91 (Ark. 1998)) (emphasis added). The fact finder may "believe or disbelieve the testimony of any witness." *Taylor*, 212 S.W.3d at 23 (citing *Found. Telecomms., Inc. v. Moe Studio, Inc.*, 16 S.W.3d 531 (Ark. 2000)). Thus, "[c]redibility determinations … are jury functions, not those of a judge." *Anderson v. Liberty Lobby*, 477 U.S. at 255.

**Second**, even if Zest had asked and Walmart had agreed to try to withdraw the '396 Bohling Application, it likely could not have done so in time to prevent publication. Zest has provided an expert declaration from Robert L. Stoll, a former Commissioner for Patents in the USPTO (among other high-level positions within the USPTO). As Mr. Stoll explains, a "petition

for express abandonment to avoid publication . . . will be denied when it is not recognized in sufficient time to avoid publication of the application." Stoll Decl., ¶ 104. "[T]he USTPO does not guarantee that a petition for express abandonment will be effective in avoiding publication unless it is received four months before the publication date, which is when the publication process begins." *Id.*, ¶¶ 102-103 (citing Manual of Patent Examining Procedure (MPEP) at section 1125); Pooley Decl., ¶ 32.

Walmart has not proven that, as the only reasonable course of action, Zest would have asked Walmart to withdraw the application with enough time remaining for Walmart to effectively do so. Walmart produced the '396 Bohling Application on February 28, 2019—about ten weeks before it published on May 16, 2019. *See* Walmart's Statement of Undisputed Material Facts, ¶ 5. Walmart's production in February 2019 was almost six months after Walmart filed the application on August 27, 2018. *See* Dkt. 508-1 at 344; Pooley Decl., ¶ 30 (noting that Walmart controlled the timing of production). By the time Walmart produced the application in February, the window to withdraw the application before publication had already passed; the publication date in May was much less than four months away. *See* Stoll Decl., ¶¶ 103-105.[6]

In sum, there is no evidence that an eleventh-hour express abandonment filing was something Walmart would have been willing or able to do. At minimum, these are questions of fact for the jury, and summary judgment should therefore be denied.

---

[6] Walmart also suggests in passing that it could have filed a "non-publication request." *See* Dkt. 585 at 14. But a non-publication request must be made at the time of filing, so that possibility had already been foreclosed by the time Walmart filed the '396 Bohling Application and *then* produced it to Zest. Stoll Decl., ¶¶ 76, 79. Further, a request for non-publication cannot be made if the same patent application is filed internationally. *Id.*, ¶¶ 76-78 (quoting MPEP § 1122). As discussed above, Walmart filed international versions of the '396 Bohling Application and both New Patents with WIPO under the PCT. *Id.*, ¶ 18. Those international filings precluded a non-publication request under U.S. law.

b.        **Zest Was Not Required to Ask Walmart to Pursue an Extraordinary and Untimely Petition Under Sections 182 or 183.**

Walmart next suggests that Zest could have asked Walmart to petition the Deputy Commissioner for Patent Examination Policy to withdraw its patent application. This option would again fail for multiple reasons.

**First**, as an initial matter, this option would again depend upon Walmart's willingness to do so, and just as with Walmart's suggestion of an express abandonment, there is at minimum a dispute of fact over whether Walmart would have agreed. *See* Pooley Decl., ¶¶ 29-30, 34.

**Second**, it was reasonable for Zest not to pursue the extraordinary relief of such a petition. Walmart suggests that it could have filed a petition under 37 C.F.R. §§ 1.182 or 1.183. To be clear, Section 182 and 183 petitions are not designed for the withdrawal of patent applications. *See* Stoll Decl., ¶ 109. As Walmart's expert concedes, these provisions are designed for relief "not specifically provided for in the regulations" or "in an extraordinary situation." *See* Kunin Decl., ¶ 9 (quoting 37 C.F.R. §§ 1.182, 1.183); Stoll Decl., ¶ 108. "By their nature, Section 182 or 183 petitions are unusual because they are the last option." *Id.* "It is not clear that either of these sections is the correct avenue to seek to prevent the publication of a patent." *Id.*, ¶ 109. It is not "reasonabl[e]" of a business to "invest[] time and resources into an exercise that has only a remote—actually completely speculative—chance of success." Pooley Decl., ¶ 31 (further noting that "in my more than 50 years of dealing with trade secret and patent matters I have never seen nor heard of such a thing being done").

**Third**, even if Walmart had agreed to pursue this extraordinary approach, it likely would not have been able to file a timely petition. "[F]iling a petition does not stay any proceeding at the

patent office," and "if a petition is not filed at least two months in advance it may be automatically dismissed as untimely." *Id.*, ¶ 111 (quoting 37 C.F.R. 1.181(f)). The "two-month period is not extendable." *Id.* Thus, just as with Walmart's suggestion of an express abandonment, there was not enough time to pursue this option. Walmart would have had to file its petition no later than March 16, 2019—only 16 days after it produced the '396 Bohling Application to Zest. In those 16 days, Zest would have had to notice the '396 Bohling Application among a document production of more than 8,000 other documents, realize its significance, ask Walmart to file a petition, obtain Walmart's agreement, and leave Walmart enough time to file the petition. The failure to pursue that nearly impossible timeline is not unreasonable as a matter of law. At a minimum, these are questions of fact for the jury and summary judgment should therefore be denied.

**c.**      **It Was Reasonable for Zest Not to Ask This Court to Enjoin Publication by the PTO.**

Finally, Walmart argues that Zest could have asked this Court to order the PTO not to publish the '396 Bohling Application, delivered such an order to the Solicitor's Office, and then provided notice of such an order to the officials there. Dkt. 585 at 13. Zest did not act unreasonably as a matter of law in failing to seek additional relief from the Court, for at least two reasons.

**<u>First</u>**, Zest had *already* asked the Court to issue preliminary injunctive relief. *See* Dkt. 18 (requesting that the Court protect Zest's trade secrets from further disclosure by Walmart under Ark. Code § 4-75-605). Twenty days *after* Zest filed the Motion for a Preliminary Injunction, Walmart filed the '396 Bohling Application on August 27, 2018. *See* Dkt. 508-1 at 344. Thus, Zest's motion for preliminary injunction was already pending at the time the '396 Bohling

Application was filed and then published.[7] There was nothing more for Zest to do, and it was not unreasonable of Zest to choose not to burden the Court with a second, duplicative request for injunctive relief. When Zest had put Walmart on notice that Walmart was misappropriating its trade secrets by filing suit and Zest had also asked the Court to restrain Walmart from further misappropriating Zest's trade secrets, at a minimum, a genuine issue of material facts exists as to whether Zest took reasonable steps to protect the secrecy of its trade secrets.

**Second**, there is no reason to believe the Court would have issued such an order had Zest requested it. Indeed, the Court did not grant Zest's motion for a preliminary injunction, ultimately dismissing it as moot in February 2020. *See* Dkt. 182 ("finding as moot 18 Motion for Preliminary Injunction"). Walmart cites *Centrifugal Acquisition Corp., Inc. v. Moon*, 2012 U.S. Dist. LEXIS 28259, 2012 WL 718999, at *7-8 (E.D. Wisc. March 5, 2012) (hereinafter "the *CAC* March 5th decision") for the premise that the Court *could have* enjoined publication of the '396 Bohling Application at Zest's request. *See* Dkt. 585 at 13-14. But the circumstances of the *CAC* March 5th decision are far different from the present case, and the case certainly does not suggest that the Court was *required* to issue such an injunction on the facts of this case.

---

[7] Similarly, the provisional applications that led to the '020 and '325 patents were also filed while the preliminary injunction motion was pending. On September 6, 2018, Walmart filed oaths and declarations for US 2019/0147396. A month and a half later, Walmart filed its U.S. provisional application No. 62/746,614 (referenced by the '020 patent). On February 20, 2019, Walmart filed the application No. 16,280,818 (which led to '020 patent and US 2020/0122926). That same day, Walmart filed oaths/declarations for US 11,078,020. The next day Walmart filed the PCT applications to WIPO for both the '396 Bohling application and the application for the '020 patent (*while on the same day agreeing to disclose all patents related to the Eden Muse project in response to RFP 101*), and on February 25, 2019 Walmart filed a provisional application No. 62/810,129 (referenced by '325 patent and '229 patent). July 30, 2019, Walmart filed Application No. 16/526,677 (which led to '325 patent and US 2020/0275010). And on July 30, 2019 and October 7, 2019, Walmart filed oaths/declarations for US 11,388,325.

When the district court entered the *CAC* March 5th decision, it had already found the defendant liable for trade secret misappropriation and had issued preliminary and permanent injunctions restraining the defendant from further use and dissemination of the trade secret. *See Centrifugal Acquisition Corp., Inc. v. Moon*, 849 F. Supp. 2d 814, 834-36 (E.D. Wis. 2012) (hereinafter "*CAC* Feb. 2, 2012") (finding on summary judgment that (i) the plaintiff's proprietary process was indeed a trade secret under the Wisconsin Uniform Trade Secrets Act, and that (2) the defendant misappropriated the trade secret). In *CAC*, the defendant filed the offending patent application *after* the Court had already issued a preliminary injunction against "directly or indirectly . . . [f]urther utilizing and/or disclosing the Proprietary Process and/or Confidential Business Information . . . ." *CAC* March 5th decision at *2 (emphasis added). In other words, the offending patent application was in *direct violation of a governing Court order*. Under those circumstances, where the question of liability for trade secret misappropriation had already been conclusively resolved, the court found that "CAC has presented evidence that they are likely to prevail on the merits of their claim that the [defendants] have violated the injunction" by pursuing the patent application. *Id*.

Here, in contrast, Walmart was not subject to an injunction at any time during the prosecution of the '396 Bohling Application. Rather, Zest filed a motion for preliminary injunction, but an injunction was never entered. *See* Dkts. 18, 182. Nor had there been any finding of liability before the '396 Bohling Application published.[8] It would not have been

---

[8] Long after publication, in February 2020, Zest moved for partial summary judgment on certain liability issues. *See* Dkt. 193 ("Motion for Partial Summary Judgment that Wal-Mart Used and Disclosed Zest's Information in the Wal-Mart Applications); Dkt 201 (Motion for Partial Summary Judgment that Information in Wal-Mart's Patent Application Was Not Generally Known or Readily Ascertainable). Here, unlike in *CAC*, the Court denied Zest's motions for summary judgment. *See* Dkt. 324.

reasonable for Zest to expect the Court to issue an injunction to prevent publication on that record. At minimum, whether it would have been reasonable for Zest to seek such extraordinary relief is a question for the jury.

**C.**               **Walmart Cannot Capitalize on its Own Misconduct.**

Ultimately, Walmart's motion is an attempt to benefit from its own misconduct, both in pursuing patents that incorporated Zest's trade secrets and in failing to produce those patents as it had promised to do during discovery in this case. Walmart does not deny that there is at minimum a dispute of fact over its extensive internal usage of Zest's trade secrets between 2016 and 2018; its brief does not even address that issue. *See* Dkt. 585. Nor does Walmart claim that Zest failed to take reasonable measures to maintain secrecy at that time. Rather, in Walmart's view, its liability for all that misappropriation was wiped away when it committed *more acts of misappropriation* by filing the '396 Bohling Application. By Walmart's logic, every additional act of misappropriation is further proof that the trade secrets were vulnerable in the first place; the more it got away with misappropriating, the less liable it should be. Walmart blames the victim for failing to stop the additional acts of misappropriation rather than taking responsibility for *committing* those acts.

That is not the law. Of course, it is true that every time a trade secret is misappropriated, it was not protected adequately enough to thwart the theft. But that does not mean the efforts to protect the trade secret were categorically unreasonable. After all, by that logic, there could never be liability for trade secret misappropriation, because *any* successful act of misappropriation would prove there were inadequate protections in place. Zest's efforts to maintain secrecy needed only to be reasonable, not perfect. *See, e.g.*, *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003) (noting that reasonable measures

"do[] not require perfection"); Pooley Decl., ¶ 27 (reasonableness does not require that "risk reduction techniques must be foolproof or result in complete security").

Walmart's failure to produce the '020 and '325 patents in discovery further compounds its misconduct in this case and the inequity of allowing it to use that misconduct as a defense. As discussed *supra*, Part IV(A)(1)(c), Walmart agreed to produce all patent applications related to the Eden system, filed two additional such patents, and failed to produce them as promised. At no time did Walmart ever produce those other two patents or applications to Zest or the court: not on submission of the provisional or the application, on publication, or on issuance. Not in its initial response, or in any supplemental response once it became aware.[9] Nor were the international versions of those patents produced. Walmart cannot now blame Zest for failing to stop it from producing patent applications that Walmart itself concealed.

Walmart's misconduct has an immediate and necessary relation to the same subject matter as the core of the litigation, Walmart's misappropriation of Zest's trade secrets. *Cf. Luv n' Care, Ltd. v. Laurain*, 98 F.4th 1081, 1094 (Fed. Cir. 2024) ("A court may find unclean hands when the misconduct of a party seeking relief 'has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation ... for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'") An unclean hands defense may be asserted against a party

---

[9] Whether Walmart's failure to produce this highly relevant information warrants sanctions is a question for another day. For example, Zest may argue that Walmart should be precluded at trial from making the "reasonable efforts" arguments it presents in this motion, as a sanction for its spoliation of this evidence. *See, e.g.*, *Bull v. United Parcel Service, Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (noting that "a party's failure to produce a document can have the same practical effect as destroying it," so "under certain circumstances, nonproduction of evidence is rightfully characterized as spoliation"). But the Court need not reach those questions to resolve the present motion.

who asks a court to do equity. *Poff v. Brown*, 374 Ark. 453, 456, (2008). The maxim is he who comes into equity must come with clean hands. 2 POMEROY'S EQUITY JURISPRUDENCE § 397 (5th ed. 1941). "Although the unclean hands doctrine is typically an affirmative defense asserted by a defendant, it may also be asserted by a plaintiff in opposition to an equitable defense such as estoppel." Unclean Hands Doctrine, Practical Law Glossary Item 6-521-9533. "General immoral or corrupt conduct is not enough to warrant application of the unclean hands doctrine. To prevail, a party must demonstrate that its opponent engaged in inequitable behavior that is related to the subject matter of the litigation." *Id*.

In short, Walmart should not have requested that the jury verdict be set aside based on this argument, and at a minimum should not be allowed to make this argument to obtain summary judgment in its own favor. Walmart should be barred equitably from arguing that Walmart's own misappropriation of Zest's trade secrets deprives Zest of any recourse for the very same act of misappropriation.

Finally, should there be any question about the merits of Walmart's argument, the Court should allow further discovery into the '020 and '325 patents—discovery Zest could not previously obtain because Walmart concealed the existence of those patents. Under Rule 56(d), after a party moves for summary judgment, if "facts are unavailable to the nonmovant . . . the court may: (1) defer considering the motion or deny it, (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Here, the Court cannot determine that there are no genuine disputes of material facts without discovery into facts, documents and other information related to Walmart's decision not to disclose the '020 and '325 patents, as well as information relating those patents to Walmart's ongoing misappropriation of Zest trade secrets. At a minimum, the Court should allow further

discovery into the '020 and '325 patents pursuant to this rule, and grant Zest the limited

additional discovery sought in its motion. Dkt. 568.

## V.    CONCLUSION

For the foregoing reasons, Walmart's motion for summary judgment should be denied.

Respectfully submitted,

/s/ *Patrick Ryan*
Patrick Ryan*
Sean R. McTigue*
Kenneth L. Richard*
Natalie A. Felsen*
BARTKO LLP
1100 Sansome Street
San Francisco, CA 94111
(415) 956-1900
pryan@bartkolaw.com
smctigue@bartkolaw.com
krichard@bartkolaw.com
nfelsen@bartkolaw.com

Scott P. Richardson
MCDANIEL WOLFF, PLLC
1307 West Fourth Street
Little Rock, AR 72201
(501) 954-8000
scott@mcdanielwolff.com

H. Christopher Bartolomucci*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com

Kate M. Falkenstien*
BLUE PEAK LAW GROUP, LLP
3790 El Camino Real, PMB 846
Palo Alto, CA 94306-3314
(281) 972-3036
kate@bluepeak.law

Dated: September 20, 2024                * Admitted *pro hac vice*