# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

ZEST LABS, INC. f/k/a INTELLEFLEX
CORPORATION; ZEST LABS HOLDINGS
LLC; and RISKON INTERNATIONAL,
INC.,

               Plaintiffs,

                                    No. 4:18-CV-500-JM

v.

WALMART INC. f/k/a WAL-MART
STORES, INC.,

               Defendant.

_____/

## PLAINTIFFS' OPPOSITION TO WALMART'S MOTIONS IN LIMINE

Plaintiffs hereby submit their responses to Walmart's Motions in Limine. *See* Dkt. 713. In addition to Walmart's ten new motions in limine (numbered 11 through 20), Walmart notes that it understands that the resolution of the motions in limine before the first trial "still apply." *Id.* at 1 (citing Dkt. 338). Zest likewise expects the parties will treat the Court's rulings on the motions in limine from the first trial as governing the retrial as well, although Zest reserves its rights for appeal to the extent it opposed some of those rulings.

**<u>Walmart's Motion #11: Zest Alleged Trade Secrets Other Than the Zest Fresh Solution</u>**

Zest agrees that the trade secret it is asserting at trial is the Zest Fresh Process.[1] Zest agrees that it will prove that Walmart misappropriated the Zest Fresh Process, which was disclosed in the Bohling Application.

Zest simply seeks to clarify that it is not limited to the disclosure in the Bohling Application as the *only* form of alleged misappropriation of the Zest Fresh Process. The same Zest trade secret was misappropriated both when it was used and disclosed in the patent application and when it was used and disclosed in other Walmart internal communications and documents. The elements of the Zest Fresh Process were used and disclosed in the Bohling patent application—that is one example of Walmart's misappropriation. The same trade secret—the Zest Fresh Process—was also misappropriated by Walmart when it disclosed Zest documents describing the Zest Fresh Process to Walmart employees who were not allowed to see them under the terms of the parties' NDA and when those employees used the Zest documents to try to copy Zest's system. That is exactly how

---

[1] Zest has other trade secrets that Walmart misappropriated in its other concealed patent applications, as discussed in Zest's opposition to Walmart's Motion for Summary Judgment last fall. *See* Dkt. 594 at 20-23. Zest understands that the Court has prohibited Zest from asserting misappropriation of these other trade secrets at this retrial. *See, e.g.*, Nov. 14, 2024 Hearing Tr. at 20:4-7. Zest disagrees with that ruling and reserves its rights on appeal, but Zest will of course comply with that instruction at retrial.

Zest proved its case at the first trial; there was ample evidence both related to the patent application and to Walmart employees' internal use and disclosure of Zest documents related to the Zest Fresh Process.

Zest understands Walmart's motion to clarify the scope of Zest's trade secret, not to limit how Zest may prove misappropriation of that trade secret. With that understanding, Zest believes the parties are in agreement about Walmart's Motion in Limine No. 11.

**Walmart's Motion #12: Alleged Walmart Treatment of Vendors**

In this motion, Walmart seeks to exclude testimony or arguments "that Walmart bullied vendors or treated them as disposable, including Zest and other vendors." Dkt. 713 at 2. Walmart's sole basis for exclusion is that this evidence is irrelevant.

As to other vendors, Zest explains in its response to Walmart's Motion in Limine No. 16 and in Zest's own Motion in Limine No. 5 why Walmart's treatment of N2N is relevant and admissible under Rule 404(b). N2N's technology is directly related to supposed Walmart innovations that Walmart witnesses testified about at the last trial.  For example, at the last trial, Walmart claimed that it improved its fresh food tracking system by digitizing the library of USDA and Walmart requirements for evaluating the condition of produce.  *See* Trial Tr. at 52:2-11 (describing how Walmart supposedly "buil[t] a digital library of food standards" by "gather[ing] the many chapters of food product specifications set out by the USDA" and "layer[ing] on top of that Walmart's own product standards").  Walmart suggested that its supposedly independent development of this digital library meant it had not used Zest's trade secrets.  In reality, the Zest Fresh Process went far beyond merely digitizing food product specifications, and Walmart misappropriated Zest's more complex trade secret system.  But it is also relevant rebuttal to Walmart's version of the story that *even the digital library of food standards* was not independently

developed by Walmart. The system Walmart described at the last trial was the very system it stole from N2N. *See* Dkt. 703-1 (N2N complaint), ¶ 28 (describing N2N's system as using "USDA parameters layered with customer defined standards called specifications" to help "facilitate accurate analysis of the condition of food products"). Zest does not seek to introduce evidence about Walmart's treatment of any other vendors, aside from N2N. But it is clearly relevant to rebut Walmart's claims of independent development that even the aspects of Walmart's Eden system it claimed to develop internally were stolen from *yet another* vendor, whom Walmart strung along using the same extended pilot process and through the actions of the same Walmart employee. The N2N evidence should be admitted.

As to Walmart's treatment *of Zest*, that evidence is clearly relevant. Walmart claims that "Walmart's treatment of Zest" is "a non-issue" in this case. Dkt. 713 at 3. But Walmart's treatment of Zest is *the central issue* in this case. This case is about how Walmart acquired the details of Zest's trade secret by suggesting Walmart wanted to work with Zest, only to cut off the potential partnership and use the information it had obtained both to try to patent Zest's trade secret and to try to copy Zest's trade secret in Walmart's internal technology. That story cannot be told without discussing "Walmart's treatment of Zest." Zest needs to explain how Walmart came to have access to Zest's trade secret—through the parties' discussions of a potential partnership. Zest needs to explain how Walmart misled Zest into disclosing details of the trade secret and hid from Zest that Walmart was using Zest's trade secret for its own purposes. And Zest needs to explain that the partnership never came to fruition and Walmart did not have Zest's consent to continue using Zest's trade secret. Without those facts, the jury could not understand Zest's claims of misappropriation or its explanation of how it protected its trade secret. Walmart's vague and overbroad request to exclude all evidence of "Walmart's treatment of Zest" would implicate nearly

all the evidence in this case.

Walmart may argue that there is no need to characterize this pattern of behavior as "bullying" or "treating Zest as disposable." But such descriptions of Walmart's behavior are also directly relevant, because it is Zest's burden to prove that "Walmart's acts were willful and malicious" to warrant exemplary damages. *See* Dkt. 369 (jury instructions, at instruction 8.7). Zest must be allowed to discuss the malicious nature of Walmart's behavior and its treatment of Zest. Walmart may of course disagree with those characterizations. But it is not unfairly prejudicial to discuss whether Walmart's actions towards Zest were malicious when that is an explicit element of Zest's burden of proof.

**Walmart's Motion #13: The "Walmart Mafia"**

Unhappy with its former CEO's terminology, Walmart seeks to prevent Zest from using Mr. Greg Foran's own words to describe his company. Mr. Foran testified that "mafia" is "a term that I use frequently, and have in all of the businesses and countries that I have worked in." Ex. A (Foran Dep. Tr.) at 11:15-25. He explained that he uses it to refer to "a group that exists in any organization that resists change," and that he "find[s] portions of the Supply Chain group resistant to change." *Id.* at 12:1-11, 15:16-19. That testimony was played at the first trial in this case, and Zest simply seeks to play the same deposition clips again on this topic.

Walmart offers no reason why its former CEO's description is inadmissible now when it was used without objection at the first trial. It claims only that the word mafia "evok[es] images of brutality and illicit activity." Dkt. 713 at 3. But that hyperbole is inconsistent with the explanation of Mr. Foran himself, who said the word "mafia" is "frequently" used in business. Zest did not choose this word to "evoke" anything. Rather, Zest is simply using the language that Walmart's own CEO used, to describe some of his own employees. Walmart cannot exclude the

substantive testimony of its own CEO because it does not like the language he chose to use.

**Walmart's Motion #14: "David" versus "Goliath"**

Walmart wants to enlist the Court and Zest to pretend Walmart isn't the biggest retailer on the block. Every juror will likely be aware of these basic background facts. Zest would agree not to use the phrase "David vs. Goliath," but Walmart's request is much broader: to prohibit "*any evidence*" or "*any arguments or references* to Walmart's size or power" in comparison to Zest. Dkt. 713 at 4 (emphasis added). Walmart's size, and its power in comparison to Zest as a smaller company, is relevant to many issues in this case. Indeed, evidence of Walmart's size was repeatedly admitted at the last trial. *See, e.g.*, Dkt. 705 (deposition excerpts from Greg Foran played at the original trial).

**First**, Walmart's size is relevant to the appropriate amount of punitive damages that would be sufficient to deter such a large company, as discussed further in Zest's Motion in Limine No. 2 and Zest's opposition to Walmart's Motion in Limine No. 15.

**Second**, Walmart's size is relevant to explain why Zest focused on Walmart as a key potential customer, rather than giving up on the Walmart business as Walmart strung Zest along without payment for more than three years. Jurors may wonder why Zest continued to disclose its trade secrets to Walmart in such detail and for such a long trial period. To meet its burden of proof in showing its reasonable efforts to protect its trade secrets, Zest needs to explain why it continued to try to work with Walmart for so long—because of Walmart's tremendous power in the grocery market.

**Third**, Walmart's power is relevant to explain why the parties agreed to the terms of Walmart's form NDA (rather than Zest drafting its own proposed NDA). It appears that Walmart intends to argue that the terms of the NDA did not sufficiently protect Zest's trade secret, because

Walmart may have allegedly believed Zest's trade secret constituted only "confidential information" subject to a lower standard of protection under the NDA. The fact that Walmart itself proposed those terms and had the market clout to force Zest to agree to Walmart's prewritten NDA is relevant rebuttal to that criticism.

**Fourth**, Walmart's power is relevant to explain why Zest lost its other customers after this lawsuit was filed. Walmart may argue that Zest's trade secret was not valuable because other companies did not adopt it. But many of those companies stopped working with Zest after Walmart subpoenaed them in this litigation. Walmart's size and power are relevant to explain why other potential Zest customers in the same industry were reluctant to become embroiled in litigation involving Walmart.

Walmart does not cite any cases requiring parties to ignore obvious size and power differences between the parties. The lone case it cited excluded references to "David and Goliath" or "similar analogies." *Old Republic Ins. Co. v. Whitaker*, No. 10-CV-3236-DW, 2012 WL 13027953, at *2 (W.D. Mo. Jan. 10, 2012). While apt, Zest does not seek to use any Biblical analogies to characterize the parties' respective sizes. But Walmart's obvious size itself is relevant to many aspects of this case. Zest should be allowed to make reference to the fact that, as almost all jurors surely know, Walmart is a large company.

**Walmart's Motion #15: Walmart's Profitability and Net Worth**

Walmart next argues that Zest should be precluded from making any arguments about Walmart's profitability or net worth. As Zest explained in its Motion in Limine No. 2, these topics are directly relevant to punitive damages, because a defendant's financial position affects the amount of punitive damages sufficient to deter future misconduct. *See* Dkt. 702 (collecting many cases holding that a defendant's financial position is relevant to punitive damages). Indeed,

evidence of Walmart's financial metrics (like revenue and profit) was admitted at the previous trial in this case. *See* Dkt. 705 (deposition excerpts played at the original trial). The Court correctly instructed the jury (consistent with the model instruction) that "[i]n arriving at the amount of exemplary damages you may consider the financial condition of Walmart, as shown by the evidence." Dkt. 369 at 16. Walmart apparently did not object, and it has not explained why this evidence which was previously admitted without objection should now be excluded at retrial.

Walmart notes that punitive damages under the DTSA are statutorily capped at two times compensatory damages.[2] Zest does not intend to ask the jury for exemplary damages of more than two times compensatory damages. But this fact does not render Walmart's financial strength irrelevant. Even with the constraint of that statutory cap, the jury must still decide whether to award those punitive damages, and Walmart's profit is relevant to that question under the long line of cases cited in Zest's Motion in Limine No. 2. *See* Dkt. 702 at 3-5.

It is unclear if Walmart intends to argue that the jury has no role in assigning punitive damages at all, because they are ultimately awarded by the Court. *See* Dkt. 713 at 5. To the extent that is Walmart's position, it is inconsistent with this Court's practice in the first trial in this case, in which the jury was asked to award punitive damages. Indeed, there are many examples of courts leaving the assessment of exemplary or punitive damages under the DTSA to the jury. *See, e.g.*, *Qorvo, Inc. v. Akoustis Techs., Inc.*, No. 1:21-cv-01417-JPM, 2024 WL 5165152, at *1 (D. Del.

---

[2] Walmart also claims that punitive damages are not allowed under the Arkansas Trade Secrets Act. Dkt. 713 at 4-5. Walmart cites an Arkansas Court of Appeals case for this point, which does not contain any analysis of the statute or legislative history to support the point. It does not appear that the Arkansas Supreme Court has had occasion to consider this question, and Zest reserves its right to argue for punitive damages under state law in post-trial or on appeal if the jury awards punitive damages beyond the amount allowed under the DTSA. The Court does not need to reach this issue, however, to decide the admissibility of evidence of Walmart's profitability, because at minimum, this evidence is relevant to punitive damages under the DTSA.

Oct. 31, 2024) (noting jury's award of punitive damages on DTSA and North Carolina trade secret claims), *appeal filed* (Fed. Cir. Dec. 5, 2024); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 15 Civ. 211 (LGS), 2024 WL 4553894, at *1 (S.D.N.Y. Oct. 23, 2024) (noting jury's prior award of punitive damages based on "either or both" the DTSA and New York law); *Killough v. All Points Logistics, LLC*, No. 5:17-CV-00247-AKK, 2022 WL 1556413, at *4 n.9 (N.D. Ala. May 17, 2022) (discussing court's jury instruction on DTSA exemplary damages); *Cajun Servs. Unltd., LLC v. Benton Energy Serv. Co.*, No. 17-0491, 2020 WL 3188991, at *33 & n.309 (E.D. La. June 15, 2020) (jury was instructed on exemplary damages under the DTSA), *aff'd*, 855 F. App'x 771 (Fed. Cir. 2021).

**Walmart's Motion #16: Other Lawsuits Against Walmart**

Walmart seeks to preclude references to other lawsuits against Walmart, including the litigation filed by N2N. Zest's Motion in Limine No. 5 explains why the evidence about Walmart's behavior towards N2N is relevant and admissible under Federal Rule of Evidence 404(b). Walmart's behavior towards Zest and N2N was strikingly similar, involving the same pattern of stringing a smaller vendor through many trials of its supply chain technology, only to eventually fire the vendor and copy their technology in-house. Indeed, the two cases even involve overlapping witnesses involved in these schemes, like Chuck Tilmon. *See* Dkt. 703 at 2-4.

As Zest explained in its Motion No. 5, a defendant's history of trade secret misappropriation or other intellectual property theft is admissible to prove motive, intent, plan, and absence of mistake under Rule 404(b). *See* Dkt. 703 (collecting cases including *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 423 (5th Cir. 2006); *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2019 WL 4394564, at *3 (E.D. Tex. Oct. 26, 2020); *Universal Engraving Inc. v. Metal Magic Inc.*, No. CV 08-1944 PHX RJB, 2011 WL 13070114, at *2 (D.

Ariz. July 12, 2011); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996); *Lincare Holdings Inc. v. Doxo, Inc.*, No. 8:22-cv-2349-VMC-ABP, 2024 WL 865881, at *4 (M.D. Fla. Feb. 29, 2024); *CPI Sec. Sys., Inc. v. Vivint Smart Home, Inc.*, 710 F. Supp. 3d 438, 453-54 (W.D.N.C. 2024); *Alarm Grid, Inc. v. Alarm Club.com, Inc.*, Case No. 17-80305-Civ-Marra, 2018 WL 8129822, at *2 (S.D. Fla. Apr. 27, 2018); *Johnson & Johnson Consumer Cos. v. Aini*, 540 F. Supp. 2d, 374, 392 n.31 (E.D.N.Y. 2008)). Walmart's pattern of behavior is also relevant to its willfulness and to the amount of punitive damages that would be adequate to punish and deter. *See* Dkt. 603 at 7-8.

The two cases Walmart cites are not to the contrary. As Walmart itself describes the holding of *McLeod*, the Sixth Circuit excluded evidence of prior lawsuits only because of "various factual dissimilarities" between those lawsuits and the case at hand. Dkt. 713 at 5 (discussing *McLeod v. Parsons Corp.*, 73 F. App'x 846, 854 (6th Cir. 2003)). *McLeod* involved a history of employment discrimination lawsuits, but the plaintiffs had "worked at several different offices" and "were discharged for a variety of reasons." 73 F. App'x at 854. *McLeod* contrasted that fact pattern to a situation in which the other plaintiffs were "similarly situated to the plaintiff" in the case at hand. *Id.*

Thus, the key question under *McLeod* is whether the allegations in a prior lawsuit were similar to the allegations in the present case. But Walmart does not engage with that comparison at all. It offers no analysis of any purported "factual dissimilarities" between how it treated N2N and Zest, and Zest has explained the many factual similarities between the two cases. *See* Dkt. 703 at 2-4, 6. Unlike in *McLeod*, the two plaintiffs at issue here were similarly situated: they were both companies in the same industry (supply chain technology) pitching their inventions to the same team at Walmart, including Mr. Tilmon. In both cases, Walmart found out more and more about

the plaintiffs' intellectual property by stringing them through years of tests and trials of their technology, only to take it and copy it in-house. The factual similarities are striking, and those similarities justify admission of the N2N evidence under the reasoning of *McLeod*.

The other case Walmart cites, *RSUI*, does not involve an alleged pattern of behavior by the defendant at all. The case involved two co-insurers fighting over liability for an underlying insurance claim. *RSUI Indem. Co. v. Am. States Ins. Co.*, No. CIV.A. 12-2820, 2015 WL 1781621, at *1 (E.D. La. Apr. 20, 2015). The plaintiff, the excess insurer, argued that the defendant, who had primary liability obligations, had not adequately defended against the insurance claim, leaving both insurers owing money to the insured. *Id.* The question before the court was whether *the plaintiff's history of handling similar claims* was relevant to whether the defendant had acted reasonably. *Id.* at *2-3. The Court denied the defendant's motion to compel, finding that how *the plaintiff* "handl[ed] similar lawsuits" is not probative of whether *the defendant* improperly handled the insurance claim at issue. *Id.* at *3. *RSUI* does not apply Rule 404(b) and does not concern the admissibility of a pattern of behavior by the same defendant.

### Walmart's Motion #17: Walmart's Alleged Misuse of Zest's Confidential Information

At the hearing on November 14, 2024, the Court granted summary judgment on Zest's claim for breach of contract under the non-disclosure agreement between the parties. *See* Nov. 14, 2024 Hearing Tr. at 14:5-8. The Court's basis for granting summary judgment was *solely* that "there wasn't any separate damage testimony" about the damages for breach of contract as distinct from trade secret misappropriation. *Id.* at 14:1-4. The Court specifically clarified that it believed the NDA would be relevant to other issues at retrial, including to show that Zest "asked [Walmart] to sign [NDAs] and that they did and that that was an effort to protect your asset." *Id.* at 15:14-17:6.

Now Walmart is attempting to transform the Court's narrow summary judgment ruling into an expansive evidentiary cudgel, barring Zest from saying *anything* about whether Walmart complied with the terms of the NDA or from introducing *any evidence* "of Walmart inappropriately sharing Zest documents internally." Dkt. 713 at 6. Although Zest is no longer claiming breach of the NDA as a separate cause of action, Walmart's violations of the terms of the NDA and its disclosures of Zest documents internally are still relevant to Zest's claims for trade secret misappropriation, in at least three distinct ways.

**<u>First</u>**, examples of Walmart "inappropriately sharing Zest documents internally" are themselves acts of misappropriation. The evidence shows that Walmart took Zest documents about its Zest Fresh System and shared them with employees who had no role in evaluating the potential partnership between Zest and Walmart—employees who were instead working to copy Zest's system for Walmart's own internal use. This misappropriation relates to the *same trade secret* Walmart disclosed in its patent application. Walmart used the information it received about Zest's trade secret to misappropriate *both* by using and disclosing that information for Walmart employees' internal efforts to copy Zest's technology *and* by using and disclosing the same information in the Walmart patent application. Zest introduced evidence to support both those arguments for misappropriation at the first trial in this case, and it intends to do so again at retrial. *See, e.g.*, Ex. B (trial transcript) at 906:12-16 (Zest's technical expert explaining his opinion that "Walmart used Zest's information for the content of the patent application" *and* "[t]hey also used the Zest know-how in building their applications and different products"). To be clear, the evidence that Walmart misappropriated by "inappropriately sharing Zest documents internally" would not be used to prove breach of contract. It is direct evidence of misappropriation. The Court did not grant summary judgment on Zest's claim for trade secret misappropriation, and there is no

reason Zest should not be allowed to prove misappropriation using evidence of Walmart's internal acquisition, use, and disclosure of Zest documents at retrial—just as it did at the first trial in this case.

**Second**, Walmart's failure to comply with the parties' NDA is also relevant to show misappropriation, because misappropriation is defined based upon the lack of consent of the trade secret holder. Misappropriation is defined to include acquisition, disclosure, or use, but all three categories involve elements based on the trade secret holder's consent or lack thereof. For example, a disclosure or use must be made "without express or implied consent." *See* Dkt. 369 at 12 (jury instruction 8.3(B)). The jury will hear evidence that Zest voluntarily disclosed its trade secret to Walmart, subject to the NDA, while the parties were considering a partnership. If the jury were left with the incorrect impression that Zest had *consented* to Walmart's use of Zest's information for Walmart's own purposes under the terms of the NDA, it could conclude that Walmart had not misappropriated because it did not use Zest's trade secret without Zest's "consent."

As another example, several elements of misappropriation refer to whether a trade secret "was acquired by improper means." *Id.* When Walmart employees received documents containing Zest's trade secret in violation of the NDA, that was an "improper means." And similarly, other elements of the definition of misappropriation refer to whether a recipient of a trade secret had "a duty to maintain its secrecy or limit its use." *Id.* The scope of Walmart's duty to limit its employees' use of Zest's trade secret under the NDA is directly relevant to that question; Zest must be allowed to explain that Walmart's use of Zest's documents violated its "duty to maintain [the trade secret's] secrecy or limit its use" under the NDA.

In other words, the scope of the NDA (i.e., what *was* allowed to be done with a trade secret) is directly relevant to whether there was any misappropriation (i.e., what *wasn't* allowed to be

done with a trade secret). *See, e.g.*, *My Fav Elecs., Inc. v. Currie*, No. 24-C-1959, 2024 WL 4528330, at *7 (N.D. Ill. Oct. 18, 2024) (finding NDA relevant in proving misappropriation, because the NDA terms show the defendant's knowledge of the limitations on how the trade secret could be used); *Gatan, Inc. v. Nion Co.*, No. 15-CV-01862-PJH, 2017 WL 1196819, at *6 (N.D. Cal. Mar. 31, 2017) (finding allegations about breach of an NDA probative of misappropriation); *B & G Gulf Coast Properties, LLC v. Demo Diva, L.L.C.*, No. 1:10-CV-143-RHW, 2012 WL 1025725, at *5 (S.D. Miss. Mar. 26, 2012) (finding terms of a contract limiting use of a trade secret relevant to proving misappropriation because the contractual scope related to "the consent" of the plaintiff, as used in the statutory definition of misappropriation). The violation of the NDA is not "a basis for liability" in and of itself, *see* Dkt. 641, ¶ 5, but it is relevant to showing the elements of trade secret misappropriation. Denying Zest the opportunity to introduce evidence about Walmart's violations of the NDA would constitute a highly prejudicial, reversible error.

**Third**, Walmart's breach of confidentiality provisions is also relevant to Zest's reasonable efforts to protect its trade secret. *See*, *e.g.*, *AKM Enterprises, Inc. v. Hayes*, No. 4:23-CV-4144, 2025 WL 593385, at *4 (S.D. Tex. Feb. 24, 2025) (finding confidentiality agreements relevant to show reasonable measures, even when plaintiff could not assert breach of contract claim); *Glob. Ref. Grp., Inc. v. PMD Analysis Inc.*, No. 21-CV-0532-JLRBCM, 2023 WL 5733968, at *12 (S.D.N.Y. Aug. 15, 2023), *R&R adopted*, 2023 WL 5734171 (Sept. 5, 2023) (collecting cases finding NDAs probative of reasonable efforts); *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, No. 8:13-CV-01880-JLSKESX, 2018 WL 4697255, at *6 (C.D. Cal. Aug. 3, 2018).

This issue cannot be fully explored without addressing the substance of the NDA to some extent. If Walmart challenges the adequacy of the terms of the NDA, as it appears likely to do, Zest must be allowed to discuss the substance of the NDA to explain why the contractual terms

were adequate to protect Zest's trade secret. And the fact that Walmart *violated* the NDAs is also relevant to reasonable efforts: Zest reasonably expected that Walmart would comply with the parties' contractual obligations, and insofar as Zest's trade secrets were disclosed to the public because Walmart did *not* comply with those obligations, Walmart's failure to do so does not mean Zest failed to reasonably protect its trade secret.

Thus, the evidence Walmart challenges is highly relevant to the exact claim remaining in this case. Walmart's internal disclosures of Zest's trade secret in violation of the parties' agreement proves both Walmart's misappropriation and Zest's reasonableness in its efforts to protect the trade secret. There is no unfair prejudice in admitting this evidence. Walmart never explains how it would be prejudiced *unfairly* by evidence of its own acts of misappropriation in sharing Zest's trade secrets internally. That evidence may prejudice Walmart only in the sense that it may convince the jury; there is nothing unfair about the jury evaluating relevant evidence to come to a decision.

### Walmart's Motion #18: Zest's Damages Exceeding $72.7 Million

Based on the Court's previous rulings (that Zest respectfully disagrees with), Dr. Becker will testify that a reasonable royalty for Walmart's misappropriation of Zest's trade secrets is $72.7 million. Zest reserves its opposition to those prior rulings, but will not relitigate them now. To the extent Walmart is asking the Court to limit other categories of damages that the jury may consider (e.g., exemplary damages) Walmart's motion should be denied. Exemplary damages are not based upon any calculations by Zest's damages expert and were not excluded at the previous trial.

### Walmart's Motion #19: Reference to Pre-Trial Motions and Speculation About Walmart's Positions

Walmart plans to argue that Zest failed to take reasonable measures to protect its trade secret because it did not attempt to stop publication of Walmart's patent application containing

Zest's trade secret. Walmart's experts have suggested a few ways Zest could have tried to stop publication, including by asking Walmart to withdraw the application or by asking the Court for a preliminary injunction to that effect. But now, in its Motion in Limine No. 19, Walmart seeks to stop Zest from probing whether those ideas would have worked. Walmart's own expert on reasonable measures concedes that part of the analysis into whether a company should have taken additional measures to protect its trade secret is whether those measures would be expected to be effective in preventing misappropriation. *See* Ex. C (Riley Dep. Tr.) at 22:12-23:2. If Walmart proposes additional measures Zest could have taken, Zest must be allowed to explore whether they would have been effective.

As to Walmart's suggestion that Zest seek a preliminary injunction, it is relevant that Zest *had* filed for a preliminary injunction and that Zest's motion was pending at the time Walmart's patent application published. *See* Dkts. 18 (motion), 182 (denial as moot in 2020, after the patent application published). Walmart cannot be allowed to suggest to the jury that Zest failed to seek an injunction protecting its trade secret while Zest is precluded from explaining that it had done exactly that. To be clear, Zest is not offering an expert to speculate about whether the Court would have intervened had Zest asked again after it learned about the Bohling Application. But if one of Walmart's experts raises the idea of a preliminary injunction or temporary restraining order, Zest should be allowed to clarify in cross-examination that that expert *does not know* what the Court or the Patent Office would have done. That line of questioning is fully consistent with the Court's instruction barring either party's expert from speculating on that subject. *See* Dkt. 641, ¶ 3. And Zest should be allowed to explain what it *had* done by introducing evidence of its earlier, pending motion for a preliminary injunction.

Similarly, as to Walmart's suggestion that Zest ask Walmart to withdraw the patent

application, it is relevant to probe whether Walmart would have agreed. Again, Zest is not offering an expert witness to speculate that Walmart would *not* have agreed. But if one of Walmart's witnesses says Zest should have asked Walmart, then Zest should be allowed to cross-examine that witness about the *lack* of evidence that Walmart would have agreed. If Walmart would not have agreed to withdraw the application, nothing would be accomplished by asking, and the jury could conclude Zest acted reasonably in not having done so.[3]

Alternatively, the Court could bar Walmart from introducing testimony or arguments claiming that Zest could have tried to stop publication of the patent application by asking Walmart to withdraw it or asking the Court for an injunction. If the Court determines that those issues are inappropriate for discussion in front of the jury, that would be a fair solution. But Zest would be greatly prejudiced if Walmart is allowed to suggest ways Zest allegedly could have stopped the publication of the patent application but Zest is not allowed to probe the effectiveness of those very measures. That *incongruity* would be unfairly prejudicial.

**Walmart's Motion #20: Reference to the Previous Trial**

Zest agrees that the parties should refer to any testimony from the previous trial as "prior testimony" and not refer to "trial testimony."

**Walmart's "Other In Limine Issues": Courtroom Sealing**

---

[3] The jury could draw this conclusion whether or not Zest's counsel actually considered and rejected the idea of asking Walmart to withdraw the patent application. The question at issue is whether Zest was objectively reasonable in the measures it took to protect its trade secret. If a plaintiff considered a potential additional protective measure and rejected it—even if the plaintiff subjectively believed it was doing enough—that would not necessarily prove it acted reasonably; sometimes, plaintiffs in good faith fail to take certain measures, and their good-faith decisions might still be unreasonable. But conversely, the fact that there is no evidence of Zest evaluating this idea and rejecting it does not answer the question of "reasonable efforts" either. The question is whether Zest acted *reasonably* from an objective perspective, not Zest's subjective motivations or contemporaneous justifications for its decisions.

Walmart requests that the courtroom be unsealed at trial because the patent application disclosing Zest's trade secret already published. It is unclear why Walmart believes the Court should deviate from its practice at the last trial, during which the courtroom was sealed. *See* Ex. D (March 15, 2021 pretrial conference) at 16:9-24 ("at the beginning of each witness, if it's anticipated that confidential documents are going to be used, . . . you let me know that" and "I will close the courtroom for that witness"). Walmart raised the same concern it raises now: that "it gives a certain impression potentially in a trade secret case if the plaintiff is constantly" asking for sealing. *Id.* at 13:13-19. But the Court found that this problem could be resolved by closing the courtroom outside of the presence of the jury and telling them it was "routine for us to kind of exclude people outside the court staff." *Id.* at 13:2-7, 16:13-15.

As the Supreme Court has recognized, the presence of trade secrets may justify restrictions on access to court records. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (court can limit the public access to "business information that might harm a litigant's competitive standing"). Courts regularly close courtrooms when trade secrets are being discussed. *E.g. CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-CV-837, 2006 WL 5349266, at *13 (S.D. Ohio Mar. 27, 2006) (granting motion to close courtroom during testimony relating to trade secrets); *Woven Elecs. Corp. v. Advance Grp., Inc.*, 1991 WL 54118, at *6 (4th Cir. 1991) (finding that once a trial court makes an "initial determination" that "trade secrets are likely to be involved" in a trial, "an order closing the courtroom during the times when trade secrets were to be exposed would have been proper").

That procedure makes sense here, just as it did at the first trial in this case. There has been no change in the relevant facts; the Bohling Application had published prior to the last trial as well. But just because the one trade secret alleged to be misappropriated in this trial has been published

does not mean every bit of confidential information in all of Zest's documents has been publicly disclosed. Zest's documents contain much more detail about its technology, its customers, and its other trade secrets or confidential technical information. Walmart cannot unilaterally declare that the industry "ha[s] advanced" and Zest's technology is no longer relevant. *See* Dkt. 713 at 8. The Court should follow this well-established practice from the first trial and other similar trials and seal the courtroom at retrial when Zest's confidential information is being discussed.

**Walmart's "Other In Limine Issues": Confidentiality Bates Stamps**

Walmart's final request is to redact all confidentiality markings included in the bates stamps the parties added to the documents during discovery. Walmart cites no case in which a Court has ever issued such an order, even though confidentiality bates labeling is standard in litigation. As Walmart notes, the Court previously instructed the jury that the bates markings were not to be considered, and Zest does not oppose a similar instruction at retrial. There is no reason to believe the jury would disobey that instruction. Redacting every document in this case would be a massive logistical undertaking—involving manually marking thousands of pages for redaction—for almost no benefit. And indeed, the redactions themselves might confuse the jury, leading them to speculate about what missing evidence had been redacted. The simplest solution is to use the documents as they were produced in discovery, as the Court did at the first trial in this case and as courts routinely do.

If the Court intends to require the redaction Walmart has requested, Zest respectfully requests that the Court notify the parties as soon as possible, before the pretrial conference later this month. The parties must print and organize many thousands of pages of exhibits in preparation for trial, and that printing will be complete by the time of the pretrial conference. Additionally, Zest would likely need to hire additional support services to redact thousands of pages of

documents and requests sufficient notice to carry out that process if the Court deems it necessary.

**Walmart's "Other In Limine Issues": Deposition Video for Available Walmart Witnesses**

Although Walmart did not file a formal motion on limine about the use of deposition video for witnesses available to testify live, it raised this issue with the Court by email on April 3, 2025, so Zest addresses it here.

Zest designated the testimony of a handful of Walmart fact witnesses whom Walmart has disclosed it plans to call live (Kelly Boyle, Josh Bohling, Denise Sharpe, and Chuck Tilmon). On the April 1 deadline to submit deposition designations, Walmart chose not to designate any testimony from the fact witnesses Zest plans to call live (Peter Mehring and Troy Richards). That was Walmart's strategic choice, and it cannot now escape the consequences of its decision by trying to bar Zest from using the deposition testimony which it properly designated and which is admissible under the Federal Rules of Evidence and Civil Procedure.

Federal Rule of Civil Procedure 32 governs the use of deposition testimony at trials, and it allows deposition testimony to be used as long as three requirements are met:

> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
>
> (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
>
> (C) the use is allowed by Rule 32(a)(2) through (8).

Fed. R. Civ. P. 32(a)(1). Rule 32(a)(2) through (8) in turn allow the use of deposition testimony in a variety of situations, including "to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence" and to use "for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6)." Fed. R. Civ. P. 32(a)(2)-(3). It is error to exclude deposition testimony—even of an available witness—because a party may "introduce, as

part of his substantive proof, the deposition of his adversary, and it is quite immaterial that the adversary is available to testify at the trial or has testified there." *Cmty. Counselling Serv., Inc. v. Reilly*, 317 F.2d 239, 243 (4th Cir. 1963); *see also Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 308 (5th Cir. 1978) (finding it "error" to "restrict[] plaintiffs' use of [an opposing party witness's] deposition to cross-examination" or to testimony "as an adverse witness"). "The trial court . . . may not refuse to allow the deposition to be used merely because the party is available to testify in person." Wright & Miller, Deposition of an Adverse Party, 8A Fed. Prac. & Proc. Civ. § 2145 (3d ed.).

The requirements of Rule 32 are met here, and the Walmart deposition testimony is admissible. Walmart was represented at the depositions of its employees. It has not raised any substantive evidentiary objection to particular portions of the testimony Zest has designated. Finally, the testimony at issue was given by Walmart's employees, who were its officers, agents, and/or Rule 30(b)(6) designees. The testimony cannot be excluded solely because Walmart chooses to bring a witness to trial.

Walmart has not suggested any reason why the designations Zest may wish to play at trial would be duplicative. Zest does not intend to cover the same material in deposition clips and live testimony, but it should be allowed to choose which approach it prefers to prove its case. The jury is tasked with weighing the credibility of witnesses, and in doing so, it may consider the demeanor of witnesses in deposition video. That aspect of the evidence cannot be fully recreated by asking the same questions again live. And if anything, playing deposition testimony, which has already been prepared, may be *more* efficient than asking the same questions of live witnesses.

The fact that Walmart witnesses may be available to testify live does not bar Zest from using deposition video clips instead of or to supplement live testimony. Deposition testimony of

opposing parties' employees is not hearsay. *See* Fed. R. Ev. 801(2) (a statement "made by [an opposing] party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay). The testimony thus does not need to fall within the "unavailable witness" exception to hearsay, *see* Fed. R. Evid. 804, to be admissible: it is simply not hearsay at all. *See, e.g.*, *In re Oster*, No. 10-12629, 2011 WL 739539, at *6 (E.D. Mich. Feb. 24, 2011), *aff'd*, 474 F. App'x 422 (6th Cir. 2012) (explaining that witness availability is relevant to admissibility of deposition testimony only for non-party witnesses, because the deposition testimony of party witnesses is admissible as non-hearsay regardless); *Howard v. Abdellatif*, No. 2:05-CV-81, 2008 WL 5411775, at *1 (W.D. Mich. Dec. 23, 2008) (allowing plaintiff to "read[] [witness's] deposition transcript into evidence where [he] is ready and available to testify in person," because the witness qualified as an agent of the opposing party). Zest anticipates that the portions of video deposition to be played will not be extensive. It requests only that it be allowed to structure its proof as counsel deems best for presentation of this complex case to the jury.

Dated: April 8, 2025                                 Respectfully submitted,

                                                    *Patrick Ryan*
                                                    Patrick Ryan*
                                                    Sean R. McTigue*
                                                    Kenneth L. Richard*
                                                    Natalie A. Felsen*
                                                    BARTKO PAVIA LLP
                                                    1100 Sansome Street
                                                    San Francisco, CA 94111
                                                    (415) 956-1900
                                                    *pryan@bartkopavia.com*
                                                    *Admitted pro hac vice*

                                                    Adam D. Mitzner*
                                                    Andrew C. Ryan*
                                                    Gianna C. Signorille*
                                                    BARTKO PAVIA LLP
                                                    555 Madison Avenue, 11th Floor
                                                    New York, NY 10022
                                                    (212) 980-3500
                                                    *Admitted pro hac vice*

                                                    Scott P. Richardson
                                                    Brittany D. Webb
                                                    MCDANIEL WOLFF, PLLC
                                                    1307 West Fourth Street
                                                    Little Rock, AR 72201
                                                    (501) 954-8000
                                                    *scott@mcdanielwolff.com*

                                                    H. Christopher Bartolomucci*
                                                    SCHAERR | JAFFE LLP
                                                    1717 K Street NW, Suite 900
                                                    Washington, DC 20006
                                                    (202) 787-1060
                                                    *cbartolomucci@schaerr-jaffe.com*
                                                    *Admitted pro hac vice*

                                                    Kate M. Falkenstien*
                                                    BLUE PEAK LAW GROUP, LLP
                                                    3790 El Camino Real, PMB 846
                                                    Palo Alto, CA 94306-3314
                                                    (281) 972-3036
                                                    *kate@bluepeak.law*
                                                    *Admitted pro hac vice*

*Attorneys for Plaintiffs ZEST LABS, INC.,*
*ZEST LABS HOLDINGS LLC, and RISKON*
*INTERNATIONAL, INC.*