# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

ZEST LABS, INC. and
ECOARK HOLDINGS, INC.,
                    Plaintiffs,

  v.                              No. 4:18CV00500 JM

                                  July 28, 2021
                                  Little Rock, Arkansas
                                  9:05 AM
WALMART, INC.,      Defendant.

                TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE JAMES M. MOODY, JR.,
          UNITED STATES DISTRICT JUDGE, and a jury
                  _____

APPEARANCES:

On Behalf of the Plaintiffs:

    MR. MICHAEL SIMONS, Attorney at Law
    MR. TODD LANDIS, Attorney at Law
    MS. SARAH TISHLER, Attorney at Law
      Williams, Simons & Landis, PLLC
      327 Congress Avenue, Suite 490
      Austin, Texas  78701

    MR. SCOTT P. RICHARDSON, Attorney at Law
      McDaniel, Wolff & Benca, PLLC
      1307 West Fourth Street
      Little Rock, Arkansas  72201

    MR. ERIC J. MAGNUSON, Attorney at Law  (BY PHONE)
      Robins Kaplan, LLP
      800 LaSalle Avenue
      Minneapolis, Minnesota  55402-2015

On Behalf of the Defendant:

    MR. JOHN RICHARD KEVILLE, Attorney at Law
    MS. CHANTE WESTMORELAND, Attorney at Law  (BY PHONE)
      Winston & Strawn LLP
      800 Capitol Street, Suite 2400
      Houston, Texas  77002

                                  (continuing)

1

2    APPEARANCES CONTINUED:

3        MR. R. RYAN YOUNGER, Attorney at Law
         MR. JOHN E. TULL, III, Attorney at Law  (BY PHONE)
4            Quattlebaum, Grooms & Tull PLLC
             111 Center Street, Suite 1900
5            Little Rock, Arkansas  72201

6

7    Also Present:  Mr. John Kinton

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22        *Proceedings reported by machine stenography.  Transcript
23    prepared utilizing computer-aided transcription.*

24

25

1          (Proceedings commencing in open court at 9:05 AM.)

2          THE COURT:  We are on the record in Zest versus

3    Walmart, Case Number 4:18CV500.  The usual suspects are mostly

4    here.  We were here to discuss originally Walmart's motion or,

5    excuse me, Zest's motions for costs, attorneys' fees, and

6    post-judgment interests, and Walmart's motion for judgment as a

7    matter of law and remittitur.  Since then, the issue of the

8    post-trial discovery issue has come up which is -- here it is

9    down in the bottom corner.  I was going to say since these are

10   sealed, I don't have docket numbers, but it appears to be

11   docket 430.  And I don't have the docket numbers written on the

12   response or the reply, but I suspect they're pretty close to

13   those following 430.  Maybe 431 and 432.

14        I have read all of that information and indicated

15   hopefully y'all got the email that this is what I wanted to

16   bring up.  Mr. Keville, since you filed the motion, I'm going

17   to let you speak first, being mindful that I read your motion

18   and your reply, so you can go to either mic that you see fit.

19        MR. KEVILLE:  Thank you.  Good morning, Your Honor.

20   So what came up here is critical to the whole path of this

21   case.  It could have changed everything from simply not even

22   having a case because the Bohling application was withdrawn, or

23   at minimum taking away the liability case certainly impacting

24   the damages case, certainly impacting any willfulness case.

25   And it's not something that could have been raised before as

1    they try to say now.

2          There's no waiver, there was no knowledge of this.  In

3    fact, there was a representation that they didn't see the

4    application, so that's why we filed the motion.  And if it

5    helps, Your Honor, I think to put it in context of a timeline

6    of where things were and then we spelled it out somewhat in the

7    motion, but January 31st, 2019, there was a hearing on their

8    needing to disclose what exactly were the trade secrets.  So at

9    that time, Walmart is still fighting to know what are the trade

10   secrets, what's at issue here.  A month later, the Bohling

11   application is produced along with the Bohling provisional

12   application.  That's February 28, 2019.  In that set of

13   documents that was produced, it specifically says the

14   anticipated publication date is May 16th, 2019.

15         So as of February 28th, the documents are in their

16   possession, the provisional patent application, the patent

17   application, and the document that says when it's expected to

18   publish.  What's new now is that we've seen these time entries,

19   right?  So from March 1st through May 1st, four attorneys

20   primarily are reviewing the production and looking at Hot Docs.

21   We don't know exactly what those Hot Docs are, but considering

22   that Mr. Bohling was mentioned in the blog post that was the

23   start of this whole case and featured prominently in their

24   complaint, certainly they would have searched the word

25   "Bohling".

1    Then we get to May 8th.  Well, in that period, we have
2    March 6th.  So March 6th, Judge, there's a hearing on the
3    motion to compel trade secrets, and at that time, the document
4    is already in their possession.  What we don't know, because
5    these entries just say Hot Docs, is had this been one of the
6    Hot Docs by March 6th, roughly a week and a half later.  What
7    we do know is that on May 8th, their entries start to say
8    review Walmart patent applications, review Zest's response to
9    Rog 1 and Walmart patent applications.  And Rog 1 is the one
10    that's supposed to identify all the trade secrets.

11    Then on May 14th, we have an entry that says work on
12    claim chart analyzing Walmart's patent application in light of
13    Zest's trade secrets.  Now it's gone from patent applications
14    plural to patent application singular.  And then the Bohling
15    application publishes on May 16th.  On June 5th, there's a
16    hearing on additional discovery motions.  There's no mention
17    from them, Judge, there's a patent application, it just
18    published two weeks ago, we need to do something about this.
19    It could have been addressed even at that point.  Now certainly
20    the big issue is the whole case.  The whole liability and
21    damages issue could have been dealt with had they addressed
22    this pre-publication.

23    But even two weeks later when it's clear they were
24    analyzing the publication and trade secrets, they were here in
25    front of you on a motion for additional discovery and they

1    didn't say anything about this.  They didn't ask for an order,

2    they didn't have it withdrawn from publication.  And we've put

3    in the evidence showing how that could have been done

4    immediately, so that's a whole second issue where they could

5    have mitigated any damages because we would certainly have had

6    a different trial if we knew, number one, they analyzed it

7    before it published and took no action.  And number two, they

8    were here with a chance to tell you about this two weeks after

9    it published, a chance to mitigate all the damages and didn't

10   do it.

11        So then we get fast forwarded to October.  And then

12   October 19, fact discovery closes and on the very date fact

13   discovery closes, they supplement their responses to allege the

14   Bohling patent application discloses their trade secrets.

15   They've been working on analyzing this for six months, and they

16   wait until the last day of discovery to put this out there.

17   And you have the Lanning expert report and you know that

18   Mr. Lanning testified extensively primarily about comparing

19   Bohling to their presentations.  Fast forward to February of

20   2020, Zest's motion for summary judgment says it's undisputed

21   that Walmart allowed the Walmart application to publish without

22   Zest's consent.  Walmart's opposition says no, no, they were

23   produced in this set of documents, and that's where we get to

24   their reply.

25        And their reply, which is docket 244 at page 32, says

1    after receiving Walmart's opposition, Plaintiff's counsel

2    searched the entire set of documents produced by Walmart on

3    February 28, 2019.  These searches, so the ones they're doing

4    now in response, revealed only one document that could possibly

5    be a document to which Walmart refers, and now they say it's

6    this draft word document.  They said:  To Plaintiff's counsel's

7    knowledge, Walmart has never produced the provisional or

8    nonprovisional Walmart applications actually filed with the

9    PTO.  And in support of that, they attach the declaration of

10   Mr. Hardt, where he says:  I and a paralegal at my review

11   searched and we didn't find any of these documents, we only

12   found this one draft.

13        So that's the state of play, and then, of course,

14   Walmart's counsel, Skadden, files a sur-reply and says here's a

15   declaration from the paralegal saying these were produced in

16   February 28, 2019, here are the documents with the Bates

17   numbers, and gives everything laid out.  So at that point,

18   we've got competing declarations, we're six months after the

19   close of fact discovery.  Zest has an attorney declaration

20   indicating that as of March 2020, almost a year after it was

21   produced or more than a year, and five months after discovery

22   closed, they had never found Walmart's production copies of the

23   Bohling application, and for the first time in 2020, they found

24   a draft.

25        On the other hand, you've got Walmart who knows the

1    Bohling application was, in fact, produced.  Now, Zest says

2    this is something we should have raised in discovery.  Well,

3    that couldn't have been done because this all happened long

4    after discovery.  Or we should have sought to reopen discovery

5    or we should have raised it at trial, and there was no way to

6    raise this at trial.  It would have been improper for me to say

7    at the time in front of a jury, Zest's attorney gave a

8    declaration and he swore under oath that he never found the

9    Walmart patent application.  I don't have the time entries

10   then.  I have nothing to challenge him with.  Nor would I.

11        Think about me having to call Mr. Hardt to the stand and

12   say, Mr. Hardt, you put in a declaration that said Walmart

13   never produced these applications and here is evidence Walmart

14   did produce them.  And I've got no evidence that he's wrong,

15   I've got no evidence they ever saw them because they said they

16   didn't find anything in the production until October of --

17   until 2020.  So I could not have addressed this at trial.  I

18   was aware of the issue.  I've got competing attorney

19   declarations.  I've got no basis, no evidence other than the

20   fact I know it was produced to say they saw it, and I have

21   attorney who swears they didn't see it.

22        So then this comes up with the new evidence of the time

23   entries in support of their motion for fees.  And that's why we

24   moved for more discovery now.  It's the appropriate time, it's

25   a very big issue.  The time entries are very clear.  Happy to

1    hand them up if Your Honor wants to see them again.

2              THE COURT:  I don't need to see them again, but go

3    ahead.  If you want to make them an exhibit, that's fine, but I

4    think --

5              MR. KEVILLE:  They're referenced in the brief for

6    the most part.  These are associates who are working the day

7    after there's a team meeting that Mr. Simons leads.

8              THE COURT:  Let me back you up.  Is that an extra

9    copy?

10             MR. KEVILLE:  Yes, I have extra copies.

11             THE COURT:  I might as well avail myself.

12             MR. KEVILLE:  On the bottom of these, Your Honor, if

13   you turn to page 104 of 171, because this is just the relevant

14   time period.

15             THE COURT:  Go ahead.

16             MR. KEVILLE:  You see on May 8th, it's the fifth

17   entry down, Matthew Melancon, associate, has a number of tasks,

18   and the second to last one says:  Review and discuss Walmart

19   patent applications.  He spent 10.8 hours that day.  On

20   May 9th, roughly in the middle of the page, Wendy Wang has an

21   entry that says:  Work on Walmart's patent analysis including

22   review Walmart's patent applications and review Zest's response

23   to its Interrogatory One.  That same day, right below that,

24   Jonathan Hardt has an entry and it says:  Teleconference with

25   Wendy Wang regarding review of Walmart patents.

1      If you go to the page before, keep in mind that these are

2  all associates, if you go to the page before, 103 of 171, the

3  day before on May 7th, 2019, Michael Simons leads a team

4  meeting, update task lists in weekly report, and Wendy Wang is

5  at that meeting.  And it says:  Weekly meeting to discuss task

6  list and action items.  So it would be very unbelievable, Your

7  Honor, to think that in a law firm, these three associates were

8  doing tasks that none of the people in charge of the case knew

9  about or had any knowledge of.

10      Then we see if we go to page 105 on May 13th, Wendy

11  Wang's entry says, in the last part:  Work on claim chart

12  analyzing Walmart's patent application.  It's now singular.

13  Remember Walmart had said that they produced the provisional

14  application and the nonprovisional application.  So now --

15  originally it says patent applications, now it's patent

16  application.  You can see on May 14th down in the bottom,

17  Michael Simons leads another team meeting:  Revise task list

18  and update weekly report.  And on the same day, Wendy Wang is

19  working on a claim chart analyzing Walmart's patent application

20  in light of Zest's trade secrets.

21      Now, when we filed this, Your Honor, I expected we would

22  see some evidence in the response that explained what those

23  entries mean.  And instead, we got things like, well, this

24  certainly isn't a smoking gun, those entries aren't clear,

25  those entries do not prove that Zest had, in fact, seen the

1    Bohling application, nothing to say this is what they were

2    looking at.  So questions that we'd like to know and that we

3    want to get out of this discovery, and maybe Mr. Simons can

4    answer today, in the May 2018 -- May 8th, 2019, time entry,

5    what Walmart patent applications was Matthew Melancon

6    reviewing?  And who did Matthew Melancon discuss Walmart patent

7    applications with?  Because we've searched all the other

8    entries from that day, May 8th, and there's no entry of someone

9    else saying discussed with Matthew Melancon the Walmart patent

10   application.

11        On May 9th, what Walmart patent applications did Wendy

12   Wang review while at the same time reviewing Zest's

13   interrogatory on trade secrets?  And what patent application is

14   analyzed in the claim chart on May 13th and 14th in light of

15   Zest's trade secrets?  So remember, Your Honor, here is the

16   entries in May saying compare the Bohling patent application to

17   Zest's trade secrets.  And it's not until five months later,

18   the day discovery closes, when they first say the Bohling

19   application is where you disclose the trade secrets.  So if it

20   is true as it appears to be and they haven't denied that Zest's

21   attorneys saw and analyzed the Bohling patent application in

22   May 2019, before it published, it changes almost everything.

23        It changes how the trial would have gone or whether there

24   even would have been a trial.  Certainly would have been a

25   summary judgment motion on behalf of Walmart.  It changes all

1    the JMOL motions and it provides a clear basis at a minimum for

2    a Rule 60 motion.  I suggest, Your Honor, that we go forward

3    with the very narrow discovery we requested.  It's in our

4    motion at page 10.  We've made it very limited.

5        Once they produce all of that from both their firm and

6    from the Vinson & Elkins firm, that we then have one to two

7    weeks to have a forensic analysis done.  This is certainly

8    going to be one of those cases where you need a forensic expert

9    to say I can tell this document was copied from another

10   document and was created on this day or was brought from this

11   attorney.  You know, it's not a case where you're going to be

12   able to just look at a PDF like this and be able to say, okay,

13   I can tell when someone created it and what they were

14   analyzing.  We're going to have to trace the history of these

15   documents, because if it goes back earlier, it makes the case

16   even clearer.

17       One of their alleged defenses to all this was that, well,

18   it would take approximately four weeks for the patent office to

19   act on it.  Well, it's quite possible that they were looking at

20   this in the Hot Docs more than four weeks before, but it's not

21   true.  Mr. Kunin, who was in charge of this area of the patent

22   office, has laid out in our reply very clearly, here are three

23   different avenues that even just days before it published or

24   even a day before, this could have been avoided.  One of which

25   is Zest coming to this court and saying we need an order.

 1    Because on an order from this court, Mr. Kunin has said the

 2    patent office would immediately take that out of publication

 3    cue.

 4        So I would suggest from the date they produce it, we have

 5    one to two weeks to do the analysis as needed and then an

 6    additional one to two weeks to brief the impact.  Like I said,

 7    the impact, it will impact all the JMOLs and it will possibly

 8    be a Rule 60 motion on new evidence and/or fraud.  Certainly

 9    goes to the fees briefing, which hasn't been requested.  Which

10    hasn't been finalized, excuse me.  So with that, I could answer

11    any questions Your Honor has.

12            THE COURT:  I may have some in just a second, but

13    I'm fine for right now.  Mr. Simons, are you up?

14            MR. SIMONS:  Yes, Your Honor.  Thank you.  The

15    interesting thing about this motion is that the allegations

16    that are being made in this motion are diametrically opposed to

17    the allegations that are being made in Walmart's JMOL motion.

18    And so what they're saying in this motion essentially is

19    despite the fact that we included the patent application in our

20    complaint, despite the fact that we had filed a motion for

21    preliminary injunction just two weeks after the case was filed

22    specifically saying we are concerned that during the course of

23    this case, Walmart is going to disclose our trade secrets to

24    third parties, and we need protection against that, we filed

25    that motion, Walmart opposed it and said this is not necessary,

1   there's nothing here, there's no need to restrict our

2   activities during the course of this case.

3       We asked for expedited discovery because we were

4   concerned that Walmart was going to disclose Zest's trade

5   secrets during the case and we wanted to make sure to protect

6   against that.  Our motion was denied, and that is what it is.

7   But that's the position that we were in.  Now, Walmart knew the

8   importance of the Bohling application.  How do we know they

9   knew?  They produced it in the case.  It's what they're saying

10  here, that they analyzed this.  There's no reason for them to

11  have produced it if they didn't think it was relevant and

12  important to the case.

13      I think the Court will recall all of the discovery fights

14  that we had in this case, and Walmart wasn't in the business of

15  just randomly producing things that they didn't feel were

16  relevant to the case.  So the notion that Walmart, the biggest

17  company in the world with the biggest law firms in the world,

18  were producing documents but they had no idea of the

19  significance of those documents and that it was our

20  responsibility after we had already sued them, after we had

21  already said we need an injunction because we believe that

22  during the course of this case, Walmart is going to disclose

23  our trade secrets to third parties, exactly what happened.  But

24  they had no idea.  And, interesting point.  We noticed

25  Mr. Bohling's deposition in February of 2019.  We noticed that

1  deposition for May 15th of 2019 before the application was

2  scheduled to publish.

3      Walmart refused to produce Mr. Bohling and they pushed

4  his deposition all the way back until August of 2019.  But in

5  that deposition -- and the Court will recall from Mr. Bohling's

6  testimony, which was, you know, a shorter version of his

7  deposition, that was when Mr. Bohling admitted that his

8  application contained our trade secrets.  And that was the

9  point late in discovery not because we didn't want to take his

10  deposition earlier, but because Walmart refused to provide him

11  for deposition earlier, they waited until almost the end of the

12  discovery period to do that.  And that's when he admitted all

13  of those things.

14      Walmart made a strategic decision that they could keep

15  prosecuting the Bohling application and also try to win this

16  case and keep the application.  And the Court might recall

17  during Mr. Bohling's testimony that he said -- he changed his

18  testimony and said, I think my patent's invalid or my

19  application's invalid.  And we asked him:  Have you gone to the

20  patent office and told them what you now think that's very

21  different from what you told the patent office?  And he hadn't

22  done that.  So the idea now that if we had just said, hey,

23  Walmart, why don't you abandon your patent application, why

24  don't you withdraw everything, why don't you agree that the

25  Bohling application contains Zest's trade secrets, Walmart

1    never would have agreed to that.

2        And it's clear that Walmart was the only party here who

3    had the ability to effect that patent application.  We couldn't

4    do it.  And despite Mr. Kunin's declaration, which kind of

5    modifies his deposition testimony, at the end of the day, he

6    agrees and says Walmart could have gone and done something

7    about it.  And then he says, well, you could have gone to the

8    Court because there's a provision that says if it's against the

9    laws of the United States or a state, then maybe you can stop

10   publication of that patent application.  But that would have

11   required the Court to find the ultimate issue in this case,

12   which is that the patent application contains Zest's trade

13   secrets, something that in the summary judgment motions was

14   determined to be a fact issue for the jury, which the jury

15   ultimately decided.

16        But Walmart suggested that that could have been decided

17   and that Walmart would have maybe agreed to that being decided

18   way back in 2019 when Walmart was fighting tooth and nail

19   refusing to provide us with any of the discovery that we were

20   looking for in this case.  So I want to step back just a little

21   bit because one of the things that's very absent from Walmart's

22   motion is any discussion of the legal standard.  What is the

23   legal standard --

24            THE COURT:  I've got the legal standard.  I mean,

25   that's the one thing I don't have to equivocate over.  I know

1    what the legal standard is.  But to put a finer focus on this,

2    this isn't about whether or not Bohling's application contained

3    trade secrets or not.  It's whether or not the timing of your

4    legal team and Zest by extension knew about the patent being

5    out there.  And that's what -- honestly, I believe I was misled

6    by Mr. Hunt or Hardt, excuse me, Mr. Hardt's application.  And

7    I'm sitting here trying to weigh the fact that, yeah, they sent

8    it and it wasn't entitled Bohling application so is it feasible

9    and do I believe Mr. Hardt when he says nobody ever read it,

10   and I'm faced with that benefit of the doubt to counsel that's

11   come in here and never -- they strongly litigated things, but

12   never misrepresented anything to me.

13       And it's not when Bohling ultimately got deposed or what

14   he admitted or didn't admit, it's the issue of at what point

15   did you guys know about this application.  And you told me it

16   wasn't until after publication.  I'm not saying just you, I'm

17   talking about the collective you or the royal "we" kind of

18   deal.  And that at a minimum was inaccurate and at least led me

19   to what I feel like is a short or improper analysis of that

20   whole situation.  So really what we're talking about is at what

21   point did Walmart have any proof whatsoever that y'all had

22   actually read the application.  And that didn't come out, in my

23   opinion, until the billing records.

24       And, honestly, I meant to but haven't gone back to see if

25   that was part of the redactions that were sent to me that I

1    don't know and can't remember because I went through the

2    hundred pages from Vinson & Elkins and the hundred pages from

3    you guys and then the three or four pages from Mr. Richardson.

4    Anyway, my point is is that I meant to go back to see what

5    redactions came about in this May of '19 if I'm shooting in the

6    dark correctly.  Anyway, so I do not believe, and I'll let you

7    state for the record if you'd like more so than you've already

8    done in your written materials, what the legal standard is.

9    And that's where I kind of cut you off, but I'm trying to apply

10   that legal standard to the focused question of when did y'all

11   find out about it and could y'all have done anything about it.

12       And I don't want to sound arrogant or whatever, but it's

13   my belief having reviewed the law that I could have done

14   something about it if I'd been asked to, short of ruling on the

15   entire case.  I don't believe I had to come to the conclusion

16   that no trade secrets were -- I mean, I don't think I had to

17   rule on the entire case and grant summary judgment for either

18   side to enter an order asking the patent office to stay their

19   publication pending us sorting these things out.  And I

20   suspect, not knowing necessarily that they would have obliged,

21   and then I could have asked more forcefully if they didn't in

22   the way of an order.

23       And so what I need to know is are you saying that these

24   records don't say what they appear to say?  I was hoping or

25   optimistic that I was going to get more in the way of a

1    response than waiver, they don't say we saw what they say we

2    saw, and even if so, the protective order prevented us from

3    doing anything.  And then we get in the other argument that

4    even so, does it even matter or would it have mattered at

5    trial.  So that, I guess, is what I want to hear from you

6    because I didn't really hear it in your response.

7            MR. SIMONS:  So to the issue of did it matter or

8    would it have mattered, if Walmart wanted to make the argument

9    at trial that we knew about it and that we should have done

10   something, it had all the evidence it needed to, because it had

11   the evidence, its own documents, its own production, they could

12   have said, here it is, we gave it to them, they had it, and

13   they should have done something about it.  So they had all of

14   the evidence that they needed.  It wouldn't matter whether we

15   actually knew.  They could say we should have known.  We gave

16   it to them.  We gave it to them, here it is, we showed it to

17   them, they did nothing about it.

18       So they didn't need that evidence.  They didn't need the

19   evidence of what did Walmart or what did Zest's lawyers know

20   about the case.  Similarly, the other side of the coin would be

21   would we need discovery into what Walmart's lawyers knew at the

22   time.  In other words, they produced the documents, were they

23   aware of what they produced and aware that they could have done

24   something.  Because, essentially, they're saying, well, we

25   didn't know we could have done anything.  But they had the

1   documents, they looked at them and they produced them because

2   they thought they were important to the case.  And so they

3   could have done something and they're essentially saying well,

4   no, Zest, it was your responsibility to make us do something.

5           THE COURT:  To be fair, Mr. Simons, they admitted

6   that they produced it, and they swore that they produced it and

7   all they did was ask you did you read it and when did you

8   become aware of it.  And your response was inaccurate and

9   misleading to me based on not one but multiple fairly specific

10  time entries from more than one lawyer saying that you were

11  reviewing it well before you told me you finally got around to

12  it, and even then, you didn't talk about any of this that's in

13  these records.  And there wasn't any proof that they could have

14  used to impeach you guys when you said we never had it.

15      So it is new evidence in my opinion.  And I sat through

16  the whole trial and I think it would have made a difference,

17  could have made a difference, and I think was a significant

18  piece of evidence that could have turned it because up until

19  the verdict, I didn't really know how the jury was going to

20  come back.  And I had people who were listening in on the whole

21  thing who were on different sides of the camp going, this is

22  how it's going to turn out.  So I'm not convinced that Walmart

23  waived in any way this argument by not bringing this to trial

24  because you guys not only just didn't answer the question, but

25  answered it incorrectly.

1       And there wasn't anything they had to do to impeach you.

2    All you had to do was say we swore to them and swore to the

3    Court that we never saw this stuff until way after publication.

4    And that just isn't true unless you're telling me somehow that

5    these records don't mean what they say.

6            MR. SIMONS:  So there are a number of entries

7    related to this that go forward in June and July, because the

8    application that we used in Mr. Bohling's deposition was a

9    public document.  It was not a document from anybody's

10   production.  And if you look in trial, same exhibit in trial, I

11   believe it was Exhibit 249, throughout this case, the exhibit

12   that has been used as the Bohling application was the public

13   version that we pulled off the PTO website, not a version from

14   anything that Walmart produced, and I don't think Walmart

15   used --

16           THE COURT:  But it doesn't really matter who

17   produced it, it's whether or not you were aware of the patent

18   application either from a public situation or otherwise, and

19   analyzed all of this prior to publication.  And I don't want to

20   get bogged down into whether or not you looked at it, but from

21   one source or another, but I think it was clear that the

22   question was -- and I understood the question to be at what

23   point did Zest become aware that what they considered their

24   trade secrets was about to be published from the patent office.

25   And your answer was not well until after it got published.  Or

1    after.  It doesn't have to be well after.

2        And that was what you told me and that's what Hardt swore

3    to.  And it appears that Hardt and others -- and that's what

4    also concerns me, that Hardt was part of this review.  And it

5    doesn't matter that I like Hardt, but I do.  But it concerns

6    me.  And I keep interrupting you, and I'm sorry.

7            MR. SIMONS:  No, Your Honor, I'm here to try to

8    answer any questions.

9            THE COURT:  I know you are.  Continue, please.

10           MR. SIMONS:  Sure.  If you look at the billing

11   records in July, in June and July after the publication, we

12   were looking at more than one patent application from Walmart

13   trying to decide the significance of those applications.  And I

14   think Mr. Bohling --

15           THE COURT:  In fairness to me, mine stopped May 17.

16   But I mean --

17           MR. SIMONS:  I'm happy to provide the Court with --

18           THE COURT:  Thank you, Mr. Simons.

19           MR. SIMONS:  If you look at --

20           THE COURT:  You gave me a PowerPoint.

21           MR. SIMONS:  Yes, Your Honor.  If you look at page

22   15, it's got some excerpts from the same billing records

23   obviously.  We don't have the full set with what defendants

24   provided, but that we were looking at these things after that

25   in anticipation of the Bohling deposition after the publication

```
1    looking at the significance of this and trying to determine
2    exactly where everything fit in, and then the Bohling
3    deposition was where all of that was crystallized.  And
4    certainly at that point if you look at the transcript of the
5    Bohling deposition, there was no question that Walmart knew
6    exactly what we were doing and exactly what we were focusing
7    on, because that deposition went through and analyzed and asked
8    Mr. Bohling the question saying, here's Zest's documents and
9    here's your application and went back and forth and compared
10   the two.
11         That was sort of the crystallization of this process and
12   that was -- they waited until the end of discovery to produce
13   Mr. Bohling for that deposition when all of that could come
14   together.  And that's the reason why that all happened near the
15   end of discovery, not because that's what we wanted.
16              THE COURT:  I'm not critical of all that.  I mean, I
17   would expect similar entries to go through trial, I mean, we
18   were working hard on every aspect of this case.
19              MR. SIMONS:  Absolutely, Your Honor.
20              THE COURT:  I don't criticize you that at all, but
21   it's the discrete question as to when did you start looking at
22   this stuff, not that you continued to look at the stuff and
23   that you weren't even completely sure about the stuff.  That's
24   not really what they asked.  They said did you have this stuff
25   before publication, and that's what I didn't get a straight
```

1    answer about.

2              MR. SIMONS:  So, you know, you can look at

3    Mr. Hardt's declaration.  I'm sure that you've looked at

4    Mr. Hardt's declaration.  And what Mr. Hardt's declaration says

5    to me is he went through with the paralegal and searched

6    through that production and said we're here, we're looking at

7    this production, searching through it trying to see what is in

8    it.  And in that search that he did, what he said was I do not

9    see, I did not find, and the reason that he did not find it may

10   well have been issues related to sometimes the OCR -- you're

11   doing search terms and the OCR is not accurate and it doesn't

12   pick certain things up.

13             I believe Mr. Hardt when he says him and a paralegal went

14   through and did that search and that's what they found.  And

15   they found the one version of the application which they talk

16   about in the declaration.  And he doesn't say this never

17   happened, he says I don't have any evidence that this happened.

18   I've searched through all this and I can't find any evidence of

19   what happened.  So I believe he was truthful in his analysis of

20   everything that he was looking at there.  That he was saying,

21   I've done this search, I asked the paralegal to do this search,

22   and this is what we found and I'm providing that information to

23   the Court.  So I don't think he was being inaccurate.  And one

24   of the --

25             THE COURT:  Well, I will say that there's no way I

1    can reconcile his declaration with your billing records,

2    especially since he was involved in the analysis and the chart.

3    I don't know exactly what to call the chart, but it's just

4    referred to as the chart.  Thank you.  Go ahead, Mr. Simons.

5    I'm disjoining your argument and I don't mean to.  I just keep

6    coming back to the fact that --

7                MR. SIMONS:  I don't think there's any question that

8    the complaint talks about a patent application, so it's not

9    that no one was aware of the fact that a patent application

10   existed out there.  That was not something that was in dispute.

11   And I don't think Walmart clearly knew that we knew because it

12   was in the complaint, it was in the exhibit in the complaint.

13   So I'm not sure what more knowledge they needed about what we

14   knew in order to make any arguments that they wanted to make to

15   the Court or to the jury about the patent application or their

16   production.

17       They could have -- they could have made all of those

18   arguments and they didn't need any additional information to

19   make the arguments because, ultimately, the legal question

20   comes down to did we have an obligation to do something or not.

21   And I don't think that that turns on whether we did a thorough

22   review of the production or not.  Either we had the obligation

23   because the information was available or we didn't have the

24   obligation.  And if we didn't find it, then I guess we should

25   have looked harder.

1          But it doesn't mean that the obligation turns on whether

2     we found something or didn't find something, and whether the

3     legal argument turned on whether we found something or we

4     didn't find something.  And if the Court -- I think you have

5     the full billing records, but if you look -- I apologize for --

6               THE COURT:  I got them.

7               MR. SIMONS:  If you look at June 18th, 2018.

8               THE COURT:  I've got everybody's, so just so

9     we're --

10              MR. SIMONS:  I apologize.  So this is Vinson &

11    Elkins.  So the early time periods are all the V&E.  Anything

12    before --

13              THE COURT:  Let me break out V&E then.

14              MR. SIMONS:  Anything before 2020 is in the V&E

15    billing records.

16              THE COURT:  I'm on V&E.  And where do you want me?

17              MR. SIMONS:  June 18, 2018, and I apologize because

18    there's multiple entires.  Virtually every day has multiple

19    entries.  It's Mr. Yoo's entry on June 18, 2018.  Remember,

20    this is before the case is filed, this is before we have

21    anything from Walmart, this is us just trying to be thorough

22    and looking around.

23              THE COURT:  So this is one of the first -- it is

24    apparently the first entry on my V&E chart.

25              MR. SIMONS:  I'm not sure if it's very first, but

1    it's very early.  But we are there and trying to figure out

2    what Walmart's patent applications are before the case is

3    filed.  So this couldn't possibly be the Bohling application

4    because we -- the case hadn't been filed yet, we don't have any

5    production from Walmart, the application hasn't published.  We

6    were looking at lots of Walmart patents and patent applications

7    trying to figure out if there was anything out there that was

8    related to Zest.  This is us trying to do our due diligence.

9         THE COURT:  So in preparation of this hearing, what

10   application -- what was Wendy Wang looking at and making a

11   claim chart on?  What application was that?  The Bohling

12   application?

13        MR. SIMONS:  I don't know is my honest answer,

14   because Wendy Wang is not at our firm and so I don't have the

15   ability to get information from her.  I can't say 100 percent

16   which application that is.  I know that we were looking at lots

17   of Walmart patent applications as you can see from the very --

18   before we filed this case.  So it was not unusual for us to try

19   to do that and try to track.  I think we had sort of a system

20   of tracking and saying, all right, we need to track to the

21   patent office and see what comes out so we're on top of

22   anything that comes out of the patent office.

23        So we were doing that from before the case was filed and

24   continued to do that after and continued to do that all the way

25   up through the trial of the case.  I think we probably checked,

1   you know, and tried to make it as regular as possible as we

2   were going along to make sure that we knew what was happening.

3   So we were doing -- being diligent trying to make sure that we

4   were staying on top of everything that was coming out of the

5   patent office, making sure that we knew what was going on.  But

6   I think Mr. Hardt's -- I believe Mr. Hardt, I believe his

7   declaration, I believe that he was trying to be accurate

8   describing what he found in his search.

9         And we've tried to be as accurate as we can in describing

10  what we did at various stages of the case.  But I think that,

11  once again, if it's a question of knowledge --

12              THE COURT:  Let the record reflect that Mr. Landis

13  made an appearance, however quietly.

14              MR. SIMONS:  Your Honor, he brought something to my

15  attention.  There's somebody in the gallery, we're not quite

16  sure who it is.

17              THE COURT:  That's Judge Rudofsky's law clerk.  I

18  can vouch for his discretion.

19              MR. SIMONS:  My apologies.

20              THE COURT:  He knows not to speak of what we speak.

21              MR. SIMONS:  But if the question is knowledge of the

22  fact that a patent application existed, that's in our

23  complaint, so there's no question that we knew.

24              THE COURT:  The question is whether or not this

25  claim chart was comparing the Bohling application to trade

1    secrets.  And while it doesn't say that, that's what I'm going

2    to order you to produce so we can find out, since you didn't

3    look.  And there's only one way to answer that question and

4    that's to look at the claim chart and the comparison and

5    potentially the discussions about those and who was involved in

6    those discussions to determine whether or not this is an entry

7    similar to the 6/18/18 entries talking about analyzing

8    Walmart's patent applications, etc., and what was discussed

9    later in May of '19 in the entries that are in question.

10        And absent you being able to tell me the answer to that

11   question, I don't know any other way to figure that out because

12   it's important whether or not you're talking about some other

13   previous application or whatever, but I don't see it fitting

14   there.

15        MR. SIMONS:  I can't make that representation to the

16   Court today.

17        THE COURT:  Understood.  I'm not -- you're not

18   telling me one way or the other, you're just telling me you

19   don't know.

20        MR. SIMONS:  I searched for this and I did not find

21   a claim chart.  So that's why I can't make that representation

22   to the Court of what was in that chart.

23        THE COURT:  So if I tell you to produce that, you're

24   not going to be able to do that?

25        MR. SIMONS:  Your Honor, if you tell me to produce

```
 1   it, I will go and I will try and I will see if it exists
 2   somewhere else.  I've searched in our firm in all of the
 3   records that we have, which we have records from the whole case
 4   at our firm.  But we will -- if you order me to do something,
 5   I'm going to do my best to do it.
 6           THE COURT:  And I appreciate that part.  I'm not
 7   talking about whether or not -- and I think you've answered the
 8   question, that there's more looking to be done if I ask you to
 9   do it as opposed to I've already looked high and low and it
10   isn't there.
11           MR. SIMONS:  I haven't looked outside to see if,
12   outside of our firm, at Vinson & Elkins that might exist.
13           THE COURT:  Fair enough.
14           MR. SIMONS:  I want to be as accurate as I can in
15   terms of what we've done and what we haven't done.
16           THE COURT:  So is that really all you've got,
17   Mr. Landis, is somebody sitting in the courtroom?
18           MS. LANDIS:  I gave him more, Your Honor, he chose
19   not to use it.
20           THE COURT:  Anything else, Mr. Simons?
21           MR. SIMONS:  In terms of the Court's concerns, does
22   it matter if it's the provisional versus the nonprovisional
23   patent application?  Is that part of the Court's concern or no?
24           THE COURT:  Let me see if I can draw in the focus.
25   Any application or any information that something was about to
```

1    go to publication that it obtained Zest's trade secrets is what

2    we're talking about from any form or for any location.  The

3    notion that the patent office is about to publish something

4    that contains Zest's trade secrets and that y'all were aware of

5    that prior to publication is the matter.  That's what we're

6    talking about, because Walmart is saying that we could have

7    argued to the jury if we had known that they had known about

8    these things pre-publication, that they should have taken

9    reasonable steps to keep their secrets and didn't.

10       And in a nutshell, that's what I understand this whole

11   controversy to be, that they asked y'all when were you aware

12   that this information was about to go to publication and y'all

13   saw that it -- y'all compared it to your trade secrets and

14   didn't do anything about it, they could argue that to the jury.

15   And right now as I stand, there's still some outstanding

16   question in my mind what you were analyzing.  It's a small gap

17   in what I know and what I don't know, but absent some

18   information that somebody says no, that was not what we were

19   talking about, that's what it looks like.

20       So I don't know if that answers your question whether or

21   not it was provisional or whether or not it was an actual

22   application, but they've said that what they sent you was the

23   application, and it's a question of not whether or not you got

24   around to reading it prior to publication, if that helps you

25   understand what I understand.

1        MR. SIMONS:  It does.  Thank you, Your Honor.

2        MS. LANDIS:  Your Honor, may I make a full

3    appearance now?  I do have something to add to this that I

4    think will be helpful, Your Honor.

5        THE COURT:  I'm happy to hear from you, Mr. Landis.

6    My fault for encouraging you.

7        MS. LANDIS:  Your Honor, I think the reason

8    Mr. Simons asked this question is, there's no question in the

9    production we learned about the provisional application.  But

10   the provisional application would never publish.  The

11   provisional applications don't publish.  We would have no

12   reason to do anything along the lines of what's being asked of

13   us for a provisional application.  There's no record that

14   somehow the provisional application went to a nonprovisional

15   application.  When Mr. Hardt did his declaration -- this is the

16   part I can add, Your Honor.

17       I was the one that said to Mr. Hardt, how did we not know

18   earlier that there was a nonprovisional application, and that's

19   when we did the search that's referenced in that declaration

20   about trying to find it and the reference to the only document

21   that he found.  I do know the provisional application we knew

22   about, the provisional application has a body to it that is

23   virtually identical.  I think it's actually identical to the

24   nonprovisional application, but we would have no reason to

25   approach Walmart about a provisional application that we

1  certainly would have analyzed a provisional application to see

2  what Walmart was doing.

3       Now, I will not stand before the Court and say I know

4  what Ms. Wang's chart is, I don't.  I was not involved with

5  that chart.  But I do know this delineation between the

6  provisional and the nonprovisional, and at least from me in

7  this case, I had never seen a production of the nonprovisional

8  application till much, much later.  I do know that people knew

9  about the provisional.  And, again, that would never have

10 published.

11      THE COURT:  Depending on what you can come up with,

12 we may or may not have to depose Ms. Wang and others that were

13 doing that analysis, I don't know, but I'm going to take it a

14 step at a time.  And I appreciate your clarification on why

15 that would make a difference, but really the question is:  Was

16 anybody on your team aware that something was about to be

17 published and they didn't do anything about it?

18      MS. LANDIS:  Understood, Your Honor.  I just wanted

19 to make sure the record was clear as to I think a little bit of

20 why Mr. Hardt's declaration says what it says and what I

21 believe we knew at the time.

22      THE COURT:  I appreciate that, Mr. Landis.

23      You want to correct anything Mr. Landis said?

24      MR. SIMONS:  No, Your Honor.  I'll let Mr. Landis

25 speak for himself.  Thank you.

```
1           THE COURT:  Last word, Mr. Keville.
2           MR. KEVILLE:  Thank you, Your Honor.
3           MR. SIMONS:  One --
4           THE COURT:  Sure.  Continue.
5           MR. SIMONS:  If our knowledge is relevant, it seems
6    like it makes sense that what Walmart lawyers knew when they
7    produced the application would be relevant as well.  Maybe
8    that's a step down the road, but if they already knew the
9    significance of it and could have taken the action on their
10   own, there's no significance to us telling them to take action
11   that they already knew they could have taken.
12          THE COURT:  I think I follow your argument,
13   Mr. Simons, that they had an equal duty if they knew that this
14   information contained trade secrets to pull it back just like
15   you did, and again, that's a step down the road because I don't
16   even know exactly where we are right now.
17          MR. SIMONS:  Understood, Your Honor.  I just wanted
18   to raise that point.
19          THE COURT:  Okay.
20          MR. KEVILLE:  Thank you, Your Honor.  A couple of
21   points.  Number one, Mr. Landis just said certainly when
22   Mr. Hardt made his declaration, I talked to him, we knew about
23   the provisional application, but that didn't give us any
24   knowledge about the nonprovisional application or it would
25   publish.  What they actually said in their reply in support of
```

1    their motion for summary judgment was, quote, To Plaintiff's

2    counsel's knowledge, Walmart has never produced the provisional

3    or nonprovisional Walmart applications.  And Mr. Hardt's

4    declaration, which is cited, says exactly the same thing.

5         Mr. Landis just said I talked to him before this

6    declaration and certainly we knew about the provisional, but

7    didn't know about the nonprovisional, and that's completely

8    inconsistent with what they told the Court back at the time

9    this was all happening.  I will note two things on the

10   nonprovisional.  Our discovery that we've requested, Your

11   Honor, is very narrow, but it would cover the nonprovisional

12   and the provisional.  And the reason why that's relevant,

13   number one, is if there's a provisional application, you have a

14   year to file a nonprovisional.  And then patent applications

15   publish 18 months from the priority date.  So even having the

16   provisional, they would have knowledge that if this provisional

17   has been made into a nonprovisional, then it's going to have a

18   publication date somewhere around here, somewhere around

19   May 2019.

20        So certainly even just seeing the nonprovisional should

21   have triggered them to come and say there's an issue with the

22   trade secrets.  And I take great issue with Mr. Simons saying

23   based on this case, there is no way Walmart would have done

24   anything if we came to them and said the Bohling application is

25   about to publish and it has all our trade secrets.  Walmart was

1    faced with a 2 billion-dollar claim at that time.  And all it

2    had to do was tell the patent office either abandon it, but

3    they didn't even have to go that far.  They could say pull it

4    out of publication.  Right?

5         So it's such a simple step to avoid the drastic outcome

6    that we had here, so the idea that that never would have

7    happened doesn't matter, but certainly they should have at

8    least taken the step at a time frame when there's a great fight

9    over saying we don't know what your trade secrets are.  And

10   they're pointing to algorithms and the Eden product and they're

11   never saying anything about the Bohling application.  When was

12   the Bohling application published?  There were broad document

13   requests on things that Bohling was doing, Bohling's documents,

14   things related to Eden, patent applications.  No one at Walmart

15   could have known this is what they were ultimately going to

16   claim is what their trade secrets are because, at the time, it

17   was about Eden and it was about algorithms and it only became

18   the Bohling application much later.

19        Not cited in here, Your Honor, and important, is in the

20   later time entry records once you get past the publication

21   date, there's a lot of discussion about should we have a

22   proceeding at the patent office to say that we own this patent

23   application, that it's a derivation process that they were

24   considering going through.  It's pretty clear someone made a

25   choice at some point and said let's use this to make our trade

1    secret case.  And it's pretty clear when they're analyzing it
2    before it publishes that people are thinking about that, why we
3    need the discovery.
4         And that's why we've asked for very targeted discovery.
5    It's quite candidly somewhat amazing that in 16 days since we
6    filed this, or 17, Mr. Simons has not pulled those emails and
7    those claim charts or called Wendy Wang and said, hey, when you
8    were working on this, what were you charting, what were you --
9    and I think it's because they know.  But we need the documents
10   to show, Your Honor's exactly right, what they knew and when
11   they knew it, because it's completely central to this whole
12   case.
13        Mr. Simons said the legal question is.  The legal
14   question is what did Zest know and did they make a
15   representation to this court.  And what I've heard today is
16   it's pretty clear they did.  Even what Mr. Landis just said
17   proves it up.  Mr. Landis said, well, certainly we knew at the
18   time of Hardt's declaration about the provisional, but we
19   didn't know anything about the nonprovisional.  And their
20   document, Mr. Hardt's declaration, says the exact opposite.
21   And their reply, which is signed by Mr. Landis, Mr. Simons,
22   specifically says we never got the nonprovisional.  And now we
23   know that that was inaccurate.
24        So I think, Your Honor, we need the very targeted
25   discovery we asked for.  If it turns out like what it appears

1    to be Mr. Simons saying, hey, I searched for these last days

2    and I can't find that we have the claim chart, then I think we

3    will need short depositions maybe of Ms. Wang, but once we get

4    the emails and once we get the various versions of the claim

5    charts -- and that almost certainly has to come from both the

6    Vinson & Elkins side and from the Simons Williams side because

7    Mr. Simons has already said he looked and he can't find these

8    documents.  And so I would ask the Court for an order that we

9    get forensically preserved copies of the emails that we

10   requested and those claim charts.  And then we see where this

11   takes us.

12        Your Honor, if I hand this up, last thing I want to show

13   you, what I've just handed the Court is the nonprovisional

14   application as produced with the Walmart Bates numbers in

15   February 28.  You can see that it has Josh Bohling's name right

16   on page 1 and it has the filing date and the application

17   number.  But if you turn to page Walmart 115410, ten pages

18   in --

19             THE COURT:  54?

20             MR. KEVILLE:  5410.  About three lines down, Your

21   Honor, it says projected publication date, May 16th, 2019.  If

22   this is part of the documents they reviewed, I mean, you can do

23   the math.  You can look at the filing date and just calculate

24   out what's 18 months, but this document tells them when the

25   patent office is projecting it's going to publish this patent

1    application.  And it was in their possession in February of

2    2019, but we couldn't raise it at trial because Mr. Hardt said

3    they searched and it wasn't there.  And he said that under

4    oath.

5         The last thing I would say, Your Honor, is he said --

6    Mr. Simons said the application we used in the Bohling

7    deposition was the public version from the PTO website, and he

8    kind of implied that that was really what we were looking at.

9    Of course, that can't be what is referred to in these time

10   entries.  So certainly they could have, after it published,

11   printed out a copy from the patent office website, but the time

12   entries are pre-publication, so whenever they got the document

13   that they used in the depositions, it wasn't what's being

14   referred to in these time entries that talk about claim charts

15   because it wasn't published yet.  With that, if Your Honor has

16   any questions, I'm happy to answer.

17        THE COURT:  I don't, other than to get an

18   acknowledgment from the lawyers that there's really no dispute

19   about the legal standard I'm supposed to use.  Is that fair

20   that y'all all agree that I'm supposed to use the same legal

21   standard?  And I don't even get to some argument like last week

22   about whether or not it's strict scrutiny or some kind of weird

23   relief type deal.  I had a case last week.  Because I'm about

24   to read what I think my legal framework is and if either one of

25   you disagree with it, I'll give you a chance to circle back.

1    But my reading of the law is that I may, in my

2    discretion, allow a party to pursue post-judgment discovery

3    when the moving party can make a prima facie demonstration of

4    success on the merits or, alternatively, a colorable claim.

5    There's a couple of district courts within the Eighth Circuit

6    that I could cite, but I'll get back to that.  So Walmart must

7    make a prima facie determination of entitlement to relief from

8    the judgment under 60(b) either because of mistake,

9    inadvertence, surprise or excusable neglect, which I don't

10   really think applies.  And what they're wanting is for me to

11   couch this as newly discovered evidence that with reasonable

12   diligence could not have been discovered in time to move for a

13   new trial under 59(b).  Or fraud, misrepresentation, or

14   misconduct by the opposing party.  If I go into (3), to prevail

15   under Rule 60(b)(3), Walmart must show with clear and

16   convincing evidence that the opposing party engaged in a fraud

17   or misrepresentation that prevented the movant from fully and

18   fairly presenting their case.  And that's the *Atkinson* case.

19       So a person moving for relief must establish that the

20   evidence was discovered after the trial, which I'm making a

21   factual finding that it did, that due diligence was exercised

22   to discover the evidence, and Zest was specifically asked when

23   did you become aware of this.  (3), that the evidence is

24   material and not merely cumulative or impeaching.  And having

25   sat through the trial and understanding the import of this new

evidence, I'm making that finding.  And (4), that the evidence
is such that a new trial would probably produce a different
result.  Unless I'm dissuaded in what I already believe, I'm
making that finding as well.

The Eighth Circuit Court of Appeals has consistently held
that a motion pursuant to 60(b) requires that the moving party
establish exceptional circumstances to obtain the extraordinary
relief that this rule provides.  Little confused how the Comal
County, Texas case found its way in the Eighth Circuit, but I
digress, and I'm making that finding as well.

Mr. Simons, did I correctly state my standard of review,
so to speak, or do you want to cite something else I need to
consider?

MR. SIMONS:  Your Honor, I believe that the cases
that you've cited are similar to the cases that we cited in our
motion, so Rule 60 is the correct standard.

THE COURT:  Okay.  Mr. Keville, do you want to let
me know I'm off base and in the wrong rule or is that the law
that you understand?

MR. KEVILLE:  That is the law as I understand it,
Your Honor.

THE COURT:  I just wanted to get past that.  So
having said that, I'm going to order that Vinson & Elkins and
Williams, Simons & Landis preserve all their attorney documents
and emails related to this case in a forensically sound manner

1    so that all relevant metadata is preserved.  I'm going to

2    instruct Mr. Simons and his group that a targeted and narrowed

3    email production from both V&E and WSL or Vinson & Elkins, for

4    the custodians Wendy Wang, W-a-n-g, Matt Melancon,

5    M-e-l-a-n-c-o-n, and Jonathan Hardt, and Sarah Tishler for the

6    periods between February 28th of '19 and May 19th using the

7    four search terms that I'm about to go through even though five

8    are presented.

9        One for -- well, the search terms that are set forth in

10   paragraph Roman numeral III, paragraph 2, paragraphs A through

11   E on page 10 of Walmart's motion for leave to conduct

12   discovery.  Once that has been done, I'm going to ask that it

13   be produced to the Court for in camera review because I don't

14   know how broad that's going to go.  That's likely to delay your

15   time frame, Mr. Keville, but I want to see the cow before I let

16   it out of the barn.  So those are all to be produced to me and

17   I will determine and preserve a record on what I think is

18   relevant to this inquiry versus what might go beyond that which

19   I don't think is appropriate to turn over.  So y'all are going

20   to have to trust me on that one.

21       Mr. Simons, I am going to ask that you look outside, as

22   you put it, whatever that means, for the claim chart, and any

23   documents that are clearly used to make it, meaning if you can

24   determine based on the claim chart what application we're

25   talking about, then I need that produced.  So I'm asking you to

1    look everywhere you have to look, whether it's V & E or your

2    firm or otherwise for the various claim chart references in

3    paragraph 3 on page 10 and 11.  And they all have to do with

4    Wendy Wang's entry about the claim chart.

5                MR. SIMONS:  Understood, Your Honor.

6                MR. KEVILLE:  Your Honor, will the claim charts be

7    produced to us?  I don't think there's any risk that those

8    would have any disclosure beyond the relevant issue.

9                THE COURT:  I'm going to say probably, but if they

10   see something that's in there that they need to bring to my

11   attention, I'll deal with that.  That I can deal with pretty

12   quickly.  In light of this ruling, I'm going to stay further

13   execution and collection of the judgment.  Mr. Simons, I need

14   not only a fair but perhaps an optimistic projection on how

15   long you think it's going to take you to round this stuff up.

16               MR. SIMONS:  The honest answer is I'm not sure given

17   that some of this material is not within my direct control.  So

18   I think my --

19               THE COURT:  I guess today you can communicate to V &

20   E and your people not to destroy anything.

21               MR. SIMONS:  Absolutely.  I think it's a question of

22   how long it's going to take to get the emails, I think, you

23   know, figure out the procedure we're going to use to get them,

24   pull them.  So I don't want to make a projection and then

25   realize that I'm wildly off because some of these things are --

1    I'm going to have to deal with other people on.

2              THE COURT:  Let me ask you this.  It's Wednesday.

3    Can you get a projection to me by Friday?

4              MR. SIMONS:  Yes, Your Honor.

5              THE COURT:  Fair enough.  Then we'll make that a

6    goal.  I'm not sure if we freeze all the documents, what the

7    hurry is, but I don't want this to go on and on.

8         Anything else that anyone needs from me in way of

9    clarification or otherwise to go about their marching orders?

10             MR. KEVILLE:  Not from Walmart's side, Your Honor.

11             THE COURT:  I do not anticipate drafting an order on

12   this.  I guess I could just draft the final order on what's

13   being asked to be done and I can leave the legal aspect record

14   of it on the record.  Unless somebody wants me to write all

15   that out and put it in an order other than this is what I want.

16   And you're going to let me know as soon as you can when that

17   expected date is, then I'll just put it in there.  I'll do that

18   on Friday.  And you can move to extend that if you think you

19   need it.

20             MR. SIMONS:  Understood, Your Honor.  With one

21   question.  Our current response on the motion for attorneys'

22   fees is due on August 6th.  Is that something that we should

23   proceed with or wait until this is resolved?

24             THE COURT:  That motion will not be heard until this

25   is resolved.  Whether or not you want to get it out of the way

```
1   and file it or not, I don't care, because I've got to deal with
2   this before we deal with the rest of it.  And I'm not going to
3   read your response until we get this resolved.  And so I don't
4   want to say I don't care, but as to the deadline, I'm not -- if
5   you want an extension of that deadline, I'll be happy to grant
6   it.  And you can do that verbally.  You don't have to write
7   something out, and we just add to the rest of the stuff I'll
8   review later.
9            MR. SIMONS:  Sure, I think that makes sense given
10  we've got another trial Monday of next week.  So given the
11  other things that we're going to need to deal with here, I
12  think it makes sense to extend that until this is resolved.
13           THE COURT:  Even Mr. Keville's looking at a month
14  once production is had, and so take what time you need.
15           MR. SIMONS:  Maybe we can just say a week after this
16  is resolved.
17           THE COURT:  Suits me.
18           MR. KEVILLE:  No objection to that, Your Honor.  I
19  would expect that some of this will play into either a
20  supplement from us on the fees or not.  The only other thing I
21  would ask is if we have an order, or if not, just the
22  transcript portion of the order can be given to Vinson & Elkins
23  so it's clear exactly what is being ordered.
24       (Telephonic interruption.)
25           THE COURT:  What was that?
```

1          MR. MAGNUSON:  Excuse me, Your Honor.  I took you

2    off mute and I was trying to get the puppy not to eat

3    something.

4          THE COURT:  Thank you for clarifying the record on

5    that.  About to go off the record.  Anybody else got anything

6    to say?  No.  All right.  Well, I will try to get something

7    brief.  The only portion of the order is going to be the last

8    findings that I read and we can have that part transcribed and

9    see that Wendy Wang and Vinson & Elkins have some guidance.

10         MR. KEVILLE:  Thank you, Your Honor.

11         THE COURT:  We're off the record.

12      (Proceedings adjourned at 10:26 AM.)

13

14                    REPORTER'S CERTIFICATE

15     I certify that the foregoing is a correct transcript of

16   proceedings in the above-entitled matter.

17

18

19   /s/ Karen Dellinger, RMR, CRR, CCR
     -----------------------------------     Date: July 29, 2021
20   United States Court Reporter

21

22

23

24

25