

**Romaine Heart Quality Evaluation Reference Sheet**

**Evaluation by sections: Leaves, ribs/mid-section and stem**

*Section: Overall*

*Overall visual quality:*

1: Excellent, essentially no symptoms of deterioration, 2: Good, minor symptoms of deterioration, not objectionable, 3: Fair, deterioration evident, but not serious, limits salability; 4: Poor, serious deterioration, limits usability, 5: Extremely poor, not usable.

*Physical Damage:*

1: None, no symptoms of any physical injuries, 2: Slight, minor symptoms of physical injury which would not affect retail price, 3: Moderate, symptoms of physical injury are evident; retail price may be affected, 4: Severe, serious physical injuries, not marketable without trimming or substantial price reduction, 5: Extreme, unusable; no market value.  See example pictures below.






PLAINTIFF'S EXHIBIT 0373

EXHIBIT 373

WM00010280

*Defect Count (Discoloring):*

Total number of visible <u>discolored</u> defect areas (may include discolored defects from physical damage but should not include defects from physical damage with no discoloring). None, no noticeable discolored defect areas, 1 through 4: count of discolored defect areas, 5+: 5 or more discolored defect areas.





WM00010281

*Largest Defect Size (Discoloring):*

Size of largest <u>discolored</u> defect area (may include discolored defects from physical damage but should not include defects from physical damage with no discoloring) . None, no noticeable discolored defects, < 1 inch: discolored defect area size is less than 1 Inch, 1 to 4 inches: discolored defect area size is between 1 and 4 inches, > 4 inches: discolored defect area size is more than 4 inches..



WM00010282

*Section: Top Leaves*

*Wilting:*

Wilting of lettuce is assessed using a visual rating scale where; 1: None, field-fresh, no signs of shriveling, 2: Slight, minor signs of shriveling, not objectionable, 3: Moderate, shriveling evident, becoming objectionable, may impact sales, 4: Severe, definitely objectionable, will impact sales, 5: Extreme, wilted and dry, not acceptable under normal conditions.



WM00010283

*Leaf Discoloring/Decay:*

Leaf surface yellowing/browning and leaf edge yellowing/browning, may also appear as decay. Leaf surface and edge yellowing/browning of lettuce is assessed using a visual rating scale where; 1: None, no yellowing/browning; fresh color, 2: Slight, small brown or yellow spots on leaf or leaf edge, 3: Moderate yellowing/browning, or signs of decay 4: Severe yellowing/browning, or signs of decay 5: extreme yellowing/browning or decay.  See example pictures below.



WM00010284

*Section: Mid-section/Ribs*

*Rib Discoloring:*

Leaf and rib discoloration is assessed using a visual rating scale as shown in the pictures below. When there are multiple areas of discoloration, evaluate the area with the most discoloration (darkest), where; 1: None, no discoloring; fresh color, 2: Slight, slight rust/brown coloring, not noticeable unless looking for it, does not "catch your eye", 3: Moderate browning, easily noticed, "catches your eye", 4: severe browning, 5: extreme browning.



WM00010285

*Bruising:*

Plants which have been bruised to the extent that they are damaged will often show a reddish-brown discoloration or a water-soaked appearance in the bruised area. When there are multiple bruised areas, evaluate the area with the most discoloration (darkest), where; 1: None, no visible bruising, 2: Slight, transparent with little or no discoloration, not noticeable unless looking for it, does not "catch your eye", 3: Moderate discoloration or water-soaked appearance, easily noticed, "catches your eye", 4: Severe discoloration or water-soaked appearance, 5: Extreme bruising with dark discoloration or water-soaked appearance.



WM00010286

*Section: Stem*

*Stem Discoloring:*

Plants that have suffered some damage in the stem may present deterioration on that part of the plant. The cut from the field in the stem is an open wound in the plant and susceptible to deterioration and should be monitored. 1: None, no visible discoloring, 2: Slight discoloring noticeable, 3: Moderate, moderate discoloration and browning or water-soaked appearance 4: Severe, severe browning or water-soaked appearance, 5: Extreme, extreme bruising with dark browning and water-soaked appearance.



WM00010287

| | |
|---|---|
| **From:** | Gary Campisi |
| **To:** | Joshua Bohling; Aubree Rankin |
| **Sent:** | 1/8/2018 5:21:49 PM |
| **Subject:** | Strawberry Retention Sampling |
| **Attachments:** | Strawberry Retention Sampling Guidelines 2018.pptx |

.

**Gary J. Campisi <> Sr. Director, Quality Control**
Fresh Grocery Division
Office  479-273-6868   Cell 479-903-3525
gary.campisi@wal-mart.com

Walmart
702 SW 8th St.
Bentonville, AR 72716
Mail Stop #0265
**Save Money.  Live Better.**

PLAINTIFF'S
EXHIBIT

0377

exhibitsticker.com

EXHIBIT

depobook.com

377



WM00067070

## Strawberry Quality Evaluation

### First sample evaluation

> Initial strawberry inspection



- ✓ Carefully remove and count each strawberry from each clamshell

- ✓ Evaluate each strawberry according to the severity of the defects listed in the following slides.

- ✓ Orient any defective strawberries toward camera, and take overhead picture of all strawberries.



- ✓ If strawberries are acceptable/not at EOL (end of life), carefully return strawberries to clamshell and place into retention sampling bin.

- ✓ EOL (end of life) occurs when the percent of the number of berries in each clamshell exceeds the 15% total defect tolerance, including 8% for serious damage, including no more than 3% for decay.

2

WM00067071



WM00067072

## Strawberry Quality Evaluation/Inspection

### Daily strawberry evaluation until EOL (end of life)



> Additional pictures of defects are acceptable as necessary to tell the story of EOL.

> Only serious damage defects are scored/evaluated for EOL

> If the sample is not EOL (end of life), return the sample to the corresponding sampling bin.



> If the sample is at EOL (end of life), record your findings and dispose of the clamshell.

> EOL (end of life) occurs when the percent of the number of berries in each clamshell exceeds the 15% total defect tolerance, including 8% for serious damage, including no more than 3% for decay.

4

WM00067073

## Strawberry Quality Evaluation/Inspection

### *Strawberry Defects*

- ✓ **BRIGHTNESS**
- ✓ *BRUISES (C)*
- ✓ CALYXES/CORES (Q)
- ✓ COLOR (Q)
- ✓ *CONDITION OF CALYXES*
- ✓ DEVELOPMENT (Q)
- ✓ DIRT OR FOREIGN MATTER (Q)
- ✓ *DISCOLORATION (C)*

- ✓ FREEZING OR FROZEN BERRIES (C)
- ✓ HAIL, INSECT, BIRD, RODENT INJURY (Q OR C)
- ✓ *MOLD (C)*
- ✓ MOISTURE (Q OR C)
- ✓ *OVERRIPE/SOFT BERRIES (C)*
- ✓ SIMILAR VARIETAL CHARACTERISTICS (Q)
- ✓ *DECAY (C)*



Listed above are all of the potential strawberry defects.
However, for strawberry retention sampling we will only be
concerned with the <u>most common</u> defects causing EOL.
Those are the 6 defects listed above in bold text.

*The description of those defects is listed in the following
slides.*

5

WM00067074

## Strawberry Quality Evaluation/Inspection

### *Bruising*

- ✓ Berries that have indented areas from the top edges of the containers should not be scored as defects unless the skin is cut or the indented area is large enough to affect the appearance of the berry.

- ✓ If the appearance is affected, berries should be scored based on the general definition of damage or serious damage. They should be described as indented and/or cut areas occurring by edges of cups or baskets.



6

WM00067075

Strawberry Quality Evaluation/Inspection

*Scoring Defects*

- ✓ Bruising
  - ✓ Damage
  - ✓ Serious damage

*Scoreable or not scoreable bruising?*

*Damage* = 1/2" on a 1.5" strawberry

*Serious damage* = 3/4" on a 1.5" strawberry



7

WM00067076



8

WM00067077



Strawberry Quality Evaluation/Inspection

_Scoring Defects_

These are scored as *damage*

✓ Bruising

*Scoreable or not scoreable bruising?*

*Damage* = 1/2" on a 1.5" strawberry

*Serious damage* = 3/4" on a 1.5" strawberry

9

WM00067078



Strawberry Quality Evaluation/Inspection

*Scoring Defects*

These are scored as serious damage →

✓ Bruising

*Scoreable or not scoreable bruising?*

*Damage* = 1/2" on a 1.5" strawberry

*Serious damage* = 3/4" on a 1.5" strawberry

10

WM00067079



WM00067080



WM00067081



WM00067082

## Strawberry Quality Evaluation/Inspection

### *Overripe/soft*

- ✓ The requirement of all U.S. No. 1 grades for berries is "firm, not overripe."

- ✓ Overripe or soft berries mean dead ripe or soft berries necessitating immediate consumption.

- ✓ Such berries are generally dark red, dull in appearance, and watery, and are serious damage.

14

WM00067083



WM00067084



Strawberry QC Retention Sampling Guidelines

16

WM00067085

| From: | Gary Campisi |
|---|---|
| To: | Stephen Steel |
| CC: | Denise Sharpe |
| Sent: | 1/7/2018 4:54:14 PM |
| Subject: | Retention Sampling Procedure |
| Attachments: | Strawberry Retention Sampling Guidelines 2018.pptx |

I borrowed from the Zest retention sampling procedure and adjusted it to what our MVP will potentially be.  Let me know your thoughts.

**Gary J. Campisi <> Sr. Director, Quality Control**
Fresh Grocery Division
Office  479-273-6868   Cell 479-903-3525
gary.campisi@wal-mart.com

Walmart
702 SW 8th St.
Bentonville, AR 72716
Mail Stop #0265
**Save Money.  Live Better.**

PLAINTIFF'S
EXHIBIT

0382

EXHIBIT
382



**Strawberry Retention Sampling Guidelines**

**January 7, 2018**

1

WM00075212

## Strawberry Quality Evaluation

**First sample evaluation**

➢ **Initial strawberry inspection**

  ✓ Carefully remove and count each strawberry from each clamshell

  ✓ Evaluate each strawberry according to the severity of the defects listed in the following slides.

  ✓ Orient any defective strawberries toward camera, and take overhead picture of all strawberries.

  ✓ If strawberries are acceptable/not at EOL (end of life), carefully return strawberries to clamshell and place into retention sampling bin.

  ✓ EOL (end of life) occurs when the percent of the number of berries in each clamshell exceeds the 15% total defect tolerance, including 8% for serious damage, including no more than 3% for decay.





2

WM00075213



WM00075214

## Strawberry Quality Evaluation/Inspection

### Daily strawberry evaluation until EOL (end of life)

> Additional pictures of defects are acceptable as necessary to tell the story of EOL.

> Only serious damage defects are scored/evaluated for EOL

> If the sample is not EOL (end of life), return the sample to the corresponding sampling bin.

> If the sample is at EOL (end of life), record your findings and dispose of the clamshell.

> EOL (end of life) occurs when the percent of the number of berries in each clamshell exceeds the 15% total defect tolerance, including 8% for serious damage, including no more than 3% for decay.





4

WM00075215

## Strawberry Quality Evaluation/Inspection

### Strawberry Defects

- ✓ BRIGHTNESS
- ✓ *BRUISES (C)*
- ✓ CALYXES/CORES (Q)
- ✓ COLOR (Q)
- ✓ *CONDITION OF CALYXES*
- ✓ DEVELOPMENT (Q)
- ✓ DIRT OR FOREIGN MATTER (Q)
- ✓ *DISCOLORATION (C)*

- ✓ FREEZING OR FROZEN BERRIES (C)
- ✓ HAIL, INSECT, BIRD, RODENT INJURY (Q OR C)
- ✓ *MOLD (C)*
- ✓ MOISTURE (Q OR C)
- ✓ *OVERRIPE/SOFT BERRIES (C)*
- ✓ SIMILAR VARIETAL CHARACTERISTICS (Q)
- ✓ *DECAY (C)*



Listed above are all of the potential strawberry defects. However, for strawberry retention sampling we will only be concerned with the <u>most common</u> defects causing EOL. Those are the 6 defects listed above in bold text.

*The description of those defects is listed in the following slides.*

5

WM00075216

## Strawberry Quality Evaluation/Inspection

### *Bruising*

    ✓ Berries that have indented areas from the top edges of the containers should not be scored as defects unless the skin is cut or the indented area is large enough to affect the appearance of the berry.

    ✓ If the appearance is affected, berries should be scored based on the general definition of damage or serious damage. They should be described as indented and/or cut areas occurring by edges of cups or baskets.

6

WM00075217

## Strawberry Quality Evaluation/Inspection

### _Scoring Defects_

- ✓ Bruising
  - ✓ Damage
    - ✓ Serious damage

_Scoreable or not scoreable bruising?_

_Damage_ = 1/2" on a 1.5" strawberry

_Serious damage_ = 3/4" on a 1.5" strawberry



WM00075218



WM00075219



### Strawberry Quality Evaluation/Inspection

_**Scoring Defects**_

✓ Bruising

_**Scoreable or not scoreable bruising?**_

_**Damage**_ = 1/2" on a 1.5" strawberry

_**Serious damage**_ = 3/4" on a 1.5" strawberry

9

WM00075220



Strawberry Quality Evaluation/Inspection

*Scoring Defects*        These are scored as *serious damage* →

   ✓ Bruising

*Scoreable or not scoreable bruising?*

*Damage* = 1/2" on a 1.5" strawberry

*Serious damage* = 3/4" on a 1.5" strawberry

10

WM00075221



WM00075222



WM00075223



WM00075224

Strawberry Quality Evaluation/Inspection

*Overripe/soft*

- ✓ The requirement of all U.S. No. 1 grades for berries is "firm, not overripe."

- ✓ Overripe or soft berries mean dead ripe or soft berries necessitating immediate consumption.

- ✓ Such berries are generally dark red, dull in appearance, and watery, and are serious damage.

14

WM00075225



WM00075226

**Strawberry QC Retention Sampling Guidelines**



WM00075227

| From: | Stephen Steel |
|-------|---------------|
| To: | Aubree Rankin |
| Sent: | 6/14/2018 5:09:39 PM |
| Subject: | Retention Sampling Information |
| Attachments: | Strawberry Retention Sampling Guidelines 2018.pptx; Strawberry Evaluation Parameter ReferenceWM DC[1] (1).pdf |

Aubree,

PFA: A copy of the ppt that Gary put together, along with some information from our favorite vendor! Please try to use the information that Gary provided, if possible.

Best Regards
Steve

PLAINTIFF'S
EXHIBIT

0386

exhibitsticker.com

EXHIBIT
386
depobook.com

WM00129892



# Strawberry Retention Sampling Guidelines

January 7, 2018

WM00129893

## Strawberry Quality Evaluation

**First sample evaluation**

> Initial strawberry inspection



- ✓ Carefully remove and count each strawberry from each clamshell

- ✓ Evaluate each strawberry according to the severity of the defects listed in the following slides.

- ✓ Orient any defective strawberries toward camera, and take overhead picture of all strawberries.



- ✓ If strawberries are acceptable/not at EOL (end of life), carefully return strawberries to clamshell and place into retention sampling bin.

- ✓ EOL (end of life) occurs when the percent of the number of berries in each clamshell exceeds the 15% total defect tolerance, including 8% for serious damage, including no more than 3% for decay.

2

WM00129894



WM00129895

### Strawberry Quality Evaluation/Inspection

**Daily strawberry evaluation until EOL (end of life)**



> Additional pictures of defects are acceptable as necessary to tell the story of EOL.

> Only serious damage defects are scored/evaluated for EOL.

> If the sample is not EOL (end of life), return the sample to the corresponding sampling bin.



> If the sample is at EOL (end of life), record your findings and dispose of the clamshell.

> EOL (end of life) occurs when the percent of the number of berries in each clamshell exceeds the 15% total defect tolerance, including 8% for serious damage, including no more than 3% for decay.

4

## Strawberry Quality Evaluation/Inspection

### *Strawberry Defects*

- ✓ BRIGHTNESS
- ✓ *BRUISES (C)*
- ✓ CALYXES/CORES (Q)
- ✓ COLOR (Q)
- ✓ *CONDITION OF CALYXES*
- ✓ DEVELOPMENT (Q)
- ✓ DIRT OR FOREIGN MATTER (Q)
- ✓ *DISCOLORATION (C)*

- ✓ FREEZING OR FROZEN BERRIES (C)
- ✓ HAIL, INSECT, BIRD, RODENT INJURY (Q OR C)
- ✓ *MOLD (C)*
- ✓ MOISTURE (Q OR C)
- ✓ *OVERRIPE/SOFT BERRIES (C)*
- ✓ SIMILAR VARIETAL CHARACTERISTICS (Q)
- ✓ *DECAY (C)*



**Listed above are all of the potential strawberry defects. However, for strawberry retention sampling we will only be concerned with the most common defects causing EOL. Those are the 6 defects listed above in bold text.**

***The description of those defects is listed in the following slides.***

5

WM00129897

## Strawberry Quality Evaluation/Inspection

### *Bruising*

✓ Berries that have indented areas from the top edges of the containers should not be scored as defects unless the skin is cut or the indented area is large enough to affect the appearance of the berry.

✓ If the appearance is affected, berries should be scored based on the general definition of damage or serious damage. They should be described as indented and/or cut areas occurring by edges of cups or baskets.

6

WM00129898



Strawberry Quality Evaluation/Inspection

*Scoring Defects*

- ✓ Bruising
  - ✓ Damage
    - ✓ Serious damage

*Scoreable or not scoreable bruising?*

*Damage = 1/2" on a 1.5"* strawberry

*Serious damage = 3/4" on a 1.5"* strawberry

7

WM00129899



WM00129900



Strawberry Quality Evaluation/Inspection

_Scoring Defects_

✓ Bruising

**Scoreable or not scoreable bruising?**

**Damage** = 1/2" on a 1.5" strawberry

**Serious damage** = 3/4" on a 1.5" strawberry

These are scored as *damage*

9

WM00129901



WM00129902



WM00129903



WM00129904



WM00129905

## Strawberry Quality Evaluation/Inspection

### *Overripe/soft*

- ✓ The requirement of all U.S. No. 1 grades for berries is "firm, not overripe."

- ✓ Overripe or soft berries mean dead ripe or soft berries necessitating immediate consumption.

- ✓ Such berries are generally dark red, dull in appearance, and watery, and are serious damage.

14

WM00129906



WM00129907

## Strawberry QC Retention Sampling Guidelines



16

WM00129908



| | 5.0 Bright | 4.5 Less bright | 4.0 Slightly dull | 3.5 Moderately dull | 3.0 Dark red | <3.0 Severe dark |
|---|---|---|---|---|---|---|
| **Color** From lighter to darker. White shoulders disappear | Bright and glossy color, sometimes present shoulders and green tips | Color slightly less bright and less glossy than at harvest | Full red color that is less bright and less glossy than at harvest | Full red color that is less bright and less glossy than at harvest | Full red to dark red color with slight to moderate loss of brightness and glossiness | Very dark red color that is dull and not shiny |

| | 5.0 None | 4.5 Very Slight | 4.0 Slight | 3.5 Slight/moderate | 3.0 Moderate | <3.0 Severe wilting |
|---|---|---|---|---|---|---|
| **Calix Wilting** | Very fresh, stiff, no yellow/brown | Calix is green but slightly less stiff than at harvest | Calix is green but slightly less stiff than at harvest | Calix is less fresh and stiff than at harvest | Calix may appear to be dry and wilted | Calix appears to be wilted and dry, yellowish or brownish-green |

*Zest Labs Confidential*

WM00129909

WM00129910

| | 4.5 Very slight | 4.0 Slight | 3.5 Slight to Moderate | 3.0 Moderate | <3.0 Severe |
|---|---|---|---|---|---|
| **Bruising/Physical damage** Generally associated to the strawberry freshness but can happen at any time | Barely noticeable bruise/surface mechanical damage | Slight bruise surface /mechanical damage in one area | Slight/Moderate bruises/surface mechanical damage in one or two areas | Moderate bruise/surface mechanical damage located anywhere in the strawberry | General bruise/surface mechanical damage. Sometimes leaking |
| **Decay (Overall Quality)** General deterioration of the berry. When severe decay, leaking may appear. | Very fresh berry | Slightly less fresh, minor signs of decay | Signs of dry fruit may be noticeable | Isolated areas of dryness or shriveling, some fruit may also show some soft spots | Some fruit may appear leaky, overripe, and very soft |

*Zest Labs Confidential*



| | >3.0 Firm | 3.0 Moderately soft | <3.0 Watery soft |
|---|---|---|---|
| **Firmness** Directly associated with freshness | Firm surface of the berry, no sunken or soft areas | Moderately soft strawberry surface. Usually loss of glossiness | Severe loss of firmness, sunken and dry areas, soft skin in the majority of the berry. Skin sinks with slight finger pressure, watery, leaking. |

| | None | Mildew presence | |
|---|---|---|---|
| **Mildew** | No signs of mildew | Any mildew presence in berry surface | |

| QC parameter | Values |
|---|---|
| **Severe Defect count** | Number of strawberries that present any severe defect. If a strawberry has more than one severe defect, count it just once. 6 severe defects will end the life of the sample. NOT including color. |

*Zest Labs Confidential*

WM00129911

# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ZEST LABS, INC. f/k/a        ) PLAINTIFFS
INTELLEFLEX CORPORATION;     )
and ECOARK HOLDING, INC.     )
                             )
VS.                          ) No. 4:18-CV-500-JM
                             )
WALMART INC. f/k/a           )
WAL-MART STORES, INC.        ) DEFENDANT.


------------------------------------

HIGHLY CONFIDENTIAL

OUTSIDE COUNSEL ONLY

------------------------------------

------------------------------------

VIDEOTAPED DEPOSITION OF

AUBREE RANKIN

OCTOBER 18, 2019

------------------------------------


        VIDEOTAPED DEPOSITION OF AUBREE RANKIN, produced as
a witness at the instance of the Plaintiffs, and duly
sworn, was taken in the above-styled and numbered cause
on October 18, 2019, from 8:36 a.m. to 3:11 p.m., before
Crystal Garrison, Certified Court Reporter, in and for
the State of Arkansas, reported by machine shorthand, at
the law offices of Mitchell Williams, 4206 South JB Hunt
Drive, Suite 200, Rogers, Arkansas 72758, pursuant to
the Federal Rules of Civil Procedure.

Page 2

1                     A P P E A R A N C E S

2

3    ATTORNEYS FOR THE PLAINTIFFS:

4         MR. JONATHAN L. HARDT
          MR. ROBERT RHODES
5         Vinson & Elkins, LLP
          2801 Via Fortuna, Suite 100
6         Austin, Texas 78746-7568
          jhardt@velaw.com
7         rrhodes@velaw.com

8

9    ATTORNEYS FOR THE DEFENDANT:

10        MR. DAVID M. LAMB
          Skadden, Arps, Slate, Meagher & Flom, LLP
11        Four Times Square
          New York, New York 10036
12        212-735-3421
          david.lamb@skadden.com

13

14

     ALSO PRESENT:
15
          MR. ROBERT GEARHART, Walmart Inhouse Paralegal
16
          MS. BETHANY SCUTTI, Videographer
17
          MS. CRYSTAL GARRISON, Court Reporter
18

19

20

21

22

23

24

25

Page 3

1                          EXAMINATION INDEX

2                                                              PAGE

3    AUBREE RANKIN
          Examination by Mr. Hardt..........................6
4
     Changes and Signature..............................178
5
     Reporter's Certificate.............................180
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                        EXHIBIT INDEX

2    NO.    DESCRIPTION                                    PAGE

3    369    10/19/17 Aubree Rankin email, 1 page...........46

4    370    10/25/17 Anand Banik email, 3 pages............49

5    371    10/19/17 Stephen Steel email, 2 pages..........53

6    273    10/25/17 Anand Banik emails, 16 pages..........55

7    372    11/29/17 Stephen Steel email, 1 page...........59

8    373    Romaine Heart Quality Eval Sheet, 8 pages......61

9    374    Strawberry Eval Reference Guide, 18 pages......62

10   375    12/4/17 email from Denise Sharpe, 1 page.......70

11   376    12/4/17 email from Denise Sharpe, 1 page.......72

12   268    12/13/17 Stephen Steel email, 29 pages.........74

13   377    1/8/18 Campisi email, 17 pages.................80

14   378    1/10/18 email from Denise Sharpe, 2 pages......85

15   379    5/7/18 email from Denise Sharpe, 3 pages.......91

16   380    10/31/18 Steerco Final Draft, 23 pages........111

17   381    1/5/18 Eden Steerco slides, 23 pages..........115

18   382    1/7/18 Campisi email, 17 pages................131

19   383    10/25/17 Anand Banik emails, 4 pages..........133

20   384    USB SanDisk...................................141

21   385    LinkedIn page, 1 page.........................161

22   386    6/14/18 Stephen Steel email, 20 pages.........165

23   387    6/14/18 Stephen Steel email, 2 pages..........168

24   388    1/5/18 John Luna email, 1 page................172

25

Page 5

1         VIDEOGRAPHER:  We are on the record.  Today's date

2    is October 18th, 2019.  And the time is 8:36 a.m.  This

3    is the video-recorded deposition of Aubree Rankin in the

4    matter of Zest Lab, Inc., f/k/a Intelleflex Corporation

5    and EcoArk Holdings, Inc., versus Walmart, Inc., f/k/a

6    Wal-Mart Stores, Inc.  Case No. 418CV500JM in the U. S.

7    District Court Eastern District of Arkansas Western

8    Division.

9         This deposition is being held at the offices of

10   Mitchell, Williams, Selig, Gates & Woodyard, 4206 South

11   J. B. Hunt Drive, Rogers, Arkansas 72758.

12        The reporter's name is Crystal Garrison.  My name is

13   Bethany Scutti, I'm the legal videographer.  We are with

14   Bushman Court Reporting, scheduling department, on

15   behalf of Lexitas.

16        Would the attorneys present please introduce

17   themselves.

18        MR. HARDT:  Jonathan Hardt with Vinson & Elkins on

19   behalf of the plaintiffs.

20        MR. LAMB:  David Lamb of Skadden Arps on behalf of

21   the defendants and the witness.

22        VIDEOGRAPHER:  Will the court reporter please swear

23   the witness.

24                   AUBREE RANKIN,

25   having been first duly sworn, testified as follows:

Page 6

1                        EXAMINATION

2    QUESTIONS BY MR. HARDT:

3    Q.    Can you state your name for the record.

4    A.    Aubree Rankin.

5    Q.    Where do you currently live, Ms. Rankin?

6    A.    Rogers, Arkansas.

7    Q.    And what's your address?

8    A.    513 South Dodson Road, Apartment G8.

9    Q.    Have you ever been deposed before?

10   A.    No.

11   Q.    Okay.  Before we get into it in earnest, let me go

12   through a couple of ground rules just so you and I are

13   on the same page.  During the course of the day, I'm

14   going to be asking you questions and you're going to be

15   providing answers.

16        The court reporter is going to take down everything

17   we say.  So for that reason, it's important that we

18   don't speak over each other, like you might do in a

19   normal conversation; does that make sense?

20   A.    Yes.

21   Q.    Okay.  I also need verbal answers.  So, for example,

22   we might often just say -- nod the head or say uh-huh

23   for a yes or a no.  That's -- that's difficult for the

24   court reporter to take down.  So, we need to say yes or

25   no, if at any point an answer to one of my questions is

Page 7

1   yes or no.  Does that make sense?

2   A.   Yes.

3   Q.   Also, so that the transcript is clear, it's

4   important that you understand all my questions.  So, I'm

5   not trying to ask you any trick questions.  If at any

6   point today, you don't understand a question, just ask

7   me to clarify and we'll get that sorted out.  Does that

8   make sense?

9   A.   Yes.

10  Q.   And do you understand that if you don't ask me to

11  rephrase a question or tell me that you don't

12  understand, I will assume that the question is clear and

13  you understand it?

14  A.   Okay.

15  Q.   You understand that you're under oath today;

16  correct?

17  A.   Correct.

18  Q.   Have you had any alcohol or medications today that

19  would prevent you from telling the truth under oath?

20  A.   No.

21  Q.   Is there any other reason today why you can't give

22  complete and truthful testimony?

23  A.   No.

24  Q.   Now, throughout the course of the day, I may ask you

25  a question and your counsel may object.  He might say

Page 8

1    something, like objection form.  That's just lawyers

2    doing lawyer stuff.  So, if he does that, after he

3    lodges his objection, you can still answer.

4         The only time that's not the case is if he instructs

5    you not to answer.  Does that make sense?

6    A.    Yes.

7    Q.    Where do you currently work?

8    A.    Walmart.

9    Q.    What is your title at Walmart?

10   A.    Software Engineer II.

11   Q.    How long have you had that title?

12   A.    Two months.

13   Q.    When did you began working at Walmart?

14   A.    July 2017.

15   Q.    Near the end of that month; is that right?

16   A.    The beginning -- July 10th.

17   Q.    Okay.  What was your title when you started on July

18   10th, 2017?

19   A.    Programmer.

20   Q.    Between the time that you were a programmer in July

21   2017, and when you became a software engineer II, did

22   you have any other titles?

23   A.    Associate software engineer.

24   Q.    When did you become an associate software engineer?

25   A.    I don't remember the exact date.

Page 9

1   Q.   Did you have any other titles?

2   A.   No.

3   Q.   In your role at Walmart, you develop user interfaces

4   for applications that Walmart uses; right?

5   A.   Correct.

6   Q.   An application is something with which a user

7   interacts on a computer; right?

8   A.   On a mobile device, in my case.

9   Q.   So, am I correct to understand that you develop

10  applications for mobile devices?

11  A.   Correct.

12  Q.   Is a TC70 one such mobile device?

13  A.   Yes.

14  Q.   Have you developed applications for any other mobile

15  devices in your time at Walmart?

16  A.   Yes.

17  Q.   What other mobile devices?

18  A.   ET51.

19  Q.   Anything else?

20  A.   Not that I remember.

21  Q.   Do those devices run on an Android operating system?

22  A.   Yes.

23  Q.   You develop those -- let me strike that question.

24  When you're developing applications, you're developing

25  user interfaces for those applications; correct?

Page 10

1   A.    Correct.

2   Q.    Do you have any other development role in the

3   applications other than user interfaces?

4   A.    From time to time.

5   Q.    What would those be?

6   A.    I have occasionally worked on some of the back end.

7   Q.    When you develop the user interfaces, you use Java;

8   right?

9   A.    Cotland, currently.

10  Q.    Have you ever used Java?

11  A.    Briefly.

12  Q.    Have you used Java in developing user interfaces at

13  Walmart?

14  A.    Briefly.

15  Q.    For what user interfaces?

16  A.    A mobile camera.

17  Q.    You said occasionally -- strike that question.  Let

18  me make sure I get this right.  You said you have

19  occasionally worked on some of the back end for

20  applications.  But am I correct in understanding you're

21  not responsible at Walmart for programming the back-end

22  layer?

23  A.    Not usually.

24  Q.    You say not usually.  Are you ever responsible for

25  that?

Page 11

1   A.   There have been a few occasions.

2   Q.   What are those occasions?

3   A.   When a minor change needs to be made based on the

4   user interface.

5   Q.   So, on occasion, you may make a minor change on the

6   back-end layer; is that correct?

7   A.   (Nodding head.)

8   Q.   Can you say --

9   A.   Yes.

10  Q.   But you've never been responsible for designing the

11  entire back-end layer for any applications; correct?

12  A.   Correct.

13  Q.   And you've also never been responsible for

14  programming the entire back-end layer; correct?

15  A.   Correct.

16  Q.   And am I correct to understand that in addition to a

17  back-end layer many of these applications may also have

18  a back-end database that stores data that's drawn upon

19  by the application?

20       MR. LAMB:  Object to the form.

21  A.   I believe so.

22  Q.   (BY MR. HARDT)  You have never designed any of the

23  back-end databases that store data for the applications;

24  correct?

25       MR. LAMB:  Object to the form.

Page 12

1    A.    Correct.

2    Q.    (BY MR. HARDT)  And you've never programmed the code

3    that runs any of the back-end databases; correct?

4          MR. LAMB:  Object to the form.

5    A.    Will you repeat the question?

6    Q.    (BY MR. HARDT)  You've never been responsible for

7    running any of -- strike that.  You've never been

8    responsible for programming the code that runs the

9    back-end databases; correct?

10         MR. LAMB:  Same objection.

11   A.    No.

12   Q.    (BY MR. HARDT)  Are you proficient in programming in

13   the Go programming language?

14   A.    I'm not.

15   Q.    And Go programming language is sometimes called

16   Golang; is that correct?

17   A.    I believe so.

18   Q.    Are you proficient in programming in Node.js?

19   A.    No.

20   Q.    Are you proficient in programming in C++?

21   A.    Somewhat.

22   Q.    Have you ever done any programming at Walmart in

23   C++?

24   A.    No.

25   Q.    Did you ever study C++ when you were at the

Page 13

1   university?

2   A.    Yes.

3   Q.    So, you have some familiarity with C++ from your

4   university work; right?

5   A.    Correct.

6   Q.    But you've never done work in C++ at Walmart;

7   correct?

8   A.    Correct.

9   Q.    Throughout the course of the day, we're probably

10  going to talk about something at Walmart called the Eden

11  system; have you heard of the Eden system before?

12  A.    I have.

13  Q.    Outside of your work on the Eden system, have you

14  ever programmed any user interfaces at Walmart?

15  A.    I've not.

16  Q.    Outside of your work on the Eden system, have you

17  ever programmed any applications at Walmart?

18  A.    I've not.

19  Q.    Am I correct to understand in your time at Walmart,

20  you've been solely working on the Eden project?

21  A.    Correct.

22  Q.    During your work on the Eden project at Walmart,

23  have you ever worked with someone named Josh Bohling?

24  A.    I have.

25  Q.    Have you worked with Josh Bohling during the entire

Page 14

1    time that you've been involved in the Eden project?

2    A.    I have.

3    Q.    What's Mr. Bohling's role -- strike that.  What's

4    your understanding of Mr. Bohling's role as to the Eden

5    project?

6    A.    The -- our product owner.

7    Q.    Excuse me, can you say that again?

8    A.    Our product owner.

9    Q.    And what is a product owner at Walmart?

10   A.    To my understanding, the business liaison between

11   the developers and the business side.  He's also a

12   designer.

13   Q.    So your understanding is that part of Mr. Bohling's

14   role is to be a liaison between the developers and the

15   business side; is that correct?

16   A.    Correct.

17   Q.    And he's also a designer of the Eden system, in your

18   understanding?

19   A.    Of the user interfaces.

20   Q.    Have you ever worked with someone on the Eden system

21   named Craig Trudo?

22   A.    I have.

23   Q.    What's your understanding of Mr. Trudo's role with

24   regard to the Eden system?

25   A.    He's a software engineer.

Page 15

1    Q.   As a software engineer, is he responsible for

2    working on the user interfaces?

3    A.   Correct.

4    Q.   Do you understand Mr. Trudo to have worked on any

5    aspects of the Eden system other than the user

6    interfaces?

7    A.   To some degree.

8    Q.   What do you mean by to some degree?

9    A.   He helped begin the Eden team.

10   Q.   What do you mean by he helped begin the Eden team?

11   A.   He had the idea for our team.

12   Q.   And what do you mean by your team or -- strike that.

13   What do you mean by the idea for your team?

14   A.   He saw the business need and helped form the team.

15   Q.   Aside from recognizing the business team, has he

16   ever done any programming on the Eden system other than

17   with regard to the user interfaces?

18        MR. LAMB:   Objection.

19   A.   I don't know the extent.

20   Q.   (BY MR. HARDT)   What's your understanding of the

21   business theme for the Eden system?

22   A.   To assist the quality control.

23   Q.   What do you mean by quality control?

24   A.   The quality control team at Walmart.

25   Q.   Where does the quality control team at Walmart work?

Page 16

1    A.    Some of the distribution centers and some in the

2    home office.

3    Q.    Am I correct to understand that the individuals at

4    Walmart that work on the actual quality control of

5    products are working at the distribution centers?

6    A.    As far as I'm aware.

7    Q.    And members of that you referred to in the home

8    office would be the supervisors or managers; is that

9    correct?

10   A.    As far as I'm aware.

11   Q.    In your time working on the Eden project, have you

12   ever worked with someone named Chuck Tilmon?

13   A.    I have.

14   Q.    What's your understanding of Chuck Tilmon's role?

15   A.    He's the vice president of quality control.

16   Q.    Would you consider Mr. Tilmon to be one of the

17   managers in the home office involved in the quality

18   control process?

19   A.    I'm unsure of the completeness of his role.

20   Q.    But you do know that he's a vice president of

21   quality control; right?

22   A.    I do.

23   Q.    In your team on the Eden project, have you ever

24   worked for someone named Anand Banik?

25   A.    I have.

Page 17

1   Q.   Who is Anand Banik?

2   A.   I'm unsure of his title.

3   Q.   What's your understanding of his role in the Eden

4   project?

5   A.   He assisted in the Cold Chain back end.

6   Q.   What do you mean by the Cold Chain back end?

7   A.   The Cold Chain project that Walmart is completing.

8   Q.   Is Eden part of the Cold Chain project?

9   A.   To some degree.

10  Q.   What do you mean by to some degree?

11  A.   We have developed an application to assist.

12  Q.   What's the name of that application?

13  A.   Sizzle.

14  Q.   Has Sizzle had any other names?

15  A.   I don't -- no, not that I'm aware.

16  Q.   Is Sizzle the only application of the Eden system?

17  A.   It is not.

18  Q.   Are you aware of any other applications in the Eden

19  system?

20  A.   I am.

21  Q.   What are those other applications?

22  A.   Inspect, Almanac, Core, Ready, Retain.

23  Q.   Any others?

24  A.   Not that are currently developed, that I can

25  remember.

Page 18

1    Q.    What's your understanding -- let me start this a

2    different way.  Other than the Sizzle application that

3    you mentioned, have you had a role in designing any of

4    the other applications you've listed?

5    A.    What do you mean by designing?

6    Q.    Have you worked on any of the other applications

7    that you listed?

8    A.    I have.

9    Q.    Which applications have you worked on?

10   A.    Inspect, Retain, Ready; briefly, Almanac.

11   Q.    And you've also worked, obviously, on Sizzle; right?

12   A.    Correct.

13   Q.    Am I correct to understand that you've done no work

14   on Core?

15   A.    Very little.

16   Q.    What little work would you have done on Core?

17   A.    Minor updates that were needed from the UI.

18   Q.    So, to the extent you worked on Core, am I correct

19   to understand that it would just be UI work?

20   A.    Additions to the back end as a result of additions

21   to the UI.

22   Q.    So, all of the work would relate to the UI?

23   A.    Correct.

24   Q.    And just so the record's clear, when we talk about

25   UI, we mean User Interface; correct?

Page 19

1   A.   Correct.

2   Q.   What's your understanding of the purpose of the

3   Inspect application?

4   A.   To use when the quality control associates are

5   receiving the produce at the distribution centers.

6   Q.   Your work on the Inspect application would include

7   work on the user interface for Inspect; correct?

8   A.   Correct.

9   Q.   Other than projects related to the user inter --

10  user interface, have you done any work -- other work on

11  Inspect?

12  A.   Not that I recall.

13  Q.   You said you briefly worked on Almanac.  What's your

14  understanding of what the Almanac application is?

15  A.   It is where we enter the USDA and Walmart and Sam's

16  specifications.

17  Q.   And did your work on Almanac involve work on the UI?

18  A.   Briefly.

19  Q.   Other than the work related to the UI, have you ever

20  had any other projects related to Almanac?

21  A.   I've not.

22  Q.   And you said your work on Almanac was brief.  What

23  projects did you do for Almanac?

24  A.   I added a couple of things to the UI and worked on

25  testing.

Page 20

1   Q.   What did you add to the UI?

2   A.   I don't remember specifically.

3   Q.   Would that -- would those additions be documented

4   anywhere?

5   A.   I don't believe so.

6   Q.   If you wanted to figure out what work you did do to

7   the UI, how would you figure that out?

8   A.   Look at GitHub.

9   Q.   GitHub is the database for the source code; right?

10  A.   Correct.

11  Q.   You have access to the GitHub -- GitHub database?

12  A.   I do.

13  Q.   Do you leave programming notes on the code in GitHub

14  so you can track what projects you've worked on and

15  when?

16  A.   Sometimes.

17  Q.   And that would be in the code?

18  A.   It would be in the message that the code -- when the

19  code was committed.

20  Q.   You make a good point, I asked an unclear question.

21  In my experience, when we're programming, we may write

22  code and above the code, we also include programming

23  notes on the same document.  Is that consistent with

24  your understanding?

25  A.   Will you repeat the question?

Page 21

1   Q.   If I'm writing code for an application, in the

2   actual file that has the code, I may include brief

3   programming notes at the top to outline what the

4   following code may do, when I did it; informational

5   things like that.  Is that consistent with how your team

6   operates in the source code for Eden?

7   A.   Not often.

8   Q.   So, where would the notes be in the source code that

9   reflect what work's been done?

10      MR. LAMB:  Objection.

11  A.   There's often not notes in the code.

12  Q.   (BY MR. HARDT)  When you do leave notes, related to

13  what work and changes you've made, where would those be?

14  A.   In the commit messages when we are pushing our

15  changes up to GitHub.

16  Q.   And those commit messages would be stored in GitHub

17  as well; right?

18  A.   Correct.

19  Q.   You said you've done some work on the Ready

20  application; is that correct?

21  A.   Correct.

22  Q.   What's your understanding of the Ready application?

23  A.   To collect logs of the banana ripening room.

24      THE REPORTER:  Banana what?

25      THE WITNESS:  Ripening.

Page 22

1    Q.    (BY MR. HARDT)   Does the Ready application have any

2    purpose other than banana ripening?

3    A.    Not currently.

4    Q.    Are you aware of any plans for the Ready application

5    to serve any purpose other than banana ripening?

6    A.    Not the extent.

7    Q.    But you are aware of some plans?

8    A.    Yes.

9    Q.    What's your understanding of those plans?

10   A.    I'm not sure.

11   Q.    You're not sure of the details of those plans?

12   A.    Correct.

13   Q.    What's your high-level understanding of those plans?

14   A.    At some point, we will add to that.

15   Q.    What's your high-level understanding of what you

16   will add to the app at some point?

17   A.    More features that will encapsulate the

18   banana-ripening process.

19   Q.    Are you aware of any plans at Walmart to add to the

20   Ready application to include any functionality that's

21   unrelated to banana ripening?

22   A.    Not that I'm aware.

23   Q.    For your work on the Ready application, has it been

24   related to the user interface?

25   A.    Yes.

Page 23

1   Q.    Have you done any work on the Ready application that

2   is unrelated to the user interface?

3   A.    Not that I recall.

4   Q.    You mentioned you'd worked on the Retain

5   application; correct?

6   A.    Correct.

7   Q.    What's your understanding of what the Retain

8   application does?

9   A.    It tracks produce after it has been received at the

10  distribution centers.

11  Q.    What does it do to track produce?

12  A.    There's the cooler walk portion, where inspections

13  are done if something needs to be pulled, and there's

14  the retention sampling portion.

15  Q.    And I'm not sure we caught the first part of your

16  answer.  Did you say core walk or core log?

17  A.    Cooler.

18  Q.    And so, is your answer that one portion of the

19  Retain application is the cooler portion or is it the

20  cooler walk portion?

21  A.    The cooler walk portion.

22  Q.    Okay.  And how does the cooler walk portion of

23  Retain operate?

24  A.    When they are walking through the cooler, they are

25  -- they being the quality control associates -- are able

Page 24

1    to do an inspection on produce or pull produce if it is

2    past its expiration date.

3    Q.    If the QC associates do an inspection as part of

4    this cooler-walk process, would that inspection be done

5    in Retain or would the inspection be done in the Inspect

6    application?

7    A.    It would be in the Retain.

8    Q.    So, the Retain app -- the Retain application has its

9    own inspection process; is that correct?

10   A.    Correct.

11   Q.    Is that inspection process for anything other than

12   the cooler walk?

13   A.    It is the same as used in retention sampling and

14   Inspect.

15   Q.    The second portion of the Retain application you

16   mentioned is retention sampling; is that right?

17   A.    That is correct.

18   Q.    What do you mean by retention sampling?

19   A.    After produce is received, some of it is set aside

20   and inspections are done daily on it until it is done.

21   Q.    And is there a user interface for that portion of

22   the Retain application?

23   A.    There is.

24   Q.    What do you call that user interface?

25   A.    I'm not sure what you mean.

Page 25

1    Q.    For the UI involved in retention sampling, would you

2    just call that part of Retain?

3    A.    Yes.

4    Q.    And you said some of the produce is set aside for

5    the retention-sampling process; did I understand that

6    right?

7    A.    Yes.

8    Q.    Do the QC associates set that aside?

9    A.    They do.

10   Q.    So, I want to walk through this process and make

11   sure I understand it.  Is it the case that the QC

12   associate when a truck of produce comes in, they would

13   -- using the Retain application, they would select a

14   portion for the retention sampling?

15         MR. LAMB:   Objection.

16   A.    Sometimes.

17   Q.    (BY MR. HARDT)  When would they not do that?

18   A.    If it's some produce that's not been specified for

19   retention sampling.

20   Q.    So, there's many types of produce; right?

21   A.    Correct.

22   Q.    Could be all the way from carrots to apples,

23   blueberries, you name it; right?

24   A.    Right.

25   Q.    If I understand you right, some of -- some types of

Page 26

1    produce would be -- would be appropriate for retention

2    sampling under the current usage of the application; is

3    that right?

4    A.    May you rephrase the question?

5    Q.    Sure.  The retention sampling app is currently set

6    up to do retention sampling with some types of produce;

7    right?

8    A.    Almost all.

9    Q.    Almost all?  Which types of produce does it not do

10   retention sampling with right now?

11   A.    I'm unaware.

12   Q.    So, it's possible that there's some type of produce

13   out there that you don't do retention sampling with, but

14   you're not aware of which ones that would be; right?

15   A.    Correct.

16   Q.    So, it would do -- you could do retention sampling

17   currently with strawberries, for example; right?

18   A.    I believe so.

19   Q.    You could do retention sampling currently with

20   cucumbers; right?

21   A.    As far as I'm aware.

22   Q.    Okay.  And of all the types of produce at Walmart

23   that you're aware of coming into the DCs you're not --

24   you can't currently recall any that you could not do

25   retention sampling with; right?

Page 27

1    A.    Correct.

2    Q.    So, for the types of produce that you can do

3    retention sampling with, am I correct to understand that

4    when the truck comes in with the produce, the QC

5    associates would set some of that aside to do retention

6    samples using the Retain application; is that right?

7    A.    That is correct.

8    Q.    And when they set that aside, do they store the

9    samples at different temperature?

10         MR. LAMB:   Objection.

11   A.    I'm unsure.

12   Q.    (BY MR. HARDT)  Do they take some samples and store

13   it at, for example, 2 degrees celsius and others store

14   it at 10 degrees celsius?

15   A.    I'm unsure.

16         MR. LAMB:   Objection.

17   Q.    (BY MR. HARDT)  So, they may do that, you just don't

18   know one way or the other; right?

19   A.    Correct.

20   Q.    And when they -- after they set aside the produce

21   for the retention sampling process, do they then watch

22   that produce over time?

23         MR. LAMB:   Objection.

24   A.    As far as I'm aware.

25   Q.    (BY MR. HARDT)  Is that a yes?

Rankin, Aubree 10/18/2019                         Zest Labs v. Walmart

Page 28

1         MR. LAMB:  Objection.

2    A.   As far as I'm aware, yes.

3    Q.   (BY MR. HARDT)  So, as far as you're aware, they

4    would set it aside during the retention-sampling process

5    and watch it over time; right?

6    A.   I believe so.

7    Q.   And over time, they would inspect that produce that

8    they've set aside for the retention-sampling process;

9    right?

10   A.   Yes.

11   Q.   And those inspections would be done in the retention

12   sampling-application; right?

13   A.   What do you mean by retention-sampling application?

14   Q.   A portion of the Retain application is for retention

15   sampling; right?

16   A.   That is correct.

17   Q.   So, for that portion of the Retain application that

18   it relates to retention sampling, that is what they

19   would currently use to inspect the produce that's been

20   set aside for retention sampling; right?

21   A.   That is correct.

22   Q.   And they would also use that same application to

23   track when the produce that they've set aside for

24   retention sampling has reached the end of life; correct?

25         MR. LAMB:  Objection.

Page 29

1    A.    What do you mean by end of life?

2    Q.    (BY MR. HARDT)   When the produce has reached the

3    point where it is no longer a salable product for

4    Walmart, would that be tracked in the retention

5    sampling-application?

6    A.    That would.

7    Q.    And I suppose, as a result of that retention

8    sampling-process, some data is generated by the

9    application; right?

10   A.    Yes.

11   Q.    Do you have a name for the data that comes out of

12   the retention sampling-application?

13   A.    Not that I'm aware.

14   Q.    Would just call it -- just so we have a label for

15   it, would you just call it retention-sampling data?

16   A.    Yeah.

17   Q.    Okay.  Do you call it anything else in the ordinary

18   course of business?

19   A.    Not that I recall.

20   Q.    So, after the retention sampling-data is collected,

21   how does Eden use that data?

22   A.    I'm --

23          MR. LAMB:   Objection.

24   A.    I'm unaware.

25   Q.    (BY MR. HARDT)   Where is the retention sampling-data

Page 30

1    stored?

2    A.    I'm not for sure.

3    Q.    Is it stored somewhere in an Eden database?

4          MR. LAMB:    Objection.

5    A.    I believe so.

6    Q.    (BY MR. HARDT)    Do you know what the name of that

7    Eden database would be?

8    A.    I'm unaware.

9    Q.    Are you aware if there's a database for storing the

10   data for retention sampling?

11   A.    May you rephrase the question?

12   Q.    Are you aware of any database for storing

13   retention-sampling data?

14   A.    Yes.

15   Q.    Does that database have a name?

16   A.    Not that I'm aware.

17   Q.    If you were talking to Mr. Bohling about that

18   database, what would you call it?

19   A.    Retention-sampling data.

20   Q.    Is that retention-sampling data used to refine the

21   Inspect application?

22         MR. LAMB:    Objection.

23   A.    What do you mean by refine?

24   Q.    (BY MR. HARDT)    The Inspect application has a list

25   of inspection criteria that it uses; right?

Page 31

1    A.    What do you mean by inspection criteria?

2    Q.    Have you never heard the term inspection criteria at

3    Walmart?

4    A.    Not that I recall, no.

5    Q.    You understand that the inspection application

6    allows QC associates to run an inspection; correct?

7    A.    Correct.

8    Q.    And the QC associates, when running that

9    application, are asked a series of questions relating to

10   the inspection; correct?

11   A.    To some degree.

12   Q.    The QC associates are also allowed to input certain

13   data points related to the inspection into the

14   application; right?

15   A.    Correct.

16   Q.    Some of those data points might be things like, the

17   color of the produce; right?

18   A.    I'm unaware.

19   Q.    Some of the things might be related to the quality

20   of the produce; right?

21   A.    Yes.

22   Q.    And there's a number of criteria used to assess

23   quality; right?

24   A.    Yes.

25   Q.    Just so that we're talking about the same thing,

Page 32

1    what are some of those criteria?

2    A.    Defects.

3    Q.    And what would a defect be?

4    A.    Something that's wrong with the fruit.

5    Q.    It could be that maybe the fruit had mold on it;

6    right?

7    A.    Correct.

8    Q.    That would be one type of defect?

9    A.    Correct.

10   Q.    Maybe the fruit has damage on it from handling, that

11   would be another type of defect; right?

12   A.    I'm unsure.

13   Q.    Other than mold, what other defects are you aware

14   of?

15   A.    I don't remember specifics.

16   Q.    Would decay be one of them?

17   A.    I believe so.

18   Q.    For produce, like a strawberry, would firmness be

19   one of them?

20   A.    I'm unaware.

21   Q.    So, this is not supposed to be a memory test.  So, I

22   understand you can't recall all of them.  But, whatever

23   the list is, there's some list of defects that the

24   inspection application uses; right?

25   A.    Correct.

Page 33

1   Q.   Is the retention-sampling data that's collected in

2   the Retain application used to inform or determine the

3   list of defects that the Inspect application will use?

4        MR. LAMB:  Objection.

5   A.   Not that I'm aware.

6   Q.   (BY MR. HARDT)  You just don't know one way or the

7   other; right?

8   A.   Correct.

9   Q.   Are you aware of any process at Walmart in which

10  samples of produce are taken and stored at different

11  temperatures?

12  A.   Not that I'm aware.

13  Q.   You mentioned the Sizzle application earlier.  What

14  is the Sizzle application?

15  A.   It's a POC application that contains many different

16  tests.

17  Q.   What do you mean by POC application?

18  A.   Proof of Concept.

19  Q.   So, we'll get into the documents in a little bit.

20  But I've seen some e-mails between you and Josh Bohling

21  and others talking about the retention sampling in

22  Sizzle.  Is there a unique retention-sampling process in

23  Sizzle from Retain?

24       MR. LAMB:  Objection.

25  A.   May you rephrase the question?

Rankin, Aubree 10/18/2019                              Zest Labs v. Walmart

Page 34

1    Q.    (BY MR. HARDT)    Is there a retention

2    sampling-application in Sizzle that is different from

3    the retention sampling in Retain?

4    A.    Yes.

5    Q.    What do you call the retention-sampling application

6    in Sizzle?

7    A.    Retention sampling.

8    Q.    And you would also call it retention sampling for

9    that portion of Retain; right?

10   A.    Yes.

11   Q.    So, you would just call it the same label?

12   A.    Yes.

13   Q.    But if I understand your testimony, those two

14   retention-sampling applications are different; right?

15   A.    Yes.

16   Q.    How do they differ?

17   A.    In Sizzle, it was more of a test.

18   Q.    When did you create that test?

19         MR. LAMB:    Objection.

20   A.    I don't remember the exact dates.

21   Q.    (BY MR. HARDT)    Would it be in early 2018?

22   A.    I believe.

23   Q.    And the retention sampling portion of the Retain

24   application, do you not consider that a test?

25   A.    I don't believe so.

Rankin, Aubree 10/18/2019                    Zest Labs v. Walmart

Page 35

1    Q.    Do you consider that a fully-deployed application at

2    this point?

3          MR. LAMB:   Objection.

4    A.    What do you mean by fully deployed?

5    Q.    (BY MR. HARDT)   Is the retention sampling portion of

6    the Retain application currently in use at DCs in the

7    United States?

8    A.    Yes.

9    Q.    How many DCs?

10   A.    I'm unaware.

11   Q.    Are you aware of any grocery distribution centers

12   that are not using the Retain application at this point?

13   A.    I'm unsure.

14   Q.    You just don't know one way or the other?

15   A.    Correct.

16   Q.    Do you know if there's more than one?

17   A.    Yes.

18   Q.    Do you know that it's more than 10?

19   A.    I'm unsure.

20   Q.    You just don't know one way or the other?

21   A.    Correct.

22   Q.    Are you aware of any distribution centers outside of

23   the US that currently use the Retain application?

24   A.    Not that I'm aware.

25   Q.    You haven't heard about a distribution center in

Page 36

1   Mexico using Retain?

2   A.   I don't believe so.

3   Q.   You don't believe you've heard that?

4   A.   I don't believe I've heard that.

5   Q.   So, for the retention sampling aspects of the Retain

6   application, when did those begin being used in

7   distribution centers?

8   A.   I'm unsure of the dates.

9   Q.   Would it be 2018?

10  A.   I don't believe so.

11  Q.   Would it be 2019?

12  A.   I believe so.

13  Q.   Would it be early 2019?

14  A.   I believe so.

15  Q.   Did you do any training of QC associates when you

16  deployed the retention -- retention sampling aspects of

17  Retain?

18       MR. LAMB:   Objection.

19  A.   What do you mean training?

20  Q.   (BY MR. HARDT)  Did you -- I've seen some training

21  videos, for example, that I believe you were involved

22  in.  Did you also go to any distribution centers and

23  train any QC associates on retention sampling?

24  A.   What do you mean by retention sampling?

25  Q.   The retention -- any retention sampling, like we've

Page 37

1   been talking about?

2   A.    Yes.

3   Q.    When did you do that training?

4   A.    June 2017 -- or 2018, I'm sorry.

5   Q.    Would that be training in North Dakota?

6   A.    Yes.

7   Q.    And another training in Minnesota?

8   A.    Yes.

9   Q.    For that retention-sampling training that you did in

10  June 2018, was that for retention sampling in Sizzle or

11  retention sampling in Retain?

12  A.    Sizzle.

13  Q.    Other than the June 2018 trainings, have you ever

14  done any other trainings at a distribution center for

15  retention sampling?

16  A.    I have not.

17  Q.    Have you ever travelled to any other distribution

18  centers, other than the ones in June 2018?

19  A.    Yes.

20  Q.    When?

21  A.    I don't remember the dates.

22  Q.    What year was it?

23  A.    2017, 2018, 2019.

24  Q.    So, it'd be -- am I correct in understanding:  Every

25  year you've been at Walmart, you've traveled to

Page 38

1    distribution centers; right?

2    A.    That is correct.

3    Q.    And you already mentioned the June 2018 training

4    that you did.   In 2018, did you travel to DCs for any

5    other purpose?

6    A.    I did.

7    Q.    What purpose was that?

8    A.    I don't recall the specific purposes.

9    Q.    It would have been related to Eden; right?

10   A.    Most -- most of the time, yes.

11   Q.    Do you recall any instances where you traveled to a

12   DC and it was not related to Eden?

13   A.    Yes.

14   Q.    What were those instances?

15   A.    To tour the distribution center.

16   Q.    Why were you touring the distribution center?

17   A.    I hadn't seen all of the different processes there.

18   Q.    And what were the processes that you saw?

19   A.    I don't recall the specifics.

20   Q.    Was it things, like the QC intake?

21   A.    I don't recall if I saw that or not.

22   Q.    Would you have used the information you learned on

23   those tours of the DCs for background when you were

24   doing your work in Eden?

25         MR. LAMB:   Object to the form.

Page 39

1    A.    May you rephrase the question?

2    Q.    (BY MR. HARDT)  After you toured the DCs, did you

3    use the information you learned for the purpose of your

4    work on Eden?

5    A.    Not that I recall.

6    Q.    (BY MR. HARDT)  So, why did you tour the DCs?

7    A.    To gain more knowledge of the distribution centers.

8    Q.    And how did you use that knowledge in your work?

9          MR. LAMB:  Object to the form.

10   A.    I'm unsure.

11   Q.    (BY MR. HARDT)  Was it just a general orientation

12   tour?

13   A.    No.

14   Q.    Who did you tour with?

15   A.    People in my area of work.

16   Q.    Was Josh Bohling there?

17   A.    He was not.

18   Q.    Was Craig Trudo there?

19   A.    No.

20   Q.    Who was there?

21   A.    I don't remember specific -- all the specifics.  But

22   Arlin, Coleson, Anand Banik, Stephen Steel, and I don't

23   remember.

24   Q.    And Anand Banik worked with you on the Eden project;

25   right?

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 40

1    A.    What do you mean by the Eden project.

2    Q.    You worked with Anand Banik with regard to retention

3    sampling on Eden; right?

4    A.    Yes.

5    Q.    And you worked with Stephen Steel with regard to

6    retention sampling in Eden; right?

7    A.    Yes.

8    Q.    And they were both on your tour -- they were both

9    joining you when you toured the DCs; right?

10   A.    Yes.

11   Q.    Okay.  In total between your -- your visits to the

12   DCs in '17, '18, and '19, how many times have you

13   visited distribution centers?

14   A.    I don't recall a specific number.

15   Q.    More than 20?

16   A.    I don't believe so.

17   Q.    More than 10?

18   A.    I'm unsure.

19   Q.    How many times a year do you go to DCs?

20   A.    It depends.

21   Q.    How many have you gone to in 2019?

22   A.    At least three.

23   Q.    Were those three separate trips or all one trip?

24   A.    Three separate trips.

25   Q.    On each trip, would you just go to one DC or would

Rankin, Aubree 10/18/2019                              Zest Labs v. Walmart

Page 41

1   you visit multiples?

2   A.    Just one.

3   Q.    Which ones did you visit in 2019?

4   A.    Bartlesville, Sterling, and I don't recall the

5   others.

6   Q.    Do you remember what state the other one was in?

7   What state of the country the other one was in?

8   A.    I don't recall.  I've been to both of those more

9   than once, so.

10  Q.    Okay.  What was the purpose of your visit to the

11  Bartlesville DC?

12  A.    To pilot the Ready application.

13  Q.    The which application?

14  A.    Ready.

15  Q.    Was your 2019 trip to Bartlesville related to any

16  other application in Eden?

17  A.    Inspect was taught.

18  Q.    So, you also gave trainings on Inspect?

19  A.    I personally did not.

20  Q.    But you know that on that trip, training to QC

21  associates for Inspect was conducted?

22  A.    On the desktop version of it.

23  Q.    And from a functionality standpoint, the desktop

24  version and the mobile version are the same; right?

25  A.    No.

Page 42

1    Q.    Does the inspection reporting differ at all between

2    the desktop version of Inspect and the mobile version of

3    Inspect?

4    A.    What do you mean by inspection reporting?

5    Q.    Inspect includes an inspect application; right?

6    A.    Yes.

7    Q.    And we talked about earlier that that includes

8    tracking things, like defects of the produce; right?

9    A.    Yes.

10   Q.    You could track those defects in the mobile

11   application for Inspect; right?

12   A.    Yes.

13   Q.    You could also track those defects in the desktop

14   version of Inspect; right?

15   A.    As far as I know.

16   Q.    Okay.  So, your 2019 trip to Bartlesville, you went

17   there for piloting of the Ready application; right?

18   A.    Yes.

19   Q.    You may not have been involved, but someone was

20   doing Inspect training on the desktop application;

21   right?

22   A.    Correct.

23   Q.    What else related to Eden was happening on that

24   trip?

25   A.    I'm unaware.

Page 43

1    Q.    At the time of that trip, were they already using

2    retention sampling at Bartlesville?

3    A.    Not that I'm aware.

4    Q.    When you travelled to Sterling in 2019, what was the

5    purpose of that trip?

6    A.    The first one was to learn about the banana-ripening

7    room process; the second was to pilot Ready and

8    Retain -- the cooler walk version of Retain.

9    Q.    And when you piloted Retain at the Sterling

10   distribution center, were they already using the

11   retention-sampling app -- portion of the Retain

12   application?

13   A.    I believe so.

14   Q.    And so, when you piloted the cooler walk portion of

15   the Retain application, that was in addition to the

16   retention sampling they were already doing; right?

17   A.    I believe so.

18   Q.    Okay.  And you said the first trip was to learn

19   about the banana-ripening room and the second trip was

20   for the pilot -- and did I understand that right, that

21   you -- that there were two separate trips?

22   A.    That is correct.

23   Q.    Okay.  So, is it your recollection, then, in 2019,

24   you went to 3 distribution centers, which would be

25   Bartlesville once and Sterling twice?

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 44

1   A.   As far as I recall, yes.

2   Q.   We been going about an hour, why don't we take a

3   break?

4   A.   Okay.

5   Q.   And just -- I'll say this on record before we break:

6   This is not an endurance test, so if at any point, even

7   if we've only been going half an hour, you need a break

8   or anything, just tell me and we'll finish a question

9   and then we can take a break.

10  A.   Okay.  Thank you.

11       VIDEOGRAPHER:  Going off the record, the time is

12  9:32 a.m.  This ends Media 1.

13                    (Brief recess.)

14       VIDEOGRAPHER:  Going back on the record.  The time

15  is 9:41 a.m.  This begins Media 2.

16  Q.   (BY MR. HARDT)  Ms. Rankin, when you started at

17  Walmart in July of 2017, you had recently graduated

18  college; right?

19  A.   That is correct.

20  Q.   Was this your first job out of college?

21  A.   Yes.

22  Q.   When you came on to the Eden team at Walmart, was

23  that pretty immediate?

24  A.   Yes.

25  Q.   Okay.  Was that your first project at Walmart?

Page 45

1    A.    Yes.

2    Q.    When you came on to the Eden team, you had no prior

3    experience with retention sampling of produce; right?

4    A.    Correct.

5    Q.    And you had no college course work in agriculture?

6    A.    No.

7    Q.    No college course work in product -- produce quality

8    assessment?

9    A.    No.

10   Q.    No prior experience with quality control for

11   produce; right?

12   A.    Correct.

13   Q.    And you've never studied agronomy; right?

14   A.    I'm not sure what you mean.

15   Q.    So, I think that's probably a yes; right?

16   A.    Correct.

17   Q.    And likewise, you've never studied horticulture;

18   right?

19   A.    What was that?

20   Q.    Horticulture?

21   A.    Not that I'm aware of.

22   Q.    Plant sciences, in general?

23   A.    Not that I'm aware of.

24   Q.    Do you think you ever studied them and you've just

25   forgotten or have you not studied them?

Page 46

1    A.    Biology, that's about it.

2    Q.    So, basic biology class?

3    A.    Correct.

4    Q.    But you've never had any plant sciences course work;

5    right?

6    A.    Correct.

7    Q.    Now, between the time you started at Walmart and the

8    time you started on the Eden retention-sampling project,

9    you did not have any documents from that period

10   regarding retention sampling; right?

11   A.    Not that I'm aware.

12   Q.    And when you did start on the retention-sampling

13   project Walmart did not have a standard set of documents

14   on how to do retention sampling; right?

15   A.    I'm not sure.

16   Q.    You're not aware; right?

17   A.    I'm not aware.

18   Q.    And if they did exist, you wouldn't have seen them;

19   right?

20   A.    I don't believe so.

21         (Exhibit No. 369 marked for identification. )

22   Q.    (BY MR. HARDT)  I'm going to hand you what's been

23   marked as Plaintiff's Exhibit 369.  This documents bears

24   the Bates No. WM00131200.  This is a October 19th, 2017

25   e-mail from Aubree Rankin to Stephen Steel.  The subject

Page 47

1    line:  Cold Chain:  Retention Sampling App Design.

2         Ms. Rankin, this is an e-mail chain between you and

3    Stephen Steel from October 2017; right?

4    A.    Yes.

5    Q.    And the subject line says:  Cold Chain:  Retention

6    Sampling App Design.  Right?

7    A.    Correct.

8    Q.    In the bottom e-mail, Mr. Steel writes you and says,

9    "Aubree, Please let me know if this time works for you?"

10   Right?

11   A.    Correct.

12   Q.    So, it sounds like Mr. Steel's trying to set up a

13   meeting; right?

14   A.    Correct.

15   Q.    And in your response, you say, "Yes.  Thank is good

16   with me."  I think you meant thanks; right?

17   A.    I believe I meant "that's."

18   Q.    Okay.  And then you write, "I believe Josh will be

19   attending as well since he is -- he will be designing

20   the app."  Right?

21   A.    Correct.

22   Q.    So at this time, did you understand that Josh would

23   be the designer of the retention sampling app?

24   A.    Yes.

25   Q.    And was your role going to be one of being the

Rankin, Aubree 10/18/2019                                    Zest Labs v. Walmart

Page 48

1   developer of the retention sampling app?

2   A.    Yes.

3   Q.    And by developer, we mean programming of the

4   retention sampling app; right?

5   A.    Yes.

6   Q.    Now, over the course of time, you also had some

7   involvement in actually designing the retention app --

8   sampling app as well; right?

9   A.    What do you mean by designing?

10  Q.    Assisting Josh in the design of the app?

11  A.    I don't recall.

12  Q.    This is one of the first e-mails I've seen with you

13  that relates to the retention sampling app.  Do you

14  recall any prior communications or correspondence about

15  retention sampling app design?

16  A.    I do not recall.

17  Q.    So, based on your recollection, this would be one of

18  the initial efforts to begin retention sampling app

19  design; right?

20        MR. LAMB:   Objection.

21  Q.    (BY MR. HARDT)  You can answer.

22  A.    What was the -- can you repeat the question?

23  Q.    Based on your recollection, this would be one of the

24  initial efforts at retention sampling app design; right?

25        MR. LAMB:   Same objection.

Page 49

1    A.    What do you mean by retention sampling app design?

2    Q.    (BY MR. HARDT)  Well, the subject line is Retention

3    Sampling App Design; right?

4    A.    Yes.

5    Q.    And you say, "Josh will be attending as well since

6    he will be designing the app."  Right?

7    A.    Yes.

8    Q.    And so, when you wrote that, you had an

9    understanding of what designing the app included; right?

10   A.    Yes.

11   Q.    And this would be one of the initial points where

12   you get involved in the app development; right?

13   A.    Correct.

14         (Exhibit No. 370 marked for identification.)

15   Q.    (BY MR. HARDT)  I'm going to hand you what's been

16   marked as Plaintiff's Exhibit 370.  And you can just set

17   them over to the side as we go through these; and if we

18   ever need to pull them back, we'll just pull them out of

19   the stack.

20         So, I'm handing you what's -- I'm marking as

21   Plaintiff's Exhibit 370.  This bears Bates No.

22   WM00125827 through WM00125829.  And it is a calendar

23   invitation from Anand Banik sent on October 25th, 2017,

24   which appears to embed in that invitation, an e-mail

25   chain from around the same time.

Page 50

1      Have you had a chance to review it?

2   A.    I have.

3   Q.    So, throughout the course of today, I may be

4   referring to Bates numbers.  That's these little numbers

5   at the bottom right.  It's just stamps that lawyers put

6   on these so we can keep track of all the -- you know,

7   the too many documents that get produced in these cases.

8        So, I'd like you to go to the page -- I think it's

9   the last page here.  It's the one with Bates No.

10  WM00125828.  Let me know when you're there.

11        MR. LAMB:  Sorry.  For the record, I believe that's

12  the second-to-last page of the exhibit.

13        MR. HARDT:  Is it?  Thank you, counselor.

14  Q.    (BY MR. HARDT)  Are you on the page WM00125828?

15  A.    I am.

16  Q.    And it looks like near the top of the page, there is

17  a -- Anand Banik sends a meeting invitation and the

18  subject is Retention Sampling App.  Do you see that?

19  A.    I do.

20  Q.    And underneath, he says, "Blocking time to come-up

21  with initial design for retention sampling app."  Right?

22  A.    Correct.

23  Q.    And if we -- if we go to the top -- the next e-mail

24  I'm going to ask you about is in the top of the prior

25  page, ending in Bates No. 827, but it's kind of broken

Page 51

1    into this page.

2        So, it looks like Anand Banik sends an e-mail

3    October 25th, 2017, with the timestamp 9:28, a.m.   Do

4    you see that one?

5    A.   I do.

6    Q.   And he says, "Thanks, Joshua, for your insight

7    yesterday."  Do you see that?

8    A.   I do.

9    Q.   And it continues -- I know the staples in the way,

10   but it continues on the next page and says, "As

11   discussed, could you please add the UI dev person on

12   this thread."  Do you see that?

13   A.   I do.

14   Q.   Is it your understanding that when he says UI here,

15   he's referring to user interface, like we've been

16   talking about?

17   A.   I do.

18   Q.   And dev person, he likely meant development person?

19   A.   Yes.

20   Q.   Okay.  And if we go now to the front page, the next

21   e-mail up is Josh Bohling responding at 9:48 a.m. on

22   October 25th; right?

23   A.   Yes.

24   Q.   And his e-mail says, "+ Aubree."  That would be you;

25   right?

Page 52

1    A.    Yes.

2    Q.    And the next e-mail up, at 9:52 a.m., says, "Thanks

3    Joshua."  Do you see that?

4    A.    I do.

5    Q.    Then it says, "Hi Aubree, Nice to meet you and

6    welcome to the project!"  So, you had not met Anand

7    Banik prior to this; correct?

8    A.    Not that I recall.

9    Q.    And prior to this, you hadn't been involved in the

10   retention sample -- retention sampling project with Mr.

11   Banik; right?

12   A.    I don't believe so.

13   Q.    And then he asked, "Would it be possible to have a

14   brief discussion today @ 3:30P.M.?"  Do you see that?

15   A.    I do.

16   Q.    And if you scroll up, we see that he sends the

17   invitation for 3:30.  And embedded in that, it says

18   "Anand, Good morning."  Do you see that part?

19   A.    I do.

20   Q.    And it says, "Yes, 3:30 should work for me!  Aubree

21   Rankin."  Do you see that?

22   A.    I do.

23   Q.    So, you guys scheduled a 3:30 appointment on

24   Wednesday the 25th, 2017; right?

25   A.    It appears that way.

Page 53

1    Q.    Do you recall the meeting on October 25th with you

2    and Mr. Banik and Mr. Bohling?

3    A.    Not specifically, no.

4    Q.    Do you recall that it would have been, like the

5    e-mail says, about the initial design for the retention

6    sampling app?

7    A.    I don't recall.

8    Q.    And so, I guess you don't recall any specifics about

9    what was discussed there?

10   A.    I do not.

11         (Exhibit No. 371 marked for identification.)

12   Q.    (BY MR. HARDT)  I'm handing you what's been marked

13   as Plaintiff's Exhibit 371.  It bears Bates No.

14   WM00128854 through WM00128855.  And it appears to be a

15   Stephen Steel e-mail to Josh Bohling and Aubree Rankin

16   on October 19th, 2017.

17         Have you had a chance to review this?

18   A.    I have.

19   Q.    So, Mr. Steel sends you an e-mail at 2:20 p.m. on

20   October 19th, 2017; right?

21   A.    Correct.

22   Q.    And can you read the subject line into the record?

23   A.    "Cold Chain:  Zest Retention Sampling Data."

24   Q.    The attachment is titled:

25   10-5-2017_Eval_Report.xlsx.  And Mr. Steel says, "PFA

Page 54

1    Retention sampling data."  Do you see that?

2    A.    I do.

3    Q.    And PFA would mean Please Find Attached; right?

4    A.    I believe so.

5    Q.    Did you have an understanding at this time of why

6    Mr. Steel was providing you Zest retention sampling

7    data?

8              MR. LAMB:  Object to the form.

9    A.    What do you mean by Zest retention sampling data?

10   Q.    (BY MR. HARDT)  I'm looking at the subject line and

11   it says:  Zest Retention Sampling Data.  You see that;

12   right?

13   A.    I do see the subject line.

14   Q.    And he attaches a spreadsheet attachment; do you see

15   that?

16   A.    I do.

17   Q.    Do you have an understanding of what the spreadsheet

18   attachment is?

19   A.    Data collected from retention sampling.

20   Q.    And it would be Zest's retention sampling data;

21   right?

22         MR. LAMB:  Object to the form.

23   A.    I don't know whose data it would be.

24   Q.    (BY MR. HARDT)  The subject line says "Zest

25   Retention Sampling Data"; right?

Page 55

1    A.    The subject line, yes.

2    Q.    Did you ask Mr. Steel whose retention sampling data

3    it was?

4    A.    I did not.

5    Q.    Do you recall Mr. Bohling asking Mr. Steel whose

6    retention sampling data this was?

7    A.    I do not recall.

8    Q.    Do you recall asking Mr. Steel who the author of

9    this Excel spreadsheet was?

10   A.    I do not recall.

11   Q.    Do you recall anything about your discussions with

12   Mr. Steel about the Zest retention sampling data that's

13   attached to this e-mail?

14        MR. LAMB:  Object to the form.

15   A.    I do not recall any specific conversation.

16   Q.    (BY MR. HARDT)  I'm going to hand you what's

17   previously been marked as Plaintiff's Exhibit 273.  This

18   document bears the Bates No. WM00079 -- 5959.  75959

19   through 75974.  This is a October 25th, 2017, e-mail

20   from Anand Banik to Aubree Rankin, Josh Bohling and John

21   Luna.

22        You can take a chance to review the document as you

23   need it, but I'll tell you right now I'm going to focus

24   on the cover e-mail for the time being.

25   A.    Okay.

Page 56

1    Q.    Have you had a chance to review the e-mail and the

2    attachment?

3    A.    I have.

4    Q.    If we look at the bottom of the first page, you'll

5    see an e-mail from you at 9:55 a.m.; you see that one?

6    A.    I do.

7    Q.    And this is the same e-mail we saw earlier where you

8    said, "Yes, 3:30 should work for me!"  Right?

9    A.    Right.

10   Q.    Then, at the top of the page, after the 3:30

11   meeting, at 4:08 p.m., Anand Banik sends an e-mail to

12   you, Josh Bohling, and John Luna; right?

13   A.    Correct.

14   Q.    He says, "Thanks Aubree for your time."  Do you see

15   that?

16   A.    I do.

17   Q.    And then, if we go underneath the -- the list of

18   data points, there's a sentence that says, Also.  Do you

19   see that?

20   A.    I do.

21   Q.    Can you read that into the record?

22   A.    "Please find attached the document which details the

23   retention sampling process for the POC.  This can be a

24   good starting point for the app design."

25   Q.    Let's turn to the attachment which begins on

```
                                                    Page 57
 1    WM00075963.  Do you see that?
 2    A.    Yes.
 3    Q.    This document is titled:  Freshness Baselining
 4    Process Training Manual.  Right?
 5    A.    Yes.
 6    Q.    And underneath that, we see "Zest Fresh," the Zest
 7    logo; right?
 8    A.    Correct.
 9    Q.    And if we turn to the second page, Bates No. 75964,
10    at the bottom of the page, bottom left, you'll see Zest
11    Labs Confidential; right?
12    A.    Right.
13    Q.    Were you familiar with Zest Labs at this point?
14    A.    I do not recall.
15    Q.    Do you recall if you asked Mr. Banik or Mr. Bohling
16    who Zest Labs was?
17    A.    I do not recall.
18    Q.    And so, you were not involved in the evaluation of
19    Zest and the proof of concept that Mr. Banik is
20    referring to; right?
21          MR. LAMB:  Object to the form.
22    A.    What do you mean by evaluation?
23    Q.    Did you have -- let me ask it a different way:  Have
24    you ever met with anybody from Zest Labs?
25    A.    I have not.
```

Page 58

1   Q.   Have you ever been responsible in your work at

2   Walmart for evaluating any Zest Labs technology?

3   A.   No.

4   Q.   So, you also would not have been involved in your

5   work at Walmart in evaluating Zest and the proof of

6   concept; right?

7   A.   (Nodding head.)

8   Q.   And just so the court reporter gets that, can you

9   give a audible answer?

10  A.   Can you repeat the question?

11  Q.   Sure.  You also would not have been involved in your

12  work at Walmart in evaluating any work of Zest and the

13  proof of concept; right?

14  A.   I was not involved.

15  Q.   If you go a little higher up in Mr. Banik's e-mail,

16  he says, "As discussed"; do you see that?

17  A.   I do.

18  Q.   Then he says, "Please find below the data-points we

19  used in out POC."  I think he probably means our POC?

20  A.   Probably.

21  Q.   And then he lists some data points.  Are you

22  familiar with what these are?

23  A.   To some extent.

24  Q.   What's your understanding of what these would be?

25  A.   The data that was collected during a pilot that was

Page 59

1   previously done.

2   Q.   And that would be the pilot with Zest?

3   A.   I'm unaware.

4   Q.   Did you ever ask?

5   A.   Ask --

6   Q.   Did you ever ask which pilot it was?

7   A.   I don't believe so.

8   Q.   The attachment title is:  Zest Freshness Baseline

9   App Review 0.31 7-12-2017.pdf.  Do you see that?

10  A.   What did you say was labeled that?

11  Q.   The attachment here.

12  A.   Okay.  Yes.

13  Q.   I was just reading that in.  Do you see that it

14  begins:  Zest Freshness Baseline App?

15  A.   Yes.

16  Q.   Did you ever ask Mr. Banik if these data points were

17  associated with the Zest freshness baseline app?

18  A.   I don't recall.

19  Q.   Did you ever come to learn that these data points

20  were associated with Zest technology?

21  A.   I don't recall.

22       (Exhibit No. 372 marked for identification.)

23  Q.   (BY MR. HARDT)  I've handed you what I'm marking as

24  Plaintiff's Exhibit 372.  This document bears Bates No.

25  WM00010279.  It's a Stephen Steel e-mail to Anand Banik,

Rankin, Aubree 10/18/2019                        Zest Labs v. Walmart

                                                          Page 60

1    Aubree Rankin, Josh Bohling, on November 29th, 2017.

2         Ms. Rankin, it appears Stephen Steel sent you this

3    e-mail on November 29th at 1:47 p.m. in the afternoon;

4    right?

5    A.    Right.

6    Q.    And he says, "Team, Further to our conversation

7    yesterday"; do you see that?

8    A.    I do.

9    Q.    He says, "Further to our conversation yesterday, PFA

10   a document relating to Romaine lettuce evaluation."  Did

11   I read that right?

12   A.    Yes.

13   Q.    Do you recall the substance of the conversation you

14   had the prior day with Mr. Steel?

15   A.    I do not recall.

16   Q.    He says, in the next line, "For today's meeting, I

17   have reserved the room 'Medal of Freedom' it's the usual

18   meeting room that we use."  So, this was in advance of a

19   meeting that the folks on this e-mail would have had

20   that day; right?

21        MR. LAMB:  Object to the form.

22   A.    I'm unaware.

23   Q.    (BY MR. HARDT)  But it looks like there's going to

24   be a meeting in the Medal of Freedom room that -- later

25   that day; is that fair?

Page 61

1   A.   It appears that way.

2   Q.   Do you recall having a meeting with Mr. Steel in the

3   Medal of Freedom room at Walmart?

4   A.   I do.

5   Q.   You do?

6   A.   Yes.

7   Q.   What did you discuss during that meeting?

8   A.   I do not recall.

9   Q.   What do you recall about the meeting?

10  A.   I don't recall.

11  Q.   You just remember that it was in the Medal of

12  Freedom room?

13  A.   I do.

14  Q.   And do you remember that Mr. Steel was there?

15  A.   As far as I'm aware.

16  Q.   Do you recall that Mr. Banik was there?

17  A.   I do not recall.

18  Q.   Do you recall that Mr. Bohling was there?

19  A.   I don't recall.

20       (Exhibit No. 373 marked for identification.)

21  Q.   (BY MR. HARDT)  I'm handing you what I've marked as

22  Plaintiff's Exhibit 373.  This is a document bearing

23  Bates.  No. WM00010280 through 10287 with the title at

24  the top:  Romaine Heart Quality Evaluation Reference

25  Sheet.

Page 62

1      Ms. Rankin, this -- this document is the attachment

2 to the prior exhibit, 372.  Do you recognize this

3 document?

4 A.    I do.

5 Q.    Did you discuss this document with Mr. Steel?

6 A.    I don't recall.

7 Q.    In the top left of the document, do you see where it

8 says Zest Fresh, and has the logo?

9 A.    I do.

10 Q.    And at the bottom left, it says, Zest Labs

11 Confidential; do you see that?

12 A.    I do.

13 Q.    Do you recall asking Mr. Steel why he was giving you

14 Zest Lab's confidential information?

15      MR. LAMB:   Object to the form.

16 A.    I do not recall.

17      (Exhibit No. 374 marked for identification.)

18 Q.    (BY MR. HARDT)  Ms. Rankin, I'm handing you what's

19 been marked Plaintiff's Exhibit 374, which bears Bates

20 Nos. WM00075399 through 75416.  It appears to be a

21 November 29th, 2017 e-mail from Stephen Steel to Josh

22 Bohling, Anand Banik and Aubree Rankin, and the

23 attachment.

24      Have you had a chance to review the document?

25 A.    I have.

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 63

1  Q.   Mr. Steel sent you this e-mail on November 29th at

2  3:56 p.m.; right?

3  A.   Correct.

4  Q.   And the subject line is Strawberries; right?

5  A.   Correct.

6  Q.   He didn't say anything in the e-mail.  He just put a

7  smiley face emoji; right?

8  A.   Yes.

9  Q.   He didn't need to say anything because you guys had

10 just had a meeting about this in the Medal of Freedom

11 room; right?

12      MR. LAMB:   Object to the form.

13 A.   I'm unaware.

14 Q.   (BY MR. HARDT)  You don't recall?

15 A.   I don't recall.

16 Q.   So, you recall meeting with Mr. Steel in the Medal

17 of Freedom room, but you don't recall this document?

18 A.   I recall the document.

19 Q.   You do recall the document?  The attached document

20 has the file name we see here:  Strawberry Product

21 Profile Process Overview WM DC[1].pdf; right?

22 A.   Correct.

23 Q.   And if we go to the document and look at page

24 WM00075400, you see the Zest Labs logo on the top left?

25 A.   Yes.

Page 64

1    Q.    And you see on the bottom, it says:    This

2    presentation is Zest Labs Confidential Material?

3    A.    Yes.

4    Q.    Let's turn to the second page.    The title at the top

5    is Materials; do you see that?

6    A.    I do.

7    Q.    And the first one says Strawberry samples; do you

8    see that?

9    A.    I do.

10   Q.    It's because this document has Zest's methodology

11   for sampling strawberries; right?

12         MR. LAMB:    Object to the form.

13   A.    I'm unaware.

14   Q.    (BY MR. HARDT)    You -- you do recall this document,

15   but you're unaware if this relates to Zest strawberry

16   sampling techniques?

17   A.    It appears that way.

18   Q.    Let's turn to the page that's going to be slide 7, I

19   believe.    It will have Bates No. WM00075406.

20   A.    (Witness complies.)

21   Q.    Are you there?

22   A.    I am.

23   Q.    At the top, this slide is titled Quality evaluation;

24   right?

25   A.    Right.

Page 65

1   Q.   And the next line starts Parameters; right?

2   A.   Right.

3   Q.   Can you read that line and sentence into the record?

4   A.   "The parameters will be recorded using the lowest

5   (worst) value from the berries in the clamshell."

6   Q.   And underneath that it lists a series of bullets

7   that are the parameters; right?

8   A.   Correct.

9   Q.   And the first one is:  Color?

10  A.   Correct.

11  Q.   The second is:  Calyx wilting?

12  A.   Yes.

13  Q.   And then:  Firmness?

14  A.   Correct.

15  Q.   And then:  Bruising physical damage?

16  A.   Correct.

17  Q.   And then:  Decay (Overall Quality); right?

18  A.   Correct.

19  Q.   Next bullet is:  Severe Defect Count?

20  A.   Yes.

21  Q.   And then:  Mildew?

22  A.   Yes.

23  Q.   And the last bullet is:  End of life?

24  A.   Yes.

25  Q.   With a question mark; right?

Page 66

1   A.   Yes.

2   Q.   And if we jump forward a couple more pages, the page

3   that ends in -- or the page bearing Bates No.

4   WM00075408, we see the title on the top is Color; right?

5   A.   Right.

6   Q.   The information here on this slide sets out the

7   details of the color parameter that we saw on the prior

8   page; right?

9        MR. LAMB:   Object to the form.

10  A.   I'm unsure.

11  Q.   (BY MR. HARDT)   Well, the first bullet we saw on the

12  prior page was a parameter for color; right?

13  A.   Correct.

14  Q.   And now, this title is Color; right?

15  A.   That is correct.

16  Q.   And you would agree with me that it has details

17  about how to evaluate color; right?

18  A.   Correct.

19  Q.   If we go to the next page, 75409.

20  A.   (Witness complies.)

21  Q.   The title here is Calyx wilting; do you see that?

22  A.   I do.

23  Q.   And that corresponds to the second bullet we saw on

24  the earlier page; right?

25  A.   Correct.

Page 67

1  Q.   And you would agree with me that this has detail

2  about evaluating Calyx wilting; right?

3  A.   Yes.

4  Q.   Let's go to the next page.  The title of this slide

5  says Firmness; do you see that?

6  A.   I do.

7  Q.   That corresponds to the third bullet we saw on slide

8  7; right?

9  A.   Right.

10  Q.   And you would agree with me that this has details

11  about evaluating firmness of strawberries; right?

12  A.   Right.

13  Q.   If you turn to the next page, slide 12, bears Bates

14  No. WM00075411, this is titled:  Bruising/Physical

15  damage; right?

16  A.   Right.

17  Q.   And that corresponds to the fourth bullet on slide

18  7, that says bruising/physical damage; right?

19  A.   Right.

20  Q.   And this slide provides detail about evaluating

21  bruising/physical damage; right?

22  A.   Right.

23  Q.   Go to the next slide, slide 13, bears Bates No.

24  WM00075412, the title is Decay (Overall Quality).  Do

25  you see that?

Page 68

1   A.    I do.

2   Q.    And this would correspond to the fifth bullet on

3   slide 7 that says Decay Overall Quality; right?

4   A.    Right.

5   Q.    And this slide provides details about evaluating

6   decay, overall quality; right?

7   A.    Yes.

8   Q.    If you go to the next slide, titled Mildew; do you

9   see that?

10  A.    I do.

11  Q.    This would correspond to the second to last

12  parameter on slide 7, which says Mildew; right?

13  A.    Correct.

14  Q.    And slide 14 that says Mildew at the top provides

15  details about evaluating mildew on strawberries; right?

16  A.    Correct.

17  Q.    Ms. Rankin, I'd like you to turn to what would be

18  slide 16, I believe.  The Bates number at the bottom is

19  WM00075415.  It has a title called Training; do you see

20  that?

21  A.    I do.

22  Q.    Underneath Training, it says:  Parameter by

23  parameter grade the berries.  Do you see that?

24  A.    I do.

25  Q.    So, this slide would be used in training on a worker

Rankin, Aubree 10/18/2019                                          Zest Labs v. Walmart

                                                                              Page 69

1    doing retention sampling to remove berries from -- from

2    the crate; do you see that?

3         MR. LAMB:  Object to the form.

4         MR HARDT:  Actually, that's a good objection.

5    Q.   (BY MR. HARDT)  Let's -- I'm one slide too far.

6    Let's back up to slide 15.  It's WM00075414.  It says

7    Training at the top; do you see that?

8    A.   I do.

9    Q.   And with regard to training, for strawberry

10   sampling, the first bullet says:  Open the lid, place

11   half berries on the lid and half inside the clamshell.

12   Do you see that?

13   A.   I do see that.

14   Q.   And if you look at the illustration or the picture

15   on the right, you see there's a picture of strawberries

16   set out so you can see all the strawberries; right?

17   A.   Right.

18   Q.   And the second bullet here says:  Count berries.  Do

19   you see that?

20   A.   I do.

21   Q.   And the third bullet on the training slide here

22   says:  Organize the strawberries by general

23   decay/deterioration in rows.  Do you see that?

24   A.   I do.

25   Q.   And all of that is in this training slide; right?

Page 70

1   A.    Yes.

2   Q.    You can set that exhibit aside.

3   A.    (Witness complies.)

4         (Exhibit No. 375 marked for identification.)

5   Q.    (BY MR. HARDT)  Ms. Rankin, I'm handing you what's

6   been marked as Plaintiff's Exhibit 375.  This e-mail

7   bears Bates No. WM00036640.  It's an e-mail from Denise

8   Sharpe to Stephen Steel, Josh Bohling and Aubree Rankin

9   on December 4th, 2017.

10        Have you had a chance to review this document?

11  A.    I have.

12  Q.    Ms. Sharpe writes in her e-mail, "Hey there, I have

13  an opportunity that I want to run by you three."  Do you

14  see that?

15  A.    I do.

16  Q.    Can you read the next two sentences of the e-mail

17  into the record?

18  A.    "I've been told that I can request to use Zest as

19  consultants, if needed.  I need to know if it would be

20  beneficial for us to use the Zest retention sampling APP

21  and devices for the pilot or if you think we'll have

22  everything we need (internally) ready to go by

23  mid-January."

24  Q.    When she says internally in parentheses, she's

25  referring to your internal efforts to develop the

Page 71

1    retention sampling app; right?

2         MR. LAMB:   Object to the form.

3    A.   I'm unsure what she means.

4    Q.   (BY MR. HARDT)   It was your understanding that you

5    were developing an internal retention sampling app at

6    this time; right?

7    A.   I'm unsure of the timeline.

8    Q.   We just saw the prior exhibits have been you and

9    Stephen Steel and Anand Banik, working on a retention

10   sampling app design; right?

11        MR. LAMB:   Object to the form.

12   A.   Correct.

13   Q.   (BY MR. HARDT)   And those are in October and

14   November of 2017; right?

15   A.   Correct.

16   Q.   And this is December 4th, 2017; right?

17   A.   Correct.

18   Q.   So, you were working on a retention sampling app at

19   this time; right?

20   A.   What do you mean by working on?

21   Q.   You were working to develop the retention sampling

22   app at this time; right?

23   A.   What do you mean by develop?

24   Q.   You're -- told me earlier you're a developer at

25   Walmart; right?

Page 72

1  A.    Correct.

2  Q.    Using your understanding of your role at Walmart,

3  you were working to develop a retention sampling app

4  around this time; right?

5  A.    To some degree.

6  Q.    Do you say to some degree because it wasn't finished

7  yet?

8  A.    Correct.

9  Q.    It was still in progress?

10  A.    What do you mean by in progress?

11  Q.    You were still working on it; right?

12  A.    I'm unsure.

13  Q.    But it wasn't finished yet; right?

14  A.    Correct.

15  Q.    At this point in time, were you aware of anyone at

16  Walmart telling Zest that your team was working to

17  develop an internal retention sampling app?

18  A.    I'm unaware.

19  Q.    Do you recall at this time asking anyone on your

20  team who Zest was?

21  A.    I do not recall.

22      `   (Exhibit No. 376 marked for identification.)

23  Q.    (BY MR. HARDT)  I'm handing you what's being marked

24  as Plaintiff's Exhibit 376.  This is an e-mail chain

25  bearing Bates No. WM00093524.  It appears to be an

Page 73

1   e-mail from Denise -- e-mail chain between Denise

2   Sharpe, Josh Bohling, Stephen Steel, and you.

3       Let me know once you've had a chance to review this

4   document.

5   A.    (Witness complies.)

6   Q.    Exhibit 376 appears to be a continuation of the

7   e-mail begun on Exhibit 375; right?

8   A.    Correct.

9   Q.    And after Denise Sharpe sends her 8:57 a.m. e-mail

10  on December 4th, Josh Bohling responds at 9:13 e-mail in

11  the middle of the page; do you see that?

12  A.    I do.

13  Q.    The second line of Josh -- or the second sentence of

14  Josh Bohling's e-mail says:  While ultimately we will

15  want retention sampling inside of Eden, it's going to be

16  difficult to hit all objectives by mid-January at this

17  point.  Do you see that?

18  A.    I do.

19  Q.    You agree that at this point in early December, it

20  was going to be difficult to hit all objections --

21  excuse me, all objectives for the retention sampling

22  application by mid January; right?

23  A.    Yes.

24  Q.    Do you have any knowledge whether or not Walmart

25  ended up engaging Zest as a consultant for retention

Page 74

1    sampling?

2    A.    I'm unaware.

3    Q.    You don't know one way or the other; right?

4    A.    Right.

5    Q.    So, to your knowledge, you finished developing the

6    retention sampling app without Zest as an actual

7    consultant; right?

8         MR. LAMB:  Object to form.

9    A.    What do you mean by actual consultant?

10   Q.    (BY MR. HARDT)  Let me -- you eventually finished

11   the retention sampling app at Walmart; right?

12   A.    That is correct.

13   Q.    And to your knowledge, you finished that retention

14   sampling app without using Zest as a consultant; right?

15   A.    Right.

16   Q.    You can set that document aside.  Ms. Rankin, I'm

17   going to hand you what's been previously marked as

18   Plaintiff's Exhibit 268.  It bears Bates Nos. WM00140286

19   through WM00140314.

20        This is an e-mail chain from Stephen Steel to John

21   Luna, Josh Bohling, Aubree Rankin, Denise Sharpe, Gary

22   Campisi and Anand Banik on December 13th, 2017; right?

23        MR. LAMB:  Sorry to interrupt .  My copy ends at

24   294.

25   Q.    (BY MR. HARDT)  Ms. Rankin, why don't you take a

Page 75

1    chance -- take an opportunity to review that, let me

2    sort this out --

3    A.    Okay.

4    Q.    -- with counsel?

5         MR HARDT:  You start on 286; right?

6         MR. LAMB:  I start on 286 but I end on 294.

7         MR HARDT:  Do you have -- there's 3 attachments.  Do

8    you have the one that's 287?

9         MR. LAMB:  Yes.  I actually have four -- five copies

10   of that.

11        MR. HARDT:  I don't want to burden you with more

12   copies than you need.

13        MR. LAMB:  I appreciate it.

14        MR. HARDT:  Okay.  So, that ends at -- so, here's

15   the one that begins on the next page; right?

16        MR. LAMB:  Yes.

17        MR HARDT:  And here's the one after that.  That

18   should get you to 314, I think.  Yeah, 314.

19        MR. LAMB:  314, yes.  Thank you.

20        MR. HARDT:  All right.

21        MR. LAMB:  We're all set.

22        BY MR HARDT:  There's too many paper clips in here.

23   A.    It was supposed to end on?

24   Q.    It should end on 314, I believe.

25   A.    Okay.

Page 76

1    Q.    Is that what you have?

2    A.    Yes.

3    Q.    Have you had a chance to review Exhibit 268?

4    A.    I have.

5    Q.    This is a December 13th, 2017 e-mail from Stephen

6    Steel; right?

7    A.    Right.

8    Q.    And he sends it to you and several others; right?

9    A.    Correct.

10   Q.    And the subject line is:  Retention Sampling

11   Guidance Documents; right?

12   A.    Right.

13   Q.    And he attaches what looks like three files; do you

14   see that?

15   A.    Yes.

16   Q.    The first is:  Lettuce Quality Evaluation Reference,

17   Baseline, 03-01-2017.pdf.  Right?

18   A.    Right.

19   Q.    And the second file he attaches is:  Strawberry

20   Product Profile Process Overview, WM DC[1].pdf.  Right?

21   A.    Right.

22   Q.    And the third file he attaches is:  Strawberry

23   Evaluation Parameter Reference WM DC[1](1).pdf.  Right?

24   A.    Right.

25   Q.    And in the body of the e-mail, Mr. Steel says:

Rankin, Aubree 10/18/2019                                    Zest Labs v. Walmart

Page 77

1    "Team, please find attached a copy of the reference

2    documents for retention sampling."  Do you see that?

3    A.   I do.

4    Q.   Now, I know some of these attachments we've seen

5    previously circulated in prior exhibits, but I want to

6    go through each one real quick.  If we turn to the first

7    attachment, it has the Bates number bearing WM00140287;

8    you see that?

9    A.   I do.

10   Q.   And at the top, it says:  Romaine Heart Quality

11   Evaluation Reference Sheet.  Do you see that?

12   A.   I do.

13   Q.   So, this was the first retention sampling reference

14   document that he refers to in his -- in his e-mail;

15   right?

16   A.   It would seem.

17   Q.   If we jump forward a little bit to Bates No.

18   WM00140295, you're going to see a new document; it's

19   going to be the second document.  Let me know when

20   you're there.

21   A.   I'm there.

22   Q.   This is the strawberry retention sampling document

23   from Zest that we saw earlier; right?

24        MR. LAMB:  Object to the form.

25   A.   I believe so.

Page 78

1    Q.    (BY MR. HARDT)   If we go near the end, the last

2    couple pages, we'll see document -- last document.  It's

3    WM00140312; do you see that?

4    A.    312?

5    Q.    Yeah.

6    A.    Okay.

7    Q.    And if this helps, I'm happy to hand you a native

8    copy because I know --

9    A.    Okay --

10   Q.    -- the gray scale is hard to read.  But I don't

11   think we need to read too much.  This last document

12   would be the third attachment he refers to, which is

13   titled:  Strawberry Evaluation Parameter Reference, WM

14   DC[1]; right?

15   A.    It would seem.

16   Q.    And at the bottom of that page, you see where it

17   says, Zest Labs Confidential; right?

18   A.    I do.

19   Q.    In fact, all three of these attachments are marked

20   Zest Labs Confidential; right?

21   A.    Yes.

22   Q.    You can set that exhibit aside.

23         MR. LAMB:  And, counsel, is now a good time for a

24   break?  We've been going a little over an hour.

25         MR. HARDT:  I was having so much fun, I didn't

Page 79

1    realize.  Yeah, I need probably some more coffee,

2    anyway.

3        VIDEOGRAPHER:  Going off the record.  The time is

4    10:45 a.m.  This ends Media 2.

5                        (Brief recess.)

6        VIDEOGRAPHER:  Going back on the record.  The time

7    is 10:57 p.m.  This begins Media 3.

8    Q.   (BY MR. HARDT)  Ms. Rankin, before we took a break,

9    we were talking about January 2018.  You also had a

10   meeting with Gary Campisi in January 2018; right?

11   A.   I'm unsure.

12   Q.   Do you recall ever meeting with Mr. Campisi about

13   the retention sampling application?

14   A.   I did.

15   Q.   Was he part of the design process for the retention

16   sampling system?

17   A.   What do you mean by the design process?

18   Q.   Was -- was Mr. Campisi helping you and Mr. Bohling

19   decide what the retention sampling process should look

20   like?

21   A.   Yes.

22   Q.   So, in terms of computer design, he may not have had

23   any involvement in that; is that right?

24   A.   Right.

25   Q.   I mean, he wasn't a programmer, for example; right?

Page 80

1    A.   Right.

2    Q.   But from defining business requirements, the general

3    process, things like that, he was involved; right?

4         MR. LAMB:   Object to the form.

5    A.   Correct.

6         (Exhibit No. 377 marked for identification.)

7    Q.   (BY MR. HARDT)   I'm going to hand you what's been

8    marked as Plaintiff's Exhibit 377.   It's an e-mail and

9    attachment, bearing Bates No. WM00067069 through 67085.

10   There you are.   And it is a January 8, 2018 e-mail from

11   Gary Campisi to Josh Bohling and Aubree Rankin.   Subject

12   line:   Strawberry Retention Sampling.

13        Let me know once you've had the chance to review

14   that.   Have you had a chance to review Exhibit 377?

15   A.   I have.

16   Q.   This is an e-mail and attachment sent my Gary

17   Campisi on January 8th, 2018; right?

18   A.   Right.

19   Q.   And the subject line is:   Strawberry Retention

20   Sampling; right?

21   A.   Right.

22   Q.   And he attaches a document called Strawberry

23   Retention Sampling Guidelines 2018.pptx; right?

24   A.   Right.

25   Q.   And just so I'm clear, at this time, Mr. Campisi was

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 81

1   an employee of Walmart; right?

2   A.    He was.

3   Q.    And he was involved in the quality control side of

4   the business; right?

5   A.    As far as I'm aware.

6   Q.    If we turn to the attachment, which begins on

7   WM00067070, it says:  Strawberry Retention Sampling

8   Guidelines at the top; right?

9   A.    Right.

10  Q.    And Mr. Campisi, looks like he's dated it January 7,

11  2018; right?

12  A.    Right.

13  Q.    So, the day before?

14  A.    Right.

15  Q.    So, in working with Mr. Campisi, this would have

16  been one of the documents you used to set out the

17  guidelines for Walmart's retention sampling application;

18  right?

19       MR. LAMB:  Object to the form.

20  A.    Can you rephrase the question?

21  Q.    (BY MR. HARDT)  Sure.  I'll rephrase it like this:

22  This strawberry retention sampling guideline that Mr.

23  Campisi sent you, would have been one of the documents

24  you used in developing the retention sampling

25  application; right?

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 82

1   A.    Right.

2   Q.    Let's turn to page with the Bates No. WM00067074.

3   A.    (Witness complies.)

4   Q.    At the top of the slide, it's titled:  Strawberry

5   Quality Evaluation/Inspection; right?

6   A.    Right.

7   Q.    And then it has a heading called Strawberry Defects;

8   do you see that?

9   A.    I do.

10  Q.    And he has a paragraph kind of at the bottom of the

11  page that says "Listed above"; do you see that -- or

12  begins with the words "Listed above"?

13  A.    I do.

14  Q.    Can you read that paragraph into the record?

15  A.    "Listed above are all of the potential strawberry

16  defects.  However, for strawberry retention sampling we

17  will only be concerned with the most common defects

18  causing EOL.  Those are the 6 defects listed above in

19  bold text."

20  Q.    He used the acronym EOL, you understand that to mean

21  End of Life; right?

22  A.    I do.

23  Q.    And he listed -- he's right, he's -- whatever it

24  was, 14 or 15 or so strawberry defects listed in total;

25  right?

Crystal Garrison, CCR

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 83

1   A.    Yeah, around there.

2   Q.    And so, these may be, for example, defects that are

3   listed in USDA guidelines or something like that, that

4   are just known; right?

5   A.    Perhaps.

6   Q.    And then he writes:  For strawberry retention

7   sampling, we will only be concerned with the most common

8   defects causing EOL or End of Life; right?

9   A.    Right.

10  Q.    And he -- so, the ones he's bolded are:  BRUISES, C;

11  do you see that one?

12  A.    I do.

13  Q.    And then I see, CONDITION OF CALYXES; do you see

14  that one?

15  A.    I do.

16  Q.    And the next one in bold is DISCOLORATION; right?

17  A.    Right.

18  Q.    And the next one he has bolded is MOLD, on the right

19  column; do you see that?

20  A.    I do.

21  Q.    The next one he has bolded is OVERRIPE/SOFT BERRIES;

22  right?

23  A.    Right.

24  Q.    And he has bolded DECAY; right?

25  A.    Right.

Page 84

1    Q.   Is it your understanding that these were the six

2    defects you used in developing the retention sampling

3    app?

4    A.   I don't remember specifically.

5    Q.   But you wouldn't have -- you wouldn't have used

6    strawberry defect factors that Mr. Campisi did not bold

7    here; right?

8    A.   Right.

9    Q.   So, at least at this point in time, it's likely that

10   you would have been relying on these to figure out which

11   strawberry defects to include in the retention sampling

12   app; right?

13   A.   Right.

14   Q.   So we have this document, some of the others we saw

15   from January of 2018.  Around this time, there was a

16   decision to delay the retention sampling test until

17   April 2018; right?

18        MR. LAMB:  Object to the form.

19   A.   I do not recall.

20   Q.   (BY MR. HARDT)  Do you recall if you began retention

21   sampling testing prior to the period we talked about

22   earlier where you visited the North Dakota and Minnesota

23   DCs?

24   A.   Not that I know of.

25   Q.   Okay.  And I realize I just misspoke.  In summer of

Page 85

1    2018, I believe you visited a DC, or a distribution

2    center, in Minnesota; right?

3    A.    That is correct.

4    Q.    And that related to retention sampling; right?

5    A.    It did.

6    Q.    With regard to the North Dakota location, that was

7    actually a Sam's Club store; right?

8    A.    That was.

9    Q.    And that was also with regard to testing retention

10   sampling at the Sam's Club location; right?

11   A.    Yes.

12   Q.    You can set that aside for now.

13        (Exhibit No. 378 marked for identification.)

14   Q.    (BY MR. HARDT)  I'm going to hand you what's being

15   marked as Plaintiff's Exhibit 378.  This document bears

16   Bates No. WM00067888 through 67889.  And it's a January

17   10th, 2018 e-mail from Denise Sharpe; right?

18   A.    Yes.

19   Q.    Have you had a chance to review this?

20   A.    I have not.

21   Q.    Okay.  Go ahead and review it.

22   A.    (Witness complies.)

23   Q.    Have you had a chance to review it?

24   A.    I have.

25   Q.    So, this is an e-mail chain with the top e-mail

Rankin, Aubree 10/18/2019                    Zest Labs v. Walmart

Page 86

1    being one from Denise Sharpe on January 10th, 2018;

2    right?

3    A.    Right.

4    Q.    And the other individuals on this e-mail chain

5    include you and Josh Bohling; right?

6    A.    Right.

7    Q.    It also includes Gary Campisi and Anand Banik and

8    John Luna; right?

9    A.    Right.

10   Q.    Subject line is:  Retention Sampling for CC Pilot;

11   right?

12   A.    Right.

13   Q.    And is it your understanding that CC pilot would be

14   the Cold Chain pilot?

15   A.    That's my understanding.

16   Q.    Turn your attention to the e-mail on the bottom of

17   the page.  Denise Sharpe sends it at 12:26 p.m. on

18   January 10th; do you see that?

19   A.    I do.

20   Q.    She says, "FYI - Late yesterday afternoon the

21   decision was made to hold off on retention sampling

22   until phase 2 in April"; right?

23   A.    Right.

24   Q.    Does this refresh your recollection that there was a

25   delay in -- in when the retention sampling testing would

Page 87

1    begin?

2    A.    Yes.

3    Q.    So, it was originally scheduled for mid January and

4    then it gets bumped to at least April; right?

5    A.    It would seem so.

6    Q.    And Gary Campisi at 12:33 p.m. says, "Thanks Denise!

7    I think the delay will help with the development of the

8    retention sampling app."  Do you see that?

9    A.    I do.

10   Q.    And he's referring to the same retention sampling

11   app we've been talking about that you and Josh Bohling

12   were involved in developing; right?

13   A.    As far as I'm aware.

14   Q.    You can set that document aside.  Have you ever

15   heard of a application in the Eden system called Tend?

16   A.    I have heard the name Tend.

17   Q.    Does the Tend application include retention --

18   retention sampling?

19   A.    Tend was never developed while it was named Tend.

20   Q.    I'm -- so, there was a application with the name of

21   Tend; is that right?

22   A.    There was a planned application.

23   Q.    So, there was a plan to have an application with the

24   name of Tend; right?

25   A.    Right.

Page 88

1    Q.    Is it your understanding that retention sampling was

2    part of the parts of the Tend application that was in

3    plan?

4    A.    I'm unaware.

5    Q.    But you're not aware of Tend ever being developed or

6    deployed; right?

7    A.    Tend was renamed to Retain.

8    Q.    To Retain?

9    A.    Right.

10   Q.    Okay.  So, I've seen -- I've gone through a lot of

11   your documents and Mr. Bohling's documents and I've seen

12   references to retention sampling and Tend together.  And

13   so, that would have just been renamed Retain; right?

14   A.    Right.

15   Q.    So, if I see Tend and retention sampling, in

16   essence, it's really Retain and retention sampling that

17   I'm seeing; right?

18   A.    Right.

19        MR. LAMB:  Object to the form.

20   Q.    (BY MR. HARDT)  So, as of January 2018, the plan

21   then became to develop the retention sampling

22   application by April of 2018; right?

23   A.    That was my understanding.

24   Q.    And that would include testing at some point in

25   presumably April as well; right?

Page 89

1    A.    As far as I'm aware.

2    Q.    And, in fact, you and the others had developed a

3    functional retention sampling application by April of

4    2018; is that right?

5    A.    I do not recall.

6    Q.    Do you recall when you did have it developed?

7    A.    It was complete for the June 2018 trip.

8    Q.    So, you don't recall if it's April of 2018, but you

9    do recall it was complete prior to visiting the DC and

10   the Sam's Club in North Dakota; right?

11   A.    That is correct.

12   Q.    Now, you said earlier that you, in fact, did visit

13   the distribution center in Minnesota; right?

14   A.    Yes.

15   Q.    And that would have been June of 2018?

16   A.    Right.

17   Q.    And that distribution center was called Mankato DC;

18   is that right?

19   A.    Yes.

20   Q.    Did Josh Bohling join you there?

21   A.    He did.

22   Q.    Okay.  And you and Josh handled training of the QC

23   associates on retention sampling at the Mankato DC;

24   right?

25   A.    As far as I remember.

Page 90

1    Q.    And on that same trip, you guys also went to the

2    Sam's Club in, I believe, Bismark, North Dakota; right?

3    A.    That is correct.

4    Q.    And you also conducted retention sampling training

5    at the Sam's Club in Bismark, North Dakota; right?

6    A.    That is correct.

7    Q.    At the Sam's Club, do they also have -- do they also

8    call certain employees QC associates?

9    A.    I'm unaware.

10   Q.    Do you recall what the employees at the Sam's Club

11   that you trained were called?  Did they have a title or

12   department?

13   A.    I don't recall.

14   Q.    But they were functioning like the QC associates at

15   the DC; right?  For purposes of retention sampling, they

16   were functioning like the associates at the DC; right?

17   A.    As far as I'm aware.

18   Q.    And, in fact, by the time we got to May of 2018, you

19   and Stephen Steel had led calls with the Sam's Club

20   associates relating to training on retention sampling;

21   right?

22   A.    I do not recall that.

23   Q.    Do you recall ever having a call with Sam's Club

24   associates on training with retention sampling?

25   A.    Not that I recall.

Page 91

1   Q.   Do you recall having a call with Sam's Club

2   associates relating to retention sampling, generally?

3   A.   Who do you mean by Sam's Clubs associates?

4   Q.   Let's try it this way.

5        (Exhibit No. 379 marked for identification.)

6   Q.   (BY MR. HARDT)  I'm handing you what I'm marking as

7   Plaintiff's Exhibit 379.  This is a document bearing

8   Bates Nos. WM00166894 through 166896.  Let me know once

9   you've had a chance to review this.

10  A.   (Witness complies.)

11  Q.   Have you had a chance to review it?

12  A.   I have.

13  Q.   This is an e-mail chain with the top e-mail being

14  from Denise Sharpe to you and Stephen Steel on May 7th,

15  2018; right?

16  A.   Right.

17  Q.   And the subject line is:  Club 4933 Cold Chain

18  Retention Sampling-Club Associate Needs.  Did I read

19  that right?

20  A.   Yes.

21  Q.   And Club 4933 would be the Sam's Club in Bismark,

22  North Dakota; right?

23  A.   I believe so.

24  Q.   And if we go down to the bottom or I'll call it the

25  middle of the first page, you'll see an -- I think it's

Page 92

1    actually a calendar invitation from one Anastacio Ordaz;

2    do you see that?

3    A.    I do.

4    Q.    And it looks like he sent this on Wednesday, April

5    18, 2018; right?

6    A.    Right.

7    Q.    And it looks like -- it says, "When:  Monday, May 7,

8    2018, 10:00 AM to 10:30 AM"; right?

9    A.    Right.

10   Q.    And several of the recipients of this are Sam's Club

11   employees; right?

12        MR. LAMB:  Object to form.

13   A.    I'm unaware.

14   Q.    (BY MR. HARDT)  Okay.  If you look at the "To" line,

15   we see the first name is Anastacio Ordaz; right?

16   A.    Right.

17   Q.    And the next -- next one is Kurt Hess; right?

18   A.    Right.

19   Q.    And in parentheses, it has his e-mail address, which

20   is Stephen.Hess@samsclub.com; right?

21   A.    Right.

22   Q.    So, at least Mr. Hess was a Sam's Club employee;

23   right?

24   A.    It appears.

25   Q.    Okay.  And the last "To" line is "04933-US-CLUB

Page 93

1    MANAGER.  You see that one; right?

2    A.    I do.

3    Q.    And the Club manager would refer to the Sam's Club

4    manager at the Bismark location; right?

5    A.    I'm unsure.

6    Q.    But it does say 04933; right?

7    A.    Right.

8    Q.    And the subject line says -- ends with the phrase

9    "Club Associate Needs"; right?

10   A.    Right.

11   Q.    And Walmart doesn't have Club associates; they just

12   have Walmart associates; right?

13   A.    Right.

14   Q.    And so, when it says Club associates, it's referring

15   to Sam's Club associates; right?

16         MR. LAMB:   Object to the form.

17   A.    As far as I'm aware.

18   Q.    (BY MR. HARDT)   Okay.   And the top e-mail in this

19   chain is from Denise to Stephen Steel and yourself;

20   right?

21   A.    Right.

22   Q.    And she says, "I'm going to introduce you guys on

23   the call and let you take the lead in the discussion";

24   right?

25   A.    Right.

Page 94

1   Q.   So, for this May 7th, 2018 call with -- regarding

2   Cold Chain Retention Sampling-Club Associate Needs, you

3   and Stephen would have taken the lead in the discussion;

4   right?

5   A.   I -- I don't recall.

6   Q.   You don't recall one way or the other?

7   A.   Right.

8   Q.   You have no reason to dispute that you weren't on

9   the call; right?

10  A.   Right.

11  Q.   So, you likely were on the call; you just don't

12  recall if you had the lead?

13       MR. LAMB:   Object to the form.

14  A.   I'm not aware.

15  Q.   (BY MR. HARDT)  You're not aware -- you just don't

16  recall if you had the lead?

17  A.   Fright.

18  Q.   Now, the -- when you went and did the retention

19  sampling at the Minnesota and North Dakota location, did

20  you consider that retention sampling testing, or

21  piloting, what was -- what were you doing?

22  A.   Training.

23  Q.   When you visited, you were doing training; right?

24  A.   Right.

25  Q.   And once you finished training the employees at

Rankin, Aubree 10/18/2019                    Zest Labs v. Walmart

Page 95

1  those two locations and they began doing retention

2  sampling, was that part of a retention sampling pilot?

3  A.   It would have been a pilot.

4  Q.   And that pilot was to test the retention sampling

5  app that you guys had developed; right?

6  A.   Right.

7  Q.   And the purpose of the retention sampling at those

8  locations was to capture shelf life data; right?

9       MR. LAMB:   Object to form.

10 A.   I'm unaware.

11 Q.   (BY MR. HARDT)  Well, one of the things that the

12 retention sampling application would capture was data

13 relating to shelf life; right?

14 A.   To some degree.

15 Q.   Would -- the retention sampling data may relate to a

16 number of things, potentially; right?

17 A.   Right.

18 Q.   But one of the things it relates to is shelf life;

19 right?

20 A.   Right.

21 Q.   And when you did the retention sampling pilot at the

22 North Dakota and Minnesota location, were those the only

23 two locations at that time that were involved in the

24 pilot?

25 A.   They were.

Crystal Garrison, CCR
Bushman Court Reporting                              501-372-5115

Page 96

1    Q.   Was Bartlesville involved at that time or near that

2    time?

3    A.   No.

4    Q.   And during that pilot, they used the retention

5    sampling app that you developed; right?

6    A.   They never used it.

7    Q.   They never used your app?

8    A.   Correct.

9    Q.   What did they use?

10   A.   The training did -- or the pilot did not end up

11   happening.

12   Q.   Why did the pilot not end up happening?

13   A.   The supplier was no longer shipping the product to

14   that site.

15   Q.   So, you did go do the training; right?

16   A.   Right.

17   Q.   And at some point after you did the training, the

18   pilot did not happen?

19   A.   Correct.

20   Q.   Did it happen later that summer?

21   A.   It did not.

22   Q.   Did you pilot the retention sampling app anywhere

23   else?

24   A.   No.

25   Q.   What testing of the retention sampling app did you

Rankin, Aubree 10/18/2019                    Zest Labs v. Walmart

Page 97

1    do before you deployed it at the DCs we talked about

2    earlier today?

3    A.    Are you referring to Mankato and Bismark?

4    Q.    No, just in general.

5    A.    Can you rephrase the question?

6    Q.    Sure.  Earlier today, you told me that you now have

7    a portion of the Retain application that relates to

8    retention sampling; right?

9    A.    Right.

10   Q.    And that application is deployed at a number of DCs;

11   right?

12   A.    As far as I'm aware.

13   Q.    Prior to that deployment at a number of DCs, did you

14   do any testing or piloting of the retention sampling

15   functionality?

16   A.    I did not.

17   Q.    Are you aware of anyone doing any piloting or

18   testing of it?

19   A.    Yes.

20   Q.    Who did?

21   A.    Cody Roueche, Craig Trudo, Josh Bohling, and maybe

22   Daniel Pumford.  That's as far as I can remember.

23   Q.    So, you were responsible for developing the

24   retention sampling app that you completed in some time

25   around April of 2018; right?

Page 98

1      MR. LAMB:  Objection.

2  A.    Can you rephrase the question?

3  Q.    (BY MR. HARDT)  You testified earlier that by the

4  end of April 2018 -- strike that.  I think I maybe

5  mischaracterizing.  You testified earlier that prior to

6  the time you went and did the training in Minnesota and

7  North Dakota, you had a retention sampling app

8  developed; right?

9  A.    That is correct.

10 Q.    And so, you were involved in the development of that

11 retention sampling app?

12 A.    I was.

13 Q.    As I understand your testimony, the testing of that

14 would ultimately have been done by some combination of

15 Cody Roueshe, Josh Bohling, and Craig Trudo?

16 A.    That is incorrect.

17 Q.    Why is it incorrect?

18 A.    I developed the retention sampling app within

19 Sizzle.

20 Q.    So, you -- you developed the retention sampling app

21 within Sizzle?

22 A.    Correct.

23 Q.    And that development was complete at some point

24 prior to June 2018; right?

25 A.    That is correct.

Page 99

1    Q.    Is it your testimony that you did not develop --

2    strike that.  The retention sampling application that

3    would have been tested later by Mr. Roueche, Mr. Bohling

4    and Mr. Trudo, would have been the retention sampling

5    function within the Retain application; right?

6    A.    That is correct.

7    Q.    Where did they test that?

8    A.    I'm unsure.

9    Q.    Who would know that?

10   A.    Any of those involved in the pilot.

11   Q.    You testified earlier that Sizzle was sort of a

12   testing environment; right?

13   A.    That is correct.

14   Q.    And so, after the testing environment work was

15   complete in Sizzle, an application would have been ready

16   to deploy; right?

17         MR. LAMB:  Object to the form.

18   A.    Can you rephrase the question?

19   Q.    (BY MR. HARDT)  Sure.  So, you used Sizzle as a

20   testing environment; right?

21   A.    Right.

22   Q.    In this case, you developed a retention sampling

23   application within Sizzle; right?

24   A.    That is correct.

25   Q.    And so, it was within the testing environment known

Page 100

1   as Sizzle; right?

2   A.    That is correct.

3   Q.    And -- and the testing we're talking about is things

4   like software testing to make sure it runs correctly,

5   bug fixes, things like that; right?

6   A.    Not necessarily.

7   Q.    Okay.  What else could it include?

8   A.    Testing of new business process things.

9   Q.    And once that testing is complete in Sizzle, what is

10  the next step?

11  A.    There is no set next step.

12  Q.    Did you say there's no set next step?

13  A.    There's no set next step.

14  Q.    It depends on circumstance?

15  A.    Correct.

16  Q.    With regard to retention sampling in Sizzle, once

17  the testing was complete, what happened to the retention

18  sampling app?

19  A.    It was no longer used.

20  Q.    Who developed the retention sampling application

21  within Retain?

22  A.    Cody Roueche, Craig Trudo developed the user

23  interface.

24  Q.    What involvement did you have in helping them

25  develop the UI?

Page 101

1    A.    Not any that I can remember.

2    Q.    Well, based on what I've seen, they would have used

3    the retention sampling app you developed and Sizzle as a

4    starting point for their retention sampling process in

5    Retain; right?

6          MR. LAMB:  Object to the form.

7    A.    I don't believe so.

8    Q.    (BY MR. HARDT)  You don't believe that's correct?

9    A.    I don't believe that's correct.

10   Q.    Why don't you believe that's correct?

11   A.    Retention sampling within Retain is very different

12   from within Sizzle.

13   Q.    What's your understanding of retention sampling

14   within Retain?

15   A.    It operates very much the same as an inspection in

16   Inspect; you can choose from any fruit, any defect.

17   Q.    And it could also be any veg -- any produce item;

18   right?

19   A.    Correct.

20   Q.    And what do you mean by any defect?

21   A.    Any defect within Almanac as defined by the USDA or

22   Walmart specific.

23   Q.    So, those are available to select; right?

24   A.    Correct.

25   Q.    Does a user -- user interface offer any initial

Page 102

1    defects to choose from?

2    A.    It does not.

3    Q.    Does user interface simply show a drop-down?

4    A.    Not a drop-down.

5    Q.    How -- how does the user of the user interface

6    choose what defect -- defect to choose?

7    A.    It has checkboxes with a list of all of them.

8    Q.    And ultimately, the process is still the same for

9    the retention sampling application in Retain; right?

10        MR. LAMB:  Object to the form.

11   A.    Can you rephrase the question?

12   Q.    (BY MR. HARDT)  Sure.  The retention sampling within

13   Retain still has a QC associate take a sample; right?

14   A.    That is correct.

15   Q.    They still apply a tag or a label to that sample;

16   correct?

17   A.    Not to the sample.

18   Q.    To the container containing the sample?

19   A.    There are slots that they put the sample in.

20   Q.    There're's slots they put the sample in?

21   A.    Correct.

22   Q.    And are those slots on a -- in a machine?

23   A.    What do you mean by --

24   Q.    What are the slots in?

25   A.    A shelf.

Page 103

1   Q.    There's slots in the shelf?

2   A.    Correct.

3   Q.    And does each slot on the shelf have its own label?

4   A.    Yes.

5   Q.    Does each shelf store the sample at different

6   temperatures?

7         MR. LAMB:   Objection.

8   A.    I'm unaware.

9   Q.    (BY MR. HARDT)  So it may; you just don't know?

10  A.    On the same shelf, I don't believe there are

11  different temperatures.

12  Q.    My question was a little bit different.  You said

13  there's -- they store the sample in slots on shelves;

14  right?

15  A.    That is correct.

16  Q.    For each of the shelves, is the produce stored at

17  different temperatures?

18  A.    I don't believe so.

19  Q.    For each of the slots, is the produce stored at

20  different temperatures?

21  A.    Can you repeat the question?

22  Q.    For each slot, is the produce stored at different

23  temperatures?

24  A.    I don't believe so.

25  Q.    Is all of the produce that's stored for the

Page 104

1   retention sampling stored at the same temperature?

2        MR. LAMB:  Objection.

3   A.   I don't believe so.

4   Q.   (BY MR. HARDT)  Are there different -- are there

5   different shelves in different areas?

6   A.   I believe so.

7   Q.   And are those different areas stored at different

8   temperatures?

9   A.   As far as I'm aware.

10  Q.   And for each of these samples that's stored in

11  different areas, at different temperatures, like the

12  retention sampling we talked about earlier, they are

13  watched over time; correct?

14  A.   I believe so.

15  Q.   So over time, multiple inspections will occur;

16  correct?

17  A.   I believe so.

18  Q.   And each time that inspection occurs, the inspector

19  will use the Retain application to enter the information

20  about that inspection; right?

21  A.   That is correct.

22  Q.   And like you testified earlier, that functionality

23  is similar, if not the same, to the regular Inspect

24  application; correct?

25  A.   That is correct.

Page 105

1   Q.   And like the retention sampling we talked about

2   earlier, each of those Retain samples is inspected and

3   tracked until it reaches end of life; right?

4   A.   As far as I'm aware.

5   Q.   And when it reaches end of life, the inspector would

6   enter the end of life information into the Retain

7   application; correct?

8   A.   What do you mean by end of life information?

9   Q.   The fact that it has reached end of life?

10  A.   I'm unsure.

11  Q.   But you do know the inspection would -- would

12  continue until the product reaches end of life?

13  A.   As far as I'm aware.

14  Q.   And at some point, the inspections would stop;

15  right?

16  A.   I believe so.

17  Q.   For example, if the strawberry had -- was passed its

18  end of life, at some point, they would stop inspecting

19  it; right?

20  A.   I believe so.

21  Q.   And they would dispose of that strawberry; right?

22  A.   I believe so.

23  Q.   And there is -- there is a way within the

24  application to indicate when the inspections have

25  ceased; right?

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 106

1   A.   Correct.

2   Q.   Do you have a name for that?

3   A.   I don't recall.

4   Q.   And those inspections would cease at or shortly

5   after the time the produce reaches end of life; right?

6   A.   I'm unaware.

7   Q.   You just don't know one way or the other?

8   A.   Correct.

9   Q.   Who would know?

10  A.   QC associates.

11  Q.   And like the -- like we talked about earlier, the

12  purpose of the retention sampling data here -- strike

13  that.  Like we talked about earlier, the purpose of the

14  retention sampling at these locations is to capture

15  shelf life data; right?

16       MR. LAMB:  Object to the form.

17  A.   I'm unsure.

18  Q.   (BY MR. HARDT)  Well, that would be one -- one

19  reason to capture the retention sampling data; right?

20  A.   I believe so.

21  Q.   There may be other reasons, but shelf life is one of

22  those reasons; right?

23  A.   I believe so.

24  Q.   And another reason is to determine which factors are

25  most indicative to product freshness; right?

Page 107

1          MR. LAMB:  Object to the form.

2     A.    I'm unaware.

3     Q.    (BY MR. HARDT)  You don't know one way or the other?

4     A.    Correct.

5     Q.    The retention sampling application that Mr. Roueche

6     -- is it Roueche or --

7     A.    Roueche.

8     Q.    Roueche.  The retention sampling application that

9     Mr. Roueche, Mr. Bohling and Mr. Trudo developed for

10    Retain, was that developed in the Sizzle application?

11    A.    It was not.

12    Q.    Where was it developed?

13    A.    In Retain.

14    Q.    So, for this particular -- let me finish my note.

15    So, for the retention sampling functionality in Retain,

16    it was never developed in Sizzle; it was developed

17    directly in Retain; right?

18    A.    That is correct.

19    Q.    How was it tested before it was deployed?

20    A.    I don't know specifics.

21    Q.    You weren't involved in the testing of it?

22    A.    I was not.

23    Q.    Were you involved in helping them in any way with

24    developing this application?

25    A.    I was involved in overall planning meetings, but

Page 108

1   that's all.

2   Q.    What's your understanding of why you were included

3   in the overall planning meetings?

4   A.    We are on the same product team.

5   Q.    And is that product team the Eden team?

6   A.    Broadly, yes.

7   Q.    What else would that product team include?

8   A.    The mobile developers on the team.

9   Q.    So, the product team would be the mobile app

10  developers for the Eden team?

11  A.    I maybe didn't use the right terminology there.  Our

12  just team within a team, I guess is -- I don't know the

13  correct terminology.

14  Q.    Would that team include Josh Bohling?

15  A.    He's included in some of our meetings.

16  Q.    Okay.  Would you consider him the boss of the -- of

17  the team?

18  A.    What do you mean by boss?

19  Q.    Do you have a boss at Walmart?

20  A.    I do.

21  Q.    Who's your boss?

22  A.    Kathryn Habetz.

23  Q.    My understanding is Ms. Habetz is fairly senior in

24  the department.  Is there anybody you report to that is

25  below her?

Page 109

1   A.   I do not.

2   Q.   Do you consider yourself to report to Josh Bohling?

3   A.   I do not.

4   Q.   Do you consider Josh Bohling a supervisor in any

5   respect?

6   A.   Not to me.

7   Q.   Has he ever been a supervisor to you?

8   A.   To me, no.

9   Q.   Has he ever reviewed your work?

10  A.   Yes.

11  Q.   Have you ever been involved in any training for the

12  Retain application?

13  A.   Yes.

14  Q.   What is that involvement?

15  A.   I was on the cooler walk pilot trip.

16  Q.   That's the one we talked about earlier; right?

17  A.   That is correct.

18  Q.   Have you ever been involved in any training for

19  retention sampling in Retain?

20  A.   I don't believe so.

21  Q.   Have you ever seen the application in operation for

22  retention sampling in Retain?

23  A.   What do you mean by in operation?

24  Q.   Let's break it down.  Have you ever seen a Walmart

25  associate at a distribution center use the retention

Rankin, Aubree 10/18/2019                                    Zest Labs v. Walmart

Page 110

1   sampling application within Retain?

2   A.    Not that I recall.

3   Q.    Have you ever seen anybody at the home office use

4   the retention sampling application within Retain?

5   A.    I have.

6   Q.    Who was that?

7   A.    I don't remember specifically.  But one of the

8   developers, I believe, either Cody Roueche or Craig

9   Trudo.

10  Q.    What's your understanding of why they developed a

11  separate retention sampling application within Retain?

12  A.    To be more -- it was kind of always in the plan to

13  have a full -- where you could do any commodity and any

14  defect -- version of retention sampling.

15  Q.    What do they call the process of retention sampling

16  within Retain?

17  A.    Retention sampling.

18  Q.    Have you ever heard of them refer to it as

19  baselining?

20  A.    Not -- I don't -- not that I recall.

21  Q.    Have you ever heard that term used at Walmart?

22  A.    Not that I recall.

23        MR. HARDT:  Ten till the lunch hour, do you want to

24  take a break now for lunch?

25        MR. LAMB:  Sure, works for us.

Page 111

1      VIDEOGRAPHER:  Going off the record.  The time is

2   11:49 a.m.  This ends Media 3.

3                      (Lunch recess.)

4      VIDEOGRAPHER:  Going back on the record.  The time

5   is 12:54 p.m.  This begins Media 4.

6      MR. HARDT:  Just so the record is clear, Robert

7   Rhodes from Vinson and Elkins has joined us for the

8   afternoon session.

9   Q.   (BY MR. HARDT)  Ms. Rankin, I think you testified

10  earlier that the Tend application was later changed in

11  name to the Retain application; is that right?

12  A.   That is correct.

13       (Exhibit No. 380 marked for identification.)

14  Q.   (BY MR. HARDT)  I'm going to hand you what's being

15  marked as Plaintiff's Exhibit 380.  This is an e-mail

16  and an attachment between Josh Bohling and Chuck Tilmon

17  on October 31st, 2018.  And it bears the Bates Nos.

18  WM00163842 through 864.

19       Have you had a chance to review Exhibit 380?

20  A.   I have.

21  Q.   Exhibit 380 is an e-mail from Josh Bohling to Chuck

22  Tilmon on October 31st, 2018; right?

23  A.   Right.

24  Q.   And the subject line says:  Steerco Final Draft;

25  right?

Page 112

1    A.    Right.

2    Q.    And the attachment is 2November -- I'll spell it out

3    so it's a little easier:  2Nov2018.pdf; right?

4    A.    Right.

5    Q.    Okay.  I'd like you to turn to the attachment that

6    begins WM00163843.

7    A.    Okay.

8    Q.    At the top -- or at the title, it says:  Muse

9    Product | FY19.  Muse product is another name for the

10   Eden product; right?

11   A.    That is correct.

12   Q.    And it says FY19.  That stands for Fiscal Year 2019;

13   right?

14   A.    Correct.

15   Q.    Now, I know this gets a little confusing, so I just

16   want to make sure I understand right.  Walmart's fiscal

17   year 2019 ends in very early 2019, probably February;

18   right?

19   A.    I believe so.

20   Q.    So, even though this is saying Q3 of fiscal year

21   '19, that's the reason it's being sent in October of

22   2018; right?

23         MR. LAMB:  Objection to form.

24   A.    I believe so.

25   Q.    (BY MR. HARDT)  I'd like you to turn to the page

Page 113

1    bearing Bates No. WM00163852.  The slide is titled:  Q3

2    Steerco Delivery Timeline.  Do you see that?

3    A.    I do.

4    Q.    On the left, it says Q4; do you see that?

5    A.    I do.

6    Q.    And underneath Q4, one of the 3 logos says Retain;

7    do you see that one?

8    A.    I do.

9    Q.    And underneath, it says Retention Sampling; right?

10   A.    Right.

11   Q.    Can you read the rest of that to us?

12   A.    "Begin closing feedback loop on shelf-life, initial

13   calculation of dynamic average shelf-life."

14   Q.    Okay.  So, the goal at this time, as you would have

15   understood, it was for the Retain -- that portion of the

16   Retain application to be completed in Q4 of 2019;

17   correct?

18        MR. LAMB:  Object to the form.

19   A.    As far as I'm aware.

20   Q.    (BY MR. HARDT)  And this is the same Retain

21   application that is currently deployed, that we talked

22   about this morning; correct?

23   A.    Correct.

24   Q.    And if we look on the right where it says Q1; do you

25   see that?

Page 114

1    A.    I do.

2    Q.    And underneath that, it says Retain; do you see that

3    one?

4    A.    I do.

5    Q.    And then underneath that, it says Cooler Walk; do

6    you see that?

7    A.    I do.

8    Q.    And it says:  Enable the cooler walk process with

9    item risk profiles to replace the Inventory Long report

10   from GLS.   Right?

11   A.    Right.

12   Q.    This would be the cooler walk that we talked about

13   earlier as one of the features of the Retain

14   application; right?

15   A.    Right.

16   Q.    And consistent with your recollection this morning,

17   it appears from this slide that the cooler walk aspect

18   of the Retain application would be implemented at some

19   point after the Retain sampling -- retention sampling

20   aspect; correct?

21         MR. LAMB:   Object to the form.

22   A.    Correct.

23   Q.    (BY MR. HARDT)   And if you look over on the right,

24   there's -- it looks like maybe a flame, and underneath

25   it, it says Core; do you see that?

Page 115

1   A.    I do.

2   Q.    And underneath that, the first paragraph says,

3   Historical Remedy Data.  Do you see that one?

4   A.    I do.

5   Q.    And then the second one says, Enhanced Teradata; do

6   you see that?

7   A.    I do.

8   Q.    And the next one says, Average Days of Life; do you

9   see that one?

10  A.    Yes.

11  Q.    And it says:  Used data from Retain to provide an

12  average shelf-life API for consumption.  Right?

13  A.    Right.

14  Q.    Have you ever worked on the development of a

15  shelf-life API within Eden or Muse?

16  A.    Not specifically, no.

17  Q.    So that particular aspect of the system is not one

18  of the projects you have personally worked on; right?

19  A.    Are you referring to Core?

20  Q.    I'm referring to the average shelf-life API within

21  Core.

22  A.    Correct.

23  Q.    Okay.  You can set that one aside.

24  A.    (Witness complies.)

25        (Exhibit No. 381 marked for identification.)

Page 116

1   Q.   (BY MR. HARDT)  Ms. Rankin, I'm going to hand you

2   what I'm marking as Exhibit 381.  It bears the Bates No.

3   WM00089230 through 89252.  Exhibit 381 appears to be an

4   e-mail and attachment from Josh Bohling on January 5th,

5   2018; right?

6   A.   Right.

7   Q.   Let me know once you've had a chance to review that.

8   Ms. Rankin, have you had an opportunity to review

9   Exhibit 381?

10  A.   I have.

11  Q.   And like we saw, Exhibit 281 is an e-mail from Josh

12  Bohling to Chuck Tilmon, Kelly Boyle, Parvez Musani,

13  Rodney Greenfield, Selena Hriz, Kathryn Habetz, Craig

14  Trudo, and Terry Osbon; correct?

15  A.   Correct.

16  Q.   And Kathryn Habetz is your boss; correct?

17  A.   Correct.

18  Q.   And the subject line is:  Fresh Strategy for Eden

19  Steer Co; right?

20  A.   Right.

21  Q.   And it has the attachment:

22  EdenSteerco_8JAN2018.pdf.  Right?

23  A.   Correct.

24  Q.   And if we turn to the next page of the exhibit,

25  which is Bates No. 89231; do you see that one?

Page 117

1    A.    I do.

2    Q.    The title here is:  8 of January 2018 | Eden Product

3    Q4 Steerco; right?

4    A.    Right.

5    Q.    I'd like you to turn to the slide with the Bates No.

6    -- I think it's slide 7, but it bears Bates No. 89237.

7    A.    (Witness complies.)

8    Q.    Are you there?

9    A.    I am.

10   Q.    This says, Q4 Eden Steerco Option 1:  Tend; do you

11   see that?

12   A.    I do.

13   Q.    And on the right, it has the graphic for Tend; do

14   you see that one?

15   A.    I do.

16   Q.    And underneath, it says Retention Sampling; right?

17   A.    Right.

18   Q.    And on the left, there's a series of bullets; right?

19   A.    Right.

20   Q.    And so, of the benefits that Tend will bring to the

21   system, the first listed here is Time Saving; right?

22   A.    Right.

23   Q.    And the second one, there's a couple sub bullets,

24   and then the second one is:  Reduces cascading effect of

25   blocking good product from shipping.  Right?

Page 118

1    A.    Right.

2    Q.    And the third bullet is:  Data to feed Freshness

3    Indicator.  Right?

4    A.    Right.

5    Q.    You can set that aside.  Ms. Rankin, we spoke this

6    morning about the retention sampling application you

7    built within Sizzle; right?

8    A.    Right.

9    Q.    At some point, you finished that in 2018; right?

10   A.    Right.

11   Q.    And you're no longer working on that; correct?

12   A.    Correct.

13   Q.    What projects are you currently working on within

14   Eden?

15   A.    At this time?

16   Q.    At the present time?

17   A.    Inspect, Retain, Ready.

18   Q.    What aspects of Inspect are you currently working

19   on?

20   A.    So, we are currently going and re-factoring a bit of

21   our code to make it more clean and write some tests.

22   So, that kind of encapsulates all three applications.

23   Q.    So for Inspect, Retain, and Ready, in a nutshell,

24   your projects are currently to re-factor a bit of the

25   code and to make it more clean and to write some tests;

Rankin, Aubree 10/18/2019                    Zest Labs v. Walmart

Page 119

1  right?

2  A.    Correct.

3  Q.    What kind of tests are you creating for Inspect?

4  A.    User interface tests and -- I'm forgetting the

5  correct term -- unit tests, that's the term.

6  Q.    What's a user interface test?

7  A.    It's code you write to make sure the user interface

8  is behaving as you expect it to.

9  Q.    Is it any different than ongoing efforts to develop

10  a working functional UI?

11  A.    Yes.

12  Q.    How does it differ?

13  A.    We're not currently adding new features to the UI.

14  Q.    You're simply updating the existing features in the

15  UI?

16  A.    Correct.

17  Q.    And what is a unit test?

18  A.    It is a test to make sure that the logic within the

19  app is behaving as it should.

20  Q.    What is the logic within the app?

21  A.    Code that tells the app how to operate based on

22  certain conditions.

23  Q.    What are the conditions?

24  A.    Anything that is done in the app that affects how

25  the app operates.

Page 120

1  Q.   Could one of those conditions be the results of

2  inspections?

3  A.   Yes.

4  Q.   Could one of those conditions be the results of

5  inspections during the retention sampling process?

6  A.   It could.

7  Q.   The Inspect app is currently deployed at all grocery

8  distribution centers in the United States; correct?

9  A.   I believe so.

10  Q.   Have you been involved in traveling to any

11  distribution centers to train QC associates on the

12  Inspect app?

13  A.   I have.

14  Q.   When was that?

15  A.   November 2018.

16  Q.   Was that the only instance?

17  A.   As far as I can remember, yes.

18  Q.   And where did you go in November 2018?

19  A.   Harrisonville, Missouri.

20  Q.   Anywhere else?

21  A.   No.

22  Q.   How many Sam's Clubs is Inspect currently deployed

23  in?

24  A.   None that I'm aware of.

25  Q.   How many international distribution centers at

Page 121

1    Walmart is Inspect currently deployed at?

2    A.    I'm unsure.

3    Q.    Are you aware of its deployment in Mexico?

4    A.    I am not.

5    Q.    Are you -- do you recall any of the international

6    distribution centers that Inspect is currently deployed

7    at?

8    A.    I believe so.

9    Q.    Which ones do you recall?

10   A.    I believe it's in Canada.

11   Q.    Where else?

12   A.    That's all that I am aware.

13   Q.    So it may be -- it may be in others; you just don't

14   know one way or the other?

15   A.    I don't believe it is.

16   Q.    Okay.

17   A.    But I can't confidently...

18   Q.    How many distribution centers is it currently

19   deployed at in Canada?

20   A.    I'm unaware.

21   Q.    More than one?

22   A.    I'm unsure.

23   Q.    How does data originating from retention sampling

24   affect the operation of the Inspect application?

25        MR. LAMB:  Object to the form.

Page 122

1    A.    I don't believe that it does.

2    Q.    (BY MR. HARDT)   In the Inspect application, how do

3    the QC associates know which parameters to inspect for?

4    A.    As far as defects?

5    Q.    Yes.

6    A.    They have a list that they are able to choose from.

7    Q.    How do you determine what is on that list?

8          MR. LAMB:   Object to the form.

9    A.    USDA specifications and Walmart spec -- Walmart or

10   Sam's specifications.

11   Q.    (BY MR. HARDT)   And there's a wide number of USDA,

12   Walmart, and Sam's specifications; right?

13   A.    Correct.

14   Q.    How does the application determine which of those to

15   include in the Inspect app?

16         MR. LAMB:   Object to the form.

17   A.    I'm unaware.

18   Q.    (BY MR. HARDT)   But it does -- it does utilize a

19   subset of the broader?

20   A.    Not that I'm aware of.

21   Q.    You're just not aware one way or the other --

22   A.    Correct.

23   Q.    -- which ones are included?

24   A.    (Nodding head.)

25   Q.    What projects are you currently working on with

Page 123

1    regard to the Retain application?

2    A.    Just testing and re-factoring the code.

3    Q.    What are you currently testing in the Retain

4    application?

5    A.    I have not tested anything in the Retain application

6    yet.

7    Q.    You said you're involved in testing for the Retain

8    application; right?

9    A.    Correct.

10   Q.    What do you mean by that?

11   A.    All of our mobile applications are within the same

12   repository on GitHub and we are going through that

13   entire repository.  I haven't specifically touched

14   anything in Retain.

15   Q.    And the documentation in GitHub, you're aware of

16   references to Zest; right?

17         MR. LAMB:  Object to the form.

18   A.    I'm not aware.

19   Q.    (BY MR. HARDT)  You've never seen any reference to

20   Zest in the GitHub database?

21   A.    No.

22   Q.    Or Intelleflex?

23   A.    No.

24   Q.    You said that you have not tested anything in the

25   Retain application yet.  Do you have plans to test

Page 124

1   anything in the Retain application?

2   A.   Our team does, yes.

3   Q.   And what are those plans?

4   A.   We plan to do UI and unit testing.

5   Q.   And what will the U -- the planned UI testing

6   involve?

7   A.   We plan to test every UI feature.

8   Q.   Is that an internal test within your team?

9   A.   Right.

10  Q.   So, when -- in this context, when we're talking

11  about testing, we're not talking about sending it to the

12  distribution center for piloting or testing; right?

13  A.   We are not.

14  Q.   Okay.  And with regard to the retention sampling

15  data generated by Retain, how is that data used?

16  A.   I'm unaware.

17  Q.   Where is it stored?

18  A.   I'm unaware of the specifics.

19  Q.   Is it stored in a database?

20  A.   I believe.

21  Q.   Which other applications draw from that database?

22  A.   I'm not aware.

23  Q.   It's one central database for the entire Eden

24  system; right?

25  A.   I -- I'm not sure.

Page 125

1    Q.    Who would know that?

2    A.    Anyone that works on the back-end for...

3    Q.    Would that include Anand Banik?

4    A.    It would not.

5    Q.    Who -- who would it include?

6    A.    Daniel Pumford, John Cragun, Anthony Lee.

7    Q.    Anyone else?

8    A.    Dzupham.

9    Q.    Could you spell that name for the record?

10   A.    D-Z-U-P-H-A-M.   There might be a couple others.   I'm

11   not for sure.

12   Q.    Are you currently working on any unit testing for

13   the Retain application?

14   A.    Not at this time.

15   Q.    Are you aware of any plans to do unit testing for

16   the Retain application?

17   A.    Yes.

18   Q.    What are those plans?

19   A.    We plan to do unit testing on all the logic within

20   Retain.

21   Q.    And what will that testing entail?

22   A.    We will write in-the-code unit tests.

23   Q.    And what is the purpose of running unit tests?

24   A.    To make sure that app is operating as we expect it

25   to.

Page 126

1  Q.    Are you aware of any current plans to change the

2  core functionality of the Retain application?

3  A.    Not that I'm aware.

4  Q.    Is it your understanding that the -- that the

5  current version -- let me strike that question because I

6  know versions has a specific meaning here.  So, let me

7  ask it this way:  Are you aware -- is it your

8  understanding that the current functionality of the

9  Retain application is finalized?

10        MR. LAMB:  Object to the form.

11  A.    I don't believe so.

12  Q.    (BY MR. HARDT)  You don't believe so?

13  A.    (Shaking head.)

14  Q.    What do you believe to still be changing?

15  A.    I'm not aware.

16  Q.    Okay.  Did you say you don't believe so just because

17  you've never -- an application is always evolving?

18  A.    Correct.

19  Q.    But you're not aware of any specific plans right now

20  to change the functionality; right?

21  A.    That is correct.

22  Q.    Have you ever worked on an application called

23  Gather?

24  A.    I have not.

25  Q.    Are you aware of an application called Gather?

Page 127

1   A.   I am.

2   Q.   Who works on Gather?

3   A.   It has not begun development yet.

4   Q.   What efforts are you aware of to develop a general

5   framework for what the Gather application will -- will

6   do?

7   A.   Can you repeat the question?

8   Q.   Sure.  What's your understanding of what the Gather

9   application will do in the future?

10  A.   Collect data at field level.

11  Q.   So that data could include things, like weather

12  conditions at the field level?

13       MR. LAMB:  Object to the form.

14  A.   Possibly.

15  Q.   (BY MR. HARDT)  Could it include irrigation

16  schedules at the field level?

17       MR. LAMB:  Object to the form.

18  A.   I'm unsure.

19  Q.   (BY MR. HARDT)  So, if I understand your testimony,

20  you have an understanding that it will involve

21  collecting field level data, you just don't know the

22  specifics of that?

23  A.   That is correct.

24  Q.   Who would know the specifics of that?

25  A.   Josh Bohling.

Page 128

1  Q.    What's your understanding as to when the Gather

2  application will be developed?

3  A.    To my understanding, within the next quarter.

4  Q.    Will the data developed -- strike that.  Will the

5  data collected by the Gather application be stored in

6  the same central databases as the other Eden data?

7  A.    I'm unsure.

8  Q.    Do any of the Eden applications currently collect

9  temperature sensor data?

10  A.    I don't believe so.

11  Q.    Is it your understanding that any of the Eden

12  applications will collect temperature sensor data in the

13  future?

14  A.    What do you mean by temperature sensor data?

15  Q.    Temperature data collected by sensors.

16  A.    Possibly.

17  Q.    What applications would collect that?

18  A.    Likely, Inspect.

19  Q.    Could it also include Gather?

20  A.    Perhaps.

21  Q.    You just don't know one way or the other?

22  A.    I don't.

23  Q.    Would Retain utilize that temperature sensor data?

24  A.    I'm unsure.

25  Q.    You don't know one way or the other?

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 129

1   A.    Correct.

2   Q.    Are you aware of Walmart's plans to begin using

3   temperature sensors supplied by a company called

4   Emerson?

5   A.    I am aware.

6   Q.    What's your understanding of Walmart's plans to use

7   temperature sensors from Emerson?

8   A.    I know they plan to be in the trucks during shipment

9   and that's about it.

10  Q.    Are you aware of any efforts at Walmart to develop

11  systems to collect the temperature data from those

12  sensors?

13  A.    To some degree.

14  Q.    What's your understanding of that?

15  A.    I know that there was some collection of that during

16  the Cold Chain pilot on the back-end that Anand created.

17  Q.    Setting aside that Cold Chain pilot, are you aware

18  of any other efforts to collect the temperature sensor

19  data from Emerson sensors?

20  A.    I'm not sure specifics.

21  Q.    What's your understanding of how Inspect will use

22  temperature data?

23        MR. LAMB:  Object to the form.

24  A.    What do you mean by temperature data?

25  Q.    (BY MR. HARDT)  We just talked about temperature

Page 130

1  data coming in from temperature sensors; right?

2  A.    Right.

3  Q.    What's your understanding of how Inspect will

4  utilize that temperature data?

5        MR. LAMB:  Same objection.

6  A.    I'm unsure of the specifics.

7  Q.    (BY MR. HARDT)  Who would know?

8  A.    Josh Bohling.

9  Q.    And you mentioned you were also doing some current

10 work on Ripen, was the third app; is that right?

11 A.    It's called Ready, now.

12 Q.    Excuse me.  It used to be called Ripen, now it's

13 called Ready; right?

14 A.    Correct.

15 Q.    And so, you're doing some work on the Ready app?

16 A.    Yes.

17 Q.    And is that also related to testing and code

18 cleanup?

19 A.    Correct.

20 Q.    Are you aware of any functionality that you're

21 developing or planning to develop in Ripen that is

22 unrelated to bananas?

23 A.    Not that I'm sure of, no.

24 Q.    What about avocados?

25 A.    I'm unsure.

Page 131

1   Q.    So, maybe in planning; you just don't know one way

2   or the other?

3   A.    That is correct.

4   Q.    Are you currently working on any projects at Walmart

5   outside of the Eden system?

6   A.    I am not.

7   Q.    And just so the record's clear, when I talk about

8   the Eden system, you -- you understand that it's

9   synonymous if I was saying Muse system; right?

10  A.    I do.

11        (Exhibit No. 382 marked for identification.)

12  Q.    (BY MR. HARDT)  Ms. Rankin, I'm going to hand you

13  what's been marked as Plaintiff's Exhibit 382, which

14  bears Bates Nos. WM00075211 through 75227.  And it is a

15  January 7th, 2018 e-mail and attachment from Gary

16  Campisi to Stephen Steel and Denise Sharpe.  Let me know

17  once you've had a chance to review it.

18        Have you had a chance to review Exhibit 382?

19  A.    I have.

20  Q.    This is a January 7, 2018 e-mail from Gary Campisi

21  with an attachment; right?

22  A.    Correct.

23  Q.    And the subject line is Retention Sampling

24  Procedure; right?

25  A.    Correct.

Page 132

1   Q.   And it has an attachment, the file name is

2   Strawberry Retention Sampling Guidelines 2018.pptx;

3   right?

4   A.   Correct.

5   Q.   And can you read the body of the e-mail for the

6   record?

7   A.   "I borrowed from the Zest retention sampling

8   procedure and adjusted it to what our MVP will

9   potentially be.  Let me know your thoughts."

10  Q.   Your understanding of the phrase MVP that Mr.

11  Campisi uses here is Minimum Viable Product; right?

12  A.   I believe so.

13  Q.   Were you aware that Mr. Campisi borrowed from the

14  Zest retention sampling procedures to develop this

15  attachment?

16       MR. LAMB:  Object to the form.

17  A.   I'm unaware of this statement.

18  Q.   (BY MR. HARDT)  My question's a little different:

19  Were you aware that Mr. Campisi borrowed from the Zest

20  retention sampling procedures to build out the attached

21  document?

22       MR. LAMB:  Same objection.

23  A.   I'm not aware that he did.

24  Q.   (BY MR. HARDT)  So, prior to today, you had no

25  knowledge of this; correct?

Page 133

1    A.    That is correct.

2    Q.    You can set aside Exhibit 382.

3    A.    (Witness complies.)

4          (Exhibit No. 383 marked for identification.)

5    Q.    (BY MR. HARDT)  Ms. Rankin, I'm going to hand you

6    what's been marked as Plaintiff's Exhibit 383.  It bears

7    Bates Nos. WM00089566 through 89569, and it is a e-mail

8    chain.  The top e-mail from Anand Banik on October 25th,

9    2017.

10         Have you had a chance to review Exhibit 383?

11   A.    I have.

12   Q.    Mr. Banik sends this e-mail to you, Josh Bohling,

13   and John Luna; right?

14   A.    Correct.

15   Q.    And the subject line is Retention Sample App; right?

16   A.    Correct.

17   Q.    And if we look at the bottom of the page, you see

18   his e-mail at 4:10 p.m., October 25th, says:  Thanks,

19   Aubree for your time.  Do you see that?

20   A.    I do.

21   Q.    And, "As discussed, please find below the

22   data-points we used in our POC."  Do you see that?

23   A.    I do.

24   Q.    So, this is a continuation of the chain we saw

25   earlier; correct?

Page 134

1   A.   Correct.

2   Q.   And Mr. Banik writes, stating in the top e-mail:

3   Please find below the basis data-flow.  Do you see that?

4   A.   I do.

5   Q.   And then, he pastes a graphic that shows the data

6   flow; right?

7   A.   Correct.

8   Q.   What does this data flow represent?

9   A.   I'm unsure.

10  Q.   Why did he send it to you?

11       MR. LAMB:  Object to the form.

12  A.   I'm not sure.

13  Q.   (BY MR. HARDT)  What's your understanding of why you

14  would have needed something like this?

15       MR. LAMB:  Object to the form.

16  A.   I'm unsure.

17  Q.   (BY MR. HARDT)  If you look in the illustration

18  here, on the right side you'll see a label, "Eden:

19  Retention Data."  Do you see that?

20  A.   I do.

21  Q.   That would be the data from the -- the retention

22  sampling and Eden; right?

23       MR. LAMB:  Object to the form.

24  A.   I believe.  I'm un -- I'm unsure.

25  Q.   (BY MR. HARDT)  And that's just one part of this

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 135

1   overall illustration; right?

2   A.    It seems that way.

3   Q.    So, this -- it seems that the data flow relates to

4   the entire Eden system, not just the retention sampling

5   system; correct?

6         MR. LAMB:  Object to the form.

7   A.    I don't believe so.

8   Q.    (BY MR. HARDT)  You don't believe it relates just to

9   the retention data system?

10  A.    Can you repeat the first question?

11  Q.    Sure.  You see where it says Eden:  Retention Data,

12  on the right; right?

13  A.    I do.

14  Q.    And has an arrow showing that's going into

15  Structured Data; right?

16  A.    I do.

17  Q.    And there's other arrows going into Structured Data;

18  right?

19  A.    Right.

20  Q.    And so, the Eden retention data's not the only thing

21  going in the Structured Data; correct?

22  A.    It would look that way.

23  Q.    And so, it appears that this illustration is for a

24  data flow of the larger Eden ecosystem, not simply the

25  retention data aspects of the Eden system; right?

Page 136

1    A.    I don't believe this is the Eden system.

2    Q.    Why don't you believe that?

3    A.    Anand didn't work directly on the Eden team.

4    Q.    On the bottom right, do you see something called

5    KAFKA?

6    A.    I do.

7    Q.    Are you familiar with KAFKA?

8    A.    Not really.

9    Q.    Do you know if KAFKA produces streams of data?

10   A.    I'm unaware.

11   Q.    You don't know one way or the other?

12   A.    Correct.

13   Q.    Have you ever worked on a KAFKA system?

14   A.    I've not.

15   Q.    Are you aware of what KAFKA topic is?

16   A.    I'm not.

17   Q.    So, you wouldn't know one way or other whether KAFKA

18   topic refers to KAFKA feed names?

19   A.    I'm unaware.

20   Q.    If you look on the right, there's an image and above

21   that -- excuse me.  I've got my left and right

22   backwards.  If you look on the left, you'll see 1, 2, 3,

23   4 graphics.  And the first one underneath it says Store;

24   do you see that?

25   A.    I do.

Page 137

1  Q.   And it looks like a little thermometer in the

2  graphic; right?

3       MR. LAMB:  Object to the form.

4  A.   I'm unsure.

5  Q.   (BY MR. HARDT)  Well, the one underneath it would be

6  the GDC; right?

7  A.   Correct.

8  Q.   And the one below that is Pre-cool; right?

9  A.   Correct.

10  Q.   And the one below that is Harvest; right?

11  A.   Correct.

12  Q.   And these are all nodes in the supply chain where

13  temperature data's collected; correct?

14       MR. LAMB:  Object to the form.

15  A.   I'm unsure.

16  Q.   (BY MR. HARDT)  You don't know?

17  A.   (Shaking head.)

18  Q.   So, you don't know if this relates to stored

19  temperature or GDC temperature or pre-cool or harvest

20  temperature?

21  A.   I do not know.

22  Q.   Okay.  All of those -- whatever they are, all of

23  them feed into the Vendor cloud; do you see that?

24  A.   I do.

25  Q.   Who operates the Vendor cloud?

Page 138

1    A.    I'm not aware.

2    Q.    You don't know one way or the other?

3    A.    Correct.

4    Q.    There's a large arrow going to the Walmart API

5    Gateway; do you see that?

6    A.    I do.

7    Q.    And to the right of that is a box with, looks like,

8    two server graphics and above it, it says, ioT Data

9    Consumer; do you see that?

10   A.    I do.

11   Q.    What is the ioT data consumer?

12   A.    I am not sure.

13   Q.    This would be the initial data services for the

14   system; right?

15         MR. LAMB:  Object to the form.

16   A.    I'm not sure.

17   Q.    (BY MR. HARDT)  That feeds into Cassandra; do you

18   see what Cassandra is?

19   A.    Not really.

20   Q.    Did you ever talk to Mr. Banik about this?

21   A.    I don't recall.

22   Q.    Do you know how the Eden system formats temperature

23   data?

24   A.    I do not.

25   Q.    Do you know how the Eden system formats data

Page 139

1    messages carrying retention sampling data?

2    A.    What do you mean by data messages?

3    Q.    A data packet carrying retention sampling data?

4    A.    In what way are you asking; how it's structured?

5    Q.    That's correct.

6    A.    Are you asking the file type, the data points?

7    Q.    Let's take it one at a time.  Are you familiar with

8    what the file type is?

9    A.    I believe it would be JSON.

10   Q.    Do you understand what the data points are?

11   A.    Not specifically.

12   Q.    Would those data points be in the JSON messages?

13   A.    Yes.

14   Q.    Other than looking at the JSON files, are you aware

15   of any other documentation of what the data points would

16   be?

17   A.    Not specifically.

18        MR HARDT:  I think we've been going almost an hour,

19   want to take a break?

20        MR. LAMB:  Sure.

21        VIDEOGRAPHER:  Going off the record.  The time is

22   1:47 p.m.  This ends Media 4.

23                      (Brief recess.)

24        VIDEOGRAPHER:  Going back on the record.  The time

25   is 2:00 o'clock p.m.  And this begins Media 5.

Page 140

1    Q.    (BY MR. HARDT)  Ms. Rankin, have you ever seen or

2    read Walmart's Global Statement of Ethics?

3    A.    I believe I have at one point.

4    Q.    When was that?

5    A.    I'm not for sure.

6    Q.    Would it have been when you started at Walmart?

7    A.    Most likely.

8    Q.    Have you read it recently?

9    A.    Not that I recall.

10   Q.    What do you recall about what Walmart's Global

11   Statement of Ethics says about trade secrets of

12   Walmart's vendors?

13   A.    I do not recall.

14   Q.    And what do you recall about what Walmart's Global

15   Statement of Ethics says about confidential information

16   of Walmart's vendors?

17   A.    I don't recall.

18   Q.    During the course of your work working on the Eden

19   project, have you ever discussed the Global Statement of

20   Ethics with any of your colleagues?

21   A.    Not that I recall.

22   Q.    Did Mr. Tilmon ever ask you to review the Global

23   Statement of Ethics?

24   A.    Not that I recall.

25   Q.    Did anyone else ever ask you to review the Global

Page 141

1  Statement of Ethics in conjunction with your work on the

2  Eden system?

3  A.   Not that I recall.

4  Q.   Do you recall anything about Walmart's Global

5  Statement of Ethics?

6  A.   Not specifically, no.

7       BY MR HARDT:  Why don't we go off the record for

8  just one minute; I just need to switch some stuff

9  around.

10      MR. LAMB:  Sure.

11      VIDEOGRAPHER:  Going off the record.  The time is

12  2:02 p.m.  This ends Media 5.

13                      (Brief pause.)

14      VIDEOGRAPHER:  Going back on the record.  The time

15  is 2:04 p.m.  This begins Media 6.

16      (Exhibit No. 384 marked for identification.)

17      MR. HARDT:  Ms. Rankin, in this case, Walmart has

18  produced several videos, including training videos

19  relating to the Eden system.  One of those bears the

20  Bates No. WM00149920.  The original file name is:

21  Retention_sampling_training_video.MP4.

22      That file is on a USB flash disk that I've marked as

23  Exhibit 384, and I'd like to play that for you.  I have

24  some questions for you about it, but it's relatively

25  short, so I think the easiest thing is just to let you

Page 142

1   watch it through one time and then we can go through and

2   ask our questions.

3   A.    Okay.

4   Q.    Does that work for you?

5   A.    Yes.

6         VIDEO NARRATOR:  "First, you will watch the Sizzle

7   application and then log in with your user credentials.

8   After successfully logging in, you will be on the Sizzle

9   home screen.  You will select the retention sampling

10  option.  When you're first receiving the sample, you

11  will want to go to the print samples option on the

12  retention sample screen to print the label for your new

13  sample.

14        On the print screen, select the new sample button,

15  and your label will be printed.  If there is an error,

16  please contact us so we can look into what is causing

17  the printer error; however, hopefully, your label will

18  print successfully.  Then, attach it to the sample.

19        If you have a sample that is staying at the DC and

20  one that is going to a Sam's Club, two labels will

21  print; put one on each sample.  When placing the label,

22  put them in a place that will have the least impact on

23  the vents on the packaging.  Once your label is printed

24  and attached to the sample, you are ready to set up the

25  sample.

Rankin, Aubree 10/18/2019                    Zest Labs v. Walmart

Page 143

1       From the main retention sampling page, select

2    create and evaluate; and then scan the new label on the

3    sample.  Following a successful sample scan, you will be

4    prompted to scan the PTI label.  And finally, it will

5    prompt you to scan the temperature sensor that came with

6    the strawberries.

7       You will then count the strawberries in the sample.

8    When counting the berries, remove them carefully, one by

9    one, by the stalk only.  Then enter the number of

10   berries on the prompt.  Then type in the P.O. number.

11   Once you do that, the app will prompt you to do an

12   initial evaluation of the strawberries.

13      Examine them for serious damage on the defects

14   listed.  If you have the poster showing the defects,

15   refer to it for reference on what each defect looks

16   like.  When you click finish on the evaluation, you will

17   be prompted to take a picture of the sample.  Be sure to

18   focus on any defects that you notice.

19      Once the picture successfully uploads, it will ask

20   you if you have more samples to add on this P.O.  Once

21   you complete that, you are all set up with the new

22   sample that you have added.  All that's left to do is

23   evaluate the sample every day the same way we did in the

24   initial evaluation until it is end of life.

25      To do the daily evaluations of the sample, you will

Page 144

1    go to the create and evaluate option on the retention

2    sampling main page and you will scan the barcode on the

3    sample.  This should bring up the evaluation page and

4    you will do the evaluation the same way as the initial

5    evaluation.

6         Every evaluation following the initial evaluation,

7    do not remove strawberries from the packaging; just

8    count the defects as best you can by examining through

9    the clamshell.  Please be sure to inspect the

10   strawberries in a chilled environment.

11        If the barcode on your label rips, you have the

12   option to reprint the sample label by selecting the

13   print label option and selecting reprint.  It will then

14   prompt you to enter the sample I.D. of the label that

15   ripped.  That I.D. is what is printed below the barcode

16   on the label.  Then reattach this label to the sample.

17        If you have any questions about the process, refer

18   to the poster or contact us at

19   retention-sampling@email.wal-mart.com.  Thanks."

20   Q.   (BY MR. HARDT)  Ms. Rankin, you've seen that video

21   before; right?

22   A.   I have.

23   Q.   That's your voice narrating the video; right?

24   A.   Yes.

25   Q.   Who helped you create this video?

Page 145

1    A.    Austin English.  He filmed the video.

2    Q.    Is Austin English a Walmart employee?

3    A.    He is.

4    Q.    Does he work in ISD?

5    A.    He does.

6    Q.    Does he work on the Eden project?

7    A.    He does.

8    Q.    What's his role on the Eden project?

9    A.    He is a developer.

10   Q.    Is his role similar to yours?

11   A.    Similar.

12   Q.    At a high level --

13   A.    Correct.

14   Q.    -- it's similar?

15   A.    (Nodding head.)

16   Q.    What Eden applications has Austin English worked on?

17   A.    Inspect desktop, Almanac.  That's all that I recall.

18   Probably the first version of Inspect.

19   Q.    Okay.  And did he have any involvement working on

20   either Sizzle or Retain?

21   A.    I don't believe so.

22   Q.    This video we just watched, this was a training

23   video you created for retention sampling; right?

24   A.    Right.

25   Q.    I want to go through this again with you.  But as we

Page 146

1    do it, I want you to have in front of you Exhibit 268

2    and Exhibit 273.  They should be right here in this

3    pile.  It's 268 and 273.  They should be the ones that

4    have gray stickers instead of bright orange.

5    A.    What was the second one after 268?

6    Q.    268 and 273.  If you can't find it, I can probably

7    get you another copy.

8    A.    I found it.

9    Q.    Okay.  Is that -- that may be the wrong one.  Is

10   that 373 or 273?

11   A.    Oh, sorry.  Yeah, it 373.

12         MR. LAMB:  Why don't you take mine and I'll...

13         THE WITNESS:  Okay.

14         MR. HARDT:  Here's a copy.  It's kind of bad copy,

15   but --

16         MR. LAMB:  It's fine.

17         BY MR HARDT:  -- I don't think I have any notes on

18   it.

19   Q.    (BY MR. HARDT)  So, Ms. Rankin, as we go back

20   through the video on Exhibit 384, do you have Exhibits

21   268 and 273 in front of you?

22   A.    I do.

23   Q.    I'm going to begin playing the video again and then

24   we'll stop at various points.

25         VIDEO NARRATOR:  "First, you will watch the Sizzle

Page 147

1    application and then log in with your user credentials.

2    After successfully logging in, you will be on the Sizzle

3    home screen.  You will select the retention sampling

4    option.  When you're first receiving the sample, you

5    will want to go to the print samples option on the

6    retention sample screen to print the label for your new

7    sample.

8        On the print screen, select the new sample button

9    and your label will be printed. "

10   Q.   (BY MR. HARDT)  Ms. Rankin, I've stopped the video

11   at second 30 from timestamp 025 to 030.  25 seconds to

12   30, you narrated:  "On the print screen, select the new

13   sample button and your label will be printed."  Right?

14   A.   That sounds correct.

15   Q.   And this reflects printing a sample label with a

16   barcode; right?

17   A.   Yes.

18   Q.   That's part of the retention sampling process;

19   right?

20   A.   Yes.

21   Q.   I'm going to hit play again.

22       VIDEO NARRATOR:  "If there's an error, please

23   contact us so we can look into what is causing the

24   printer error.  However, hopefully, your label will

25   print successfully.  Then attach it to the sample."

Page 148

1   Q.   (BY MR. HARDT)  I've stopped the video at second 45.

2   From second 36 to 45, you narrated:  "However,

3   hopefully, your label will print successfully.  Then

4   attach it to the sample."  Is that correct?

5   A.   That is correct.

6   Q.   Let's turn to Exhibit 273.  And in particular, I'd

7   like you to go to page Bates labeled WM00075965.  In the

8   middle of the page, do you see where it has a No. 2 in

9   the left margin?

10  A.   I do.

11  Q.   And it says:  Attached pre-printed sample ID barcode

12  label to sample, place sample in pre-tagged bin.

13  Correct?

14  A.   It does.

15  Q.   I'm going to hit play again.

16       VIDEO NARRATOR:  "If you have a sample that is

17  staying at the DC and one that is going to a Sam's Club,

18  two labels will print; put one on each sample.  When

19  placing the label, put them in a place that will have

20  the least impact on the vents on the packaging.  Once

21  your label is printed and attached to the sample, you

22  are ready to set up the sample.

23       From the main retention sampling page, select

24  create and evaluate."

25  Q.   (BY MR. HARDT)  I've stopped the video at timestamp

Page 149

1    1 minute 13 seconds.  And on the video from 1:09 to

2    1:13, you narrated, quote, "From the main retention

3    sampling page, select create and evaluate."  Is that

4    right?

5    A.    That is correct.

6    Q.    This is how you would start the evaluation; right?

7    A.    Yes.

8    Q.    I'd like you to turn to the page Bates labeled 75968

9    in Exhibit 273.  Are you there?

10   A.    I am.

11   Q.    On the left side of the page, there's three images.

12   Do you see those?

13   A.    I do.

14   Q.    The top one says Freshness Baseline; do you see

15   that?

16   A.    Yes.

17   Q.    And at the bottom that image of the user interface,

18   it had a bar that says, Start evaluation; right?

19   A.    Correct.

20   Q.    I'm going to hit play on the video again.

21        VIDEO NARRATOR:  "And then scan the new label on the

22   sample."

23   Q.    (BY MR. HARDT)  I stopped the video at 1 minute, 17

24   seconds.  From 1:14 to 1:17 on the video, you narrated,

25   quote, "And then scan the new label on the sample."

Page 150

1    Right?

2    A.    Correct.

3    Q.    If we turn back to the page Bates labeled 75968; do

4    you see that?

5    A.    I do.

6    Q.    I want you to look at the paragraph at the top of

7    the page, the heading is to:  Select "+" to add new

8    samples.  Do you see that?

9    A.    Yes.

10   Q.    And the last sentence reads:  Existing samples can

11   be evaluated by selecting the Start Evaluation button at

12   the bottom of the screen or by simply scanning an

13   existing sample's barcode label.  Do you see that?

14   A.    I do.

15   Q.    I'm going to hit play on the video again.

16         VIDEO NARRATOR:  "Following a successful sample

17   scan, you will be prompted to scan the PTI label."

18   Q.    (BY MR. HARDT)  I stopped the video at 1 minute, 25

19   seconds.  From 1:18 to 1 minute, 25 seconds on the

20   video, you narrated:  "Following a successful sample

21   scan, you will be prompted to scan the PTI label."  Is

22   that correct?

23   A.    That's correct.

24   Q.    I want you to turn back to Exhibit 273, in the

25   middle of the same page, Bates page 79 -- 75968, do you

Page 151

1   see the paragraph that begins 3?

2   A.    I do.

3   Q.    And then the title says:  Scan Bin ZIPR Tag and PO

4   Number?

5   A.    I do.

6   Q.    The beginning of this first sentence says:  When

7   prompted, scan the bin ZIPR Tag barcode to capture the

8   bin ID; right?

9   A.    Right.

10  Q.    I'm going the hit play on the video again.

11        VIDEO NARRATOR:  "And finally, it will prompt you to

12  scan the temperature sensor that came with the

13  strawberries."

14  Q.    (BY MR. HARDT)  I've stopped the video at 1 minute,

15  31 seconds.  From timestamp 1:25 to 1:31, you narrated:

16  "And finally, it will prompt you to scan the temperature

17  sensor that came with the strawberries."  Correct?

18  A.    Correct.

19  Q.    Now, turn to Exhibit 273 on the next page, the Bates

20  label is 75969.  Do you see the paragraph at the top of

21  the page that says, 5:  ZIPR Tag ID?

22  A.    I do.

23  Q.    That paragraph begins:  If you scanned the sample's

24  barcode label, the sample ID will be filled in on the

25  Scan Sample dialog box.  Do you see that?

Page 152

1   A.   I do.

2   Q.   Please read the rest of the sentence for the record.

3   A.   "Next scan sample's associated ZIPR Tag."

4   Q.   I'm going to hit play on the video again.

5        VIDEO NARRATOR:   "You will then count the

6   strawberries in the sample.  When counting berries,

7   remove them carefully, one by one, by the stalk only."

8   Q.   (BY MR. HARDT)  I've stopped the video at timestamp

9   1 minute 42 seconds.  From 1 minute, 32 seconds to 1

10  minute, 42 seconds, you narrated, "You will then count

11  the strawberries in the sample.  When counting berries,

12  remove them carefully, one by one, by the stalk only."

13  Is that correct?

14  A.   That is correct.

15  Q.   Ms. Rankin, I'd like you now to turn to Exhibit 268,

16  it's the document that begins with Bates No. WM00140286?

17  A.   Correct.

18  Q.   Are you there?

19  A.   I am.

20  Q.   The Strawberry Evaluation attachment begins at Bates

21  label WM00140295, kind of halfway through it.  Let me

22  know when you're there.

23  A.   I'm there.

24  Q.   Now, this page says "Zest Labs" in the top right;

25  correct?

Page 153

1  A.    Correct.

2  Q.    And the title's:  Strawberry Evaluation Ref Guide

3  for WM DC; right?

4  A.    Right.

5  Q.    Okay.  I'd like you to flip forward until we get to

6  the Bates-labeled page WM00140309.  Are you there?

7  A.    I am.

8  Q.    This is a page that says Training on the top;

9  correct?

10  A.    Correct.

11  Q.    The second bullet says, quote, "Count berries."

12  Correct?

13  A.    Correct.

14  Q.    I'm going to hit play on the video again.

15        VIDEO NARRATOR:  "Then enter the number of berries

16  on the prompt.  Then type in the P.O. number.  Once you

17  do that, the app will prompt you to do an initial

18  evaluation of the strawberries.  Examine them for

19  serious damage on the defects listed."

20  Q.    (BY MR. HARDT)  I've stopped the video at timestamp

21  2 minutes, 4 seconds.  From 1:55 to 2 minutes, 4

22  seconds, you narrated, quote, "Once you do that, the app

23  will prompt you to do an initial evaluation of the

24  strawberries.  Examine them for serious damage on the

25  defects listed."  Is that right?

Page 154

1   A.   That's correct.

2   Q.   I want you to turn on Exhibit 268 to the page

3   bearing Bates label WM00140310.  It should be the next

4   page.

5   A.   (Witness complies.)

6   Q.   This one also says Training at the top; right?

7   A.   Correct.

8   Q.   And it has six bullets down the left margin; right?

9   A.   Yes.

10   Q.   And each of these bullets is a strawberry defect;

11   correct?

12   A.   It appears so.

13   Q.   The top line says:  Parameter by parameter grade the

14   berries; correct?

15   A.   Correct.

16   Q.   To grade the berries, you would have to examine the

17   berries; right?

18       MR. LAMB:  Object to the form.

19   A.   I suppose.

20   Q.   (BY MR. HARDT)  And on the right side of the page,

21   we see a photograph with arrows beside it.  Do you see

22   that photograph?

23   A.   Yes.

24   Q.   In the top portion of that photograph, it has three

25   rows of strawberries.  And then, underneath that, it

Rankin, Aubree 10/18/2019                                    Zest Labs v. Walmart

Page 155

1  says:  Good marketable quality; right?

2  A.    I can't make it out on my copy, but it seems.

3  Q.    I can probably get you a better copy.  Let's look on

4  one, just so you know.  I'm going to hand you the

5  original, which has a little bit better image.  I'm not

6  going to mark it; it's the same -- same document.

7  A.    I can see it.

8  Q.    So, looking at -- looking at the Bates page bearing

9  140310, do you see in the middle, it says, Good

10  marketable quality; right?

11 A.    Right.

12 Q.    And at the bottom, it says, Severe defects; right?

13 A.    Right.

14 Q.    And this page also shows, however many, you know, 24

15 or so strawberries laid out for evaluation; right?

16 A.    It appears that way.

17 Q.    And at this point in the video, at time-stamped

18 2:04, the video shows that you've laid out the

19 strawberries on a towel for evaluation also; right?

20 A.    I have.

21 Q.    I'm going to hit play on the video again.

22       VIDEO NARRATOR:  "If you have the poster showing the

23 defects, refer to it for reference on what each defect

24 looks like.  When you click Finish on the evaluation,

25 you will be prompted to take a picture of the sample.

Page 156

1    Be sure to focus on any defects that you noticed."

2    Q.    (BY MR. HARDT)  I've stopped the video at 2 minutes,

3    19 seconds.  From timestamp 2:10 to 2 minutes, 19

4    seconds, you narrated, "When you click Finish on the

5    evaluation, you will be prompted to take a picture of

6    the sample.  Be sure to focus on any defects that you

7    noticed."  Correct?

8    A.    Correct.

9    Q.    I want you to turn back to Exhibit 273.  Let me know

10   when you're there.

11   A.    I'm there.

12   Q.    I want you to flip forward a couple of pages until

13   we're at the page Bates labeled WM00075972.

14   A.    (Witness complies.)

15   Q.    Are you there?

16   A.    I am.

17   Q.    At the top right of the page, there's a paragraph

18   that says 3:  Take a Picture.  Do you see that?

19   A.    I do.

20   Q.    I'd like you to read that paragraph in the record,

21   please.

22   A.    "Tapping the camera button at any point during an

23   evaluation will open the camera and allow you to take

24   one or multiple pictures.  At least one picture must be

25   taken each time the sample is evaluated in order for

Page 157

1   that evaluation to be saved."

2   Q.   So, as the title indicates, this paragraph relates

3   to taking a picture during the evaluation; right?

4   A.   Correct.

5   Q.   I'm going to hit play on the video again.

6        VIDEO NARRATOR:   "Once the picture successfully

7   uploads, it will ask you if you have more samples to add

8   on this P.O.  Once you complete that, you are all caught

9   up with the new samples that you have added.  All that's

10  left to do is evaluate the sample every day, the same

11  way that we did the initial evaluation, until it is end

12  of life."

13  Q.   (BY MR. HARDT)  I've stopped the video at timestamp

14  2 minutes and 42 seconds.  From 2:35 until 2 minutes, 42

15  seconds, you narrated, "All that's left to do is

16  evaluate the sample every day, the same way we did in

17  the initial evaluation until it is end of life."  Did I

18  read that right?

19  A.   That's correct.

20  Q.   That's what you said; correct?

21  A.   Yes.

22  Q.   I want you to turn back to Exhibit 273.  Now, we

23  should be on the same page, the one bearing Bates label

24  75972.

25  A.   Okay.

Page 158

1    Q.    Do you see the paragraph beginning 4, in the middle

2    of the page?

3    A.    I do.

4    Q.    It says, 4:  Quote, "End of Life," end quote; right?

5    A.    Right.

6    Q.    The first sentence says, "The last parameter listed

7    is the End of Life parameter, which is used to mark the

8    samples end of life," parentheses, "(EOL)," close

9    parentheses.  Did I read that right?

10   A.    Yes.

11   Q.    The next sentence says:  Leave this set to No until

12   the sample is determined to be EOL, based on the defined

13   criteria for the selected product.  Did I read that

14   right?

15   A.    Yes.

16   Q.    And the third sentence says:  When the sample is

17   determined to be EOL, set to Yes and leave the default

18   EOL reason set to End of Life.  Excuse me, End of Shelf

19   Life.  Did I read that right?

20   A.    Yes.

21   Q.    I'm going to hit play on the video again.

22         VIDEO NARRATOR:  "To do the daily evaluations of the

23   sample, you will go to the create and evaluate option on

24   the retention sampling main page and you will scan the

25   barcode on the sample .  This should bring up the

Page 159

1    evaluation page and you will do the evaluation the same

2    way as the initial evaluation.

3        Every evaluation following the initial evaluation,

4    do not remove strawberries from the packaging; just

5    count the defects the best you can by examining through

6    the clamshell.  Please be sure to inspect the

7    strawberries in a chilled environment."

8    Q.    (BY MR. HARDT)  I've stopped the video, Ms. Rankin,

9    at timestamp 3 minutes and 15 seconds.  From 3:10 to

10   3:15 on the video, you narrated:  "Please be sure to

11   inspect strawberries in a chilled environment."

12   Correct?

13   A.    Correct.

14   Q.    In Exhibit 273, I'd like you to turn to the Bates

15   labeled page WM00075966.

16   A.    (Witness complies.)

17   Q.    In the middle of this page, there's a sentence that

18   says -- that begins, Samples should be stored; do you

19   see that one?

20   A.    I do.

21   Q.    Can you read that into the record?

22   A.    "Samples should be stored in a designated holding

23   area in the DC."

24   Q.    And at the end of that sentence, there's a footnote

25   2; right?

Page 160

1    A.    Right.

2    Q.    Footnote 2 is at the bottom of the page; right?

3    A.    Right.

4    Q.    Footnote 2 states:  Care should be taken to store

5    product samples in a location at the receiving DC that

6    meets the product's normal storage temperature.  Right?

7    A.    Right.

8    Q.    One other thing, this video right now is paused at

9    timestamp 3 minutes and 15 seconds.  Can you see the

10   screen?

11   A.    I can.

12   Q.    On this screen, you see somebody holding a handheld

13   device.  It may even be you; right?

14   A.    Right.

15   Q.    That's a TC70 device; right?

16   A.    Right.

17   Q.    On Exhibit 273, I'd like you to turn to the second

18   page of the attachment.  It's actually page 1 of the

19   presentation, it has Bates No. WM00075964.  Are you

20   there?

21   A.    I am.

22   Q.    On the bottom -- very bottom of the page, it says

23   REV.0.31.0; do you see that?

24   A.    Right here?

25   Q.    Yes.

Page 161

1    A.    Okay.

2    Q.    To the left of that is three words.  Can you read

3    those words into the record?

4    A.    "Zest Labs Confidential."

5    Q.    I'd like you to go to Exhibit 268.

6    A.    (Witness complies.)

7    Q.    And as you may recall, the pages we've been focused

8    on this part of the examination began on what's Bates

9    labeled WM00140295.  Let me know when you're there.

10   A.    I'm there.

11   Q.    On the bottom of the slide, there's some language

12   beginning "This presentation"; do you see that?

13   A.    I do.

14   Q.    Can you read that in the record?

15   A.    "This presentation is Zest Labs Confidential

16   Material."

17   Q.    You can set these exhibits aside.

18   A.    (Witness complies.)

19        BY MR HARDT:  And just so the record's clear, I'm

20   now removing the flash disk from the computer, which

21   will be marked Exhibit 384 for the court reporter's

22   record.

23        (Exhibit No. 385 marked for identification.)

24   Q.    (BY MR. HARDT)  Ms. Rankin, I'm handing you what's

25   been Bates labeled Exhibit -- excuse me, strike all

Page 162

1    that.  Ms. Rankin, I'm handing you what's been labeled

2    Plaintiff's Exhibit 385.  This is a printout copy of

3    your LinkedIn page printed from the internet this week.

4    Do you recognize this document?

5    A.    Not particularly.

6    Q.    You do have a LinkedIn page; right?

7    A.    I do.

8    Q.    And at the top of this page, it says Aubree Rankin;

9    right?

10   A.    Right.

11   Q.    And underneath that, it says, "Programmer at

12   Walmart"; right?

13   A.    Right.

14   Q.    So, you agree this is a -- likely a current

15   reflection of your LinkedIn page; correct?

16         MR. LAMB:  Object to the form.

17   A.    I'm unsure.

18   Q.    (BY MR. HARDT)  Recently, you had a picture on your

19   LinkedIn page, too; right?

20   A.    I have a profile picture, yes.

21   Q.    And in the last -- last couple weeks, that profile

22   picture's been removed and is no longer visible; right?

23   A.    I don't believe so.

24   Q.    It's not visible on this sheet; right?

25   A.    That is correct.

Page 163

```
1   Q.   And at least as of about a month ago, you had some

2   descriptions of your roles at Walmart underneath where

3   it says, Walmart Associate Software Engineer; right?

4   A.   I believe so.

5   Q.   And those are not on this version; right?

6   A.   It appears not.

7   Q.   They've been removed from your LinkedIn profile

8   that's public facing; right?

9        MR. LAMB:  Object to the form.

10  A.   No.

11  Q.   (BY MR. HARDT)  Should we get on the internet?  I

12  will represent to you that this is a current version of

13  your LinkedIn page.  We can get on the internet if we

14  need to.

15  A.   I don't -- I mean, okay.

16  Q.   Did you -- did you remove any information from your

17  LinkedIn page?

18  A.   I did not.

19  Q.   Were you told to remove any information from your

20  LinkedIn page by anyone?

21  A.   I was not.

22       MR. LAMB:  Object to the form.

23  Q.   (BY MR. HARDT)  You can -- can you answer the

24  question again?

25  A.   I was not.
```

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

```
                                                    Page 164
 1    Q.   You received a document retention notice, in this

 2    case; right?

 3    A.   What was that?

 4    Q.   Did you receive, in conjunction with this

 5    litigation, a document or e-mail instructing you to

 6    preserve your documents and not destroy anything?

 7    A.   I did.

 8    Q.   When did you receive that?

 9    A.   I don't recall.

10    Q.   Would it have been approximately August of 2018 or

11    would it be recent?

12    A.   I don't believe recent, but I don't recall the date.

13    Q.   More than six months ago?

14    A.   I believe so.

15    Q.   Have you complied with that document retention

16    notice?

17    A.   I have.

18    Q.   Are you aware of anyone in your working group that

19    has not complied with it?

20    A.   I am not.

21         MR HARDT:  Why don't we take a short break?

22         MR. LAMB:  Sure.

23         VIDEOGRAPHER:  Going off the record.  The time is

24    2:38 p.m.  This ends Media 6.

25                        (Brief recess.)
```

Page 165

1       VIDEOGRAPHER:  Going back on the record.  The time
2    is 2:50 p.m.  This begins Media 7.
3       (Exhibit No. 386 marked for identification.)
4    Q.   (BY MR. HARDT)  Ms. Rankin, I'm going to hand you
5    what I've marked as Plaintiff's Exhibit 386.  It bears
6    Bates No. WM00129892 through 129908.  Let me know once
7    you've had a chance to review that.
8    A.   I'm ready.
9    Q.   Excuse me.  This exhibit should be Bates labeled
10   WM00129892 through 129911.  I'm going to hand you the
11   last couple of pages that were left off.  There you go.
12   Now, let me know when you're done reviewing the exhibit.
13   A.   Okay.
14   Q.   Have you had a chance to review Exhibit 386?
15   A.   I have.
16   Q.   Exhibit 386 is an e-mail from Stephen Steel to you
17   on June 14th, 2018; right?
18   A.   Right.
19   Q.   Subject line is:  Retention Sampling Information;
20   right?
21   A.   Right.
22   Q.   And it has two attachments; correct?
23   A.   Correct.
24   Q.   Stephen Steel writes, "Aubree, PFA," which I believe
25   means Please Find Attached; right?

Page 166

1   A.    Right.

2   Q.    "Please find attached a copy of the PowerPoint that

3   Gary put together, along with some information from our

4   favorite vendor!"  Did I read that right?

5   A.    You did.

6   Q.    And who is your favorite vendor?

7   A.    I'm unsure -- I'm for -- I'm not for sure who he's

8   referring to, but I believe it to be Zest.

9   Q.    Why would he refer to Zest as our favorite vendor?

10  A.    I'm unsure.

11  Q.    Have you ever heard anybody else refer to Zest as

12  your favorite vendor?

13  A.    Not that I recall.

14  Q.    Do you think he's being sarcastic here?

15  A.    I'm unsure.

16  Q.    Did you ask him why he called Zest our favorite

17  vendor?

18  A.    I did not.

19  Q.    First attachment, Bates number begins WM00129893.

20  Are you there?

21  A.    Yes.

22  Q.    The cover page says:  Strawberry Retention Sampling

23  Guidelines.  Do you see that?

24  A.    I do.

25  Q.    And then it says January 7th, 2018.

Page 167

1   A.   Yes.

2   Q.   You see that?

3   A.   Yes.

4   Q.   This is the same presentation that you received in

5   January from Gary Campisi; right?

6        MR. LAMB:  Object to the form.

7   A.   I believe so.

8   Q.   (BY MR. HARDT)  The second attachment begins on

9   what's Bates labeled WM0012990; right?

10  A.   Right.

11  Q.   And at the bottom of the page, it says "Zest Labs

12  Confidential"; right?

13  A.   Right.

14  Q.   So, this would be the information from our favorite

15  vendor; right?

16       MR. LAMB:  Object to form.

17  A.   I believe that's what he would mean.

18  Q.   (BY MR. HARDT)  Stephen Steel was providing this to

19  you because around this time, in June of 2018, you were

20  putting the final -- final changes into the retention

21  sampling app before the Minnesota and North Dakota trip;

22  right?

23       MR. LAMB:  Object to form.

24  A.   I'm not sure.

25  Q.   (BY MR. HARDT)  Do you recall working with Stephen

Page 168

1   Steel in June of 2018 to finalize the phase -- excuse

2   me -- the retention sampling app before the training in

3   Minnesota and North Dakota?

4         MR. LAMB:  Object to form.

5   A.    I do not recall.

6         (Exhibit No. 387 marked for identification.)

7   Q.    (BY MR. HARDT)  Ms. Rankin, I'm handing you what's

8   been marked as Exhibit 387.  This document bears Bates

9   labels WM00128969 through 128970.  And it appears to be

10  an e-mail chain between Stephen Steel and Aubree Rankin

11  on June 14, 2018; do you see that?

12  A.    I do.

13  Q.    And the subject line is:  Retention Sampling

14  Information; right?

15  A.    Right.

16  Q.    In the bottom e-mail on the second page is at 5:10

17  p.m., on June 14th; right?

18  A.    Right.

19  Q.    This is the e-mail we just saw in the prior exhibit,

20  Exhibit 386; right?

21  A.    It appears to be.

22  Q.    Your response to this e-mail was, "Steve, Do we just

23  want the images of each defect and that is all?  Or do

24  we want some of the text explanation as well?"  Do you

25  see that?

Page 169

1    A.    I do.

2    Q.    And then, two e-mails up, at 5:15 p.m., you say,

3    "Yes, that is what I had in mind."  Do you see that?

4    A.    I do.

5    Q.    And then you say, "I will make it tonight or in the

6    morning and send it your way for approval before

7    printing it."  Correct?

8    A.    Correct.

9    Q.    And that would have been before printing for the

10   training that's going to take place in North Dakota and

11   Minnesota that you guys were leaving for shortly;

12   correct?

13   A.    I believe so.

14   Q.    You can set that exhibit aside.  Have you ever heard

15   of a company called IFCO?

16   A.    Yes.

17   Q.    Who is IFCO?

18   A.    I'm not for sure.

19   Q.    You have heard of them, but you just don't know what

20   they do?

21   A.    Right.

22   Q.    Have you ever worked with them?

23   A.    A little bit.

24   Q.    What have you worked with them on?

25   A.    Scanning PTI labels.

Page 170

1  Q.    What was their role with scanning PTI labels?

2  A.    They would scan the PTI labels in the PTI audit in

3  Sizzle.

4  Q.    What is the PTI audit in Sizzle?

5  A.    It is another app within Sizzle that is used to scan

6  PTI labels and check for compliance.

7  Q.    Check for compliance with what?

8  A.    Walmart standards for the PTI label.

9  Q.    Is -- is -- is that compliance purely focused on

10 whether the actual physical label is in compliance from

11 a formatting standpoint?

12 A.    Mostly, yes.

13 Q.    Does it -- what else would it include?

14 A.    If the scan comes in correctly.

15 Q.    Then what would happen?

16 A.    Data is collected on whether or not it will scan or

17 not.

18 Q.    Does scanning the PTI labels provide any additional

19 data if the PTI label was on a produce product?

20 A.    Can you rephrase the question?

21 Q.    Sure.  PTI labels could be on a case of produce

22 coming in as well; right?

23 A.    Correct.

24 Q.    And so, those PTI labels could be scanned in the

25 Eden system; right?

Rankin, Aubree 10/18/2019                           Zest Labs v. Walmart

Page 171

1   A.    Yes.

2   Q.    What information from those PTI labels does Eden

3   collect?

4   A.    The whole label.

5   Q.    And how does Eden use that information?

6   A.    To get compliance with our suppliers on their PTI

7   labels.

8   Q.    What do you mean by compliance with the suppliers?

9   A.    For their labels to match our Walmart standards.

10  Q.    So in other words, if the label is required to have

11  -- be formatted a certain way and the supplier's not

12  using that format, this would catch that?

13  A.    Correct.

14  Q.    What else could it catch?

15  A.    It catches the different data contained within the

16  PTI label.

17  Q.    Does it collect harvest time data?

18  A.    If the harvest data's contained within the PTI

19  label, yes.

20  Q.    Does it collect lot data?

21  A.    It does.

22  Q.    Does it collect the name of the supplier?

23  A.    Not directly, no.

24  Q.    Would you know the name of the supplier by cross

25  referencing other information on the PTI label?

Page 172

1    A.    I believe you could.

2    Q.    Does Eden do that?

3    A.    Not to my knowledge.

4    Q.    Does the scan of the PTI label provide Eden with

5    information about the produce type?

6    A.    Not currently.

7    Q.    Is there plans for it to provide that information?

8    A.    I'm not for sure.

9    Q.    Does the scan of the PTI label provide Eden with

10   information about the variety type?

11   A.    Not that I'm aware.

12   Q.    Is the data that's collected from a scan of the PTI

13   label fed into the Inspect application?

14   A.    Yes.

15   Q.    Is the data that's collected from the PTI label fed

16   into the Retain application?

17   A.    I'm not for sure.

18   Q.    You just don't know one way or the other?

19   A.    I believe it does, but I'm not confident in that

20   answer.

21   Q.    It likely would because Retain has similar

22   functionality to Inspect; right?

23         MR. LAMB:  Object to the form.

24   A.    It does have similar functionality.

25         (Exhibit No. 388 marked for identification.)

Page 173

1    Q.   (BY MR. HARDT)  Ms. Rankin, I'm going to hand you

2    what I'm marking as Plaintiff's Exhibit 388.  This

3    document bears Bates label WM00116075.  Have you had a

4    chance to review Exhibit 388?

5    A.   I have.

6    Q.   This appears to be an e-mail chain including John

7    Luna, Gary Campisi, Derek Thomas, Jeff Kerbs and

8    yourself; correct?

9    A.   Correct.

10   Q.   And it's dated January 5th, 2018; right?

11   A.   Right.

12   Q.   The subject line says:  TC-70/Eden Access for IFCO

13   team; do you see that?

14   A.   I do.

15   Q.   The bottom e-mail that's time stamped 2:01 p.m.; you

16   see that one?

17   A.   I do.

18   Q.   Gary Campisi writes, "John, Last month on the Cold

19   Chain WebEx with Denise and Stephen Steel, we talked

20   about utilizing Acosta for the retention sampling

21   Killer app.  I believe you mentioned that there is a

22   possibility of giving them a temporary user ID, similar

23   to what we do for the temporary help, so they can access

24   the device to enter the information."  Did I read that

25   right?

Page 174

1    A.    You did.

2    Q.    It continues, "We are looking to utilize IFCO

3    associates to utilize the TC-70 to access the Eden PTI

4    label scans.  We have hired IFCO to perform the

5    analytics for the PTI & CAP initiative, so giving them

6    access is critical to the success of the initiative."

7    Did I read that right?

8    A.    You did.

9    Q.    What Eden access did you give the IFCO associates?

10        MR. LAMB:  Object to the form.

11   A.    They sat in the home office and used Sizzle to scan

12   PTI labels.

13   Q.    (BY MR. HARDT)  Did they sit with your team when

14   they did that?

15   A.    I was present.

16   Q.    Did they access any portion of Eden other than PTI

17   label scanning?

18   A.    They did not.

19   Q.    In the top sentence here, it says -- I'm going to

20   jump about halfway through after it says Stephen Steel,

21   and it says, "we talked about utilizing Acosta for the

22   retention sampling Killer app."  Do you see that?

23   A.    I do.

24   Q.    Who is Acosta?

25   A.    They are a third party who was being considered to

Rankin, Aubree 10/18/2019                                    Zest Labs v. Walmart

                                                                    Page 175

1    do the retention sampling at the distribution centers,

2    initially.

3    Q.    Did you ever use Acosta?

4    A.    No.

5    Q.    Have you ever used them to -- you know, up to --

6    through today, have you ever used Acosta?

7    A.    Not that I'm aware of.

8    Q.    Okay.  And what is the retention sampling Killer

9    app?

10   A.    It is the retention-sampling app within Sizzle.

11   Q.    Do you have an understanding what he means when he

12   refers to it as the Killer app?

13   A.    It was sometimes referred to that, due to it

14   determining end of life, as the Killer app.

15   Q.    Because that was one of the purposes of the -- of

16   the retention sampling was to determine end of life;

17   right?

18   A.    Correct.

19   Q.    Ms. Rankin, I have one more thing for you, just so

20   we can help the court reporter have a very clean record

21   today.  I'm going to hand you this computer.  It's

22   opened up to the -- this PC screen.

23        I'm going to hand you Exhibit 384, and I'd like you

24   to plug Exhibit 384 into the screen -- or into the

25   computer, I should say.  There's another one on the

Page 176

1    other side, if that makes it easier.

2    A.    Is this the right side?

3    Q.    Like that.  There you go.  All right.  I heard the

4    noise.  So, did the USB disk pop up on the --

5    A.    (Nodding head.)

6    Q.    Can you click on the icon for the flash disk?

7    A.    I'm used to a Mac, sorry.

8    Q.    So, you've now opened up the contents of the flash

9    disk on Exhibit 384, I believe it is?  It opened on the

10   screen for you; right?

11   A.    It is.

12   Q.    How many files do you see?

13   A.    One.

14   Q.    Can you read the file name into the record?

15   A.    "WM00149920-retention_sampling_training_video.MP4."

16   Q.    Ms. Rankin, you can now close the -- the window and

17   we'll eject the flash disk that's marked as Plaintiff's

18   Exhibit 384.  I'm happy to do it too --

19   A.    Okay.

20   Q.    -- if you need help.  All right.  And we'll hand

21   Exhibit 384 back to the court reporter.

22        MR. HARDT:  At this time, I have no further

23   questions.

24        MR. LAMB:  We have no questions.  We would note that

25   we are designating the transcript Highly Confidential,

Page 177

1    Attorneys' Eyes Only.

2          MR. HARDT:  Understood.  No objection.  And just

3    before we get off the record, Ms. Rankin, I want to say

4    thank you for your time today.

5          THE WITNESS:  Thank you.

6          VIDEOGRAPHER:  This concludes the videotaped

7    deposition of Aubree Rankin at 3:11 p.m.  We are off the

8    record.

9

10

11

12

13

14

15

16

17

18

19                    .

20

21

22

23

24

25

Rankin, Aubree 10/18/2019                    Zest Labs v. Walmart

Page 178

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  AUBREE RANKIN

3    DATE:  OCTOBER 18, 2019

4    PAGE LINE        CHANGE            REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Rankin, Aubree 10/18/2019                          Zest Labs v. Walmart

Page 179

1          I, AUBREE RANKIN, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

4

5                          _____
                           AUBREE RANKIN
6

7

8

9  THE STATE OF _____)

10 COUNTY OF _____)

11

12      Before me, _____, on this day

13 personally appeared AUBREE RANKIN, known to me (or

14 proved to me under oath or

15 through_____) (description of

16 identity card or other document)) to be the person whose

17 name is subscribed to the foregoing instrument and

18 acknowledged to me that they executed the same for the

19 purposes and consideration therein expressed.

20      Given under my hand and seal of office this

21 _____ day of _____, _____.

22

23

24                         _____
                           NOTARY PUBLIC IN AND FOR
25                         THE STATE OF _____

Page 180

1                    REPORTER'S CERTIFICATION

2            VIDEOTAPED DEPOSITION OF AUBREE RANKIN

3                        OCTOBER 18, 2019

4

5        I, CRYSTAL GARRISON, Certified Shorthand Reporter

6    in and for the State of Arkansas, hereby certify to the

7    following:

8        That the witness was duly sworn by the officer and

9    that the transcript of the VIDEOTAPED DEPOSITION is a

10   true record of the testimony given by the witness;

11       I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties or

13   attorneys in the action in which this proceeding was

14   taken, and further that I am not financially or

15   otherwise interested in the outcome of the action.

16       Certified to by me this _____ day of _____,

17   2019.

18

19

20

21

22   _____
     Crystal Garrison, CCR # 613
23   Bushman Court Reporting
     620 West Third Street, Suite 302
24   Little Rock, Arkansas 72201
     (501) 372-5115

25