**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | |
|---|---|
| ZEST LABS, INC. f/k/a INTELLEFLEX CORPORATION; ZEST LABS HOLDINGS, LLC; and RISKON INTERNATIONAL, INC. | CIVIL ACTION NO. 4:18-CV-500-JM |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| WALMART INC. F/K/A WAL-MART STORES, INC., | |
| Defendant. | |

<u>**BRIEF IN SUPPORT OF
WALMART INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW**</u>

Plaintiffs ("Zest") claim that Walmart publicly disclosed an alleged trade secret—the Zest Fresh "solution"—in a patent application (the "Bohling Application").  Walmart is entitled to judgment as a matter of law for several reasons:

First, Zest failed to identify its purported trade secret with sufficient particularity.

Second, Zest failed to offer sufficient evidence that its "solution" was a trade secret.  What Zest claimed was its trade secret in the Bohling Application was generally known and readily ascertainable.  This "solution" had no actual or potential commercial value by virtue of its non-existent secrecy.  And Zest did not take reasonable measures to protect its alleged trade secret, including admittedly allowing it to publish after knowing that publication was imminent.

Third, Zest failed to offer sufficient evidence that the Bohling Application disclosed its purported "solution."

Fourth, Zest failed to offer sufficient evidence that its alleged damages were proximately caused by the claimed misappropriation.

Fifth, with no misappropriation claim, Zest has no argument for exemplary damages. Even if the misappropriation claim survives, the Court should enter judgment against the request for exemplary damages. The parties' contract expressly precluded exemplary damages, making an award of exemplary damages an unlawful windfall. And there is no evidence that filing the Bohling Application involved the kind of reprehensible conduct that can support punitive damages.

## LEGAL STANDARD

Under Rule 50, this Court grants judgment as a matter of law if "a party has been fully heard on an issue during a jury trial and the [C]ourt finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 953 (8th Cir. 2021) (quoting Fed. R. Civ. P. 50).

## ARGUMENT

**I.      Walmart Is Entitled to Judgment as a Matter of Law Because Zest Failed to Identify Its Purported Trade Secret With Sufficient Particularity.**

To prove its claims for trade-secret misappropriation, Zest bears the burden of describing "the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *Double Eagle Alloys, Inc. v. Hooper*, --- F.4th ---, 2025 WL 1162473, at *5 (10th Cir. 2025). "This particularity requirement ensures that defendants," like Walmart here, "have '*concrete identification* to prepare a rebuttal.'" *Id.* (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (emphasis added)). "For particularity, the plaintiff 'must clearly refer to *tangible trade secret material* instead of referring to a system which *potentially* qualifies for trade secret protection." *Id.* at *13 (emphasis added).

The sole alleged trade secret is the Zest Fresh "solution." *E.g.*, Tr. 1312:17-20. Mr. Mehring admitted that the Zest Fresh "solution" was not a combination of individual trade secrets. Tr. 1061:5-9. Instead, he vaguely testified that "the overall way we bring it all together is kind of that recipe, that process, to make it all work." Tr. 1061:7-9. Mr. Mehring testified: "It's pulling it all together with our secret sauce … but also some public information, some things that are generally available, but how it's pulled together was and what we did and produced from, it was different and unique." Tr. 1061:18-23.

But Zest adduced no specific evidence of "how it's pulled together," whatever that means. Mr. Mehring testified that this "slide basically encompass[es]" Zest's "whole process." Tr. 1059:10-12 (testifying about PTX 417, slide 7).



PTX 264 at 7. He said, "[I]t's an *overview* of the process showing the *major components*" and "*how they work together*." Tr. 1520:15-16 (emphasis added). Mr. Mehring admitted that this chart

does not show any detail or how Zest does what it does, but simply illustrates "what needs to be combined." Tr. 1520:10-12. That is not sufficient identification of the entire Zest Fresh "solution" to sustain a claim for trade-secret misappropriation.

Like Mr. Mehring's testimony in general, this chart lacks the required particularity. For instance, the "Pre-Harvest," "Harvest," and "Post-Harvest" factors are non-exclusive lists of generic words, all ending with "Etc." Moreover, the generic words that flow into the "Scouting App/Supplier QC Data" bubble give no actionable detail. For example, Zest never identified the pertinent "soil conditions," "fertilizer types," or "Irrigation Schedule[s]." Zest never explained what weight its "solution" gave to any of the many identified or unidentified variables. Mr. Mehring testified at length about an end-to-end process that collected data on various inputs, used sensors to perform pallet-level monitoring, and generated ZIPR codes to allow a First Expired, First Out ("FEFO") logistics model and permit "intelligent pallet routing." But Zest adduced no evidence detailing the specifics of any secret source code, software technology, computer program, or the like. This type of presentation failed to satisfy Zest's burden of identifying its trade secret with the requisite particularity. *Hooper*, 2025 WL 1162473, at *6 ("'Long lists of general areas of information containing unidentified trade secrets,' 'catchall phrases,' and 'categories of trade secrets' that the plaintiff intends to pursue at trial fail to identify the trade secret with sufficient particularity.") (quoting *InteliClear*, 978 F.3d at 658).

The only evidence of any equation, calculation, or algorithm is a picture of a whiteboard:

4



PTX 317.  But even accepting that this image depicts the bare bones of an algorithm, it falls far short of showing anything that could be a trade secret:  Zest has abandoned any claim that this algorithm was a trade secret, and it appears nowhere in the Bohling Application in any event.  Nor is it specific enough to show "how" the Zest Fresh "solution" actually worked.  Tr. 1348:23:1349:5.  Indeed, Mr. Mehring told a Walmart associate, Jeff Kerbs, that Zest's algorithm was its trade secret and the only item that could give its competitors a significant benefit and therefore Zest would not disclose it.  DTX 45; Tr. 1344:14-1345:5.  And for different produce, the key variables would be different in the algorithm.  Tr. 1346:14-24.  There is no evidence at all of the specifics of any algorithm in the Zest Fresh "solution."

Zest also looked to PTX 412/56 in an attempt to add substance to its formless trade secret:



PTX 412/56.  Much like PTX 417, this exhibit provides no source code or other executable, repeatable functions.  It is simply a list of functionality, not what enables functionality.

In *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, the plaintiff testified that, although the components of its brushless motors were well known, "the real proprietary nature" of its trade secret was "how these things are all put together[.]"  491 F.3d 350, 354 (8th Cir. 2007).  Like Zest produced no technical information showing how its "solution" supposedly worked, the plaintiff produced no engineering specifications or drawings demonstrating how the motors worked.  Like Zest's witnesses, the designer of the Montevideo motor "testified numerous times to the effect that '[w]hat makes the [Montevideo] motor unique and novel is the combination of all of the inclusive parts and the design configuration,'" that "'one thing does not constitute a design,'" and that "'you can't look at the design in one specific area, you have to look at them all.'"  *SL Montevideo Tech., Inc. v. Eaton Aero., LLC*, No. 03-3302, 2006 WL 1472860, at *3 (D. Minn. May 26, 2006).  Just as Mr. Mehring never explained the weighting of variables that made Zest's system secret, or even what the variables might be, the motor designer in *Montevideo* "was never asked to testify in any detail regarding the specifics of *how* the Montevideo motor, as a whole, is unique and novel such that it would be entitled to trade secret status."  *Id.* (emphasis added).  Like the undefined "width, thickness, and overall geometry" in *Montevideo*, Zest's "algorithms and processes" that allegedly

transformed the known ingredients of its "solution" into a trade secret are absent from the evidence and the Bohling Application. *Id*. As the Eighth Circuit reasoned, "[i]n a trade secret case, simply to assert [that] a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status." *Montevideo*, 491 F.3d at 354.

Other courts have recognized the particularity requirement and similarly rejected claims of trade-secret misappropriation. In *Olaplex, Inc. v. L'Oreal USA, Inc*., 855 F. App'x 701, 710 (Fed. Cir. 2021), the plaintiff claimed trade-secret protection for "testing methods" and "know how" that constituted the company's "playbook" and "roadmap" to its technology, but the plaintiff failed to sufficiently identify what those methods and know-how were. The Federal Circuit rejected the trade-secret claim, holding that "Olaplex's lack of specificity in describing the 'testing and know how'" constituted a "failure of proof on trade-secret status." *Id.* at 711. The court observed that "[t]here is a general requirement that a person claiming rights in a trade secret bears the burden of defining the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection and determine the fact of an appropriation." *Id.* (internal quotation omitted). The requirement for particularity is necessary, the court explained, because, "without particularity (before trial and at trial), there is an inadequate basis for a fair adjudication of what information was actually used by the defendants." *Id.* at 712 (citing *InteliClear*, 978 F.3d at 658); *see also, e.g., Zunum Aero, Inc. v. Boeing Co.*, No. C21-0896JLR, 2024 WL 3822780, *7 (W.D. Wash. Aug. 14, 2024) (where alleged combination trade secret could not be sufficiently identified to permit jury to know what it did or did not encompass, substantial evidence did not support jury verdict); *TLS Mgmt. & Mktg Servs. LLC v. Rodriguez-Toledo*, 966 F.3d 46, 54 (1st Cir. 2020) (where product's content "generally comprised public information," no reasonable jury

could find that the plaintiff proved its claim by "merely asserting that the process for compiling" it was a trade secret); *Sun Media Sys., Inc. v. KDSM, LLC*, 564 F. Supp. 2d 946, 973 (S.D. Iowa 2008) (where "most aspects of the process can be independently determined by others," claim of trade-secret protection in the "why" and "how" of the process was "wholly insufficient to identify with particularity the trade secrets Plaintiff is claiming"). Similar cases abound.[1]

Like the plaintiffs in all these cases, Zest had to "explain *how* the combination of much of what appears to be generally known information can constitute a trade secret." *BioD*, 2014 WL 3864658 at *6 (emphasis added). It never did. If there ever was an algorithm or computer code that actually "connected the dots" in Zest's system, Zest never showed it to Walmart—or to the jury. Zest never elaborated on the pre-harvest and field factors that inform its scouting app. It never showed the jury one specific instance of how it engages in product profiling. Instead, Zest danced around the "how" throughout the trial, refusing to identify the "how" with any particularity. At no point did Zest ever explain how any variables were weighted or how that weighting changed the system of known components into a trade secret. *See Cent Holding Co., LLC v. Wolfram Research Inc.*, No. 5:21-cv-00418-RDP, 2024 WL 5056622, at *15 (N.D. Ala. Dec. 10, 2024)

---

[1] For example, in *Tucson Embedded Sys. Inc. v. Turbine Powered Tech. LLC*, the court granted summary judgment because the "compilation" at issue was not sufficiently identified. No. CV-14-01868-TUC-BGM, 2016 WL 1408347, at *8 (D. Ariz. Apr. 11, 2016). The court relied in particular on language from *BioD, LLC v. Amnio Tech., LLC*, which held that "Plaintiffs cannot claim that a method or process is a trade secret without identifying the steps in the process and explaining *how* those steps make their method or process unique." No. 2:13-cv-1670-HRH, 2014 WL 3864658 at *6 (D. Ariz. Aug. 6, 2014) (emphasis added); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 662 (4th Cir. 1993) (finding that the plaintiff failed to sufficiently identify a trade secret where it "presented evidence that [its computer program] had both a structure and an organization, but explained neither how the program was structured nor how it was organized"); *Switch Commc'n Group v. Ballard*, No. 2:11–cv–00285–KJD–GWF, 2012 WL 2342929, at *5 (D. Nev. June 19, 2012) ("Switch must specifically describe what particular combination of components renders each of its designs novel or unique, how the components are combined, and how they operate in unique combination.") (internal citations omitted).

("Although Plaintiffs refer to technical terms like 'new computer logic, embodied as computer code' … or 'a new method for real-time dynamic cross-market portfolio construction', they have yet to specify how this 'logic,' 'code,' or 'method' embodies a trade secret through its combination, organization, or sequencing."); *RoadRunner Recycling, Inc. v. Recycle Track Systems, Inc.*, No. C 23-04804 WHA, 2024 WL 4876947, at *4 (N.D. Cal. Nov. 23, 2024) (where no "precise combination was claimed," there was no way for a jury to conclude that the plaintiff's burden of proof was met).

Because Zest failed to identify its alleged trade secret with the required particularity, Walmart is entitled to judgment as a matter of law.

## II. Zest Failed to Offer Sufficient Evidence That Its "Solution" Was a Trade Secret.

### A. Everything in the Bohling Application That Supposedly Came From Zest Was Generally Known and Readily Ascertainable.

Putting aside Zest's failure to identify its alleged trade secret with sufficient particularity, the evidence shows that everything in the Bohling Application that supposedly came from Zest was generally known and readily ascertainable.  18 U.S.C. § 1839(3)(B) (affording trade-secret protection only to information that is not "generally known" and "readily ascertainable through proper means"); Ark. Code Ann. § 4-75-601(4) (same); *see also Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1064 (8th Cir. 2002) (affirming summary judgment because marketing company's questions "were readily ascertainable").  As Mr. Mehring admitted, if something is publicly known, it cannot be a trade secret. *E.g.*, Tr. 1313:5-7.

Long before the Bohling Application published, BT9 showed an end-to-end solution, and Mr. Mehring described the Zest Fresh "solution" as an end-to-end solution.  Tr. 1315:5-17.  BT9 also had a computer system; pre-harvest, temperature, and humidity sensors in the field; and

sensors associated with post-harvest.  Tr. 1315:18-1316:15.  BT9 calculated compliance with temperature bands and claimed to generate a shelf-life prediction.  Tr. 1316:23-1317:11.

The components and ordering of the "Zest Fresh solution" were widely known for years before the Bohling Application published.  DTX 58 includes a 2008 PowerPoint presentation Motorola shared with Zest that discussed a supply chain "Solution" using harvest-to-store temperature monitoring allowing for FEFO "inventory management."



Motorola described "RFID Enabled Cold Chain <u>Solution</u> Components":



DTX-58 at 3, 11.

Also in 2008, Manish G. Gupta, as lead inventor, filed a patent application titled "Supply Chain Management System." DTX 640. The abstract of the application describes a "method of transporting commodities in a supply chain." *Id.* The United States Patent and Trademark Office ("USPTO") determined that Claim 1 of the Bohling Application was unpatentable, in part, based on the Gupta patent. PTX 2346 at 2.

In 2009, Israel Ben-Tzur's patent application titled "Pre and Postharvest QC Data Acquisition System for Agricultural Products" published. DTX 641. A year later, Mr. Ben-Tzur filed a patent application for an invention titled "Perishable Lifetime Management System And Method." DTX 388. This Ben-Tzur patent describes "[a] system for managing perishables in a supply chain, including at least one sensor module adapted to sense at least one parameter of at least one monitorable shipping unit of perishables through multiple stages of the supply chain." *Id.* The USPTO cited this Ben-Tzur patent as prior art in the USPTO's notice of final rejection regarding the Bohling Application. PTX 2346 at 2.

In 2011, Zest publicly stated that it "[p]roduced a hardware solutions platform that is used in the cold supply chain condition monitoring." Tr. 1317:16-1318:14. In this same interview, Mr. Mehring disclosed that the Zest system used RFID sensors that were "put into the middle of the product to measure the core condition, whether it's temperature or humidity, shock, and vibration in the cold supply chain, primarily temperature." Tr. 1318:15-1319:3. In 2011, Mr. Mehring knew that "there were other people trying to address this issue in the supply chain by using sensors and monitors and computer programs." Tr. 1319:14-18. In 2011, Mr. Mehring said publicly, "The Zest system could maintain the product profile from the very beginning, from harvest or from manufacturing all the way through delivery." Tr. 1321:1-15. In 2011, Mr. Mehring disclosed that

Zest had "an end-to-end system" that was a "computer system" that used "RFID sensors" "measuring temperature and humidity." Tr. 1322:17-25.

In 2014, an academic article illustrated "how using accelerated shelf-life loss data to manage inventory rotation by first expiring first out (FEFO) versus first in first out (FIFO) can greatly reduce waste and improve quality." DTX 619 at 2; Tr. 1370:18-22. The article noted, "In addition to the real-world studies and examples, we present a comprehensive summary of shelf life prediction factors, which are all affected by temperature, but where knowing more than just temperature history is valuable, and why." DTX 619 at 2.

Mr. Mehring testified about a different 2014 study "about reducing strawberry waste and losses in the post-harvest supply chain via intelligent distribution management." Tr. 1374:10-13; DTX 715. The researchers reported that they "used wireless temperature sensors, remote monitoring (RFIDs), algorithms, and diagnostics to demonstrate that shelf life can be automatically calculated in real-time using web-based computer models." Tr. 1374:24-1375:3; DTX 715 at 4. The study also discussed a shelf-life algorithm and provided an equation. DTX 715 at 8. Mr. Mehring conceded that, in 2014, shelf-life modeling was a common concept in the industry. Tr. 1464:25-1465:4.

In 2015, according to Mr. Mehring, a number of different companies were marketing end-to-end solutions based on sensor tracking and shelf-life algorithms. DTX 468. Mr. Mehring compared Zest with three competitors, HarvestMark, Intelligistics, and BT9. *Id.* Mr. Mehring wrote that HarvestMark's solution was the closest one to Zest's. *Id.* at 2. He noted that Intelligistics had an "end-to-end" solution. *Id.* at 3. He wrote that BT9 had "the most complete temperature monitoring solution." *Id.* at 4.

Also in 2015, Mr. Mehring disclosed publicly that "Intelleflex ha[s] put together a complete solution with Zest as a cloud component." Tr. 1323:3-13. Mr. Mehring also disclosed that Zest could provide the benefit of intelligent routing and FEFO. Tr. 1323:24-1325:23. In the same year, Mr. Mehring and Zest's Thomas Reese filed a patent application titled "Intelligent Routing Code For Improved Product Distribution." DTX 214. This patent application described calculating an "Intelligent Routing" code that Zest later rebranded as the ZIPR code. *Id.*

In March 2016, IBM filed a patent application titled "Geospatial Database for Maintaining Produce Quality." DTX 1027. This patent application published in September 2017 (nearly two years before the Bohling Application was published by the USPTO). *Id.*; *see also* PTX 416. The World International Patent Organization cited the IBM patent as its basis for rejecting the Bohling Application for lack of novelty. DTX 1030 at 4.

Zest's website in 2016 disclosed that "Cut-to-Cool time delays directly impact shelf life." DTX 1032A at 8. Zest advertised "Pallet-level Time & Temperature Tracking." DTX 1032A at 9. Zest touted "Pre-Cool Prioritization and Monitoring" and its ZIPR code. DTX 1032A at 10. "Zest Intelligent Pallet Routing" loomed large on Zest's website. DTX 1032A at 11. Zest disclosed "Freshness Quality Management," including the use of "comprehensive quality data and dynamic shelf life models." DTX 1032A at 14.

In 2017, Mr. Mehring publicly disclosed "real-time pallet-level process monitoring and intelligent routing with the ZIPR code." Tr. 1325:19-1327:23. He disclosed, "With Zest Fresh, we get real-time visibility and each pallet has a sensor." Tr. 1334:19-22. He disclosed, "It automatically updates and that access point reads the wireless sensor, it's pushed to the cloud, and if there's an alert, it's pushed directly to the person's handheld." Tr. 1334:23-1335:4. He said, "We can tell what the remaining freshness is, that freshness capacity. We call it the ZIPR code."

Tr. 1335:5-17.  He also said, "That's what the ZIPR code is all about.  It takes and distills down all the data we collect about the quality at harvest, the freshness capacity at harvest, how it's been handled, where it's going in the supply chain, we take all that data and distill it down into one metric"—the "core concept."  Tr. 1335:23-1336:9.  He disclosed that "the ZIPR code used machine learning based on continuous sampling."  Tr. 1336:22-25.  And he said that the Zest Fresh solution used shelf-life prediction models.  Tr. 1337:1-10.  He said, publicly, "So we literally add these devices, these tags in the field to start tracking the product as soon as it's harvested.  And this is true for lettuce, for grapes, for blueberries, for all different products because all of them are field packed."  1338:9-16.  He "disclosed monitoring in the truck and in the precool."  Tr. 1338:17-21.  He said, "You can look at what's known as cut-to-cool time, how long the product takes to come in from the field.  For some products that's a critical metric."  Tr. 1338-22-1339:3.

A 2017 Zest white paper similarly disclosed the Zest Fresh "solution."  DTX 215 publicized "**The ZIPR Code Freshness Metric**."  *Id.* at 1.

> The **Z**est **I**ntelligent **P**allet **R**outing Code (ZIPR Code) is the industry's first freshness metric and is a component of the Zest Fresh™ solution. The ZIPR Code, introduced in January 2017, is a dynamic date code that empowers workers and systems to better manage product based on actual freshness, rather than relying on the false assumption that the harvest date label accurately represents remaining freshness. Zest Fresh includes autonomous product condition data capture for each pallet of produce from harvest to retail. Wireless IoT temperature sensors, inserted into the pallets at harvest, monitor the product's condition and processing and, combined with cloud-based artificial intelligence, machine learning and predictive analytics, dynamically calculates the ZIPR Code providing growers, shippers and retailers with a freshness metric that improves inventory and distribution management.

*Id.*  In this single paragraph, Zest described the ZIPR code, end-to-end pallet-level monitoring, and intelligent routing.  Zest further disclosed other aspects of the Zest Fresh "solution":

The ZIPR Code is:

- A dynamic, real-time calculation of the days of remaining freshness or shelf life.
- Continuously updated for each pallet, as quality and freshness can vary by pallet, even within a single day's harvest.
- A goal-oriented metric for freshness requirements.
- Normalized to easily implement across product categories.
- Specifically calculated for every product, from strawberries to lettuce to broccoli, etc., based on variety, harvest location and product specific profile.

This paragraph emphasizes product profiling and pre-harvest data. *Id.* This one does as well, adding in the concept of retention sampling:

Zest Fresh uses machine learning to improve the actual ZIPR Code forecasting based on real world results. The changing of pre-harvest and harvest field and weather conditions can vary the impact of post-harvest handling, so Zest Fresh tracks these trends and adjusts the forecasting to match actual results. The combination of product profiling based on actual samples and the machine learning from actual results provides a dynamic forecasting model that accommodates the variations in nature.

*Id.* at 3. Zest's end-to-end "solution" appeared in this white paper.

Moreover, Zest helped pen a 2017 article touting the Zest Fresh "solution":

15

> Thankfully, there is an affordable system available that provides accurate estimates of the actual remaining shelf life of each pallet of produce. Zest Labs has developed a solution comprised of devices, software, methodologies, and algorithms that take into account the product type, variety, the specific location (field or lot number) of harvest, harvest conditions (weather, ripeness[2]/maturity level), time of season, and most importantly, temperature exposure history.
>
> Each pallet has its own unique history of temperature exposure in its end-to-end journey from field to shelf. That is by far the single biggest determinant of freshness.[3] Therefore, to get an accurate measure of remaining shelf life, the temperature history of each pallet of produce must be monitored, from the time it is harvested in the field, until the end of its journey when it is delivered at the store.[4] However, temperature history data by itself is not enough. An algorithm is required to accurately calculate the actual remaining shelf life of each pallet, based on a combination of pre-harvest factors, harvest conditions, and its temperature exposure history to-date.

DTX 216; *see also* Tr. 1364:22-24 (Mr. Mehring testifying that Zest contracted "ChainLink Research" to publish a series of papers for Zest). The Zest Fresh "solution" was all there:

> To realize these benefits, temperature tracking alone is not enough. What is needed is a system bringing together the end-to-end temperature history of each pallet from harvest to shelf, knowledge of the temperature response of different varieties grown in different locations under different conditions, knowledge of variety-specific criteria for freshness, capabilities to match each pallet's Condition-based Expiration Date with different customers' requirements, and finally, prescribing simple actions to workers and supervisors, based on all of that knowledge to ensure the best match between remaining shelf life and customer need. Zest Labs provides the only solution we know of that brings together all these required elements.

*Id.* at 11.

Also in 2017, Zest shared a presentation with Hy-Vee, DTX 1054, in which Zest disclosed that the "Zest Fresh Solution tracks freshness at the pallet level" and "establishes the freshness metric, the ZIPR code." Tr. 1357:9-16. The presentation also advertised intelligent pallet-routing. Tr. 1357:17-19. Zest provided this presentation to Hy-Vee without any confidentiality markings. Tr. 1357:23-25; Tr. 1361:19-22. Zest provided this presentation to Hy-Vee without a nondisclosure agreement in place. Tr. 1358:24-1359:9.

In 2017, Walmart received responses to a request for information from four companies, including Zest, in connection with the 2017 Cold Chain Proof of Concept. DTX 399 (Emerson);

DTX 400 (Intelligistics); DTX 401 (Sensitech); PTX 414 (Zest). The companies all touted their ability to use algorithms to predict shelf life. Tr. 648:10-649:11.

In 2018, Mr. Mehring told the public during a podcast, "Our key product is Zest Fresh, and what it does is it uses a combination of sensors at the pallet level of food. So when food is harvested in the field and put on a box or carton or flat and built into a pallet, we start monitoring the condition of the product right in the field." Tr. 1340:12-1341:25. In that interview, he said, "The Zest Fresh System included software models that determine how the heat and how the handling affect the specific product down to the variety and the microclimate the product is harvested." Tr. 1342:1-11. He said, "The system is one in per pallet, and, again, capturing the product data and sending to the cloud." Tr. 1343:2-8. He said, "We seem to be the first ones really focused on post-harvest ag tech. There's a lot of interest in drones and sensors for pre-harvest." Tr. 1351:9-12.

All of the above was public, generally known, and readily ascertainable before the Bohling Application published in May 2019. No reasonable jury could find that the Zest Fresh "solution," as disclosed in the Bohling Application, was a trade secret. The Court should grant judgment as a matter of law in favor of Walmart. *Coenco, Inc. v. Coenco Sales, Inc.*, 940 F.2d 1176, 1179 (8th Cir. 1991) (affirming judgment notwithstanding the verdict because the alleged ideas, whether viewed by component or in whole, could be reverse engineered or readily ascertained by simple observation).

### B. Zest's "Solution" Had No Actual or Potential Commercial Value by Virtue of Its Non-existent Secrecy.

The Zest Fresh "solution"—to the extent it was disclosed in the Bohling Application—cannot qualify as a trade secret for the additional reason that it had no actual or potential commercial value by virtue of its secrecy because the Bohling Application disclosed no Zest secret,

as discussed above.  Zest adduced no evidence at all that anything about the secrecy of its purported "solution" gave it any actual or potential commercial value.  This failure, too, requires judgment in favor of Walmart.

### C.  Zest Did Not Take Reasonable Measures to Protect Its Alleged Trade Secret.

A final reason that the Zest Fresh "solution" was not a trade secret as a matter of law is that Zest failed to take reasonable efforts to maintain its secrecy.  To qualify for trade-secret protection, the owner of proprietary information must prove (among other things) that the information "was the subject of reasonable efforts to maintain its secrecy."  *Farmers Edge v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020).  To satisfy this requirement, the party alleging misappropriation must have *clearly identified* the alleged trade secret *before* disclosing it to the other party.  *Tyson Foods, Inc. v. ConAgra, Inc.*, 349 Ark. 469, 483 (2002) (emphasis added).  A party that discloses proprietary information to others without identifying it as a trade secret forfeits its right to the "legal status" for trade secrets "fixed by statute."  *Id*.

This duty to identify information as a trade secret was recognized and applied by Judge Brooks in *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 2018 WL 1597976, at *5 (W.D. Ark. Mar. 31, 2018), *aff'd sub nom. Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101 (8th Cir. 2020).  There, the court granted judgment as a matter of law on two alleged trade secrets because the evidence did not show that they had ever been identified as trade secrets before disclosure to Walmart.  *Id*. (rejecting claim for trade-secret protection where "there is no evidence in the record that Cuker ever 'clearly identif[ied]' its Phased Release Support Technique and Zoning Tools as 'information it considered to be a trade secret' at any time before this information was disclosed to Walmart").  The court reached that conclusion despite the existence of a confidentiality agreement between the two parties.

Zest's claim suffers from the same deficiency: There is no evidence that the Zest Fresh "solution" was ever clearly identified as a trade secret to Walmart. The evidence showed only one occasion when Zest may have identified something as a trade secret—on April 11, 2016, when Mr. Mehring represented that Zest's "actual algorithm is a trade secret" and "*the one item* that could give our competition a significant benefit from our years of experience." DTX 45 (emphasis added). In that same email, Mr. Mehring stated that Zest chose *not* to disclose that purported trade secret to Walmart. Zest's own experts conceded that they had not seen Zest formulas or algorithms. *E.g.*, Tr. 1842:15-17 (Mr. Lanning testifying that he has never seen Zest's source code).

That Zest shared some information about its "solution" with Walmart under a confidentiality agreement does not alter the analysis. The same was true in *Cuker*, and Judge Brooks still found that the plaintiff there failed to sufficiently protect its trade secrets *qua* trade secrets. Even if Zest's information were considered confidential under the parties' agreement (and it was not), to obtain the status of a trade secret, Zest must have sufficiently protected it as such. Here, the distinction is even more critical, because the 2015 nondisclosure agreement ("NDA") treats the broad term "Confidential Information" differently than trade secrets, specifically setting a more limited three-year confidentiality requirement for the former versus the latter. *See* PTX 91 at WM00053289 (2015 NDA §2(a)). In *Tyson*, a similar distinction was fatal to the trade-secret claim because knowledge that something is generally considered "confidential" does not suffice to show specific identification of a trade secret. 349 Ark. at 483.

This distinction is particularly important in this case because the alleged misappropriation—publication in the Bohling Application—occurred on May 16, 2019, well over three years after the effective date of the 2015 NDA. But the exhibits presented by Zest at trial to

show the allegedly misappropriated trade secret were labeled only as "Confidential." *See* PTX 343 ("Intelleflex Confidential"); PTX 417 ("Zest Labs Confidential"); PTX 56 ("Company Confidential"); PTX 418 ("Intelleflex Confidential"); PTX 414 ("Zest Labs Confidential"). To protect this information as trade secret, "it was incumbent on [Zest] to clearly identify what information it considered to be a trade secret" at the time of disclosure. *See Tyson*, 349 Ark. at 483. Zest did not do so.

Under the NDA, a confidentiality designation would only protect the information until July 21, 2018. *See* PTX 91 at WM00053289 (2015 NDA §2(a)) (stating a time period of three years after the effective date, July 21, 2015). After that time, Walmart would be under no obligation to protect allegedly "Confidential" information disclosed by Zest. This is legally insufficient to protect it as a trade secret and cannot support a misappropriation claim for a disclosure more than three years later. *Tyson*, 349 Ark. at 483.

The proof goes further. Mr. Richards testified that Mr. Kerbs told him (on multiple occasions) in 2016 and 2017 that Walmart associates, including Kelly Boyle, "were going to get as much information [from Zest] as we can and then get rid of [Zest]." Tr. 194:14-17. Mr. Richards testified that he told both Randy May and Peter Mehring each time Mr. Kerbs made such statements. Tr. 195:5-12. Despite having that information, Zest continued to provide Walmart with what it now claims are portions of the Zest Fresh "solution," including PTX 417, dated June 7, 2017.

Moreover, the Eden blog post, PTX 52, published on March 1, 2018. Zest was actively working with Walmart then, but did nothing to protect what it claims was a trade secret.

Finally, Zest stipulated that its attorneys were aware of the Bohling Application by March 3, 2019, and that its attorneys were aware of its contents by April 3, 2019. The non-provisional

Bohling Application specifically stated that it would publish on May 16, 2019.  It is undisputed that Zest did nothing to halt publication despite this knowledge.

No reasonable jury could conclude that Zest took reasonable measures to protect the Zest Fresh "solution" as a trade secret, which entitles Walmart to judgment as a matter of law.

**III.    There Is Insufficient Evidence to Support a Finding That Walmart Misappropriated the Zest Fresh "Solution."**

Even if Zest had disclosed the Zest Fresh "solution" to Walmart and identified it as a trade secret at that time, and even if Zest had presented evidence at trial sufficient to identify what about the entire Zest Fresh "solution" qualifies it as a trade secret, its claims would still fail because there is no evidence from which a jury could conclude that Walmart misappropriated the Zest Fresh "solution."

**A.    There Is No Evidence That the Bohling Application Disclosed the Entire Zest Fresh "Solution."**

Zest relies on disclosure in the Bohling Application to prove misappropriation of its trade secret, the entire Zest Fresh "solution."  But Mr. Mehring admitted that the Bohling Application does not contain the entire Zest Fresh solution.  He testified that the Bohling Application contains "significant chunks of the Zest Fresh process" and that its "core" is in the Bohling Application.  Tr. 1076:12-15.  Mr. Lanning admitted that there is more to the Zest Fresh "solution" than the Bohling Application contains.  Tr. 1840:4-7.  But the alleged trade secret is the entire Zest Fresh "solution," which is not in the Bohling Application—which contains no algorithm, software technology, or source code.

At no point did Mr. Mehring, Mr. Lanning, or any other witness claim that the Bohling Application disclosed the entire Zest Fresh "solution."  Indeed, Mr. Lanning simply identified similar sounding words in Zest PowerPoints and the Bohling Application.  *See, e.g.*, Tr. 1796:8–1797:7 (Mr. Lanning testifying that the number 21 shown on PTX 317 somehow relates to the

number 8 at the top of Lot 1 in Figure 3 of the Bohling Application).  Without evidence that the entire alleged trade secret was disclosed, there can be no misappropriation.  "It is the secrecy of the claimed trade secret *as a whole* that is determinative" of its status as a trade secret.  R.3d of Unfair Competition § 39 cmt f.  If what is disclosed is not the trade secret "as a whole," but only individual parts of it that are not themselves trade secrets, then no misappropriation has occurred.  Walmart is entitled to judgment as a matter of law.

### B. There Is No Evidence That Mr. Bohling Had Access to Any Secret Zest Information Before the Patent Application Was Prepared.

To prove that Walmart misappropriated a trade secret by disclosing it in the Bohling Application, Zest had to prove that Mr. Bohling and his fellow inventors had access to that trade secret when they prepared the application.  The evidence cannot support that conclusion.

The unrebutted evidence at trial showed that Mr. Bohling finished preparing the substance of his patent application no later than early August 2017.  Tr. 2106:15-16.  The evidence also showed that Mr. Bohling first received a copy of a Zest presentation labeled "confidential" on August 25, 2017—two weeks *after* he completed his work on the application.  PTX 168; PTX 265. To the extent that Mr. Bohling had any information about Zest and its products while working on the application, the evidence showed that he obtained that information from Zest's "public facing website"—precluding any claim that the information included the trade secret at issue, the entire Zest Fresh "solution."  Tr. 1998:11-1999:22.

Even if there were evidence that (as Zest's counsel insinuated) Mr. Bohling had access to any Zest presentations before August 2017, that evidence would still be insufficient to support a finding of misappropriation.  There is no evidence that any presentation disclosed the Zest Fresh "solution" in its entirety—which Mr. Mehring explained was "how we connected the dots for that whole system end to end" using a "computer system"—though that is the only trade secret at issue.

Mr. Mehring's claims of trade secret related only to individual presentation slides that disclosed parts of the "solution"—not its entirety.  Nor could Mr. Mehring have plausibly claimed that any Zest presentation disclosed the alleged trade secret because nothing in any presentation discloses any details about the "computer system" that implements the Zest Fresh "solution" or how it "connected the dots."  It is undisputed that Zest never supplied Walmart with the computer source code, algorithm, or other technology that might have allowed Walmart to understand how the Zest Fresh "solution" actually worked.

In addition, the Zest presentations on which Mr. Mehring's testimony relied failed to identify *any* information as a trade secret.  The presentation dated June 11, 2015, contains an "Intelleflex Proprietary and Confidential" label on each page but does not distinguish between what is public, what is confidential, and what is trade secret.  PTX 343.  The undated presentation admitted as PTX 417 includes the word "CONFIDENTIAL" on each page but labels no information as trade-secret information.  And the "Zest Architecture Review" presentation admitted as PTX 56/412 merely labels each page as "Company Confidential."  Even if Mr. Bohling and his team had access to any Zest presentations, there is no evidence that they (or anyone else at Walmart) knew that any of the information in them was a Zest trade secret.

Without evidence that Mr. Bohling had access to the purported trade secret (*i.e.*, the Zest Fresh "solution" in its entirety) when he prepared the patent application, a reasonable jury could not find that filing the application misappropriated that secret.  Walmart is entitled to judgment on Zest's misappropriation claim.

**IV.    Walmart Is Entitled to Judgment as a Matter of Law Because Zest Failed to Prove That Walmart's Alleged Misappropriation Proximately Caused Recoverable Damages.**

**A.    Walmart Is Entitled to Judgment as a Matter of Law on Zest's State-Law Claim Because the Arkansas Trade Secrets Act Does Not Allow Damages of a Reasonable Royalty.**

Zest's only evidence of damages came from Dr. Becker, whose damages model spoke only to a reasonable royalty.  Zest adduced evidence of no other category of damages.  Unlike the federal Defend Trade Secrets Act and the Uniform Trade Secrets Act, as amended, the Arkansas Trade Secrets Act does not permit a reasonable royalty as damages.  Ark. Code Ann. § 4-75-606; *R.K. Enter., LLC v. Pro-Comp Mgmt., Inc.*, 356 Ark. 565, 575, 158 S.W.3d 685, 690 (2004) (statutory enumeration of damages is "exclusive").  Because a reasonable royalty is the only category of damages Zest seeks, Zest can have no claim under the Arkansas Trade Secrets Act as a matter of law, and this Court should grant judgment as a matter of law on that claim.

**B.    Walmart Is Entitled to Judgment as a Matter of Law Because Zest Failed to Prove Proximate Causation.**

Federal and state trade-secret statutes permit the award of compensatory damages only to the extent that those damages are "caused by the misappropriation."  18 U.S.C. § 1836(b)(3)(B)(ii).

Zest did not meet its burden of proving proximate causation.  Zest presented evidence of only one actionable act of misappropriation—the publication of the Bohling Application.  In opening statement, Mr. Ryan told the jury that "Zest was destroyed by Walmart taking steps that caused this patent to publish.  Any chance for profiting from its own technology, which it had spent seven years, a hundred million dollars, seven years of hard work developing, it couldn't make a penny from it because of Walmart."  Tr. 56:17-21.  But Troy Richards testified that Zest went out of business *because it sued Walmart* (before the Bohling Application published) and vendors did not want to do business with Zest as a result.  Tr. 252:10-13; Tr. 254:13-16.  Mr.

24

Mehring testified that the company went out of business *because Walmart "fired" Zest*.  Tr. 1119:25-1120:4.  Zest presented insufficient evidence to show that publication of the Bohling Application caused Zest any damages.

The damages theory presented by Zest's damages expert, Dr. Becker, was based not on the purported destruction of the trade secret, but on its hypothetical use by Walmart.  Dr. Becker's proposed royalty—which is based on "a fee of $7 … per monitored pallet" of produce—makes no sense as a measure of damages for the purported destruction of Zest's trade secret by the publication of the Bohling Application.  Indeed, Dr. Becker freely admitted that his proposed $72.7 million royalty was 72.6 million number was "not tied specifically to the publishing of the Bohling application."  Tr. 1935:17-20.

The lack of any causal connection between Zest's evidence of misappropriation and its evidence of damages is fatal to Zest's damages claims.  *See, e.g.*, *W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 8:13CV47, 2016 WL 165698, at *3 (D. Neb. Jan. 13, 2016) (stating that "a particular measure of damages" is inappropriate "where the causal relationship between the misappropriation and the particular loss or gain being measured was not sufficiently shown").  Because a reasonable jury could not find that the publication of the Bohling Application proximately caused the damages identified by Dr. Becker, Walmart is entitled to judgment as a matter of law.

## V.    Walmart Is Entitled to Judgment as a Matter of Law on Zest's Request for Punitive Damages.

The Arkansas Trade Secrets Act does not permit an award of exemplary, or punitive, damages.  *Jenkins v. APS Ins.*, *LLC*, 2013 Ark. App. 746, 10, 431 S.W.3d 356, 363 (2013); Ark. Code Ann. § 4-75-606 (omitting reference to punitive damages); 1 Arkansas Law Of Damages § 33:16 ("Punitive damages are not authorized by the Trade Secrets Act.").  The Defend Trade

Secrets Act does not require a jury trial on exemplary damages and leaves the authority to grant or deny such damages to the discretion of the Court. *See* 18 U.S.C. § 1836(b)(3)(C) (providing that "a court *may* … if the trade secret is willfully and maliciously misappropriated, award exemplary damages"); *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-CV-04238-MMC, 2023 WL 5723670, at *1 (N.D. Cal. Sept. 5, 2023), *aff'd sub nom. Proofpoint, Inc. v. Vade USA, Inc.*, No. 23-16085, 2024 WL 4003096 (9th Cir. Aug. 30, 2024); *Agrofresh Inc. v. Essentiv LLC*, No. CV 16-662 (MN), 2020 WL 7024867, at *23 (D. Del. Nov. 30, 2020); *Smart Team Glob. LLC v. HumbleTech LLC*, No. 19CV4873AJNBCM, 2022 WL 847301, at *11 (S.D.N.Y. Feb. 18, 2022), report and recommendation adopted, No. 19CV4873AJNBCM, 2022 WL 846927 (S.D.N.Y. Mar. 22, 2022) ("Even where the 'willful and malicious' standard is met, the court may decline to award exemplary damages, attorney's fees, or both.").

Here, the evidence does not support any award of exemplary damages. First, it is undisputed that (i) the Master Services Agreement ("MSA") governed the parties' relationship at the time of the alleged misappropriation and (ii) the MSA bars Zest from recovering exemplary damages. Second, the overall record does not suggest the kind of culpability that could support punitive damages.

### A. The MSA Categorically Bars Zest's Recovery of Exemplary Damages.

The MSA became effective on January 18, 2016, and provided that "all Services … provided by Service Provider to Walmart will be covered by and are subject to the terms of" the MSA. DTX 181-00001. Among its comprehensive provisions is Section 14, "Limitation of Liability." That section specifies that "in no event shall either party be liable to the other party for any punitive, special, incidental, or consequential damages of any kind … arising from or relating to … the relationship between service provider and Walmart." DTX 181-00006.

There is no dispute that the MSA categorically precludes Zest from recovering exemplary damages. The language of Section 14 is broad and unequivocal:

> *In no event shall either party be liable to the other party for any punitive, special, incidental or consequential damages of any kind* (including but not limited to lost profits, business revenues, business interruption, and the like) *arising from or relating to (i) the relationship between Service Provider and Walmart, including prior dealings and agreements*; (ii) the conduct of business under this Agreement any statement of work; (iii) breach of this Agreement or any statement of work, or (iv) termination of business relations between the parties and *regardless of whether the claim under which such damages are sought is based upon breach of warranty, breach of contract, negligence, tort, strict liability, statute, regulation, or any other legal theory or law*.

DTX 181-00006 (emphasis added).

The "exemplary" damages authorized by the DTSA are punitive damages. *See, e.g.*, Black's Law Dictionary (defining "exemplary damages" by cross-reference to the definition of "punitive damages"); *Pac. Mut. Life Ins. Co. v. Haslipp*, 499 U.S. 1, 25 (1991) (Scalia, J., concurring) (equating "punitive, or exemplary, damages"). They therefore fall within the scope of Section 14's prohibition on "punitive, special, incidental or consequential damages of any kind."

Zest's trade-secret misappropriation claims relate to information shared with Walmart under the auspices of the MSA. Its request for exemplary damages thus necessarily "arises from" or "relates to" "the relationship between" Zest and Walmart. That Zest's claims are rooted in federal trade secret law rather than contract is immaterial: The liability limitation extends broadly to tort claims, statutory claims, and claims under "any other legal theory."

Given the plain terms of the MSA, a reasonable factfinder could not lawfully award exemplary damages to Zest. *See, e.g.*, *Erdman Co. v. Phoenix Land & Acquisition, LLC*, 2013 WL 3776405 at *2-3 (W.D. Ark. July 17, 2013) (applying limitation-of-liability clause to preclude claims for consequential damages).

**B.  Walmart's Conduct Does Not Support Exemplary Damages as a Matter of Law.**

Finally, the Court should eliminate the exemplary damages prayer because the record includes insufficient evidence that Walmart's conduct warrants it.  The evidence will not allow a reasonable conclusion that Walmart's conduct was willful and malicious.  Zest failed to offer such proof in at least two ways.  First, because Zest never identified the Zest Fresh "solution" as a trade secret before any alleged misappropriation, Walmart could not have acted willfully and maliciously in publishing the Bohling Application.  And second, even if the Court were to find that Zest sufficiently identified the Zest Fresh "solution" as a trade secret, there is no evidence that anyone involved in any alleged misappropriation knew that it was a trade secret or acted willfully and maliciously in the face of that fact.

To prove willfulness, Zest had to prove that Walmart acted willfully and maliciously *with respect to the particular trade secret at issue*.  Here, the only trade secret Zest presses is the Zest Fresh "solution"—that is, Zest's entire "end to end" system, in the sense of how Zest "connects the dots" between the various system elements.  But when the alleged misappropriation occurred, Zest had identified only one trade secret to Walmart—a shelf-life algorithm that Zest declined to share.  DTX 45.  Zest had never told Walmart that its entire Zest Fresh "solution" was a trade secret (and indeed had publicly disclosed most of that "solution" on its own website and in Mr. Mehring's patent application).  *See supra* Section II.A.

At the time of the misappropriation, therefore, Walmart could not have willfully and maliciously allowed publication of the relevant trade secret.  Without evidence that Zest informed Walmart that the Zest Fresh "solution" in its entirety was a trade secret, Walmart is entitled to judgment on the prayer for exemplary damages.

Further, *willful and malicious* misappropriation under 18 U.S.C. § 1836 must involve something more than just mere misappropriation.  As one court put it, "a plaintiff may not recover

28

punitive damages" for trade-secret misappropriation "unless it shows that a defendant engaged in some form of egregious misconduct beyond the misappropriation of trade secrets." *Cacique, Inc. v. Stella Foods, Inc.*, No. B3139433, 2002 WL 705675, at *9 (Cal. Ct. App. Apr. 24, 2002). The mere fact that a misappropriation involves knowledge or intent to misappropriate does not make it "willful and malicious": *Every* misappropriation involves some level of intent. *See, e.g.*, *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 653–54 (7th Cir. 1998) ("Trade secret misappropriation is an intentional tort."); *Matter of Miller*, 156 F.3d 598, 604 (5th Cir. 1998) ("Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful."). Put another way, the misappropriation itself is a bad act; to rise to the level of willful and malicious, the defendant must have done something even worse.

Here, to the extent any evidence shows that Walmart misappropriated the Zest Fresh "solution" at all, there is no evidence that it did so willfully and maliciously. The only misappropriation alleged here is the publication of the Bohling Application. No evidence supports the inference that anyone involved in filing the application knew that it included Zest's alleged trade secret; that any information Walmart had was a trade secret; or that its publication would likely harm Zest. There is thus no evidence to support a finding that in filing the application Walmart acted willfully and maliciously. Even if the evidence supported a contention that the Bohling Application was a product of strategic behavior intended to gain a competitive advantage, it would not support an inference that Walmart desired to harm Zest. *See, e.g.*, *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1120-21 (Fed. Cir. 1996) (holding that, where a misappropriation defendant was "motivated by competition with its biggest rival, rather than by any malice against" the plaintiff, the "award of exemplary damages [was] an abuse of discretion.").

29

Because no evidence supports the inference of willfulness or malice, no reasonable factfinder could award exemplary damages.

But even if the evidence were sufficient for a finding of willful and malicious misappropriation, it does not follow that exemplary damages are warranted. The Court may grant or deny exemplary damages based on a wide variety of factors relating to the culpability and reprehensibility of the defendant's conduct—for example, "the duration of misappropriative conduct, the defendant's consciousness of resulting injury[,] and any efforts to cover up malfeasance." *Agrofresh*, 2020 WL 7024867, at *24.

Such considerations weigh heavily against an award of exemplary damages here. The alleged misappropriation (the Bohling Application) was essentially a one-time act by a relatively junior Walmart employee. There is no evidence that anyone at Walmart knew that Mr. Bohling's conduct in filing the Bohling Application was wrongful or likely to injure Zest. Nor is there any evidence that Walmart tried to cover up the Bohling Application, which like every patent application was made public about 18 months after filing.

Other circumstances also weigh heavily against an award of exemplary damages in this case. The USPTO ultimately concluded that the concepts disclosed in the Bohling Application were not novel, calling into question both Zest's claim of trade-secret protection and the value of the purported secret. When Walmart decided not to proceed with the Zest relationship, it offered to pay Zest $1.5 million. Tr. 538:10-18. Walmart did not have to make this gesture. This is not the act of a party behaving reprehensibly.

## CONCLUSION

For all these reasons, the Court should enter judgment as a matter of law in favor of Walmart and dismiss the complaint with prejudice.

John R. Keville (*pro hac vice*)
jkeville@sheppardmullin.com
Robert L. Green (*pro hac vice*)
rgreen@sheppardmullin.com
Chante B. Westmoreland (*pro hac vice*)
cwestmoreland@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
700 Louisiana Street, Suite 2750
Houston, Texas 77002-2791
(713) 431-7100 Telephone
(713) 431-7101 Facsimile

John E. Tull III (84150)
E. B. Chiles IV (96179)
R. Ryan Younger (2008209)
Glenn Larkin (2020149)
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas  72201
(501) 379-1700 Telephone
(501) 379-1701 Facsimile
jtull@qgtlaw.com
cchiles@qgtlaw.com
ryounger@qgtlaw.com
glarkin@qgtlaw.com

*Attorneys for Defendant Walmart Inc.
f/k/a Wal-Mart Stores, Inc.*