IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

ZEST LABS, INC. f/k/a INTELLEFLEX
CORPORATION; ZEST LABS HOLDINGS
LLC, and RISKON INTERNATIONAL,
INC.,

          Plaintiffs,

v.                                                                                   No. 4:18-CV-500-JM

WALMART INC. f/k/a WAL-MART
STORES, INC.,

          Defendant.

## ZEST'S REQUEST TO MODIFY JURY INSTRUCTIONS

Plaintiffs ("Zest") respectfully recommend changes to the Court's Jury Instructions and Verdict Form distributed on Friday, May 9. Zest's requested changes are described herein and shown in the attached redlined versions of the Jury Instructions (Exhibit A) and Verdict Form (Exhibit C). Separately, Zest attaches a version of the instructions implementing AMI where possible to avoid tension with the statutory text (Exhibit B).[1]

### I.    INTRODUCTION

Zest greatly appreciates the changes the Court made to the Jury Instructions between May 8 and May 9. This Introduction highlights Zest's key remaining proposed changes. First, in light of the "clear and convincing" instruction in Instruction No. 14, Zest recommends that the Court

---

[1] *Center v. Johnson*, 295 Ark. 522, 528 (1988) (non-AMI instruction improper where AMI covers the issue); *Newman v. Crawford Constr. Co.*, 303 Ark. 641, 644 (1990) (same); *Blankenship v. Burnett*, 304 Ark. 469, 472-73 (1991) (AMI governs unless it misstates the law); *Barnes v. Everett*, 351 Ark. 479, 492-93 (2003) (AMI "are to be used as a rule"); *Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 572 (2002) (same); *Engleman v. McCullough*, 2017 Ark. App. 613, 648 (trial court must give model instruction unless inaccurate).

revise the Verdict Form to omit language in Interrogatory No. 1-C suggesting a different evidentiary standard ("greater weight of the evidence"), which could confuse the jury.

Second, in defining "willfully and maliciously" in Instruction No. 14, the Court relied on an Eighth Circuit case that applied Arkansas trade-secrets law, not the federal Defend Trade Secrets Act. Zest recommends that the Court use a definition crafted by the Federal Judicial Center. Using that definition should resolve any objections Walmart may have to the word "recklessly" in the Court's definition.

Third, on May 8, Zest agreed to an instruction on the law of agents and principles, but that agreement was based on Zest's expectation that the instruction would apply mutually to both parties, not just Zest. The law of agency applies to both sides of this case. Mr. Bohling testified that he worked with Walmart's patent lawyers on the patent application (2106:14-16; 2079:1-23.); those lawyers are Walmart's agents.

Fourth, in Instruction No. 9, the terms "compilation" and "procedure" should be added to the definition of a trade secret. Those terms come from the model instructions and the Arkansas and federal trade-secret statutes, and those terms fit the facts of this case. Zest witnesses used these words at trial to describe and discuss Zest's trade secret.

Fifth, the Court should instruct the jury on the difference between patents and trade secrets. Zest's proposed Instruction No. 15 is necessary because at trial Walmart repeatedly used the language of patent law to suggest to the jury that Zest lacks a trade secret. Instruction No. 15 will clarify the distinction between patent law and trade secrets law and avoid jury confusion.

Sixth, and finally, Your Honor's decision to adjust the instructions to allow the jury to determine misappropriation based on the definition instruction is firmly supported by, among other things, *Bohnsack v. Varco, L.P.,* 668 F.3d 262 (5th Cir. 2012). In that case, an inventor, Bohnsack,

disclosed his "Pit Bull" drilling-mud cleaner to Varco under an NDA for joint development. Varco then diverted the information into its own R&D, filed a patent application listing its lawyer as co-inventor, and ultimately assigned the pending unauthorized patent application to Bohnsack without ever putting the product on the market. The Fifth Circuit held that these acts satisfied the "use" prong of misappropriation even without the trade secret ever becoming public and having ended up back in the inventor's sole control. The court reasoned that "Any exploitation of the trade secret that is likely to result in injury to the trade-secret owner or enrichment to the defendant is a 'use[.]'" *Id*. at 279. ["[E]mploying the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret ... all constitute 'use.'" *Id*. Importantly, the court held that "Varco's act of filing a patent application to the Pit Bull was 'likely to result in injury to the trade secret owner' because it lowered the market value of Bohnsack's invention." *Id*. at 280. In summary, unauthorized R&D or patent-office activity that diverts a confidential design to an unconsented purpose is actionable misappropriation, and the injury arises from the adverse use itself even when the secret is never publicly disclosed.

### Instruction No. 7 – Agents and Principals

As written, Instruction No. 7 applies only to Zest.  But the law of agents and principals applies to Walmart as much as it does to Zest.  Therefore, the instruction should be changed so that it even-handedly applies to both Zest and Walmart.

### Instruction No. 9 – Trade Secret Definition

In Instruction No. 9, the definition of a trade secret should be expanded to include "compilation" and "procedure."  During the discussion of the proper definition of a trade secret, the Court appeared resistant to including the statutory terms "compilation" and "procedure" in the

definition, focusing instead on the Zest Fresh Solution generally. The Court stated: "The question of whether or not the Zest Fresh process is a trade secret is a jury question. I don't define the Zest Fresh process as a trade secret. That's a question they have to decide." (2141:19-22).

While Zest agrees that whether the Zest Fresh Solution qualifies as a trade secret is a jury question, the definition provided to the jury should include the complete statutory definition,[2] but at a minimum must include "compilation" and "procedure." The statutory definition under both Arkansas and federal law includes these terms because trade secrets often consist of compilations of information or procedures.

As the Eighth Circuit recognized in *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011), "collections of information" can qualify as trade secrets. The Court explained that "the fact that some of the information was publicly available does not preclude protection for AvidAir's compilation of the information because it is the unique compilation, rather than the individual elements, that comprises the valuable product." *Id*. at 972-73.

Peter Mehring testified that Zest's trade secret was a compilation of various elements and procedures working together.

> Q. So you view it as a compilation of lots of materials. . . . [H]ow it all fits together, that's the trade secret you're alleging? . . .
>
> A. Yes. I mean, compilation is the word we use in writing computer programs for exactly that. So, yes, it is. It's pulling it all together with our secret sauce, as they asked, but also some public information, some things that are generally available, but how it's pulled together was and what we did and produced from, it was different and unique. And that's – I mean, again, this is where we got constant recognition for that when we explained it to people. At the time, we were thinking that would just help our cause in trying to get this deployed. And we shared this with others as well at Walmart, but other growers never -- or retailers never asked for this

---

[2] AMI 2602 accurately reflects the statutory language, and accordingly should be used. See fn. 1.

>    level of detail.
>
>    Q. It was only Walmart that wanted this level of detail?
>
>    A. It was.
>
>    I mean, they were, interestingly from all our customers, the only ones that ever visited our offices and our labs as well.

(1061:10-1062:8.)

The jury should be informed that a compilation or procedure can qualify as a trade secret under the law.

### Instruction No. 11 – Misappropriation

Zest requests the Court use AMI 2601.[3] Instruction No. 11 does not currently state that a trade secret may be misappropriated by acquisition, use, or disclosure. Instruction No. 11 defines misappropriation as disclosure or use. But the third type of misappropriation, acquisition, is missing, as is the statutorily complete statement of what makes disclosure or use misappropriation.

The Arkansas Uniform Trade Secrets Act ("AUTSA") and the federal Defend Trade Secrets Act ("DTSA") define misappropriation to include acquisition, use, and disclosure. *See* Ark. Code Ann. § 4-75- 601(2); 18 U.S.C. § 1339(5). All three forms of misappropriation have been supported by evidence in this case, as shown below.

The Eighth Circuit recognized in *Walmart Inc. v. Cuker Interactive*, LLC, 949 F.3d 1101, 1107 (8th Cir. 2020), that misappropriation under Arkansas law can occur through acquiring, using, or disclosing confidential information obtained during a business relationship. The district court had analyzed evidence of Walmart's improper acquisition, use, and disclosure of trade secrets, and the Eighth Circuit affirmed the jury's finding of misappropriation.

The Eighth Circuit has confirmed this interpretation in other cases. In *BP Chemicals Ltd.*

---

[3] See fn. 1.

*v. Jiangsu Sopo Corp.*, 285 F.3d 677, 684 (8th Cir. 2002), the Court stated: "a plaintiff may premise his misappropriation claim on any or all of these alternate forms of improper conduct." (emphasis added). Federal courts in Arkansas have also explicitly recognized that wrongful acquisition or disclosure alone, even without use, can constitute misappropriation. In *3A Composites USA, Inc. v. United Indus., Inc.*, 2017 WL 1013304, at *4 (W.D. Ark. Mar. 15, 2017), the court stated: "To be clear, the Court is not saying that evidence of use is strictly necessary to support a claim for misappropriation of trade secrets; wrongful acquisition or disclosure can also constitute misappropriation, even if the confidential information is never actually implemented."

Dr. Becker testified that Walmart's misappropriation began in January 2017, well before publication of any patent, when Walmart, having acquired Zest's trade secret, began using it to develop the Eden system internally and to prepare the patent applications. Mr. Mehring and Dr. Lanning both testified about Walmart's internal acquisition and use of Zest's trade secrets. Mr. Bohling himself testified that he discussed the technology extensively.

> Q. And who were the people you presented to?
>
> A. It was a big audience. I know Chuck Tilmon was obviously there. I believe Laura Heins was in -- was on the buying side of produce. There were regional quality control managers who were there. Kind of stakeholders from all the fresh departments, replenishment, data and analytics. I don't remember everyone. It was a big audience.
>
> Q. Was it exciting for you guys?
>
> A. Oh, absolutely. Any time you have a pitch that goes well, that is really exciting.
>
> Q. And was this the first time you met Chuck Tilmon?
>
> A. I think so. Yeah.
>
> Q. Did you then start to interact with him a lot more?
>
> A. Yeah. I mean, once we were the chosen group, he became our business partner, right? In product development terms, he was the -

> - he was our customer in many ways, right? It was his organization that we were starting with and that we were focusing on and what we were building.
>
> Q. Did you learn a lot, you and your team, about produce and inspecting produce and all that through Mr. Tilmon?
>
> A. Oh, yeah. He's a wealth of information.

(1985:13-1986:8.)

> Q. Did you talk to a whole lot of people in Walmart in produce as your work was progressing on Eden and other things?
>
> A. Oh my goodness, yes.
>
> Q. What's your thought, you and the team -- you're data and computer people, correct?
>
> A. Yeah.
>
> Q. What's your thoughts as you're gathering all this information on what you can do with it?
>
> A. Yeah, so what I think became clear very early on, I mentioned that store associate example, right, but essentially our thought is we have -- Walmart has people in all the right places, and to varying degrees they are capturing information, but often it's not making it to the next step in the process effectively. Right? So if the quality control associate doesn't check their email for a day, they might have missed the signal from the Florida office that there's an opportunity to look out for quality problems, right? So that's a lost insight. So as data people, we're saying if you put all of this into one repository and you have all of these signals from people Walmart already has in place, things Walmart already does, you can surface that in the right moment to the right people.

(1990:4-1991:1.)

> Q. Then if we look under the bullets under one-on-one GFS meetings, what's GFS?
>
> A. Global food sourcing.
>
> Q. It talks about rag scores, MABD, and fill rates. What are those?
>
> A. So the rag score is essentially the suppliers' score card, how they're performing relative to Walmart's expectation, and that's the

>umbrella for MABD, which is "Must Arrive By Date", whether the supplier is getting their product to the distribution center in time; fill rate meaning did they ship the amount that we asked them to ship because that's not always the case as well. So this is just helping us understand how suppliers are graded and scored.

(1994:10-22.)

>Q. When you were down in Miami, do you remember what you and Riley were thinking big picture?
>
>A. Yeah. I remember distinctly, we had heard about the field techs, but as we talked to them and understood that there was this consistency of what they were doing even if they didn't have a standard data output, that it became clear that, like -- and I think I've already mentioned this -- Walmart has people in the right places, they have humans, they have processes, they have things that we're doing. This all needs to be knit together in a meaningful way. There's not just the three apps that we envisioned, but actually there's apps for almost every touch point.

(1996:9-20.)

## **Instruction No. 13 – Compensatory Damages**

Instruction No. 13 should be revised to permit the jury to award Zest either unjust enrichment damages, which may include saved research-and-development ("R&D") costs, or alternatively a reasonable royalty.[4]

Several measures of monetary relief are available under DTSA, including either "a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret" or "*damages for any unjust enrichment caused by* the misappropriation." 18 U.S.C. § 1836(b)(3)(B) (emphasis added). Here, Zest is seeking a reasonable royalty for Walmart's misappropriation. In the alternative, Zest is entitled to recover as damages Walmart's unjust enrichment caused by its misappropriation. There is substantial evidence in the record that would support an award of unjust

---

[4] AMI 2604 given in the form with AMI 2201 accurately reflects the statutory language and could be used. See fn. 1.

enrichment damages, including for saved R&D costs. And whether a defendant has been unjustly enriched as a result of its wrongdoing is a question for the jury. *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1112 (8th Cir. 2020).

Unjust enrichment "can take several forms and cover a broad array of activity." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.,* 68 F.4th 792, 808-09 (2d Cir. 2022), *cert. denied*, 144 S. Ct. 352, 217 L. Ed. 2d 188 (2023). As relevant here, this includes "saved" or "avoided" research and development costs. *See, e.g., Id.; Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 390-391 (6th Cir. 2022); *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1132 (7th Cir. 2020); *GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016). The AUTSA is in accord. *See, e.g.*, *R.K. Enterprises, LLC v. Pro-Comp Management, Inc.*, 372 Ark. 199, 207 (Ark. 2008) (Defendant was "unjustly enriched by its use of the various lists and databases without having to contribute to the time, effort, and cost of their development. Therefore, the development and labor costs of the trade secrets were properly included in the award of damages for unjust enrichment.").

"The costs a plaintiff spent in development ... can be a proxy for the costs that the defendant saved." *GlobeRanger Corp.,* 836 F.3d at 499; *accord PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156, 163 (3d Cir. 2022) (plaintiff's R&D costs "indicative of the costs … avoided by misappropriating the fruits" of plaintiff's work); *Bourns, Inc. v Raychem Corp.*, 331 F.3d 704, 709-710 (9th Cir. 2003) (affirming district court's damages award of $9 million after relying on evidence that the plaintiff's development cost was $3 million per year and that the defendant saved at least three years of development costs); *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974) ("[T]he actual development costs of the plaintiff [can be] the complete measure of damages.").

Peter Mehring testified it took Zest many years and in excess of $100 million to develop the Zest Fresh Solution.

> Q. Okay. And you said you never paid hundreds -- not hundreds of millions. What was it that were invested?
>
> A. No. The investment in total prior to that was roughly a hundred million dollars before Randy May took over.
>
> Q. And then how much after?
>
> A. He put in, and through the other investors, probably another 40 million or so.
>
> Q. So a total of 140 million?
>
> A. Correct.

(1219:23-1220:6.).

Troy Richards testified: "For $1.3 million, immediately it started raising money. And probably over the three to four years that we were doing the work with Walmart, we probably raised 40 to 50 million on top of that. So north of 120 million was invested in it." (184:3-7.)

> Q. Over time, how much money in total did the Ecoark investors invest in Zest?
>
> A. As I said, probably about 40 to 50 million. I don't know the exact number, but north of 40.
>
> Q. So between the private equity investment and Ecoark, in total how much money was invested in Zest?
>
> A. It was well over 120 million.

(185:1-7.)  He also testified:

> Q. What did Zest do with all the money that was invested by Ecoark?
>
> A. Basically, we started ramping up right away to work with Walmart.  I mean, we started buying hardware. We hired back all the software engineers, the hardware engineers. You know, it was down to two employees, so the money was used to bring it back up to the 70, 75 employees."

(310:20-311:1.)

Mr. Mehring also testified about the effort that had gone into the technology Walmart stole and disclosed:

> Q. Was it seven years total working on the trade secret, the Zest Fresh process?
>
> A. Yeah, I mean, at least up until that time. I mean, obviously, that's -- just a lot of time and investment. I mean, a lot of people, thousands of hours, you know, spending a lot of time on farms. We were down in Mexico and Chile, not all of it was easy. There was a lot of time, sweat, and hard work that went into this. And we really did it thinking we had an opportunity to win business and make a change for the better; that was our goal.
>
> Q. How much money was invested into the Zest Fresh process technology?
>
> A. I mean, overall to the company was well over a hundred million dollars.
>
> Q. I think there were 75 people working on this over time?
>
> A. Yeah, I mean, we had, yes, roughly 75 people. And a lot of -- you know, it was a whole mix of people we brought in, specialists, obviously in agronomy, to understand what's going on in agriculture and practical farming, but specialists in industrial engineering and process flow. I mean, just a lot of different --
>
> Q. Keep going. Just slow down.
>
> A. And everyone -- not what you're asking specifically, but everyone buys into the vision. Everyone wants to help do something important. And, you know, preventing food waste was that vision and that was important, and to see it blow up is where some of my emotion is coming from.

(1078:25:1080:1.)

Walmart claimed to have been able replicate technology in a six-month "hackathon." The truth is that Walmart was able to save years of effort and because it improperly *acquired* and *used* Zest's trade secret to develop the Bohling patent applications. The R&D that Walmart saved is

unjust enrichment it should not retain. *See R.K. Enters., LLC v. Pro-Comp Mgmt., Inc.* 356 Ark. 565, 574–76 (2004) (AUTSA "includes the recovery of ***actual loss plus any unjust enrichment***"; remanding because record did not yet show "Nationwide's gains resulting from the misappropriation of trade secrets"); *Pro-Comp Mgmt., Inc. v. R.K. Enters., LLC*, 366 Ark. 463, 475–76 (2006) (rejecting view that unjust enrichment is limited to profits and noting evidence that "***Nationwide did avoid at least some of the initial start-up costs*** … at the considerable expense of another"); *R.K. Enters., LLC v. Pro-Comp Mgmt., Inc.*, 372 Ark. 199, 207 (2008) ("development and labor costs … are clearly part of the fair-market value of the trade secrets"; Nationwide was unjustly enriched by using them "***without paying for their development***") (all of the above emphases added).

### Instruction No. 14 – Exemplary Damages

The DTSA does not define the term "willfully and malicious" in its provision authorizing exemplary damages. *See* 18 U.S.C. § 1836(b)(3)(C). In Instruction No. 14, the Court has defined the term. Zest believes the Court's definition of "willfully and maliciously," while grounded in law, may be improved.

Instruction No. 14 states: "WALMART ACTED WILFULLY AND MALICIOUSLY IF IT CONTEMPLATED THE EXISTENCE OF THE TRADE SECRET AND TOOK ACTIONS IN RECKLESS DISREGARD AS TO WHETHER THOSE ACTIONS WOULD CONSTITUTE MISAPPROPRIATION OF THAT TRADE SECRET." That definition comes from *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1114 (8th Cir. 2020), a trade secrets case arising under the AUTSA. Zest's claim for exemplary damages is based on the DTSA.

Zest recommends using the definition of "willfully and maliciously" found in the Federal Judicial Center's Trade Secret Case Management Judicial Guide (2023) in Appendix 10.1:

> *Willful and Malicious Conduct*
>
> If you decide that either Smith or XYZ has misappropriated a trade secret of ABC, you will be asked on your verdict form to indicate whether such misappropriation was willful and malicious. An act is done "willfully" if it is voluntary and intentional, rather than by mistake or accident. An act is done "maliciously" if prompted or accompanied by such gross indifference to the rights of others as will amount to a willful act without just cause or excuse. To find that an act was done "maliciously" you are not required to find that defendant had personal animus toward or hated the plaintiff.

Federal Judicial Center, *Trade Secret Case Management Judicial Guide*, Appendix 10.1 at 10-21 (2023). Accordingly, Zest recommends that the Court insert the following language after the first sentence of Instruction No. 14::

> IF YOU DECIDE THAT WALMART HAS MISAPPROPRIATED A TRADE SECRET OF ZEST LABS, YOU WILL BE ASKED ON YOUR VERDICT FORM TO INDICATE WHETHER SUCH MISAPPROPRIATION WAS WILLFUL AND MALICIOUS. AN ACT IS DONE "WILLFULLY" IF IT IS VOLUNTARY AND INTENTIONAL, RATHER THAN BY MISTAKE OR ACCIDENT.  AN ACT IS DONE "MALICIOUSLY" IF PROMPTED OR ACCOMPANIED BY SUCH GROSS INDIFFERENCE TO THE RIGHTS OF OTHERS AS WILL AMOUNT TO A WILLFUL ACT WITHOUT JUST CAUSE OR EXCUSE.  TO FIND THAT AN ACT WAS DONE "MALICIOUSLY" YOU ARE NOT REQUIRED TO FIND THAT DEFENDANT HAD PERSONAL ANIMUS TOWARD OR HATED THE PLAINTIFF.

The Court should then delete the definition of "willfully and maliciously" that is now the final sentence of the first paragraph of Instruction No. 14. *See* Zest's redline attached hereto.

### **Zest's Proposed Instruction No. 15 – Difference Between Patent and Trade Secret**

The Court should add to the Jury Instructions Zest's proposed Instruction No. 15, which would explain to the jury important differences between a patent and a trade secret. As set forth in our prior bench brief filed at Docket 778, this curative instruction is necessary to avoid jury confusion in light of Walmart's frequent resort at trial to patent-law concepts to suggest that Zest

does not have a trade secret.  Docket 778 is attached hereto as Exhibit D and incorporated by reference.

### Verdict Form – Recommended Changes

Zest recommends two changes to the Verdict Form.  First, "Zest Labs" should be changed to "Plaintiffs."   Second, Interrogatory No. 1-C should be revised to remove the words "by the greater weight of the evidence" to avoid any possible inconsistency with the Court's instruction on clear and convincing evidence in Instruction No. 14. In the event the damages instruction is changed, the verdict form would also have to conform.

### CONCLUSION

Zest recommends and requests that the Court make the above-described changes to the Jury Instructions and Verdict Form.  Zest objects to the Court's Jury Instructions and Verdict Form to the extent they do not adopt the changes offered by Zest in this brief and in Zest's redlined version of those documents.

Dated: May 11, 2025                                              Respectfully submitted,

                                                Patrick Ryan*
                                                Sean R. McTigue*
                                                Kenneth L. Richard*
                                                Natalie A. Felsen*
                                                BARTKO PAVIA LLP
                                                1100 Sansome Street
                                                San Francisco, CA 94111
                                                (415) 956-1900
                                                *pryan@bartkopavia.com*
                                                *smctigue@bartkopavia.com*
                                                *krichard@bartkopavia.com*
                                                *nfelsen@bartkopavia.com*
                                                *Admitted *pro hac vice*

Katie Allgood*
BARTKO PAVIA LLP
555 Madison Avenue, 11th Floor
New York, NY 10022
(212) 980-3500
*kallgood@bartkopavia.com*
*Admitted pro hac vice*

Scott P. Richardson
MCDANIEL WOLFF, PLLC
1307 West Fourth Street
Little Rock, AR 72201
(501) 954-8000
*scott@mcdanielwolff.com*

H. Christopher Bartolomucci*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
*cbartolomucci@schaerr-jaffe.com*
*Admitted pro hac vice*

Kate M. Falkenstien*
BLUE PEAK LAW GROUP, LLP
3790 El Camino Real, PMB 846
Palo Alto, CA 94306-3314
(281) 972-3036
*kate@bluepeak.law*
*Admitted pro hac vice*

*Attorneys for Plaintiffs ZEST LABS, INC., ZEST LABS HOLDINGS LLC, and RISKON INTERNATIONAL, INC.*