# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

ZEST LABS, INC. *f/k/a* INTELLEFLEX
CORPORATION; ZEST LABS HOLDINGS,
LLC; *and* RISKON INTERNATIONAL, INC.

        *Plaintiffs,*

    *v.*

WALMART INC. *f/k/a*
WAL-MART STORES, INC.,

        *Defendant.*

No. 4:18-cv-500-JM

## WALMART INC.'S POST-TRIAL BRIEF
## <u>REGARDING EXEMPLARY DAMAGES</u>

# <u>TABLE OF CONTENTS</u>

**Pages**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................. 1

LEGAL STANDARD ........................................................................................... 2

ARGUMENT ....................................................................................................... 2

I.     EXEMPLARY DAMAGES ARE UNAVAILABLE BECAUSE WALMART DID NOT
ACT WILLFULLY OR MALICIOUSLY ......................................................... 2

     A.     The Evidence Establishes That, To The Extent Walmart
Misappropriated A Trade Secret, Such Misappropriation Was Not
Willful ...................................................................................................... 3

     B.     At A Minimum, There Is Not Clear And Convincing Proof That
Walmart Acted Maliciously .................................................................... 10

II.    THE PARTIES' BINDING CONTRACT BARS EXEMPLARY DAMAGES, AND
EQUITABLE PRINCIPLES LIKEWISE MAKE EXEMPLARY DAMAGES
INAPPROPRIATE ...................................................................................... 11

     A.     The Parties' Master Services Agreement Waives Exemplary
Damages ................................................................................................ 12

     B.     The Relevant Factors Weigh Against Exemplary Damages ................... 14

III.   TO THE EXTENT ANY EXEMPLARY DAMAGES COULD BE JUSTIFIED, THEY
SHOULD BE IN A MUCH SMALLER AMOUNT ........................................... 18

CONCLUSION ................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*Advanced Fluid Systems, Inc. v. Huber*,
   958 F.3d 168 (3d Cir. 2020)..................................................................13

*Alabama Aircraft Industries, Inc. v. Boeing Co.*,
   133 F.4th 1238 (11th Cir. 2025) ...........................................................13

*Allianz Versicherungs, AG v. Profreight Brokers Inc.*,
   99 F. App'x 10 (5th Cir. 2004) .............................................................14

*Arconic Inc. v. Novelis Inc.*,
   2020 WL 7247112 (W.D. Pa. Dec. 9, 2020)......................................4, 8

*Arnold's Office Furniture, LLC v. Borden*,
   2022 WL 3597239 (E.D. Pa. Aug. 23, 2022) .................................11, 16

*B&L Farms v. Monsanto Co.*,
   2022 WL 9285881 (E.D. Mo. Oct. 14, 2022) ......................................13

*Bach v. First Union National Bank*,
   486 F.3d 150 (6th Cir. 2007) ...............................................................21

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*,
   1 F. Supp. 3d 224 (S.D.N.Y. 2014) .......................................................4

*Bimbo Bakeries USA, Inc. v. Sycamore*,
   2018 WL 1578115 (D. Utah Mar. 29, 2018) .......................................19

*Bimbo Bakeries USA, Inc. v. Sycamore*,
   39 F.4th 1250 (10th Cir. 2022) ..............................................................2

*Boerner v. Brown & Williamson Tobacco Co.*,
   394 F.3d 594 (8th Cir. 2005) .........................................................20, 21

*Capricorn Management Systems, Inc. v. Government Employees Insurance Co.*,
   2020 WL 1242616 (E.D.N.Y. Mar. 16, 2020)......................................6

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*,
   2021 WL 863203 (W.D. Ky. Mar. 8, 2021) ........................................19

*Citcon USA, LLC v. RiverPay, Inc.*,
   2020 WL 5365980 (N.D. Cal. Sept. 8, 2020) ......................................15

*Coenco, Inc. v. Coenco Sales, Inc.*,
   940 F.2d 1176 (8th Cir. 1991) ...............................................................3

*Cruzan v. Director, Missouri Department of Health*,
497 U.S. 261 (1990)..................................................................................................3

*Double Eagle Alloys, Inc. v. Hooper*,
134 F.4th 1078 (10th Cir. 2025) .............................................................................8

*E.J. Brooks Co. v. Cambridge Security Seals*,
2015 WL 9704079 (S.D.N.Y. Dec. 23, 2015) .......................................................4

*Erdman Co. v. Phoenix Land & Acquisition, LLC*,
2013 WL 3776405 (W.D. Ark. July 17, 2013) .....................................................13

*Finagin v. Arkansas Development Finance Authority*,
139 S.W.3d 797 (Ark. 2003)..................................................................................14

*Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*,
758 F.3d 1051 (8th Cir. 2014) ...............................................................................20

*Harbor Compliance Corp. v. Firstbase.IO, Inc.*,
2025 WL 383804 (E.D. Pa. Feb. 4, 2025) ......................................................14, 15

*Harris v. Secretary, United States Department of the Army*,
119 F.3d 1313 (8th Cir. 1997) .................................................................................2

*Imax Corp. v. Cinema Technologies, Inc.*,
152 F.3d 1161 (9th Cir. 1998) .................................................................................7

*Jenkins v. APS Insurance, LLC*,
431 S.W.3d 356 (Ark. Ct. App. 2013) .....................................................................2

*John Bean Technologies Corp. v. B GSE Group, LLC*,
2023 WL 6164322 (D. Utah Sept. 21, 2023)....................................................15, 16

*Jones v. United Parcel Service, Inc.*,
674 F.3d 1187 (10th Cir. 2012) .............................................................................20

*Lompe v. Sunridge Partners, LLC*,
818 F.3d 1041 (10th Cir. 2016) .............................................................................21

*Mattel, Inc. v. MGA Entertainment, Inc.*,
801 F. Supp. 2d 950 (C.D. Cal. 2011) ...................................................................18

*Monster Energy Co. v. Vital Pharmaceuticals, Inc.*,
2023 WL 8168854 (C.D. Cal. Oct. 6, 2023)..............................................11, 12, 15

*Proofpoint, Inc. v. Vade Secure, Inc.*,
2021 WL 5407521 (N.D. Cal. Nov. 18, 2021) .........................................12, 14, 15

*Saccameno v. U.S. Bank National Association*,
943 F.3d 1071 (7th Cir. 2019) ...............................................................................20

*Sit-Up Ltd. v. IAC/InterActiveCorp.*,
    2008 WL 463884 (S.D.N.Y. Feb. 20, 2008)...........................................................4

*SL Montevideo Technology, Inc. v. Eaton Aerospace, LLC*,
    491 F.3d 350 (8th Cir. 2007) ...............................................................6, 7, 8

*Square Liner 360, Inc. v. Chisum*,
    691 F.2d 362 (8th Cir. 1982) ...............................................................1

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
    538 U.S. 408 (2003)...........................................................20

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ...............................................................3

*Storagecraft Technology Corp. v. Kirby*,
    2012 WL 4467519 (D. Utah Sept. 27, 2012)...........................................................19

*TLS Manegement & Marketing Services, LLC v. Rodriguez-Toledo*,
    966 F.3d 46 (1st Cir. 2020).......................................................3

*Tri-Lady Marine, Ltd. v. Bishop Mechanical Services, LLC*,
    763 F. App'x 882 (11th Cir. 2019) ...............................................................14

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*,
    2017 WL 11681850 (W.D. Ark. Apr. 5, 2017)...........................................................13

*Walmart Inc. v. Cuker Interactive, LLC*,
    949 F.3d 1101 (8th Cir. 2020) ...............................................................4

*Williams v. ConAgra Poultry Co.*,
    378 F.3d 790 (8th Cir. 2004) ...............................................................21

*Youtie v. Macy's Retail Holding, Inc.*,
    653 F. Supp. 2d 612 (E.D. Pa. 2009) ...............................................................14

## STATUTES AND RULES

18 U.S.C.
    § 1836...........................................................2
    § 1836(b)(3)(C)...........................................................2, 18

Fed. R. Civ. P. 26(e)(1)...........................................................9

## OTHER AUTHORITIES

1 *Milgrim on Trade Secrets* § 1.01[2A][f][iii] ...........................................................3

iv

## INTRODUCTION

The jury's advisory verdict on exemplary damages cannot be squared with the law or the trial record. The decision whether to accept or reject that advisory verdict is entrusted to this Court's discretion. *See, e.g.*, *Square Liner 360, Inc. v. Chisum*, 691 F.2d 362, 379 (8th Cir. 1982) (no abuse of discretion in declining to treble damages in patent suit where jury's finding was "merely advisory"). This Court should reject it.

There is no basis for concluding that any alleged misappropriation of Zest's purported trade secret was willful or malicious. That is not least because it is still not clear—after years of litigation culminating in two trials—what that secret is. Zest's former CEO Peter Mehring testified that Zest's purported trade secret largely consists of public information and that what makes it protectable is the "recipe, that process, to make it all work." Tr.1061:7-9. Neither Mr. Mehring nor any other witness could explain what that special "process" was. The only specific trade secret Zest ever identified for Walmart was an algorithm that Zest *never disclosed* to Walmart. Absent an identifiable trade secret that was identified as such to Walmart, Walmart cannot possibly have willfully and maliciously misappropriated Zest's trade secret. Zest's inability to identify its alleged trade secret with any particularity should bar liability altogether. At minimum, it precludes exemplary damages: Walmart cannot have willfully and maliciously misappropriated a trade secret that Zest itself still struggles to define.

Even if there were some basis to conclude that Walmart acted willfully and maliciously, the Court should exercise its discretion not to award exemplary damages (or, at least, should award far less than $150 million). As a threshold matter, the Master Services Agreement between Walmart and Zest bars exemplary damages in cases like this one. Furthermore, many pertinent factors—for example, the size of the compensatory damages award and the reprehensibility of the conduct—weigh heavily against any exemplary damages award here. Finally, given the $72.7

million compensatory-damages verdict, the jury's advisory exemplary damages verdict is so disproportionate as to violate due process. This Court should thus either exercise its discretion to reject the jury's recommended award or significantly lower it.

## LEGAL STANDARD

Zest has expressly conceded that its request for exemplary damages rests entirely on the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. *See* Dkt. 786 at 12 (Zest representing that its "claim for exemplary damages is based on the DTSA.").[1] Under the DTSA, this Court may award exemplary damages only if the alleged trade secret was both "willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(C).[2]

Without objection from Zest, this Court asked the jury to render an advisory verdict on whether any misappropriation by Walmart was "willful and malicious" and, if so, what if any exemplary damages to award. *See* Pretrial Conference Transcript (April 24, 2025) 55:4-17, 56:20-22; Trial Tr.2161:10-18; Tr.2165:16-19.[3] The jury's advisory verdict receives no deference: This Court may "accept or reject the jury's advisory verdict in making its own findings," and those findings are reviewed on appeal "as if there had been no jury." *E.g., Harris v. Secretary, U.S. Dep't of the Army*, 119 F.3d 1313, 1320 (8th Cir. 1997).

## ARGUMENT

### I. EXEMPLARY DAMAGES ARE UNAVAILABLE BECAUSE WALMART DID NOT ACT WILLFULLY OR MALICIOUSLY

Zest must prove willful and malicious misappropriation by clear and convincing evidence. Dkt. 798 at 17 (Jury Instruction 15); *see also Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th

---

[1] Exemplary damages are unavailable under the Arkansas Uniform Trade Secrets Act. *See Jenkins v. APS Ins., LLC*, 431 S.W.3d 356, 363 (Ark. Ct. App. 2013).

[2] Internal quotation marks and citations are omitted and emphases added unless otherwise noted.

[3] All transcript cites are to the trial transcript unless otherwise noted.

2

1250, 1256 (10th Cir. 2022). Clear and convincing evidence is "is proof that enables you without hesitation to reach a firm conviction that the allegation is true." Dkt. 798 at 17 (Jury Instruction 15); *see also Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 285 n.11 (1990) (defining clear and convincing evidence as evidence "so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue"). To prove that trade-secret misappropriation was willful, Zest must prove Walmart acted with "actual or constructive knowledge of its [acts'] probable consequences." Dkt. 798 at 17 (Jury Instruction 15); 1 *Milgrim on Trade Secrets* § 1.01[2A][f][iii]. To prove malicious misappropriation, Zest must prove Walmart "intend[ed] to cause [Zest] injury." Dkt. 798 at 17 (Jury Instruction 15); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) (affirming decision that malice under the DTSA requires "intent to cause injury or harm").

### A. The Evidence Establishes That, To The Extent Walmart Misappropriated A Trade Secret, Such Misappropriation Was Not Willful

Zest has never identified with particularity the trade secret that Walmart allegedly misappropriated. As Walmart will explain in its forthcoming motion under Rule 50(b), Zest's failure to adequately define the alleged trade secret requires entry of judgment as a matter of law for Walmart. *See Coenco, Inc. v. Coenco Sales, Inc.*, 940 F.2d 1176, 1178 (8th Cir. 1991) (affirming JMOL for defendant where plaintiff "never quite specified what 'trade secrets' had been taken from it"); *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 54 (1st Cir. 2020) (reversing misappropriation judgment because plaintiff "failed to identify what process constituted a trade secret … with specificity"). At a minimum, however, Zest's evasive description of the alleged trade secret in this case forecloses any finding that Zest proved *willful* misappropriation by clear and convincing evidence.

As a general matter, a party alleging trade secret misappropriation must "clearly identify what information it considered to be a trade secret" at some point "*before* the information was

disclosed." *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1109 (8th Cir. 2020) (interpreting Arkansas statute that parallels the DTSA). This rule protects defendants from "inadvertently … transgress[ing]" the trade secret's boundaries. *Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008); *E.J. Brooks Co. v. Cambridge Sec. Seals*, 2015 WL 9704079 (S.D.N.Y. Dec. 23, 2015) (same). Thus, a plaintiff's "broad declaration" that all information shared "was its exclusive property [i]s insufficient as a matter of law to clearly identify th[o]se technique[s] or tools as trade secrets." *Cuker*, 949 F.3d at 1009; *see also Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 259 (S.D.N.Y. 2014) (no liability where a plaintiff "made virtually no effort to identify its alleged trade secret with particularity at the time [it] disclos[ed]" the purported secret to the defendant). Here, Zest had an especially salient obligation to distinguish its trade secrets, as the parties' NDA distinguished allegedly "Confidential" information protectable only until July 21, 2018 from "trade secret" information protectable for as long as such information was deemed to remain a trade secret. *See* PTX-091 § 2.a.[4]

Indeed, with just one possible exception, Zest never provided Walmart with documentation invoking the NDA's elevated protection for "trade secrets" and never put Walmart on notice about the metes and bounds of Zest's purported secret. *See, e.g.*, PTX-264 ("Zest Labs Confidential"); PTX-414 (same); PTX-056/412 ("Company Confidential"). The exception is telling: Zest identified to Walmart just "one" piece of information—Zest's "shelf life algorithm"—that was supposedly "a trade secret." DTX-045 at 1. Crucially, Zest consciously "decided not to share"

---

[4] The necessity of specifically identifying information claimed as a potential trade secret is "heightened when," as here, "the parties' contracts specifically permit the other party to use" certain information, such as "general industry practices" or "improvements it independently developed," *Arconic Inc. v. Novelis Inc.*, 2020 WL 7247112, at *12 (W.D. Pa. Dec. 9, 2020). Here, the parties' NDA provided an extra layer of protection for information designated as "trade secrets," *see* PTX-091 § 2.a, and the parties' contracts permitted use of information that was "in or … part of the public domain," *see* DTX-181 § 1(B); *see also* PTX-091 § 2(d).

4

the "actual algorithm" with Walmart, as it was (in the words of Zest's CEO Mr. Mehring to a senior Walmart employee) "*the one item* that could give our competition a significant benefit." *Id.* Thus, Walmart reasonably understood from Mr. Mehring's statement that none of the information that Zest actually disclosed to Walmart was a trade secret.

Furthermore, in this litigation, Zest has disclaimed reliance on the Zest "shelf life algorithm" as its purported trade secret. *See* Dkt. 725 at 2-3 (agreeing that the trade secret is only the "Zest Fresh Process"); *e.g.* Tr.1354:3-19 (Mehring) (distinguishing the Zest Fresh Process from the algorithm).[5]  And for good reason: (1) Walmart employees never saw Zest's "shelf life algorithm," *see* Tr.395:10-397:20 (Velez), Tr.650:3-4 (Sharpe), Tr.847:3-6 (Tilmon), Tr.2022:14-15 (Bohling); and (2) Zest's algorithm does not appear in any of the documents presented at trial, including the Bohling Application itself and the image of a whiteboard drawing, Tr.1643:22-1644:5 (Beckles); Tr.1346:14-1350:6, Tr.1521:18-1522:6 (Mehring).  Zest could never have held Walmart liable for misappropriation of an algorithm that Walmart never saw.

Nor could Walmart have misappropriated the general concept of using an algorithm to estimate shelf life from inputs such as "product type, variety, the specific location, field or a lot number of harvest, harvest conditions, weather, ripeness, maturity level," since that concept was publicly disclosed by Zest. *See, e.g.*, Tr.1367:16-22 (Mehring).  And even beyond Zest's own work, moreover, other algorithms for shelf-life estimation were publicly available, *e.g.* DTX-641; DTX-388; Tr.1375:14-17 (Mehring); and some of Zest's competitors disclosed that they had shelf-life prediction algorithms, *see, e.g.*, Tr.872:11-19, Tr.886:12-15 (Tilmon); Tr.1375:14-17 (Mehring); Tr.2034:15-18 (Bohling).  Regardless, a plaintiff is not entitled to trade secret protection merely because it can describe "various functions" of an alleged trade secret, without

---

[5] Mr. Mehring also admitted that the equation he once wrote on a whiteboard in a meeting with Walmart employees did not disclose the Zest algorithm.  *See* Tr.1346:14-1350:15; *see also* Tr.395:3-20 (Velez).

further "evidence of how [those functions] work together in a unique and valuable way." *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, 2020 WL 1242616, at *8-9 (E.D.N.Y. Mar. 16, 2020); *see also SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 353 (8th Cir. 2007) (interpreting Minnesota trade secret law and holding that "[s]imply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status"). Thus, Zest cannot assert that Walmart misappropriated—much less *willfully* misappropriated—its trade secret without showing that it disclosed to Walmart the thing that made Zest's system "work … in a unique and valuable way": the Zest shelf life algorithm. *See Capricorn Mgmt. Sys.*, 2020 WL 1242616, at *8-9. But Zest made no such disclosure, and it has disclaimed any reliance on that theory.

Unable to rely on "the one item" that Zest did tell Walmart "is a trade secret," DTX-045 at 1, Zest has fallen back on the vague assertion that its misappropriated trade secret is the overall "Zest Fresh process." Tr.1060:19-21 (Mehring). But there is no evidence that Zest ever identified the "Zest Fresh process" or "Zest Fresh Solution" as a trade secret before or during this litigation— much less that it told Walmart that such "process" was a trade secret with sufficient specificity that Walmart *willfully* misappropriated it. Even at trial, Mr. Mehring, who purported to "describe[]" the alleged trade secret to the jury, Tr.2430:24-25, 2444:23-25 (Zest's closing), was unable to identify the supposed trade secret with any specificity:

> Q. So the trade secret you're alleging in this case is the Zest Fresh process, correct?
>
> A. It is. It's the process.
>
> Q. When you use the word "process", are there other words that you view interchangeably with process?
>
> A. Yeah. I mean, so in day-to-day language, a solution is a process. A system can be a process. It's a bigger scope, but it's basically

saying it's just not one piece or one component. It's really everything underneath like this slide represents. There is a lot of components to it, a lot of pieces to it.

Q. Is it – how it all fits together?

A. That's a big part of it. I mean, there are pieces that are very interesting, also. But some of the pieces are also public knowledge. It's not all unique. But the overall way we bring it all together is kind of that recipe, that process, to make it all work.

Q. So you view it as a compilation of lots of materials. Some things you may consider a trade secret. Some things may be public. Some things may just be confidential. But how it all fits together, that's the trade secret you're alleging?

…

A. Yes. I mean, compilation is the word we use in writing computer programs for exactly that. So, yes, it is. It's pulling it all together with our secret sauce, as they asked, but also some public information, some things that are generally available, but how it's pulled together was and what we did and produced from, it was different and unique.

Tr.1060:19-1061:23.  The Eighth Circuit has held that very similar testimony—acknowledging that motor components were "well known, but 'the real proprietary nature is how these things are all put together and how the tradeoffs are made during the design effort such that the customer's spec is met'"—is insufficiently particular.  *SL Montevideo Tech.*, 491 F.3d at 353.  Zest conceded at trial that numerous aspects of its trade-secret "system" were public, *e.g.*, Tr.1061:6-7, 1231:8-11, 1315:5-1319:18, 1614:6-13 (Mehring), and no Zest witness has ever specifically explained what the phrase "how it all fits together," Tr.1061:12-18, means or delineated the purported secret from information generally known in the industry.  *See, e.g.*, *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998) (rejecting an attempt to use a "catchall phrase" to describe the trade secret without identifying "precise numerical dimensions and tolerances" that were supposedly valuable).

Mr. Mehring's admission that much of the "Zest Fresh process" was "public knowledge" only further reinforces why Walmart did not *willfully* misappropriate Zest's trade secret.   As *Montevideo* explains, where an alleged trade secret includes some public information, a party may not "simply assert [that] a trade secret resides in some combination of otherwise known data"; instead, "the combination itself must be delineated with some particularity."  491 F.3d at 354. Accordingly, where a plaintiff asserts a combination trade secret, it must identify "the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1092 (10th Cir. 2025).  Zest's "[l]ong lists of general areas of information containing unidentified trade secrets," "catchall phrases," and "categories" cannot possibly suffice for "particularity."  *Id.* at 1089.  And as explained above, the "requirement of particularity … at the time of disclosure" "exists for the simple reason that a defendant must know what constitutes a plaintiff's trade secret, so that it does not infringe upon that trade secret."  *Arconic*, 2020 WL 7247112, at *11.  Walmart, which had been told by Zest that the "one item" that could give Zest's competition a significant benefit and that Zest kept as a trade secret was its proprietary "shelf life algorithm," DTX-045 at 1, could not possibly have known that the use of some unidentified combination of other elements of Zest's alleged "process" would amount to misappropriation of a trade secret.

That conclusion makes particularly good sense in this case, as Zest repeatedly disclosed details to the public (other than the algorithm) about how "it[] pulled together" data from various sensors to generate a freshness prediction. *See, e.g.*, DTX-1032 (Zest website describing numerous components of the purported trade secret); DTX-215 (Zest white paper describing Zest's end-to-end solution).  And Mr. Mehring admitted both that no Zest document describes the "Zest Fresh Solution" as a trade secret and that Zest "didn't generally talk about our solution as a trade secret to most people."  Tr.1354:3-19.  In light of Zest's failure to describe or delineate the contours of

its purported trade secret, there is no clear and convincing evidence that Walmart *willfully* misappropriated a trade secret.

Finally, Zest's conduct in the early stages of this litigation underscores the ambiguity of Zest's purported trade secret and undermines any possible inference that Walmart acted willfully. Zest's Complaint initially alleged it possessed a trade secret in "its multi-layer solution, architecture, and *algorithms* for tracking food freshness from farm to stores." Dkt. 1 ¶ 47. Zest reinforced this confusion in December 2018, when it responded to Walmart's Interrogatory No. 1, which asked Zest to "[i]dentify with particularity all trade secrets Plaintiffs allege were disclosed to Walmart," Dkt. 89, Ex. C at 6-7, by claiming numerous "solutions" as trade secrets, including "a variety of algorithms associated with calculating and tracking freshness," Dkt. 89, Ex. C at 11. Despite Zest's ongoing duty to supplement its interrogatory responses, *see* Fed. R. Civ. P. 26(e)(1), it was only on the last day of discovery (and months after the Bohling Application issued) that Zest noted for the first time (in the last paragraph of a 50-page discovery response) that "certain of Zest Labs' process know-how trade secrets … were incorporated into [the Bohling Application]." Dkt. 161, Ex. C at 61. As the Court is well aware, Zest concedes it knew of the Bohling Application by March 3, 2019, and knew of its content by April 3, 2019. Tr.174:8-16. Walmart cannot reasonably be said to have acted willfully by failing to block publication of the Application in May 2019 when (1) Walmart disclosed the Application several months *before* publication, (2) Zest did not raise its Bohling Application theory until five months *after* publication, and (3) Zest has *never* clearly identified the trade secret supposedly contained within the Application.

*        *        *

In short, Zest failed to notify Walmart that Zest considered any information it shared to be a trade secret. Zest deliberately chose not to share "the one item" that it identified as "a trade

secret"—its "shelf life algorithm." DTX-045 at 1. And Zest is to this day unable to sufficiently define the metes and bounds of the purported Zest Fresh Solution that it claims as a trade secret. Walmart certainly cannot have *willfully* misappropriated a trade secret when it has never been told what that trade secret is.

### B.    At A Minimum, There Is Not Clear And Convincing Proof That Walmart Acted Maliciously

To establish malice, Zest must show by clear and convincing evidence that Walmart intentionally sought to harm Zest. *See supra* p. 3. Zest has not carried that heavy burden.

Zest introduced no direct evidence to suggest that Mr. Bohling or the team that worked on the Bohling Application intended to injure Zest or even had access to the purported trade secret Zest now alleges Walmart misappropriated. In fact, only three emails linked Mr. Bohling to any Zest information before the non-provisional patent application was filed on November 10, 2017.

- In June 2016, Mr. Bohling received an email with a link to Zest's website, DTX-1032, but nothing on a public website could be a trade secret, let alone maliciously misappropriated.

- In May 2017, a Walmart employee copied Mr. Bohling on an email that attached a Walmart "[v]endor comparison document," PTX-208, but this document included only information that Zest had publicly disclosed on its website and in a white paper, *see* DTX-1032 at 11; DTX-215 at 1, 3.

- In late August 2017—*after* Mr. Bohling had submitted the patent application to Walmart's attorneys—Mr. Bohling was forwarded a Zest presentation, PTX-265 (email), PTX-264 (attachment), but Mr. Bohling testified he did not see the presentation before this litigation. Tr.2106:11–16, 2045:1-2046:7.

None of the three emails discussed above even contained the complete "Zest Fresh Solution" that Zest asserted at trial was a trade secret. *E.g.* Tr.1520:10-16 (Mehring) (discussing the Zest presentation as showing "what needs to be combined"); Tr.1137:20-1138:6 (Mehring) (indicating that information about "how it works" was communicated orally).

At trial, Zest focused heavily on two points in order to attempt to meet its burden on malice and willfulness: (1) the fact that Walmart filed the Bohling Application after litigation began and

(2) that a Walmart employee named Ckristian Velez had expressed concerns about Walmart accessing Zest's confidential algorithm. *Cf.* Tr.2474:8-10 (Zest closing); *see* Tr.2389:25-2390:4 (Zest's JMOL argument), 2563:18-2564:5 (Zest's rebuttal summation). As to the first point, Walmart's production of the Bohling Application to Zest in discovery on February 28, 2019—nearly three months before the Application published—is fundamentally inconsistent with Zest's assertion of malicious intent. *See* Tr.1698:8-13 (Stoll). As to the second point, Mr. Velez testified at trial that (1) he had "never seen" Zest's algorithm, and (2) he "did not use any of th[e] information that [he] received about Zest in [his] work on Walmart's freshness indicator and algorithm." *See* Tr.328:23-329:1, Tr.397:19-20. While Zest focused at trial on a meeting invitation in which Mr. Velez expressed caution about "the risk it represents *if any of us is exposed* to the Zest[] algorithm knowing that will be a conflict to ours," PTX-203, this language indicates that Mr. Velez had *not* seen Zest's (undisclosed) algorithm, and Mr. Velez confirmed as much at trial, Tr.397:19-20 ("Q. So have you ever seen Zest's shelf life algorithm? A. I have never seen it."). And while Mr. Velez later stopped working on Walmart's freshness indicator in December 2016, *see* Tr.344:1-4, he vehemently rejected Zest's suggestion at trial that he had been reassigned as retribution for highlighting the potential risk, Tr.344:14-345:17, Tr.379:6-7.

Because Zest did not adduce clear and convincing evidence of willfulness and malice, exemplary damages are unavailable and should be denied.

## II.    THE PARTIES' BINDING CONTRACT BARS EXEMPLARY DAMAGES, AND EQUITABLE PRINCIPLES LIKEWISE MAKE EXEMPLARY DAMAGES INAPPROPRIATE

Even if Zest could prove by clear and convincing evidence that Walmart acted willfully and maliciously—though it did not—that "does not in and of itself justify exemplary damages" under the DTSA. *Arnold's Office Furniture, LLC v. Borden*, 2022 WL 3597239, at *2 (E.D. Pa. Aug. 23, 2022). That is because this Court "has an independent obligation to consider the facts and calculate an equitable and constitutionally sound exemplary damages award." *Monster Energy*

11

*Co. v. Vital Pharms., Inc.*, 2023 WL 8168854, at *20 (C.D. Cal. Oct. 6, 2023). Courts often decline to impose exemplary damages on trade-secret defendants that juries have found behaved willfully and maliciously. *See, e.g.*, *Monster Energy*, 2023 WL 8168854, at *21 (concluding that defendant's conduct was not "the most reprehensible form of trade secret misappropriation" and that compensatory damages sufficed); *Proofpoint, Inc. v. Vade Secure, Inc.*, 2021 WL 5407521, at *3 (N.D. Cal. Nov. 18, 2021) (similar).

Here, the Court should decline to award exemplary damages for two reasons. First, exemplary damages are legally unavailable, because Zest contractually waived exemplary damages arising from its relationship with Walmart. Second, the relevant equitable factors weigh against any exemplary damages award.

### A.    The Parties' Master Services Agreement Waives Exemplary Damages

Exemplary damages are legally unavailable because the parties' Master Services Agreement ("MSA"), signed on January 16, 2016, precludes exemplary damages in this context. *See* DTX-181 § 14(A). The MSA's "Limitation of Liability" section provides that "in no event shall either party be liable to the other party for *any punitive*, special, incidental, or consequential *damages* of any kind" in certain circumstances. *Id.* This limitation applies to any liability "arising from or relating to (i) the relationship between [Zest] and Walmart, including all prior dealings and agreements, (ii) the conduct of business under th[e MSA] …, (iii) breach of th[e MSA] …, or (iv) termination of business relations between the Parties, and regardless of whether the claim under which such damages are sought is based upon … breach of contract, … tort, … statute, … or any other legal theory or law." *Id.* By these plain terms, the MSA precludes either party from recovering exemplary damages under the DTSA, as the "terms 'exemplary damages' and 'punitive

damages' are synonymous." *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 173 n.1 (3d Cir. 2020).[6]

Contrary to Zest's insistence at the motion *in limine* stage, *see* Dkt. 740, the MSA's § 14 is a "damages waiver," not an "exculpatory clause." *See Erdman Co. v. Phoenix Land & Acquisition, LLC*, 2013 WL 3776405, at *1 (W.D. Ark. July 17, 2013). The clause "waives damages, not entire theories of recovering damages, i.e., theories of liability." *Id.* The limitation of liability is therefore not subject to the "greater scrutiny" to which Arkansas law subjects "exculpatory clauses." *Id.* Zest's prior reliance on the Eighth Circuit and district court opinions in *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC* (cited at Dkt. 740 at 4), is misplaced. *Cuker* concerned a different type of provision limiting damages to the amount paid, which the district court concluded had the potential to operate as a complete bar on any liability. 2017 WL 11681850, at *3-4 (W.D. Ark. Apr. 5, 2017). As the district court explained, that particular provision "effectively g[ave] Walmart the authority to decide whether it shall have any liability at all" by refusing to make any payment, thereby setting its own damages cap after the fact. *Id.* at *4 n.3. By contrast, Arkansas law permits more specific contractual limitations on punitive damages such as Section 14. *E.g.*, *B&L Farms v. Monsanto Co.*, 2022 WL 9285881, at *7 (E.D. Mo. Oct. 14, 2022). And regardless, those specific limitations should not raise any meaningful concerns here because "sophisticated parties" like Zest and Walmart are "free to contractually limit future remedies." *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 133 F.4th 1238, 1248 (11th Cir. 2025)

---

[6] Zest has argued that section 10(B) of the MSA specifically authorizes punitive damages for misuse of confidential information, such that punitive damages for trade secret misappropriation are exempt from the liability limitation of section 14(B). *See* Dkt. 740 at 5-6. In reality, Section 10(B) notes only that its specific authorization of injunctive relief does not itself limit "other remedies available at law or equity." DTX-181 § 10(B). Section 14(B) requires that the agreement "expressly provide[]" for the "specific rights or remedies" in order for those rights or remedies to be exempted from the liability limitation, DTX-181 § 14(B), and Zest has not identified any such express provision.

(applying similar limitation of liability clause to bar exemplary damages in trade secret case, under Missouri law).

Moreover, and in the alternative, even if MSA § 14 were an exculpatory clause, Arkansas law expressly recognizes that "[a]n exculpatory clause "may be enforced: (1) when the party is knowledgeable of the potential liability that is released; (2) when the party is benefiting from the activity which may lead to the potential liability that is released; and (3) when the contract that contains the clause was fairly entered into." *Finagin v. Arkansas Dev. Fin. Auth.*, 139 S.W.3d 797, 808 (Ark. 2003). Each of these factors supports enforcing the provision here, and courts have enforced similar liability limitations in trade secret cases. *See Youtie v. Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 630 (E.D. Pa. 2009).[7]

### B.    The Relevant Factors Weigh Against Exemplary Damages

Neither the Eighth Circuit nor any other appellate court has adopted a definitive standard for when a district court should exercise its discretion to award exemplary damages under the DTSA. But "district courts have considered a number of factors," *Proofpoint*, 2021 WL 5407521, at *2, including most saliently whether the jury already imposed a "high award" sufficient to "deter future misconduct," *Harbor Compliance Corp. v. Firstbase.IO, Inc.*, 2025 WL 383804, at *20 (E.D. Pa. Feb. 4, 2025), whether the jury's compensatory award "represents the entire amount of damages requested," *id.*, the "degree of reprehensibility" of the conduct, *Proofpoint*, 2021 WL 5407521, at *2, and other factors like the duration of the misappropriation, the party's litigation

---

[7] There is no procedural bar to Walmart asserting its rights under the MSA. Even if one considers a limitation of liability to be an affirmative defense, *see* Dkt. 740 at 1-2, Zest "received notice of the defense by some means other than the pleadings and had a chance to rebut it." *Tri-Lady Marine, Ltd. v. Bishop Mech. Servs., LLC*, 763 F. App'x 882, 885 (11th Cir. 2019). That "the applicability of a contract provision is a pure question of law belies [the] assertion that [Zest] needed more time for discovery" into the MSA's terms, so "no prejudice to [Zest] resulted" from the Answer omitting the limitation of liability's effect on exemplary damages. *Allianz Versicherungs, AG v. Profreight Brokers Inc.*, 99 F. App'x 10, 12 (5th Cir. 2004).

conduct, the closeness of the case, and the defendant's efforts to conceal the misconduct, *Harbor Compliance Corp.*, 2025 WL 383804, at \*20; *John Bean Techs. Corp. v. B GSE Grp., LLC*, 2023 WL 6164322, at \*3 (D. Utah Sept. 21, 2023).  These factors weigh strongly against awarding exemplary damages here.

**The compensatory damages verdict—which is the full amount Zest sought—suffices for deterrence.**  Where "the jury's compensatory damages award … sufficiently deters and punishes [the defendant] for its misconduct," exemplary damages are not warranted.  *See Monster Energy*, 2023 WL 8168854, at \*21.  The jury's $72.7 million compensatory damages verdict exceeds the awards that caused numerous other courts to decline to order exemplary damages.  *See, e.g.*, *Proofpoint*, 2021 WL 5407521, at \*3 ($13.5 million compensatory award was "sufficient to deter future misappropriation"); *Citcon USA, LLC v. RiverPay, Inc.*, 2020 WL 5365980, at \*5 (N.D. Cal. Sept. 8, 2020) (concluding that $1.5 million in compensatory damages under California's trade secrets law was "sufficient to both punish [] and to deter similar conduct").  $72.7 million is a significant sum for any company, and on its own it will deter future conduct that could be misappropriation.  This is particularly true because Walmart did not profit from the Bohling Application, as the patent claims were rejected and no patent issued.  This sum also represents the entire damages amount requested by Zest.  *See* Tr.2473:7 (closing).  That fact also weighs against an exemplary damages award.  *E.g.*, *Harbor Compliance*, 2025 WL 383804, at \*20.

**The one-time instance of asserted misappropriation did not exhibit reprehensibility.**  "The largest exemplary awards are reserved for the most reprehensible acts."  *Monster Energy Co.*, 2023 WL 8168854, at \*20.  Walmart's alleged conduct did not "cause physical harm," "disregard[] the health or safety of others," "target[] a financially vulnerable party," or arise from "intentional malice."  *Id.* at \*20-21; *see supra* pp. 3-11.  Moreover, the Bohling Application's submission was a one-time act, *see supra* pp. 10-11, not "repeated" misconduct.  *Id.* at \*20.  No

15

evidence established that Walmart leveraged any aspect of the "Zest Fresh Solution" for its own use or that the alleged misappropriation affected anything other than the Bohling Application. Similarly, no credible evidence indicated that Walmart's business relationship with Zest was a pretext for misappropriation. *See* Tr.1427:23-1428:16 (Foran) (Walmart declined to proceed with Zest because Zest had "had enough [] time and had failed effectively to demonstrate that it could do what it was purported it could do").

      ***No evidence demonstrates consciousness of resulting injury.*** No evidence demonstrates that Mr. Bohling or his colleagues knew that the Bohling Application contained any alleged trade secret. *See supra* pp. 3-11. Moreover, Zest has not proven that the Bohling Application's publication caused Zest any determinable injury, Tr.1935:20-22 (Becker) (Zest's damages expert conceding that he did not add damages "from the publication of the Bohling patent application"), much less injury of which Walmart would or could have been aware. To the contrary, Zest alleged that it ended up suffering financial struggles because customers reacted poorly to normal discovery requests from this litigation—an action *Zest initiated*. Tr.1564:10-20 (Mehring).

      ***Walmart took no efforts to cover up the misappropriation but, because Zest did not identify the trade secret, Walmart could not take remedial action before the Bohling Application published.*** Far from spoliating or hiding evidence, Walmart produced the relevant document on February 28, 2019, well before it published—this is the opposite of a cover-up. *See supra* pp. 9, 11. Indeed, courts decline to find this factor supporting an exemplary damages award unless the defendant "engage[d] in wholesale destruction of evidence to conceal [its] wrongdoing." *Arnold's*, 2022 WL 3597239, at *2. Walmart's transparency in litigation contrasts markedly with that of Zest's attorneys, who misled this Court in a sworn declaration that led to a new trial. Dkt. 530 at 2; *see* Dkt. 508 at 1; *John Bean*, 2023 WL 6164322, at *3 (noting defendant's litigation conduct as another factor).

On remedial action, because Zest failed to identify any alleged trade secret before the Bohling Application published, Walmart had no warning that Zest would assert that the application contained an alleged trade secret. Zest presented no evidence that Walmart ever used the purported "Zest Fresh Solution" in its operations, nor has Walmart marketed, licensed, or sold any aspect of the "Zest Fresh Solution." Walmart also sought to compensate Zest for its long-term engagement with Walmart. As the parties' relationship came to an end, Walmart offered to pay Zest $1.5 million to help defray amounts Zest paid to a consultant assisting with a pilot project on lettuce. Tr.538:8-25 (Boyle); Tr.1190:5-7 (Mehring). And Walmart ultimately did pay Zest over $1 million. *See* Tr.539:19-22 (Boyle); DTX-099 at 5 (contract reflecting intended monthly payments of $250,000).

***Walmart believed in good faith that it did not misappropriate any trade secret*.** Zest never gave Walmart reason to believe that it was misappropriating a trade secret by filing an ultimately unsuccessful patent application about tracking freshness and predicting shelf life. Zest had never identified any such alleged trade secret to Walmart, despite the parties' agreements noting special provisions for disclosed trade secrets. *Supra* pp. 3-10. And Walmart never received—and so is not alleged to have misappropriated—"*the one item*" that Zest identified as a trade secret, namely Zest's undisclosed "shelf life algorithm." S*upra* pp. 4-5.

***The case was close*.** As Walmart will demonstrate in its forthcoming motion under Rule 50(b), this case was close to say the least. Indeed, no reasonable jury could have found the existence of a trade secret in the amorphous, publicly disclosed "Zest Fresh Solution." *See supra* pp. 3-10. Zest's failure to ever identify its supposed trade secret with adequate specificity is both a threshold legal reason to reject liability and an impediment to any reasonable jury finding that the alleged trade secret was not generally known, not readily ascertainable, or subject to reasonable efforts to protect its secrecy.

More broadly, this Court has already acknowledged that the record evidence suggests a close case. The most recent trial was held only because newly discovered evidence that Zest had been on notice of the Bohling Application months before it issued "would probably produce a different result" at this second trial. Dkt. 530 at 2. Walmart respectfully submits that it would be inequitable for Zest to reap a windfall from the second trial in the form of exemplary damages. Indeed, the advisory verdict on exemplary damages at the first trial—which was vacated *because of Zest's litigation misconduct*—was only one-third the size of the second jury's advisory verdict. Giving Zest a $100 million additional windfall because its counsel made material misrepresentations to the Court at that first trial would be fundamentally unjust.

## III. TO THE EXTENT ANY EXEMPLARY DAMAGES COULD BE JUSTIFIED, THEY SHOULD BE IN A MUCH SMALLER AMOUNT

Finally, and in the alternative, if this Court should find that an exemplary damages award were warranted, such award should be markedly lower than the compensatory damages verdict. The $150 million advisory verdict rendered by the jury is clearly unlawful and inequitable. As an initial matter, the statute caps punitive damages at twice the amount of the compensatory award, meaning that the maximum amount that could be awarded is $144.4 million. *See* 18 U.S.C. § 1836(b)(3)(C). But any award should be far lower.

In assessing the appropriate ratio of exemplary damages to compensatory damages, courts often consider whether the conduct at issue "represent[s] the most reprehensible form of trade secret misappropriation" and "[t]he need for deterrence." *Mattel, Inc. v. MGA Entm't, Inc.*, 801 F. Supp. 2d 950, 956 (C.D. Cal. 2011) (awarding "an amount equal to the remitted compensatory damage award" despite defendant's "maliciousness"). Here, Walmart "should not be punished by the largest exemplary damage award available." *Id.* To the contrary, in the circumstances of this

case, even the most severe exemplary award must—as a matter of law and equity—be significantly smaller than the large compensatory damages verdict rendered by the jury.

**First**, as explained, Walmart's conduct was not especially reprehensible.  *See supra* pp. 15-16.  While Walmart's decision not to purchase and widely deploy Zest's technology was likely disappointing to Zest, Walmart is not accused of having used any information obtained from Zest to compete with Zest or to divert its customers.  Nor is Walmart alleged to have engaged in any fraudulent, criminal, or otherwise unlawful conduct.  To the extent that Zest's customer relationships suffered as a byproduct of this litigation, that is a consequence of Zest filing suit and of the onerous nature of discovery, not any malicious misappropriation.  *See supra* p. 16.  Courts evaluating far more reprehensible conduct regularly award exemplary damages at lower ratios to compensatory awards.  *See, e.g.*, *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 2021 WL 863203, at *13 (W.D. Ky. Mar. 8, 2021) (awarding exemplary damages equal to 41% of compensatory damages, even where defendant "deliberately and systematically courted" an employee that defendant knew was under an NDA in order to obtain a trade secret); *Bimbo Bakeries USA, Inc. v. Sycamore*, 2018 WL 1578115, at *3-4 (D. Utah Mar. 29, 2018) (awarding exemplary damages equal to half the compensatory damages, even though defendant "could not have a good faith belief that it was not misappropriating a trade secret"); *Storagecraft Tech. Corp. v. Kirby*, 2012 WL 4467519, at *2-9 (D. Utah Sept. 27, 2012) (awarding exemplary damages equal to half the compensatory damages, where defendant copied 100,000 emails from plaintiff's email systems before ending his employment, gave those emails a to third party, defied a court order to produce discovery, was motivated by "revenge" and a desire to harm plaintiff, and sought to conceal his misconduct).  Even on Zest's framing, none of Walmart's alleged conduct comes close.

**Second**, the need for deterrence is low.  The $72.7 million compensatory damages verdict is very large, even for Walmart.  While Walmart did not intentionally misappropriate any alleged

trade secret, the $72.7 million verdict is, on its own, more than sufficient to induce Walmart and its employees to exhibit much greater caution in the future. Moreover, Walmart neither enjoyed any significant gain nor avoided any substantial cost by filing the Bohling Application. The patent claims were rejected, and Walmart was ultimately unable to develop a comprehensive freshness indicator along the lines contemplated in the Bohling Application.

*Third*, due process principles also weigh against any exemplary damages award greater than the $72.7 million compensatory damages verdict. It is well established that a punitive damages award may be so excessive as to violate due process after considering (1) the reprehensibility of the conduct; (2) the disparity between the harm caused and the punitive damages award; and (3) the difference between the punitive damages award "and the civil penalties authorized or imposed in comparable cases," which may include a comparison of punitive damages awards in "comparable cases from our circuit." *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1060-1061 (8th Cir. 2014). Moreover, "when [as here] compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Applying this guidance, the Eighth Circuit has reduced exemplary damages awards in cases with large compensatory damages to around a 1:1 ratio, despite "highly reprehensible" conduct. *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 602-603 (8th Cir. 2005) (awarding punitive damages at a near 1:1 ratio with "the $4,025,000 compensatory damages award" in a case involving "highly reprehensible" conduct—"actively misle[ading] consumers about the health risks associated with smoking"—that "exhibited a callous disregard" for smokers' health).[8]

---

[8] Courts have often treated awards in the mid-six-figures and higher as "substantial" and thus warranting a 1:1 ratio. *See, e.g., Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1090 (7th Cir. 2019) ($582,000); *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1207-1208 (10th Cir.

To exceed a one-to-one ratio, the Eighth Circuit has insisted on specific "[f]actors that justify a higher ratio, such as the presence of an 'injury that is hard to detect,' or a 'particularly egregious act that has resulted in only a small amount of economic damages," *id.*—neither of which is present here.  Zest's position at trial was that misappropriation was apparent on the face of the Bohling Application, which Walmart disclosed to Zest before the Application published. Nor has Zest argued that the conduct resulted in only a "small amount of economic damages," *Boerner*, 394 F.3d at 603, as Zest sought over $70 million in *compensatory* damages.  Finally, as described above, Walmart's actions were not particularly egregious or reprehensible, and the Eighth Circuit has reduced punitive damages to a 1:1 ratio in at least one case where reprehensibility was relatively low, *see Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004) (reducing punitive damages to a 1:1 ratio where the court "c[ould not] say that [the defendant's] conduct … was so egregiously reprehensible that it justifies an unusually large award"), and to a near 1:1 ratio even where the conduct was "highly reprehensible," *see Boerner*, 394 F.3d at 603.

## CONCLUSION

For the foregoing reasons, Walmart respectfully requests that the Court decline to award exemplary damages.

---

2012) ($630,000); *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 156 (6th Cir. 2007) ($400,000); *Williams*, 378 F.3d at 799 ($600,000); *see also Lompe v. Sunridge Ptrs., LLC*, 818 F.3d 1041, 1069 (10th Cir. 2016) (noting that some cases draw the line at roughly one million).  The high eight-figure compensatory verdict is unquestionably substantial.

John E. Tull III (84150)
E. B. Chiles IV (96179)
R. Ryan Younger (2008209)
Glenn Larkin (2020149)
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700 Telephone
(501) 379-1701 Facsimile
jtull@qgtlaw.com
cchiles@qgtlaw.com
ryounger@qgtlaw.com
glarkin@qgtlaw.com

Mark C. Fleming (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6909 Telephone
(617) 526-5000 Facsimile
mark.fleming@wilmerhale.com

Thomas G. Sprankling (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
(650) 858-6062 Telephone
(650) 858-6100 Facsimile
thomas.sprankling@wilmerhale.com

John R. Keville (*pro hac vice*)
Robert L. Green (*pro hac vice*)
Chante B. Westmoreland (*pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
700 Louisiana Street, Suite 2750
Houston, Texas 77002-2791
(713) 431-7100 Telephone
(713) 431-7101 Facsimile
jkeville@sheppardmullin.com
rgreen@sheppardmullin.com
cwestmoreland@sheppardmullin.com

*Attorneys for Defendant Walmart Inc.*
*f/k/a Wal-Mart Stores, Inc.*

22