# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

ZEST LABS, INC. f/k/a INTELLEFLEX
CORPORATION; ZEST LABS HOLDINGS
LLC, and RISKON INTERNATIONAL,
INC.,

                Plaintiffs,

                                    No. 4:18-CV-500-JM

v.

WALMART INC. f/k/a WAL-MART
STORES, INC.,

                Defendant.

_____ /


**ZEST'S RESPONSE TO WALMART'S BRIEF ON EXEMPLARY DAMAGES AND
REQUEST FOR ADOPTION OF THE JURY'S EXEMPLARY DAMAGES AWARD
SUBJECT TO THE STATUTORY CAP**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 2

II.    LEGAL STANDARDS ........................................................................................ 9

    A.    DTSA Authorizes an Exemplary Award of Up to Twice the Compensatory Award ......................................................................................................... 9

    B.    The Jury Decides Whether the Misappropriation Was Willful and Malicious ................................................................................................... 9

    C.    The Jury's Factual Findings — Including that Walmart's Misappropriation Was Willful and Malicious — Are Entitled to at Least *Extreme* Deference ......... 13

    D.    Even if Walmart's Brief Were a Proper Challenge to the Jury's Findings, Which It Is Not, Those Findings Are Conclusive if Supported by Substantial Evidence ................................................................................ 14

III.   THE JURY'S FACTUAL FINDINGS ............................................................... 16

IV.    THE JURY'S FINDINGS OF A "TRADE SECRET" AND "WILLFUL AND MALICIOUS" MISAPPROPRIATION ARE SUPPORTED BY SUBSTANTIAL EVIDENCE ....................................................................................................... 17

    A.    Walmart's "Unknown Trade Secret" Argument Is Meritless and Does Not Overcome the Substantial Evidence that It Acted Maliciously ...................... 18

    B.    Clear and Convincing Evidence Supports the Jury's Finding that Walmart Acted Willfully ........................................................................................ 22

    C.    Clear and Convincing Evidence Supports the Jury's Finding that Walmart Acted Maliciously ..................................................................................... 23

        1.    The Scheme to "Get Rid" of Zest ................................................... 23

        2.    False Inventorship Declaration ...................................................... 24

        3.    Removal of "Zest" Confidentiality Legends and Redistribution Inside Walmart ........................................................................... 25

        4.    Walmart's Intentional Abandonment of the Bohling Application and False Narrative Regarding USPTO's Findings .......................... 27

V.     WALMART'S MERITLESS "EQUITABLE FACTORS" DO NOT JUSTIFY EXONERATING IT FROM EXEMPLARY DAMAGES ..................................... 29

    A.    Walmart's "High Compensatory Award" Argument Is Meritless ................... 30

    B.    Walmart's "Full Compensatory Award" Argument Is Meritless ................... 30

    C.    Walmart's "Duration of the Misappropriation" Argument Is Meritless ........... 30

    D.    Walmart's "Litigation Conduct" Argument Is Meritless ............................. 31

    E.    Walmart's "It Did Not Conceal Its Misconduct" Argument Is Meritless ......... 31

F.      Walmart's "Unknown Trade Secret" Argument Is Meritless .................................32

G.      Walmart's "Remedial Measures" Argument Is Meritless .....................................32

H.      Walmart's "Close Case" Argument Is Meritless .....................................................32

VI.    THE COURT SHOULD AWARD EXEMPLARY DAMAGES F $145.4 MILLION, CONSISTENT WITH THE JURY'S FINDINGS S PERMITTED UNDER DTSA ......................................................................................................................33

      A.      Contrary to Walmart's Assertion, This Court Is Free to Defer to the Jury's Award of Exemplary Damages .........................................................................................33

      B.      The Five Reprehensibility Factors Strongly Support the Maximum DTSA Award ............................................................................................................................34

            1.      Walmart's Misconduct Evinced Indifference or Reckless Disregard........35

            2.      Zest Was Financially Vulnerable, Especially in Comparison to Walmart.............................................................................................................36

            3.      Walmart's Misconduct Involved Repeated Actions and Was Not an Isolated Incident...............................................................................................38

                  a.      The String-Along Scheme (2016-2017)..........................................38

                  b.      Information Gathering and Doctoring Documents (2016-2018) .................................................................................................38

                  c.      Patent Preparation, Drafting, Filing, and Publication (2017-2019) .................................................................................................38

                  d.      Post-First-Trial Conduct and Lack of Remorse (2018-2025)........39

            4.      The Harm Inflicted by Walmart on Zest Resulted from Malice, Trickery, or Deceit, and Was Not a Mere Accident ...............................40

            5.      While Zest Did Not Suffer Physical Harm, It Suffered Extreme Economic Harm ...............................................................................................41

      C.      Deterrence Strongly Supports the Maximum 2:1 Exemplary Damages Award............................................................................................................................42

      D.      Awarding Exemplary Damages of $145.4 Million Easily Satisfies the Three Due Process Guideposts ...............................................................................45

            1.      The Reprehensibility Guidepost .................................................................45

             2.      The Ratio of Exemplary Damages to Compensatory Damages Guidepost .........................................................................................................46

             3.      The Comparability to Other Penalties Guidepost ......................................47

      E.      The Cases Cited by Walmart to Reduce the Exemplary Award Are Distinguishable and Do Not Justify a Lower Award ............................................48

VII.   WALMART'S RELIANCE ON THE MSA TO ATTEMPT TO DIVEST THE COURT OF ITS AUTHORITY TO IMPOSE EXEMPLARY DAMAGES FAILS ........49

A. This Court Already Rejected Walmart's Argument that the MSA Bars Zest From Recovering Punitive Damages, and Walmart Fails to Demonstrate Why The Court Should Reconsider Its Prior Ruling .............................................. 51

B. The Limitation of Damages Provision Does Not Apply to Walmart's Theft of Zest's Trade Secret ........................................................................................ 52

    1. Walmart Has Failed to Establish that the MSA Controls Over the Parties' NDA which Does Not Exclude Punitive Damages ...................... 52

    2. Section 14(B) of the MSA Expressly Exempts The Damages Limitation under Section 14(A) from Zest's Trade Secret Claim ............ 53

C. Walmart Waived Its Limitation of Damages Defense, and Zest Would be Prejudiced if Walmart Were Permitted to Raise it Now ........................................ 57

    1. Not Pleaded in Answer ............................................................................ 57

    2. Omitted at First Trial's Pretrial Conference ............................................. 61

    3. Missing in First Trial's Rule 50(a) Motion .............................................. 62

    4. Ignored in Summary Judgment Motions ................................................. 62

D. The Limitation of Damages Provision Is Unenforceable ..................................... 63

    1. The Limitation of Damages Provision is Unenforceable Under Arkansas Public Policy ............................................................................ 63

    2. The MSA Was Not Fairly Entered Into .................................................... 67

    3. The MSA is an Unenforceable Agreement to Agree ................................ 68

VIII. CONCLUSION ............................................................................................................ 69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advantage Prop. Mgmt. v. Burkhard*
  2024 Ark. App. 342 (2024)........................................................................54

*All Business Sols., Inc. v. NationsLine, Inc.*
  629 F. Supp. 2d 553 (W.D. Va. 2009) .....................................................65

*Arnold's Off. Furniture, LLC v. Borden*
  2022 WL 3597239 (E.D. Pa. Aug. 23, 2022) ...........................................48

*ASi Indus. GMBH v. Elec. Materials, Inc.*
  2008 WL 413819 (E.D. Mo. Feb. 13, 2008)..............................................58

*B&L Farms v Monsanto Co.*
  2022 WL 9285881 (E.D. Mo. Oct. 14, 2022) ...........................................63

*Belk v. City of Eldon*
  228 F.3d 872 (8th Cir. 2000) .............................................................13, 15

*Bessemer Sys. Fed. Credit Union v. Fiserv Sol., LLC*
  472 F. Supp. 3d 142 (W.D. Pa July 14, 2020) .........................................65

*BLB Aviation S.C., LLC v. Jet Linx Aviation, LLC*
  748 F.3d 829 (8th Cir. 2014) ...................................................................60

*Blonder–Tongue Lab'ys. v. Univ. of Illinois Found.*
  402 U.S. 313 (1971)..................................................................................56

*BMW of N. Am., Inc. v. Gore*
  517 U.S. 559 (1996)...............................................................34, 42, 45, 47

*Broadway v. Norris*
  193 F.3d 987 (8th Cir. 1999) ...................................................................51

*Byme, Inc. v. Ivy*
  367 Ark. 451, 241 S.W.3d 229 (2006).....................................................54

*C&C Int'l Trading Co. v. Buckhead Meat Co.*
  527 F. Supp. 3d 1016 (E.D. Ark. 2021)...................................................54

*Cajun Servs. Unltd., LLC v. Benton Energy Serv. Co.*
  2021 WL 5833967 (E.D. La. Dec. 9, 2021)..............................................12

*Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*
   439 F.3d 894 (8th Cir. 2006) ................................................................61

*Cap. Inventory, Inc. v. Green*
   2024 WL 1480484 (N.D. Ga. Feb. 20, 2024) ........................................12

*Capitol Records Inc. v. Thomas-Rasset*
   2009 WL 1664468 (D. Minn. Jun. 11, 2009).........................................56

*Carroll Shelby Licensing, Inc. v. Wilhelm*
   2007 WL 9817861 (C.D. Cal. May 4, 2007) ............................56, 57, 58

*Chauffeurs, Teamsters and Helpers v. Terry*
   494 U.S. 558 (1990)...............................................................................12

*Chicago Title Ins. Co. v. Resol. Tr. Corp.*
   53 F.3d 899 (8th Cir. 1995) ...................................................................15

*City of Los Angeles v. Heller*
   475 U.S. 796 (1986)...............................................................................19

*Coenco, Inc. v. Coenco Sales, Inc.*
   940 F.2d 1176 (8th Cir. 1991) ...............................................................21

*Connectus LLC v. Ampush Media, Inc.*
   2017 WL 1155448 (M.D. Fla. March 28, 2017).....................................65

*Crabar/GBF, Inc. v. Wright*
   --- F.4th ---, 2025 WL 1740313 (8th Cir. June 24, 2025)......................59

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*
   528 F.3d 1001 (8th Cir. 2008) ........................................................13, 15

*Crutcher v. MultiPlan, Inc.*
   22 F.4th 756 (8th Cir. 2022) ..................................................................56

*Denton v. Pennington*
   82 Ark. App. 179 (2003).........................................................................54

*Dewitt v. Smith*
   152 F.R.D. 162 (W.D. Ark. 1993) .........................................................55

*Doe v. Univ. of Arkansas - Fayetteville*
   2022 WL 1479958 (W.D. Ark. May 10, 2022) ......................................51

*Dorchester Mins., L.P. v. Chesapeake Expl., LLC*
   215 F. Supp. 3d 756 (E.D. Ark. 2015)...................................................54

*Dovers v. Stephenson Oil Co.*
   354 Ark. 695 (2003)................................................................................15

*DWDubbell Ark., LLC v. Bushey*
   2021 WL 4392493 (W.D. Ark. Sept. 24, 2021)...................................67

*E.J. Brooks Co. v. Cambridge Security Seals*
   2015 WL 9704079 (S.D.N.Y. Dec. 23, 2015) .....................................21

*EchoSpan v Medallia, Inc.*
   2023 WL 9019053 (N.D. Cal. October 30, 2023) ................................64

*EchoSpan, Inc. v. Medallia, Inc.*
   2023 WL 9019054 (N.D. Cal. Dec. 11, 2023)......................................12

*Elder-Keep v. Aksamit*
   460 F.3d 979 (8th Cir. 2006) ...............................................................51

*Fin. Info. Techs., LLC v. iControl Sys. USA, LLC*
   21 F.4th 1267 (11th Cir. 2021) .............................................................11

*First Nat'l Bank of Crossett v. Griffin*
   310 Ark. 164 (1992)..............................................................................54

*First Union Nat. Bank v. Pictet Overseas Tr. Corp.*
   477 F.3d 616 (8th Cir. 2007) ...............................................................56

*Floyd v. Laws*
   929 F.2d 1390 (9th Cir. 1991) .............................................................13

*Gurlen v. Henry Mgmt., Inc.*
   2010 Ark. App. 855 (2010)..................................................62, 63, 65

*Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*
   758 F.3d 1051 (8th Cir. 2014) .........................................35, 36, 40, 41

*Harbor Compliance Corp. v. Firstbase.IO, Inc.*
   2025 WL 383804 (E.D. Pa. Feb. 4, 2025) ...........................................48

*Harrington v. City of Council Bluffs*
   902 F. Supp. 2d 1195 (S.D. Iowa 2012) .............................................61

*Harris v. Sec'y, U.S. Dep't of the Army*
   119 F.3d 1313 (8th Cir. 1997) .............................................................34

*Harris v. Union Elec. Co.*
   787 F.2d 355 (8th Cir. 1986) ...............................................................15

*I-Mab Biopharma v. Inhibrx, Inc.*
  2024 WL 4437227 (D. Del. Oct. 1, 2024) ...........................................................................11

*Ingersoll-Rand Co. v. El Dorado Chem. Co.*
  373 Ark. 226 (2008)............................................................................................................66

*Innovation Ventures, LLC v. N2G Distrib., Inc.*
  763 F.3d 524 (6th Cir. 2014) ............................................................................................46

*Insulet Corp. v. EOFlow Co.*
  2025 WL 1196055 (D. Mass. Apr. 24, 2025) ....................................................................46

*Jacobsen v. Massachusetts Port Auth.*
  520 F.2d 810 (1st Cir. 1975)..............................................................................................57

*John Bean Techs. Corp. v. B GSE Grp., LLC*
  2023 WL 6164322 (D. Utah Sept. 21, 2023)...........................................................4, 12, 34

*Jordan v. Diamond Equip. & Supply Co.*
  362 Ark. 142 (2005)............................................................................................................66

*Killough v. All Points Logistics, LLC*
  2022 WL 1556413 (N.D. Ala. May 17, 2022).....................................................................12

*Klingenberg v. Vulcan Ladder USA, LLC*
  936 F.3d 824 (8th Cir. 2019) .......................................................................................59, 61

*Larada Scis., Inc. v. Prediatric Hair Sols. Corp.*
  2025 WL 1684439 (D. Utah June 16, 2025).......................................................................11

*Leffler v. United States*
  409 F.2d 44 (8th Cir. 1969) ...............................................................................................14

*LexMac Energy, L.P. v. Macquarie Ltd.*
  2014 WL 12669718 (D.N.D. Feb. 9, 2014) ........................................................................65

*London Luxury, LLC v. Walmart, Inc.*
  2024 WL 1025125 (W.D. Ark. Mar. 8, 2024) ....................................................................67

*Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*
  2019 WL 12529179 (S.D. Iowa May 29, 2019) ..................................................................61

*Maritrans Operating Partners v. Diana T*
  1999 WL 144458 (E.D. La. March 15, 1999)......................................................................60

*Mathias v. Accor Economy Lodging, Inc.*
  347 F.3d 672 (7th Cir. 2003) ......................................................................................42, 43

*McKnight By & Through Ludwig v. Johnson Controls*
   36 F.3d 1396 (8th Cir. 1994) ...............................................................15

*Monster Energy Co. v. Vital Pharmaceuticals, Inc.*
   2023 WL 8168854 (C.D. Cal. Oct. 6, 2023).........................................48

*Motorola Sols., Inc. v. Hytera Commc'ns. Corp.*
   108 F.4th 458 (7th Cir. 2024) .................................9, 20, 40, 46, 47, 48

*Muhammad v. McCarrell*
   536 F.3d 934 (8th Cir. 2008) ...............................................................19

*Nephron Pharms. Corp. v. Hulsey*
   2020 WL 7137992 (M.D. Fla. Dec. 7, 2020).......................................11

*Nor-West Cable Comms. P'ship v. City of St. Paul*
   924 F.2d 741 (8th Cir. 1991) ...............................................................13

*Patriot Rail Corp. v. Sierra R. Co.*
   2014 WL 5426446 (E.D. Cal. Oct. 23, 2014)..................................37, 40

*Peacock v Ciba-Geigy Corp.*
   1980 WL 98419 (E.D. Ark. Oct. 30. 1980) ..........................................63

*PetroChoice Holdings, Inc. v. Orobono*
   2022 WL 138008 (E.D. Pa. Jan. 14, 2022)...........................................11

*PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd*
   47 F.4th 156 (3d Cir. 2022) .................................................................46

*Proofpoint, Inc. v. Vade Secure, Inc.*
   2023 WL 5723670 (N.D. Cal. Sept. 5, 2023) .......................................12

*Pulla v. Amoco Oil Co.*
   72 F.3d 648 (8th Cir. 1995) .................................................................42

*Qorvo, Inc. v. Akoustis Techs., Inc.*
   2024 WL 5165152 (D. Del. Oct. 31, 2024) ..........................................12

*Robinson Ins. & Real Estate Inc. v. Sw. Bell Tel. Co.*
   366 F. Supp. 307 (W.D. Ark. 1973).............................................62, 63, 65

*Shakeri v. ADT Sec. Services, Inc.*
   2016 WL 6565743 (N.D. Tex. Nov. 4, 2016).......................................56

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*
   491 F.3d 350 (8th Cir. 2007) ...............................................................21

*Smith v. Health Res. of Ark., Inc.*
  656 F. App'x 790 (8th Cir. 2016) .......................................................................13

*Square Liner 360, Inc. v. Chisum*
  691 F.2d 362 (8th Cir. 1982) ...........................................................................12

*State Farm Mut. Auto. Ins. Co. v. Campbell*
  538 U.S. 408 (2003)...............................................................34, 35, 42, 46, 47

*Superior FCR Landfill, Inc. v. Wright Cnty., Minnesota*
  2002 WL 511460 (D. Minn. Mar. 31, 2002) .....................................................15

*Tri-Lady Marine, Ltd. v. Bishop*
  763 F. App'x 882 (11th Cir. 2019) ...................................................................58

*Trickey v. Kaman Indus. Tech. Corp.*
  705 F.3d 788 (8th Cir. 2013) ...........................................................................40

*Troutman Oil Co. v. Lone*
  75 Ark. App. 346 (2001).................................................................................67

*TXO Prod. Corp. v. All. Res. Corp.*
  509 U.S. 443 (1993).......................................................................................42

*United States v. Howley*
  707 F.3d 575 (6th Cir. 2013) ...........................................................................20

*United States v. Krumrei*
  258 F.3d 535 (6th Cir. 2001) ...........................................................................20

*United States v. Roberts*
  2009 WL 5449224 (E.D. Tenn. 2009) ...............................................................20

*United States v. Young*
  806 F.2d 805 (8th Cir. 1986) ...........................................................................51

*United States v. Yu Xue*
  2020 WL 5645765 (E.D. Pa. 2020) ...................................................................20

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*
  2017 WL 3206942 (W.D. Ark. July 28, 2018) ....................................................64

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*
  2018 WL 1597976 (W.D. Ark. Mar. 31, 2018) ...................................................64

*Wal-Mart Stores, Inc. v. Lee*
  348 Ark. 707 (2002)........................................................................................15

*Walmart Inc. v. Cuker Interactive, LLC*
    949 F.3d 1101 (8th Cir. 2020) ..............................................................21, 22, 50, 62, 63, 64, 66

*Walmart Stores, Inc. v Cuker Interactive, LLC*
    2017 WL 11681850 (W.D. Ark. April 5, 2017) ................................................50, 63, 64, 65, 66

*Wells Fargo & Co. v. United States*
    957 F.3d 840 (8th Cir. 2020) ..........................................................................................13

*Williams v. ConAgra Poultry Co.*
    378 F.3d 790 (8th Cir. 2004) ..........................................................................................13

*Williams v. Liberty Bank*
    2011 Ark. App. 220 (2011)...............................................................................................14

*Wood v. Milyard*
    566 U.S. 463 (2012)........................................................................................................56

*Zucker, Tr. of Anita G. Zucker Tr. Dated April 4, 2007 v. Bowl Am., Inc.*
    2022 WL 7050991 (D. Md. Oct. 11, 2022) ......................................................................56

## Constitutions

Seventh Amendment.......................................................................................................12, 13, 14

## Statutes

15 United States Code
    § 15(a) ............................................................................................................................47
    § 1117(a) .........................................................................................................................47

18 United States Code
    § 1001..............................................................................................................................25
    § 1832..........................................................................................................................20, 47
    § 1836................................................................................................................................1
    § 1836(b)(3) ....................................................................................................................12
    § 1836(b)(3)(C)........................................................................................................9, 33, 46
    § 1964(c) .........................................................................................................................47

35 United States Code
    § 284................................................................................................................................47

**Court Rules**

Federal Rules of Civil Procedure

Rule 8(c) .................................................................................................................56, 57

Rule 49(a) .........................................................................................................................13

Rule 50(a) .................................................................................................................60, 61

Rule 50(b) ...............................................................................................1, 14, 61, 64

Rule 60(b) .................................................................................................................51, 52

Rule 60(b)(1) .....................................................................................................................51

Rule 60(b)(6) .....................................................................................................................51

Rule 60(c)(1) ...........................................................................................................51, 52

## Other Authorities

1 *Fed. Jury Practice & Instr.* § 8:7 (6th Ed. Jan. 2025 Update) ...................................................13

Fed. Prac. & Proc. Evid. (Wright & Miller) § 5037.18 ...............................................................61

https://corporate.walmart.com/suppliers/investing-in-american-jobs...........................................37

Plaintiffs Zest Labs, Inc., a Nevada Corporation, and Zest Labs Holdings LLC (Nevada)[1] (together, "Zest") ask the Court to adopt the jury's exemplary damages award with a minor reduction to comport with the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), which caps the exemplary award at twice the compensatory award (2:1 cap). After the first trial in this case, this Court accepted and entered judgment on the amount of exemplary damages awarded by the jury and rejected many of the same arguments Walmart recycles now. (*See* Dkt. 368, 376).[2] The evidence of the reprehensibility of Walmart's conduct was even greater in the second trial. Walmart has provided no valid reason why the Court should deviate from its approach in the first judgment with the exception of comporting with DTSA's 2:1 cap applying to the exemplary damages award.

Zest also responds to the Post-Trial Brief Regarding Exemplary Damages ("Walmart's Brief") submitted by defendant Walmart Inc. ("Walmart"). When Walmart asked for leave to submit its brief, it was not intended to be a Rule 50(b) or 59 motion (or give Walmart an additional challenge not contemplated under those rules). Nevertheless, Walmart states that it will raise much of the arguments in its brief a second time in its "forthcoming motion under Rule 50(b)." (Walmart's Brief, p. 3). Thus, while the brief is not a proper vehicle for challenging the jury's findings, Walmart seeks two bites at the apple. But the ***only*** issue properly before the Court is whether the jury's exemplary damages award should be affirmed, subject to a slight

---

[1] Judgment should be entered only in the names of plaintiffs Zest Labs, Inc., a Nevada Corporation, and Zest Labs Holdings LLC (Nevada), and not in the names of Ecoark, Inc., Ecoark Holdings, Inc., or its successor RiskOn International, Inc. (*See, e.g.*, Docket # 576-3 - Stock Purchase Agreement).

[2] This Court's Order of June 15, 2022, then denied almost all of Walmart's motion for judgment as a matter of law, rejecting Walmart's arguments that "the jury's award of exemplary damages was advisory, precluded by contract, and unreasonable; that "there was insufficient evidence that Walmart acted willfully and maliciously"; and that "Zest failed to sufficiently identify its purported trade secret." (Dkt. 462 at 3). Walmart's brief recycles those arguments, but they fare no better the second time around, as shown below.

reduction to comport with DTSA. But even if Walmart's challenge to the jury's factual finding were properly heard in advance of post-judgment motions (it is not), it should nevertheless be rejected for the reasons set forth herein.

## I.     INTRODUCTION

The jury has spoken. In fact, two Arkansas juries have now done so. The second jury, like the first jury, spent two weeks evaluating the credibility of the witnesses and other evidence offered by the parties; and, just like the first jury, found that Walmart ***willfully and maliciously*** misappropriated Zest's trade secret. Contrary to Walmart's assertion, ***the jury was required*** to answer this question, ***not the Court***. And the jury resoundingly answered that question: "Absolutely"! Indeed, it is black-letter law that whether the misappropriation was "willful and malicious" is a question solely for the jury, and the jury's answer is entitled to "extreme" deference, and it is conclusive if supported by substantial evidence — the most stringent evidentiary standard for Walmart to overcome.

Much of Walmart's brief depends on the false premise that, for the misappropriation to be willful, trade secret plaintiffs are required to identify which portions of their confidential information constitute a trade secret "before the information was disclosed." (Walmart's Brief, § I.A). But this is ***not*** the law and never has been. To prove willfulness to the jury, Zest need only have shown that Walmart acted with "actual or constructive knowledge of its [acts'] probable consequences." In plain English, if Walmart knew or should have known that it was exceeding its authorization using Zest's Confidential Information in a way that would result in disclosure, that is enough to find willfulness. That is the law.

Zest must also show that it took reasonable measures to protect the secrecy of its confidential information that might later be determined to be a trade secret. One such protective measure is the use of non-disclosure agreements, which trade secret owners use to protect the

secrecy of the information that they provide to others, including would-be business partners. And here, the parties' Non-Disclosure Agreement ("NDA") affords protection to all materials merely designated as "Confidential." The NDA did not require that things be marked "Trade Secret," regardless of whether the producing party considered them as such at the time. Walmart's expert reluctantly admitted this point during cross examination. Thus, Walmart's argument that it could not willfully and maliciously misappropriate Zest's confidential information because it was not expressly identified as a "Trade Secret" at the time is contrary to both the law and the parties' express agreement. Walmart's argument is also contrary to the jury's finding that Zest had a trade secret that Walmart misappropriated. As noted, the jury's finding is given extreme deference.

The second jury, like the first, also determined that Walmart should pay exemplary damages for its willful and malicious misappropriation after being explicitly instructed that it need *not* award *any* exemplary damages even if the conduct was willful and malicious. Where a jury has weighed the evidence and found willfulness and malice, the law does not permit the Court to set aside the jury's finding by substituting its own views for the unanimous view of the second Arkansas jury, which reached the same exact conclusion as the first. This Court should not accept Walmart's invitation to commit an error by doing so.

The *only* issue *properly* before the Court now is whether the amount of exemplary damages awarded by the jury comports with due process and should be affirmed, subject to a reduction from $150 million to $145.4 million to comport with DTSA's 2:1 cap, which is already a significant limit on exemplary damages and is presumed to satisfy due process. Given the reprehensibility of Walmart's conduct, its enormous financial resources ($19 billion in profits last year alone), and the fact that even the maximum award under DTSA here is an infinitesimal

amount (less than eight-thousandths) of Walmart's profits last year, anything less than the maximum award would not even get Walmart's attention, much less deter it and other similarly situated companies from harming others in the future. As such, awarding anything less than the maximum amount would send the wrong message to Walmart and other large companies — that stealing trade secrets from small businesses or startups can be a good business strategy. This is especially true since misappropriation of trade secrets can be hard to detect, hard to prove, and few small businesses or startups have the resources and fortitude to take on powerful companies like Walmart through multi-year protracted litigation. Deterrence through a sufficiently large exemplary award is the most effective way to reduce such conduct considering the above. And by adopting the jury's amount up to the cap, this Court can make a real difference for future small business and startups like Zest.

Walmart argues the Court should ignore the jury's award because it was merely "advisory" and thus entitled to "no deference." (Walmart's Brief, p. 2). Not so. The very purpose of the advisory exemplary award was to actually "***advise***" the Court, which can then review it to ensure it comports with due process. Walmart offers no explanation or authority for the proposition that the Court, having requested and received the jury's advice, should simply disregard it. Not surprisingly, courts have expressly rejected Walmart's "no deference" argument: "Where the question of willful and malicious misappropriation has already been decided by the jury, … a district court's discretion over exemplary damages is limited. In such circumstances, a court may refuse to enhance damages ***only if it can do so without second guessing the jury or contradicting its findings***." *John Bean Techs. Corp. v. B GSE Grp., LLC*, 2023 WL 6164322, at *3 (D. Utah Sept. 21, 2023) (emphasis added). But this is precisely what Walmart asks the Court to do here — second guess the jury.

Indeed, the Court should disregard the bulk of Walmart's Brief as it constitutes an improper invitation to second guess the jury's findings on a variety of issues. But the jury was instructed by the Court, and, accordingly, the Court should presume the jury actually followed those instructions. And the jury's factual findings are entitled to "extreme deference" and are conclusive if supported by substantial evidence. As shown below, far more than substantial evidence supported all of the jury's findings, and none of the following five grounds asserted by Walmart have merit.

**1. Walmart claims trade secrets must be explicitly identified to the defendant "*before the information was disclosed*" by the plaintiff for the misappropriation to be willful.** (Walmart's Brief, § I.A). But Walmart has simply fabricated a rule to evade responsibility, as this is not, and never has been, the law. Walmart's cited cases do not stand for that proposition. If this truly were the rule, many trade secret cases would be dead on arrival, as it is often the case that neither side knows precisely which aspects of the plaintiff's confidential information were taken or will eventually be adjudicated as a viable trade secret. Companies often do not even undertake such a potentially expensive analysis of identifying what their trade secrets are until they think their confidential information might have been taken or misused.

Walmart's argument also ignores that the jury was instructed on the elements of a trade secret, including that all that is required is that the plaintiff took reasonable measures to protect the trade secret, which can include entering an NDA with the party receiving the trade secret information. Critically here, under the NDA, Walmart was prohibited from using *any* of Zest's Confidential Information, including any potential trade secrets contained therein, but knowingly used that information in preparing, filing, and causing the publication of the Bohling patent application. Thus, Walmart expressly agreed that Zest was not required to do what Walmart now

claims it was required to do to protect its potential trade secrets. At trial, Zest more than sufficiently identified its trade secret as the Zest Confidential Information that "was used in the Bohling patent applications that were ultimately published. That is the trade secret we are talking about. That is the trade secret Mr. Mehring described to you. It's the trade secret Mr. Lanning described to you. That's why we're here."[3] (*See* Section IV.A below).

As to the finding of willfulness, Zest need only have proven to the jury that Walmart acted with "actual or constructive knowledge of its [acts'] probable consequences." Here, Walmart knew it was using Zest's Confidential Information in excess of Zest's permission, as Walmart deliberately prepared and filed the Bohling patent application on August 27, 2018 — after having been put on explicit notice — by virtue of a cease-and-desist letter, the complaint in this action, and a motion for a preliminary injunction — that it could not and should not use any of Zest's Confidential Information for any purpose. (*See* Section IV.B below).

When Walmart improperly used and disclosed Zest's Confidential Information contrary to the NDA, it assumed the risk that it was misappropriating a trade secret.

And it is a key function of a trade-secrets trial to determine whether any of the plaintiff's confidential information misused by the defendants was, in fact, a trade secret. A trade secret is a legal construct that only becomes officially such when a jury says so, which is what happened here.

**2. Walmart argues the evidence of maliciousness was not clear and convincing.**

(Walmart's Brief, § I.B). But the Court, at Walmart's request, instructed the jury on both the definition of "malice" (intent to injure Zest) and the higher "clear and convincing evidence"

---

[3] Tr. 2430:22-2431:1. All citations to "Tr." are to the transcripts of the second trial (April 28-May 13, 2025).

standard. And the jury found, by clear and convincing evidence, that Walmart intended to injure Zest. The evidence included Walmart's systematic misconduct spanning more than half a decade, including a scheme to "string" Zest along and then "get rid" of it, running a secret Walmart team to try to duplicate Zest's technology for Walmart's own use, including preparing and filing a patent application using that technology, erasing Zest's identity from its confidential documents and passing them off internally as Walmart's own technology, filing a false inventorship declaration, and filing a non-provisional patent application consisting of Zest's Confidential Information even after repeated warnings and being sued by Zest. (*See* Section IV.C below). And even after the first trial, Walmart continued its malicious conduct by abandoning the Bohling patent, causing its rejection, and then claiming to the second jury that the rejection was a ruling on the merits determining that Zest had no trade secret.

**3. Walmart argues that exemplary damages should not be awarded based on its cherry-picked "equitable factors."** (Walmart's Brief, § II.B). But exemplary damages based on the jury's finding of willful and malicious misappropriation are necessary for deterrence, and Walmart's purported "equitable factors" are meritless. This includes Walmart's argument that the jury's "high award" of compensatory damages should be a sufficient deterrent. The compensatory award compensates Zest for its ***actual harm***; the exemplary award punishes Walmart and deters it and similarly situated companies from wronging others in the future. Further, none of these purported equitable factors can override the primary factors — including the reprehensibility of Walmart's conduct — that the jury determined warranted exemplary damages. Tellingly, the jury was explicitly instructed that it was "not required" to award ***any*** exemplary damages, but it found they were necessary. (*See* Section V below).

**4. Walmart argues that "the jury's advisory exemplary damages verdict is so**

**disproportionate as to violate due process."** (Walmart's Brief, pp. 1-2 and § III). While the Court must ensure that the exemplary award comports with due process, DTSA already imposes a cap of twice the compensatory award (2:1 ratio), which presumptively satisfies due process. Walmart at least concedes that exemplary damages equal to the compensatory award (1:1 ratio) would satisfy "due process." (*Id.*, p. 20). But the relevant factors — including the need to deter a company whose ***profit*** last year alone exceeded ***$19 Billion*** — warrant the maximum award under DTSA of $145.4 million.[4] Indeed, this award amounts to ***less than 1%*** of Walmart's profit last year, or ***less than three days of profit***. Anything less than the maximum award would not even get Walmart's attention, let alone deter it and other similarly situated companies from harming others in the future. (*See* Section VI below).

    **5. Walmart claims that exemplary damages are excluded by the parties' Master Services Agreement.** (Walmart's Brief, § II.A). This argument — which constitutes an affirmative defense that Walmart would have borne the burden of proof had it been pled — should be rejected for multiple independent reasons: (i) the Court previously rejected this exact argument, and Walmart provides no basis for seeking reconsideration; (ii) the limitation of damages provision on which Walmart relies contains an express, unambiguous carve-out for any "rights or remedies" that Zest may have with regard to its "Confidential Information," which includes the trade secret misappropriated by Walmart; (iii) even if Walmart could show that the express carve-out is ambiguous, it is black-letter law that such an ambiguity would be a question of fact for the jury to decide, not for the Court to decide on a post-trial motion; (iv) Walmart repeatedly waived this affirmative defense, and Zest would suffer extreme prejudice if Walmart

---

[4] Walmart states that the maximum award under the DTSA is $144.4 million. (Walmart's Brief, p. 18). Zest assumes this was just a mathematical mistake by Walmart, as twice the compensatory award of $72.7 million is $145.4 million.

were allowed to raise the defense post-trial and deprive Zest of its right to conduct discovery, present evidence and argument to the jury, and have the jury properly instructed by the Court on issues and elements Walmart was required to prove; and (v) the purported exclusion is unenforceable because Arkansas public policy prohibits a party from using a contract to prospectively avoid liability for its future willful and malicious conduct. (*See* Section VII below).

## II.    LEGAL STANDARDS

### A.    DTSA Authorizes an Exemplary Award of Up to Twice the Compensatory Award

DTSA authorizes courts to award "exemplary damages in an amount not more than 2 times the amount of the damages awarded" for willful and malicious trade secret misappropriation. 18 U.S.C. § 1836(b)(3)(C).

"The DTSA's two-to-one cap reflects Congress's specific determination about the proper scope of punitive damages for trade secret misappropriation…." *Motorola Sols., Inc. v. Hytera Commc'ns. Corp.*, 108 F.4th 458, 495-96 (7th Cir. 2024) (citation omitted). When exemplary damages are available under a federal statute, such as DTSA, that "narrowly describes the type of conduct subject to punitive liability, and reasonably caps that liability, courts should give substantial deference to Congress's legislative judgment about appropriate sanctions." *Id* at 498. Because of DTSA's statutory cap, an award within that range presumptively satisfies Due Process. *Id.*

### B.    The Jury Decides Whether the Misappropriation Was Willful and Malicious

Walmart misrepresents what happened at the pretrial hearing to falsely claim that Zest conceded that the "willfulness" issue was advisory. Not so. What actually happened is that when the Court was poised to take the amount of exemplary damages away from the jury by not asking **Interrogatory 1-D** ("Exemplary Amount Question"), Zest offered to forego using Walmart's net

worth evidence if in exchange the Court permitted the jury to answer Exemplary Amount Question. Zest never stated that **Interrogatory 1-C** ("the Willfulness Question) was "advisory." By casting the Court's pretrial transcript in a false light, Walmart has misrepresented to the Court that the question of "willfulness" is for the Court to decide and that the jury's finding on Interrogatory 1-C is merely "advisory." At the April 24, 2025 pre-trial conference, however, Judge Moody stated with regard to the Willfulness Question "[t]he jury is going to be given an interrogatory on willful, wanton or whatever the language is."[5] But Judge Moody went on to indicate, regarding the Exemplary Amount Question, "I'm not going to have them assign punitive damages … ."[6] Walmart urged exclusion of "revenue, net worth and the like"[7] since "whether to award the exemplary damages and if so to set the amount" is "for the Court, not the jury."[8] Walmart maintained that such evidence would be unduly prejudicial, in part because "the maximum exemplary damages can be two times [the reasonable royalty], and that bears no relation to the billions of dollars of revenue and net worth that we would be talking about if we were talking about admitting evidence of Walmart's financial metrics."[9] Zest offered compromise regarding the Exemplary Amount Question that "at a minimum, an advisory verdict is helpful under the DTSA and that's what was done last time," which the Court accepted. Therefore, in response, the Court agreed to include **Interrogatory 1-D** (Exemplary Damages Amount). Thus, Walmart's contention — based on this transcript — that Zest conceded "willfulness" as an advisory finding is flatly false.

   Three weeks later, by email on May 15 at 5:48 p.m., the Court indicated some confusion

---

[5] Pretrial Tr. 50:10-11.
[6] Pretrial Tr. 50:14-15.
[7] Pretrial Tr. 54:13.
[8] Pretrial Tr. 54 8-10.
[9] Pretrial Tr. 54:24-55:2.

on the issue when it stated "whether I find Walmart's misappropriation was willful and malicious and, if so, what are appropriate exemplary damages."[10] At 9:09 a.m. the next morning, Zest replied: "Zest's position will be that willful and wanton was a jury question and so the question to the Court is just amount of exemplary damages."[11] Walmart neither answered the email nor asked the Court to revisit the issue. Instead, Walmart now tries to latch onto the Court's confusion in the email, asking it to throw aside black-letter law in an effort to persuade this Court to ignore the jury's finding of willfulness.

Tellingly, Walmart fails to cite a single apt case that supports its false proposition that the Court decides willfulness. This is not surprising because, in DTSA cases, it is black-letter law that "[i]t is for the ***jury to determine whether a misappropriation was willful and malicious***." *Fin. Info. Techs., LLC v. iControl Sys. USA, LLC*, 21 F.4th 1267, 1275 (11th Cir. 2021) (emphasis added). The decision of whether a misappropriation was willful and malicious "fall[s] within the province of the jury." *Nephron Pharms. Corp. v. Hulsey*, 2020 WL 7137992, at *2 (M.D. Fla. Dec. 7, 2020). This is "a highly fact-specific question best left to the jury." *PetroChoice Holdings, Inc. v. Orobono*, 2022 WL 138008, at *6 (E.D. Pa. Jan. 14, 2022) (quotation marks omitted); *accord I-Mab Biopharma v. Inhibrx, Inc.*, 2024 WL 4437227, at *2 (D. Del. Oct. 1, 2024) ("the issue of whether a defendant has acted willfully and/or maliciously [under DTSA] is a highly fact-specific question best left to the jury") (internal quotation omitted). Consistent with this rule, numerous other federal cases addressing claims under DTSA have left the question of whether the misappropriation was willful and malicious to the jury.[12]

---

[10] [Dkt. 812-3, Ex. C]

[11] [*Id.*]

[12] *E.g. Larada Scis., Inc. v. Prediatric Hair Sols. Corp.*, 2025 WL 1684439, at *3 (D. Utah June 16, 2025) ("The jury found . . . all Defendants willfully and maliciously misappropriated

The sole case cited by Walmart does not support its erroneous assertion that the Court decides willfulness. Indeed, that case concluded, rather unremarkably, that the trial court did not abuse its discretion in not trebling a patent infringement award after the jury found ***the opposite*** of here — "that there was ***not*** willful infringement." (Walmart's Brief, p. 1, citing *Square Liner 360, Inc. v. Chisum*, 691 F.2d 362, 379 (8th Cir. 1982)). Thus, even Walmart's own pre-DTSA case confirms that "willfulness" is a jury question.[13]

---

Larada's trade secrets under the DTSA"); *Qorvo, Inc. v. Akoustis Techs., Inc.*, 2024 WL 5165152, at *1 (D. Del. Oct. 31, 2024) ("The jury found that the [DTSA] misappropriation was willful and malicious"); *Cap. Inventory, Inc. v. Green*, 2024 WL 1480484, at *2 (N.D. Ga. Feb. 20, 2024) ("the jury found by clear and convincing evidence that Defendants willfully and maliciously misappropriated Plaintiff's trade secrets" under DTSA and GTSA); *EchoSpan, Inc. v. Medallia, Inc.*, 2023 WL 9019054, at *1 (N.D. Cal. Dec. 11, 2023) ("the jury found Medallia's conduct was willful and malicious" under DTSA and GTSA); *John Bean*, 2023 WL 6164322, at *2 ("the jury found, by clear and convincing evidence, that the Defendants' conduct was 'willful and malicious' for the purpose of [the plaintiff's DTSA and UTSA] trade secrets misappropriation claims"); *Proofpoint, Inc. v. Vade Secure, Inc.*, 2023 WL 5723670, at *1 (N.D. Cal. Sept. 5, 2023) (jury found that certain trade secrets were misappropriated willfully and maliciously in violation of DTSA), *aff'd*, 2024 WL 4003906 (9th Cir. Aug. 30, 2024); *Killough v. All Points Logistics, LLC*, 2022 WL 1556413, at *4 n.9 (N.D. Ala. May 17, 2022) (summarizing court's jury instruction on "willful and malicious misappropriation" under DTSA); *Cajun Servs. Unltd., LLC v. Benton Energy Serv. Co.*, 2021 WL 5833967, at *1 (E.D. La. Dec. 9, 2021) ("the jury found that Besco's conduct ... violated the DTSA and LUTSA willfully and maliciously").

[13] While the parties agreed to an advisory verdict on exemplary damages at the pretrial conference, it is not explicit in the statute that a jury cannot award exemplary damages itself. DTSA provides a "civil action" for trade secret misappropriation. 18 U.S.C. § 1836(b)(3). Walmart concedes in this case that the damages allowed under 1836(b)(3)(B) are determined by a jury and that verdict is binding on the Court. Walmart contends that when exemplary damages under 1836(b)(3)(B) are determined by a jury that verdict is advisory to the Court. There is no principled reason to treat the two sections differently as they use the same language. The Seventh Amendment preserves Zest's right to a jury trial in a civil action. *Chauffeurs, Teamsters and Helpers v. Terry*, 494 U.S. 558, 565 (1990). "Maintenance of the jury as a fact-finding body is of such importance … that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Id.* (internal cites and quotes omitted). In essence, Walmart proposes that the Court strip from Zest its right to a jury trial on exemplary damages; an issue traditionally assigned to a jury.

**C.      The Jury's Factual Findings — Including that Walmart's Misappropriation Was Willful and Malicious — Are Entitled to at Least *Extreme* Deference**

The Eighth Circuit has held that "[a] jury verdict is entitled to ***extreme deference*** … and we will not set it aside unless no reasonable jury could have reached the same verdict based on the evidence submitted." *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1009 (8th Cir. 2008) (emphasis added); *accord Smith v. Health Res. of Ark., Inc*., 656 F. App'x 790, 793 (8th Cir. 2016) (affirming the district court's award of liquidated damages "[o]n the basis of the jury's willfulness finding," as there was "no basis for overcoming the ***extreme deference*** we afford jury verdicts.") (emphasis added); *Wells Fargo & Co. v. United States*, 957 F.3d 840, 846 (8th Cir. 2020) (where "relevant factual findings were made by a jury following a trial … the jury's verdict is 'entitled to ***extreme deference***.'"), quoting *Craig Outdoor Advert.*, 528 F.3d at 1009 (emphasis added); *Williams v. ConAgra Poultry Co*., 378 F.3d 790, 794 (8th Cir. 2004) ("we give ***great deference*** to a jury's findings.") (emphasis added).

But here, the jury's verdict is entitled to ***even greater*** deference for two reasons. ***First***, as the Eighth Circuit explained, "[w]here a case has been submitted to the jury on ***special verdicts*** pursuant to Fed. R. Civ. P. 49(a), the jury's findings are usually binding on the district court," *Nor-West Cable Comms. P'ship v. City of St. Paul*, 924 F.2d 741, 745 (8th Cir. 1991), ***unless*** "all of the evidence points one way and is susceptible of no reasonable inference sustaining the" jury's findings. *Belk v. City of Eldon*, 228 F.3d 872, 877-78 (8th Cir. 2000). "A special verdict is an authoritative finding of fact in the particular area submitted. Special verdicts responsive to the issues and supported by the evidence are entitled to the respect of the trial court and generally are ***conclusive*** of the case." *1 Fed. Jury Practice & Instr.* § 8:7 (6th Ed. Jan. 2025 Update) (emphasis added). Indeed, failing to give due regard to the jury's factual findings would violate the Seventh Amendment. *See Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991) ("[U]nder Rule 49(a), the

trial court simply cannot choose to ignore a legitimate finding that is part of the special verdict. The special verdict reflects the jury's findings of fact, and it would be a violation of the Seventh Amendment right to jury trial for the court to disregard a jury's finding of fact.").

*Second*, the jury's "***willful and malicious***" finding is entitled to even greater deference because it goes to Walmart's ***intent***. "In few areas is the admonition to give proper deference to the jury's findings of fact more compelling than in the necessarily subjective area of intent." *Leffler v. United States*, 409 F.2d 44, 51 (8th Cir. 1969) (citation omitted).

In sum, all of the jury's findings are entitled to at least "***extreme***" deference, and the jury's "willful and malicious" finding is entitled to even greater deference, as it was made by special verdict and addressed Walmart's intent.

**D.    Even if Walmart's Brief Were a Proper Challenge to the Jury's Findings, Which It Is Not, Those Findings Are Conclusive if Supported by Substantial Evidence**

Walmart's Brief is not a Rule 50(b) or 59 motion and, accordingly, cannot properly challenge the jury's findings. Walmart appears to have filed its brief in an effort to have two bites at the apple, as it states that it plans to raise much of its brief a second time in its "forthcoming motion under Rule 50(b)." (Walmart's Brief, p. 3). But if it were a proper challenge, it is black-letter law under both Arkansas and federal law that the jury's verdict is conclusive if supported by substantial evidence. The Court should order that Walmart is precluded from rearguing these issues in its post-judgment motions, as it should not be permitted to burden the Court and the parties with repetitious arguments at inappropriate times, and it should not be allowed two bites at the apple.

Similar to their federal counterparts, Arkansas courts uphold the jury's verdict if "supported by substantial evidence." *Williams v. Liberty Bank*, 2011 Ark. App. 220, 225, 382 S.W.3d 726, 732 (2011). "It is not the … court's place to try issues of fact; rather, this court

simply reviews the record for substantial evidence to support the jury's verdict. … In reviewing the sufficiency of the evidence as being substantial …. [c]ircumstantial evidence may meet the substantial-evidence test." *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 719 (2002). "It is only where there is no reasonable probability that the incident occurred according to the version of the prevailing party or where fair-minded persons can only draw a contrary conclusion that a jury verdict should be disturbed." *Dovers v. Stephenson Oil Co.*, 354 Ark. 695, 700 (2003).

Likewise, in the Eighth Circuit, factual findings by the jury may not be overturned if the verdict is supported by substantial evidence. *Harris v. Union Elec. Co.*, 787 F.2d 355, 362 (8th Cir. 1986). A jury verdict is conclusive "unless no reasonable jury could have reached the same verdict based on the evidence submitted." *Craig Outdoor Advert.*, 528 F.3d at 1009 (8th Cir. 2008); *accord Chicago Title Ins. Co. v. Resol. Tr. Corp.*, 53 F.3d 899, 904 (8th Cir. 1995) (a jury's verdict is conclusive unless, viewing the evidence in the light most favorable to the prevailing party, a reasonable jury could not have found for that party). "Judgment as a matter of law is appropriate only when ***all of the evidence points one way*** and is 'susceptible of no reasonable inference sustaining the position of the nonmoving party,'" and courts "resolve all doubts in favor of the non-moving party and give that party the benefit of all reasonable inferences." *Belk*, 228 F.3d at 877-78 (emphasis added), quoting *McKnight By & Through Ludwig  v. Johnson Controls*, 36 F.3d 1396, 1400 (8th Cir. 1994).

At the end of the day, as another trial court in this Circuit observed: "It is not the province of this Court to undertake the job of fact-finding, either during trial or while entertaining post-trial motions. The Court will not re-weigh the evidence or second guess the factual findings of the jury." *Superior FCR Landfill, Inc. v. Wright Cnty., Minnesota*, 2002 WL 511460, at *3 (D. Minn. Mar. 31, 2002). Yet here, Walmart would have this Court substitute its

own view for the factual findings of two unanimous juries on the issue of willfulness. It is hard to imagine a more inappropriate request to a trial court.

### III.    THE JURY'S FACTUAL FINDINGS

The jury, after being instructed on the law, found by *special interrogatory* as follows (Dkt. 797, pp. 2-3):

**By the greater weight of the evidence:**

1-A: Zest Labs proved its claim of trade secret misappropriation

1-B: $72,700,000 reasonably and fairly compensates Zest Labs for damages that Walmart's misappropriation proximately caused.

**By clear and convincing evidence:**

1-C: Walmart's misappropriation of Zest Labs' trade secret was willful and malicious.

In the terms the Court instructed the jury on in connection with the above findings, the jury found that based on "the testimony of the witnesses, documents, and other things … received as exhibits" it was "more likely true than not true" that Zest had "information such as patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs or codes" that "derive[d] actual or potential independent economic value from not being generally known," "was not readily ascertainable through proper means," and "was the subject of reasonable efforts to maintain its secrecy."[14]

In the process of "publishing the Bohling patent," Walmart "disclos[ed] or use[d]" Zest's "information" "without express or implied consent" despite knowing or having reason to know "that its knowledge of the [information] was derived from or through a person who had a duty to

---

[14] Tr 2424:22, 2425:4-6, 2427:11-13, 2427:15-16.

maintain its secrecy or limit its use." Walmart "act[ed] … through its agents or employees," and was "b[ou]nd … by acts and statements made while acting within the course and scope of … [the employee's] duties as an employee of the corporation" and bound by "any knowledge, actions or inactions." The jury found it was more likely than not that Walmart's conduct caused "a natural and continuous sequence" of events "without which the damage" to Zest "would not have occurred."[15]

As to the "willful and malicious" finding, the jury "without hesitation [] reach[ed] a firm conviction that" Walmart "acted with actual or constructive knowledge of … its probable [con]sequences" and "intended to cause Zest Labs injury."[16] Indeed, when the Court asked the jury foreman if it was the jury's finding that Walmart's misappropriation was "willful and malicious" (Interrogatory 1-C), the foreman memorably answered "Absolutely"![17] . The jury determined that Walmart should pay $150 million in exemplary damages. Dkt. 797 1-D.

## IV. THE JURY'S FINDINGS OF A "TRADE SECRET" AND "WILLFUL AND MALICIOUS" MISAPPROPRIATION ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

As noted, the jury's findings are conclusive if supported by substantial evidence — the most stringent evidentiary standard for Walmart to overcome. Here, the evidence presented at trial overwhelmingly supports the jury's factual findings — including that (i) Zest had a trade secret, (ii) Walmart misappropriated it, and (iii) the misappropriation was willful and malicious — and these findings are entitled to extreme deference. Were this properly a challenge to those findings — which it is not — Walmart would need to prove that **all** of the evidence supports Walmart's position, and **none** supports the jury's findings, which is impossible here. (Section

---

[15] Tr. 2427:24-25, 2428:4, 2427:11, 2428:5, 2428:7-9, 2426:17-18, 2426:18-22, 2426:24-25, 2428:12-13, 2428:13-14, 2428:14.
[16] Tr. 2429:4-5, 2428:25-2429:2, 2429:2-3.
[17] Tr. 2571:5-6.

II.D above.) Walmart's attempt to suggest that no trade secret was identified for the jury, or to characterize its misappropriation as an innocent misunderstanding, ignores reams of evidence and a systematic pattern of deception and misappropriation that shocked the jury's conscience.

As explained below, far more than substantial evidence supports the jury's findings that Zest had a "trade secret" (subsection A) and that Walmart misappropriated it "willfully" (subsection B) and "maliciously" (subsection C).

A. **Walmart's "Unknown Trade Secret" Argument Is Meritless and Does Not Overcome the Substantial Evidence that It Acted Maliciously**

Walmart argues that its misappropriation could not have been willful because Zest did not sufficiently define its trade secret. (Walmart's Brief, p. 4). That is incorrect. Walmart's obligations to limit use of shared information extended to all of Zest's Confidential Information, which necessarily included any trade secrets. The jury's unanimous findings rule out any possibility of an innocent mistake by Walmart, and, as discussed above, the jury's findings are accorded extreme deference:

- Under the 2015 NDA, Walmart was prohibited from using ***any*** of Zest's Confidential Information in publishing the Bohling patent application.[18] That prohibition included any trade secrets within the Confidential Information. Nonetheless, Walmart knowingly used that information.

- The NDA did not require that information be marked as a trade secret to be protected, even if the producing party considered the information to be a trade secret. Walmart's expert admitted this point during cross examination.[19] Thus, Walmart's argument that Zest was bound to inform Walmart what Zest considered to be a trade secret in order for the information to be protected is contrary to the parties' express agreement in the NDA.

- There was substantial evidence to allow the jury to conclude that Walmart placed into the Bohling patent application information Zest designated as Confidential Information under the 2015 NDA.

- After Walmart terminated Zest, Zest sent Walmart three escalating warnings that Walmart was not permitted to use any of Zest's Confidential Information for any

---

[18] PTX-801.
[19] Tr. 2289:14-17 (Louis Riley).

purpose: (1) Zest's cease-and-desist letter, (2) the complaint in this action, and (3) a motion for a preliminary injunction. Each put Walmart on explicit notice that *none* of Zest's Confidential Information—let alone its trade secrets—could be used.

- Despite those warnings, Walmart prepared and filed the non-provisional patent application, which caused its publication. Whether Walmart knew at that time which specific portions of Zest's Confidential Information might be trade secrets, Walmart *intentionally* used information it knew it had no right to use.

- In closing argument, Zest identified its trade secret as what "was used in the Bohling patent applications that were ultimately published. That is the trade secret we're talking about. That is the trade secret Mr. Mehring described to you. It's the trade secret Mr. Lanning described to you. That's why we're here."[20]

Walmart's argument also ignores that the jury was instructed on each element to support

a finding of a trade secret, including that the "information" must: (i) "derive actual or potential

independent economic value from not being generally known"; (ii) not be "readily ascertainable,

through proper means"; and (iii) be "the subject of reasonable efforts to maintain its secrecy."

(Dkt. 798, Jury Instruction No. 10, at 12.) The jury is presumed to have followed this instruction

in finding that Zest possessed a trade secret. "[W]e must presume that the jury followed the

instructions as given." *Muhammad v. McCarrell*, 536 F.3d 934, 938 (8th Cir. 2008), citing *City

of Los Angeles v. Heller*, 475 U.S. 796, 798, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) ("the

theory under which jury instructions are given by trial courts and reviewed on appeal is that

juries act in accordance with the instructions given them ...").

The jury was also instructed as to what constitutes "misappropriation" for the purpose of

their verdict — the "disclosure or use of" the information the jury found to be "a trade secret

belonging to [Zest], without [Zest's] express or implied consent," which Walmart "at the time of

disclosure or use, knew or had reason to know that [its] knowledge of" that information "was

derived from or through a person who owed a duty to maintain its secrecy or limit its use." (Dkt.

798, Jury Instruction No. 12, at 14.) Again, the jury is presumed to have followed this

---

[20] Tr. 2430:22-2431:1.

instruction.

Thus, while Walmart argued to the jury in closing that there was no trade secret, as "the patent office said nothing new" (Tr. 2483:4-6), the jury rejected this argument and found Zest had a protectable trade secret that Walmart misappropriated. Walmart's argument that it could not act willfully if Zest did not specifically identify what portions of its Confidential Information were trade secrets prior to Zest sharing the information with Walmart is unavailing. Walmart knew that ***all*** of the Zest Confidential Information it misused and eventually disclosed in the filing and publication of the patent was protected, including any trade secrets that might have been contained therein.

In addressing whether a trade secret defendant has acted reprehensibly in willfully misappropriating trade secrets, the criminal trade secret statute (18 U.S.C. § 1832) provides an appropriate guide post, especially since it contains a *mens rea* requirement that is analogous to the reprehensibility requirement for exemplary damages. *E.g.*, *Motorola Solutions,* 108 F.4th at 497. Under Section 1832, a defendant "need not know that the stolen information met the legal definition of a trade secret. Instead, ***all that is required is that a defendant knew the trade secret was 'confidential information to which he had no claim*****.**'" *United States v. Yu Xue*, 2020 WL 5645765, at *3 n.8 (E.D. Pa. 2020), *aff'd sub nom., United States v. Xue*, 42 F.4th 355 (3d Cir. 2022), citing *United States v. Krumrei*, 258 F.3d 535, 537-38 (6th Cir. 2001) (emphasis added); *see also United States v. Roberts*, 2009 WL 5449224, at *5 (E.D. Tenn. Nov. 17, 2009), *recommendation adopted*, 2010 WL 56085 (E.D. Tenn. Jan. 5, 2010), *aff'd sub nom. United States v. Howley*, 707 F.3d 575 (6th Cir. 2013) ("a defendant must know that the information he or she seeks to steal is proprietary, meaning belonging to someone else who has an exclusive right to it, but does not have to know that it meets the statutory definition of a trade secret").

Criminal statutes generally provide more protection to defendants than civil statutes. If a *criminal* defendant need not know that the stolen information met the legal definition of a trade secret to be *convicted of a crime*, the standard cannot be higher for a *civil* defendant like Walmart facing a *monetary award*.

In trying to support its "no trade secret" argument, Walmart relies on cases that are inapt and utterly unpersuasive. Unlike *Coenco, Inc. v. Coenco Sales, Inc.*, 940 F.2d 1176, 1178 (8th Cir. 1991), where the plaintiff ***failed to identify any trade secret*** and ***made no attempts to protect it***, Zest complied with the NDA and took reasonable measures to protect it, including marking all the key exhibits at issue in the trial even though there were other ways that the information could have been protected under the NDA. Similarly, in *E.J. Brooks Co. v. Cambridge Security Seals*, 2015 WL 9704079, at *7-10 (S.D.N.Y. Dec. 23, 2015), the court actually ***denied*** the defendant's motion for judgment based on the plaintiff's alleged failure to identify trade secrets. And in *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 353 (8th Cir. 2007), the plaintiff abandoned its trade secret claim on appeal.

Finally, Walmart argues that the jury's "trade secret" finding should be overridden because a party needs to identify its trade secrets before disclosing that information to the defendant. (Walmart's Brief, pp. 3-4, citing *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1109 (8th Cir. 2020)). But *Cuker* is inapposite. In *Cuker*, unlike here, Cuker shared information with Walmart ***without having any contractual protection***. This resulted in a finding that Cuker failed to take reasonable steps to maintain the secrecy of the information such that it could not qualify as a trade secret. But here, the NDA supports the jury's finding of a trade secret, as it shows that Zest took reasonable measures to protect its trade secret. Zest transacted at arm's length under the NDA before sharing its already-developed technology for the limited

purpose of evaluating that technology. Further, in *Cuker*, the misappropriation was by wrongful ***acquisition*** (which the Court did not instruct the jury on here) and the Court was assessing whether Walmart could be held to have wrongfully acquired information it did not even know was confidential, let alone a trade secret. (*Id*. at 1109).

**B.    Clear and Convincing Evidence Supports the Jury's Finding that Walmart Acted Willfully**

Walmart argues that Zest must, but failed to, prove Walmart acted with "actual or constructive knowledge of its [acts'] probable consequences." (Walmart's Brief, p. 3). Again, this ignores a plethora of evidence. Walmart ignores that after it thoroughly interrogated Zest on its Zest Fresh System, Walmart summarily terminated its relationship with Zest on November 9, 2017 and the very next day filed its provisional patent application using Zest's Confidential Information. Thus, according to the evidence presented at trial, Walmart was secretly working on its patent since at least January 2017, ten months earlier. And, thereafter, Walmart continued to use Zest's Confidential Information to develop Walmart's own fresh food management system (Eden) in addition to memorializing this willful conduct in a patent application. Further, Walmart omits that the jury heard substantial evidence that Walmart filed the non-provisional Bohling Application on August 27, 2018 after receiving ***three*** explicit and escalating warnings to stop:

- Walmart received Zest's July 20, 2018 ***demand letter*** which "request[ed] that Walmart ***return all Confidential Information*** that it received from Zest Labs" and reminded Walmart that its "obligations to Zest Labs do not end with the return of this information Please ***do not retain or use the information***, because as stated in the NDA, 'any and all duties or obligations existing under this Agreement will remain in full force and effect,' and ***your obligations not to use or disclose Zest's trade secrets continue indefinitely***."[21]

- On August 1, 2018, Zest served Walmart with Zest's ***Complaint*** alleging trade secret misappropriation. (Dkt. 14).[22]

---

[21] PTX-2358; Tr. 1194:23, 1197:3-1198:22 (Peter Mehring) (emphasis added). Any emphasis in quotations from the trial transcript has been added.
[22] Tr. 1198:23-1199:20 (Mehring).

- On August 7, 2018, Zest served Walmart with Zest's ***motion for a preliminary injunction***, specifically seeking to prevent further use and disclosure of its trade secrets. (Dkt. 18).[23]

Twenty days after receiving the Motion for Preliminary Injunction, Walmart deliberately filed the non-provisional patent application, setting it on course for publication by the Patent Office to the world. The jury heard evidence that such applications automatically publish 18 months after a provisional filing unless the applicant takes steps to stop it.[24] This deliberate action by Walmart is further evidence that Walmart acted with actual or constructive knowledge of the probable consequences of its actions. If Walmart had simply allowed the earlier filed provisional application to expire, the Patent Office would not have published Zest's trade secret.[25]

In short, the evidence showed that Walmart acted willfully in filing its application despite receiving multiple escalating warnings, fully supporting the jury's finding that Walmart had "actual or constructive knowledge" of the "probable consequences" of its actions.

**C.    Clear and Convincing Evidence Supports the Jury's Finding that Walmart Acted Maliciously**

Walmart argues that Zest must, but failed to, "show by clear and convincing evidence that Walmart intentionally sought to harm Zest." (Walmart's Brief, p. 10.) But the jury heard overwhelming evidence of Walmart's malice, including the following.

**1.    The Scheme to "Get Rid" of Zest**

The jury heard about Walmart's true intentions from the beginning — to "string" Zest along and then "get rid" of Zest. The evidence included the following:

- Kelly Boyle, Walmart's senior director of Fresh Flow, repeatedly told fellow employee Jeff Kerbs that "we're going to get as much information as we can and ***then get rid of them***"[26]; Jeff Kerbs "said that Kelly [Boyle] was trying to extract as much

---

[23] Tr. 1199:23-1200:12 (Mehring).
[24] Tr. 1675:23-1676:4 (Robert Stoll).
[25] Tr. 1075:20-1076:3 (Mehring).
[26] Tr. 194:15-16 (Troy Richards).

information and ***get rid of us.***[27].

- Jeff Kerbs was so disturbed by this plan that he "started stomping his foot" in the parking lot, saying, "I'm so mad at Kelly Boyle. She just said again that ***she's going to take this and then get rid of you guys***."[28]

- Both Walmart CEO Greg Foran and Kelly Boyle later admitted to stringing Zest along. In July 2017, Ed Oldham wrote in an email: "Greg F. [Foran] wants to get Zest out of his office and acknowledge the way ***we as Walmart have jerked them around***. … "Some ***bad things*** happened there" and "***Walmart does need to own it***."[29]

- Walmart CEO Foran admitted that "Walmart then spent the next three years shuffling Zest throughout [Walmart]" while "Zest was spending money trying to show Walmart that their technology worked really well." He further admitted that Walmart could not justify its stringing Zest along, noting that "three years is too long to be able to validate" the Zest Fresh process.[30]

- Kelly Boyle similarly admitted in a November 2017 email: "There is a bit of back and forth. Trying to be sensitive to the relationship and the ***stringing along we did***."[31]

## 2. False Inventorship Declaration

The jury heard overwhelming evidence that Joshua Bohling's claimed invention was a sham. Most tellingly, there are ***no*** inventor notes or documentation of any kind whatsoever showing the conception or development of the claimed invention.[32] Patent expert Mark Lanning testified that "in all my experience, I've never seen a patent or a patent application without any notes."[33]

The supposed inventors also conducted no field tests or surveys and compiled no data when allegedly developing the invention.[34] Neither Bohling nor his co-inventors had any relevant education, training, or experience in agronomy, agricultural engineering, food sciences,

---

[27] Tr. 195:9-11 (Richards).
[28] Tr. 204:9-14 (Richards).
[29] Tr. 1458:16-1459:4 (Greg Foran); PTX-336.
[30] Tr. 1459:5-1460:11 (Foran).
[31] Tr. 478:8-478:23 (Kelly Boyle); PTX-97.
[32] Tr. 2064:24-2065:2; 2069:13-2070:3; 2070:24-25; 2076:20-2077:4; 2095:6-10 (Josh Bohling).
[33] Tr. 1776:21-1778:8 (Mark Lanning).
[34] Tr. 2066:6-14; 2074:20-23; 2075:16-18 (Bohling).

or the food industry.[35]

When asked to explain how he developed the invention, Bohling could only lamely offer that it was "intuition" and "a stab in the dark."[36] What Bohling did have access to was years of Walmart's mining of Zest for its Confidential Information about its system, as key parts of that information were shown to have been directly sent to him, while even more information was widely disseminated within Walmart and to people with whom Mr. Bohling worked.

Despite all the evidence that Joshua Bohling's claimed invention was a sham, he declared under penalty of perjury to the Patent Office, on behalf of Walmart, on August 27, 2018 (as to application number 16/112,974): "I believe that I am the original inventor or original joint inventor of a claimed invention in the application. [¶] I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. § 1001 by fine or imprisonment of not more than five (5) years, or both."[37]The jury had ample evidence to conclude that Mr. Bohling lied in his deposition and at trial — his lies were attributable to Walmart as the jury was instructed, (Dkt. 798, Jury Instruction 7, at 9). ("A corporation acts only through its agents or employees … [who] may bind the corporation ….") — and the jury was free not only to disbelieve his testimony about being the inventor but other aspects of his and Walmart's other testimony and evidence as well, and to attribute his reprehensibility to Walmart.

### 3.  Removal of "Zest" Confidentiality Legends and Redistribution Inside Walmart

The jury saw evidence that Walmart erased Zest's identity from confidential documents and claimed them as Walmart's own. Walmart took the Zest Fresh Shelf Life Model Overview

---

[35] Tr. 2061:21-2063:21, 2064:14-16; 2073:17-2074:19 (Bohling).
[36] Tr. 2068:20-2069:3 ("Q. How did you determine that what you just read could occur? A. Intuition."); Tr. 2030:16-24 ("This is very much just us taking a stab in the dark basically...").
[37] PTX-250.

from PTX-264, removed Zest's name, logo, and confidentiality stamp, and replaced them with Walmart's name, logo, and confidentiality stamp.[38] Walmart then inserted this doctored slide into an internal presentation entitled "Cold Chain: Compliance, End of Life Measurement Using IOT."[39] Mr. Mehring testified that this doctored page included "all of the key points of where we collect data and how we process that to produce the shelf life model" and it was "***a very important part of the Zest Fresh process trade secret***."[40]

Beyond this blatantly malicious conduct, Walmart systematically distributed Zest's confidential information throughout its organization, including to Mr. Bohling, without regard for its express obligation not to do so under the 2015 NDA. For example, the jury heard about Walmart employee Nikhil Cherian's receipt and distribution of Zest's information. In June 2017, Mr. Cherian visited Zest's offices and growers, receiving "extremely detailed information about how the process worked."[41] Mr. Cherian then forwarded Zest's presentation to unauthorized Walmart personnel, including Josh Bohling, stating: "I recommend you connect with Josh (copied here) who is the product manager/designer for Eden which is our Quality control execution application and will be one of the key integration points for the freshness algorithm."[42] Mr. Mehring had no idea who these individuals were, and Zest never authorized the sharing of Zest's information with them.[43] He had no idea Walmart was developing a competing product.[44] Walmart took Zest's information and intentionally used it in excess of permission to develop a

---

[38] Tr. 1151:19-1154:12 (Mehring); PTX-264; PTX-762.
[39] *Id*.
[40] Tr. 1153:7-11, 1153:15-18 (Mehring).
[41] Video deposition of Cherian played during trial at Tr. 717:10; PTX-161; 143:23-144:10; 146:2-8 ("how it worked, how the data would go back to Walmart, where the sensors are placed physically"); .
[42] PTX-168.
[43] Tr. 1142:22-1143:16 (Mehring).
[44] Tr. 1144:10-1145:3 (Mehring).

competing technology to benefit Walmart and harm Zest.

### 4.    Walmart's Intentional Abandonment of the Bohling Application and False Narrative Regarding USPTO's Findings

After it revealed Zest's trade secret to the world by pursuing the patent process, and after its defeat in the first trial, Walmart acted to extinguish the Bohling Application that the first jury found contained Zest's trade secret. In so doing, Walmart destroyed any potential value for Zest once Zest won at the first trial. This crystalized and finalized the harm done to Zest: not only did Walmart reveal Zest's trade secret but, after being caught, destroyed the potential residual value in the patent. The second jury heard evidence that, not only did Walmart steal and destroy Zest's trade secret through the publication of the Bohling Application, but Walmart intentionally abandoned the Application by not responding to a Patent Office action.[45] The second jury, *unlike the first since the events had not yet happened*, heard that Walmart could have responded to the Patent Office action but simply chose not to.[46] Both Mr. Mehring and Mr. Stoll testified that it is commonplace for patent applications to be rejected multiple times but then go on to be allowed after further "back-and-forth" communications with the examiner.[47] But Walmart chose to walk away.

Walmart, which remained in control of the then in-progress Bohling Application, intentionally chose not to respond to the Patent Office, despite seeing at trial all that Zest had been through relating to the technology Walmart had disclosed — including seven years and thousands of hours developing its technology,[48] investing $140 million in the technology,[49] three

---

[45] Tr. 1695:2-12 (Stoll); PTX-2347.
[46] Tr. 1695:2-12 (Stoll).
[47] Tr. 1183:25-1185:15 (Mehring); 1674:8-12 (Stoll).
[48] Tr. 1078:25-1079:9 (Mehring).
[49] Tr. 1220:5-6 (Mehring).

years of pilots and presentations with Walmart,[50] being terminated by Walmart only to see the Walmart blog post a few months later,[51] and the publication of Zest's trade secret in Walmart's patent application.[52] Rather, Walmart just moved on as though nothing had happened, leaving Zest with no way to make a profit from its own invention, nor any opportunity to assign the patent.

To add further insult to injury, in closing argument Walmart repeatedly mischaracterized the Bohling Application's rejection as being due to a conclusive determination by the Patent Office that nothing in the application was novel, construing that as a finding by a neutral arbiter that Zest had no trade secret.[53] But the jury saw that the Notice of Abandonment plainly states that the Bohling Application was abandoned due to Walmart's "failure to timely file a proper reply to the Office letter mailed on 27 April 2021."[54] Thus, the jury was aware that Walmart had attempted to mislead them by mischaracterizing the reason and import of the Patent Office's rejection of the patent.

Further, Walmart, for the first time at the second trial, disavowed responsibility for the publication of the Bohling Application, explicitly arguing to the second jury that it was Zest's responsibility to stop publication of a patent that Walmart had prepared, drafted, and filed, lest

---

[50] Tr. 1088:21-1089:6 (Mehring).
[51] Tr. 1090:1-1091:12; 1190:24-1192:4 (Mehring).
[52] Tr. 1078:8-24 (Mehring).
[53] *See, e.g.*, Tr. 107:10-13 (PTO has "no interest in this case… [t]hey just examine patents … and they said Claim 1 is rejected"); 107:25-108:7 (describing PTO as a "neutral, government party" that found "nothing new" and deemed the information "readily ascertainable"); 109:6-13 (conflating patent novelty with trade secret standards); 121:7-9 ("patent office … said … [t]here is nothing new here"); 1472:11-13 (cross-exam: WIPO, "this neutral body," found "Claim 1 lacks novelty"); 1476:2-4 (cross-exam: PTO rejection was "a good judgment"); 1477:3-4 (cross-exam: "two different neutral bodies … said there is nothing new"); 1482:8-9 (cross-exam: PTO "determined there is nothing new"); 2483:4-6 ("We filed the patent application. The patent office said nothing new. That was the end of the story.").
[54] PTX-2347.

Zest not have taken reasonable steps to protect its trade secret.[55] But the jury heard that Walmart had the power to prevent publication of the application by filing a notice of abandonment or withdrawal.[56] In fact, Walmart's own expert admitted that *only Walmart could have filed an express abandonment*.[57] But Walmart chose not to do so. Patent expert Robert Stoll testified that in over 100 patent cases, he had never heard a party argue that someone other than the patent owner was responsible for the publication.[58] Yet Walmart tried to blame Zest — the victim — for the publication. Walmart had the power to prevent the publication but intentionally chose not to. Thus, Walmart's new defense at the second trial, relating to the publication of the patent, emphasized Walmart's reprehensibility to the second jury in a way that was not before the first jury. These facts, alone, more than support the jury's finding that Walmart's failure to stop publication was malicious and reprehensible.

In sum, the jury's finding that Walmart "intended to cause Zest Labs injury" is amply supported by (i) Walmart employees' repeated statements about jerking Zest around and then getting rid of Zest, (ii) the doctoring of documents to remove Zest's identity, (iii) the false inventorship declaration, (iv) the mischaracterizing of its abandonment of the Bohling Application, and (v) blaming the victim for what Walmart itself had caused.

## V. WALMART'S MERITLESS "EQUITABLE FACTORS" DO NOT JUSTIFY EXONERATING IT FROM EXEMPLARY DAMAGES

Walmart argues that, despite the extreme reprehensibility of its "willful and malicious" conduct, it should get a pass on exemplary damages because of several purported "equitable factors." As explained below, this argument is meritless and its "equitable factors" certainly do

---

[55] Tr. 2536:13-17.
[56] Tr. 1667:5-1668:22; 1677:5-19; 1692:12-1693:12 (Stoll).
[57] Tr. 2319:9-20 (Robert Bahr).
[58] Tr. 1669:3-9.

not justify exonerating Walmart from exemplary damages.

## A.    Walmart's "High Compensatory Award" Argument Is Meritless

As a threshold matter, it is irrelevant whether the compensatory award is labeled "high," "low," or anything in between. It simply reflects the jury's assessment of the ***actual harm*** that Walmart caused Zest. Further, the compensatory award serves an entirely different purpose than exemplary damages. Compensatory damages serve to make Zest whole for the harm Walmart caused; exemplary damages serve to punish Walmart and deter it from harming others. For a company with $19.4 billion in *profits* for its last fiscal year, the maximum statutory award represents ***less than three days of profit***. Allowing Walmart to get away with paying only compensatory damages for willful and malicious conduct creates a perverse incentive: steal rather than deal. If the worst consequence for intentional misappropriation is paying what Walmart should have paid anyway, then theft would become a rational business strategy.

## B.    Walmart's "Full Compensatory Award" Argument Is Meritless

That the jury awarded Zest's requested damages confirms the severity of the harm and the reasonableness and credibility of Zest's position on damages, not that additional deterrence is unnecessary. The jury heard evidence that Zest invested $140 million developing the stolen technology alone.[59] The fact that the award was less than the investment into the destroyed technology evinces the limited nature of the recovery here. Further, as noted above, full compensation for past harm does not deter future wrongdoing. Finally, as Walmart is well aware, Zest intended to seek other, greater damages, but was not permitted to do so at trial.

## C.    Walmart's "Duration of the Misappropriation" Argument Is Meritless

Far from brief, Walmart's conduct spanned half a decade (2016-2021). The "string

---

[59] Tr. 1220:5-6 (Mehring).

along" began in 2016, the theft crystallized with the 2017 patent filing, the publication occurred in 2019, and Walmart abandoned the application post-trial in 2021 to destroy residual value. Thus, Walmart's attempt to characterize its misconduct as being of a very limited duration is simply false. And while a single act can justify exemplary damages, here there was a systematic course of misconduct spanning more than half a decade, making this an especially compelling case for exemplary damages.

**D.    Walmart's "Litigation Conduct" Argument Is Meritless**

Walmart's litigation conduct amplifies rather than lessens the need for exemplary damages. Most prominently, Walmart filed the non-provisional application after the complaint in this case was filed, and after receiving a motion for a preliminary injunction. Then, after losing the first trial, Walmart abandoned the patent application to later argue that the technology was "nothing new," and blamed Zest in front of the second jury for not stopping publication of Walmart's own patent application. This litigation misconduct only exacerbated Walmart's pattern of deception and abuse.

**E.    Walmart's "It Did Not Conceal Its Misconduct" Argument Is Meritless**

Walmart's supposed "transparency" consisted of surreptitiously stringing along Zest only to get rid of it, doctoring Zest's documents to remove Zest's identity, filing a perjurious inventorship declaration, and pursuing publication after three explicit warnings. That Walmart produced documents in discovery (as legally required) six months after secretly filing the documents hardly excuses willful and malicious misappropriation. Further, the jury heard evidence and argument regarding when Walmart produced the Bohling Application, and when Zest's attorneys became aware of it and its contents and still found that Walmart acted willfully

and maliciously.[60]

## F.    Walmart's "Unknown Trade Secret" Argument Is Meritless

The jury rejected this argument. Walmart knew it was using Zest's Confidential

Information without permission after receiving a cease-and-desist letter, the complaint in this

action, and a preliminary injunction motion. Willfulness requires only knowledge that the

information was confidential and belonged to another. (*See* Section IV.A above).

## G.    Walmart's "Remedial Measures" Argument Is Meritless

Walmart identifies no true remedial measures. To the contrary, it never returned Zest's

information, never apologized, and pursued publication even after being sued. Offering to pay

$1.5 million for consultant costs while stealing $140 million in technology is not remediation.

## H.    Walmart's "Close Case" Argument Is Meritless

The Court's granting of a new trial based on Zest's former counsel's representation says

nothing about the merits of the prior trial nor the case presented to the second jury. Two separate

juries found willful and malicious misappropriation and, despite being instructed that they were

"not required" to award ***any*** exemplary damages but they did so.[61] The second jury, in awarding

greater exemplary damages, heard a significant amount of additional evidence of Walmart's

reprehensible conduct that the first jury did not hear, including abandoning the patent to claim

that the PTO had determined that Zest's trade secret was not a trade secret and was worthless.

The second jury, unlike the first, was also presented with Walmart's reprehensible blame-the-

victim defense. It concluded that exemplary damages "absolutely" were warranted.[62]

---

[60] Tr. 123:2-19 (Walmart Opening); 1702:11-22 (Stoll).
[61] (Dkt. 798, Jury Instruction No. 15, at 17).
[62] Tr. 2571:5-6.

## VI.    THE COURT SHOULD AWARD EXEMPLARY DAMAGES F $145.4 MILLION, CONSISTENT WITH THE JURY'S FINDINGS S PERMITTED UNDER DTSA

After hearing two weeks of evidence, the jury found, by clear and convincing evidence, that Walmart willfully and maliciously misappropriated Zest's trade secret. The jury was also instructed that it need not award ***any*** exemplary damages, unless justified by the evidence.[63] The jury found exemplary damages were justified by the evidence and awarded $150 million in exemplary damages against Walmart, which is slightly more than the $145.4 million maximum award permitted under DTSA's 2:1 cap.

Zest respectfully submits that, to achieve the deterrent purpose of exemplary damages here, the Court should adopt the jury's award of exemplary damages capped at twice the compensatory award, or $145.4 million. This is based on the following considerations: (a) this Court is free to defer to the jury's verdict, but not free to reject it without a proper basis; (b) the ***reprehensibility*** of Walmart's "willful and malicious" misappropriation strongly supports a 2:1 award; (c) achieving a sufficient ***deterrent effect*** in light of Walmart's enormous wealth strongly supports a 2:1 award, which amounts to ***less than 1%*** of Walmart's annual ***profit*** in its most recent year, and ***less than three days of profit***; and (d) due process is easily satisfied by a 2:1 award.

### A.    Contrary to Walmart's Assertion, This Court Is Free to Defer to the Jury's Award of Exemplary Damages

As a threshold matter, Walmart asserts that "[t]he jury's advisory verdict receives *no deference*." (Walmart's Brief, p. 2, emphasis added). It cites no authority for this assertion other than that under DTSA, "the court" assesses the amount of exemplary damages. 18 U.S.C. § 1836(b)(3)(C). But nowhere does DTSA say or any court hold that the Court can disregard the

---

[63] Instruction No. 15, Dkt. 798, p. 17.

jury's determination, giving it no deference, as Walmart invites the Court to do. To the contrary, "[w]here the question of ***willful and malicious misappropriation has already been decided by the jury***, some courts have cautioned that a district court's discretion over exemplary damages is limited. In such circumstances, a court may refuse to enhance damages ***<u>only if it can do so without second guessing the jury or contradicting its findings</u>***." *John Bean*, 2023 WL 6164322, at *3 (emphasis added).

In addition, although Walmart admits that the Court asked the jury to render an advisory verdict on "what if any exemplary damages to award" (Walmart's Brief, p. 2, citing the transcript from the April 24, 2025 Pretrial Conference), Walmart offers no authority or explanation for why the Court, having asked the jury to advise on the amount of exemplary damages, should give the jury's recommendation "no deference."[64]

## B.    The Five Reprehensibility Factors Strongly Support the Maximum DTSA Award

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003), citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). "In assessing reprehensibility, we consider (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially

---

[64] Walmart's reliance (Brief, p. 2) on *Harris v. Sec'y, U.S. Dep't of the Army*, 119 F.3d 1313 (8th Cir. 1997), a Title VII case, is misplaced. *Harris* stated that "[w]hen a district court submits a claim to an advisory jury, the court is free to accept or reject the jury's advisory verdict in making its own findings." *Id*. at 1320. In the instant case, no "claim" was submitted to an advisory jury. The jury's verdict as to Walmart's liability on Zest's misappropriation claim was not advisory. Likewise, the jury's finding, by clear and convincing evidence, that Walmart's misappropriation was willful and malicious, was not merely advisory. Only the jury's determination of the *amount* of exemplary damages was advisory. This Court fixes the actual amount, but the jury's willful-and-malicious finding is entitled to extreme deference. (*See* Section II.C above).

vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1061 (8th Cir. 2014), citing *State Farm,* 538 U.S. at 419. As shown below, all five of these factors demonstrate that Walmart's misconduct exhibited extreme reprehensibility.

### 1.    Walmart's Misconduct Evinced Indifference or Reckless Disregard

Walmart's conduct demonstrates shocking indifference to Zest's rights. In finding that Walmart acted ***willfully***, the jury necessarily found that Walmart acted with "***knowledge of [the] probable consequences" of its conduct***. In finding that Walmart acted ***maliciously***, the jury necessarily found that Walmart "***intended" to injure Zest***. Intent to injure is an even higher level of culpability than "indifference" or "reckless disregard," thus constituting the highest level of reprehensibility. The evidence on which the jury relied included, among a plethora of other evidence, that Walmart filed the Bohling Application after being explicitly warned not to do so ***three*** times and then took no steps to stop publication after filing it. The evidence also included Walmart employee Josh Bohling declaring under penalty of perjury that the Bohling Application contained inventions by Walmart: "I believe that I am the original inventor or original joint inventor of a claimed invention in the application."[65] The jury necessarily found Bohling's declaration was false, as it found that it was ***Zest's*** trade secret. This malicious — potentially criminal — conduct was properly attributable to Walmart as his employer, as the jury was instructed.[66]

This pattern of intentional harm, with knowledge of its consequences, deception, and disregard for the truth mirrors the type of conduct courts have found most reprehensible. *E.g.,*

---

[65] PTX-250.
[66] (Dkt. 798, Jury Instruction 7, at 9).

*Hallmark Cards*, 758 F.3d at 1060 ("This massive cover-up demonstrates, at the very least, that Clipper acted in reckless disregard of the rights of Hallmark.").

### 2.    Zest Was Financially Vulnerable, Especially in Comparison to Walmart

As noted, Walmart destroyed Zest's business model by stealing and publishing the very technology that formed the foundation of Zest's software-as-a-service business. Walmart exploited a profound power imbalance to victimize Zest. As a small technology company, Zest invested years and substantial resources pursuing a partnership with the world's largest retailer, spending significant money "trying to show Walmart that their technology worked really well."[67] Indeed, Zest devoted nearly all its "limited resources" into developing its relationship with Walmart "instead of spreading [its] resources out" because Zest "figured that [by] working with Walmart we would have a much bigger impact on the environment, on food waste, on their bottom line, on our bottom line."[68] The jury found Walmart intended to cause Zest injury while Zest was relying on Walmart for its future — that makes Walmart's conduct particularly reprehensible.

Further, Walmart leveraged its power over a much more vulnerable business partner like Zest to take what it wanted without paying for it, knowing that Zest had limited resources to fight back. One internal email noted: "Some inside Walmart have said, 'We don't want Zest folks to get rich.'"[69] Walmart knew Zest's vulnerability, as it knew Zest's entire business model depended on maintaining its trade secrets to provide its software-as-a-service. Dr. Becker, a damages expert, explained to the jury that Walmart's theft destroyed Zest's ability to "pursue its

---

[67] Tr. 1459:25-1460:6 (Foran).
[68] Tr. 201:19-202:5 (Richards). *See also* Tr. 203:7-12 (Richards) ("Q Why did Zest agree to do another round of testing? A Well, we had already come this far, so it's like, you know, it -- we kind of didn't have a choice.").
[69] PTX-340.

business plan."[70] Further, Mr. Mehring explained that Walmart's termination of the relationship "led to shutting down Zest" and "[e]veryone lost their jobs."[71]

If Zest had not had the fortitude to take on a juggernaut like Walmart over seven grueling years, Walmart would have gotten away with causing catastrophic economic harm merely to add to its already enormous profits. Walmart's exploitation of a vulnerable business partner parallels cases in which courts have found maximum damages to be appropriate. *E.g.*, *Patriot Rail Corp. v. Sierra R. Co.,* 2014 WL 5426446, at *4 (E.D. Cal. Oct. 23, 2014*), (*financial vulnerability of the target supports exemplary damages).

Indeed, while maliciously exploiting a small innovative startup business partner like Zest, Walmart continues to publicly and hypocritically tout its support for American small businesses. For example, perhaps seeking to lure in more trade secret victims, Walmart markets itself to the world as a company that invests billions of dollars in other businesses. The judgment in this case should be sufficient to deter Walmart from using its billions to do to others what it did to Zest, and, instead, fulfill its promise to support small businesses in America and treat them fairly in accordance with the law. (https://corporate.walmart.com/suppliers/investing-in-american-jobs, last accessed on July 15, 2025). Additional examples of statements by Walmart continuing to publicly tout its support for small businesses appear in Appendix B. It is hard to overstate the reprehensibility of purporting to support its small business partners while surreptitiously preying on their vulnerability. As evidenced by other large verdicts against Walmart,[72] which have yet to

---

[70] Tr. 1908:17-1909:12 (Becker).
[71] Tr. 1119:25-1120:6 (Mehring).
[72] *Walmart, Inc. v. Cuker Interactive, Inc.,* 2018 WL 159796 (W.D. Ark. Mar. 31, 2018) *aff'd* 949 F.3d. 1101 (8th Cir. 2020); *London Luxury, LLC v. Walmart, Inc.,* 2025 WL 967114 Case No. (Mar. 31, 2025); *K7 Design Group, Inc. v. Walmart, Inc.,* 2025 WL 1910554 (8th Cir. Jul. 11, 2025).

deter Walmart, it is going to take a lot for Walmart to get the message. Here, the maximum

exemplary award is needed. Doing so is the only way to send the message to Walmart that

victimizing startups and small business is not tolerated, and those startups and small businesses

will both be warned against and protected from serious violations of commercial ethics.

### 3.    Walmart's Misconduct Involved Repeated Actions and Was Not an Isolated Incident

Far from being "a one-time act" as Walmart contends (Walmart's Brief, p. 15), Walmart

engaged in a systematic course of conduct spanning nearly a decade (2016-2025) that resulted in

the disclosure and publication of Zest's trade secret.

### a.    The String-Along Scheme (2016-2017)

Kelly Boyle repeatedly told colleagues Walmart would "get as much information as we

can and then get rid of them."[73] Both CEO Greg Foran and Boyle later admitted to "jerking

[Zest] around" and "stringing along" Zest for three years.[74]

### b.    Information Gathering and Doctoring Documents (2016-2018)

Throughout the relationship, Walmart gathered detailed information about Zest's trade

secret and distributed it internally to unauthorized personnel, including Josh Bohling.[75] Walmart

even doctored Zest documents, erasing Zest's identity and claiming them as Walmart property.[76]

### c.    Patent Preparation, Drafting, Filing, and Publication (2017-2019)

At least as of January 2017, Walmart must have started using Zest's Confidential

Information to begin preparing and drafting its patent application, unbeknownst to Zest.[77]

Walmart filed the Bohling Application the day after terminating Zest (November 10, 2017),

---

[73] Tr. 194:15-16 (Richards).
[74] Tr. 1458:16-24 (Foran); PTX-336; 477:22-478:18 (Boyle); PTX-97.
[75] Cherian depo. 143:23-144:10; PTX-168.
[76] Tr. 1151:19-1154:12 (Mehring); PTX-264; PTX-762.
[77] Tr. 1085:10-22 (Mehring); 1778:9-18 (Lanning); 1892:9-18 (Becker).

knowing it was unauthorized to use any Zest information after the Zest project was concluded.[78]

Then, it filed the non-provisional application after being sued, putting publication into motion

and failing to stop it. (*See* Sections IV.A, B above).

### d.    Post-First-Trial Conduct and Lack of Remorse (2018-2025)

Walmart's post-2018 conduct, which was not before the first jury and helps explain the

larger second-trial verdict, further demonstrates Walmart's reprehensibility. After gleaning

Zest's technology during three years of pilots and presentations, Walmart poured that know-how

into the Bohling patent application, thereby causing Zest's trade secret to be published. While in

the course of a patent prosecution there are routinely correspondences between the Patent Office

and the applicant, including office actions indicating initial issues with or rejections of a patent.

Here, after the Patent Office issued an April 27, 2021 office action, Walmart intentionally let the

deadline pass without a response, thereby abandoning the application and ensuring the  demise of

Zest's technology.[79]

Walmart then weaponized its own inaction, telling the jury that the "neutral" Patent

Office had decided the invention was "nothing new."[80] Walmart further argued to the jury that

the Patent Office's rejection was a decision on the merits that Zest's trade secret had no value

and did not constitute a trade secret, falsely claiming a ***neutral arbiter*** had already made that

decision.[81] But the Patent Office's Notice of Abandonment makes clear that the case was closed,

not because Zest's trade secret had no value, was not new, or was not a trade secret, but rather

because of Walmart's "failure to timely file a proper reply."[82] Indeed, internal Walmart

---

[78] Tr. 1189:7-11 (Mehring).
[79] Tr. 1183:25-1185:15 (Mehring), 1695:2-12 (Stoll); PTX-2347.
[80] Tr. 108:1-7 (Walmart Opening); Tr. 2483:4-6 (Walmart Closing).
[81] Tr. 107:10-13; Dkt. 778.
[82] PTX-2347.

correspondence showed that it had, in fact, argued that the claims were novel before strategically reversing course.[83] Walmart's calculated scheme — stealing, filing, setting publication in motion, and then pivoting to abandoning it after a jury caught Walmart — deprived Zest of any ability to profit from or assign its own invention, and epitomizes Walmart's "shocking" disregard for Zest's rights. In short, the second jury was presented with substantially more evidence demonstrating Walmart's willfulness and malice — and therefore reprehensibility — than the first jury.

Walmart's multi-year scheme echoes the repeated conduct courts have found warranted maximum exemplary damages. *E.g., Motorola Solutions*, 108 F.4th at 500 (defendant used plaintiff's trade secrets to launch a new product line and then sold it worldwide); *Patriot Rail Corp. v. Sierra R. Co.*, 2014 WL 5426446, at *5 (E.D. Cal. 2014) (party continuously breached the NDA and misled the owner of the trade secret).

### 4. The Harm Inflicted by Walmart on Zest Resulted from Malice, Trickery, or Deceit, and Was Not a Mere Accident

This factor — alone — can justify an exemplary damage award. *E.g., Hallmark Cards*, 758 F.3d at 1061, citing *Trickey v. Kaman Indus. Tech. Corp.*, 705 F.3d 788, 803 (8th Cir. 2013) (evidence of this factor "by itself can support a punitive damages award, as long as that award remains proportionate to the reprehensibility of the defendant's conduct.").

Here, Walmart's misconduct was no "mere accident." The jury found by clear and convincing evidence that Walmart's misappropriation was ***willful*** and ***malicious***, including that Walmart "acted with actual or constructive knowledge of its probable consequences" and "***intended***" to injure Zest. In addition to the evidence cited in subsections 2 and 3 directly above, the following evidence further demonstrated Walmart's reprehensible conduct toward Zest:

---

[83] DTX-642.0087-88; Tr. 2211:16-2213:21 (Hutt).

- Kelly Boyle's repeated statements about extracting information from Zest before getting rid of Zest.[84]

- Walmart's deliberate erasure of Zest's identity from confidential documents, replacing Zest's name and confidentiality stamps with Walmart's own.[85] These documents were circulated within Walmart, causing Walmart employees to use Zest's information without even realizing they were using Zest's information.

- Walmart's filing of patent documents under penalty of perjury claiming that its employees invented the technology, when they had actually stolen it from Zest. The complete absence of inventor documentation and Bohling's admission that it was "a stab in the dark" expose this deception.[86]

- Walmart' secret plan to steal Zest's technology. Using a secret competitive team, Walmart worked on developing Walmart's competing technology and preparing and drafting a patent application which Walmart filed the day after it terminated Zest.[87]

- Walmart's pursuit of the publication of Zest's trade secret after being sued and explicitly warned to stop.

### 5. While Zest Did Not Suffer Physical Harm, It Suffered Extreme Economic Harm

Walmart's misconduct caused extreme economic — and emotional — harm to Zest and its workers. While Walmart's misappropriation did not cause physical harm, this factor is typically not considered in trade secret cases. *Hallmark Cards*, 758 F.3d at 1065 ("Clipper's actions did not endanger anyone's physical health or safety, and Hallmark is not financially vulnerable ... but … the harm that befell Hallmark resulted from malice, trickery, and deceit."). Here, the economic harm to Zest was severe — Walmart destroyed Zest's business model by stealing and publishing the very technology that formed the foundation of Zest's software-as-a-service business. The jury's award of $72.7 million — roughly half of what Zest had invested in the technology — in compensatory damages reflects only a fraction of the magnitude of the harm Walmart inflicted.

---

[84] Tr. 194:15-16; 195:9-11; 204:9-14 (Richards).
[85] Tr. 1151:19-1154:12 (Mehring).
[86] Tr. 2030:16-24 (Bohling).
[87] PTX-340.

In sum, the five reprehensibility factors strongly support the maximum exemplary damages award under DTSA.

**C.**    **Deterrence Strongly Supports the Maximum 2:1 Exemplary Damages Award**

Because exemplary damages are intended to punish the wrongdoer and deter future wrongdoing, a wealthy wrongdoer should face a higher exemplary damages award than a less wealthy party. *E.g.*, *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462-63 (1993) (affirming a "certainly large" award of punitive damages where the jury was instructed "to take account of 'the wealth of the perpetrator' in recognition of the fact that effective deterrence of wrongful conduct 'may require a larger fine upon one of large means than it would upon one of ordinary means under the same or similar circumstances.'"); *Pulla v. Amoco Oil Co.*, 72 F.3d 648, n.16 (8th Cir. 1995) ("a defendant's wealth may be taken into account in order to ensure that an award will adequately deter any future such conduct,…") (citing *TXO,* 509 U.S. at 462-63); *State Farm*, 538 U.S. at 427-28, citing *Gore,* 517 U.S. at 585 (recognizing that a defendant's wealth, while not sufficient to justify an otherwise unconstitutional award, may be considered in setting the amount of punitive damages).

The exemplary award should also be sufficient to account for the fact that many wrongdoers are either not caught or prey on victims who lack the necessary money, time, and overall fortitude to litigate against a much more powerful adversary. "If a tortfeasor is 'caught' only half the time he commits torts, then when he is caught ***he should be punished twice as heavily in order to make up for the times he gets away***." *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (emphasis added). This notion applies with particular force to trade secret misappropriation, where detection can be very difficult and often depends on fortuitous circumstances.

Here, the amount of exemplary damages must be sufficient to actually deter Walmart and

other powerful companies from harming other small businesses and start-ups in the future. To say the least, Walmart's financial resources are extraordinary:

- For the fiscal years from 2017 to 2025, Walmart's **_revenues_** were approximately **5.1 Trillion**.

- For its most recent fiscal year (ending January 2025), its **_revenues_** were approximately **$681 Billion**.

- For the fiscal years from 2017 to 2025, its **_profits_** were approximately **$118.7 Billion**.

- For its most recent fiscal year (ending January 2025), its **_profits_** were approximately **$19.4 Billion**.[88]

Even focusing on just Walmart's **_profits_**, an award of $145.4 million in exemplary damages is **_less than 1%_** of Walmart's **_profit_** for its last fiscal year ($19.4 Billion); it represents **_less than three days of profit_**.

Further, Walmart got caught here, and Zest, the abused vendor, was willing to take on Walmart in a court of law. But Walmart will not always get caught when it misuses a vendor's confidential information, and many abused vendors, even if they catch Walmart, may not have the financial resources or fortitude to take on such a powerful behemoth with unlimited resources, which can litigate endlessly and aggressively. The exemplary award should be sufficiently high to ensure that Walmart, while it may know that it could get away with abusing at least some of its vendors, will be deterred from trying and will, instead, negotiate and act fairly with other vendors. *Mathias,* 347 F.3d at 677–78.

Is an award of $145.4 million in exemplary damages sufficient to fully deter a company

---

[88] *See* Appendix C and Zest's accompanying Request for Judicial Notice.

that had **_profits_** of $19.4 Billion in its last fiscal year? Likely not, but that is the maximum award available under DTSA. If nothing else, this is a compelling reason why the award should not be anything less than the maximum under DTSA. Indeed, it is hard to imagine that an award **_less than 1%_** of Walmart's annual **_profit_**, or **_less than three days of its profit_**, would have a sufficient deterrent effect on Walmart. Anything less than the maximum exemplary award under DTSA would create a perverse incentive for Walmart to steal rather than deal with its vendors. The maximum award is essential to send the strongest message possible to Walmart under the statutory scheme, thereby offering the greatest protection to future victims.

Another important consideration weighing in favor of the maximum award under DTSA is that the exemplary award here serves as a deterrent to **_other companies_** as well. If they see that Walmart received what amounts to a mere slap on the wrist considering its enormous financial resources, other companies — regardless of size but especially large companies like Walmart — could reasonably conclude that if they were to engage in willful and malicious conduct, they too would likely receive a mere slap on the wrist proportional to their financial resources. The result would be that at least some of these companies would view exploiting their vendors as a viable business strategy, just as Walmart did, because the financial consequences of getting caught are too small to deter future theft.

Finally, a higher exemplary award is warranted than that determined in the first trial, as the jury in the second trial heard additional evidence of Walmart's reprehensible conduct and awarded a higher amount of compensatory damages than in the first trial. For example, the second jury heard additional evidence that Walmart caused the Bohling patent application to be rejected by intentionally abandoning it, and then used that rejection to argue to the second jury — deceitfully — that the Patent Office's rejection of the application confirmed that there was no

trade secret.[89] In addition, Walmart argued to the second jury (and in its brief here) that Zest was responsible for stopping Walmart's misappropriation via publication of the Bohling Application, even though the patent never would have published but for Walmart filing the non-provisional patent application during the litigation after being put on express notice by Zest at least three times not to use Zest's Confidential Information in any way. Walmart's post-first-trial conduct showed Walmart's profound disregard for the Court's rulings and the prior jury's findings. Indeed, Walmart is still ignoring the jury's finding that Zest had *a trade secret* and that Walmart *misappropriated it*. This and other additional evidence of Walmart's reprehensible conduct are aggravating factors warranting a higher exemplary award.

**D.    Awarding Exemplary Damages of $145.4 Million Easily Satisfies the Three Due Process Guideposts**

Walmart argues that "the jury's advisory exemplary damages verdict is so disproportionate as to violate due process." (Walmart's Brief, pp. 1-2). But an award of $145.4 million easily satisfies the three-factor test for assessing whether an exemplary damages award comports with due process. Specifically, the U.S. Supreme Court identified three "guideposts" that should be considered in assessing whether an exemplary damages award violates due process: (1) the *reprehensibility* of the defendant's conduct; (2) the *ratio* of punitive damages to the actual harm inflicted on the plaintiff (i.e., the compensatory award); and (3) the comparability of exemplary damages and other civil or criminal penalties that could be imposed for comparable misconduct. *Gore,* 517 U.S. at 574-75. Here, under these three guideposts, an award of $145.4 million easily satisfies due process.

**1.    The Reprehensibility Guidepost**

Walmart's conduct was extremely reprehensible as detailed in Section VI.B above.

---

[89] *See* Dkt. 778, collecting where Walmart made this argument.

### 2. The Ratio of Exemplary Damages to Compensatory Damages Guidepost

An exemplary award must bear a reasonable relation to the compensatory award. If it does not, it may not comport with due process. For example, in *State Farm*, the U.S. Supreme Court overturned an exemplary damages award of $145 million that was 56 times larger than the $2.6 million compensatory award. 538 U.S. at 429. The *State Farm* Court noted that most exemplary damages award should not exceed a single digit multiplier of compensatory damages (i.e., a 9:1 ratio), though some cases may warrant a higher ratio. *Id*. at 425.

Here, there is no concern as to the ratio of exemplary damages to compensatory damages, as Congress, in enacting DTSA, capped exemplary awards at twice the compensatory award (i.e., a 2:1 ratio). And it did so for the precise misconduct found by the jury here: willful and malicious misappropriation of a trade secret. 18 U.S.C. § 1836(b)(3)(C). "The DTSA's two-to-one cap reflects Congress's specific determination about the proper scope of punitive damages for trade secret misappropriation…" *Motorola Solutions*, 108 F.4th at 495-96 (citation omitted). Courts should give substantial deference to Congress's judgment about appropriate sanctions under DTSA, and the existence of the statutory cap provides a presumption that an award within that range satisfies Due Process. *Id.* DTSA's 2:1 cap is well within the 9:1 ratio that the Supreme Court held should be the outer bounds in most cases.

Thus, in cases involving the ***misappropriation of trade secrets***, courts have frequently upheld ratios between exemplary and compensatory damages ranging from 1:1 to the maximum 2:1. *See, e.g., Motorola Solutions,* 108 F.4th at 495 (upholding a ratio of 2:1; $271.6 million exemplary award compared to a $135.8 million compensatory award); *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 544-45 (6th Cir. 2014) (upholding a ratio of 2:1); *PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156, 160 (3d Cir. 2022) (affirming maximum 2:1 ratio); *Insulet Corp. v. EOFlow Co.*, 2025 WL 1196055, at *8 (D. Mass. Apr. 24,

2025) (upholding 2:1 ratio after deduplication of permanent injunction). As noted above,

Walmart concedes, at a minimum, that exemplary damages equal to the compensatory award

(1:1 ratio) would satisfy "due process" scrutiny, even in cases "with large compensatory

damages." (Walmart's Brief, p. 20).

### 3.    The Comparability to Other Penalties Guidepost

This guidepost is easily satisfied, as the DTSA and the Uniform Trade Secrets Act

authorize exemplary damages of up to twice the amount of compensatory damages, and other

similar federal statutes authorize double or treble damages:

> In capping punitive damages at a ratio of two-to-one, the DTSA functions like
> a host of other federal statutes authorizing double or treble damages—
> especially for wrongdoing in commerce—***whose constitutionality is virtually
> beyond question***. *State Farm*, 538 U.S. at 425 ("[S]anctions of double, treble,
> or quadruple damages to deter and punish" have "a long legislative history,
> dating back over 700 years and going forward to today."); *Gore*, 517 U.S. at
> 580 & n.33 (noting centuries-long history of such legislation); *see, e.g.*, 15
> U.S.C. § 15(a) (mandating treble damages for antitrust violations); 18 U.S.C.
> § 1964(c) (mandating treble damages for racketeering violations); 35 U.S.C.
> § 284 (authorizing treble damages for patent infringement); and 15 U.S.C.
> § 1117(a) (authorizing treble damages for trademark infringement).

*Motorola Solutions*, 108 F.4th at 497.

Further, under the criminal statute for the theft of trade secrets, organizations "shall be

fined not more than the greater of $5,000,000 or 3 times the value of the stolen trade secret to the

[misappropriating] organization, including expenses for research and design and other costs of

reproducing the trade secret that the organization has thereby avoided." 18 U.S.C. § 1832. Here,

there was evidence in the record that Zest invested nearly $140 million into the development of

the misappropriated technology. Under such circumstances, Walmart could have been fined $420

million on the saved research and development costs alone, before considering the value to

Walmart of its own stated, anticipated avoided food waste costs. Thus, the award here pales by

comparison.

E.     **The Cases Cited by Walmart to Reduce the Exemplary Award Are Distinguishable and Do Not Justify a Lower Award**

The cases Walmart cites to reduce the exemplary award, are readily distinguishable, and do not warrant reducing the award below the 2:1 maximum authorized by DTSA. In *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, 2023 WL 8168854, at \*21 (C.D. Cal. Oct. 6, 2023), the court characterized the defendant's conduct as "not particularly reprehensible" and "***silly, not evil***" — a far cry from the systematic theft and deception the jury found here.

Similarly, *Harbor Compliance Corp. v. Firstbase.IO, Inc.*, 2025 WL 383804, at \*19 (E.D. Pa. Feb. 4, 2025) involved a defendant that "does not have significant wealth" and had filed for bankruptcy — hardly comparable to Walmart's $681 billion in annual revenue and $19.4 billion in annual profit. And in *Arnold's Off. Furniture, LLC v. Borden*, 2022 WL 3597239, at \*3 (E.D. Pa. Aug. 23, 2022), the court found the compensatory award already "sufficiently deters future misconduct," but, again, that defendant's resources paled in comparison to Walmart's.

Here, Walmart's wrongdoing is far more analogous to — and in key respects exceeds — the wrongdoing that justified the maximum 2:1 award in *Motorola Solutions*. Like the defendant in that case (Hytera), Walmart's conduct "falls squarely within the statutory prohibitions" (108 F.4th at 497-498) because it deliberately exploited Zest's technology after entering into a written NDA and ***three separate legal warnings*** (the cease-and-desist letter, the complaint in this action, and the motion for a preliminary injunction). Further, the jury found Walmart acted "willfully and maliciously," which exactly matches the *mens rea* threshold that *Motorola* held "easily satisfies *Gore*'s concern that conduct be reprehensible." *Id.* at 497 ("The DTSA also limits punitive damages to willful and malicious violations… This *mens rea* requirement … easily satisfies *Gore*'s concern that conduct be reprehensible.").

In sum, the most appropriate exemplary award is $145.4 million. This award reflects the reprehensibility of Walmart's conduct in preying on a vulnerable business partner, including its continued defiance in the face of escalating legal warnings to stop. This award will also provide the greatest deterrent effect possible, consistent with DTSA's 2:1 cap, without being excessive. Indeed, this award represents *less than 1%* of Walmart's profits for its last fiscal year, or **merely three days** of profits. Indeed, were it not for DTSA's cap, the appropriate award to serve the deterrent effect of exemplary damages would be orders of a higher magnitude, potentially up to the 9:1 ratio (which would amount to $654 million) that the U.S. Supreme Court has held may satisfy due process.

## VII.    WALMART'S RELIANCE ON THE MSA TO ATTEMPT TO DIVEST THE COURT OF ITS AUTHORITY TO IMPOSE EXEMPLARY DAMAGES FAILS

Walmart seeks to escape the consequences of the jury's verdict by invoking a provision in the Master Services Agreement ("MSA") that purports to bar an award of punitive damages. (Dkt. 810, at 17-19).[90] This parry fails for many reasons.

As an initial matter, the Court previously considered and rejected this exact same argument.[91] There is no reason — let alone one that would satisfy the strict requirements for a "motion for reconsideration" — why the Court should change its mind about the viability of this defense, especially now that a second jury has again found by clear and convincing evidence that Walmart's conduct was willful, malicious, and warrants punitive damages.

Even if the Court were inclined to reconsider Walmart's argument, it still fails for three independent reasons. First, Walmart has failed to establish that the MSA controls over the parties' NDA which does not exclude punitive damages. But even if Walmart had established

---

[90] DTX-181, § 14(A) [MSA]).
[91] Dkt. 462, at 3 [June 15, 2022 Order re Walmart's Motion for Judgment as a Matter of Law and Remittitur].

that the MSA is controlling, the limitation of damages provision explicitly exempts from that limitation Zest's assertion of any "rights or remedies" regarding its "Confidential Information" or Zest's "Intellectual Property," both of which clearly encompass the trade secret misappropriated by Walmart.[92] But even if Walmart were to contend that the "Confidential Information" and "Intellectual Property" exceptions are ambiguous (*i.e.*, even if Walmart were able to demonstrate that these exceptions are reasonably susceptible to a contrary interpretation), that ambiguity would have had to be presented to a jury to resolve after weighing witness credibility and other issues of fact related to the objective manifestation of the parties' intent after receiving proper instructions from the Court. But none of this occurred because Walmart failed to raise the defense in a timely and appropriate manner. And the Court cannot remedy the absence of necessary jury findings by assuming the role of factfinder and substituting its own judgment of the facts for that of a jury.

Second, Walmart waived this affirmative defense many times over, and Zest would be prejudiced if Walmart were permitted to escape an award of punitive damages through a post-trial motion without Zest having had fair notice of the defense, as well as the opportunity to conduct appropriate discovery, offer evidence and argument to the jury regarding the relevant provisions in the MSA, and have the jury properly instructed.

Third, as recently confirmed by Judge Timothy Brooks and the Eight Circuit in a case involving a similar provision in another of Walmart's boilerplate vendor agreements, the provision is unenforceable because Arkansas public policy prohibits a party from limiting its liability for willful misconduct.[93] And this is for good reason. Were that not the case, a party like

---

[92] MSA, §§ 14(B), 10(A), and 9(B).

[93] *Walmart Stores, Inc. v Cuker Interactive, LLC*, 2017 WL 11681850, at *4-5 (W.D. Ark. Apr.5,

Walmart, having forced its vendor to sign a take-it-or-leave-it contract, would be free to willfully and maliciously harm its vendor with impunity.

## A.    This Court Already Rejected Walmart's Argument that the MSA Bars Zest From Recovering Punitive Damages, and Walmart Fails to Demonstrate Why The Court Should Reconsider Its Prior Ruling

Although it does not say as much, Walmart's motion is asking this Court to reconsider its June 22, 2022 Order rejecting Walmart's argument that Section 14 of the MSA prohibits an award of punitive damages.[94] Walmart's effort fails because it does not even attempt to establish that it is entitled to this relief and, even if it were, it failed to seek such relief in a timely manner.

"The Federal Rules of Civil Procedure 'do not mention motions for reconsideration.'" *Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006) (quoting *Broadway v. Norris,* 193 F.3d 987, 989 (8th Cir. 1999)). A party may nonetheless ask a court to reconsider an order under specific and limited circumstances, including "mistake, inadvertence, surprise, or excusable neglect" or "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1) and (6).[95] The Eighth Circuit has recognized that Rule 60(b) "provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances." *United States v. Young,* 806 F.2d 805, 806 (8th Cir. 1986). A Rule 60(b) motion, however, "'is not a vehicle for simple reargument on the merits.'" *Doe v. Univ. of Arkansas - Fayetteville*, 2022 WL 1479958, at *1 (W.D. Ark. May 10, 2022) (quoting *Broadway v. Norris*, 193 F.3d at 990). And a motion under Rule 60(b) "must be made within a reasonable time—and for reasons (1) . . . no more than a year after entry of the [] order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1).

---

2017), *aff'd sub nom.*, *Walmart, Inc. v Cuker Interactive, Inc.*, 949 F.3d 1101, 1111 (8th Cir. 2020).

[94] Dkt. 462, at 3 [June 15, 2022 Order re Walmart's Motion for Judgment as a Matter of Law and Remittitur].

[95] The other grounds for relief under Rule 60(b) are not potentially applicable here.

Walmart's Brief does not offer **any** explanation whatsoever — let alone one that would qualify as a "mistake, inadvertence, surprise, or excusable neglect" or "any other reason" — that would satisfy the requisite "exceptional circumstances" justifying the "extraordinary relief" of asking the Court to reconsider its order denying Walmart's argument that punitive damages were precluded by the MSA.[96] Even if there were such a reason (there is not), Walmart's motion was made almost two years after the expiration of the one-year period applying to a Rule 60(b) motion based on "mistake, inadvertence, surprise, or excusable neglect" and certainly cannot qualify as being made within a "reasonable time" for purposes of a motion based "on any other reason that justifies relief." Fed. R. Civ. P. 60(c)(1).

**B.    The Limitation of Damages Provision Does Not Apply to Walmart's Theft of Zest's Trade Secret**

It is not surprising that Walmart never pled an affirmative defense based on the limitation of damages in Section 14(A), as Walmart well knows that the provision itself — in Section 14(B) — exempts Zest's trade secret claims. But even before getting to the Section 14(B) exemptions to the damages limitation, Walmart's argument fails for a threshold reason: It assumes, without any evidence, that the MSA controls over the parties' NDA which does not exclude punitive damages. Both of these points are addressed below.

**1.    Walmart Has Failed to Establish that the MSA Controls Over the Parties' NDA which Does Not Exclude Punitive Damages**

Walmart's entire argument hinges on its assumption that the MSA controls over the parties' NDA. But the NDA and MSA are in conflict as to the availability of punitive damages: Punitive damages **are** available to Zest under the NDA but **not**, according to Walmart, under the

---

[96] Dkt. 462, at 3 [June 15, 2022 Order re Walmart's Motion for Judgment as a Matter of Law and Remittitur].

MSA. To prove up its affirmative defense based on the damages limitation, it was incumbent on Walmart to prove, not assume, that the MSA controls over the NDA. Walmart failed in this regard. To the contrary, there are strong indications that the NDA controls over the MSA with regard to Zest's recovery here, including the following:

- Zest's trade secret is protected by the NDA, not the MSA. Zest does not rely on the MSA to protect its trade secret.

- The NDA is a focused agreement explicitly protecting Zest's Confidential Information. In terms of this protection, the NDA "represents the *entire agreement* between the Parties..." (NDA, section 11, emphasis added).

- By contrast, the MSA merely "sets forth the *general terms of the business relationship* between Walmart and [Zest]." (MSA, opening provision, emphasis added). And as explained in subsection 3, the MSA is merely an agreement to agree.

- The NDA was signed *before* the MSA, so Walmart was well aware of it when it gave the MSA to Zest to sign. But while the MSA states that it controls over the parties' Statement of Work (MSA, section 2(B)), it does not expressly state that it controls over the NDA. In fact, the MSA expressly exempts the damages limitation from applying to breaches of "confidentiality." In stark contrast, the NDA expressly states that *the NDA constitutes the parties' "entire agreement" as to the protection of "Confidential Information."* Thus, had this issue gone to the jury, as it would if Walmart had properly raised it, a reasonable inference the jury could have drawn is that the parties intended that the NDA would continue to occupy the field of confidentiality because otherwise the exception in the MSA would have been meaningless.

At the very least, it would have been for the jury to determine the factual issues underlying whether the MSA controls over the NDA, including evidence of the parties' intent and the credibility of witnesses. But Walmart's failure to properly and timely raise its affirmative defense deprived Zest of the ability to conduct discovery, present evidence and argument to the jury, have the jury properly instructed by this Court, and have the jury fulfill its duty of deciding the questions of fact underlying which agreement controls.

### 2. Section 14(B) of the MSA Expressly Exempts The Damages Limitation under Section 14(A) from Zest's Trade Secret Claim

Even if the jury had determined that the MSA controls over the NDA as to Zest's trade secret claims (which was not even possible given Walmart's failure to properly and timely raise

its affirmative defense), Section 14(B) of the MSA exempts the damages limitation from Zest's
trade secret claims.

Specifically, Section 14(B) provides that Section 14(A) "shall ***not limit*** (i) the specific
rights and remedies expressly provided in this Agreement, including Sections 8 and 10 … ."[97]
There are at least two applicable provisions in the MSA that fall within this exception to the
limitation of damages provision.

First, Section 10 [Confidentiality; Non-Disclosure; Restrictions on Use; Remedies]
broadly protects the parties' "Confidential Information"[98] and provides that:

> (A) Each Party (receiving Party) shall treat as confidential the
> other Party's (disclosing Party) Confidential Information and
> protect it from unauthorized access, use, or disclosure. The
> receiving Party shall not use or copy the disclosing Party's
> Confidential Information for any purpose other than the in
> furtherance of authorized purposes under this Agreement. Further,
> the receiving Party shall restrict disclosure of, and access to, the
> disclosing Party's Confidential Information solely to its personnel,
> agents or contractors who need to know such Confidential
> Information in furtherance of the Authorized Purposes under this
> Agreement, and only after the receiving Party advises such
> personnel, agents or as to, and they have acknowledged and agreed
> to comply with, the restrictions as to such Confidential Information
> under this Agreement as they apply to the receiving Party.[99]

Thus, Zest's rights with respect to the sanctity of its Confidential Information under this section
of the MSA (which includes the trade secrets Walmart misappropriated when it published the
Bohling patent application) are specifically excluded from the limitation of damages provision.

Second, Zest's rights to enforce Walmart's representations under Section 9(B)
[Ownership and Assignment of Intellectual Property] are also excluded from the MSA's

---

[97] MSA, § 14(B) (emphasis added).
[98] "Confidential Information" is defined as "any information, in any form or medium, that is
provided by a Party to the Other Party" and unquestionably includes Zest's trade secret that
Walmart misappropriated. (MSA, at p. 2(C)).
[99] MSA, § 10(A).

limitations of damages provision:

> (B)  Notwithstanding the foregoing, Walmart shall have no rights to or interests in Service Providers [Zest's] Intellectual Property. "Service Provider's Intellectual Property" shall consist of proprietary information of Service Provider, including, without limitation, any materials, trademarks, methods, inventions, information, reports, practices, procedures, equipment, ideas. documentation, business plans, databases, software, or processes licensed to or developed or used by Service Provider for its general business and not developed specifically as part of the Services.[100]

Section 10(A) and Section 9(B) assured Zest's rights to its confidential information (including its trade secret) and that Walmart would not claim ownership of or engage in any unauthorized use or disclosure of that confidential information and trade secret. Section 14(B) expressly exempts these rights, and Zest's right to enforce these promises and representations against Walmart from the limitation of damages provision in Section 14(A).

At trial, the jury heard abundant evidence that Walmart deliberately filed the Bohling Application with the Patent Office, falsely claiming Walmart was the owner of Zest's trade secret, directly contrary to Zest's rights under Sections 10(A) and 9(B) of the MSA. As a result, the limitation of damages does not bar Zest's recovery of punitive damages for Walmart's willful and malicious misappropriation of Zest's confidential information, which the jury found to be a trade secret.

The above analysis is based on the unambiguous terms of Sections 9, 10 and 14 of the MSA. If, however, there is any question regarding how these provisions should be construed, it is resolved by the *contra proferentum* rule, which requires that any doubts as to the meaning of a contract are "construed strictly against the drafter." *C&C Int'l Trading Co. v. Buckhead Meat Co.*, 527 F. Supp. 3d 1016, 1028 (E.D. Ark. 2021); *accord Byme, Inc. v. Ivy*, 367 Ark. 451, 459,

---

[100] MSA, § 9(B).

241 S.W.3d 229, 236 (2006) (same). This rule applies with extra force here, as Walmart's MSA was a take-it-or-leave-it form contract. (*See* Section VIII.D.2 below).

In the alternative, even if Walmart disputes the plain language of Sections 9, 10, and 14 and is able to advance a reasonable counter-interpretation, the interpretation and application of these provisions would then have been ***questions of fact for the jury*** to resolve. "Language in a contract is ambiguous when there is doubt or uncertainty as to its meaning or it is fairly susceptible of two interpretations." *Dorchester Mins., L.P. v. Chesapeake Expl., LLC*, 215 F. Supp. 3d 756, 761 (E.D. Ark. 2015) (quoting *Denton v. Pennington*, 82 Ark. App. 179, 183, 119 S.W.3d 519, 521 (2003)). In such circumstances, "parol evidence is admissible and the meaning of ambiguous term becomes ***a question of fact for the factfinder***." *Dorchester Mins.*, 215 F. Supp. 3d at 761 (quoting *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992)) (emphasis added); *accord Advantage Prop. Mgmt. v. Burkhard*, 2024 Ark. App. 342, 690 S.W.3d 157, 165 (2024) ("When a contract is ambiguous as to the intent of the parties, and the meaning of the language depends on disputed extrinsic evidence, the issue is a question of fact for the jury.") (citation omitted).

But here, because Walmart failed to plead or pursue at trial an affirmative defense based on the limitation of damages provision, the jury was never presented with any evidence related to these provisions (including the parties' intent) or the circumstances surrounding the execution of the MSA, and was unable to assess the credibility of witnesses on these subjects. Indeed, ***no*** evidence or argument was presented to the jury regarding any of the provisions in the MSA. Nor was the jury provided with any instructions or directed to make findings relevant to the provisions.

And all of this did not happen because Walmart failed to raise the limitation of damages

provision as an affirmative defense in a proper and timely manner. Instead, Walmart is improperly raising the issue in a post-trial motion and asking the Court to assume the role of factfinder. The Court, however, "is not free to weigh the evidence or to pass on the credibility of the witnesses or to substitute its judgment of the facts for that of the jury." *Dewitt v. Smith*, 152 F.R.D. 162, 165 (W.D. Ark. 1993) (discussion regarding role of court in deciding post-trial motions). This would deprive Zest of its right to a have jury decide the meaning of the MSA (assuming Walmart were able to show that it is ambiguous) and whether its provisions bar Zest from recovering punitive damages.

**C.    Walmart Waived Its Limitation of Damages Defense, and Zest Would be Prejudiced if Walmart Were Permitted to Raise it Now**

Walmart's affirmative defense also fails because Walmart did not properly assert this defense in the first trial and cannot now resurrect it in the second trial, especially since Walmart raised the defense for the first time on the day the jury was instructed. (*See* Tr. at 1662-664 [April 8, 2021]). And even if Walmart was not prohibited from asserting this defense in the second trial, it waived any right to do so because it again failed to properly raise the defense during the proceedings leading up to the second trial.

**1.    Not Pleaded in Answer**

Walmart failed to assert the limitation of damages provision as an affirmative defense in its Answer (Dkt. 78) and is thus barred from raising it now. Federal Rule of Civil Procedure 8(c) requires a party to "affirmatively state any … affirmative defense." A provision limiting liability or damages is an affirmative defense. *See, e.g.*, *Zucker, Tr. of Anita G. Zucker Tr. Dated April 4, 2007 v. Bowl Am., Inc.*, 2022 WL 7050991, at \*3 (D. Md. Oct. 11, 2022) ("the exculpation provision is an affirmative defense"); *Shakeri v. ADT Sec. Services, Inc.*, 2016 WL 6565743, at \*3 (N.D. Tex. Nov. 4, 2016) (limitation of damages provision "is an affirmative defense on

which [defendant] will have the burden of proof at trial"); *Carroll Shelby Licensing, Inc. v. Wilhelm*, 2007 WL 9817861, at *4 (C.D. Cal. May 4, 2007) ("damages limitations provision of the agreement was an affirmative defense"). And absent extenuating circumstances (which are not present here), a failure to include an affirmative defense in an answer "results in its forfeiture and exclusion from the case." *Crutcher v. MultiPlan, Inc.*, 22 F.4th 756, 765 (8th Cir. 2022), citing *Wood v. Milyard*, 566 U.S. 463, 470 (2012); *accord First Union Nat. Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 622 (8th Cir. 2007) (same); *Capitol Records Inc. v. Thomas-Rasset*, 2009 WL 1664468, at *10 (D. Minn. Jun. 11, 2009) (affirmative defense waived because it was not raised until shortly before second trial).

The rule requiring a defendant to plead any defense as to which it has the burden of proof is grounded in basic fairness and to prevent surprise. *See Blonder–Tongue Lab'ys. v. Univ. of Illinois Found.,* 402 U.S. 313, 350 (1971) (The purpose of Rule 8(c) "is to give the opposing party notice of the plea of [the affirmative defense] and a chance to argue, if he can, why the imposition of [the affirmative defense] would be inappropriate."). This is why courts have not hesitated to find that a party has waived a limitation of damages defense when it has not been pled as an affirmative defense and the defense is raised late in the proceedings.

The decision in *Jacobsen v. Massachusetts Port Auth.*, 520 F.2d 810 (1st Cir. 1975) is instructive. The court affirmed a district court's refusal to permit the defendant to assert such a defense for the first time *after* the "close of evidence." In so holding, the court found the affirmative defense "presented issues of such complexity and fundamental importance to the conduct of the litigation that both plaintiff and the court could not, in fairness, be forced to forego the advance notice they were entitled to under Rule 8(c)." *Id.* at 813-14.

A similar rationale underpinned the district court's decision in *Carroll Shelby*. There,

much like here, the plaintiff and counter-defendant (Shelby) did not raise the contractual

limitation of damages provision as a defense until "[a]fter the jury's verdict on the liability phase

of the case, and minutes before opening statements on the damages phase were to begin." 2007

WL 9817861, at *3. Shelby sought to amend the judgment or, in the alternative, a new trial. In

holding that "Shelby waived the affirmative defense by failing to raise it until after the jury's

verdict on liability," the court concluded that:

> The fact that the issue was raised so belatedly is clearly prejudicial
> to Wilhem. He was unable to obtain a pretrial construction of the
> provision by the court, or to offer any parole evidence supporting
> an interpretation favorable to him. He was also unable to engage in
> any discovery on, or admit any evidence of, either procedural or
> substantive unconscionability.

*Id.* at *5. So too here.

Walmart's failure to properly and timely assert the limitation of damages provision as an

affirmative defense prejudiced Zest. Zest (and the Court) had no notice during discovery of what

plainly is an issue of "fundamental importance to the conduct of the litigation." Zest was unable

to pursue discovery regarding the limitation of damages provision, including, for example, the

circumstances leading up the MSA being signed, the parties' intent, and the parties'

understanding regarding the limitation of damages provision and the exceptions to such

provision.

Walmart attempts to sidestep this law and the underlying rationale, citing to *Tri-Lady

Marine, Ltd. v. Bishop,* 763 F. App'x 882 (11th Cir. 2019) as support for the proposition that a

party's failure to plead a limitation of damages provision as an affirmative defense may be

excused in some circumstances. Although this may be true in very limited situations, this is not

one of them, and the facts in *Tri-City* highlight why Walmart's assertion of its affirmative

defense came much too late. Unlike here, the defendant in *Tri-Lady* raised the defense in a

motion for summary judgment and the plaintiff had "'a chance to rebut it.'" *Id.* at 885. Moreover, although the plaintiff was "fully aware" the defendant was "relying on the limitation clause," the plaintiff did not "challenge the enforceability of the limitations clause" or "'assert any prejudice from the lateness of the pleading." *Id.* Here, unlike the plaintiff in *Tri-Lady*, Walmart did not raise the defense in any of its motions for summary judgment, and Zest is both contesting the enforceability of the provision as explained below and asserting prejudice as explained above.

Courts have also held that the viability of a limitation of damages provision is a fact-specific inquiry that must be decided by the **jury**. For example, in *ASi Indus. GMBH v. Elec. Materials, Inc.*, 2008 WL 413819 (E.D. Mo. Feb. 13, 2008), the court denied cross-motions for summary judgment based on a "limitation on damages provision" in the parties' contract because "[d]etermining the reasonableness of limitations on remedies requires distinctly case and fact specific inquiry" (citation omitted) and "whether the limitation in the terms and conditions was reasonable, and whether it materially altered the parties' agreement, is a question of fact to be resolved by the jury." *Id.* at *5; *see also Carrol Shelby*, 2007 WL 9817861, at *3.

Here, by not timely raising the affirmative defense, Zest was denied the opportunity to conduct relevant pretrial discovery and to challenge the defense at trial through evidence and argument. In fact, no evidence or argument regarding the limitation of damages provision was presented to the jury in either of the trials. Further, Walmart's failure to raise this issue prevented the Court from instructing the jury on the defense and prevented the jury from deciding the defense through special interrogatories. This is quintessential prejudice.

Moreover, Walmart altogether failed to meet its burden of proof on this affirmative defense and there is no amount of after-the-fact argument that can resuscitate this defense. To dismiss Zest's claim for punitive damages now, after a jury has again found that Walmart's

misappropriation was willful and malicious and further recommended imposing $150 million in punitive damages, would be the epitome of unfairness.

## 2.    Omitted at First Trial's Pretrial Conference

Even if the Court excused Walmart's failure to plead the limitation of damages provision as an affirmative defense, Walmart waived the defense by not raising it in the pretrial conference before the first trial. It is undisputed that Walmart did not mention the limitation of damages provision until the jury instruction conference, which occurred the day the jury was instructed, and that Zest objected because Walmart had not "pled this" and the conference was "the first time it's ever been discussed."[101] This is fatal to the defense. The Eight Circuit recently addressed the consequences of a party's failure to raise an argument during the final pretrial conference, finding that a "fail[ure] to raise its [limitation of liability] argument at any point during the final pretrial" results in a waiver of the argument. *Crabar/GBF, Inc. v. Wright*, 2025 WL 1740313, at *2-3 (8th Cir. June 24, 2025); *accord Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 831 (8th Cir. 2019) ("abandonment of the [statute of limitations] issue at the final pretrial conference and in the final pretrial order waived it"); *BLB Aviation S.C., LLC v. Jet Linx Aviation, LLC*, 748 F.3d 829, 839 n.5 (8th Cir. 2014) ("[D]efenses not included in the pretrial order are waived."); *Maritrans Operating Partners v. Diana T*, 1999 WL 144458, at *8 (E.D. La. Mar. 15, 1999) ("defense of limitation of liability" not included in pretrial order "was waived by defendants").[102]

This Court made clear that it expected the retrial to be "the same case with nothing more than" Walmart's new defense about reasonable measures, "and that's the only thing that's going

---

[101] *See* Tr. at 1662-664 [April 8, 2021].

[102] Walmart also did not raise its argument that the limitation of damages provision barred any recovery of punitive damages during the final pretrial conference before the second trial held on April 24. 2025.

to be different about the case."[103] Walmart never objected to the Court's statement, nor asked the Court for leave to add a new defense based on the MSA. Walmart's attempt to introduce a *new*, unpleaded affirmative defense and excise one of the jury's findings is contrary to that guidance. And it is prejudicial as explained above. If Walmart wanted to try this defense and could show that the MSA, which it drafted, was ambiguous, the jury would have needed to evaluate factual matters related to the purported affirmative defense (including whether the waiver provision is reasonable and what it means) and assesses the credibility of the witnesses who negotiated and signed that MSA. The jury did not have an opportunity to consider these matters or answer special interrogatories regarding these and other relevant issues. And the Court cannot now step into to do so and make them up after the fact, as Walmart suggests it can and should.

### 3.    Missing in First Trial's Rule 50(a) Motion

Walmart failed to preserve this defense in its Rule 50(a) motion at the first trial. Instead, Walmart waited until the penultimate day of the first trial to raise its contention that the limitation of damages provision barred Zest's claim for punitive damages.[104] Walmart's failure to raise this defense in its Rule 50(a) motion constitutes a separate and additional waiver of the affirmative defense. *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 901 (8th Cir. 2006); *see also Klingenberg*, 936 F.3d at 834 (a party "cannot use a Rule 50(b) motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict.").

### 4.    Ignored in Summary Judgment Motions

Walmart also failed to raise this defense in any of its motions for summary judgment — including its motion for summary judgment filed *after* the first trial in this case. Instead, Walmart

---

[103] Hearing Tr. at 14:9-13 [Nov. 14, 2024].
[104] *See* Trial Tr. at 1662-664 [April 8, 2021].

raised this issue for the first time in the second trial proceedings in a single, half-hearted paragraph in its opposition to Zest's motion in limine No. 2. (Dkt 719, at 1). If Walmart truly believed Zest's claim for punitive damages was barred, the proper vehicle and time for seeking such a ruling would have been in one of its several motions for summary judgment. *See* Fed. Prac. & Proc. Evid. (Wright & Miller) § 5037.18 (a motion in limine is not a "substitute for a motion for summary judgment or other peremptory ruling in civil cases"). It failed do so. And a party cannot use a motion in limine, let alone an opposition to a motion in limine, to attempt an end run around the Court's dispositive motions deadline. *Harrington v. City of Council Bluffs*, 902 F. Supp. 2d 1195, 1198 (S.D. Iowa 2012); *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 2019 WL 12529179, at *2 (S.D. Iowa May 29, 2019) (collecting cases).

For all of these reasons, Walmart waived its affirmative defense based on the MSA's purported limitation of damages.

**D.     The Limitation of Damages Provision Is Unenforceable**

Finally, even if the Court were to (i) reconsider its prior order, (ii) decide the limitation of damages provision applies notwithstanding the two clear exceptions in the MSA discussed above, (iii) hold Walmart had shown that the MSA was ambiguous, and (iv) then conclude Walmart had not waived its right to pursue this affirmative defense, the limitation of damages provision would be unenforceable here as a matter of Arkansas public policy and for other reasons.

**1.     The Limitation of Damages Provision is Unenforceable Under Arkansas Public Policy**

As an initial matter, Walmart's attempt to evade the legal consequences of its willful and malicious conduct is based on a misapprehension of the law in Arkansas and the holdings of the *Walmart v Cuker* case. Put simply, the damages exclusion is unenforceable and, therefore, does

***not*** — as a matter of law — bar Zest's recovery of punitive damages. Under longstanding Arkansas law, a contractual provision purporting to limit liability or bar recovering damages for any claims involving "intentional wrongdoing" or "willful misconduct." is against Arkansas public policy and unenforceable. *Robinson Ins. & Real Estate Inc. v. Sw. Bell Tel. Co.*, 366 F. Supp. 307, 311 (W.D. Ark. 1973) ("the contract limitation provision relied on by defendant cannot stand in the face of willful and wanton misconduct or gross negligence"); *accord Gurlen v. Henry Mgmt., Inc.*, 2010 Ark. App. 855 (2010) (lease provision limiting landlord's liability did not bar claims based on intentional wrongdoing, including conversion).

In an effort to circumvent Arkansas public policy, Walmart proffers a number of meritless arguments and theories. Walmart first contends there is a relevant analytical difference between a provision that purports to limit all or certain types of liability and one that purports to limit categories of damages. (Dkt. 810, at 18). Walmart is mistaken. This is because, as noted above, a party cannot limit either its ***liability*** or ***damages*** for ***intentional*** or ***willful*** acts under Arkansas law. *See, e.g., Robinson Ins.*, 366 F. Supp. at 311; *Gurlen*, 2010 Ark. App. 855.

Walmart next tries to recast Arkansas public policy based on a Missouri district court case, purportedly applying Arkansas law. (Dkt. 810, at 18 (citing *B&L Farms v Monsanto Co.*, 2022 WL 9285881, at *6-7 (E.D. Mo. Oct. 14, 2022).) The *B&L Farms* case relies, in turn, on another case as support for its decision dismissing a punitive damages claim. *B&L Farms*, 2022 WL 9285881, at *7 (citing *Peacock v Ciba-Geigy Corp.*, 1980 WL 98419 (E.D. Ark. Oct. 30. 1980).) The *Peacock* case, however, did ***not*** involve a claim for punitive damages. Rather, the question in *Peacock* was whether a provision prohibiting "consequential, special, or indirect damages" was enforceable so as to bar claim for consequential damages. *Peacock*, 1980 WL 98419, at *688. An award of punitive damages, unlike "consequential, special or indirect

damages," requires a finding by clear and convincing evidence that the defendant engaged in *willful and malicious* conduct. As such, the Missouri district court's opinion in *B&L Farms* is both unsupported and an incorrect application of Arkansas law.

Walmart then misconstrues the holdings in the *Walmart v. Cuker* cases, which actually debunks Walmart's argument entirely. There, Judge Brooks addressed the enforceability of a broad limitation of damages provision in another of Walmart's standard contracts to claims for trade secret misappropriation and unjust enrichment to the extent those claims were based on "***intentional wrongdoing***." *Walmart Stores, Inc. v Cuker Interactive, LLC*, 2017 WL 11681850 (W.D. Ark. Apr. 5, 2017), *aff'd sub nom., Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1110 (8th Cir. 2020) (emphasis added). Walmart filed a motion in limine seeking to limit evidence of Cuker's damages based on a provision in the party's consulting agreement that, among other things, limited any potential damage recovery to the total contract price. *Id.* at *1. Like the limitation of damages provision in the MSA here, the provision also purported to relieve Walmart of liability for any non-compensatory damages, including punitive damages. Judge Brooks denied Walmart's motion, holding that the provision would not bar recovering damages on a claim for trade secret misappropriation or unjust enrichment in excess of the damages cap ***if the jury found "that Walmart acted willfully*.**" *Id.* at *4-5 (emphasis added).

After losing at trial, Walmart renewed its argument in a Rule 50(b) motion. Judge Brooks denied Walmart's motion in relevant part, finding there "is sufficient evidence to support the ***jury's findings of intentional wrongdoing*** by Walmart with respect to both unjust enrichment and misappropriation of Cuker's [] trade secrets" and, therefore, "***the limitation-of-liability clause will not be applied to cap damages***." *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 2018 WL 1597976, at *11 (W.D. Ark. Mar. 31, 2018), *aff'd sub nom., Walmart Inc. v. Cuker*

*Interactive, LLC*, 949 F.3d 1101 (8th Cir. 2020) (emphasis added).[105] The Eight Circuit upheld

Judge Brooks' ruling, concluding that "there is sufficient evidence of ***intentional wrongdoing*** to

avoid the liability cap." *Walmart, Inc. v Cuker Interactive, Inc.*, 949 F.3d 1101, 1111 (8th Cir.

2020) (emphasis added).

      Numerous decisions in other jurisdictions have likewise found that parties cannot enforce

limitation of liability provisions to limit recoverable damages in trade secret cases involving

intentional wrongdoing, willful misconduct or even lesser standards like gross negligence. *See,*

*e.g., EchoSpan v Medallia, Inc.*, 2023 WL 9019053, at *4-5 (N.D. Cal. Oct. 30, 2023) ("If the

jury finds Medallia's conduct in misappropriating one or more trade secrets was grossly

negligent or willful or wanton conduct, then the Limitations of Liability Clause will not apply.");

*Connectus LLC v. Ampush Media, Inc.*, 2017 WL 1155448, at *6 (M.D. Fla. Mar. 28, 2017)

("Defendants' Motion is denied to the extent it seeks to have the CUTSA claim dismissed or

damages awarded thereunder capped per the limitation-of-liability clause."); *LexMac Energy,*

*L.P. v. Macquarie Ltd.*, 2014 WL 12669718, at *38 (D.N.D. Feb. 9, 2014) ("Allowing

Macquarie Bank to enforce an exculpatory provision to avoid liability for intentional torts

committed in the future is against the public policy … The Court concludes that the Plaintiffs

may recover damages available under the UTSA in North Dakota."); *see also Bessemer Sys. Fed.*

*Credit Union v. Fiserv Sol., LLC*, 472 F. Supp. 3d 142, 182 (W.D. Pa July 14, 2020) (defendants'

motion to strike plaintiff's "request for punitive damages and allegations in support of punitive

---

[105] Notably, Judge Brooks *did* enforce the damages cap provision as to one of the trade secret claims because the jury found Walmart's misappropriation of this trade secret was not "willful and malicious." *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 2017 WL 3206942, at *4 (W.D. Ark. July 28, 2018), *aff'd sub nom., Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101 (8th Cir. 2020). This holding further confirms that a provision limiting liability may not be enforced as to claim(s) involve intentional or willful conduct.

damages" based on limitation of liability provision denied); *All Business Sols., Inc. v. NationsLine, Inc.*, 629 F. Supp. 2d 553, 559-60 (W.D. Va. 2009) (in-depth analysis of treatises and case law, concluding that a limitation of liability clause was unenforceable under Virginia law on public policy grounds to the extent it would "exempt a party from liability resulting from that party's future intentional misconduct.").

Finally, Walmart claims in the alternative that because exculpatory clauses are enforceable in certain circumstances under Arkansas law, the limitation of damages provision in the MSA should be enforced to bar an award of punitive damages. (Dkt. 810, at 18). This argument is a red herring. As confirmed by Judge Brooks and the Eighth Circuit in the *Walmart v. Cuker* cases, as well as in *Robinson* and *Gurlen*, an exculpatory clause is ***not*** enforceable as to a claim involving intentional or willful conduct.

## 2.    The MSA Was Not Fairly Entered Into

The damages exclusion is also not enforceable because the MSA was not "fairly" entered into. As a general matter, Arkansas law disfavors contractual provisions that purport to limit a party's liability in advance. *Ingersoll-Rand Co. v. El Dorado Chem. Co.*, 373 Ark. 226, 231-32, 283 S.W.3d 191, 195 (2008). This is true even when the scope of such provision is limited to simple negligence. *See id.*; *Jordan v. Diamond Equip. & Supply Co.,* 362 Ark. 142, 148-49, 207 S.W.3d 525, 530 (2005). A court will not enforce an exculpatory clause unless three requirements are satisfied, one of which is that "the contract that contains the clause was fairly entered into." *Ingersoll-Rand*, 373 Ark.at 232, 283 S.W.3d at 195.

Here, the MSA was ***not*** "fairly entered into in that it is a one-sided form document prepared by Walmart that any service provider who wants to do business with Walmart is required to sign. Further, there is compelling evidence that Walmart deceived Zest and intended to engage in predatory business practices and misappropriate Zest's trade secrets as soon as "the

ink on the signature page was dry."[106] *Walmart Stores, Inc. v Cuker Interactive, LLC*, 2017 WL 11681850, at *5 (W.D. Ark. Apr. 5, 2017), *aff'd sub nom., Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101 (8th Cir. 2020). Additionally, damages exclusion is one-sided because it does not by its express terms apply to any "improper use of Wal-Mart's Confidential Information," only restricting the damages available if the vendor's information is misused by Walmart.[107] The MSA, and in particular the damages exclusion, is the antithesis of a fairly-entered-into agreement and therefore cannot bar the recovery of exemplary damages for Walmart's willful and malicious conduct.

### 3.    The MSA is an Unenforceable Agreement to Agree

Finally*,* the MSA is not an agreement at all but rather an agreement to agree. And "Arkansas courts have long held agreements to agree are 'too vague to enforce.'" *DWDubbell Ark., LLC v. Bushey*, 2021 WL 4392493, at *4 (W.D. Ark. Sept. 24, 2021) (quoting *Troutman Oil Co. v. Lone*, 75 Ark. App. 346, 352, 57 S.W.3d 240, 244 (2001)). As such, the limitation of damages provision within the MSA is of no force even if it could be read as barring Zest from recovering punitive damages for Walmart's willful misappropriation of Zest's trade secrets.

Judge Brooks recently had occasion to carefully analyze Walmart's master supplier agreements, which are functionally similar to the MSA. *London Luxury, LLC v. Walmart, Inc.*, 2024 WL 1025125, at *16 (W.D. Ark. Mar. 8, 2024). As Judge Brooks explained, "[a]t most, these documents are normative agreements about future business procedures, since the only benefit a supplier receives upon signing a supplier agreement with Walmart is the hope of

---

[106] *See, e.g.*, Tr. 194:15-16 (Kelly Boyle told Jeff Kerbs that "we're going to get as much information as we can and then get rid of them"); 195:9-11 (Jeff Kerbs "said that Kelly was trying to extract as much information and get rid of us"); Tr. 204:12-14 (Jeff Kerbs said "I'm so mad at Kelly Boyle. She just said again that she's going to take this and then get rid of you guys.").
[107] *See* MSA, §§ 13 and 14(B)(ii).

someday doing business with the retailing giant." *Id.* Thus, although such an agreement "may define the rules for how the game will be played, but until the game actually begins, the rules are of no moment because no one has yet to step to the plate, much less throw the first pitch." *Id.* This rationale apples with equal force here.

## VIII.   CONCLUSION

For the foregoing reasons, Zest respectfully requests that the Court enter judgment awarding Zest compensatory damages of $72,700,000 and exemplary damages of $145,400,000, as set forth more particularly in the proposed form of judgment (Appendix A).

Dated: July 15, 2025                              Respectfully submitted,

Patrick Ryan*
Sean R. McTigue*
Kenneth L. Richard*
Natalie A. Felsen*
BARTKO PAVIA LLP
1100 Sansome Street
San Francisco, CA 94111
(415) 956-1900
*pryan@bartkopavia.com*
*smctigue@bartkopavia.com*
*krichard@bartkopavia.com*
*nfelsen@bartkopavia.com*
*Admitted *pro hac vice*

Adam D. Mitzner*
Katie Allgood*
Andrew C. Ryan*
BARTKO PAVIA LLP
555 Madison Avenue, 11th Floor
New York, NY 10022
(212) 980-3500
*amitzner@bartkopavia.com*
*kallgood@bartkopavia.com*
*aryan@bartkopavia.com*
*Admitted *pro hac vice*

Scott P. Richardson
McDaniel Wolff, PLLC
1307 West Fourth Street
Little Rock, AR 72201
(501) 954-8000
*scott@mcdanielwolff.com*

H. Christopher Bartolomucci*
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
*cbartolomucci@schaerr-jaffe.com*
*Admitted *pro hac vice*

Kate M. Falkenstien*
Blue Peak Law Group, LLP
3790 El Camino Real, PMB 846
Palo Alto, CA 94306-3314
(281) 972-3036
*kate@bluepeak.law*
*Admitted *pro hac vice*

*Attorneys for Plaintiffs ZEST LABS, INC.,
ZEST LABS HOLDINGS LLC, and RISKON
INTERNATIONAL, INC.*

## <u>Appendix A — Proposed Form of Judgment</u>

The matter having been duly tried, and after deliberating thereon, the jury returned a verdict on May 13, 2025, in accordance with the verdict form (Dkt. 797), the findings in which are incorporated herein by reference. The jury found in favor of Plaintiffs Zest Labs, Inc. (formerly known as Intelleflex Corporation) and Zest Labs Holdings LLC (Nevada) on the claim of misappropriation of a trade secret against Defendant Walmart Inc. (formerly known as Wal-Mart Stores Inc.). The jury awarded Zest Labs, Inc. and Zest Labs Holdings LLC (Nevada) $72,700,000.00 in compensatory damages to be paid by Walmart Inc. The jury found the misappropriation of a trade secret by Walmart was willful and malicious, and awarded exemplary damages to Zest Labs, Inc. and Zest Labs Holdings LLC (Nevada) against Walmart Inc. in the amount of $150,000,000.00. The exemplary damage award is capped by the Defend Trade Secrets Act at twice the compensatory award, or $145,400,000.00, and, accordingly, is reduced to that amount, for a total damages award of $218,100,000.00. All damages will accrue interest from this date at the rate of [1 year T-Bill rate] per annum until the date paid. The judgment shall be amended to reflect any award of pre-judgment interest and/or attorneys' fees, which shall also accrue interest at such rate from the date of the amendment until the date paid.

**Appendix B — Examples of Statements by Walmart**

**Publicly Touting Its Support for Small Businesses**

- "Building on a previous commitment, Walmart's new pledge to invest an additional $350 billion by 2030 in products that support U.S. jobs is estimated to support over 750,000 jobs based on estimates by Boston Consulting Group. More than two-thirds of Walmart U.S. total product spend in FY2024 was on items our suppliers reported were made, grown, or assembled in the United States." (https://corporate.walmart.com/suppliers/investing-in-american-jobs, last accessed on July 15, 2025)

- Nordic Ware: "60,000 sq. ft expansion to distribution facility" (https://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/nordic-ware , last accessed on July 15, 2025

- Grind Goods: "Through this partnership with Walmart, the impact is going to scale on a level I don't even think I understand yet. … This partnership with Walmart and our ability to grow and help is something that is hard to fathom" (https://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/grind-goods , last accessed on July 15, 2025

- Igloo: "Walmart put a big order for us, it represents for us in a way a challenge because first, we want to build the best cooler possible, and two it opened up a lot of opportunities for Igloo and the community." (https://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/igloo , last accessed on July 15, 2025

- Proud Source: "A Walmart supplier since 2021, Proud Source Water has grown their team by 50% and they're the largest employer in Mackay, ID." (https://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/proud-source , last accessed on July 15, 2025

- Freshpet: "Freshpet started working with Walmart in 2007. Now they're in thousands of Walmart stores and have created over 900 jobs in communities like Ennis, TX and Bethlehem, PA." (https://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/freshpet , last accessed on July 15, 2025

- PhoLicious: "Anh and Joseph Trousdale transformed traditional, made-from-scratch Pho into a product that was fast, easy to make and oh so pho-licious. Now, they're in over 133 Sam's Clubs, and they're reinvesting their success into their Texas-based company – and the people they employ!" "So, the first order going to Sam's Club, it was very overwhelming, for sure. And you know, that very first order was the confirmation that we did it." "[It] has been huge for us and our growth. We can invest in our employees, we can invest in our equipment, we can invest in ourselves, and in turn turn PhoLicious into an even bigger company than it is now." (https://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/pholicious , last accessed on July 15, 2025

- Athletic Brewing Company: "When Bill Shufelt and John Walker began selling their

non-alcoholic beer with Walmart, it sparked construction of their Connecticut-based brewery – and added 200 new hires to their team." "Athletic Brewing Started working with Walmart, and started to brew a lot more non-alcohol beer and hire a lot more people: 200 more people." (http://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/athletic-brewing , last accessed on July 15, 2025

- Ferrero: "Everyone obviously knows Walmart, but they bring our products to Americans every day, they are our most important retail partner, not only an amazing forward thinking retailer, but a true champion for the resurgence of American manufacturing." (https://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/Ferrero , last accessed on July 15, 2025

- Milo's Tea: "Milo's Tea just poured new energy into Spartanburg, South Carolina with a $200M facility — brewing more U.S.-made sips and projecting 200 new jobs along the way." (https://corporate.walmart.com/suppliers/investing-in-american-jobs/partners-in-change/milos , last accessed on July 15, 2025

## Appendix C — Walmart's Revenue and Profit

(See Zest's accompanying Request for Judicial Notice, attaching copies of Walmart's 10k filings with the U.S. Securities and Exchange Commission)

| Fiscal Year Ending January 30 | Total Revenue | Net Income | Citation |
|---|---|---|---|
| 2017 | $481.3 Billion | $13.6 Billion | 2019 10k, p. 48 |
| 2018 | $500.3 Billion | $9.7 Billion | 2019 10k, p. 48 |
| 2019 | $514.4 Billion | $6.7 Billion | 2019 10k, p. 48 |
| 2020 | $524 Billion | $14.9 Billion | 2022 10k, p. 53 |
| 2021 | $559.2 Billion | $13.5 Billion | 2022 10k, p. 53 |
| 2022 | $572.8 Billion | $13.7 Billion | 2022 10k, p. 53 |
| 2023 | $611.3 Billion | $11.7 Billion | 2025 10k, p. 53 |
| 2024 | $648.1 Billion | $15.5 Billion | 2025 10k, p. 53 |
| 2025 | $681 Billion | $19.4 Billion | 2025 10k, p. 53 |
| Total: | **$5.1 Trillion** | **$118.7 Billion** | |